IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA          )
                                  )
          v.                      )          Criminal No. 18-292
                                  )
ROBERT BOWERS                     )


MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION
TO STRIKE THE DEATH PENALTY AS A SENTENCE OPTION
ON THE GROUND THAT THE FEDERAL DEATH PENALTY
AS ADMINISTERED IS AN UNCONSTITUTIONAL PUNISHMENT


1001 Liberty Avenue          Judy Clarke
Suite 1500                   Clarke Johnston Thorp & Rice, PC
Pittsburgh, PA 15222
(412) 644-6565               Michael J. Novara
                             First Assistant Federal Public Defender

                             Elisa A. Long
                             Supervisory Assistant Federal Public
                             Defender

                             Attorneys for Defendant,
                             Robert Bowers

1

# <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................ 1

ARGUMENT ..................................................................................... 8

I.   The General Fifth and Eighth Amendment Principles that the Supreme
     Court has Recognized Govern Mr. Bowers's Challenge to the Death Penalty..9

     A.   The Constitution prohibits inherently barbaric and torturous
          punishments. ............................................................ 9

     B.   The Eighth Amendment prohibits punishments that are excessive and
          disproportionate to the offense. ...................................... 9

     C.   Punishments that are arbitrary or discriminatory are cruel and
          unusual under the Eighth Amendment and therefore prohibited. ...... 12

II.  There is Now Almost Half a Century's Worth of Studies, Surveys, and
     Experience that Demonstrates the Procedural Protections Included in the
     Federal Death Penalty Act have Failed to Achieve Their Intended Goal of
     Reliable, Rational, Consistent, Fair, Non-Arbitrary, and Non-Discriminatory
     Application of the Death Penalty.. .................................... 20

     A.   The death penalty cannot be reliably applied, and therefore it is cruel
          and unusual under the Eighth Amendment. ........................... 21

     B.   The Supreme Court recognized in the seminal decision *Furman v.
          Georgia* that arbitrary punishments are cruel within the meaning of
          the Eighth Amendment......................................................... 41

          1.   Arbitrariness, by the inability to administer capital punishment
               in a manner that produces reliable, consistent results has
               plagued the death penalty since the era that led to *Furman*. ... 45

          2.   Over 30 years of administering the federal death penalty has
               demonstrated that it operates in an arbitrary, capricious,
               irrational and discriminatory manner....................................... 45

               a.   The federal death penalty has proven to be a failed
                    experiment. ...................................................... 46

b.    The federal death penalty is imposed and carried out in an arbitrary and capricious manner that is akin to being struck by lightning: Revisiting the constitutional premise of *Furman v. Georgia* in the context of the federal death penalty. ............................................................... 46

c.    The numbers on how the federal death penalty is actually sought demonstrate arbitrariness in its rarity ............... 55

d.    The absence of a principled basis for distinguishing between cases where the federal death penalty is imposed from cases where it is not imposed renders the federal death penalty unconstitutional. ....................................... 58

e.    The Federal Death Penalty is unevenly applied on a regional basis and suffers from intractable problems of racial discrimination in the targeting of minority and male defendants and a demonstrated race/gender-of-victim effect. .................................................................. 70

1.    Introduction ............................................................ 70

2.    Twelve years after the reinstitution of the federal death penalty, a DOJ study found intolerable racial and regional disparities in its authorization and imposition. ............................................................ 74

3.    The regional disparity in pursuit and imposition of federal death sentences is a persistent invidious condition that traces to the confederacy. .............. 80

4.    The continuing and unabated practice of targeting males and minorities for the federal death penalty, the long-documented "white-victim effect," and the emergence of a "white female victim effect" further demonstrate the arbitrary and irrational operation of the federal death penalty. ................................ 910

(a)    *The law on race and the death penalty* ...... 93

(b)    *The effect of gender of defendant, and of race and gender of victim in the application of the FDPA* .......................................................... 101

C.     Federal prosecutors' discretion to charge a capital offense, seek death, accept or reject a plea, and charge aggravators is the source from which the endemic arbitrariness in the federal death penalty flows. .............................................................................................. 110

D.     The inherent and necessary delays in federal prosecutions create a secondary, preliminary punishment of prolonged isolated incarceration and remove any execution so far in time from the offense to be punished that there is no deterrent effect to justify the execution.... 117

       1.     Persons sentenced to death endure a separate punishment before their execution by living in solitary confinement for years awaiting an execution that may never come. .......................... 118

       2.     The prolonged time that is necessary for review removes any execution that does occur so far in time from the offense, that there is no deterrent effect to killing the defendant, thus making it gratuitous. .......................................................................... 123

E.     Where the majority of States do not carry out executions, and a majority of Americans no longer support the death penalty, the evolving standards of decency that mark the progress of our nation's maturation as a society have relegated capital punishment to history, and a few isolated jurisdictions cannot set the standard for the whole country. ................................................................................ 129

F.     The Doctrine of *Stare Decisis* .......................................... 142

CONCLUSION.......................................................................... 148

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Arizona v. Rumsey*, 467 U.S. 203 (1984) .................................................................. 145

*Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252 (1977) ......... 96

*Atkins v. Virginia*, 536 U.S. 304 (2002) ...........................................................*passim*

*Barnette v. West Virginia Board of Education*, 47 F. Supp. 251 (S.D.WVa 1942) . 146

*Batson v. Kentucky*, 476 U.S. 79 (1986) .................................................................. 98

*Baze v. Rees*, 553 U.S. 35 (2008) ......................................................... 9, 18, 128, 147

*Bolling v. Sharpe*, 347 U.S. 497 (1954) ................................................................... 98

*Bordenkircher v. Hayes*, 434 U.S. 357 (1978) .................................................. 111,114

*Bullington v. Missouri*, 451 U.S. 430 (1981) .......................................................... 99

*Bush v. Gore*, 531 U.S. 98 (2000) ........................................................................... 89

*Chapman v. United States*, 500 U.S. 453 (1991) ...................................................... 8

*Coker v. Georgia*, 433 U.S. 584 (1977) ............................................................ 10. 143

*Coleman v. Balkcom*, 451 U.S. 949 (1981) .................................................... 124, 128

*Davis v. Ayala*, 135 S. Ct. 2187 (2015) ......................................................... 49, 120

*DeGarmo v. Texas*, 474 U.S. 973 (1985) .............................................................. 112

*Eddings v. Oklahoma*, 455 U.S. 104 (1982) ................................................. 12, 43, 59

*Enmund v. Florida*, 458 U.S. 782 (1982) .......................................................... 10, 11

*Ford v. Wainwright*, 477 U.S. 399 (1986) .............................................................. 34

*Furman v. Georgia*, 408 U.S. 238 (1972) ..........................................................*passim*

*Gardner v. Florida*, 430 U.S. 349 (1977) .................................................................. 7

*Glossip v. Gross*, 135 S.Ct. 2726 (2015) ............................................................*passim*

*Godfrey v. Georgia*, 446 U.S. 420 (1980) ...................................................... 14, 18, 42

*Gomez v. Fierro*, 519 U.S. 918 (1996) ................................................................. 124

*Graham v. Collins*, 506 U.S. 461 (1993) .......................................................... 14, 100

*Graham v. Florida*, 560 U.S. 48 (2010) ........................................................ 9, 11, 126

*Gregg v. Georgia*, 428 U.S. 153 (1976) ..............................................................*passim*

*Hall v. Florida*, 134 S.Ct. 1986 (2014) ..............................................................*passim*

*Hartman v. Moore*, 547 U.S. 250 (2006) ................................................................. 15

*Herrera v. Collins*, 506 U.S. 390 (1993) ................................................................. 33

*Hunter v. Erickson*, 393 U.S. 385 (1969) ................................................................. 98

*In re Kemmler*, 136 U.S. 436 (1890) ....................................................................... 9

*In re Medley*, 134 U.S. 160 (1890) ........................................................................ 121

*Johnson v. Bredesen*, 558 U.S. 1067 (2009) ........................................................... 120

*Jones v. Chappell*, 31 F.Supp.3d 1050 (C.D. Cal. 2014) ................... 49, 125, 126, 135

*Jurek v. Texas*, 428 U.S. 262 (1976) ........................................................................ 1

*Kansas v. Marsh*, 548 U.S. 163 (2006) .............................................................. 21, 144

*Kennedy v. Louisiana*, 554 U.S. 407 (2008) ........................................................*passim*

*Kervin v. Barnes*, 787 F.3d 833 (7th Cir. 2015) ...................................................... 121

*Lackey v. Texas*, 514 U.S. 1045 (1995) ................................................................. 127

*Lockett v. Ohio*, 438 U.S. 586 (1978) ......................................................... 1, 17, 19, 99

*Lowenfield v. Phelps*, 484 U.S. 231 (1988) .............................................................. 13

*McCleskey v. Kemp*, 481 U.S. 279 (1987) ..........................................................*passim*

*Miller v. Alabama*, 132 S. Ct. 2455 (2012) ........................................................ 68, 139

*Morgan v. Illinois*, 504 U.S. 719 (1922) ................................................................ 33

*Morris v. Ylst*, 447 F.3d 735(9th Cir. 2006) ........................................................ 113

*Obergefell v. Hodges*, 135 S. Ct. 2584 (2015) ................................................ 139, 143

*Payne v. Tennessee*, 501 U.S. 808 (1991) .............................................................. 146

*Penry v. Lynaugh*, 492 U.S. 302 (1989) .................................................................. 139

*People v. Anderson*, 6 Cal.3d 628 (1972) ................................................................ 125

*People v. Seumanu*, 61 Cal.4th 1293 (2015) ...................................................... 7, 50

*Pulley v. Harris*, 465 U.S. 37 (1984) ......................................................................... 68

*Ring v. Arizona*, 536 U.S. 584 (2002) ................................................................. 19, 53

*Roberts v. Louisiana*, 428 U.S. 325 (1976) ............................................................. 99

*Roper v. Simmons*, 543 U.S. 551 (2005) ........................................................*passim*

*Rose v. Mitchell*, 443 U.S. 545 (1979) ...................................................................... 98

*Stanford v. Kentucky*, 492 U.S. 361 (1989) ....................................................... 2, 139

*State v. Santiago*, 318 Conn. 1 (Conn. 2015) ...................................................*passim*

*Sykes v. United States*, 564 U.S. 1 (2011) ............................................................. 144

*Thompson v. McNeil*, 556 U.S. 1114 (2009) .......................................................... 126

*Thompson v. Oklahoma*, 487 U.S. 815 (1988) ................................................. 10, 125

*Trop v. Dulles*, 356 U.S. 86 (1958) ................................................. 7, 126, 130, 144

*Tuilaepa v. California*, 512 U.S. 967 (1994) ................................................ 14, 16, 18

*Turner v. Murray*, 476 U.S. 28 (1986) ............................................................... 17, 99

*United States v. Barnette*, 211 F.3d 803 (4th Cir. 2000) ........................................ 40

*United States v. Bass*, 266 F.3d 532 (6th Cir. 2001) ........................................... 77, 78

*United States v. Bernard*, 299 F.3d 467 (5th Cir. 2002) .................................... 39, 63

*United States v. bin Laden*, 126 F. Supp.2d 256 (S.D.N.Y. 2000) ..................... 78, 89

*United States v. Buckendahl*, 251 F.3d 753 (8th Cir. 2001) ................................... 89

*United States v. Butz*, 517 F. Supp. 1167 (S.D.N.Y. 1981) ...................................... 15

*United States v. Caro*, 597 F.3d 608 (4th Cir. 2010) ................................................ 53

*United States v. Causey*, 185 F.3d 407 (5th Cir. 1999) ........................................... 40

*United States v. Chanthadara*, 230 F.3d 1237 (10th Cir. 2000) ........................ 40, 76

*United States v. Cooya*, 2011 WL 3608611 (M.D.Pa. Aug. 16, 2011) ................... 116

*United States v. Ebron*, 683 F.3d 105 (5th Cir. 2012) .............................................. 39

*United States v. Fell*, 217 F.Supp.2d 469 (2002) ........................................................ 6

*United States v. Fell*, 571 F.3d 264 (2d Cir. 2009) .................................................... 51

*United States v. Fell*, 224 F.Supp.3d 327 (D. VT. 2016) ...................................*passim*

*United States v. Hager*, 731 F.3d 167 (4th Cir. 2013) .............................................. 39

*United States v. Hammer*, 404 F. Supp. 2d 676 (M.D. Pa. 2005) ..................... 38, 123

*United States v. Hammer*, 564 F.3d 628 (3d Cir. 2009) ........................................... 38

*United States v. Hardy*, 762 F. Supp. 2d 849 (E.D. La. 2010) ................................ 37

*United States v. Higgs*, 353 F.3d 281 (4th Cir.2003) ............................................... 68

*United States v. Jacques*, 2011 WL 1675417 (D.Vt. May 4, 2011) .................... 15, 89

*United States v. Johnson*, 900 F.Supp.2d 949 (N.D. Iowa 2012) ............................ 89

*United States v. Jones*, 132 F.3d 232 (5th Cir. 1998) .............................................. 68

*United States v. Lighty*, 616 F.3d 321 (4th Cir. 2010) ............................................. 40

*United States v. Littrell*, 478 F. Supp. 2d 1179 (C.D. Cal. 2007) .................. 115, 116

*United States v. McCullah*, 76 F.3d 1087 (10th Cir. 1996) ....................................... 40

*United States v. Mitchell*, 502 F.3d 931 (9th Cir. 2007) .......................................... 68

*United States v. Montgomery*, 635 F.3d 1074 (8th Cir. 2011) ......................... 40, 107

*United States v. Purkey*, 428 F.3d 738 (8th Cir. 2005) ............................................ 40

*United States v. Redondo-Lemos*, 955 F.2d 1296 (9th Cir.1992) ...................... 114-15

*United States v. Runyon*, 707 F.3d 475 (4th Cir. 2013) ........................................... 39

*United States v. Sampson*, 2015 WL 6511247 (D. Mass. Oct. 28, 2015) .. 8, 15, 31, 36

*United States v. Sampson*, 275 F. Supp.2d 49 (D. Mass. 2003) ........................*passim*

*United States v. Stitt*, 250 F.3d 878 (4th Cir. 2001) .......................................... 37, 40

*United States v. Troya*, 733 F.3d 1125 (11th Cir. 2013) .......................................... 39

*United States v. Webster*, 162 F.3d 308 (5th Cir. 1998) .......................................... 40

*Walker v. Georgia*, 129 S.Ct. 453 (2008) .................................................................. 69

*Walton v. Arizona*, 497 U.S. 639 (1990) ............................................................. 19, 53

*Wayte v. United States*, 470 U.S. 598 (1985) ........................................... 15, 112, 114

*Weems v. United States*, 217 U.S. 349 (1910) ................................................... 6, 130

*Weinberger v. Wisenfeld*, 420 U.S. 636 (1975) ........................................................ 98

*Woodson v. North Carolina*, 428 U.S. 280 (1976) ...............................................*passim*

*Yick Wo v. Hopkins*, 118 U.S. 356 (1886) ................................................................ 94

*Zant v. Stephens*, 462 U.S. 862 (1983 ............................................................. 47, 100

## United States Constitution

Amendment V ......................................................................................................*passim*

Amendment VIII ................................................................*passim*

Amendment XIV ...............................................................*passim*

## INTRODUCTION

Forty-three years ago, our nation undertook an experiment. The hypothesis was that the governments of the states could execute people as punishment without running afoul of the Constitution by ensuring that statutes were structured to narrow eligibility for the death penalty and that juries deciding sentences were given adequate information and guidance to avoid the arbitrary and capricious imposition of death sentences. The expectation, and requirement for purposes of the Constitution, was that only the worst of the worst would be sentenced to death. Twelve years after the experiment began, the federal government decided to participate.

Like every experiment, there were rules. States had to decide a sentence for each individual defendant whom they wanted to execute; death could not be an automatic sentence.[1] Jurors who decided sentences could not have unfettered discretion to do so; they had to have guidance for their decisions.[2] Defendants facing the prospect of death were allowed to present any factor of their character or the offense that could be a reason for a sentence less than death.[3] At first juvenile

---

[1] *See Woodson v. North Carolina*, 428 U.S. 280 (1976).

[2] *See Gregg v. Georgia*, 428 U.S. 153 (1976); *Proffit v. Florida*, 428 U.S. 242 (1976); *Jurek v. Texas*, 428 U.S. 262 (1976).

[3] *See Lockett v. Ohio*, 436 U.S. 586 (1978).

offenders were part of the experiment,[4] but then they were excluded.[5]  Similarly, intellectually disabled people were included for almost the first 30 years, but then were removed from the pool of subjects.[6]  States could only conduct the experiment on people who committed homicide.[7]  Attorneys who defended people facing a death sentence had to meet a certain standard of performance.[8]

Now, with fifty years of data from states, 30 years of data from the federal government, over 7,500 death sentences imposed, and 1,500 executions carried out, we can see that the experiment has failed.[9]  The arbitrariness and caprice that were rampant before the experiment began are just as present today.  And for this reason, it is time to end the experiment.  For the reasons set forth herein, this Court should find that the death penalty cannot be imposed in this case because it is an unconstitutional punishment.

---

[4] *Stanford v. Kentucky*, 492 U.S. 361 (1989).

[5] *Roper v. Simmons*, 543 U.S. 551 (2005).

[6] *Atkins v. Virginia*, 536 U.S. 304 (2002).

[7] *Kennedy v. Louisiana*, 554 U.S. 407 (2008).

[8] *See Strickland v. Washington*, 466 U.S. 668 (1984); *Williams v. Taylor*,529 U.S. 362 (2000); *Wiggins v. Smith*, 539 U.S. 510 (2003).

[9] For death sentence and execution counts *see* Death Penalty Information Center, *available at* https://deathpenaltyinfo.org/facts-and-research/sentencing-data/death-sentences-in-the-united-states-from-1977-by-state-and-by-year *and* https://deathpenaltyinfo.org/executions/execution-database (last visited Dec. 17, 2019).

More than half of the jurisdictions in the nation have already reached this conclusion, and are no longer executing defendants.  Others, though they have left the punishment in their statutes, have not issued a death sentence in several years. The majority of Americans are now opposed to executing people as punishment.

A federal court exercising capital jurisdiction considered this same question three years ago in *United States v. Fell*, 224 F.Supp.3d 327 (2016).  After a week-long hearing that includes testimony from several defense experts (much of which the government did not contest), that court concluded that,

> The record of arbitrary imposition  of  the death penalty through the FDPA is clear. . .  It has become clear that the adoption of the bifurcated jury trial by so many states and the federal government has not done enough to eliminate the arbitrary imposition of the death penalty.  The court's question [is h]as actual experience borne out the promise for a more reliable system of capital punishment in the *Gregg* decision?  The evidence produced for the court answers the question in the negative. . . .
>
> The time has surely arrived to recognize that the reforms introduced by *Gregg* and subsequent decisions have largely failed to rememdy the problems identified in *Furman*.

*Fell*, 224 F.Supp.3d at 358.  *See* Ex. A (complete record of hearing in *United States v. Fell*).

The road map for that litigation was laid out by Justice Breyer in his dissent in *Glossip v. Gross*, __ U.S. __, 135 S.Ct. 2726, 2755-2780 (2015), in which Justice Ginsburg joined.  The case presented a challenge to the constitutionality of Oklahoma's lethal injection protocol, but Justice Breyer looked behind the question of *how* states may execute people to ask, based on the record of the administration of the death penalty in the United States since *Gregg*, *whether* they should be

3

allowed to execute people.  He concluded that "the death penalty, in and of itself, now likely constitutes a legally prohibited 'cruel and unusual punishmen[t],'" *Id.* at 2755-2780, and called for litigation to develop a record beyond the data he had gathered.

Justice Beyer drew his decision from "[a]lmost 40 years of studies, surveys, and experience" that "strongly indicate", that the delegation of the significant responsibility to the States to develop procedures that would protect against those constitutional problems, "has failed."  He discerned that the administration of the modern, post-*Furman* death penalty involves "three fundamental constitutional defects: (1) serious unreliability, (2) arbitrariness in application, and (3) unconscionably long delays that undermine the death penalty's penological purpose."  *Glossip*, 135 S.Ct. at 2755-56.  By looking at the very small number of counties that actively sought death sentences, he concluded that "most places within the United States have abandoned [the death penalty's] use."  *Id.*

Barely two months after Justice Breyer issued his dissent in *Glossip*, the Connecticut Supreme Court, relying extensively on the analysis of Justices Breyer and Ginsburg, ruled that state's death penalty was unconstitutional.  The Connecticut court found that capital punishment "is so out of step with our contemporary standards of decency as to violate the state constitutional ban on excessive and disproportionate punishment."  *State v. Santiago*, 318 Conn. 1, 45-46,

122 A.3d 1 (Conn. 2015), *reconsideration denied*, 319 Conn. 912 (2015).[10]   The Connecticut court cited the *Glossip* dissent for factual and legal propositions that were critical to its ruling. For example, as of  2012 "less than 2 percent of the nation's counties accounted for all of the death sentences imposed nationwide"; "between 1973 and 1995, state and federal courts found errors in more than two thirds of the capital cases that they reviewed"; and statistical analyses "have demonstrated to a near certainty that innocent Americans have been and will continue to be executed in the post-*Furman* era." *Santiago*, 318 Conn. at 80, 93 n.6, and 104.  Most critically, the state's high court found that the question of constitutionality was for it to decide:  "court[s], not legislature[s] ultimately must determine whether capital punishment comports with evolving standards of decency because [these]  are quintessentially judicial matters . . . [that] concern the infliction—indeed the unfair, cruel, and unusual infliction—of a serious punishment [on] an individual. " *Id.* at 138-39.

In 2003, a federal court in Massachusetts struggled with the constitutionality of the federal death penalty in *United States v. Sampson.* Though the judge denied the defendant's challenges to the Federal Death Penalty Act ("FDPA") on a record that predated *Glossip*, he explicitly noted his "concern[] about the potential rate of error in federal capital cases generally and the risk of the execution of the innocent

---

[10] While the Connecticut court decided *Santiago* on state constitutional grounds, it expressly ruled that "when construing the state constitutional freedom from cruel and unusual punishment, we broadly adopt the framework that the federal courts have used to evaluate eighth amendment challenges." *Santiago*, at 45-46.

particularly." *See Sampson*, Cr. No. 01-10384-MLW, 2015 WL 6511247 *21 (D. Mass., Oct. 28, 2015) (citing *Glossip* (Breyer, J., dissenting)). *See id.* at *20 ("the FDPA, like state death penalty statutes, will inevitably result in the execution of innocent people.").

It is this Court's role and obligation to assure that the punishments imposed pursuant to these proceedings comport with the law and the limits of the Constitution. Though the Supreme Court affirmed the capital statutes it reviewed in *Gregg v. Georgia*, it did so "on grounds which one may fairly call *a priori* rather than evidence based." *Fell*, 224 F.Supp.3d at at 357. Mr. Bowers cannot be sentenced to death if the Federal Death Penalty Act has not delivered what *Gregg* promised. Moreover, where the Supreme Court has recognized that the requirements of the Eighth Amendment are not static or "fastened to the obsolete but may acquire meaning as public opinion becomes enlightened by a humane justice," it is up to this Court to determine what punishment is constitutional today. *Weems v. United States,* 217 U.S. 349, 378 (1910). *See also Hall v. Florida*, 572 U.S. 701, 707 ("[t]he Eighth Amendment's protection of dignity reflects the [n]ation we have been, the [n]ation we are, and the [n]ation we aspire to be"); *United States v. Sampson*, 275 F. Supp. 2d 49, 86 (D. Mass. 2003)("It will… be incumbent on courts in future cases to monitor the reactions of legislatures and juries to the mounting evidence that death penalty statutes have resulted in death sentences and executions of innocent individuals much more often than previously understood."); *United States v. Fell*, 217 F.Supp.2d 469, 477 (2002) (The Supreme

Court has " acknowledged an ongoing 'obligation to re-examine capital-sentencing procedures against evolving standards of procedural fairness in a civilized society.'")(quoting *Gardner v. Florida*, 430 U.S. 349, 357 (1977)); *Santiago,* 318 Conn. at 47 ("Because the legal standard is an evolving one, it is both necessary and appropriate for us to consider the issue anew, in light of relevant recent developments, when it is raised."); *People v. Seumanu,* 61 Cal. 4th 1293, 1369 (2015) (quoting *Trop v. Dulles*, 356 U.S. 86 (1958) ("[D]octrine can evolve. This is especially true when interpreting the Eighth Amendment, which was ratified in 1791. The [] Supreme Court has recognized that the notion of cruel and unusual punishment is not a concept carved in 18th-century stone, instead explaining that although 'the words of the [Eighth] Amendment are not precise, . . . their scope is not static. The Amendment must draw its meaning from the evolving standards of decency that mark the progress of a maturing society.'").

For the reasons and the arguments set forth herein the defendant Robert Bowers, moves this Court to examine the death penalty, which the government seeks to impose on him pursuant to the Federal Death Penalty Act, under the lens of the evolving Eighth Amendment standard.  Mr. Bowers further moves this Court, upon review of the evidence set forth herein under that standard to find that the federal death penalty is a cruel and unusual punishment under the Eighth Amendment that cannot be imposed in this case.  In the alternative, Mr. Bowers urges this Court to set this matter for an evidentiary hearing where expert testimony may be provided.

## ARGUMENT

I.  **The General Fifth and Eighth Amendment Principles that the Supreme Court has Recognized Govern Mr. Bowers's Challenge to the Death Penalty.**

The Due Process Clause of the Fifth Amendment prohibits the imposition of punishment on the basis of "arbitrary distinction[s]." *Chapman v. United States,* 500 U.S. 453, 465 (1991). "In the capital punishment context, 'arbitrariness' has a procedural component and a substantive component." *Sampson,* 2015 WL 6511247, at *14 . Procedurally, "[b]ecause of the uniqueness of the death penalty, *Furman* ...held that it could not be imposed under sentencing procedures that created a substantial risk that it would be inflicted in an arbitrary and capricious manner." *Gregg,* 428 U.S. at 188. The high service rendered by this requirement is "to require legislatures to write penal laws that are evenhanded, nonselective, and nonarbitrary, and to require judges to see to it that general laws are not applied sparsely, selectively, and spottily to unpopular groups." *Sampson,* 2015 WL 6511247, at *14. Substantively, "a defendant's sentence may still be 'arbitrary and capricious' if it is sought or imposed based on impermissible considerations of immutable characteristics, such as race." *Id.*

The Eighth Amendment imposes additional restrictions on the infliction of punishment. As summarized in the Eighth Amendment establishes the minimum standards for what constitutes impermissibly cruel and unusual punishment. Specifically, the United States Supreme Court has indicated that at least three types of punishment may be deemed unconstitutionally cruel: (1) inherently

barbaric punishments; (2) excessive and disproportionate punishments; and (3) arbitrary or discriminatory punishments. [11]

### A.    The Constitution prohibits inherently barbaric and torturous punishments.

First, the Eighth Amendment categorically prohibits the imposition of inherently barbaric punishments. *Graham v. Florida*, 560 U.S. 48, 59 (2010). This prohibition is directed toward manifestly and unnecessarily cruel punishments, such as torture and other wanton infliction of physical pain. *See, e.g.*, *Gregg v. Georgia*, 428 U.S. 153, 170–72 (1976) (opinion announcing judgment); *In re Kemmler*, 136 U.S. 436, 447. (1890). In the context of capital punishment, the Eighth Amendment also bars particular modes of execution that present a substantial or objectively intolerable risk of inflicting severe pain. *Baze v. Rees*, 553 U.S. 35, 50, 52 (2008) (opinion announcing judgment).

### B.    The Eighth Amendment prohibits punishments that are excessive and disproportionate to the offense.

Second, the Eighth Amendment mandates that punishment be proportioned and graduated to the offense of conviction. *See Graham*, 560 U.S. at 59. In the capital punishment context, the United States Supreme Court has held, for

---

[11] In addition, some members of the United States Supreme Court have suggested that a punishment may be so unusual that it runs afoul of the Eighth Amendment on that basis alone. *See, e.g., Glossip*, 135 S.Ct. at 2774 (Breyer and Ginsburg, JJ., dissenting)(executions could be so infrequently carried out that they " 'would cease to be a credible deterrent or measurably to contribute to any other end of punishment in the criminal justice system . . . when imposition of the penalty reaches a certain degree of infrequency, it would be very doubtful that any existing general need for retribution would be measurably satisfied' ")(quoting *Furman v. Georgia*, 408 U.S. 238, 311 (1972) (White, J., concurring).

example, that the death penalty is categorically excessive and disproportionate when imposed on certain classes of offenders. *See*, e.g., *Roper v. Simmons*, 543 U.S. 551, 568(2005) (prohibiting execution of individuals who were under eighteen years of age when they committed capital crimes); *Atkins v. Virginia*, 536 U.S. 304, 321 (2002) (execution of intellectually disabled individuals was held to be unconstitutional).   The Court also has concluded that capital punishment is never warranted for non-homicide crimes against individuals. *See, e.g.*, *Kennedy v. Louisiana*, 554 U.S. 407, 446 (2008) (death penalty was held to be disproportionate punishment for child rape); *Enmund v. Florida*, 458 U.S. 782, 797 (1982) (Eighth Amendment does not permit execution of defendant who did not kill or intend to kill but who played minor role in felony in course of which murder was committed by others); *Coker v. Georgia*, 433 U.S. 584, 592 and n. 4 (1977) (plurality opinion) (sentence of death for rape of adult woman was held to be grossly disproportionate and excessive punishment).

A court engages in a two-stage analysis in determining whether a challenged punishment is unconstitutionally excessive and disproportionate. *Enmund*, 458 U.S. at 788–89.  First, the court looks to "objective factors" to determine whether the punishment at issue comports with contemporary standards of decency. *Id.* at 788.  These objective indicia include "the historical development of the punishment at issue," legislative enactments, and the decisions of prosecutors and sentencing juries. *Id.*; see also *Roper*, 543 U.S. at 563; *Thompson v. Oklahoma*, 487 U.S. 815, 821–22 (1988).

This objective evidence of contemporary social mores, however, does not wholly determine the issue. "Although legislative measures adopted by the people's chosen representatives provide one important means of ascertaining contemporary values, it is evident that legislative judgments alone cannot be determinative of Eighth Amendment standards since that Amendment was intended to safeguard individuals from the abuse of legislative power." *Gregg*, 428 U.S. at 174 n. 19 (opinion announcing judgment). Because the Eighth Amendment imposes "a restraint [on] the exercise of legislative power"; *Id.* at 174, the United States Supreme Court repeatedly has emphasized that courts must conduct a second stage of analysis in which they bring their own independent judgments to bear, giving careful consideration to the reasons why a civilized society may accept or reject a given penalty. *See*, *e.g.*, *Hall v. Florida*, __U.S. __, 134 S.Ct. 1986, 1993, 1999–2000 (2014); *Atkins*, 536 U.S. at 312; *Thompson*, 487 U.S. at 822–23. "Although the judgments of legislatures, juries, and prosecutors weigh heavily in the balance, it is for [the court] ultimately to judge whether the [constitution] permits imposition of the death penalty. . . ." *Enmund*, 458 U.S. at 797. A court's independent analysis must be informed not only by judicial precedents, but also by its own understanding of the rights secured by the constitution. *Kennedy*, 554 U.S. at 434. This analysis necessarily encompasses the question of whether the penalty at issue promotes any of the penal goals that courts and commentators have recognized as legitimate: deterrence, retribution, incapacitation, and rehabilitation. *E.g.*, *Graham*, 560 U.S. at 71. A sentence materially lacking any legitimate penological justification would

be nothing more than the "gratuitous infliction of suffering" and, by its very nature, disproportionate.  *Gregg*, 428 U.S. at 183 (opinion announcing judgment).[12]

### C.   Punishments that are arbitrary or discriminatory are cruel and unusual under the Eighth Amendment and therefore prohibited.

Third, the Eighth Amendment prohibits punishments that are imposed in an "arbitrary and unpredictable fashion . . . ."  *Kennedy*, 554 U.S. at 436.  The ultimate punishment must be reserved for the very worst offenders, and may not be "wantonly [or] . . . freakishly imposed."  *Furman*, 408 U.S. at 310 (Stewart, J., concurring). In *Eddings v. Oklahoma*, 455 U.S. 104, 112 (1982), the Court referred to the other side of this approach, requiring "that capital punishment be imposed fairly, and with reasonable consistency, or not at all."  More recently in *Kennedy v. Louisiana*, the Court warned, "When the law punishes by death, it risks its own sudden descent into brutality, transgressing the constitutional commitment to decency and restraint."  554 U.S. at 420.  For that reason, the Court wrote, "[c]apital punishment must 'be limited to those offenders who commit "a narrow category of the most serious crimes" and whose extreme culpability makes them 'the

---

[12] Some Justices have suggested that these considerations—whether a punishment is excessive or disproportionate, whether it comports with contemporary standards of decency and dignity, and whether it satisfies any legitimate penological goals—represent three distinct elements or prongs of the Eighth Amendment analysis. *See, e.g., Furman v. Georgia*, 408 U.S. 238, 330–32, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) (Marshall, J., concurring). However, as correctly pointed out in *Santiago*, "[w]hether these considerations are treated as distinct elements or merely as distinct components of a common element, however, is merely semantic and ultimately immaterial, because it is clear that a sentence's failure to satisfy any of these requirements would render it unconstitutional under the eighth amendment." *State v. Santiago*, 318 Conn. at 22 n. 18.

most deserving of execution.'"  *Id.*  In the context of capital punishment, the United

States Supreme Court has indicated that there are two dimensions to this rule.

On the one hand, in *Furman v. Georgia*, 408 U.S. 238, 239–40 (1972), in

which the Court held, in a *per curiam* opinion, that capital punishment as then

applied violated the Eighth Amendment, and four years later in *Gregg v. Georgia*,

428 U.S. 153, in which the court held that Georgia's revamped capital punishment

statute did not offend the United States constitution, *Id.* at 206–207 (opinion

announcing judgment); the Court established the principle that a capital sentencing

scheme must provide the sentencing authority sufficient guidance as to which

crimes and criminals are death worthy to ensure that the death penalty is not

imposed in an arbitrary or freakish manner.  *Id.* at 192–95 (opinion announcing

judgment).  "To pass constitutional muster, a capital sentencing scheme must

genuinely narrow the class of persons eligible for the death penalty and must

reasonably justify the imposition of a more severe sentence on the defendant

compared to others found guilty of murder."  *Lowenfield v. Phelps*, 484 U.S. 231,

244 (1988).  "This means that if a [s]tate wishes to authorize capital punishment it

has a constitutional responsibility to tailor and apply its law in a manner that

avoids the arbitrary and capricious infliction of the death penalty.  Part of a [s]tate's

responsibility in this regard is to define the crimes for which death may be the

sentence in a way that obviates standardless [sentencing] discretion . . . .  It must

channel the sentencer's discretion by clear and objective standards that provide

specific and detailed guidance, and that make rationally reviewable the process for

imposing a sentence of death." *Godfrey v. Georgia*, 446 U.S. 420, 428 (1980) (plurality opinion).

It goes without saying that the Eighth Amendment is offended not only by the random or arbitrary imposition of the death penalty, but also by the greater evils of racial discrimination and other forms of pernicious bias in the selection of who will be executed. *See, e.g.*, *Tuilaepa v. California*, 512 U.S. 967, 973 (1994) (guarding against bias or caprice in sentencing is "controlling objective" of court's review); *see also Graham v. Collins*, 506 U.S. 461, 484 (1993) (Thomas, J., concurring) (racial prejudice is "the paradigmatic capricious and irrational sentencing factor"); *Furman v. Georgia*, 408 U.S. at 242 (Douglas, J., concurring) (one aim of English Declaration of Rights of 1689, in which Eighth Amendment language originated, was to forbid discriminatory penalties); *Id.* at 310 (Stewart, J., concurring) ("if any basis can be discerned for the selection of these few to be sentenced to die, it is the constitutionally impermissible basis of race"). The Eighth Amendment, then, requires that any capital sentencing scheme determine which defendants will be eligible for the death penalty on the basis of legitimate, rational, nondiscriminatory factors.

On the other hand, the United States Supreme Court also has insisted that, at the sentencing stage, juries must have unlimited discretion to assess "the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death." *Woodson v. North Carolina*, 428 U.S. 280 (1976) (opinion

announcing judgment).  The Court in *Woodson* held that this sort of individualized

sentencing determination is necessary to arrive at a just and appropriate sentence

and to honor the Eighth Amendment's "fundamental respect for humanity . . . ."  *Id.*

The Court also has consistently indicated that the government has broad discretion

as to whom to prosecute and what charge to file.  *See, e.g.*, *Hartman v. Moore*, 547

U.S. 250, 263 (2006); *McCleskey v. Kemp*, 481 U.S. 279, 296–97 (1987); *Wayte v.*

*United States*, 470 U.S. 598, 607 (1985).  "As currently construed, then, the federal

constitution simultaneously requires that states narrowly limit and carefully define

which offenders are eligible for capital punishment, while, paradoxically, also giving

prosecutors and juries, respectively, virtually unfettered discretion whether

actually to charge defendants with capital crimes and whether to sentence

convicted offenders to death."  *Santiago*, 318 Conn. at 25.

     Most of the challenges to the FDPA have been met with the response that the

Act is constitutional because it contains the safeguards articulated in *Gregg*.  *See,*

*e.g.*, *United States v. Sampson*, 2015 WL 6511247 * 18; *United States v. Jacques*,

2011 WL 1675417 * 3 (D.Vt. May 4, 2011).  The constitutional problem with this

response is that it ignores the actual experience of utilizing these particular

safeguards.[13]  As articulated in *Glossip*, "the Court in effect delegated significant

responsibility to the States [and Congress] to develop procedures that would protect

---

[13] "Indeed, in the pursuit of our judicial mission, hardly a day passes without the forceful reminder of Mr. Justice Holmes (The Common Law p. 1) that "The life of the law has not been logic: it has been experience." *United States v. Butz*, 517 F. Supp. 1167, 1168 (S.D.N.Y. 1981)

against those constitutional problems. Almost 40 years of studies, surveys, and experience strongly indicate, however, that this effort has failed." *Id.* at 2755, And as was held in *Santiago*,

> [I]t has become apparent that the dual federal constitutional requirements applicable to all capital sentencing schemes—namely, that the jury be provided with objective standards to guide its sentence, on the one hand, and that it be accorded unfettered discretion to impose a sentence of less than death, on the other—are fundamentally in conflict and inevitably open the door to impermissible racial and ethnic biases.

318 Conn. at 14.

> The question is whether this individualized sentencing requirement inevitably allows in through the back door the same sorts of caprice and freakishness that the court sought to exclude in *Furman*, or, worse, whether individualized sentencing necessarily opens the door to racial and ethnic discrimination in capital sentencing. In other words, is it ever possible to eliminate arbitrary and discriminatory application of capital punishment through a more precise and restrictive definition of capital crimes if prosecutors always remain free not to seek the death penalty for a particular defendant, and juries not to impose it, for any reason whatsoever? We do not believe that it is.

*Id.* at 108-109.

In support of this conclusion, the *Santiago* court aptly noted that "the United States Supreme Court itself has expressed serious doubts as to whether its own commandments can be reconciled." *Id.* at 109. In *Tuilaepa*, the Court recognized that "[t]he objectives of these two inquiries can be in some tension . . . ." *Id.* at 973. Fourteen years later, in *Kennedy*, the Court again acknowledged that "[t]he tension between general rules and case-specific circumstances has produced results not altogether satisfactory." *Kennedy*, 554 U.S. at 436. "Our response to this case law," the Court frankly conceded, "is still in search of a unifying principle . . . ." *Id.* at

437. *See also Turner v. Murray*, 476 U.S. 28, 35 (1986) (plurality opinion) ("[b]ecause of the range of discretion entrusted to a jury in a capital sentencing hearing, there is a unique opportunity for racial prejudice to operate").

"In fact, in the four decades since the United States Supreme Court struck down the death penalty (as then-applied) in *Furman* and then resuscitated it four years later in *Gregg*, at least one-half dozen members of that court—jurists of all jurisprudential stripes—have concluded that the demands of *Furman*, on the one hand, and of *Woodson* and *Lockett*, on the other, are, ultimately, irreconcilable." *Santiago*, 318 Conn. at 109-110.  In *Furman* itself, of the five concurring justices, two (Justices Brennan and Marshall) took the position that capital punishment is so inherently arbitrary as to constitute cruel and unusual punishment under all circumstances, and a third (Justice Douglas) opined that any non-mandatory capital sentencing scheme would be inherently subject to discrimination and hence unconstitutional.  *See Furman*, 408 U.S. at 255 (Douglas, J., concurring) ("we know that the discretion of judges and juries in imposing the death penalty enables the penalty to be selectively applied, feeding prejudices against the accused if he is poor and despised, and lacking political clout, or if he is a member of a suspect or unpopular minority, and saving those who by social position may be in a more protected position"); *Id.* at 294 (Brennan, J., concurring) ("[n]o one has yet suggested a rational basis that could differentiate . . . the few who die from the many who go to prison"); *Id.* at 365 (Marshall, J., concurring) ("committing to the untrammeled discretion of the jury the power to pronounce life or death in capital

17

cases is . . . an open invitation to discrimination" [internal quotation marks omitted]).

Justice Marshall elaborated on this "fundamental defect" in the Court's Eighth Amendment jurisprudence in *Godfrey*, 446 U.S. at 420:

> [A]ppellate courts are incapable of guaranteeing the kind of objectivity and evenhandedness that the Court contemplated and hoped for in *Gregg*. The disgraceful distorting effects of racial discrimination and poverty continue to be painfully visible in the imposition of death sentences . . . . The task of eliminating arbitrariness in the infliction of capital punishment is proving to be one which our criminal justice system—and perhaps any criminal justice system—is unable to perform . . . .
>
> The . . . inability to administer . . . capital punishment . . . in an evenhanded fashion is . . . symptomatic of a deeper problem that is proving to be genuinely intractable . . . .
>
> [T]he task of selecting in some objective way those persons who should be condemned to die is one that remains beyond the capacities of the criminal justice system.  For this reason, I remain hopeful that even if the Court is unwilling to accept the view that the death penalty is so barbaric that it is in all circumstances cruel and unusual punishment forbidden by the Eighth and Fourteenth [a]mendments, it may eventually conclude that the effort to eliminate arbitrariness in the infliction of that ultimate sanction is so plainly doomed to failure that it—and the death penalty—must be abandoned altogether."

*Id.* at 439-42 (Citations omitted; footnotes omitted.) (Marshall, J., concurring in the judgment).

Both Justices Stevens and Blackmun have reached similar conclusions. *See Baze*, 553 U.S. at 85 (Stevens, J., concurring in the judgment) ("[a] . . . significant concern is the risk of discriminatory application of the death penalty"); *Tuilaepa,* 512 U.S. at 991–92 (Blackmun, J., dissenting) ("One of the greatest evils of leaving

jurors with largely unguided discretion is the risk that this discretion will be exercised on the basis of constitutionally impermissible considerations—primary among them, race . . . . For far too many jurors, the most important 'circumstances of the crime' are the race of the victim or the defendant.") (Citations omitted).

Justice Scalia, while drawing a different legal conclusion than his more liberal brethren, has been no less persuaded by the premise that the United States Supreme Court's *Furman* and *Woodson/Lockett* lines of jurisprudence are fundamentally incompatible: "To acknowledge that 'there perhaps is an inherent tension' between this line of cases and the line stemming from *Furman*, *McCleskey v. Kemp*, 481 U.S. at 363 (BLACKMUN, J., dissenting), is rather like saying that there was perhaps an inherent tension between the Allies and the Axis Powers in World War II. And to refer to the two lines as pursuing 'twin objectives,' *Spaziano v. Florida*, 468 U.S. at 459 . . . is rather like referring to the twin objectives of good and evil. They cannot be reconciled." *Walton v. Arizona*, 497 U.S. 639, 664 (1990) (Scalia, J., concurring in part and concurring in the judgment), *overruled in part on other grounds by Ring v. Arizona*, 536 U.S. 584 (2002).

And now, Justices Breyer and Ginsburg have added their voices to this consensus, declaring that:

> Four decades ago, the Court believed it possible to interpret the Eighth Amendment in ways that would significantly limit the arbitrary application of the death sentence. *See Gregg*, 428 U.S. at 195, 96 S.Ct. 2909 (joint opinion of Stewart, Powell, and Stevens, JJ.) ("[T]he concerns expressed in *Furman* that the penalty of death not be imposed in an arbitrary or capricious manner can be met"). But that no longer seems likely.

*Glossip*, 135 S. Ct. at 2762 (Breyer and Ginsburg, JJ., dissenting).

It is also clear, based on the analysis conducted in both the *Glossip* dissent and in *Santiago*, that there are numerous other flaws in the current administration of the death penalty.  As demonstrated below, these flaws are not restricted to state death penalty schemes and apply specifically to the FDPA, rendering any death sentence under it unconstitutional.

II.     **There is Now Almost Half a Century's Worth of Studies, Surveys, and Experience that Demonstrates the Procedural Protections Included in the Federal Death Penalty Act have Failed to Achieve Their Intended Goal of Reliable, Rational, Consistent, Fair, Non-Arbitrary, and Non-Discriminatory Application of the Death Penalty.**

The *Glossip* dissent and the *Santiago* opinion provide a current roadmap of the multiple problems with the administration of the death penalty nationwide.  By definition, these problems extend to the FDPA, which utilizes the same procedural mechanisms that have produced such a morass in the state death penalty systems. As Justices Breyer and Ginsburg point out, "[a]lmost 40 years of studies, surveys, and experience strongly indicate… that [the death penalty] effort has failed. Today's administration of the death penalty involves three fundamental constitutional defects: (1) serious unreliability, (2) arbitrariness in application, and (3) unconscionably long delays that undermine the death penalty's penological purpose. Perhaps as a result, (4) most places within the United States have abandoned its use." *Glossip*, 135 S.Ct. at 2755-56.

If the government disputes the accuracy of the factual basis underlying this argument, a hearing is requested at which counsel will prove their assertions.

**A.  The death penalty cannot be reliably applied, and therefore it is cruel and unusual under the Eighth Amendment.**

The Court has specified that the finality of death creates a "qualitative difference" between the death penalty and other punishments (including life in prison).  *Woodson*, 428 U.S. at 305 (plurality opinion).  That "qualitative difference" creates "a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case."  *Id.*  "There is increasing evidence, however, that the death penalty as now applied lacks that requisite reliability."  *Glossip*, 135 S.Ct. at 2756 (Breyer and Ginsburg, JJ., dissenting).  "Unlike 40 years ago, we now have plausible evidence of unreliability that (perhaps due to DNA evidence) is stronger than the evidence we had before. In sum, there is significantly more research-based evidence today indicating that courts sentence to death individuals who may well be actually innocent or whose convictions (in the law's view) do not warrant the death penalty's application."  *Id.* at 2759.  *See also*, *Kansas v. Marsh*, 548 U.S. 163, 207–211 (2006) (Souter, J., dissenting) (DNA exonerations constitute "a new body of fact" when considering the constitutionality of capital punishment); *Santiago*, 318 Conn. at 106 ("In concluding that the death penalty is unconstitutional… we recognize that the legal and moral legitimacy of any future executions would be undermined by the ever present risk that an innocent person will be wrongly executed.").

This new research-based evidence has several different components.  First, "despite the difficulty of investigating the circumstances surrounding an execution for a crime that took place long ago, researchers have found convincing evidence

21

that, in the past three decades, innocent people have been executed." *Id.* at 2756. [14]

*See also Santiago*, 318 Conn. at 104 ("Statistical analyses have demonstrated to

near certainty that innocent Americans have been and will continue to be executed

in the post-*Furman* era."). In *Santiago*, the Connecticut Supreme Court observed

that

> all punishment is tainted by the possibility of error. Capital
> punishment, however, is especially problematic. When we impose
> capital punishment on a convicted murderer, there cannot be any room
> for error since the murderer can never be brought back to life
> afterward if error is discovered at some later date. If there remains a
> substantial risk of error, as demonstrated by advances in scientific
> testing in cases [in which] a person has been sentenced beyond a
> reasonable doubt in a fair trial, then we have good reason on
> retributivist grounds to reject capital punishment in favor of an
> alternative sanction.

---

[14] Citing Liebman, *Fatal Injustice; Carlos DeLuna's Execution Shows That a Faster, Cheaper Death Penalty is a Dangerous Idea*, L.A. Times, June 1, 2012, p. A19 (describing results of a 4–year investigation, later published as The Wrong Carlos: Anatomy of a Wrongful Execution (2014), that led its authors to conclude that Carlos DeLuna, sentenced to death and executed in 1989, six years after his arrest in Texas for stabbing a single mother to death in a convenience store, was innocent); Grann, *Trial By Fire: Did Texas Execute An Innocent Man?* The New Yorker, Sept. 7, 2009, p. 42 (describing evidence that Cameron Todd Willingham was convicted, and ultimately executed in 2004, for the apparently motiveless murder of his three children as the result of invalid scientific analysis of the scene of the house fire that killed his children). *See also, e.g., Press Release: Gov. Ritter Grants Posthumous Pardon in Case Dating Back to 1930s*, Jan. 7, 2011, p. 1 (Colorado Governor granted full and unconditional posthumous pardon to Joe Arridy, a man with an IQ of 46 who was executed in 1936, because, according to the Governor, "an overwhelming body of evidence indicates the 23–year–old Arridy was innocent, including false and coerced confessions, the likelihood that Arridy was not in Pueblo at the time of the killing, and an admission of guilt by someone else"); Rob Warden, *Wilkie Collins's The Dead Alive: The Novel, the Case, and Wrongful Convictions* 157–158 (2005) (in 1987, Nebraska Governor Bob Kerrey pardoned William Jackson Marion, who had been executed a century earlier for the murder of John Cameron, a man who later turned up alive; the alleged victim, Cameron, had gone to Mexico to avoid a shotgun wedding).

*Id.* at 105-06.

Second, "the evidence that the death penalty has been wrongly **imposed** (whether or not it was carried out), is striking." *Glossip*, 135 S.Ct. at 2756 (Breyer and Ginsburg, JJ., dissenting) (emphasis in original).  When the Court decided in 2002 that the Constitution prohibits executing intellectually disabled persons, the Supreme Court wrote that "we cannot ignore the fact that in recent years a disturbing number of inmates on death row have been exonerated." *Atkins*, 536 U.S. at 320 n. 25 (noting approximately 60 death row exonerations).  Thirteen years later, when Justice Breyer returned to this issue in his dissent in *Glossip,* the number of exonerations in capital cases had risen to 115 or even 154, depending on how "exoneration" is defined.  In the one year before *Glossip,* six people who had been sentenced to death more than 30 years earlier (one almost 40 years earlier) were exonerated based on *actual innocence*.  *See Glossip*, 135 S.Ct. at 2756.[15]

Third, as *Glossip* noted, the incidence of exonerations is far more frequent among capital convictions than non-capital ones.  Justice Breyer found that "Researchers have calculated that courts (or State Governors) are 130 times more likely to exonerate a defendant where a death sentence is at issue [and] nine times more likely to exonerate where a capital murder, rather than a noncapital murder,

---

[15] Citing National Registry of Exonerations, Exonerations in the United States, 1989–2012, pp. 6–7 (2012), and Death Penalty Information Center (DPIC), Innocence: List of Those Freed from Death Row (now "Innocence Database," *available at* https://deathpenaltyinfo.org/policy-issues/innocence-database (last visited Dec. 14, 2019).  After *Glossip* was decided on June 29, 2015, two more exonerations were added to DPIC's List of Those Freed From Death Row.

is at issue." *Glossip*, 135 S.Ct. at 2757.[16]  The higher rate of wrongful convictions in capital cases may be attributable to the fact that "the crimes at issue in capital cases are typically horrendous murders, and thus accompanied by intense community pressure on police, prosecutors, and jurors to secure a conviction.  This pressure creates a greater likelihood of convicting the wrong person." *Id.*[17]

The pressure on – and zeal from – prosecutors to obtain a capital conviction and death sentence is compounded by a built-in component of capital prosecutions, the practice of "death-qualifying" juries.  Justice Breyer observed that the process "'skews juries toward guilt and death.'"  *Id.* at 2758.[18]  The federal court in *Fell*, following an evidentiary hearing, reached far more troubling conclusions.

The court heard testimony from Dr. Craig Haney, a social psychologist from the University of California at Santa Cruz.  Ex. A at 23-268.  Noting the Supreme

---

[16] Citing Exonerations 2012 Report 15–16, and nn. 24 & 26.

[17] Citing Gross, Jacoby, Matheson, Montgomery, & Patil, *Exonerations in the United States 1989 Through 2003*, 95 J. Crim. L. & C. 523, 531–533 (2005); Gross & O'Brien, *Frequency and Predictors of False Conviction: Why We Know So Little, and New Data on Capital Cases*, 5 J. Empirical L. Studies 927, 956–957 (2008) (noting that, in comparing those who were exonerated from death row to other capital defendants who were not so exonerated, the initial police investigations tended to be shorter for those exonerated); *see also* B. Garrett, *Convicting the Innocent: Where Criminal Prosecutions Go Wrong* (2011) (discussing other common causes of wrongful convictions generally including false confessions, mistaken eyewitness testimony, untruthful jailhouse informants, and ineffective defense counsel).

[18] Quoting Rozelle, *The Principled Executioner: Capital Juries' Bias and the Benefits of True Bifurcation*, 38 Ariz. S.L.J. 769, 772–793, 807 (2006) (summarizing research and concluding that "[f]or over fifty years, empirical investigation has demonstrated that death qualification skews juries toward guilt and death").

Court's skepticism of the social science on jury selection bias effect in *Witherspoon v. Illinois*, 391 U.S. 510 (1968) and *Lockhart v. McCree*, 476 U.S. 162 (1986), the Court found that "Since at least 1980, Dr. Haney was worked to fill in the gap in the [social science] record.  With respect to the compositional bias of the death-qualified jury, it can no longer be seriously questioned that panel who have announced their openness to a death penalty verdict and have been selected on that basis are more likely to convict than jurors who more closely mirror the full range of values in our society." *Fell*, 224 F.Supp.3d at 333.  Dr. Haney testified that among the reasons that death qualification results in capital juries that are biased in favor of the prosecution are that it excludes minorities; selects jurors who are more likely to impose the death penalty than other jurors; and promotes death sentences because of the psychological effect of the questions asked and answers given.  *Id.* at 332. The judge found as matter of fact that "death qualified juries have a disposition towards conviction which is significantly greater than the attitude of juries who have not passed through the filter of death qualification." *Id.* at 335.

The Court also heard testimony regarding the Capital Jury Project ("CJP"). The CJP is a data-set of almost 1200 interviews over 15 years with people who sat on capital juries that was funded by the National Science Foundation.  *Fell,* 224 F.Supp.3d at 335.  Dr. Wanda Foglia, a law professor who conducts social science research in the area of criminology, testified to three primary findings from the CJP:  (1) the process of death-qualification in voir dire produces juries biased in favor of imposing death; (2) the majority of capital jurors decide the punishment

25

before completing the culpability stage and never engage in the weighing of

mitigating and aggravating factors to decide sentence; (3) jurors are consistently

unable to understand and apply the instructions from each phase of a capital trial.

*Id.* at 335-36; Ex. A at 643-875.  Specifically, Dr. Foglia testified that:

- Half of the jurors interviewed had decided the sentence before they determined the defendant was guilty;

- Depending on offense, 46% to 72% of jurors believed that death was the only appropriate sentence;

- Half of jurors did not understand they were required to consider mitigating evidence, two-thirds did not understand that mitigating factors did not need to be found unanimously, and one-third to one-half did not understand the respective burdens of proof for mitigating and aggravating factors;

- From 33% to 44% of jurors believed that death was mandatory upon proof of ceratin aggravating factors;

- A substantial number of jurors did not believe that people sentenced to life without parole would not be released.

*Id.* at 336-37.

Following Dr. Foglia, Dr. Scott Sundby, a law professor who had been active

with the CJP, testified that "it is beyond human present ability to formulate a

capital punishment scheme which would get [] the type of non-arbitrary, non-

capricious decisions that the Supreme Court has said we must have after *Furman*."

*Id.* at 337; Ex. A at 884.  Professor Sundby explained that

> Based on hundreds of hours of juror interviews, he came to appreciate
> that the penalty phase determination "is . . . at the bottom, inevitably .
> . . a moral, spiritual, religious value judgment. It is not like the guilt
> phase judgment . . . . The ultimate question in the capital punishment
> context . . . is does this defendant deserve to live or die. And there is
> absolutely no way to make that decision other than looking at your
> own values."  In contrast to the guilt phase (or all other criminal cases)

26

in which the jury is making a fact-based decision, the penalty phase
decision depends upon the jurors' subjective moral values. Because the
determination is not fact-based, it is inherently unpredictable and
ungovernable by legal standards.

*Id.* at 337 (citations omitted). *See* Ex. A at 885.  Based on the CJP testimony and

evidence, the court in *Fell* found that the social science had "converged on a

common conclusion that the process by which jurors are selected does not measure

up to the standards of detached objectivity required by *Gregg*" and it "supported the

position [] that jury selection since *Gregg* is not the solution to inherent jury bias,

but rather part of the problem." *Id.* at 338.

Looking at all of the testimony and evidence about capital juries and the

selection process, the court in *Fell* made this finding:

> [T]he procedures for conducting trials mandated by the *Gregg* decision
> have not cured systemic shortcomings in jury selection and
> deliberations.  The death qualification process continues to weight jury
> panels in favor of convicrion and in favor of the death penalty through
> the exclusion of a large portion of the community which holds views
> opposed to the death penalty.  When surveyed, jurors who actually
> served in capital cases had great difficulty in following courts'
> instructions.  It is an inadequate response to presume that juries
> follow our instructions when the evidence is to the contrary.  The
> evidence introduced at the hearing demonstrates that despite efforts to
> create a more just death penalty regime, the FDPA – like the very
> similar state death penalty statutes enacted after *Furman* – remains
> inherently unreliable as it seeks to identify those cases in which death
> is the just outcome.

*Id.* at 339-40.

Another demonstrated source of erroneous convictions and death sentences is flawed forensic evidence, including from the FBI.[19]  In 1997, the DOJ learned that that the FBI crime lab had engaged in massive flawed forensic work, including the "use of scientifically unsupportable analysis and overstated testimony by [13] FBI Lab examiners in criminal prosecutions." *See*, United States Department of Justice, Office of the Inspector General, *An Assessment  of the 1996 Department of Justice Task Force Review of the FBI Laboratory* at 1 (July 2014) ("2014 OIG Report").[20]  A Criminal Division Task Force was appointed to identify, review, and follow-up on more than 7,500 cases linked to 13 problematic FBI examiners.  Those examiners' work factored into 64 capital convictions and death sentences.  *See also* FBI, National Press Releases, *FBI Testimony on Microscopic Hair Analysis Contained Errors in at Least 90 Percent of Cases in Ongoing Review*, Apr. 20, 2015 (review finds FBI provided flawed forensic hair analysis testimony provided in 33 of 35 death sentence cases (94 percent), and nine of the defendants had already been

---

[19] "In general, both the prosecution and the defense rely more extensively on experts in death penalty cases than in other federal criminal cases." Judicial Conference of the United States, Committee on Defender Services, Subcommittee on Federal Death Penalty Cases, *Federal Death Penalty Cases: Recommendations Concerning The Cost And Quality of Defense Representation* (May 1998) at 14.

[20] *Available at* https://oig.justice.gov/reports/2014/e1404.pdf (last visited Dec. 14, 2019).

executed and five died of other causes awaiting execution before errors were discovered.).[21]

At least three inmates were executed before their cases were identified for further review– for one of them, it literally cost him his life.  An independent scientist later determined that the FBI lab analysis that led to the 1997 execution of Benjamin H. Boyle in Texas was scientifically unsupportable and the testimony incorrect.  *See* OIG 2014 Report at 51. Because the DOJ and the FBI did not immediately alert state authorities that Mr. Boyle's convictions might be called into question, prosecutors did not delay the execution.  The OIG reports that "but for" that tainted testimony, "**Boyle would not have been convicted of the capital offense that rendered him eligible for the death penalty.**" *Id.* at 52, 66-67, 86 (emphasis added).  Two other capital defendants, Michael Lockhart and Gerald Stano, were executed before their cases were identified for Task Force Review.

There was little to no public knowledge of this colossal failure until a series of articles published in the Washington Post in April 2012 generated a public outcry.[22] The account was indeed scathing:

---

[21] *Available at* https://www.fbi.gov/news/pressrel/press-releases/fbi-testimony-on-microscopic-hair-analysis-contained-errors-in-at-least-90-percent-of-cases-in-ongoing-review (last visited Dec. 20, 2019).

[22] *See* Spencer S. Hsu, *Convicted defendants left uninformed of forensic flaws found by Justice Dept.*, The Washington Post (Apr. 16, 2012), available at https://www.washingtonpost.com/local/crime/convicted-defendants-left-uninformed-of-forensicflaws-found-by-justice-dept/2012/04/16/gIQAWTcgMT_story.html; Spencer S. Hsu, *DOJ review of flawed FBI forensics processes lacked transparency*, The Washington Post (Apr. 17, 2012), *available at* https://www.washingtonpost.com/local/crime/dojreview-of-flawed-fbi-forensics-

> The documents and interviews tell a story of how the Justice Department's promise to protect the rights of defendants became in large part an exercise in damage control that left some prisoners locked away or in the dark for years longer than necessary. The Justice Department continues to decline to release the names of defendants in the affected cases. . . . .
>
> The Justice Department's decision to allow prosecutors to decide what to disclose to defendants was criticized at the time and allowed most of the process to remain secret. But by cloaking cases in anonymity, failing to ensure that defendants were notified of troubles with their cases and neglecting to publicly report problems or recommend solutions, the task force obscured problems from further study.

Hsu, *DOJ review of flawed FBI forensics processes lacked transparency*, supra, n.22.

The full extent of the failures not only by the FBI, but also by the DOJ in not notifying defendants and the defense bar once it became aware that active capital convictions were jeopardized and leaving that process in the hands of prosecutors, was not known until July 2014, when the first report reviewing the Task Force's conduct was published.  The report concluded that the Task Force and the FBI "did not take sufficient steps to ensure that the capital cases were the Task Force's top priority. . . . [w]e found evidence that the independent scientists' reports were forwarded to capital defendants in only two cases.  The department should have handled all death penalty cases with greater priority and urgency." OIG 2014 Report, at i-ii. [23]  The lesson from this critical failure of the FBI and the DOJ is

---

processes-lacked-transparency/2012/04/17/gIQAFegIPT_story.html (last visited Dec. 20, 2019).

[23] In response to the OIG's 2014 Assessment, disturbingly, the DOJ expressed disagreement with the OIG's conclusion that it was a mistake to delegate to prosecutors the sole "responsibility for making appropriate disclosures to

apparent – people have been executed based on evidence now known to be hopelessly unreliable.

As a consequence of these and other factors, "researchers estimate that about 4% of those sentenced to death are actually innocent." *Id.*[24]  In other words, approximately 1 in 25 capital defendants in the United States are sentenced to death for crimes they did not commit.  Given this rate of error and the sheer number of exonerations in capital cases, which is steadily increasing, there is ample basis to conclude, as Judge Wolf did recently in *United States v. Sampson*, 2015 WL 6511247, at *20, that "the FDPA, like state death penalty statutes, will inevitably result in the execution of innocent people."

---

defendants or defense counsel" when confronted with the fact that an independent scientist had concluded that evidence in their own cases was tainted. Department Response to OIG Report, July 9, 2014 at 4, available at 2014 OIG Report at 131.

[24] Citing Gross, O'Brien, Hsu, & Kennedy, Rate of False Conviction of Criminal Defendants Who Are Sentenced to Death, 111 Proceeding of the National Academy of Sciences 7230 (2014) (full-scale study of all death sentences from 1973 through 2004 estimating that 4.1% of those sentenced to death are actually innocent); Risinger, Innocents Convicted: An Empirically Justified Factual Wrongful Conviction Rate, 97 J. Crim. L. & C. 761 (2007) (examination of DNA exonerations in death penalty cases for murder-rapes between 1982 and 1989 suggesting an analogous rate of between 3.3% and 5%).

Additional studies cited in the *Santiago* opinion on this same point include: H. Bedau & M. Radelet, Miscarriages of Justice in Potentially Capital Cases, 40 Stan. L.Rev. 21, 36 (1987) (citing high rate of error in death penalty cases); D. Benson et al., Executing the Innocent, 3 Ala. C.R. & C.L. L.Rev., no. 2, 2013 at 3 ("We know . . . that [the] intolerable event [of executing an innocent person] takes place with some regularity in . . . death penalty jurisdictions" [emphasis omitted] ); U. Bentele, Does the Death Penalty, by Risking Execution of the Innocent, Violate Substantive Due Process?, 40 Hous. L.Rev. 1359, 1365 (2004) ("[s]ince capital punishment was given a renewed seal of approval in 1976, more than [100] people have been sentenced to death [and have been] subsequently found to be innocent").

31

Notwithstanding the federal death penalty system's greater funding for capital defense and prosecutors and judges who are purportedly apolitical because their positions are not elected, any notion that the problem of wrongful capital convictions and sentences is confined to the state systems, and that the federal capital punishment system is somehow immune from such problems, does not bear out. The Massachusetts district court in *Sampson* rejected the government's argument that "similar errors and injustices could not occur in the federal courts."

> The government's confidence that the FDPA will never lead to the execution of innocent individuals is not shared by the only federal judge to have presided over an FDPA prosecution in Massachusetts. Judge Ponsor conducted the trial of Kristen Gilbert, a nurse convicted of murdering four of her patients and attempting to murder three others. She was sentenced to life in prison in 2001. Judge Ponsor later wrote regarding the Gilbert trial that:
>
>> The experience left me with one unavoidable conclusion: that a legal regime relying on the death penalty will inevitably execute innocent people—not too often, one hopes, but undoubtedly sometimes. * * * * * *. . . I have a hard time imagining anything as complicated as a capital trial being repeated very often, even by the best system, without an innocent person eventually being executed.
>
> A–90, A–95, Michael Ponsor, *"Life, Death and Uncertainty,"* Boston Globe, July 8, 2001, at D2.
>
> Commonsense, the experience to date in this case, and evidence from other cases combine to persuade this court that Judge Ponsor's prediction is prophetic. Federal judges, like state judges, are human and, therefore, fallible. Indeed, many federal judges have previously been state judges. Jurors in federal cases are essentially the same citizens who serve as jurors in state cases. In addition, many federal cases, including the instant case, result from investigations conducted primarily, if not exclusively, by state and local law enforcement agents.

*Sampson*, 275 F. Supp. 2d  at 78.  *See also* W.J. Clinton, *My Reasons for the Pardons*, N.Y. Times, February 18, 2001 (explaining commutation of death sentence for David Ronald Chandler, citing Attorney General Reno's serious concerns about whether Mr. Chandler was actually innocent of the crime for which he had been prosecuted and condemned to death and noting that "the defendant's principal accuser later changed his testimony, casting doubt on the defendant's guilt.").

Far more disturbing than convictions, which may be overturned even years later (though at what cost to the exoneree's life?), is the substantial likelihood that innocent people have been executed.  *See* n. 14, *supra*.  Just as the presence of one juror on the panel who would automatically vote for the death penalty is "one too many," *Morgan v. Illinois*, 504 U.S. 719, 734, n. 8 (1922), the wrongful conviction – much less execution – of even one person is "one too many."  It is axiomatic that "the execution of a legally and factually innocent person would be a constitutionally intolerable event."  *Herrera v. Collins*, 506 U.S. 390, 419 (1993) (O'Connor, J., concurring).[25]  Indeed, "[t]he execution of a person who can show [that] he is innocent comes perilously close to simple murder."  *Santiago*, 318 Conn. at 104 (internal quotation marks omitted)

If the capital punishment systems in the nation have convicted and sentenced to death innocent people, and there is no evidence suggesting it will not recur, that

---

[25] "In *Herrera*, a majority of the Justices agreed that the execution of an innocent person would violate the Constitution." *Sampson*, 275 F. Supp. 2d at 76.

by itself ought to settle the discussion over whether our systems can reliably impose a death sentence.

While many of these same concerns are present in any criminal case, two considerations magnify their importance in capital cases.  First, as pointed out above, these reliability adulterators are more likely to present themselves in capital cases which are "typically horrendous murders, and thus accompanied by intense community pressure on police, prosecutors, and jurors to seek a conviction." *Glossip*, 135 S. Ct. at 2757-58 (Breyer, J., dissenting).

The second differentiating feature is obvious – the finality of the punishment. This qualitative difference between death and any other punishment resides at the core of the Eighth Amendment jurisprudence of capital punishment.  Justice Stewart's observation in *Woodson*, 428 U.S. at 305-06, that "the penalty of death is qualitatively different from a sentence of imprisonment" has been repeatedly acknowledged in the ensuing years by the Court.  *See, e.g.*, *Gregg*, 428 U.S. at 187 ("the death penalty is unique in its severity and irrevocability."); *Ford v. Wainwright*, 477 U.S. 399, 411 (1986) ("this especial concern is a natural consequence of the knowledge that execution is the most irremediable and unfathomable of penalties."); *Roper*, 543 U.S. at 568 ("Because the death penalty is the most severe punishment, the Eighth Amendment applies to it with special force.").

Finally, the definition of 'exoneration' is expanded to include instances in which courts failed to follow legally required procedures, the numbers increase by

10 or more.  Between 1973 and 1995, courts identified prejudicial errors in 68% of the capital cases before them.  Gelman, Liebman, West, & Kiss, *A Broken System: The Persistent Patterns of Reversals of Death Sentences in the United States*, 1 J. Empirical L. Studies 209, 217 (2004).  State courts on direct and post-conviction review overturned 47% of the sentences they reviewed.  *Id.* at 232.  Federal courts, reviewing capital cases in habeas corpus proceedings, found error in 40% of those cases.  *Id.*"  *Glossip*, 135 S. Ct. at 27582759 (Breyer, J., dissenting).  *See also Santiago*, 218 Conn. at 104 (Gelman study, demonstrating "extremely high error rates", was relevant to the Court's conclusion that the death penalty was unconstitutional).

Moreover, as explained at greater length *infra*, the eventual outcome of cases reversed indicates that they were not worthy of death sentences, which makes their initial outcome arbitrary.  A 2011 report by the Death Penalty Information Center ("DPIC"), *Struck by Lightning: The Continuing Arbitrariness of the Death Penalty Thirty-Five Years After Its Re-instatement in 1976* (Washington, D.C. 2011) ("DPIC, Struck by Lightning," Ex. B), noted that "[n]ationally, the most comprehensive study of death penalty appeals found that two-thirds of death sentences were overturned, **and upon reconsideration over 80% received an outcome of less than death. In all of these re-sentencings, the judgment went from 'worst of the worst' to something less severe—the difference between life and death.**"  DPIC,

Struck by Lightning, at 11 (emphasis added).[26]  The Report quotes then Illinois Gov.

Pat Quinn, who, upon signing the bill abolishing that state's death penalty in 2011,

said,

> I have concluded that our system of imposing the death penalty is
> inherently flawed. The evidence presented to me by former prosecutors
> and judges with decades of experience in the criminal justice system
> has convinced me that it is impossible to devise a system that is
> consistent, that is free of discrimination on the basis of race, geography
> or economic circumstance, and that always gets it right.

DPIC, Struck by Lightning, at 3.

The federal system a better but still unacceptable rate of constitutional error

in capital cases.  In *Sampson*, the court identified 17 out of 73 defendants whose

cases had been reversed.  *Sampson*, 2015 WL 6511247, at *19 (D. Mass., Oct. 28,

2015).[27]  The vast majority of these reversals came after 2003:  David Paul

Hammer, Cr. No. 4:96-239 (M.D. Pa.) (*Brady* violation); David Lee Jackson, No. 05-

CR-51 (E.D. Tex.) (*Brady* violation); John Johnson, Cr. No. 2:04-17 (E.D. La.)(trial

---

[26] A case in point in the federal system is Angela Johnson. In 2005, Ms. Johnson
was convicted of participating in the execution-style killing of two government
informants, and three innocent bystanders, including a mother and her two young
children, in furtherance of a large scale drug operation. In 2012, following her
unsuccessful direct appeal, her death sentence was set aside in 2255 proceedings
because of ineffective assistance of counsel. *See Johnson v. United States*, 860
F.Supp.2d 663 (N.D. Iowa 2012). The Department of Justice originally demanded a
penalty retrial, but on December 17, 2014, the government filed a notice
withdrawing its intent to seek the death penalty.

[27] Citing Death Penalty Information Center, Federal Death Row Prisoners,
available at https://deathpenaltyinfo.org/state-and-federal-info/federal-death-penalty/list-of-federal-death-row-prisoners (last visited Dec. 14, 2019).

error, including improper argument by the government); Ronell Wilson, Cr. No. 1:04-1016 (E.D.N.Y.) (trial error, including improper argument by the government); Angela Johnson, Cr. No. 01-3046 (N.D. Iowa) (ineffective assistance of counsel); Darryl Johnson, Cr. No. 96-379 (N.D. Ill.) (trial error); Richard Stitt, Cr. No. 98-47 (E.D. Va.) (ineffective assistance of counsel); George Lecco and Valerie Friend, Cr. No. 2:05-107 (S.D.W.V.) (as to both, juror misconduct); Gary Sampson, Cr. No. 01-cr-10384 (D. Mass.) (juror misconduct).[28]

Significantly, two of these cases were overturned upon the revelation of federal investigatory and prosecutorial misconduct.   First, in 2013 it came to light that the death sentence of David Lee Jackson in 2007 in the Eastern District of Texas was tainted by a *Brady* violation.  At the § 2255 stage, Jackson raised an *Atkins* claim. In connection with the discovery for that claim, it was revealed that the government did not disclose at the first trial evidence from the Bureau of Prisons that Mr. Jackson had been diagnosed by a BOP psychiatrist with paranoid schizophrenia, nor that he underwent a change in psychotropic medication.  In a court filing, the government confessed to the *Brady* violation, admitting both that the information had been withheld, and that it "was relevant to multiple issues in the sentencing phase," including "allowing counsel to more effectively cross-examine

---

[28] For summaries of these cases, see DPIC, Federal Death Row Prisoners. Additionally, Paul Hardy had been sentenced to death in 1996, and his sentence was overturned by the Fifth Circuit in 1999. Prior to his resentencing, on November 24, 2010, the district court held that Hardy suffered from an intellectual disability, and thus Atkins prohibited his execution, and ordered he be sentenced to life in prison. See *United States v. Hardy*, 762 F. Supp. 2d 849, 905 (E.D. La. 2010).

certain of the government's penalty-phase witnesses" as well as constituting "relevant mitigating evidence." *Jackson v. United States*, No. 1:09-cv-1039-RC, Gov't's Resp. Pet'r Supplement to Pet. For Collateral Relief, D.E. 171 at 4 (E.D. Tx. Mar. 22, 2013). On March 25, 2013 the district court accepted the agreement of the parties to settle the case and vacated the judgment of death. *See Id.* D.E. 172.

Second, in *United States v. Hammer*, 404 F. Supp. 2d 676, 801 (M.D. Pa. 2005), the district court granted a § 2255 petition to vacate a death sentence in an FDPA case on the ground that the United States Attorney's Office violated its *Brady* obligations in failing to turn over 33 FBI 302 statements that summarized interviews with prison inmates. *See also United States v. Hammer*, 564 F.3d 628, 631 (3d Cir. 2009) (summarizing procedural history). Mr. Hammer had been sentenced to death for the killing (by strangulation) of another inmate, Andrew Marti. In particular, the government had argued that the fact that Mr. Hammer braided his sheets into ropes supported the "substantial planning and premeditation" aggravating factor. The jury agreed, recommending a sentence of death in 1998. *See Hammer*, 404 F. Supp. 2d at 690, 799.

On September 29, 2005, the 29th day of an evidentiary hearing on Mr. Hammer's Third Amended § 2255 Petition, the government for the first time revealed the 33 FBI 302's that it had had in its possession since the beginning of the case, which among other things contained statements that Mr. Hammer was known to braid sheets into ropes for consensual sexual bondage. *See id.* The district court found that the suppressed 302's were both exculpatory and material, because a

38

juror reasonably could have found that the braiding sheets into ropes was evidence of his preparation for sexual activity, not the murder of Mr. Marti. *See id.* at 798-99.  On July 17, 2014, after a resentencing trial before Judge Slomsky, Mr. Hammer received a sentence of life imprisonment without possibility of parole. *See* Cr. No. 4:96-0239, D.E. 1770 (M.D. Pa. July 17, 2014).

In other circuits, appellate courts reviewing federal death penalty cases have also found a variety of errors at the trial level.  *See, e.g.*, *United States v. Aquart*, 913 F.3d 1 (2018) (error by prosecutor in summation for criticizing defense theory, saying lawyers did not believe it); *United States v. Troya*, 733 F.3d 1125, 1136-38 (11th Cir. 2013) (error in excluding defense expert's testimony on future non-dangerousness, which should have been admitted as both mitigation and rebuttal); *United States v. Hager*, 731 F.3d 167, 206 (4th Cir. 2013) (district court's and prosecutor's use of present tense to describe defendant's supposed lack of remorse, in jury instructions and summation, was error); *United States v. Runyon*, 707 F.3d 475, 492-99 (4th Cir. 2013) (finding error in introduction at sentencing of videotape of an interrogation of the defendant in which police confronted him with the evidence and facts of the crime and urged him to confess and show remorse by making references to his religion and ethnicity, and defendant, for the most part, kept silent.); *United States v. Ebron*, 683 F.3d 105, 153 (5th Cir. 2012) (erroneous finding of substantial-planning aggravating factor); *United States v. Bernard*, 299 F.3d 467, 484-487 (5th Cir. 2002) (jury's invalid finding of pecuniary-gain aggravating factor (based on insufficient evidence) was error.); *United States v.*

*Montgomery*, 635 F.3d 1074, 1091-92 (8th Cir. 2011)(summation remarks criticizing the decision to have defendant's children testify in mitigation were improper); *United States v. Lighty*, 616 F.3d 321, 363 (4th Cir. 2010)(finding or assuming district court erred in excluding mitigating evidence); *United States v. Purkey*, 428 F.3d 738, 757759 (8th Cir. 2005)(error in preventing defense psychologist from opining that defendant suffered from fetal alcohol syndrome and in refusing to allow cross examination of government expert); *United States v. Stitt*, 250 F.3d 878, 898-899(4th Cir. 2001)(erroneous admission of victim-impact evidence in rebuttal); *United States v. Chanthadara*, 230 F.3d 1237, 1264-1268 (10th Cir. 2000)(two errors — faulty instruction on pecuniary gain and six jurors' exposure to newspaper headline conveying that district judge had referred to defense theory as a "smokescreen" — were prejudicial enough to require new sentencing hearing.); *United States v. Barnette*, 211 F.3d 803, 825 (4th Cir. 2000)(erroneous exclusion of surebuttal testimony by defense mental-health expert was not harmless); *United States v. Webster*, 162 F.3d 308, 326 (5th Cir. 1998)(erroneous instruction on "substantial planning" aggravator); *United States v. Causey*, 185 F.3d 407, 423 (5th Cir. 1999)(reversing two codefendants' convictions on one of three capital counts (because of lack of evidence on an essential element); *United States v. McCullah*, 76 F.3d 1087, 1102 (10th Cir. 1996) (erroneous admission at trial of defendant's coerced statements to government informant was not harmless as to sentence).

The fact that constitutional error is discovered in so many federal capital cases, sometimes through assiduous investigation, sometimes through little more

than happenstance, compels the conclusion that the federal capital sentencing system is incapable of identifying and remedying every instance of serious constitutional error. *See Sampson*, 275 F. Supp. 2d at 79 n.12 (collecting cases in which one or more Supreme Court Justices perceived there was harmful error in a capital case, but execution occurred anyway).

Given the many sources of inaccuracy and error, whether from investigators, prosecutors, jurors, witnesses, or even the defendant's own counsel, it is simply unrealistic to believe that the federal death penalty system is capable of identifying and remedying them with the constitutionally requisite accuracy and reliability. The lack of reliability in a procedure with a demonstrated, nonnegligible and potentially non-remediable risk of condemnation of factually and legally innocent individuals cannot be harmonized with a 21st Century Eighth Amendment. *See Hall*, 134 S.Ct. at 1992 ("[t]he Eighth Amendment's protection of dignity reflects the [n]ation we have been, the [n]ation we are, and the [n]ation we aspire to be").

> **B. The Supreme Court recognized in the seminal decision *Furman v. Georgia* that arbitrary punishments are cruel within the meaning of the Eighth Amendment.**
>
> > **1. Arbitrariness, by the inability to administer capital punishment in a manner that produces reliable, consistent results has plagued the death penalty since the era that led to *Furman*.**

"The arbitrary imposition of punishment is the antithesis of the rule of law." *Glossip*, 135 S.Ct. at 2759 (Breyer and Ginsburg, JJ., dissenting). For that reason,

Justice Potter Stewart (who supplied critical votes for the holdings in *Furman* and

*Gregg*) found the death penalty unconstitutional as administered in 1972:

> These death sentences are cruel and unusual in the same way that being struck by lightning is cruel and unusual.  For, of all the people convicted of [death eligible crimes], many just as reprehensible as these, the[se] petitioners are among a capriciously selected random handful upon which the sentence of death has in fact been imposed."

*Furman*, 408 U.S. at 309–310 (concurring opinion).  *See also id.* at 310 ("[T]he

Eighth and Fourteenth Amendments cannot tolerate the infliction of a sentence of

death under legal systems that permit this unique penalty to be so wantonly and so

freakishly imposed"); *Id.* at 313 (White, J., concurring) ("[T]he death penalty is

exacted with great infrequency even for the most atrocious crimes and . . . there is

no meaningful basis for distinguishing the few cases in which it is imposed from the

many cases in which it is not").

When the death penalty was reinstated in 1976, the Court acknowledged that

the death penalty is (and would be) unconstitutional if "inflicted in an arbitrary and

capricious manner."  *Gregg*, 428 U.S. at 188 (joint opinion of Stewart, Powell, and

Stevens, JJ.).  *See also id.* at 189 ("[W]here discretion is afforded a sentencing body

on a matter so grave as the determination of whether a human life should be taken

or spared, that discretion must be suitably directed and limited so as to minimize

the risk of wholly arbitrary and capricious action"); *Godfrey v. Georgia*, 446 U.S. at

428 (plurality opinion) (similar).

The Court consequently has sought to make the application of the death

penalty less arbitrary by restricting its use to those whom Justice Souter called

"'the worst of the worst.'" *Kansas v. Marsh*, 548 U.S. at 206 (dissenting opinion); *see also Roper*, 543 U.S. at 568 ("Capital punishment must be limited to those offenders who commit a narrow category of the most serious crimes and whose extreme culpability makes them the most deserving of execution").

However, "[d]espite the *Gregg* Court's hope for fair administration of the death penalty, 40 years of further experience make it increasingly clear that the death penalty is imposed arbitrarily, *i.e.*, without the 'reasonable consistency' legally necessary to reconcile its use with the Constitution's commands." *Glossip*, 135 S.Ct. at 2760 (Breyer and Ginsburg, JJ., dissenting) (quoting *Eddings*, 455 U.S. at 112, (1982)). "Thorough studies of death penalty sentences support this conclusion. . . . Such studies indicate that the factors that most clearly ought to affect application of the death penalty—namely, comparative egregiousness of the crime—often do not. Other studies show that circumstances that ought **not** to affect application of the death penalty, such as race, gender, or geography, often *do*." *Id.* (emphasis in original). "Thus, whether one looks at research indicating that irrelevant or improper factors—such as race, gender, local geography, and resources—do significantly determine who receives the death penalty, or whether one looks at research indicating that proper factors—such as "egregiousness"—do not determine who receives the death penalty, the legal conclusion must be the same: The research strongly suggests that the death penalty is imposed arbitrarily." *Id.* at 2762. "The studies bear out my own view, reached after considering thousands of death penalty cases and last-minute petitions over the

course of more than 20 years.  I see discrepancies for which I can find no rational explanations." *Id.* at 2763.  In short, "the constitutionality of capital punishment rests on its limited application to the worst of the worst . . . [a]nd this extensive body of evidence suggests that it is not so limited." *Id.  See also*, *Santiago*, 318 Conn. at 106-07 ("[Another] reason that our state's capital punishment system fails to achieve its retributive goals is that the selection of which offenders live and which offenders die appears to be inescapably tainted by caprice and bias. . . .  To the extent that the ultimate punishment is imposed on an offender on the basis of impermissible considerations such as his, or his victim's, race, ethnicity, or socio-economic status, rather than the severity of his crime, his execution does not restore but, rather, tarnishes the moral order.").

As will be seen, each of the factors identified in *Glossip* and *Santiago* as determinative of the issue of arbitrariness has relevance to the constitutionality of the Federal Death Penalty Act as administered.

> **2.      Over 30 years of administering the federal death penalty has demonstrated that it operates in an arbitrary, capricious, irrational and discriminatory manner.**
>
> > **a.      The federal death penalty has proven to be a failed experiment.**

A "modern" federal death penalty has been in effect for more than 25 years.[29] There are presently 62 men and 1 woman under an active federal sentence of

---

[29] On November 18, 1988 Congress enacted a federal death penalty as part of the AntiDrug Abuse Amendments ("ADAA"), authorizing capital punishment for murders occurring in the context of drug trafficking.  21 U.S.C. § 848(e).  The reach of the federal death penalty was later expanded when, on September 13, 1994,

death.[30]  Some of them have been there for more than 20 years.  Over the past quarter of a century, in hundreds of federal capital trials around the country, the federal death penalty has revealed itself to be arbitrary, capricious, irrational, discriminatory in impact and, in the final analysis, fundamentally incapable of answering in a rational and predictable way the profound question of who should live and who should die.  This Court should strike it down.

To summarize what is to follow:

- Only a tiny handful of those federal defendants who could face the federal death penalty ever do.

- The theoretically national federal death penalty is, in reality, a regional death penalty, heavily pursued in the South and virtually ignored in the rest of the nation.

- From its earliest days to the present, the FDPA has consistently and disproportionately targeted members of minority groups.

- Of the few defendants actually targeted for death, nearly half (234/498) have been permitted to enter plea agreements that take death off the table.

- Of the cases that proceed to trial, two-thirds of defendants are spared the death penalty by juries or judges.

---

President Clinton signed into law the Federal Death Penalty Act of 1994 ("FDPA"), 18 U.S.C. § 3591 *et seq*.  In March, 2006, the procedural provisions of the ADAA, 21 U.S.C. §§ 848(g), were repealed.

[30]  These statistics are compiled and maintained by the Federal Death Penalty Resource Counsel Project.  Established in early 1992 by the Administrative Office of the United States Courts, Defender Services Division (now the Defender Services Office), for the benefit of court-appointed CJA panel attorneys, federal defenders, and the judiciary, the Federal Death Penalty Resource Counsel Project (FDPRCP) is comprised of highly experienced capital defense attorneys who are assigned to assist the federal courts, federal defenders, and appointed counsel in connection with matters relating to the defense function in federal capital cases at the trial level.

- There has been a sharp drop in the number of cases authorized by the Attorney General for capital prosecution, a sharp drop in the number of capital trials, and an even sharper drop in the numbers of death verdicts returned by juries.

- Approximately one-third of federal death sentences have been set aside on direct appeal or in proceedings brought pursuant to 28 U.S.C. § 2255.

- Despite the fact that federal death-row inmates have only one round of direct appeal and one round of collateral review, there are federal death row inmates who have been there for more than 20 years.

- There has been a presidential clemency grant to one federal death row inmate because of concerns he was innocent.

- In the past 27 years there have been just three federal executions, the most recent of which took place more than 12 years ago, a circumstance stripping the FDPA of any valid penological purpose.

> ### b. The federal death penalty is imposed and carried out in an arbitrary and capricious manner that is akin to being struck by lightning: Revisiting the constitutional premise of *Furman v. Georgia* in the context of the federal death penalty.

As indicated above, in 1972, when the Supreme Court in *Furman*, citing the arbitrary and capricious imposition of capital punishment across the land, struck down all existing death-penalty schemes as incompatible with the guarantees of the Eighth and Fourteenth Amendments to the United States Constitution, the random and capricious imposition of the penalty was best captured in the comparison drawn in *Furman* by Justice Stewart between receiving a sentence of death and being struck by lightning:

> These death sentences are cruel and unusual in the same way that being struck by lightning is cruel and unusual.  For, of all the people convicted of rapes and murders, . . . many just as reprehensible as these, the petitioners are among a capriciously selected handful upon

46

whom the sentence of death has in fact been imposed. My concurring Brothers have demonstrated that, if any basis can be discerned for the selection of these few to be sentenced to die, it is the constitutionally impermissible basis of race . . .  I simply conclude that the Eighth and Fourteenth Amendments cannot tolerate the infliction of a sentence of death under legal systems that permit this unique penalty to be so wantonly and so freakishly imposed.

*Furman*, 408 U.S. at 309-10 (Opinion of Stewart, J., concurring; citations and footnotes omitted).  In *Zant v. Stephens*, 462 U.S. 862 (1983), the Court stated:

A fair statement of the consensus expressed by the Court in *Furman* is that "where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action."

Members of the *Furman* Court also found that the death penalty was fraught with invidious and irrational selectivity, "feeding prejudices against the accused if he is poor and despised, and lacking political clout, or if he is a member of a suspect or unpopular minority . . . ."  *Furman*, 408 U.S. at 255 (Douglas, J., concurring). Justice White, who concurred in the result, highlighted the infrequent utilization of the death penalty:  "That conclusion, as I have said, is that the death penalty is exacted with great infrequency even for the most atrocious crimes and that there is no meaningful basis for distinguishing the few cases in which it is imposed from the many cases in which it is not."  408 U.S. at 313 (White, J., concurring). Justice White further concluded: "'[C]ommon sense and experience tell us that seldom-enforced laws become ineffective measures for controlling human conduct and that the death penalty, unless imposed with sufficient frequency, will make little contribution to deterring those crimes for which it may be exacted."  *Id.* at 312.  In

fact, the infrequency with which defendants were targeted for capital punishment was noted by each of the five concurring Justices in the *Furman* majority.  *See Furman*, 408 U.S. at 248 n. 11 (Douglas, J., concurring); *id.* at 291-95 (Brennan, J., concurring); *id.* at 309-10 (Stewart, J., concurring); *id.* at 312 (White, J., concurring); and, *id.* at 354 n. 124 362-63 (Marshall, J., concurring).

In 1972, Justice Brennan, positing a nation of 200 million people that carries out 50 executions per year, noted that "when government inflicts a severe punishment no more than 50 times a year, the inference is strong that the punishment is not being regularly and fairly applied," *Furman,* 408 U.S. at 294, and, "When the punishment of death is inflicted in a trivial number of the cases in which it is legally available, the conclusion is virtually inescapable that it is being inflicted arbitrarily.  Indeed, it smacks of little more than a lottery system." *Id.*  We are now a nation of 320 million people.  The last time this country carried out 50 or more executions was 2009.  In the 31 years since the return of the federal death penalty, out of a universe of more than 4,300 potential federal capital cases, there have been 86 federal death verdicts. Declaration of Kevin McNally, Ex. H at 3-4.  Just three federal prisoners have been executed.  *Id.*[31]  The FDPA suffers from the

---

[31] *See also*, Eric A. Tirschwell and Theodore Hertzberg, *Politics and Prosecution: a Historical Perspective on Shifting Federal Standards for Pursuing the Death Penalty in Non-Death Penalty States*, 12 U. PA. J. CONST. L. 57 (2009)(hereinafter "*Politics and Prosecution*"). The lead author of this article, a former United States Attorney in the Eastern District of New York, summarizes the statistical situation as of 2001:

> Prison population figures recently published by the Bureau of Justice Statistics suggest that out of the more than 2.3 million people incarcerated in the United States, about 3,297 of them (0.1%) are

same vice as the systems condemned in *Furman* in that only a handful of federal

defendants who are potentially eligible for capital punishment are ever targeted.

And those who are targeted are rarely sentenced to death and even more rarely are

they executed.

In 2014, the federal court for the Central District of California struck down

the California death penalty on the basis, in part, that it was so rarely carried out.

*See, Jones v. Chappell,* 31 F.Supp.3d 1050 (C.D. Cal. 2014).  The court concluded

that in California, "the execution of a death sentence is so infrequent, and the

delays preceding it so extraordinary, that the death penalty is deprived of any

deterrent or retributive effect it might once have had. Such an outcome is

antithetical to any civilized notion of just punishment."  *Id.* at 1063.[32]  One year

---

awaiting execution. Of those 3,297, only fifty-five (1.7%) are on
federal death row. Equally remarkable is the tiny number of federal
executions compared to "stateside" executions. Since 1977, 1,173
people have been executed in the United States. Of those individuals,
only three (0.3%) were federal convicts. . . .  As one commentator has
noted, "the score of prisoners on federal death row are in some
respects little more than a footnote."

*Id.* at 59 (quoting *John Brigham, Unusual Punishment: The Federal Death Penalty
in the United States*, 16 WASH. U. J.L. & POL'Y 195, 209 (2004)).

Since 2001, these numbers have remained relatively the same. According to
the Bureau of Prisons, "at year end 2014, the United States held an estimated
1,561,500 prisoners in state and federal correctional facilities." BOP, *Prisoners in
2014*, available at http://www.bjs.gov/content /pub/pdf/p14.pdf. According to DPIC,
as of October 30, 2015, there were 3002 inmates awaiting execution (0.2 %). Of
those 3002, only 61 (2 %) are on federal death row. *Id.*  Since 1976, 1419 people have
been executed. Of those individuals, still only three (0.2 %) were federal convicts. *Id.*

[32] This case subsequently was overturned on procedural grounds.  *See Jones v.
Davis*, 806 F.3d 538, 541 (9th Cir. 2015) (finding that theory of claim on which
district court granted relief was new rule of law that could not be applied

later the Connecticut Supreme Court struck down that state's death penalty in

*Santiago* for the very same reason – "aside from the inevitable delays, the sheer

rarity with which death sentences are imposed and carried out in Connecticut—

and, indeed, the entire northeastern United States—suggests that any conceivable

deterrent value will be far less than in a state like Texas, for example, which carries

out executions on a regular basis.  318 Conn. at 94, 139-140 (holding that capital

punishment, as currently applied, violates the constitution of Connecticut because

of  "Connecticut's long, troubled history with capital punishment: the steady

replacement by more progressive forms of punishment; the increasing inability to

achieve legitimate penological purposes; the freakishness with which the sentence

of death is imposed; the rarity with which it is carried out; and the [influence of]

racial, ethnic, and socioeconomic [factors].").[33]

---

retroactively on federal habeas review); *But see id*. at 553 ("Many agree with
Petitioner that California's capital punishment system is dysfunctional and that the
delay between sentencing and execution in California is extraordinary.").

　　However, the very next year the California Supreme Court invited further
litigation of this claim in future habeas corpus proceedings in *People v. Seumanu*,
61 Cal. 4th 1293, 1368, 355 P.3d 384, 438 (2015). The state court observed that
"although we have consistently, and recently, rejected the Eighth Amendment/delay
claim, doctrine can evolve" and "the recently decided *Jones* . . . provides an
opportunity to reconsider whether our prior position on this issue remains valid and
supportable." *Id. See also Santiago*, 318 Conn. at 99-100 ("[Another] reason the
death penalty has lost its retributive mooring in Connecticut is that the lengthy if
not interminable delays in carrying out capital sentences do not just undermine the
death penalty's deterrent effect; they also spoil its capacity for satisfying
retribution.").

[33] *See also, Politics and Prosecution* at 59 ("Since the creation of the American
republic more than two centuries ago, the federal government has executed 340
people, whereas the State of Texas has executed more than that many in the past
fifteen years.")  Indeed, just since 1976, Texas has executed 567 inmates.  *See*

Judge Calabresi of the Court of Appeals for the Second Circuit, in considering

the federal capital prosecution of Donald Fell in Vermont, observed that

> What is going on here is that the existence of certain local values
> makes the imposition of the federal death penalty in states that do not
> have the death penalty truly uncommon.  It is in that sense
> significantly more "unusual" than was the execution of 16- and 17-
> year-olds or the execution of the mentally retarded, before the
> Supreme Court found those practices to be "cruel and unusual" in
> *Roper*. . . and *Atkins*.  In all of these categories, values that made a
> death sentence unusual were at work.  In cases involving juvenile and
> mentally retarded defendants, the values were apparently related to
> the culpability of the offender.  *See, e.g.*, *Atkins*, 536 U.S. at 306 . . . .
> In cases from states without the death penalty, the constitutionally
> salient values are not just the "local" values, like the existence of
> substantial generalized opposition to capital punishment, but much
> more fundamentally the value and endurance of federalism itself-the
> recognition that we are part of a country, of a polity, that has to live
> with both Texan values and Northeastern values.

*United States v. Fell*, 571 F.3d 264, 289-290 (2d Cir. 2009) (Calabresi, J., dissenting

from the denial of rehearing *en banc*).

In *Santiago*, the Connecticut state Supreme Court noted the conclusion of

then-Judge Alex Kozinski of the Court of Appeals for the Ninth Circuit that put the

problem most plainly: "'Rather than go through the competing considerations, let's

cut to the meat of the coconut. The death penalty, as we now administer it, has no

deterrent value because it is imposed so infrequently and so freakishly.  To get

---

Death Penalty Information Center, *available at* https://deathpenaltyinfo.org/state-
and-federal-info/state-by-state/texas (last visited Dec. 14, 2019).  "On the other
hand, the two multi-district federal circuits in which capital punishment is least
prevalent are the First and Second Circuits, both of which are located in the
northeast. The seven states that make up those two circuits—Connecticut, Maine,
Massachusetts, New Hampshire, New York, Rhode Island, and Vermont—have
collectively executed one person since 1976." *Politics and Prosecution* at 87.

executed in America these days you have to be not only a truly nasty person, but also very, very unlucky . . . .'" *Santiago*, 318 Conn. at 95 (quoting, A. Kozinski & S. Gallagher, *Death: The Ultimate Run–On Sentence*, 46 Case W. Res. L.Rev. 1, 25 (1995)).

This argument – that the federal death penalty should be struck down because it is so infrequently sought or imposed – cannot be effectively addressed by more frequent use of it.  As Justice Brennan stated in *Furman*,

> The States claim, however, that this rarity is evidence not of arbitrariness, but of informed selectivity.
>
> Informed selectivity, of course, is a value not to be denigrated. Yet, presumably the States could make precisely the same claim if there were 10 executions per year, or five, or even if there were but one.  That there may be as many as 50 per year does not strengthen the claim.  When the rate of infliction is at that low level, it is highly implausible that only the worst criminals who commit the worst crimes are selected for this punishment.  No one has yet suggested a rational basis that could differentiate in these terms the few who die from the many who go to prison.  Crimes and criminals simply do not admit of a distinction that can be drawn so finely as to explain, on that ground, the execution of such a tiny sample of those eligible.  Certainly the laws that provide for this punishment do not attempt to draw that distinction; all cases to which the laws apply are necessarily "extreme."

408 U.S. at 293-94 (Brennan, J., concurring).  When *Furman* was decided, as noted in the opinion, 15-20% of convicted murderers and rapists were actually sentenced to death in those jurisdictions with the death penalty.  *Furman*, 408 U.S. at 386 n. 11 (Burger, C.J., dissenting) (citing four sources to support the statistic).  *See also id.* at 435 n. 19 (Powell, J., dissenting) (citing similar statistics).  Justice Stewart, for his part, utilized Chief Justice Burger's statistical analysis to lend further

support to his ultimate conclusion that the death penalty was, indeed, in an Eighth Amendment sense, "unusual."

Among the conclusions in *Furman*, was that arbitrariness and caprice are inevitable side-effects of the very rare imposition of death sentences.  Justice White, who had reviewed hundreds of state and federal death-penalty cases in 10 years on the Court, stated it thusly, "the death penalty is exacted with great infrequency even for the most atrocious crimes and [] there is no meaningful basis for distinguishing the few cases in which it is imposed from the many cases in which it is not."  408 U.S. at 313 (White, J., concurring).  *Accord Gregg*, 428 U.S. at 182 n. 26 (reiterating the conclusion of *Furman* that in the years leading up that decision "less than 20% of those convicted of murder were sentenced to death in those States that authorized capital punishment."); *Walton v. Arizona*, 497 U.S. 639, 658 (1990) (Scalia, J. concurring) (the key opinions in *Furman* "focused on the infrequent and seeming randomness with which, under the discretionary state systems, the death penalty was imposed."), *overruled on other grounds*, *Ring v. Arizona*, 536 U.S. 584 (2002).  *See also Woodson*, 428 U.S. at 295 n.31.  Thirty-eight years after *Furman*, Judge Gregory of the Court of Appeals for the Fourth Circuit, came to the same conclusion in his dissent in a federal death penalty case:  "When the government selects a few offenders from such a large pool for execution, it cannot further its legitimate penological interests; instead it merely inflicts gratuitous pain and suffering."  *United States v. Caro*, 597 F.3d 608, 636 (4th Cir. 2010) (Gregory, Cir.J., dissenting).

After more than 25 years of experience with a post-*Gregg* federal death penalty, it is a simple truth that the federal death penalty is sought and imposed far more rarely than in the cases of the five petitioners examined in *Furman*. Being sentenced to death in the federal system is truly akin to being struck by lightning.[34] Indeed, as explained *infra*, there is no meaningful basis that can be discerned for distinguishing those cases – even among the most extreme[35] – where death is imposed from those cases in which it is not.

---

[34] *See* G. Ben Cohen. & Robert J. Smith, *The Racial Geography of the Federal Death Penalty,* 85 Washington Law Rev. 425, 431 (2010) ("The infrequency of the federal death penalty – with 67 federal death sentences in the face of over 150,000 murders – makes death by lightning-strike look positively routine. Indeed, a federal death sentence is akin to winning (or in this instance losing) the lottery.") (noting that there were 424 deaths by lightning in the years 1999–2008.) In August 2006 *National Geographic* published a chart setting out the odds of dying by various means. For example, there is a 1 in 5 chance of dying from heart disease, and a 1 in 84 chance of dying in a car accident. Far down the list is the chance of dying by lethal injection, 1 in 62,468. The next item on the list reported the odds of being killed by lightning as 1 in 79,746. *Id.* at p. 21.

[35] In the District of Colorado, Timothy McVeigh was sentenced to death and executed for utilizing a truck bomb to blow up the Murrah Federal Building in Oklahoma City, killing 168 people and injuring hundreds. In the Southern District of New York, two men associated with Usama bin Laden and al-Qaeda were spared the death penalty after being convicted of simultaneous terrorist attacks, utilizing truck bombs, that destroyed two American embassies in East Africa, killing 224 – including 12 Americans – and injuring thousands. Zacharias Moussaoui was spared the death penalty in the Eastern District of Virginia despite a jury finding that he was responsible for the thousands of deaths that occurred as a result of the September 11, 2001 terrorist attacks. Eric Rudolph – the Olympics and abortion-clinic bomber – entered a guilty plea to a life sentence, as did Theodore Kaczynski, the Unabomber, as did Jared Loughner whose mass-shooting murder victims included a child and a federal judge. In Boston, in 2015, Dzhokhar Tsarnaev was sentenced to death for the bombing of the Boston Marathon where fewer people were killed than in other terrorism cases.

The Death Penalty Information Center 2011 report, *Struck by Lightning,* collects the data and presents arguments that the scheme of capital punishment that is practiced in our courts is unconstitutional based on the arbitrariness theory of *Furman.* The report examines the facts of several extremely aggravated federal death penalty cases in which the death penalty was not sought or imposed (*e.g.*, Eric Rudolph, Steven Flemmi, Oscar Veal, Joseph Massino, Vincent Basciano, Theodore Kaczynski, Zacharias Moussaoui, and Terry Nichols) and rightly points out that "[e]ven in cases evoking national fear, a death sentence is not a predictable result." Ex. B, DPIC, Struck by Lightning at 17.

As will be further demonstrated below, this is why capital punishment as carried out in the federal system violates the constitution.

c. **The numbers on how the federal death penalty is actually sought demonstrate arbitrariness in its rarity.**

The following numbers account for the way the federal death penalty has been sought and imposed since its post-*Gregg* reinstitution in 1988.

TABLE 1:  THE STATUS AND DISPOSITION OF ALL POTENTIAL FEDERAL CAPITAL CASES FROM 1988 TO 2015

| | |
|---|---|
| Total Potential Cases | 4,379 |
| Total defendants authorized for capital prosecution | 530 |
| Defendants pending trial | 29 |
| Capital trial avoided by negotiated plea, government withdrawing death notice with no plea, judge barring death penalty | 213 |
| Charges dismissed before trial on grounds of actual innocence | 3 |

| Defendant died or found incompetent before trial | 5 |
|---|---|
| Government withdrew request for death or discontinued capital prosecution due to plea bargain at trial | 34 |
| Acquitted of capital charges | 14 |
| Trial resulting in life sentence | 155 |
| Trial resulting in death sentence | *86 |
| Died before execution | 1 |
| Executions | 3 |
| Clemency | 2 |
| Federal Death Row, Active Death Sentence | 63 |

*Counting 4 defendants tried and sentenced to death twice*

See Ex. H.  *See also* "Current Statistics re: Use of Federal Death Penalty", *available at* https://fdprc.capdefnet.org/doj-activity/statistics/current-statistics-re-use-of-federal-death-penalty-february-2017 (last visited Dec. 14, 2019).

These numbers indicate that the Department of Justice has authorized United States Attorneys' offices to seek a death sentences in barely 12% of the cases that could be prosecuted capitally.  In *Furman*, the five justices in the majority found that where the death penalty was imposed on 20% of people convicted of capital offenses across the nation – almost twice the rate at which the federal government even **seeks** death – that infrequency virtually assured an application of the death penalty that was unconstitutionally arbitrary and capricious.  The proportion of federal death sentences presents an even more stark disparity.  Juries impose death in less than 2% of capital killings, not even 1/10[th] the rate that raised

constitutional concerns in *Furman*.[36]  The number of death sentences also indicates that juries believe that death is the appropriate sentence in 2/3 of those cases where the federal government believes death is appropriate (those it tries to a conviction and sentencing hearing).[37]  However, as noted *infra*, there are staggering national disparities between "death-zone" states like Texas, Missouri, and Virginia, which account for half of all federal death sentences, and Pennsylvania and Ohio, which each have one.  Two-thirds – 66% – of those who stand trial for their life in the Fifth Circuit are sentenced to death. In the Third Circuit the figure is 11%.[38]

Looking at executions, the rate is virtually nil.  Of the 4,379 cases that were eligible for federal capital prosecution, three have had death sentences carried out.  That means executions occur in less than 1/1000[th] of federally death eligible cases, or 0.06% compared to the 20% rate that caused concern in *Furman*.[39]

---

[36] It also bears noting that in 5% of capital prosecutions the jury did not even find the defendant guilty of a capital charge.

[37] In fact, the numbers indicate that the federal government, itself, believes that a death sentence is appropriate for only half of the defendants for whom capital prosecution is authorized.  (530 authorizations with 29 cases pending trial; 213 trials averted by plea, 3 death notices withdrawn over concerns for innocence, and 34 pleas accepted during trials).

[38]  As also explained, *infra*, this disparity tracks the nation's history of slavery, with the steepest execution rates coming in states formerly in the confederacy.

[39] Three federal executions were scheduled to have been carried out on December 9, 11, and 13, the week before this motion is filed.  Two more were to have been carried out in January 2020.  These were stayed because the execution protocol pursuant to which the executions were to have been conducted violated the FDPA which requires the federal government to use the facilities of the state wherein a federal defendant is convicted and sentenced to carry out executions, or, if that state does not have the death penalty, some other state ordered by the judge presiding at the trial.  *See* Petitioner's motion to declare the FDPA unconstitutional for violating

The unavoidable conclusion from these numbers is that, according to the analysis that the Supreme Court found persuasive in *Furman,* the federal death penalty is sought and imposed in an arbitrary and capricious manner.  *Cf. Roper,* 543 U.S. at 567 (execution of juveniles violates the Eighth Amendment, in part because of "the infrequency of its use even where it remains on the books"); *Atkins*, 536 U.S. at 316 (execution of mentally retarded offenders violates the Eighth Amendment, in part because "even in those states that allow the execution of mentally retarded offenders, the practice is uncommon").  *See also Thompson*, 487 U.S. at 822 n. 7 ("[C]ontemporary standards, as reflected by the actions of legislatures and juries, provide an important measure of whether the death penalty is 'cruel and unusual' [in part because] whether an action is 'unusual' depends, in common usage, upon the frequency of its occurrence or the magnitude of its acceptance.").

That the federal death penalty is sought, imposed, and carried out in an arbitrary and capricious manner makes it, by the *Furman* analysis, unconstitutionally "unusual."  Whether the most accurate analogy is being struck by lightning or participating in, and losing, a deadly lottery, the federal death penalty does not operate in a rational, constitutional manner.   On this basis, the Court should strike it down.

> d.   **The absence of a principled basis for distinguishing between cases where the federal death penalty is imposed**

---

the anti-commandeering doctrine (filed simultaneously with this motion).  However, even if all five of those executions had been carried out as scheduled, this would still result in a rate of .2% − 2/1000[th]s.

**from cases where it is not imposed renders the federal
death penalty unconstitutional.**

As set forth above, the Supreme Court has ruled that the Constitution does
not tolerate death sentences that are imposed in a manner that is arbitrary or
capricious.  The Court set forth the same rule in the inverse in *Eddings v.
Oklahoma*, 455 U.S. 104, 112 (1982), where it held "that capital punishment be
imposed fairly, and with reasonable consistency, or not at all."  The Court returned
to that principle in *Kennedy v. Louisiana*, where it warned that, "When the law
punishes by death, it risks its own sudden descent into brutality, transgressing the
constitutional commitment to decency and restraint," and, therefore, "capital
punishment must 'be limited to those offenders who commit "a narrow category of
the most serious crimes" and whose extreme culpability makes them 'the most
deserving of execution.'" *Kennedy,* 554 U.S. at 420.  In practice, the federal death
penalty has failed to meet that Constitutional standard.  It operates in an arbitrary
and irrational manner that was explained in detail in the *Glossip* dissent and in the
Connecticut Supreme Court's decision in *Santiago.*

Close inspection of the operation of the federal death penalty reveals that the
manner in which federal juries (and in three cases, federal judges) have imposed or
declined to impose the federal death penalty or, indeed, which cases the government
allows to plead out to life terms or less and which it takes to trial, is devoid of any
consistency or predictability. The Federal Death Penalty Resource Counsel
Project has collected the verdict sheets reflecting findings in aggravation and
mitigation in the penalty-phases of virtually all completed federal death penalty

prosecutions posted and posted them on its website.[40]  Those 225 verdict sheets

bring into stark relief the hopelessly irremediable problem of arbitrariness and

caprice that marks the administration of the federal death penalty system.  One is

at a loss to discern any rhyme, reason, or predictability as to who is sentenced to

death and who is spared or who is not even made to face a jury on a life-or-death

decision.

> This argument cannot be dismissed or refuted by the reality of the difficulty

that is inherent in comparing cases.  A review of summaries of the cases[41] and the

verdict sheets disposes of that argument, which at most addresses process and not

the substance of the conclusion reached.  What follows is a sampling of the range of

outcomes in federal capital cases:

- *United States v. Joseph Sablan and William Guerrero* (CDCA). Two inmates murdered a federal corrections officer at USP/Atwater in 2008. Both had prior murder convictions and were serving life sentences. One defendant had murdered a prison guard previously while serving a sentence in Guam. In 2015 both death notices were withdrawn and both defendants entered guilty pleas to life sentences.

- *United States v. Anthony Battle* (NDGA). In 1994 a federal inmate serving a life sentence for the murder of his wife on an army base killed a federal corrections officer at USP/Atlanta with a hammer. Tried, convicted, sentenced to death. Remains on death row 21 years later.

- *United States v. Roy C. Green* (CDCA). In 1997 defendant stabbed one federal corrections officer to death and seriously wounded a second. Three

---

[40] The verdict sheets are more than 2500 total pages.  For the sake of convenience, they are not made an exhibit to this motion, but can be viewed here, https://fdprc.capdefnet.org/verdict-forms.

[41] A summary of all authorized federal capital cases, and how each case was disposed of is included as Exihibt J.  Kevin McNally's declaration also references this exhibit.

other officers were also seriously injured. Mr. Green has been declared incompetent and has never stood trial for this crime.

- *United States v. Naeem Williams* (DHI). From December 13, 2004, to July 16, 2005, the defendant, a member of the military, engaged with his wife in numerous acts of abuse and torture of their five year-old special needs child, leading to her death from multiple injuries. On May 23, 2014, despite findings in aggravation that the defendant committed the offense in an especially heinous, cruel, or depraved manner that involved torture or serious physical abuse, that the victim was particularly vulnerable, and that the defendant obstructed justice, the jury was unable to agree on a penalty verdict and the defendant was sentenced to life imprisonment.

- *United States v. John McCluskey* (DNM). In 2010, McCluskey, serving a life sentence in Arizona for attempted murder, escaped and then carjacked a vehicle at gunpoint to get him to New Mexico, where he carjacked a second vehicle at gunpoint and eventually executed the two occupants- a newly retired vacationing couple in their 60s-and burned their bodies. He then travelled to the South where he committed an armed robbery. The aggravating factors in that case included two prior convictions for robbery and numerous instances of in-custody misconduct, including an assault on an investigative officer in the courtroom. Despite overwhelming aggravation, on December 11, 2013, the jury in that case hung 9-3 in favor of death, and McCluskey was sentenced to life imprisonment.

- *United States v. Larry Lujan* (DNM). Lujan was convicted of what the Tenth Circuit described as a "a gruesome [crime] in which Lujan (and his cohorts) severely beat [the victim] over a significant period of time, sexually assaulted [him], and engaged in other acts to terrify and isolate [the victim]." *United States v. Lujan*, 603 F.3d 850, 852 (10th Cir. 2010). In addition, at the penalty phase, the government convinced the jury beyond a reasonable doubt that Lujan had committed two additional murders which the Tenth Circuit described as "equally gruesome." *Id.* at 853. These additional murders included the facts that after Lujan slit the throats of the two victims, he "poured gasoline over the victims' bodies, including the apparently still-breathing Alfredo, and set them on fire. . . .  The victims' eleven-year-old daughter discovered the bodies the next afternoon." *Id.* Based on these murders and other evidence the jury specifically found that Lujan would be a danger in the future. On October 5, 2011, after the jury was unable to reach a unanimous verdict, Larry Lujan received a life sentence.

- *United States v. Dzohkhar Tsarnev* (DMA), bombing of Boston Marathon, murder of a police officer, total of 4 killed, dozens injured. Tried, convicted, sentenced to death.

- *United States v. Timothy McVeigh* (DCO).  The Oklahoma City bombing case. 168 dead. Hundreds injured. Tried, convicted, sentenced to death, executed.

- *United States v. Terry Nichols* (DCO). McVeigh's co-defendant.  Tried, convicted, sentenced to life.

- *United States v. Khalfan Mohamed and Daoud Rashed al`-Owhali*,  (SDNY). Two defendants associated with Usama bin Laden and al Qaeda convicted in simultaneous terrorist truck-bombings in 1998 of two American embassies in East Africa.  224 killed, including 12 Americans; thousands injured. Tried, convicted, sentenced to life.

- *United States v. Eric Rudolph* (NAL). The Olympic and abortion-clinic bomber. Victims included a police officer.  Arrested after five-year manhunt. Described by Attorney General Ashcroft as "America's most notorious fugitive."  Negotiated guilty plea for life sentence.

- *United States v. Zacharias Moussaou*, (EDPA). Defendant convicted of causing thousands of deaths in the September 11, 2001 attacks on the United States. Sentenced to life by jury.

- *United States v. Theodore Kaczynski* (EDPA).  The Unabomber.  Three murders by mailbombs. Plea agreement. Sentenced to life.

- *United States v. Jared Loughner* (DAZ). Mass shooting at public event resulting in 6 deaths including a child and the Chief Judge of the United States District Court for Arizona; 13 others shot and wounded including Congresswoman Gabriel Gifford. Plea agreement. Sentenced to life.

- *United States v. Antonio Johnson* (WVA). Defendant indicted for a murder at USP/Lee where he was serving a virtual life sentence when he stabbed another inmate to death. On March 21, 2012 – after DOJ approval of a life plea – Antonio Johnson entered a guilty plea.

- *United States v. Basciano* (EDNY). Mafia crime boss serving life sentence for RICO murder accused of another Mafia hit murder. On June 1, 2011, after deliberating for less than 2 hours, a unanimous jury rejected the death penalty and sentenced Basciano to life imprisonment.

- *United States v. Duong* (NDGA). Mr. Duong was previously sentenced to death in California state court for 4 murders that occurred in a nightclub in 1999. Federal prosecutors in the Northern District of California indicted Mr. Duong in a 29-count, multi-defendant racketeering indictment, alleging 3

capital homicides (arising out of a string of robberies), and an additional 5 RICO murders. On December 15, 2010, a federal jury sentenced Anh The Duong to life in prison.

- *United States v. Edgar Diaz and Emile Fort* (NDGA). Attorney General approved 40-year plea agreements for both defendants, in a case involving seven gang-related murders, including (in Mr. Fort's case) the murder of an innocent child.

- *United States v. Joseph Minerd* (WDPA). Arson/pipebomb murder of pregnant girlfriend, her fetus and three-year old daughter. Tried, convicted, sentenced to life.

- *United States v. Coleman Johnson* (WVA.). Pipe-bomb used to kill pregnant girlfriend and their unborn child to avoid child support. Tried, convicted, sentenced to life.

- *United States v. Christopher Dean* (DVT). Defendant sends pipebomb through the mails killing victim and disfiguring victim's mother. Plea agreement. Sentenced to life.

- *United States v. Billy Cooper* (DMZ). Car-jacking double homicide. Tried, convicted, sentenced to life.

- *United States v. Christopher Vialva and Brandon Bernard* (WDTX). Car-jacking double homicide. Tried, convicted, sentenced to death.

- *United States v. Gary Sampson* (DMA). Two murders during separate car-jackings. Plead guilty, sentenced to death by jury. Later set aside. Pending re-trial.

- *United States v. David Paul Hammer* (MDPA). Prison inmate guilty of strangling to death cellmate at USP/Allenwood. Sentenced to death. Sentence later vacated. Sentenced to life on re-trial.

- *United States v. Michael O'Driscoll* (MDPA). Prison inmate guilty of stabbing to death fellow inmate at USP/Allenwood. Same judge, same courtroom, same defense attorneys as *Hammer*. Sentenced to life.

- *United States v. Storey* (DKS). Prison inmate with Aryan Brotherhood ties kills fellow prisoner at USP/Leavenworth. Plea agreement. Sentenced to less than life sentence.

- *United States v. Douglas Black and Steven Riddle* (DCO).  Inmates at USP/Florence attack two suspected "snitches," one killed one injured.  Plea agreements. Substantially less than life sentences.

- *United States v. William Sablan and Rudy Sablan* (DCO).  Two cousins housed at USP/Florence kill their cellmate, eviscerate his body, hang his entrails around the cell, and, on videotape, display the victim's heart and liver to responding officers. Defendants tried separately.  Life verdicts in each case.

- *United States v. Barry Mills, et al.* (CDCA). A RICO mega-indictment targeting 40 members of the Aryan Brotherhood prison gang and charging 17 murders.  Initially 27 defendants were death-eligible and 14 defendants were actually authorized for capital prosecutions.  After two lengthy trials, juries spared the first four defendants facing the death penalty – the alleged leaders of the gang – and the government has withdrawn its efforts to seek death as to the remaining authorized capital defendants.

- *United States v. Fu Xin Chen, Jai Wu Chen and You Zhong Peng* (EDNY). Chinese gang members who kidnap, rape and murder victims held for ransom.  Fu Xin Chen and Jai Wu Chen enter plea agreements.  Attorney General withdraws death authorization shortly before Peng trial.   Peng convicted after trial.  All three sentenced to life.

- *United States v. Louis Jones* (NDTX).  Decorated Gulf War veteran with no prior record abducts, rapes and kills young woman soldier.  Tried, convicted, sentenced to death, executed.

- *United States v. Chevy Kehoe and Daniel Lee* (WDAK). Triple murder of two adults and small child in connection with activities of white supremacist organization. Tried and convicted together.  Kehoe – considered more culpable – sentenced to life. Lee sentenced to death by the same jury.

- *United States v. Jacques* (DVT). Defendant with prior convictions for sexual assaults kidnaps, rapes and murders 12-year-old niece. Case authorized for federal capital punishment. Allowed to plead guilty to life sentence.

- *United States v. Gurmeet Singh Dhinsa* (EDNY).  Millionaire Sikh businessman hires killers of two employees cooperating with authorities in criminal investigation of defendant.  Tried, convicted, sentenced to life.

- *United States v. Trinity Ingle and Jeffrey Paul* (WDAR).  Murder of elderly retired National Parks employee.  Victim shot while bound and gagged.  At

64

separate trials, Ingle is convicted and sentenced to life; Paul is convicted and sentenced to death.

- *United States v. Kristen Gilbert* (DMA).  VA nurse murders four patients and attempts to murder three more.  Tried, convicted, sentenced to life.

- *United States v. LaFawn Bobbitt and Rashi Jones* (EDPA).  Fatal shooting of bank teller during robbery.  Security guard also shot and blinded.  Tried, convicted, sentenced to life.

- *United States v. Bille Allen and Norris Holder* (WDMO).  Fatal shooting of bank teller during robbery.  Tried, convicted, and both defendants sentenced to death.

Where a killing occurs in the context of drug-dealing, the disparities are even more striking.

- *United States v. Alexis Candelario* (DPR). Defendant with 13 prior murder convictions released from prison engineers and participates in massacre at rival drugdealer's drinking establishment where eight people and unborn fetus are killed, 20 wounded. Tried, convicted, sentenced to life.

- *United States v. Azibo Aquart* (DCT). Three drug-related murders. Tried, convicted, sentenced to death.

- *United States v. Azikiwi Aquart* (DCT). Same three drug-related murders committed with his brother Azibo. Pled guilty to all three murders with no cooperation agreement, sentenced to life.

- *United States v. Corey Johnson, James Roane, and Richard Tipton* (EDPA). Eleven drug-related murders.  Tried, convicted, sentenced to death.

- *United States v. Dean Anthony Beckford* (EDPA).  Six drug-related murders. Tried, convicted, sentenced to life.

- *United States v. Clarence Heatley and John Cuff* (SDNY).  Fourteen drug-related murders.  Plea agreement.  Sentenced to life.

- *United States v. Alan Quinones and Diego Rodriguez* (SDNY).  Torture murder of suspected informant. Tried, convicted, sentenced to life.

- *United States v. Elijah Williams and Michael Williams* (SDNY).  Execution-style triple murder by father and son.  Tried, convicted, sentenced to life.

65

- *United States v. Thomas Pitera* (EDNY). Nine drug-related murders in organized crime and large-scale drug trafficking context.  Victims tortured and bodies dismembered.  Tried, convicted, sentenced to life.

- *United States v. German Sinisterra and Arboleda Ortiz* (WDMO).  One drug-related murder and one attempted murder. Tried, convicted, sentenced to death.

- *United States v. John Bass* (EDMI). Four drug-related murders.  Tried, convicted, sentenced to life.

- *United States v. Kevin Grey and Rodney Moore* (DDC).  Thirty-one drug-related murders.  Tried, convicted, sentenced to life.

- *United States v. Daryl Johnson* (NDIL).  Allegedly directed two murders as a leader in a drug-dealing gang-one victim was a confidential government witness against Johnson-and was alleged to have directed four more.  Tried, convicted, sentenced to death. Death sentence overturned. While retrial was pending, death notice withdrawn.

- *United States v. Peter Rollock* (SDNY). Eight drug-related murders, including some ordered by defendant while incarcerated.  Plea agreement. Sentenced to life.

- *United States v. Tommy Edelin* (DDC).  Fourteen drug-related murders. Tried, convicted, sentenced to life.

- *United States v. Reynaldo Villarreal and Baldemar Villarreal* (EDTX). Drug-related murder of law enforcement officer.  Tried, convicted, sentenced to life.

- *United States v. Shahem Johnson and Raheem Johnson* (EDPA). Brothers tried for **five** drug-related murders.  Tried, convicted, sentenced to **life**.

- *United States v. Juan Raul Garza* (SDTX).  **Three** drug-related murders. Tried, convicted, sentenced to death, **executed**.

- *United States v. Claude Dennis* (EDPA). **Six** drug-related murders.  Tried, convicted, sentenced to **life**.

- *United States v. Emile Dixon* (EDNY). **Two** drug-related murders, including machine-gunning death of suspected informant.  Tried, convicted, sentenced to **life**.

66

- *United States v. Anthony Jones* (D MD). **Six** drug-related murders.  Tried, convicted, sentenced to **life**.

- *United States v. Walter Diaz and Tyrone Walker* (NDNY). Two defendants kill a drug-dealer and flee to New York City where, in a failed effort to steal a car, they shoot and kill a woman in lower Manhattan. Later in same day the defendants fired at, but missed, a retired school teacher in Coney Island in a failed armed robbery. Defendant Walker was also found by the jury to have beaten to death an elderly man during a burglary when Walker was 19 years-old. Both defendants tried, convicted, sentenced to life.

These are only selected cases from the entire pool of potential and authorized

federal capital cases. The argument that the outcomes of the cases are arbitrary

based on their inexplicable variation is only reinforced by the cumulative effect of

reviewing the summaries of authorized cases compiled by the Federal Death

Penalty Resource Counsel Project and the verdict sheets on the Project website.

After reviewing this data, presented through Mr. McNally's testimony, the court in

*Fell* concluded that

> there are no identifiable, objective criteria which distinguish one
> multiple homicide which resulted in the death penalty from the great
> majority which did not. . . .The more carefully one reviews the chart
> and the underlying case summaries, the more arbitrary the
> distinctions become. . . .  [T] decision to impose death is subjective,
> multi-factorial, unreproducible, and for these reasons, irremediably
> arbitrary."

*Fell,* 224 F.Supp.3d at 341.

Where all of these cases were authorized by the Attorney General of the

United States for capital prosecution, each should be (or should have been) by

definition the "worst of the worst" in the federal system.  That would mean that for

every crime on the list a prosecutor ought to be able to argue convincingly in

summation, "If this case doesn't call for the death penalty, what case does?"  And yet, in case after case – indeed, in the overwhelming *majority* of such cases – juries (and in three instances judges) returned life verdicts.  Even more so, the government accepted plea agreements and life sentences.

It is true that a person one cannot read these accounts of the myriad ways in which men and women have delivered mortal harm to one another without concluding that *all* of the cases are, on the facts, horrible and left the victims and survivors with grievous pain.  Yet, the individuals have participated in federal juries have found only a minority of the cases that reached a sentencing hearing worthy of a death sentence; the majority of juries were not unanimously persuaded so.  Though the reasons why some were selected to die and others were not cannot be assuredly ascertained, as the following discussion illustrates, race, region, and gender were critical drivers in the outcomes.

Such factors can only be discerned in after-the-fact comparative analysis.  But where the system does not provide for that, the system does not recognize the effect of those factors and so is unable to respond to their pernicious effect.  Many Courts of Appeal reviewing federal death sentences have held fast to the Supreme Court's decision in *Pulley v. Harris*, 465 U.S. 37 (1984), and ruled that proportionality review is not a constitutionally necessary component of the Federal Death Penalty Act.  *See, e.g., United States v. Mitchell*, 502 F.3d 931, 981 (9th Cir. 2007); *United States v. Higgs*, 353 F.3d 281, 320–21 (4th Cir.2003); *United States v. Jones*, 132 F.3d 232, 240-241 (5th Cir. 1998).  *But see Miller v. Alabama*, 132 S. Ct.

2455, 2463 (2012) ("The concept of proportionality is central to the Eighth Amendment" and must be viewed "less through a historical prism than according to 'the evolving standards of decency that mark the progress of a maturing society.'"). They have not heeded Justice Stevens observation in his dissent from denial of *certiorari* in *Walker v. Georgia*, 129 S.Ct. 453 (2008), that the state had sharply curtailed the scope of its statutory proportionality review of death sentences, and "[t]he likely result of such truncated review . . . is the arbitrary or discriminatory imposition of death sentences in contravention of the Eighth Amendment." *Id.* at 457.

   As Justices Breyer and Ginsburg pointed out in *Glossip*, "since this Court held that comparative proportionality review is not constitutionally required . . ., it seems unlikely that appeals can prevent the arbitrariness I have described."  If such proportionality review is not required, then what federal capital defendants in particular, are left with are the conflicting procedural mechanisms that *Gregg* approved of 43 years ago that clearly have failed to cure the problem of arbitrariness.  A capital defense attorney in a state with a long history of the death penalty observed that

> Almost forty years have passed since *Furman*, and nobody seriously argues that the Court's decision to regulate procedure has solved the constitutional problem of arbitrariness.  In fact, evidence indicates that the application of the death penalty is just as arbitrary today as it was when the Court decided *Furman*.  If *Furman* inspired positive changes in its immediate wake, those changes have been all but eviscerated in the past two decades.

B. Sarma, *Furman's Resurrection: Proportionality Review and the Supreme Court's Second Chance to Fulfill Furman's Promise*, 2009 Cardozo L.REV. DE NOVO 238 (2009, at 242.

For all of these reasons, this Court should, with language modified only as needed to address the federal system, reach the same conclusion that the Connecticut Supreme Court did in *Santiago*:

> After thoroughly reviewing the operation of [the federal] capital sentencing scheme over the past [twenty-five years], we are persuaded that these critiques are well founded and that the opportunity for the exercise of unfettered discretion at key decision points in the process has meant that the ultimate punishment has not been reserved for the worst of the worst offenders. There is no doubt that our death row has counted among its residents the perpetrators of some of the most heinous crimes in [national] history. It is equally clear, however, that the process of selecting offenders for execution has been both under inclusive and over inclusive. Many who commit truly horrific crimes are spared, whereas certain defendants whose crimes are, by all objective measures, less brutal are condemned to death . . . . To the extent that the population of death row has been chosen on grounds other than the atrocity of the offenders' crimes, this would undermine all confidence that capital punishment, as applied, is morally proportionate and serves a legitimate retributive function in [the federal system].

*Santiago*, 318 Conn. at 114-15.

     e.    **The Federal Death Penalty is unevenly applied on a regional basis and suffers from intractable problems of racial discrimination in the targeting of minority and male defendants and a demonstrated race/gender-of-victim effect.**

     1.    **Introduction**

Since the federal government returned to a national effort to impose and carry out death sentences, its attempt has been marked by patterns of uneven and

apparently discriminatory application.  The federal death penalty has been utilized almost exclusively by United States Attorneys' offices in the South from the very beginning.  Hence, as should be expected, the overwhelming majority of federal death verdicts that have been returned have been in those traditional "death-belt" jurisdictions.  This arbitrary regional utilization of capital prosecutions was compounded by the invidious factor of race as the federal death penalty was deployed to target minority groups disproportionately, particularly African-Americans and Hispanics.

By 1994 – less than a decade after the "modern" resurrection of the federal death penalty – plain and undeniable racial disparities were apparent in the Justice Department's prosecution of federal capital cases.  In response, the House Subcommittee on Civil and Constitutional Rights initiated an investigation, which concluded that "[r]ace continues to plague the application of the death penalty in the United States.  On the state level, racial disparities are most obvious in the predominant selection of cases involving white victims.  **On the federal level, cases selected have almost exclusively involved minority defendants.**" *Racial Disparities in Federal Death Penalty Prosecutions 1988-1994*, Staff Report by the Subcommittee on Civil and Constitutional Rights, Committee on the Judiciary, 103rd Congress, 2nd Session, March 1994 (emphasis added).[42]  That report found that as of 1994, after six years of the federal death penalty having been reinstituted, 33 of the 37 defendants – 87% – authorized for capital punishment under the 21 U.S.C.

[42]Available at https://www.ncjrs.gov/pdffiles1/153840.pdf (last visited Dec. 14, 2018).

§ 848(e) (Anti-Drug Abuse Act, or ADAA) scheme were Black or Hispanic.  *Id.*  As of October of this year, with the Attorney General having authorized the government to seek the death penalty 530 against defendants, 68% have been Black or Hispanic (50% and 18%, respectively), 27% have been white, and 5% have been Asian/Indian/Pacific Islander/Native American/Filipino/Middle Eastern.  Thus 73%, of the defendants approved for a capital prosecution by the Attorney Generals to date are people of color.

The United States government has repeatedly been made aware of this glaring disparity.  At the time Congress enacted the § 848(e), the agency formerly known as the General Accounting Office (now the Government Accountability Office or GAO) was directed to undertake a study of the potential influence of race on the death penalty. 21 U.S.C. § 848(o)(2) (Repealed).  The GAO undertook such a study in 1990 and reported,

> Our synthesis of the 28 studies shows a pattern of evidence indicating racial disparities in the charging, sentencing and imposition of the death penalty after the *Furman* decision.
>
> In 82 percent of the studies, race-of-victim was found to influence the likelihood of being charged with capital murder or receiving the death penalty, i.e. those who murdered whites were found to be more likely to be sentenced to death than those who murdered blacks.  This finding was remarkably consistent across data sets, states, data collection methods and analytic techniques.  The finding held for high, medium, and low quality studies.

72

United States General Accounting Office, Report to Senate and House Committee On The Judiciary, *Death Penalty Sentencing: Research Indicates Pattern of Racial Disparities* (Feb. 1990) at 5.[43]

Nine years later, and five years after the report by the Subcommittee on Civil and Constitutional Rights, Professor Rory Little, who served on Attorney General Reno's Capital Case Review Committee, noted in a law review article that serious questions about regional and racial disparities had not been ameliorated by the administrative process within the Justice Department. Rory K. Little, *The Federal Death Penalty: History and Some Thoughts About the Department of Justice's Role*, 26 FORDHAM URB. L.J. 347, 450-90 (1999). *See also*, Rory K. Little, *What Federal Prosecutors Really Think: The Puzzle of Statistical Race Disparity Versus Specific Guilt, and the Specter of Timothy McVeigh*, 53 DEPAUL L. Rev. 1591, 1613-14 (2004) ("Statistical race disparity does not prove purposeful racial discrimination in federal capital prosecutions. Nevertheless, it is a persistent and disturbing fact. Lingering doubts remain that it occurs due to subconscious or attenuated systemic biases impossible to isolate or detect, but which are harmful nevertheless.").

The record is clear that the government has been on notice from the very beginning of the modern federal death penalty that the disparate patterns of its application indicate severe and likely intractable problems.

---

[43] Available at https://www.gao.gov/assets/220/212180.pdf (last visited Dec. 14, 2019).

2.    **Twelve years after the reinstitution of the federal death penalty, a DOJ study found intolerable racial and regional disparities in its authorization and imposition.**

In the final six months of his presidency, Bill Clinton (who had made a special trip to Arkansas during his presidential campaign to oversee the execution of an intellectually disabled person[44]) was asked at a press conference about a Texas execution that received extensive press coverage.  The reporter asked the then-President whether he believed it was time "for the American people to stop and reassess where we stand on implementation of the death penalty."  He responded,

> The issues at the federal level relate more to the disturbing racial composition of those who have been convicted and the apparent fact that almost all the convictions are coming out of just a handful of states, which raises the question of whether, even though there is a uniform law across the country, what your prosecution may turn solely on where you committed the crime.

(Transcript of the President Clinton's 6/28/2000 press conference, *available at* http://www.presidency.ucsb.edu/ws/index.php?pid=1666 (Last visited Dec. 14, 2019).

President Clinton also noted that there was a review underway of both those issues.

On September 12, 2000, the Department of Justice released that comprehensive study.  It laid out in detail how the federal death penalty had been

---

[44]  *See* "The Time that Bill Clinton and I Killed a Man," *The Atlantic*, May 28, 2015, available at https://www.theatlantic.com/politics/archive/2015/05/the-time-bill-clinton-and-i-killed-a-man/460869/ (last visited Dec. 14, 2019); "Death for the mentally disabled," *The Economist*, Mar. 28, 2014, available at https://www.economist.com/united-states/2014/03/08/death-for-the-mentally-disabled (last visited Dec. 14, 2019).

administered for the 12 years from its reinstitution up to that year.[45]  The essence

of the 2000 study's findings was that the federal death penalty had been

disproportionately sought against minority-group defendants and irrationally

sought on a regional basis.  The study reported that federal death row housed 13

Black men, four White men, one Hispanic man, and one "other."  Reflecting the

nation's application of the death penalty the United States had obtained 12 of the

19 death sentences in the South.  Four sentences were imposed in Virginia and and

four were imposed in Texas.  When the study was issued, no more than a single

death sentence had been obtained in any other jurisdiction.[46]

   The report looked behind the sentence results at which defendants actually

faced the federal death penalty.  It found that 71 (44.7%) of the 159 cases that had

been authorized for capital prosecution by the Attorney General were Black

defendants, 44 (27.7%) were white, 32 (20.1%) were Hispanic, and another 12 were

identified as "other" (7.5%).  *See* DOJ Study, Table 1A.  Thus, as of the summer of

---

[45] *See* United States Department of Justice, "The Federal Death Penalty System: A
Statistical Survey (1988-2000)," ("DOJ Study") *available at*
https://www.justice.gov/sites/default/files/dag/legacy/2000/09/13/_dp_survey_final.pd
f (last visited Dec. 14, 2018).  The Department filed a supplemental report on June
6, 2001 after the change in administration. See, "The Federal Death Penalty
System: Supplementary Data, Analysis and Revised Protocols for Capital Case
Review (June 2001)," *available at*
https://www.justice.gov/archive/dag/pubdoc/deathpenaltystudy.htm (last visited
Dec. 14, 2019). Additionally, on June 7, 2007, DOJ transmitted statistics and more
recent findings on the administration of the federal death penalty to Senator
Feingold in the course of oversight hearings,
http://www.deathpenaltyinfo.org/DOJResponses6-07.pdf.

[46] In the almost two intervening decades, there has been no substantial change in
the regional percentages of federal death sentences imposed.

2000, more than 70% – almost 3/4ths – of the defendants targeted for the federal death penalty were people of color.

In addition to the racial disparity in federal death-penalty prosecutions, the study also found a regional disparity in the enforcement of the federal death penalty. The DOJ Study revealed the following disproportions:

- From 1995 onward, of the 94 separate federal districts in the federal system, only 49 had ever submitted a case recommending capital prosecution. (DOJ Study at 14.)[47]

- Twenty-two federal districts had never submitted a case for review at all.[48] (DOJ Study at T-59.)

- Twenty-one federal districts, although submitting one or more cases for review, had never sought permission to seek the death penalty in any case.[49]

---

[47] As of December 2019, 22 of the 94 federal districts had never had an authorized capital case. Ex. H at 7. This includes entire districts in California, Alabama, Minnesota, the Eastern and Western Districts of Washington, Nebraska, Oklahoma, and the Eastern and Western Districts of Wisconsin, South Dakota, Utah, Wyoming and Montana.

[48] The potential universe of federal capital prosecutions is vast. Virtually any murder committed in the course of a federal firearms violation is a potential federal death penalty case. 18 U.S.C. § 924(j). In *United States v. Chanthadara,* 230 F.3d 1237 (10th Cir. 2000), where the government proceeded on a Hobbs Act theory of federal prosecution, the defendant was sentenced to death for a murder committed in the course of the robbery of a restaurant, an unfortunately garden variety type of criminal behavior. That sentence of death was vacated on appeal on other grounds (and the defendant later sentenced to life imprisonment), but the potential number of cases that could be prosecuted on this theory is staggering. Any murder committed while engaged in a narcotics conspiracy involving more than 50 grams of crack cocaine or 5 kilograms of heroin remains a potential federal capital case. 21 U.S.C. § 848(e).

[49] The importance of the recommendation that accompanies a submission cannot be understated. The Attorney General followed the recommendation of the local United States Attorney in 91% of cases where the local office did not want to prosecute the case as a death penalty case. DOJ Study at 43. Conversely, the Attorney General followed the local United States attorney's office recommendation in 83% of cases where death-penalty authorization was requested. *Id.* These

*Id.*

Following up to the question put to President Clinton leading up to the release of the report, the White House, through the Justice Department, reported that then-Attorney General Janet Reno was "'sorely troubled' by stark racial disparities in the federal death penalty and ordered United States attorneys to help explain why capital punishment is not applied uniformly across ethnic groups." M. Lacey and R. Bonner, "Reno Troubled by Death Penalty Statistics," *N.Y. Times*, September 13, 2000. The Attorney General reportedly wanted "a broader analysis."[50] Then-Deputy Attorney General Eric Holder, the highest-ranking African-American at the Justice Department at the time, said,

> "I can't help but be personally and professionally disturbed by the numbers that we discuss today. [] To be sure, many factors contributed to the disproportionate representation of racial and ethnic minorities throughout the federal death penalty process. Nevertheless, no one reading this report can help but be disturbed, troubled, by this disparity."

*Id.* [51] The White House deputy press secretary responded to the report by saying,

"'At first glance, those numbers are troubling. We need to know what's behind the

---

figures are based on the 575 defendants whose cases were reviewed by the Attorney General from 1995-2000. In the "pre-protocol" period – November 1988 through January 27, 1995 – the only cases reviewed were those where the local United States Attorney affirmatively had requested capital-authorization. The approval rate for those cases was 90%. DOJ Study at 10.

[50] In *United States v. Bass,* 266 F.3d 532 (6th Cir. 2001), *reversed*, 532 U.S. 1035 (2002) (per curium), the Sixth Circuit quoted at length from the public statements of Attorney General Reno and Deputy Attorney General Holder in response to the release of the DOJ Study. *Bass*, 266 F.3d at 538.

[51] As indicated in the *Politics and Prosecution* article, "during his confirmation hearing, Holder said that the Department of Justice's 2000 report on the death

numbers.'"[52]  The next year, after a change in administrations, Attorney General nominee John Ashcroft commented that evidence of racial disparity in the federal death penalty "troubled [him] deeply." *See United States v. Bass,* 266 F.3d at 538 n.1.

Professor Little, who served on the Department of Justice Capital Case Review Committee, wrote in 2004 that "[s]tatistical race disparity. . . is a **persistent** and disturbing fact." Little, *What Federal Prosecutors Really Think*, *supra* at 1613-14 (emphasis added).  He suggested two specific reforms to address the problem. First, "we should restrict capital punishment to 'high-end' cases with defined, extremely aggravating, factors. This could be done statutorily or as a matter of prosecutorial policy. But it would necessitate removing certain vague or too easily manipulated statutory 'aggravating' factors that are commonly used today, such as 'heinous or atrocious,' 'committed for pecuniary gain,' or 'committed in conjunction with another felony.'" *Id.* at 1611.  The verdict forms on the Federal Death Penalty Resource Counsel Project ("FDPRC") website clearly demonstrates that this suggested reform never gained traction at the DOJ.

---

penalty 'raised some very disturbing questions about not only the racial identity of people who were in the death system—in the federal death system, but also the geographic distribution of those people.'" *Politics and Prosecution* at 96 (quoting Confirmation Hearing on the Nomination of Eric H. Holder to be Attorney General of the United States: Hearing Before the S. Comm. on the Judiciary, 111th Cong. 67 (2009)).

[52]  Considering the impact of the study, Judge Sand in *United States v. bin Laden*, 126 F. Supp.2d 256, 258 (S.D.N.Y. 2000) found the statistical evidence "indeed troubling," but ultimately rejected a challenge to that capital prosecution.

Second, noting emerging "anecdotal information [that] suggests that the current administration under Attorney General John Ashcroft may be lowering the standard of aggravation for approval of federal capital prosecutions," Professor Little recommended that "strict enforcement of the 'substantial federal interest' requirement for federal capital prosecutions" and that Ashcroft's amendment to the protocols that allowed the availability of the death penalty itself to fulfill the federal interest requirement be abolished. "Most murder cases," Professor Little wrote, "should remain at the state level, and the simple fact that a state has chosen not to enact a death penalty should not be sufficient without a more identifiable 'federal' interest to drive a case into the federal system." [53] *Id.* at 1606 n. 17, 1613. *Accord* John Gleeson, *Supervising Federal Capital Punishment: Why the Attorney General Should Defer When U.S. Attorneys Recommend Against the Death Penalty*, 89 Va. L.Rev. 1697, 1716 (2003) ("In a federal system that rightly accords great deference to states' prerogatives, the federalization of the death penalty should be limited to cases in which there is a heightened and demonstrable federal interest, one that justifies the imposition of a capital prosecution on communities that refuse to permit them in their own courts.").

---

[53] As pointed out by Little, under Attorney General Janet Reno, the DOJ Capital Case Protocols provided that "the fact that the maximum Federal penalty is death is insufficient, standing alone, to show a more substantial interest [than a state's] in federal prosecution." *Id.* at 1613 n. 95. This provision was repealed in 2001 under Attorney General Ashcroft. The current DOJ Death Penalty Protocol does not contain the abolished provision.

The government's prosecution of Mr. Bowers embodies the appropriateness of these recommendations. Mr. Bowers is susceptible to capital prosecution in the Pennsylvania courts. Moreover, as manifested in the public statements of victim congregations in this case, there are strong local and community interest that are appropriately addressed by the state courts. [54]

The government has been on notice of the problems that plague its administration of the federal death penalty **and mechanisms to address those problems** through its enactment. Yet inexplicably, it has not taken the measures that it could, while other problems seem to be intractable. Without any reforms, much less efforts at reform, federal officials have effectively chosen to abide their "troubled" and "disturbed" state over these arbitrary and invidious practices. The effect is that a "non-existent problem" has gotten worse. *See* Kevin McNally, *Race and the Federal Death Penalty: A Nonexistent Problem Gets Worse*, 53 DEPAUL L. REV. 1615 (2004).

> 3. **The regional disparity in pursuit and imposition of federal death sentences is a persistent invidious condition that traces to the confederacy.**

The "modern" federal death penalty has come into shape largely in the southern-dominated tradition of the death penalty in the United States. Two-thirds of federal death verdicts have come out of the traditional "death belt" states.

---

[54] The thin federal jurisdictional premise of the capital counts in this case is that Mr. Bowers obstructed by force the congregants at the Tree of Life synagogue in the enjoyment of the free exercise of their religious beliefs." ECF 44 at 3, 5. This is patently a distinctly local homicide case, subject to Pennsylvania's own capital homicide statutes.

Additionally, these states sentence federal defendants to death at a significantly higher rate – proportion of cases brought where a death sentence is imposed – than elsewhere in the country.

TABLE II: 1988-2015
STATES WITH MORE THAN ONE FEDERAL DEATH VERDICT

| State | Authorized Cases | Defendants Tried | Death Sentences | Rate |
|---|---|---|---|---|
| Texas | 36 | 23 | 16 | 70 % |
| Missouri | 40 | 22 | 10 | 45% |
| Virginia | 57 | 42 | 8 | 19% |
| Louisiana | 14 | 5 | 4 | 80% |
| North Carolina | 10 | 4 | 3 | 75% |
| Georgia | 9 | 6 | 3 | 50% |
| Oklahoma | 6 | 6 | 3 | 50% |
| Maryland | 26 | 12 | 2 | 17% |
| Pennsylvania | 24 | 13 | 2 | 15% |
| Arkansas | 7 | 5 | 2 | 40% |
| California | 44 | 12 | 2 | 17% |
| Florida | 16 | 10 | 2 | 20% |
| Illinois | 14 | 6 | 2 | 30% |
| Iowa | 4 | 2 | 2 | 100% |

| | | | |
|---|---|---|---|
| Massachusetts | 5 | 3 | 2 | 66% |
| New York | 48 | 24 | 1 | 4% |
| South Carolina | 5 | 5 | 4 | 80% |
| West Virginia | 10 | 2 | 2 | 66% |

Source:  Ex H at 42-44

In its decision in the *Santiago* case the Connecticut Supreme Court, noting the regional caprice of the death-penalty on a nation-wide basis, examined the death-penalty sentencing rates of the 13 states that made up the Confederacy. That court concluded that those states were responsible for 75% of the executions carried out in the United States since 1976.  *Santiago*, 318 Conn. at 81.[55] In terms of federal death verdicts and the confederacy (the number of federal executions – three –  are not enough to reach a meaningful conclusion, nonetheless two out of the three were cases from Texas) shows that 38 of 81 federal death verdicts have come out of the states that formed the confederacy, more than 62% of all federal capital verdicts. Just two of those former confederate states – Texas and Virginia – account for 20 federal death verdicts, 30% of the total.

When one examines the numbers on a circuit basis, as outlined in the McNally Declaration, Ex. H, the results reflect the same regional bias. Stated plainly, if we have a national death penalty it should not matter where you are

---

[55] The states of the Confederacy were: Alabama, Arkansas, Florida, Georgia, Kentucky, Louisiana, Mississippi, North Carolina, South Carolina, Tennessee, Texas, and Virginia.

tried in terms of the likelihood of receiving a death sentence but that very much is

the reality.

TABLE III: 1988-2015
DEATH SENTENCING RATES BY CIRCUIT

| CIRCUIT | DEFENDANTS TRIED | SENTENCED TO DEATH | PER CENT |
|---|---|---|---|
| First | 12 | 2 | 17% |
| Second | 31 | 0[56] | 10% |
| Third | 17 | 2[57] | 12% |
| Fourth | 70 | 16 | 20% |
| Fifth | 29 | 15 | 66% |
| Sixth | 19 | 3 | 16% |
| Seventh | 9 | 3 | 33% |
| Eighth | 31 | 15 | 48% |
| Ninth | 22 | 4 | 18% |
| Tenth | 18 | 5 | 28% |

[56] Two death verdicts have been delivered in the Second Circuit, but both were overturned.  *See United States v. Wilson*, No. 1:04-cr-01016-NGG-1 (E.D.N.Y), D.E. 1536 (vacating death sentences and sentencing to life without parole); *United States v. Aquart,* No. 3:06-cr-00160-SRU (D.CT.), D.E. 1268 (mandate of 2d Cir. Vacating death sentence).

[57] Neither death sentence in the Third Circuit is final.  One was overturned in §2255 proceedings and the defendant was resentenced to life without parole.  *See United States v. Hammer*, No. 4:96-cr-00239-JHS (M.D.P.A), D.E. 1782.  The other is pending on direct appeal in the Third Circuit.  *See United States v. Savage*, No. 14-9003 (3d Cir.), Order (Aug. 8, 2019) (setting oral argument for Jan. 7, 2020).

| Eleventh | 20 | 6 | 30% |
|---|---|---|---|
| DC | 4 | 0 | 0% |

Source: Ex. H at 8-13.

Historically, the death penalty has been a largely Southern phenomenon. That remains the case today. As of December 12, 2019, 1,419 executions have been carried out in the United States in the post-*Gregg* era. Death Penalty Information Center "Facts About The Death Penalty," *available at* https://files.deathpenaltyinfo.org/documents/pdf/FactSheet.f1576162137.pdf (last visited Dec. 14, 2018) Of these, 1,237 – 87% – have been carried out by southern states. *Id.* Texas, Oklahoma, and Virginia by themselves account for 792 executions. *Id..* [58]

It flows logically from that understanding of the historical and regional predominance in the modern era of capital punishment in the United States that federal jurisdictions in states with an established culture of state killing reflect that culture, consciously or not, in in their capital prosecutions. Similarly, it flows logically that federal juries accustomed to seeing death sentences routinely returned in their own communities would do the same.

---

[58] A recent study conducted by the DPIC concluded that "[t]he South has carried out 82% of the executions, the Northeast, less than 1%", and that more than half of this nation's *post-Furman* executions came as a result of cases prosecuted in two per cent of the nation's counties. *See* "The 2% Death Penalty: How a Minority of Counties Produce Most Death Cases at Enormous costs to All" (Death Penalty Information Center 2013); Ex. G.

Regional bias, however, is antithetical to a penalty that is intended (and expected) to be sought and imposed using consistent national standards. The Attorney General's Capital Case Protocol, published as part of the United States Attorneys Manual, promotes national consistency as a goal in deciding whether to authorize a capital prosecution in a given case. [59] *See, e.g.,* § 9-10.030 - Purposes of the Capital Case Review Process ("Each such decision must be based upon the facts and law applicable to the case and be set within a framework of consistent and even-handed national application of Federal capital sentencing laws."); § 9-10.140 - Standards for Determination ("The standards governing the determination to be reached in cases under this Chapter include fairness, national consistency, adherence to statutory requirements, and law-enforcement objectives.").

The below table, prepared by the 2255 Project illustrates that the DOJ has utterly and indisputably failed to achieve its own stated standards.

---

[59] Available at http://www.justice.gov/usam/usam-9-10000-capital-crimes (last visited Dec. 14, 2019).

STATES WHERE FEDERAL DEATH VERDICTS HAVE BEEN RETURNED[60]



Federal Capital Habeas Project (as of October 2019)

---

[60] *Available at* https://2255.capdefnet.org/General-Statistics/Federal-Death-Row-Population-State-Circuit (last visited Dec. 14, 2019).

In spite of written standards of national consistency, the federal death penalty plainly remains a Southern phenomenon.  No state outside the south has returned more than two federal death sentences.  Southern federal districts align with their state counterparts and dominate seeking and receiving authorization to prosecute cases capitally and convincing juries to return death verdicts.  Thus, "[o]f the 86 federal death sentences imposed by juries since 1988, 56 [65 %] have come from the traditional 'death belt' states, the states that have historically executed the most people." Ex. H at 7

After having received testimony and evidence in the hearing in *Fell*, the court found that "The imposition of the death penalty depends greatly upon geography. . . . [T]he death penalty continues to be imposed in an arbitrary manner.  The state in which a crime occurs is the strongest predictor of whether a death sentence will result.  Whether the murder victim is white is also a significant predictor.  These findings are true of cases brought under the FDPA as they are for state death sentences." *Fell*, 224 F.Supp.3d at 345.

In 2010, the Washington Law Review published a study of this issue.  The authors examined the DOJ policy and the irreconcilable outcome.

> Geographic disparities . . . persist. To promote uniformity, United States Attorneys submit all death-eligible federal cases to the United States Attorney General for death-authorization.  Yet the geography of the federal death penalty is anything but uniform.   Six of the ninety-four federal judicial districts account for one-third of death-authorizations.  More than half of all death-authorizations come from fourteen federal districts.  Seven federal districts are responsible for approximately 40% of the individuals on federal death row.  Two-thirds of districts have not sentenced anyone to death.  Nearly one-third of

federal districts have not sought a death sentence.  Fewer than 20% of federal districts have sentenced more than one person to death.

G. Ben Cohen. & Robert J. Smith, *The Racial Geography of the Federal Death Penalty,* 85 WASHINGTON LAW REV. 425, 429-430 (2010).  As of 2015 23% of the 94 federal districts have *never* had an authorized federal capital case.  Ex. H at 7.

The truth cannot be denied:  there has been no significant change in the federal death penalty since the 2000 DOJ Study; it remains a distinctly and overwhelmingly disproportionately Southern phenomenon.  Judging by the numbers, as the court did in *Furman*, the inapposite notion of geographical location appears to be as determinative in who receives federal death sentence as the crime committed. This is the essence of arbitrariness and caprice. As then-President Clinton remarked, "[W]hat your prosecution is may turn solely on where you committed the crime."[61]  *See also Glossip*, 135 S. Ct. at 2761 (Breyer and Ginsburg, JJ., dissenting)(" Geography also plays an important role in determining who is sentenced to death."); *Santiago*, 318 Conn. at 85 ("In the case of capital punishment, the regional disparities are both instructive in their character and striking in their magnitude.").

---

[61] It also appears that trying to "fix" one part of the geography problem may give rise to others.  *See* B. Weiser and W. Glaberson, *Ashcroft Pushed Executions in More Cases in New York, N.Y. Times,* 2/6/03 (Reporting on efforts by the Attorney General to require federal prosecutors in New York and Connecticut to seek death more often;);  B. Weiser and W. Glaberson, *Decisions on Death Cases Raise Questions of Race, N.Y. Times,* 2/14/03 (Pointing out that the 12 defendants as to whom Attorney General Ashcroft overruled a New York area federal prosecutor's decision not to seek the death penalty were all black or Hispanic).

To administer the death penalty based on an arbitrary ground is unconstitutional under both the Eighth Amendment and the due process and equal protection guarantees of the Fifth Amendment. *See Bush v. Gore*, 531 U.S. 98, 106 (2000) (equal protection and due process violations found where "the standards for accepting or rejecting contested ballots might vary not only from county to county but indeed within a single county from one recount team to another. This is not a process with sufficient guarantees of equal treatment."); *see also United States v. Bin Laden*, 126 F. Supp. 2d 256, 263 (S.D.N.Y. 2000) (Eighth Amendment would be violated if the federal government had decided to seek the death penalty on the basis of geographic considerations). *See also United States v. Buckendahl*, 251 F.3d 753, 764-65 (8th Cir. 2001) ("Regrettably, there is as much regional disparity in sentencing now as there was prior to the creation and enactment of the Sentencing Commission and Guidelines. The origin of that disparity, however, has shifted from the judiciary to politically appointed prosecutors."). *Accord, United States v. Jacques*, 2011 WL 3881033 * 4 (D. Vt. Sept. 2, 2011); *United States v. Johnson*, 900 F.Supp.2d 949, 962-963 (N.D. Iowa 2012).

The Eighth Amendment and Fourteenth Amendment's due process and equal protection clauses prohibit allowing or disallowing the death penalty based solely on the arbitrary factor of geography, or on the equally arbitrary and related geographic factor that a particular state does not endorse the death penalty. *See Politics and Prosecution* at 57, 87 (the lead author, a former United States Attorney who "participated in committee meetings advising the U.S. Attorney on the disposition

89

of capital cases" admits that beginning with Attorney General Ashcroft's administration and his modification of the death penalty Protocol, non-death penalty states such as Vermont were "seemingly targeted by the Department of Justice.")[62]

> 4.   **The continuing and unabated practice of targeting males and minorities for the federal death penalty, the long-documented "white-victim effect," and the emergence of a "white female victim effect" further demonstrate the arbitrary and irrational operation of the federal death penalty.**[63]

Through the lens of more than 30 years of administering the federal death penalty, one can see clearly that the past 19 years have simply cemented, not improved, the patterns of race and region that "disturbed" and "troubled" government officials after the first 12 years.  It seems indisputable that these problems are intractable and embedded in the DNA of capital punishment in the United States, among the states and in the federal system.

---

[62] The authors point to Ashcroft's change in the Protocol, the firing of local United States Attorneys who disagreed with DOJ's death penalty policies, and the experience in Vermont, Massachusetts, New York, and  Puerto Rico as stark evidence of this geographic targeting. With respect to Puerto Rico, the authors note: Puerto Rico's deep-seated opposition to capital punishment is reflected in its Constitution, which declares bluntly that "[t]he death penalty shall not exist." Nonetheless, Puerto Rico has been a virtual repository for the Department of Justice's capital prosecution efforts and once had the greatest number of pending death penalty cases in the entire federal system. *Id.* at 95.

[63] The victims in this case are white, as is Mr. Fell. Mr. Fell has standing to raise the present argument. *See McCleskey v. Kemp*, 481 U.S. 481 U.S. 279, 291 n. 8 (1987)("It would violate the Equal Protection Clause for a State to base enforcement of its criminal laws on "an unjustifiable standard such as race, religion, or other arbitrary classification . . . . Because McCleskey raises such a claim, he has standing."); *Sampson*, 275 F. Supp.2d at 69, 87.

These below tables illustrate the present state of affairs:

**TABLE IV: 1988-2019**
**THE RACE OF THE 530 FEDERAL DEFENDANTS AUTHROIZED FOR CAPITAL PROSECUTION**

| | | |
|---|---|---|
| AFRICAN-AMERICAN | 263 | 50% |
| CAUCASIAN | 142 | 27% |
| HISPANIC/ LATINO | 98 | 18% |
| OTHER | 27 | 5% |

The numbers reflect that 73% of the defendants selected for capital prosecutions were people of color; half of the defendants are African-American. The state of affairs has devolved. In 2000, the DOJ Study found that 70% of authorized defendants were minorities.

The next chart illustrates the effect that the disproportionate targeting of people of color for the federal capital prosecutions has had on the composition of the federal death row. It is as would be expected.

RACIAL COMPOSITION OF FEDERAL DEATH ROW (Oct. 2019) [64]

## Federal Death Row Population By Race



Federal Capital Habeas Project (as of October 2019)
(Note: Percentages do not necessarily add up to 100% due to rounding.)

---

[64] Taken from the Federal Capital Habeas Project website, *available at* https://2255.capdefnet.org/General-Statistics/Federal-Death-Row-Population-By-Race (last visited Dec. 14, 2019).  The Federal Capital Habeas Project (the "§ 2255 Project") was created in early 2006 by the Office of Defender Services of the Administrative Office of the United States Courts. The § 2255 Project was established to assist federal courts with appointment of counsel in federal death penalty habeas proceedings pursuant to 28 U.S.C. § 2255 and aims to ensure that all individuals sentenced to death in federal court who have completed their direct appeals receive post-conviction representation consistent with the highest standards of the legal profession.

Thus, as of October 2019, 57% percent of those presently on federal death row are people of color.  This is an unacceptable perpetuation of the history of racialized punishment that this country purports to have moved beyond.  In 2019, these figures should be a source of unbearable concern to the Department of Justice.

(a)    *The law on race and the death penalty.*

The year before the federal death penalty was reenacted, the Supreme Court considered the effect of race in capital sentencing.  *See McCleskey v. Kemp*, 481 U.S. 279 (1987).  In *McCleskey*, a rigorous statistical study of Georgia's capital sentencing practices found that killers of whites, regardless of their own race, were more likely to be sentenced to death than killers of African-Americans.  One of the major statistical models relied on by McCleskey showed that "defendants charged with killing white victims (whatever their own race) were 4.3 times as likely to receive a death sentence as defendants charged with killing blacks." 481 U.S. at 287.  The Court held that it did not violate the Eighth Amendment to be sentenced to death by a system where race was a demonstrated factor.  Rather, a defendant could only prevail upon a claim by showing that race influenced his own trial.

In dissent, Justices Brennan, Marshall, Blackmun and Stevens hypothesized a conversation between an African-American defendant charged with capital murder and his attorney where the client asks what the chances were that he would be sentenced to death.  *McCleskey*, 481 U.S. at 321.  Relying on the statistical analysis presented to the Court in *McCleskey*, the four dissenters posited that

93

defense counsel would have to level with the client and tell him that his race would

play an important role – perhaps a determinative one – in whether he lived or died:

> First, counsel would have to tell [the client] that few of the details of
> the crime or of [his] past criminal conduct were more important than
> the fact that his victim was white.  Furthermore, counsel would feel
> bound to tell [him] that defendants charged with killing white victims
> in Georgia are 4.3 times as likely to be sentenced to death as
> defendants charged with killing blacks. In addition, frankness would
> compel the disclosure that it was more likely than not that the race of
> [his] victim would determine whether he received a death sentence. . . .
> The story could be told in a variety of ways, but [the client] could not
> fail to grasp its essential narrative line: there was a significant chance
> that race would play a prominent role in determining if he lived or died

*McCleskey*, 481 U.S. at 321 (opinion of Brennan, Marshall, Blackmun and Stevens,

J.J., dissenting).[65]

Just before the turn of the 20th century, the Court observed in *Yick Wo v.

Hopkins*, 118 U.S. 356 (1886), that application of seemingly neutral laws "with an

evil eye and an unequal hand, so as practically to make unjust and illegal

discrimination between persons in similar circumstances" amounts to a denial of

equal protection.  *Id.* at 373-74.  It is an undeniable fact of United States history

that capital punishment and race have always been inextricably intertwined.  That

interplay will assuredly remain active until racism is gone. *See, e.g.*, C. J.

Ogletree (Ed.) and A. Sarat, *From Lynch Mobs to the Killing State: Race and the

Death Penalty in America* (New York University Press 2006); R. K. Little, *What*

---

[65] After his retirement from the bench, Justice Powell wrote that he regretted both
voting with the majority, and authoring the Court's 5-4 opinion upholding the
death-penalty in *McCleskey*.  *See* Jeffries, *Justice Lewis F. Powell, Jr.* (1994) at pp.
451-52.

*Federal Prosecutors Really Think: The Puzzle of Statistical Race Disparity Versus Specific Guilt, and the Specter of Timothy McVeigh*, 53 DEPAUL L. REV. 1591 (2004); K. McNally, *Race and the Federal Death Penalty: A Nonexistent Problem Gets Worse*, 53 DEPAUL L. REV. 1615 (2004); C. J. Ogeltree, *Black Man's Burden: Race, and the Death Penalty in America*, 81 OREGON L.REV. 15 (2002); G. L. Pierce, M. L. Radlet, *Race, Region, and Death Sentencing in Illinois*, 81 OREGON L.REV. 39 (2002); S. Bright, *Discrimination, Death and Denial: The Tolerance of Racial Discrimination in the Infliction of the Death Penalty*, 35 SANTA CLARA L.REV. 433 (1995); D. Baldus, *Reflections on the 'Inevitability' of Racial Discrimination in Capital Sentencing and the 'Impossibility' of its Prevention, Detection and Correction*, 51 WASH. & LEE L.REV. 359 (1994); Bienen, Weiner, Denno, Allison and Mills, *The Reimposition of Capital Punishment in New Jersey: The Role of Prosecutorial Discretion*, 41 RUTGERS L.REV. 27, 100-57 (1988).

In the *Santiago* decision in Connecticut, the state supreme court examined the issue of race and the death penalty and came to this conclusion:

> [D]ata from three authoritative governmental sources . . . all suggest that the death penalty in Connecticut continues to be imposed disproportionately based on the race and ethnicity of the offender and the victim. The alleged disparities are significant and hold across hundreds of cases. We are not aware of any study or report to have reached a contrary conclusion.

*Santiago*, 318 Conn. at 151. A study of death verdicts returned in Philadelphia illustrates the insidious and fatal nature of relationship between race and the death penalty. The study concluded that convicted murderers with stereotypical African-American features (flat noses, large lips, kinky hair) and dark skin were more likely

95

to receive the death penalty for killing a white person than lighter-skinned African-American defendants with more Caucasian features.  J. Eberhardt, P.G. Davies, V. J. Purdie-Vaughns, S.L. Johnson, *Looking Deathworthy: Perceived Sterotypicality of Black Defendants Predicts Capital-Sentencing Outcomes*, 17 PSYCHOLOGICAL SCIENCE 383 (Spring 2006).[66]  As Justices Breyer and Ginsburg observed in *Glossip*, "racial and gender biases may, unfortunately, reflect deeply rooted community biases (conscious or unconscious), which, despite their legal irrelevance, may affect a jury's evaluation of mitigating evidence." *Glossip v. Gross*, 135 S.Ct at 2763.

At least one jurisdiction, upon recognizing the effect of race on its capital punishment scheme, has found it unconstitutional.  In *State v. Gregory*, 192 Wash.2d 1 (Wash. 2018), the Washington Supreme Court reviewed data on the

---

[66] *See also* Justin D. Levinson, Robert J. Smith & Danielle M. Young, *Devaluing Death: an Empirical Study of Implicit Racial Bias on Jury-Eligible Citizens in Six Death Penalty States*, 89 NEW YORK UNIVERSITY LAW REVIEW 513 (2014) (study conducted on 445 jury-eligible citizens in six leading death penalty states found that "jury-eligible citizens harbored two different kinds of the implicit racial biases we tested: implicit racial stereotypes about Blacks and Whites generally, as well as implicit associations between race and the value of life," and that "death-qualified jurors— those who expressed a willingness to consider imposing both a life sentence and a death sentence—harbored stronger implicit and self-reported (explicit) racial biases than excluded jurors."); Mona Lynch and Craig Haney, *Mapping the Racial Bias of the White Male Capital Juror: Jury Composition and the "Empathic Divide"*, 45 LAW & SOCIETY REVIEW 69, 91 (2011)("[T]he white male jurors in this study judged a black defendant whom they tended to view as driven by the defendant's own depraved predispositions, and as someone whose criminal behavior they were reluctant to interpret as the product of the defendant's dysfunctional and psychologically damaging background.").

influence of race in that state's administration of capital punishment that indicated that capital cases "involving Black defendants were between 3.5 and 4.6 times as likely to result in a death sentence as proceedings involving non-Black defendant." *Gregory*, 192 Wash. 2d at 19.  The court found that "It is now apparent that Washington's death penalty is administered in an arbitrary and racially biased manner."  *Id.* at 18–19 (2018).  In light of that finding, the court held that "[t]he arbitrary and race based imposition of the death penalty cannot withstand the evolving standards of decency that mark the progress of a maturing society."  *Id.* at 23 (internal quotations and citations omitted).  The opinion also noted that if Washington's death penalty had been imposed in an arbitrary and racially biased manner, then "it logically follows that the death penalty fails to serve penological goals."  *Id.* at 24.

 Mr. Bowers showing in this motion is sufficient to establish a *prima facie* case of arbitrariness and invidious discrimination in the application of the federal death penalty.  *See Sampson*, 275 F. Supp. 2d at 89 ("If the sentences of similarly situated defendants based on these three factors [the race of the defendant, the race of the victim, and the geographic location of the prosecution] were so great as to make the imposition of the death penalty arbitrary and capricious, the Eighth Amendment would be violated. The first two factors, the race of the defendant and the race of the victim, also implicate the Fifth Amendment's guarantee of equal protection of the law.")  It defies logic and evidence to suggest that some factor other than racism can explain the arbitrarily racially disproportionate manner in which the federal

death penalty has been administered in terms those who are prosecuted and sentenced. *See Batson v. Kentucky*, 476 U.S. 79, 93-94 (1986). There is "a clear pattern, unexplainable on grounds other than race." *Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252, 266 (1977).

It is axiomatic that in our nation's legal structure, "the core of the Fourteenth Amendment is the prevention of meaningful and unjustified official distinctions based on race." *Hunter v. Erickson*, 393 U.S. 385, 391 (1969). As a federal prosecution, the protections of the Due Process Clause of the Fifth Amendment, which has long been held to embody a guarantee of equal protection, *Bolling v. Sharpe*, 347 U.S. 497, 499 (1954), govern the proceedings. *See Weinberger v. Wisenfeld*, 420 U.S. 636, 638 n.2 (1975) ("[Our] approach to Fifth Amendment equal protection claims has . . . been precisely the same as to equal protection claims under the Fourteenth Amendment.") Racial discrimination in criminal proceedings "strikes at the fundamental values of our judicial system and our society as a whole." *Rose v. Mitchell*, 443 U.S. 545, 556 (1979). This is the reason that the Supreme Court "has consistently recognized [the strong policy] of combating racial discrimination." *Id.* at 558. The federal death penalty's arbitrary racially discriminatory administration directly violates that strong policy and the Fifth Amendment equal protections in which it is rooted. For these reasons, Mr. Bowers has standing pursuant to the Eighth Amendment and Fifth Amendment Due Process Clause not to be prosecuted in a capital punishment system that is unconstitutionally arbitrary.

The Eighth Amendment's prohibition of the arbitrary use of the death penalty imposes constitutional limitations on capital punishment that do not apply to lesser punishments.  *See*, e.g.,*Woodson v. North Carolina*, 428 U.S. 280 (1976) and *Roberts v. Louisiana*, 428 U.S. 325 (1976) (mandatory death sentences – but not other mandatory sentences – are unconstitutional); *Lockett v. Ohio*, 438 U.S. 586 (1978) (sentencer must be free to give  "independent mitigating weight" to any fact about the defendant or the offense, in a capital case); *Bullington v. Missouri*, 451 U.S. 430 (1981) (imposition of a death sentence after reversal of a sentence of life imprisonment is unconstitutional, although there is no similar *per se* ban on harsher sentencing on retrials of other criminal cases); *Turner v. Murray*, 476 U.S. 28 (1986) (capital defendants in interracial murders – but not non-capital murder defendants – are automatically entitled to have potential jurors questioned about the effects of possible racial biases).

Furthermore, *Furman* was clear and explicit in its condemnation of arbitrariness in the form of racial discrimination.  All of the justices concurred on that point.  *See Furman*, 408 U.S. at 157, 255 (Douglas, J.) (the capital statutes at issue were "pregnant with discrimination," and thus ran directly counter to "the desire for equality . . . reflected in the ban against `cruel and unusual punishments` contained in the Eighth Amendment."); *Id.* at 310 (Stewart,J., concurring in judgment) ("if any basis can be discerned for the selection of these few sentenced to die, it is the constitutionally impermissible basis of race.");  *See id.* at 364-65 (Marshall, J., concurring) ("capital punishment is imposed discriminatorily against

certain identifiable classes of people. . . .  Indeed, a look at the bare statistics regarding executions is enough to [make] immediately apparent that Negroes were executed far more often than whites in proportion to their percentage of the population."); *Id.* at 389 n.12 (Burger, C.J. dissenting) ("If a statute that authorizes the discretionary imposition of a particular penalty for a particular crime is used primarily against defendants of a certain race, and if the pattern of use can be fairly explained only by reference to the race of the defendants, the Equal Protection Clause of the Fourteenth Amendment forbids continued enforcement of that statute in its existing form."); *Id.* at 449-50 (Powell, J., dissenting).  The Court has adhered to that interpretation in subsequent cases.  *See, e.g., Zant v. Stephens*, 462 U.S. at 885 (*Furman* would be violated if a state based its capital sentencing on "factors that are constitutionally impermissible or totally irrelevant to the sentencing process, such as . . . the race . . . of the defendant.").

These two points – that the Eighth Amendment arbitrariness prohibition imposes unique restrictions on the use of the death penalty and arbitrariness based on race violates the Constitution – are the crux of this argument:  The Cruel and Unusual Punishments Clause of the Eighth Amendment imposes a constitutional prohibition against racial discrimination in the use of the death penalty that is at least as strict as the general proscription of racial and gender discrimination in the (implicit) equal protection clause of the Fifth Amendment. *Accord Graham v. Collins*, 506 U.S. 461, 484 (1993) (Thomas, J., concurring) (racial prejudice or bias in the context of capital punishment "is the paradigmatic capricious and irrational

sentencing factor."*).*  Where the death penalty is administered in a manner that is demonstrably racially disparate and there is no acceptable explanation for that disparity, it contravenes the constitutional concerns that underlay *Furman*'s striking down of capital punishment.

**(b)**     ***The effect of gender of defendant, and of race and gender of victim in the application of the FDPA.***

It cannot be disputed that the Constitution would not abide a capital punishment scheme that explicitly provided, through aggravating factors, that the death penalty is more appropriate where the defendant is a male, or where the victim is white.  So, then, where a the procedure of selecting offenders to be put to death – through authorizing a capital prosecution, composing a jury, and submitting the question of sentence to the jury – consistently obtains that very result, even if only through unconscious prejudices of the actors in the process, neither can the Constitution tolerate that system.  Research by state agencies and legal academicians repeatedly shows that defendants charged with killing a White person are more likely to face a sentence of death and to be sentenced to death than those who kill members of minority groups.

A race-of-victim effect has been repeatedly found to be present in capital prosecutions, including the federal system.[67]  *See Glossip*, 135 S.Ct. at 2760 (Breyer,

---

[67] For a comprehensive discussion of the white-victim effect, *see* D. Baldus and G. Woolworth, *Race Discrimination and the Legitimacy of Capital Punishment: Reflections on the Interaction of Fact and Perception*, 53 DEPAUL L. REV. 1411, 1423-1428 (2004).  Utilizing statistics current at the time of the study, the authors noted that the nation-wide average for execution of those who killed whites was in the 83% range, while whites were victims of murder in only approximately 45% of

J., dissenting) ("Numerous studies have concluded that individuals accused of murdering white victims, as opposed to other black or minority victims, are more likely to receive a death penalty.")[68]   Recent studies also have begun to demonstrate that there is a gender-based capriciousness to death sentences as well, whereby those who are guilty of murdering White females are substantially more likely to face the death penalty and be sentenced to death than those who kill a woman of color or a man. This is further evidence of the arbitrary, capricious and biased nature of the death penalty.

Research commissioned by the governments of California, Maryland, Nebraska and Illinois has consistently found that defendants convicted of killing white victims are more frequently sentenced to death than defendants convicted of killing non-white victims. *See Maryland Commission on Capital Punishment: Final*

---

such cases. *Id.* at 1423.  *See also,* K. McNally, *Race and the Federal Death Penalty: A Non-Existent Problem Gets Worse*, 53 DEPAUL L. REV. 1615, 1623-24 (2004)("Between January 27, 1995 and July 20, 2000, Attorney General Reno's approval rate for capital prosecutions was .37 (61/167) in white-victim cases and .21 (81/383) in minority-victim cases-a 16 percentage point difference that is statistically significant at the .001 level."); *Id.* at 1626 ("Under Attorney General Ashcroft, the probability of being targeted for a capital prosecution are: 34% (38 of 112) if the defendant is accused of killing a white victim . . . but only 24% (64 of 267) if the defendant is charged with killing a nonwhite victim.").

[68] Citing GAO, Report to the Senate and House Committees on the Judiciary: *Death Penalty Sentencing* 5 (GAO/GGD–90–57, 1990) (82% of the 28 studies conducted between 1972 and 1990 found that race of victim influences capital murder charge or death sentence, a "finding. . . remarkably consistent across data sets, states, data collection methods, and analytic techniques"); Shatz & Dalton, *Challenging the Death Penalty with Statistics: Furman, McCleskey, and a Single County Case Study*, 34 Cardozo L. Rev. 1227, 1245–1251 (2013) (same conclusion drawn from 20 plus studies conducted between 1990 and 2013).).

*Report To the General Assembly* (2008), Ex. C at 10 ("The evidence shows that the troublesome factor of race plays a dominant role in the administration of the death penalty in Maryland. Research [] showed that cases in which an African-American offender killed a Caucasian victim are almost two and a half times more likely to have death imposed than in cases where a Caucasian offender killed a Caucasian victim."); State of Illinois, *Report of the Governor's Commission on Capital Punishment* (2002), Ex. D at 196 ("When certain facts in aggravation, such as previous criminal history of the defendant, are controlled for, there is evidence that the **race of the victim** influences who is sentenced to death. In other words, defendants of any race who murder white victims are more likely to receive a death sentence than those who murdered black victims.") (emphasis in original); State Bar of New Mexico, Task Force on the Administration of the Death Penalty in New Mexico: Final Report (2004), Ex. E at 13 (studies in other states "have found that the race of the defendant and the race of the victim affect to a significant degree whether a particular defendant convicted of first-degree murder will be sentenced to die.")

Private studies of state capital schemes also have uniformly reported a significant race-of-victim effect. *See, e.g.,* Marcia Wilson, *The Application of the Death Penalty in New Mexico, July 1979 Through December 2007: an Empirical Analysis*, 38 N.M. L. REV. 255, 260 (2009) ("The data strongly suggest that the race and ethnicity of the victims and the defendants affected the determination of who would live and who would die."); Pierce and Radelet, *Death Sentencing in East*

*Baton Rouge Parish*, 1990-2008, 71 LOUISIANA LAW REV. 671 (2011) (In

Louisiana, the odds of a death sentence were 97 % higher for those whose victim

was white than for those whose victim was black.); G. Ben Cohen. & Robert J.

Smith, *The Racial Geography of the Federal Death Penalty,* 85 WASHINGTON

LAW REV. 425, 428 (2010) ("Statistics suggest that defendants are more likely to be

sentenced to death for killing a white victim than a black victim."); R. Paternoster,

G. Pierce, & M. Radelet, *Race and Death Sentencing in Georgia, 1989-1998*, in

American Bar Association, <u>Evaluating Fairness And Accuracy In State Death</u>

<u>Penalty Systems: The Georgia Death Penalty Assessment Report</u>," (with respect to

capital prosecutions in Georgia, "[t]he data show that among all homicides with

known suspects, those suspected of killing whites are 4.56 times as likely to be

sentenced to death as those who are suspected of killing blacks"); Andrew Welsh-

Huggins, *Death Penalty Unequal - Study: Race, Geography Can Make a Difference*,

*The Cincinnati Enquirer* (May 7, 2005) (analysis of death penalty verdicts in the

state of Ohio from 1981 to 2002 reveals that "[o]ffenders facing a death penalty

charge for killing a white person were twice as likely to go to death row [compared

to those charged with having] killed a black victim. Death sentences were handed

down in 18 percent of cases in which the victims were white, compared with 8.5

percent of cases when victims were black"); G.L. Pierce & M. Radelet, *The Impact of*

*Legally Inappropriate Factors on Death Sentencing in California Homicides*, 46

SANTA CLARA L. REV. 1 (2005), noting that the killers of whites were over three

times more likely to be sentenced to death than those who killed blacks and 4 times as likely than those who killed Latinos.

Not surprisingly, the studies of the operation of the federal death penalty system replicate the race of victim findings of the state court studies. [69] As discussed, the report by Federal Death Penalty Resource Counsel Kevin McNally, *Race and the Federal Death Penalty: A Non-Existent Problem Gets Worse*, was one of the first studies to report a significant race of victim effect in federal death penalty cases. McNally noted that in 2004 "The persistent presence of statistical disparity not only continues, it is getting worse." *Id.* at 1616. The current situation is documented in Mr. McNally's Declaration:

> Since 2000, in a grossly disproportionate number of cases, juries have imposed the death penalty when the victim was a white female. As of December 17, 2019, white female victim cases constituted 38% (24 of 63) of federal death row but only 5% (182 of 3354) of the available pool of potential defendants since the year 2000. Moreover, 42% (27 of 64) of

---

[69] Contrary to all of the studies discussed in this section, one study purported to find no race of victim effect in the federal death penalty system. See Rand Corporation, *Race and the Decision to Seek the Death Penalty in Federal Cases* (2006), available at http://www.rand.org/content/dam/rand/pubs/technical_reports/2006/RAND_TR389.pdf . The study itself, based on data from 1995-2000, notes that the authors "agreed that their analytic methods cannot provide definitiveanswers about race effects in death-penalty cases", that "[r]esults could be different with other variables, methods, and cases", and that "[e]xtrapolating beyond the data we analyzed here to other years, other defendants, other points in the decisionmaking process, or other jurisdictions would be even more problematic." *Id.* Commenting on this study in 2009, Senator Feingold, in support of his bill to abolish the Federal Death Penalty Act, pointed out that "the long anticipated study did not address the root question about the application of the Federal Death Penalty: it did not study the decison-making process for bringing defendants into the Federal system in the first place. Of course this study only covers 1995-2000. So we still have very little information about racial disparities from 2001 forward." 115 Congressional Record-Senate 8071-72 (May 19, 2009).

all death sentences between 2000 and 2019 have involved white female victims. This is many times greater than one would expect given the pool of white female victim cases.

Ex. H at 6.

As of October 2019, 38 of the 62 people currently on federal death row – 60% – were convicted of killing a white person.  Twenty-four of them, 38%, killed a white female.[70]

In combination, these studies all demonstrate that "[d]eath row's racial disparity [] is not the result of race-neutral application of the death penalty or a perverse form of affirmative action to favor black defendants. Rather, a racial hierarchy clearly exists among cases based upon who the victim is." *See* J. Blume, T. Eisenberg, and M. T. Wells, *Explaining Death Row's Population and Racial Composition*, 1 JOURNAL OF EMPIRICAL LEGAL STUDIES 1, 167 (March 2004).

The evidence of a victim-gender bias in imposition of death sentences should not be mistook for a recent development or a matter of the "modern" death penalty. Almost 60 years ago, Justice Marshall addressed this very matter in *Furman*. "There is . . . overwhelming evidence that the death penalty is employed against men and not women . . . . It is difficult to understand why women have received such favored treatment since the purposes allegedly served by capital punishment seemingly are equally applicable to both sexes." *Furman*, 408 U.S. at 365

---

[70] Federal Death Penalty Capital Resource Counsel website, *available at* https://fdprc.capdefnet.org/doj-activity/statistics/current-statistics-re-use-of-federal-death-penalty-february-2017 (last visited Dec. 14, 2019).

(Marshall, J., concurring).  Forty-five years after that, the dissenting justices in *Glossip* noted, "many . . . studies have found that the gender of the defendant or the gender of the victim makes a not-otherwise-warranted difference." [71] *Glossip,* 135 S.Ct. at 2761.  Thus, in continuing to permit the death penalty as a punishment, the United States, individually in those jurisdictions with capital punishment and collectively through the federal government, has perpetuated a known bias in the sentencing process – and by corollary, executing people – even where that bias offends the Constitution.

Since the federal death penalty was reinstated in 1988, of the 530 cases authorized for federal capital prosecution, only nine were women:  Kristen Gilbert (D. MA), No. CR No. 98-30044-MAP; Angela Johnson (N.D. Iowa), No. 3:01-CR-03046-MWB; Donna Moonda (N.D. OH), No. 1:06-CR-00395-DDD; Valerie Friend (S.D. WV), No. CR-2:05-00107; Tamara  Llamas (E.D.N.C.), No. CR No. 7:97-CR-63-1-H; Lorie Ann Taylor-Keller; Barbara Brown (N.D.WVa), No. CR No. 1:98CR34; Janette A. Able (N.D.W.V), No. CR No. 1:98CR34; and Lisa Montgomery (W.D.

_____

[71] Citing the "many studies" discussed in the Shatz & Dalton article at page 1251-53.  One of the studies on this issue referenced in the Shatz & Dalton article cited in *Glossip* is Victor L. Streib, *Rare and Inconsistent: The Death Penalty for Women*, 33 FORDHAM URB. L.J. 609, 621–22 (2006). Streib, who has tracked the issue for many years, reports that, in terms of raw numbers, women homicide defendants receive more favorable treatment at each stage of the criminal process, so that, although women constitute 10% of those arrested for murder, they constitute only 2% of those sentenced to death at trial, and only 1% of those actually executed. See also, Steven F. Shatz & Naomi R. Shatz, *Chivalry Is Not Dead: Murder, Gender, and the Death Penalty*, 27 BERKELEY J. GENDER L. & JUST. 64 (2012) (while women constituted 5.3% of defendants convicted of first-degree murder and death-eligible, they constituted only 1.2% of those sentenced to death.)

MO), No. 5:05-CR-06002-GAF.   All but Montgomery achieved a life sentence, making her the one woman out of 63 people on federal death row.

Although the victim's race as a determinant – albeit social, not statutory – in death sentencing outcomes has been discussed least since *Furman*, the question of whether and if so how the combined effects of victim race and victim gender improperly skew sentencing outcomes in capital cases has only recently gained the attention of researchers. *Accord Glossip,* 1356 S.Ct. at 2761.  Within the last decade, three empirical studies drawing on state court data from Colorado, Georgia, and Ohio, examined the joint effects of victim race and gender in capital prosecutions.  Each found that defendants were treated most harshly when a white female victim was present.

The Colorado study examined prosecutors' decisions to seek the death penalty after conviction, while Georgia and Ohio studies looked at capital sentencing outcomes.  In their analysis of Colorado death penalty cases spanning the two decades from 1980 to 1999, researchers found that prosecutors were more likely to seek the death penalty in cases involving white, female victims than they were in cases involving victims of any other race/gender combination.  *See* Hindson, Potter and Radelet, *Race, Gender, Region and Death Sentencing in Colorado, 1980-1999*, 77 COL. L. REV. 549 (2006).  The authors determined that in Colorado the death penalty was sought for defendants who kill white females "at a rate much higher than it is sought for any other victims. White females, who account for only 17.9 percent of all homicide victims, make up 34.5 percent of victims in death

penalty cases. Thus, death sentences are pursued against those who kill white women at almost twice the rate as their rate of homicide victimization." *Id.* at 577.

In 2004 a research group published findings that death sentences in Ohio were a product of a strong association between one victim race-gender group – white female victims – and the imposition of a death sentence.  Holcomb, Williams, DeMuth, *White Female Victims and Death Penalty Research*, 21 *Justice Quarterly* 877-902 (2004).  Three years earlier, the same group published its analysis of state court data from Georgia cases in the 1970's.  Williams, DeMuth and Holcomb, *Understanding the Influence of Victim Gender in Death Penalty Cases: The Importance of Victim Race, Sex-Related Victimization and Jury Decision Making*, 45 CRIMINOLOGY 4, 865 (2007).  The data indicated that defendants convicted of murdering females are more likely to receive a death sentence than defendants who murder males, and, more narrowly "that large differences exist in the likelihood of receiving a death sentence when the variables 'victim race' and 'victim gender' are considered jointly. Cases that involve white female victims are treated the most harshly . . . ." *Id.* at 885.

The defendants in *United States v. Valerie Friend and George Lecco* , 05-cr-00107 (S.D.WVa.), faced capital prosecution for the murder of a white woman.  They moved the court to bar the death penalty on the basis of an asserted arbitrary and discriminatory victim-related race and gender effect.  Their motion relied on an expert statistician's analysis of 400 authorized federal capital cases that determined that defendants in federal capital cases whose victims were white females were

more than three times as likely to be sentenced to death than other federal capital defendants.  *See* Ex. F.  The statistician concluded that the finding was "highly statistically significant, systemic, and not the result of chance."  From 2000 to December 2007, when the motion was filed,

- the Attorney General authorized capital prosecution in 56% of the cases that involved a White female victim and 22% of the cases that involved a White male victim, but only 18% of the cases that involved a victim of color;

- and 59% of death sentences from federal juries involved a White female, versus 29% for White men, and 11% for people of color.

Thus, the evidence in 2007 showed that it was effectively a greater offense under the federal death penalty process to have killed a White female than it was to have killed a person of color.  That is arbitrariness, simple and plain.

Accordingly, this Court should find that the existence of gender of defendant discrimination, in combination with a "white female victim" effect renders the federal death penalty unconstitutional.  In the alternative, this Court should set this motion for an evidentiary hearing and grant discovery, so that Mr. Bowers may fully develop and present his claim.

### C.    Federal prosecutors' discretion to charge a capital offense, seek death, accept or reject a plea, and charge aggravators is the source from which the endemic arbitrariness in the federal death penalty flows.

The process of sentencing a person to death begins in the prosecutor's office. *See* William Schabas, <u>The Death Penalty as Cruel Treatment and Torture: Capital Punishment</u>, 74 (1996) (discussing the effect of plea bargaining on arbitrariness in

capital cases).  The most determinative event in the process occurs when a prosecutor decides what to charge and, if capital charges are brought, whether to seek a death sentence or accept a plea in exchange for a lesser sentence.  *See* Elisabeth Semel, *Reflections on Justice John Paul Stevens's Concurring Opinion in Baze v. Rees: A Fifth Gregg Justice Renounces Capital Punishment*, 43 *U.C. Davis L. Rev.* 783, 788 (2009).

The problem of arbitrariness that prosecutorial discretion creates has been examined by reform commissions.  *See Report and Recommendation on the Administration of the Death Penalty in California*, California Commission on the Fair Administration of Justice, 102-04, JUNE 30, 2008 (finding "great variation in the practices for charging special circumstances, a lack of racial diversity among the individuals who made the decision, great variation in when the decision was made, and significant variation in the involvement of the defense in the process.")[72]; *Report of the Governor's Comm. on Capital Punishment* (April 15, 2002), *supra*; Ex. D at 82 (noting criticisms that Illinois' procedure "contains no standards elucidating the criteria to be considered in determining whether or not to seek the death penalty in a particular case.").

Although our legal system vests broad in prosecutors to selecting whom to prosecute and what crimes to charge, "there are undoubtedly constitutional limits upon its exercise." *Bordenkircher v. Hayes*, 434 U.S. 357, 365 (1978). *See Id.* (such

---

[72] *Available at* https://digitalcommons.law.scu.edu/cgi/viewcontent.cgi?article=1000&context=ncipp ubs (last visited Dec. 14, 2019).

broad discretion "carries with it the potential for both individual and institutional abuse.").  A person may not be prosecuted "based upon an unjustifiable standard such as race, religion, **or other arbitrary classification**." *Id.* at 364 (emphasis added).  Where there is a claim of selective prosecution, it will be judged according to ordinary equal protection standards.  *Wayte v. United States*, 470 U.S. 598, 608 (1985).  This problem has not gone unnoticed in the courts in the years since *Gregg*.

Justice Brennan articulated exactly the problem that prosecutorial discretion creates in the capital punishment context.  In *DeGarmo v. Texas*, 474 U.S. 973 (1985) (Brennan and Marshall, JJ., dissenting from denial of certiorari), the petitioner, with a female co-defendant, had kidnapped and murdered a young woman.  The prosecutor sought and obtained a death sentence for DeGarmo, while his co-defendant, who was equally culpable, was sentenced to only 10 years' deferred probation.  The Court denied DeGarmo's petition, but Justice Brennan, joined by Justice Marshall, dissented.  "This case," wrote Justice Brennan, "demonstrates just one way in which capital sentencing schemes have failed to eliminate arbitrariness in the choice of who is put to death. . . .  This gross disparity in treatment [between DeGarmo and his co-defendant] is solely a product of the prosecutor's unfettered discretion to choose who will be put in jeopardy of life and who will not." *DeGarmo*, 474 U.S. 973, 974.

> [T]his disparity in treatment highlights the utter failure of the elaborate sentencing schemes approved by the Court in *Gregg* and its companion cases to meaningfully limit the arbitrary infliction of death []. When *Gregg* was decided several Members of the Court expressed the belief that channeling juror discretion would minimize the risk that the death penalty would be imposed on a capriciously selected

group of offenders, thereby making it unnecessary to channel discretion at earlier stages in the criminal justice system.  But discrimination and arbitrariness at an earlier point in the selection process nullify the value of later controls on the jury. **The selection process for the imposition of the death penalty does not begin at trial; it begins in the prosecutor's office.  His decision whether or not to seek capital punishment is no less important than the jury's.**  Just like the jury, then, where death is the consequence, the prosecutor's discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action.

Instead, the decisions whether to prosecute, what offense to prosecute, whether to plea bargain or not to negotiate at all are made at the unbridled discretion of individual prosecutors. . . .  [I]f the price of prosecutorial independence is the freedom to impose death in an arbitrary, freakish, or discriminatory manner, it is a price the Eighth Amendment will not tolerate.

*Id.* at 475-476 (citations and quotations omitted) (emphasis added).

Twenty years later, a judge of the Ninth Circuit Court of Appeals resurrected Justice Brennan's concern and concluded that "[a]s long as a prosecutor's discretion in seeking the ultimate penalty-death-remains thus unbridled, the administration of the death penalty in the United States will violate the guarantees of due process and freedom from cruel and unusual punishment enshrined in the Constitution." *Morris v. Ylst*, 447 F.3d 735, 746 (9th Cir. 2006) (Ferguson J., concurring).  He went on,

In the years since Furman, legislatures and courts have struggled to meet this daunting challenge, yet "the death penalty remains fraught with arbitrariness, discrimination, caprice, and mistake.".  The problems today are not identical to those of thirty years ago. Rather, those problems that were originally pursued down one hole with procedural rules and verbal formulas have come to the surface somewhere else, just as virulent and pernicious as they were in their original form.  Even as the courts have tried to limit the jury's discretion to impose the death penalty, discrimination and

> arbitrariness at an earlier point in the selection process nullify the value of later controls on the jury."
>
> Here, the prosecutor's unbridled discretion to single out Morris for prosecution under the death penalty, when the guilt is equally spread among his co-defendants, is a rank example of arbitrariness at an earlier point in the selection process. . . .  Such arbitrariness in the administration of the death penalty violates the Eighth Amendment and the Due Process Clause.

*Id.* at 747 (quotations and citations omitted).  Thus, the caprice laid out above of who is authorized, who is permitted to plead guilty for a life-without-parole sentence, and who is ultimately sent to death row stems exclusively from the office of the prosecutor.

Nevertheless, notwithstanding these judicial acknowledgments of the connection between prosecutorial discretion and the arbitrariness of death sentences and executions, this Court's power to encroach on that discretion is limited, at best.  In *United States v. Redondo-Lemos*, 955 F.2d 1296 (9th Cir.1992), overruled *en banc* on other grounds by *United States v. Armstrong*, 48 F.3d 1508 (9th Cir.1995), *rev'd*, 517 U.S. 456 (1996), the Ninth Circuit distinguished between the general right "not to have charging or plea bargaining decisions made in an arbitrary or capricious manner" and a specific claim that prosecutorial decisions were made on the basis of sex, race, religion, or similar characteristics.  The latter case would raise both Due Process and Equal Protection problems and so would permit a judicial inquiry into whether protected classes of people were being treated differently.  *Id.* at 1301 (citing *Wayte v. United States,* 470 U.S. 595, 608 (1985); *Bordenkircher*, 434 U.S. at 364; *Oyler v. Boles*, 368 U.S. 448, 456 (1962)).

However, where an exercise of prosecutorial discretion is arbitrary but there is no hint of class-based discrimination, the *Redondo-Lemos* majority ruled that there was no judicial remedy available to a defendant-even while acknowledging that such an arbitrary exercise of power would be a Due Process violation. *Id.* at 1300. This result was justified on separation-of-powers grounds:  for a court to inquire into a prosecutor's decision-making processes would entangle them "in the core decisions of another branch of government." *Id.*

At least one court has over-ridden a prosecutor's decision, striking a notice of intent to seek the death penalty. *United States v. Littrell*, 478 F. Supp. 2d 1179 (C.D. Cal. 2007). The court found that in light of the government's actions with respect to other co-defendants "it is clear that no rational decision-maker would continue to seek to execute Gary Joe Littrell.  Accordingly, the Government's continued intention to seek the death penalty is arbitrary and capricious, and must be stricken." *Littrell*, 478 F. Supp. 2d at 1192. *See also id.* 1179 ("It is vital to the constitutional protections of due process and to the moral authority of the Government . . . that the decision to seek death is neither arbitrary and capricious nor wholly divorced from reason."). The court found its authority for to intervene in the government's decision to seek death in *Furman's* prohibition on arbitrary and capricious jury decision-making.

> *Furman* mandates that where discretion is afforded a sentencing body
> on a matter so grave as the determination of whether a human life
> should be taken or spared, that discretion must be suitably directed
> and limited so as to minimize the risk of wholly arbitrary and
> capricious action.  *Furman* and its progeny are concerned solely with
> the imposition of the death penalty by the judge or jury.  The cases

make no comment on the breadth of the discretion afforded to the Government to seek the death penalty against a particular defendant. However, it would be fundamentally inconsistent with the constitutional prohibition on the arbitrary **imposition** of the death penalty to say that an arbitrary decision **to seek** the death penalty is constitutionally permissible. The Fifth Amendment requires that every aspect of the process by which the Government seeks to put a defendant to death is consistent with due process of law.  At a bare minimum, the protections of the Fifth Amendment must guarantee that the Government's decision to seek the death penalty is rational. When the Government's decision to seek death is wholly divorced from reason and arbitrarily disregards the totality of the relevant evidence, a capital prosecution based on that decision would be repugnant to the Constitution.

*Id.* at 1186-1187 (emphasis in original).  Few courts, however, have been willing to

follow suit.  *See, e.g.*, *United States v. Cooya*, No. 4:08-CR-70, 2011 WL 3608611, at

*3 (M.D. Pa., Aug. 16, 2011) (*Littrell* "appears to be in direct contrast to every other

decision, including United States Supreme Court decisions" on the issue.")

(collecting cases).

Thus, prosecutorial discretion in the charging of federal capital cases that is

the seed of arbitrariness in the federal death penalty remains unchecked.  *See*

*Santiago*, 318 Conn. at 25 ("As currently construed, then, the federal constitution

simultaneously requires that states narrowly limit and carefully define which

offenders are eligible for capital punishment, while, paradoxically, also giving

prosecutors [] virtually unfettered discretion in whether actually to charge

defendants with capital crimes [].").  This rest of the arbitrariness that arises all

stems from this point – whether to accept a guilty plea for a lesser sentence, what

aggravators to charge, teeing up the sentencing decision to go to a jury, all of which,

in turn, produces the inconsistent, unpredictable, and inexplicable variation among

federal capital cases in the examples given above.  *See id.* at 114 ("these critiques are well founded and [] the opportunity for the exercise of unfettered discretion at key decision points in the process has meant that the ultimate punishment has not been reserved for the worst of the worst offenders.").

Where prosecutorial discretion has been identified as the genesis of the arbitrariness in the federal death penalty by all levels of federal courts, but those same courts have recognized an inability to impinge on that discretion, this Court should therefore hold that the FDPA has failed to eliminate arbitrariness in the choice of who is put to death; that Eighth Amendment does not tolerate capricious or wanton imposition of death sentences and execution for the sake of prosecutorial autonomy; and where the law prohibits encroaching on a prosecutor's discretion to seek to execute a defendant, the arbitrariness is unbounded, and, therefore, the administration of the death penalty by the United States government violates the Constitutional guarantee of due process and prohibition of cruel and unusual punishment.

> **D.** **The inherent and necessary delays in federal prosecutions create a secondary, preliminary punishment of prolonged isolated incarceration and remove any execution so far in time from the offense to be punished that there is no deterrent effect to justify the execution.**

The Supreme Court has recognized that death as a punishment is quintessentially different from any other by virtue of its finality.  *Woodson*, 428 U.S. at 303.  In view of this, the Court has required, and states and the federal government have established, protective proceedings to assure a conviction and sentence are constitutionally sound before a person is executed.  While these

protections are appropriate and should not be diminished, they have an unintended and unavoidable effect that compounds the arbitrariness discussed above.  Persons convicted and sentenced to death are made to wait for years – often decades – in solitary confinement conditions, which is a punishment unto itself, for an execution that, if it does happen, has no deterrent value because of the time that has passed since the offense.

> 1.  **Persons sentenced to death endure a separate punishment before their execution by living in solitary confinement for years awaiting an execution that may never come.**

The Eighth Amendment's prohibition on cruel and unusual punishment reaches beyond the arbitrary and capricious concerns of *Furman* and *Gregg*.  Public and institutional concerns over the accuracy and propriety of death sentences, and the growing disfavor for capital punishment generally, have resulted in years of delay between conviction to execution that was surely not foreseen or intended by the majority in *Gregg*.  This delay, in turn, imposes years of dehumanizing incarceration on federal death row that compound the Eighth Amendment issues created.  *See Glossip*, 135 S. Ct. at 2764 (Breyer and Ginsburg, JJ., dissenting) (The problems of reliability and unfairness almost inevitably lead to a third independent constitutional problem: excessively long periods of time that individuals typically spend on death row, alive but under sentence of death. That is to say, delay is in part a problem that the Constitution's own demands create . . . . [U]nless we abandon the procedural requirements that assure fairness and reliability, we are forced to confront the problem of increasingly lengthy delays in capital cases.").

Two years ago, the average time between the imposition of a death sentence

and execution was almost 243 months, one short of twenty years.  Ten years earlier,

the average was 153 months, and 20 years earlier the average was 86 months.[73]   It

is not unusual for a death sentence, if ever carried out, to be done so 25 years or

more years after the conviction. *Glossip*, 135 S. Ct. at 2764-65, (Breyer and

Ginsburg, JJ., dissenting)(citing sources).[74]  The five federal death row inmates had

been on death row for an average of almost 17 years.[75]

These delays are unavoidable, "given the special need for reliability and

fairness in capital cases." *Id.* at 2770-72 (citing examples where DNA evidence

exonerated defendants who otherwise would have been wrongly executed years

before but for the delays occasioned by necessary appellate and post-conviction

review).  *Accord Santiago*, 318 Conn. at 93 n. 96 ("Delays, then, are indispensable if

the ultimate punishment is to be reliably applied, and, if the constitution did not

mandate such close scrutiny, the execution of innocent persons would inevitably

result.").  Justice Breyer described real-life cases in the Supreme Court where these

---

[73] *Available at* https://deathpenaltyinfo.org/death-row/death-row-time-on-death-row (last visited Dec. 14, 2019).

[74] *See also* Tr. Oral Argument, *Hall v. Florida*, Case # 12-10882, March 3, 2013, at 46 (Justice Kennedy pointing out that "the last ten people Florida has executed have spent an average of 24.9 years on death row."), *available at* http://www.supremecourt.gov/oral_arguments/argument_transcripts/12-10882_6kh7.pdf.

[75] Alfred Bourgeois and Dustin Honken were sentenced in 2004 (15 years); Daniel Lee was sentenced in 2002 (17 years); Lezmond Mitchell was sentenced in 2003 (16 years); and Wes Purkey was sentenced in 1998 (21 years).

lengthy delays have avoided unthinkable mistakes but the need to avoid sacrificing reliability for swift execution was perhaps even more eloquently expressed by Gordon (Randy) Steidl, who was exonerated after 17 years of incarceration, 12 of which were on Illinois' Death Row. *See* Hal Dardick, *Inmates Free After 17 Years*, Chicago Tribune., May 29, 2004 (Metro), at 16.  Testifying before Illinois legislators some seven years after his release, Mr. Steidl pointed out: "If you want to kill John Wayne Gacy, you have to kill me, as well." *See* Rob Warden, *How and Why Illinois Abolished the Death Penalty*, 30 L. & Inequality 245 (2012).  Translation:  the price of a rush to execution increases the specter of irremediable miscarriage.

Such prolonged delays create an Eighth Amendment whiplash effect. Defendants sentenced to death are normally housed under severe, punitively isolating conditions on death rows. *Johnson v. Bredesen*, 558 U.S. 1067, 1069 (2009) (statement of Stevens, J., respecting denial of certiorari) (after recounting petitioner's confinement in a solitary cell awaiting his execution for nearly 29 years: "the delay itself subjects death row inmates to decades of especially severe, dehumanizing conditions of confinement."); *accord Glossip*, 135 S. Ct. at 2764-65 (Breyer and Ginsburg, JJ., dissenting).  The result is that a person is effectively being in solitary confinement for years and sometimes decades. *See Davis v. Ayala*, 135 S. Ct. 2187, 2208-2210 (2015) ("[I]f his confinement follows the usual pattern, it is likely respondent has been held all or most of the past 20 years or more in a windowless cell no larger than a typical parking spot for 23 hours a day; and in the

120

one hour when he leaves he likely is allowed little or no opportunity for conversation or interaction with anyone.").

The alarmingly deleterious consequences of prolonged solitary confinement for mental health are clear.  Justice Breyer observed that "[I]t is well documented that such prolonged solitary confinement produces numerous deleterious harms." *Glossip*, 135 S. Ct. at 2765 (Breyer and Ginsburg, JJ., dissenting). [76] See *also In re Medley,* 134 U.S. 160, 167-68 (1890) (describing psychiatric harm occasioned by solitary confinement: "A considerable number of the prisoners fell, after even a short confinement, into a semi-fatuous condition, from which it was next to impossible to arouse them, and others became violently insane; others, still, committed suicide . . ."). *Kervin v. Barnes*, 787 F.3d 833, 836 (7th Cir. 2015) (citing studies documenting the "serious psychological consequences" of solitary confinement).

In the *Fell* hearing, Dr. Haney also testified to the issue of prolonged solitary confinement on death row while awaiting execution or judicial relief.  Ex. A at 23-195.  From his testimony and the evidence the court concluded that "the process of holding prisoners for indefinite terms extending into decades in solitary

---

[76] Citing Haney, *Mental Health Issues in Long–Term Solitary and "Supermax" Confinement*, 49 Crime & Delinquency 124, 130 (2003) (cataloguing studies finding that solitary confinement can cause prisoners to experience "anxiety, panic, rage, loss of control, paranoia, hallucinations, and self-mutilations," among many other symptoms); Grassian, *Psychiatric Effects of Solitary Confinement*, 22 Wash U. J. L. & Policy 325, 331 (2006) ("[E]ven a few days of solitary confinement will predictably shift the [brain's] electroencephalogram (EEG) pattern toward an abnormal pattern characteristic of stupor and delirium").

confinement is highly damaging.  No persuasive evidence was offered that such

severe isolation was necessary for reasons of security or prison safety.  It appears

instead that it is a long-standing practice – centuries old – to isolate condemned

criminals. . . .   In the modern era, the practice of holding people in solitary

confinement under conditions of extreme solation has little apparent justification

[].”  *Fell,* 224 F.Supp.3d. at 347.

These persons are held under these conditions not because of any distinctive

feature of their crime or their character.[77]  It is simply because prisons have chosen

to house death row inmates in that manner.  Thus, people sentenced to death will

serve a preliminary sentence of 15 years or more of the psychological duress of this

confinement in addition and as a condition precedent to their actual sentence.

Moreover, for those whose sentenced are converted to life, they have nonetheless

endure those conditions needlessly.

Thus, the federal death penalty gives rise to a secondary Eighth Amendment

violation by the conditions in which those sentenced to die are held for years while

their sentence is litigated.

---

[77] All federal death row inmates are housed in solitary confinement – in a cell by
themselves unable to see anyone except persons who walk past their cell – for 23
hours a day, seven days a week.  If a person does present a behavior problem or
danger, he is subjected to additional restrictions.

### 2. The prolonged time that is necessary for review removes any execution that does occur so far in time from the offense, that there is no deterrent effect to killing the defendant, thus making it gratuitous.

The other consequence of the protracted time periods that are necessary for capital cases to be processed and through appeal and §2255 post-conviction proceedings is that, by the time a defendant is executed, so much time has passed since the offense that the execution has no deterrent value at all.  This means that deterrence cannot be a justification for the federal death penalty.  The two federal cases that have gone to a death penalty in Pennsylvania are illustrative.

David Hammer pleaded guilty in June 1998 to killing his cellmate in April 1996.  His case may have actually been accelerated because he waived his appeal.  *United States v. Hammer*, 226 F.3d 229 (3d Cir. 2000).[78]  He then initiated post-conviction pleadings wherein the district court determined that the government had withheld exculpatory evidence from Hammer's defense counsel in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), and ordered a re-sentencing.  *See United States v. Hammer*, 404 F.Supp.2d 676, 800–01 (M.D.Pa.2005).  After further litigation, Hammer was ultimately re-sentenced to life in prison without parole in August 2014, 18 years after the offense (during which time he was held in the solitary confinement of federal death row).  Had the district court imposed a death sentence again, further litigation would have been required, extending the delay to any execution even more.

---

[78] The Third Circuit heard his case to determine whether Hammer could waive his appeal.

In 2013, Kaboni Savage was sentenced to death in the Eastern District of Pennsylvania for murders that took place in Philadelphia in October of 2004.[79]  The Court of Appeals for the Third Circuit will hear oral argument in his direct appeal on January 7, 2020 more. *See United States v. Savage*, No. 14-9003 (3d Cir.), Order (Aug. 8, 2019).  It is a reasonable estimate that the appellate court will not issue a decision before June 2020, 16 years after the homicides of conviction.  If the conviction or sentence is reversed, the process will begin again.  If it is affirmed, the *Hammer* case demonstrates that post-conviction litigation could take 16 years, and still not result in a final death sentence.  That would mark 32 years since the offense of conviction.[80]

"The deterrent value of any punishment is, of course, related to the promptness with which it is inflicted." *Coleman v. Balkcom*, 451 U.S. 949, 952 (1981) (Stevens, J., concurring in the denial of certiorari); see also *Gomez v. Fierro*, 519 U.S. 918, 918 (1996) (Stevens, J., dissenting) ("[d]elay in the execution of judgments imposing the death penalty frustrates the public interest in deterrence and eviscerates the only rational justification for that type of punishment"); *Furman*, 408 U.S. at 302 (Brennan, J., concurring) ("[a] rational person contemplating a murder or rape is confronted, not with the certainty of a speedy

---

[79]  Savage was also convicted of murders as far back as 1998, 14 years before his trial.

[80] It bears noting that resolution of post-conviction litigation does not yield an immediate execution.  For any number of reasons, that could be delayed for an additional period of time.

death, but with the slightest possibility that he will be executed in the distant future"); *Jones v. Chappell*, 31 F.Supp.3d 1050, 1064 (C.D.Cal. 2014) (law and common sense dictate that "long delays preceding execution frustrate whatever deterrent effect the death penalty may have"); *People v. Anderson*, 6 Cal.3d 628, 652 (1972) ("capital punishment can have a significant deterrent effect only if the punishment is swiftly and certainly exacted"); L. Powell, commentary, "Capital Punishment," 102 Harv. L.Rev. 1035, 1035 (1989) ("years of delay between sentencing and execution . . . [undermine] the deterrent effect of capital punishment and [reduce]public confidence in the criminal justice system"); *Santiago*, 218 Conn. at 93 ("[T]he fact that one who commits the most heinous of crimes can expect to spend decades in prison prior to any execution suggests that capital punishment promises little if any deterrence over and above life imprisonment.").

Any notion that the unlikely prospect of being executed some 20 or more years in the future provides more of a deterrent than the far more immediate possibility of a definite sentence of life without parole is fanciful.  As the Supreme Court observed in *Thompson v. Oklahoma*, 487 U.S. 815, 837 (1988), the likelihood that an offender engages in this kind of "cost-benefit analysis . . . is so remote as to be virtually nonexistent."[81]  *See also Santiago*, 318 Conn. at 99 ("[Another] reason the death penalty has lost its retributive mooring in Connecticut is that the lengthy if not interminable delays in carrying out capital sentences do not just undermine

---

[81] Thompson made that observation in the context of the deterrent effect of the death penalty for juvenile offenders.

the death penalty's deterrent effect; they also spoil its capacity for satisfying retribution."); *Jones v. Chappell*, 31 F.Supp.3d at 1064. Conversely, the prospect of an immediate and severe sentence of life-without-parole overwhelms any conjectural notion that a possible death sentence 20 years after a crime will deter could-be killers. *See Roper*, 543 U.S. at 572.

Moreover, the Eighth Amendment restrains what can be done strictly in the name of deterrence. A public flogging or drawing-and-quartering immediately upon conviction broadcast on television and livestreamed on the internet could possibly deter more homicides, but the nation's evolved standards of decency would not abide that. *Accord Trop v. Dulles*, 356 U.S. at 100.

As the Connecticut Supreme Court observed in *Santiago*, 318 Conn. at 87-103, decades-long delay also undermines the deterrence and retribution rationales for capital punishment. "The penological justifications for the sentencing practice are . . . relevant to the [Eighth Amendment] analysis. *Graham v. Florida*, 560 U.S. at 71. *Thompson v. McNeil*, 556 U.S. 1114, 1115 (2009) (Statement of Stevens, J., respecting denial of certiorari) ("[D]elaying an execution does not further public purposes of retribution and deterrence . . ."); *Jones v. Chappell*, 31 F.Supp.3d at 1053 ("[S]ystemic delay has made [most] execution[s] so unlikely that the death sentence carefully and deliberately imposed by the jury has been quietly transformed into one no rational jury or legislature could ever impose: life in prison, **with the remote possibility of death**. As for the random few for whom execution does become a reality, they will have languished for so long on Death Row that their

126

execution will serve no retributive or deterrent purpose and will be arbitrary.") (emphasis in original).

Moreover, to carry out an execution after decades have elapsed since the offense also saps the retributive purpose from the punishment.  With the passage of so much time, the identity and feelings of both the community and offender may change.  The call for "swift justice" is more effectively fulfilled by a life-without-parole sentence that is imposed immediately upon conviction far more than an execution years after many family members may have passed or moved on.  *See, e.g.,* Campbell Robertson, "She doesn't want her daughter's killer to be put to death. Should the government listen?", New York Times, Oct. 29, 2019[82] (mother of victim disagrees with scheduled execution of federal death row inmate Daniel Lee); Adam Tamburin, "Victim's daughter seeks mercy from Gov. Bill Lee for death row inmate Donnie Edward Johnson," *Nashville Tennessean*, April 3, 2019[83] (daughter resists execution of her father for killing her mother).  *Accord Valle v. Florida*, 564 U.S. 1067 (2011) (Breyer, J., dissenting from the denial of stay of execution) ("I would ask how often [the] community's sense of retribution would forcefully insist [on] a death that comes only several decades after the crime was committed"); *Lackey v. Texas*, 514 U.S. 1045, 1045–46 (1995) (statement respecting the denial of certiorari)

---

[82]*Available at* https://www.nytimes.com/2019/10/29/us/arkansas-federal-death-penalty.html (last visited Dec. 15, 2019).

[83]  *Available at* https://www.tennessean.com/story/news/crime/2019/04/03/tennessee-execution-victim-daughter-seeks-mercy-death-row-inmate-donnie-edward-johnson/3345860002/ (last visited Dec. 15, 2019).

(expressing doubt whether execution following extended imprisonment satisfies state's interest in retribution); *Coleman v. Balkcom*,, 451 U.S. at 960 (Rehnquist, J., dissenting from the denial of certiorari) ("[t]here can be little doubt that delay in the enforcement of capital punishment frustrates the purpose of retribution").

The Eighth Amendment also touches on retribution.  It forbids punishments that are "cruel and unusual" regardless of proffered retribution justifications.  The Supreme Court is unanimous that punishments that intend to add "terror, pain, or disgrace" are prohibited.  *Bucklew v.* Precythe, 587 U.S. __, 139 S.Ct. 1112, 1124 (2019) (quoting *Baze,* 553 U.S. at 48 (2008)).  *See also Glossip,* 135 S. Ct. 2726.  The retributive rational for punishment left unchecked by the Eighth Amendment would permit public floggings or drawing and quartering.  That is no longer who we are as a nation.  As Justice Kennedy observed in *Kennedy v. Louisiana*, which ruled that the Constitution forbids execution for a non-homicide offense (rape of a child), "It is [] retribution, that most often can contradict the law's own ends. This is of particular concern when the Court interprets the meaning of the Eighth Amendment in capital cases.  When the law punishes by death, it risks its own sudden descent into brutality, transgressing the constitutional commitment to decency and restraint."  554 U.S. at 420.

In sum, the lengthy delays that are inherent and even necessary to the death penalty process pose two special constitutional conflicts.  A lengthy delay "in and of itself is especially cruel because it subjects death row inmates to decades of especially severe, dehumanizing conditions of confinement." *Glossip*, 135 S. Ct. at

2765, (Breyer and Ginsburg, JJ., dissenting) (internal quotation omitted). And, too, those delays undermine the death penalty's penological rationale, perhaps irreparably so." *Id.* at 2767. "[L]engthy delays both aggravate the cruelty of the death penalty and undermine its jurisprudential rationale." *Id.* at 2769. A death penalty does not fulfill the goals of deterrence or retribution, "is nothing more than the purposeless and needless imposition of pain and suffering, and hence an unconstitutional punishment." *Atkins*, 536 U.S. at 319.

E.   **Where the majority of States do not carry out executions, and a majority of Americans no longer support the death penalty, the evolving standards of decency that mark the progress of our nation's maturation as a society have relegated capital punishment to history, and a few isolated jurisdictions that cannot be allowed to set the standard for the entire country.**

When Justice Breyer wrote his dissent in *Glossip*, he noted that the Eighth Amendment "forbids punishments that are cruel and *unusual*," and observed that in the preceding year, only seven States had carried out an execution. *Glossip*, 135 S. Ct. at 2772 (Breyer and Ginsburg, JJ., dissenting)(emphasis in original)  Though the number of states carrying out executions is the same, the number of executions this year was 22, versus 35 in the year that Justice Breyer observed.  The intervening years, 2015 to 2018, were marked by 28, 20, 23, and 25 executions, respectively.

The measure that informs the Eighth Amendment was not settled when it was enacted.  It has changed according to the "evolving standards of decency that

mark the progress of a maturing society."[84]  Thus, what was accepted forty-three years ago is not foreclosed from re-examination today.  Indeed, three of the justices who joined the majority in *Gregg* publicly regretted their decision later in life.  *See Callins v. Collins*, 510 U.S. 1141, 1145 (1994) (Blackmun, J., dissenting from denial of certiorari); John C. Jeffries, Jr., Justice Lewis F. Powell, Jr.: A Biography 451 (1994) (Quoting Justice Powell: "I have come to think that capital punishment should be abolished."); *see generally* John Paul Stevens, *Six Amendments: How and Why We Should Change the Constitution*, 107-123 (2014); Semel, *Reflections on Justice John Paul Stevens' Concurring Opinion in Baze v. Rees: A Fifth Gregg Justice Renounces Capital Punishment*, *supra.*

The foregoing sections of this memorandum have laid out the arbitrary, capricious, irrational, and invidious manner in which the federal death penalty operates in practice. But not only is the death penalty cruel for its arbitrariness, it is cruel for its rarity, *i.e,* its unusualness.  Our nation has reached a point where the federal death penalty does not comport with the trajectory of our societal values and is therefore constitutionally "unusual" within the meaning of the Eighth Amendment.

Justice Breyer's dissent in *Glossip* pointed to eleven specific developments to support his conclusion that, in the two years leading up to the *Glossip* decision, the

---

[84] As pointed out above, the idea that the Eighth Amendment is not static has long been a key element of Eighth Amendment analysis. *See, e.g., Hall v. Florida*, 134 S.Ct. 1986, 1992 (2014); *Trop v. Dulles*, 356 U.S. 86, 101 (1958) (plurality opinion); *Weems v. United States,* 217 U.S. 349, 378 (1910).

death penalty had become constitutionally "unusual."  What may have been arguable then is clear now.

1. The greatest indicia of society's current rejection – or acceptance – of the death penalty may be its willingness to impose it where it is available.[85]  *See Graham*, 560 U.S. at 62 ("Actual sentencing practices are an important part of the [c]ourt's inquiry into consensus.").  In 2015 Justice Breyer observed that the number of death sentences handed down each year had begun to decrease around 2000 and were continuing to do so as of the time he wrote his dissent.  *Id.* at 2772-73; 2777 (Appendix A, graph showing number of death sentences from 1977-2014).  In 1998, there were 295 death sentences; in the year before the *Glossip* decision, there were 74, a 75% decrease.  This year there have been 33 death sentences imposed (1 was federal), an 89% decrease since 1998, and a 55% decrease since 2014.  DPIC, "The Death Penalty in 2019:  Year End Report."[86]

2. Justice Breyer also observed the downward trend in the number of executions per year.  *Id.* at 2773, 2777 (Appendix B, graph showing

---

[85] As discussed, executions may occur decades after the death sentence is imposed. Thus, a jurisdiction's execution activity may more reflect its trial activity from years before than the populace's present perspective on capital punishment.  The average time between sentence and execution for people put to death this year was 21 years. *See* Death Penalty Information Center, "Execution List 2019," *available at* https://deathpenaltyinfo.org/executions/2019 (last visited Dec. 17, 2019).

[86] *Available at https://deathpenaltyinfo.org/facts-and-research/dpic-reports/dpic-year-end-reports/the-death-penalty-in-2019-year-end-report* (last visited Dec. 18, 2019).

executions from 1977–2014).  In 1999 there were 98 executions; the next year that number fell by 13% to 85; and in 2014, there were 35 executions, a 64% drop from 1999.  This year there were 22 executions, a 78% drop from 1999, and a 38% drop from 2014.  *See* DPIC, "Fact Sheet."[87]

3.  In 2015, when Justice Breyer issued his dissent in *Glossip*, 30 States had either formally abolished the death penalty or not conducted an execution in more than eight years. *Glossip*, 135 S.Ct. at 2773-74.  There are now 32 states *plus* the federal government, military, and District of Columbia that have not executed anyone in 10 years, and 38 states plus the three federal jurisdictions that have not had an execution since *Glossip*.  DPIC, "States With No Recent Executions."[88]  Five of the 20 States that have conducted an execution in the last 10 years have executed only one or two people (South Carolina, Louisiana, Delaware, Utah, Washington, Nebraska, Idaho).  In the last eight years, no more than nine states have carried out an execution in any given year, only three states – Florida, Georgia, and Texas – have executed someone in each of the last 8 years, and since 2012 no more than 4

---

[87] *Available at* https://files.deathpenaltyinfo.org/documents/pdf/FactSheet.f1576162137.pdf (last visited Dec. 17, 2019).

[88] *Available at* *https://deathpenaltyinfo.org/executions/executions-overview/states-with-no-recent-executions* (last visited Dec. 18, 2019).

states each year have had three or more executions.  DPIC, "Executions by State and Region Since 1976."[89]

4. Looking at the frequency, or rarity, of the death penalty at the granular level, Justice Breyer noted that the overwhelming majority of counties in the United States have not executed anyone.  Between 1976 and 2007, there were no executions in 86% of America's counties. *Id.* at 2774, 2779 (Appendix D). This year, only 19 counties, 1% of the all in the nation, had an execution. DPIC, "Executions by County (2019)."[90]

5. Even more than the rates and percentages, it is "the consistency of the direction of change" that reflects that evolution of the standard of decency is on-going.  *Roper*, 543 U.S. at 566. When Justice Breyer wrote his dissent, seven States had abolished the death penalty in the preceding decade. *Glosssip,* 135 S.Ct. at 2774-2775.  In the past five years, three more have done so.  There are now 21.[91]  DPIC, "State by State."[92] Eleven of the 29 states that do have the death penalty have not executed anyone in ten years.

---

[89] *Available at* https://deathpenaltyinfo.org/executions/executions-overview/number-of-executions-by-state-and-region-since-1976 (last visited Dec. 17, 2019).

[90] *Available at* https://deathpenaltyinfo.org/executions/executions-overview/executions-by-county (last visited Dec. 17, 2019).

[91] *See also*, Anna Staver, "Householder says legislature may dump Ohio's death penalty law," *The Columbus Dispatch*, Dec. 19, 2019, *available at* https://www.dispatch.com/news/20191219/householder-says-legislature-may-dump-ohiorsquos-death-penalty-law (last visited Dec. 20, 2019).

[92] *Available at*, https://deathpenaltyinfo.org/state-and-federal-info/state-by-state (last visited Dec. 17, 2019).

DPIC, "Executions by State."  Perhaps most critically, in three of the four states where the governor has imposed a moratorium on executions, the people of those states have re-elected the governor one or more times since the *Glossip* decision.[93]  Thus, in 24 states, voters have expressed their consent to deactivating the death penalty.

6.  Today, as was the case five years ago when Justice Breyer called for the re-examination of capital punishment, the direction of the trend is almost singular. *Glossip,* 135 S.Ct. at 2775.  Only one state in the last 25 years has enacted legislation to establish the death penalty; Nebraska voters did so by direct referendum after the legislature repealed it. DPIC, "State and Federal

---

[93] In Oregon, Governor Kitzhaber, announced a moratorium in his first year in office.  *See* https://en.wikipedia.org/wiki/Capital_punishment_in_Oregon (last visited Dec. 19, 2019).  He was then re-elected in 2015, but resigned shortly thereafter.  *See* https://en.wikipedia.org/wiki/John_Kitzhaber (last visited Dec. 19, 2019).  His successor Kate Brown announced she would keep the moratorium in place, and she was then re-elected in a special election in 2016.  *See* https://en.wikipedia.org/wiki/Kate_Brown (Last visited Dec. 19, 2019).  In May, 2013, then-Governor John Hickenlooper of Colorado imposed a moratorium.  DPIC, "Colorado Governor Indefinitely Stays Execution Over Concerns About Flawed System."  *Available at* https://deathpenaltyinfo.org/news/colorado-governor-indefinitely-stays-execution-over-concerns-about-flawed-system (last visited Dec. 19, 2019).  He was re-elected in 2014. https://en.wikipedia.org/wiki/John_Hickenlooper (last visited Dec. 19, 2019).  Jared Polis, who succeeded Hickenlooper in 2018, voiced his opposition to capital punishment during his campaign and has committed to commuting the sentences of the three men on Colorado's death row if the legislature prospectively abolishes the state's death penalty.  DPIC, "Colorado Governor Likely to Commute Death Sentences if State Abolishes Death Penalty," *available at* https://deathpenaltyinfo.org/news/colorado-governor-likely-to-commute-death-sentences-if-state-abolishes-death-penalty (last visited Dec. 19, 2019). Pennsylvania Governor Tom Wolf declared a moratorium in 2015 and was re-elected in 2018.

Info Nebraska."[94]  Indeed, even in many States most associated with the death penalty, remarkable shifts have occurred. Texas, almost the *sine qua non* of the death penalty in the United States, has sentenced fewer than 10 people to death in each of the last five years.[95]

7.     Finally, when Justice Breyer wrote his dissent in *Glossip* in 2015, 60% of Americans favored the death penalty. *Id.* at 2775.  This year, the Gallup poll that has tracked the preference for the death penalty versus life without parole since 1985 found that 60% of Americans preferred life without parole to a death sentence.  DPIC, "Gallup Poll – For First Time, Majority of Americans Prefer Life Sentence to Capital Punishment."[96] *See also Glossip*, 135 S.Ct. at at 2774, 2778 (Appendix C) (looking at percentage of U.S. population that lives in a State that had carried out an execution preceding three years and finding over 20 years it had fallen from 70% to 33%; this year it is 24%); at 2774 (looking at execution among the states in summary); at 2776 (noting that the American Law Institute had withdrawn the capital punishment statute that was the basis for the statutes affirmed in *Gregg* from the Model Penal Code in part because of doubts that the American Law

---

[94] *Available at* https://deathpenaltyinfo.org/state-and-federal-info/state-by-state/nebraska (last visited Dec. 19, 2019).

[95] California has sentenced 10 or more people to death every year except 2018.  But California has had only 1 execution in the last 14 years and only 13 since *Gregg*. *See Jones v. Chappell,* 31 F.Supp.3d 1050.

[96] *Available at* https://deathpenaltyinfo.org/news/gallup-poll-for-first-time-majority-of-americans-prefer-life-sentence-to-capital-punishment (last visited Dec. 19, 2019).

135

Institute could "recommend procedures that would" address concerns about the administration of the death penalty); at 2775-76 (noting that 95 of the 193 members of the United Nations had formally abolished the death penalty only eight countries executed more than 10 individuals in 2013 – the United States, China, Iran, Iraq, Saudi Arabia, Somalia, Sudan, Yemen).

Taken in summary, there have been fewer than 50 death sentences each year for the last five years across 30 states and two federal jurisdictions that have the death penalty; less than 1/10th of the states regularly conduct executions; voters in 24 states and the District of Columbia have consented to no executions; seven states in the last 10 years have abolished the death penalty and none have enacted it.  In this country, the death penalty has become unusual.  *Furman*, 408 U.S. at 311 (White, J., concurring) (executions could be so infrequently carried out that they "would cease to be a credible deterrent or measurably to contribute to any other end of punishment in the criminal justice system . . . when imposition of the penalty reaches a certain degree of infrequency, it would be very doubtful that any existing general need for retribution would be measurably satisfied"). *See also Santiago*, 318 Conn. at 78-86.

While the fact that the death penalty has *become* unusual across the nation informs whether the federal death penalty is unconstitutionally unusual, the distinction that the federal death penalty has *never* been usual since its enactment must be taken into account.  As the court found in *Fell* "The federal experience is not so much a decline in executions as it is a decision on the part of many decision-

136

makers within the federal legal system never to begin." *Fell*, 224 F.Supp.3d at 349. The federal system has carried out three executions since 1988 from a pool of more than 4,300 potential capital cases, a rate of .06%. There have been no executions in the past 15 years. Over that same time span the average number of death sentences per year has been 2.6.  The federal government has authorized capital prosecutions for only 13% of capital-eligible defendants to be prosecuted for a death sentence and has prosecuted only 6% to a penalty phase (less than half of the number authorized).

To whatever extent such hyper-rarity may be regarded as a "norm," given that the federal death penalty is a national policy and therefore theoretically standardized across the country, the geographic concentration of federal capital prosecutions and sentences makes the reality that since 1988 effectively only three states have had a federal death penalty.





The data in the preceding charts was compiled by the Federal Death Penalty Resource Counsel Project.  The trend of federal capital prosecutions and death sentences plainly tracks the national trend.  Between 2004 and 2005 53 defendants were prosecuted and 15 death sentences were obtained (still less than 0.1% of capital eligible).  Between this year and last year there have been 4 trials and two sentences.

The Supreme Court's consideration of state legislative trends in its decisions that have restricted the imposition of the death penalty or other punishments under the Eighth Amendment also instruct that death penalty, nationally, has become cruel and unusual.  *See Roper*, 543 U.S. at 565 (characterizing as "telling" that five states had amended laws to prohibit execution of offenders younger than 18 since decision in *Stanford v. Kentucky*, 492 U.S. 361 (1989) in ruling that executing juvenile offenders violates the Eighth Amendment).  *See also Kennedy*, 554 U.S. at 432 (considering state legislation in finding Eighth Amendment prohibits execution for rape of a child).  In *Atkins v. Virginia*, the Court noted that 16 states had changed their position on executing intellectually disabled persons since the decision in *Penry v. Lynaugh*, 492 U.S. 302 (1989) had found no bar.  *Accord Miller* 132 S. Ct. at 2471 (holding that life without parole sentences for juveniles who commit homicide violates the Eighth Amendment even where 28 states and the Federal Government provided for life-without-parole sentences for some juveniles convicted of murder); *Obergefell v. Hodges*, 135 S. Ct. 2584, 2615 (2015) (Roberts, C.J., dissenting)(finding constitutional right of same-sex couples to marry even

139

though the practice was sanctioned by the legislatures of only 11 states and the District of Columbia).  Moreover, the fact that "in the last two decades, no State without a death penalty has passed legislation to reinstate the death penalty," *Glossip* at 2775 (Breyer, J., dissenting), "carries special force in light of the general popularity of anticrime legislation."

And, while the Supreme Court looks to legislation or state government action to discern the standard of decency for purposes of an Eighth Amendment inquiry, where the legislative process is often influenced or controlled by issues that are tangential or even entirely unrelated to a specific matter, public opinion polls offer clear insight into what the current mindset of the nation is.  As indicated above, after more than 20 years of a majority of Americans preferring execution over life without parole as a sentence for murder, and a brief period of equilibrium, that percentage has now inverted.  Two thirds of Americans favor life without possibility of parole as a punishment for murder.  There is additional evidence that public support for the death penalty in this country is trending downwards.  *See* DPIC, "Gallup Poll – For First Time, Majority of Americans Prefer Life Sentence to Capital Punishment," *supra*.

As noted above, while no Supreme Court justice has ever expressed regret or second thoughts about having voted to strike down capital punishment, three have publicly stated that they erred by not having done so when they had the chance.  In this vein, a marker of the condition of capital punishment of which this Court must take heed is the number of former death penalty proponents who have changed

140

their position either because of the financial costs of obtaining and enforcing death

sentences, the lack of any dispositive evidence that the death penalty deters

murder, the ever-increasing number of cases of people sentenced to death who are

subsequently proven innocent, or evolving moral standards on the value of life.  *See,*

*eg.,* DPIC, "New Position of National Association of Evangelicals Shows Cracks in

Death Penalty Support"[97]; "Retired Judges Support Death Row Inmate's Appeal"[98];

Former State and Federal Judges, Prosecutors, and Law Enforcement Officials and

Families of Murder Victims Urge Federal Government to Call Off Executions"[99];

"More Than 250 Conservative Leaders Join Call to End Death Penalty"[100] ;

"Prosecutors in Colorado and Nevada Call for Death-Penalty Repeal"[101]; "National

Think Tank Calls on Conservatives to Reject Death Penalty."[102]  *See also*

"https://conservativesconcerned.org/ (last visited Dec. 19, 2019).

---

[97] *Available at* https://deathpenaltyinfo.org/news/new-position-of-national-association-of-evangelicals-shows-cracks-in-death-penalty-support (last visited Dec. 19, 2019).

[98] *Available at* https://deathpenaltyinfo.org/news/new-voices-retired-judges-support-death-row-inmates-appeal (last visited Dec. 19, 2019).

[99] *Available at* https://deathpenaltyinfo.org/news/former-state-and-federal-judges-prosecutors-and-law-enforcement-officials-and-families-of-murder-victims-urge-federal-government-to-call-off-executions (last visited Dec. 19, 2019).

[100] *Available at* https://deathpenaltyinfo.org/news/more-than-250-conservative-leaders-join-call-to-end-death-penalty (last visited Dec. 19, 2019).

[101] *Available at*  https://deathpenaltyinfo.org/news/new-voices-prosecutors-in-colorado-and-nevada-call-for-death-penalty-repeal (last visited Dec. 19, 2019).

[102] *Available at* https://deathpenaltyinfo.org/news/national-think-tank-calls-on-conservatives-to-reject-death-penalty (last visited Dec. 19, 2019).

The trend and the pattern is clear.  The death penalty does not reflect a national consensus.  It is the choice of a steadily dwindling minority of jurisdictions, prosecutors, and juries.  Within the nation, it is patently unusual.  This prompts one to paraphrase former Secretary of State John Kerry:  how do you tell a man he will be the last person punished by a method known to be cruel and unusual?

F.    The Doctrine of *Stare Decisis*

The results of a half century's experimentation demonstrate that the hypothesis of *Gregg* has not proven to be true.  Narrowing statutes and guided jury discretion have not cured the arbitrariness that *Furman* found infected capital punishment.  It has simply hung that same arbitrariness – and now, in growing response to that, a derivative unusualness – atop a structure of capital offenses and aggravating and mitigating factors.  Where this conclusion is supported by the evidence, it is this Court's role and authority to strike the death penalty in this case.

The doctrine of *stare decisis* does not limit this Court's action.  Indeed to strike the death penalty would be legally sound where the principles articulated in *Gregg* clearly have not been fulfilled.  But more than that, where the interests of justice implicate taking a person's life, conflicts with the decisions of the Supreme Court do not limit this Court's powers.

In his dissent in *Glossip*, Justice Breyer explained the role of the courts in upholding the protections recognized in *Furman* and affirmed in *Gregg* to call for judicial review of capital punishment.

The [] matters I have discussed, such as lack of reliability, the
arbitrary application of a serious and irreversible punishment,
individual suffering caused by long delays, and lack of penological
purpose are quintessentially judicial matters. They concern the
infliction – indeed the unfair, cruel, and unusual infliction—of a
serious punishment upon an individual. I recognize that in 1972 this
Court, in a sense, turned to Congress and the state legislatures in its
search for standards that would increase the fairness and reliability of
imposing a death penalty. The legislatures responded. But, in the last
four decades, considerable evidence has accumulated that those
responses have not worked.

**Thus we are left with a judicial responsibility.  The Eighth
Amendment sets forth the relevant law, and we must interpret that
law.** See *Marbury v. Madison*, 1 Cranch 137, 177, 2 L.Ed. 60 (1803);
*Hall*, 572 U.S. at ___, 134 S.Ct. at 2000 ("That exercise of independent
judgment is the Court's judicial duty"). We have made clear that "'the
Constitution contemplates that in the end our own judgment will be
brought to bear on the question of the acceptability of the death
penalty under the Eighth Amendment.'" *Id.* at ___, 134 S.Ct. at 1999
(*quoting Coker v. Georgia*, 433 U.S. 584, 597, 97 S.Ct. 2861, 53 L.Ed.2d
982 (1977) (plurality opinion)); [].

*Glossip*, 135 S.Ct. at 2776 (emphasis added).[103]  The federal court in *Sampson*

likewise recognized that it was the court's role and duty to undertake a

constitutional review of the administration of the death penalty.  There, the district

court judge explained that

the Court has repeatedly held that courts must look to 'evolving
standards of decency that mark the progress of a maturing society' in
deciding whether the Eighth Amendment permits a particular
punishment for a particular crime. *Hall v. Florida*, 134 S.Ct. 1986,

---

[103] A majority of the Court shares this view. See *Obergefell v. Hodges*, 135 S. Ct.
2584, 2605 (2015) ("[T]he freedom secured by the Constitution consists, in one of its
essential dimensions, of the right of the individual not to be injured by the unlawful
exercise of governmental power. Thus, when the rights of persons are violated, 'the
Constitution requires redress by the courts,' notwithstanding the more general
value of democratic decision-making. This holds true even when protecting
individual rights affects issues of the utmost importance and sensitivity.") (internal
citations omitted).

1992 (2014) (quoting *Trop v. Dulles*, 356 U.S. 86, 101 (1958)); *Roper v. Simmons*, 543 U.S. 551, 560-61 (2005). The question of whether standards of decency have materially changed since the Supreme Court decided an issue is a factual question. *See, e.g., Kansas v. Marsh*, 548 U.S. 163, 207-11 (2006) (Souter, J., dissenting). Fact-finding is, in the first instance at least, typically done based on evidence presented in the district courts, where the adversary process operates to test that evidence and material disputes are decided by a trial judge or jury. *See Sykes v. United States*, 131 S.Ct. 2267, 2286 (2011) (Scalia, J., dissenting); see also Allison Orr Larsen, *The Trouble with Amicus Facts*, 100 Va. L. Rev. 1757 (2014); Adam Liptak, *Seeking Facts, Justices Settle for What Briefs Tell Them*, N.Y. Times, Sept. 2, 2014, at A10.

Therefore, **if there has been a material change in facts relevant to the evolving standards analysis – a question initially for the trial courts—an issue is not foreclosed by Supreme Court precedent because the Supreme Court has not decided the matter in dispute. Rather, the district court is deciding a distinguishable case and controversy.** As this court wrote in 2003, when the Supreme Court held that the death penalty was not per se unconstitutional in *Gregg v. Georgia*, 428 U.S. 153 (1976), "the Court also implicitly acknowledged that future developments might challenge the basis of its decision." *Sampson*, 275 F.Supp.2d at 72 (citing *Gregg*, 428 U.S. at 187). Accordingly, in evaluating Sampson's 2014 challenges to the death penalty, the court has examined the alleged facts on which Sampson relies and decided whether they are significantly different than the facts in the cases in which the Supreme Court or the First Circuit decided the analogous issue. If there is no significant difference in the facts, this court must follow the higher court's holdings. **If there might be a significant difference in the proven facts, this court has both the authority and the obligation to decide whether new facts have been proven and, if so, whether they are material in the sense that they require a different conclusion.**

*United States v. Sampson*, Cr. No. 01-10384-MLW, 2015 WL 6511247 at *4.

(emphasis added). *See also id.* at *8 ("The Supreme Court recently stated that it is settled that capital punishment is constitutional. However, [] if there is proof that the facts on which the Supreme Court decided an issue have materially changed,

then the issue is not the same and prior decisions would not dictate the outcome.").
*Cf. Bucklew v. Precythe*, __ U.S. __, 139 S. Ct. 1112, 1122 (2019)

 ("The Constitution allows capital punishment. . . .  [This] means that the judiciary

bears no license to end a debate reserved for the people and their representatives.").

*But see Furman* (declaring capital punishment unconstitutional on Eighth

Amendment grounds).

   Indeed, noting that Gregg is "still the law of the land," the court in *Fell*,

stopped "short [] of altering the holding in *Gregg* that the concerns expressed in

*Furman* that the penalty of death not be imposed in an arbitrary or capricious

manner can be met by a carefully drafted statute that ensures that he sentencing

authority is given adequate information and guidance."  *Fell*, 224 F.Supp.3d at 358.

But that ruling conflicts with the court's characterization at the outset of its order

of the inquiry as "whether the constitutional requirements for a death penalty

statute set out in *Gregg* have been met in practice," *Id.* at 329, and that in *Gregg*

the Supreme Court approved the statute reviewed "on grounds which one may fairly

call *a priori* rather than evidence based."  *Id.* at 357.  Thus, the Court's ruling in

*Gregg* was what results the statute was *expected* to produce, not what it had been

found to produce.

   Moreover, the doctrine of *stare decisis* is not an "inexorable command."

*Burnet v. Coronado Oil & Gas Co.,* 285 U.S. 393, 405 (1932) (Brandeis, J.,

dissenting), and a court may depart from the doctrine where there is "special

justification."  *Arizona v. Rumsey*, 467 U.S. 203, 212 (1984).

> Such justifications include the advent of subsequent changes or
> development in the law that undermine a decision's rationale; the need
> to bring [a decision] into agreement with experience and with facts
> newly ascertained; and a showing that a particular precedent has
> become a detriment to coherence and consistency in the law.

*Payne v. Tennessee*, 501 U.S. 808, 849 (1991) (Marshall, J. dissenting) (citations omitted). In The Supreme Court's decision in *Ramsey* and Justice Marshall's dissent in *Payne* cited to other decisions wherein the Court had broken with its own precedent. However, the opportunity to break with precedent if the conditions are met are not limited to the Court.

In the Third Circuit, however, those reasons apply to lower courts as well. In *United States v. Babich*, 785 F.2d 415 (3d Cir. 1986), the defendant urged a claim that had been decided to his detriment by the *en banc* court three years earlier. The Court of Appeals concluded that there was "no argument, nor have we been furnished empirical data or 'facts newly ascertained' that constitute a 'special justification to recommend that a court in banc be convened in this case to depart from the doctrine of *stare decisis*." *Babich*, 785 F.2d at 418. *See also United States v. Brace*, No. 1:17-CV-00006 (BR), 2018 WL 9815249, at *2 (W.D. Pa. Aug. 10, 2018) (acknowledging that district court could, but declining to, depart from the doctrine of *stare decisis*). *Accord Barnette v. West Virginia Board of Education*, 47 F. Supp. 251 (S.D. W.Va. 1942) (refusing to follow Supreme Court decision in *Minersville School District v. Gobitis*, 310 U.S. 586 (1940), holding that public schools could require students to salute the flag and recite the *Pledge of Allegiance* over their religious objections as Jehovah's Witnesses), *affirmed in West Virginia State Board*

146

*of Education v. Barnette*, 319 U.S. 643 (1943) (overruling *Minersville School District*); *Lewis v. Gaylor*, 914 F.Supp.2d 925 (S.D. Ind. 2012) (adopting magistrate judge's report and recommendation finding limited circumstances to depart from Seventh Circuit precedent where the district court was "powerfully convinced" that the Court of Appeals would overrule its previous decision at the first opportunity).

The promises of *Gregg* require reassessment of the administration of capital punishment to ensure that the underlying values of the Eighth Amendment's prohibition against cruelly arbitrary and capricious and unusually infrequent punishments have not become buried beneath the silt of routine and indifference. Some jurists recognized the inherent human flaws in the capital punishment experiment began. *See Gregg*, 428 U.S. at 427 (Brennan, J. dissenting); *id.* at 231 (Marshall, J., dissenting).  Others came to recognize over time.  *See Baze*, 553 U.S. 35 at 86 (Stevens, J., concurring in judgment) (concluding that the death penalty is "patently excessive and cruel and unusual punishment violative of the Eighth Amendment.") (citation omitted); *Callins v. Collins, supra.*

This Court can do the assessment in the first instance here.  The empirical data and newly ascertained facts presented herein constitute a "special justification" to find that the death penalty, where it has failed to fulfill the unfounded predictions **and requirements** set out in *Gregg* is unconstitutional, and for that reason, the federal death penalty must be struck as a sentencing option in this case.

## CONCLUSION

An experiment shown to have failed should not be continued.  The intention and promise of *Gregg* has been overborne by the idiosyncrasies, subjectivities, frailties of the people who are necessary to deliver on that promise.  The result is not an indictment of any one actor.  It is a realization about us all.  We, as a human society, are not able to administer capital punishment without arbitrariness and caprice, and for that reason, the death penalty is unconstitutional.

Mr. Bowers moves this Court to enter an order finding the federal death penalty constitutes a cruel and unusual punishment prohibited by both the Fifth and Eighth Amendments and striking the government's Notice of Intent to Seek Death.

Respectfully submitted,

*/s/ Judy Clarke*
Judy Clarke
Clarke Johnston Thorp & Rice, PC

*/s/ Michael J. Novara*
Michael J. Novara
First Assistant Federal Public Defender

*/s/ Elisa A. Long*
Elisa A. Long
Supervisory Assistant Federal Public Defender