IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 18-292 |
| | ) | **UNDER SEAL** |
| ROBERT BOWERS | ) | |

**MOTION TO EXCLUDE UNDER *DAUBERT***
**THE PROPOSED EXPERT TESTIMONY OF WILLIAM BRANIFF**
**OR, ALTERNATIVELY, TO HOLD A *DAUBERT* HEARING**[1]

Defendant Robert Bowers, through counsel, moves the Court to exclude the

testimony of William Braniff, whom the government disclosed as an expert witness. For

several reasons, the Court should exclude Mr. Braniff's testimony.

First, the proposed testimony will not "help the trier of fact to understand the

evidence or to determine a fact in issue." Fed. R. Evid. 702(a). Mr. Braniff's proposed

testimony appears to be a history lesson of sorts, encompassing historical events and

figures and seeking to tie Mr. Bowers to those past events. In addition, the government

seeks to have him testify regarding the proliferation of white supremacist ideologies on

social media platforms. Neither of these topics is helpful to the jury in determining the

facts of this case; rather, such testimony seeks to inflame the jury against Mr. Bowers by

tying him to the beliefs of other people whom the jury will likely view unfavorably.

Additionally, Mr. Braniff's proposed testimony is not helpful in determining intent for

---

[1] The government provided expert disclosures on February 14, 2023, in response to this Court's Order. *See* ECF 931. In a previous Order, this Court gave the defense 14 days after the government's production of discovery material in response to the Court's ruling to file *Daubert* challenges. The defense *Daubert* challenge to Mr. Braniff's testimony is due February 28, 2023.

counts 1–11, 34–35, and 40–47 because Mr. Braniff lacks the factual basis to opine on Mr. Bowers intentions or mental state;[2] to the extent that Mr. Braniff's proposed testimony relates to counts 12–22 and 36–37 concerning Mr. Bowers' motivations, his opinions impermissibly direct the jury to find the "because of" element of the offenses rather than aiding the jury in drawing its own conclusions; finally, the testimony is not helpful because it is too attenuated from any determination that the jury must make.

Second, Mr. Braniff is not qualified to testify about Mr. Bowers' mental condition. The government proposes that Mr. Braniff testify as though he is inside Mr. Bowers' mind and knows what Mr. Bowers means and intends when he used certain terms or phrases. The government further proposes that Mr. Braniff testify as though he knows that Mr. Bowers shares a belief system and ideology with a larger community of white supremacists and anti-Semites. Mr. Braniff is not qualified to offer opinions on Mr. Bowers' mental state or condition, either directly or indirectly. *See* Fed. R. Evid. 702.

Third, the premise of Mr. Braniff's proposed testimony, that Mr. Bowers is a rational actor who shares beliefs and an ideology with a larger community of white supremacists, is not based on sufficient facts or data and nor is it the product of reliable principles and methods that Mr. Braniff reliably applied to the facts of the case. *See* Fed. R. Evid. 702(b), (c), and (d). In addition to not being qualified to testify about Mr. Bowers' mental state, Mr. Braniff has no foundation for the claim that Mr. Bowers shares

---

[2] Counts 23–33, 38–39, and 52–63, which charge offense under 18 U.S.C. § 924, have one of the charges in counts 1–11, 34–35, and 40–47 as the underlying crime of violence.

a belief system and ideology with a larger community of white supremacists such that he could be said to have been radicalized in a shared ideology.

Fourth, Mr. Braniff's proposed testimony about the role of social media platforms in the proliferation of white supremacist and neo-Nazi tenets is not based on sufficient facts or data and nor is it the product of reliable principles and methods that Mr. Braniff has reliably applied to the facts of the case. Fed. R. Evid. 702(b), (c), and (d). Even assuming there was a reliable method for obtaining such data, Mr. Braniff does not have a basis for applying supposed trends of activity on the internet to Mr. Bowers.

Fifth, the premise of Mr. Braniff's proposed testimony, that Mr. Bowers engaged in an act of domestic "terrorism" related to "white nationalism," is not based on sufficient facts or data and is not the product of reliable principles and methods that he has reliably applied to the facts of this case and, therefore, his entire testimony should be excluded.

Sixth, certain portions of the proposed testimony do not constitute "scientific, technical, or other specialized knowledge." Fed. R. Evid. 702(a). The proposed testimony is well within the commonsense understanding of the jury and requires no expertise. To the extent it is within the realm of specialized knowledge, Mr. Braniff is not qualified to offer his opinions and certain of his opinions are not the product of reliable principles and methods reliably applied to the facts of this case.

And finally, Mr. Braniff is not qualified to offer testimony on domestic terrorism and white nationalism.

For these reasons, the Court should exclude Mr. Braniff's testimony or, alternatively, hold a *Daubert* hearing to elicit additional evidence.

## I.     Background

The government seeks to admit expert testimony from William Braniff on domestic terrorism and white nationalism. It asserts that Mr. Braniff will testify as follows:

> Braniff will testify about anti-Semitism as it relates to the oral and written statements of the defendant. Specifically, he will discuss terminology, such as words like "kike," "holohoax" and "Yids," and concepts such as the dehumanizing of Jews. He will also testify about neo-Nazi and white supremacist ideological tenets as they relate to the oral and written statements of the defendant, including concepts like "the 14 words," "1488," "white genocide," "globalists," "Zion Occupied Government," and "invaders." He will testify about a hand gesture associated with the "white power" movement. He will testify about the defendant's references to the Bible and heterodox Christian concepts as they relate to anti-Semitism.
>
> He will testify about the defendant's support for Hitler and the mass killing of Jews in the Holocaust, the white supremacist murder of a counter-protester in Charlottesville during a white supremacist rally, and the terrorist attack perpetrated by Anders Breivik in Norway. He will also testify about threats of violence made by the defendant towards the Jewish community in general.
>
> Mr. Braniff will testify about the statements the defendant made regarding the Jewish community and its relationship to immigrants and refugees, including the Hebrew Immigrant Aid Society (HIAS), and specifically the white supremacist idea that white people are being replaced by non-white populations. Finally, Mr. Braniff will testify about the role of social media platforms, including Gab, with respect to domestic terrorism and the proliferation of white supremacist and neo-Nazi ideological tenets.

Exhibit A (portion of government's June 6, 2022, expert notice). Regarding Mr. Braniff's qualifications, the government offers the following:

> William Braniff is the Director of the National Consortium for the Study of Terrorism and Responses to Terrorism (START) and a Professor of the Practice at the University of Maryland. See Exhibit W, Curriculum Vitae. In that role, he oversees and participates in a multi-million dollar per year research enterprise, undergraduate and graduate level educational programs, and training programs for current practitioners. START is well known for

generating high-quality datasets that examine terrorism across all ideologies in the United States and globally, and the organization uses those data to produce analyses, educational and training products related to domestic terrorism.

In 2019, Braniff testified before the Senate Homeland Security and Government Affairs Committee on the topic of domestic terrorism and has testified before Congress on four other occasions. In recent years he has consulted with the FBI Counterterrorism Division leadership on the topic, the National Security Council, the Department of State's Global Engagement Center, and the Intelligence Community. He has provided briefings for law enforcement audiences on domestic terrorism on numerous occasions through the State and Local Anti-Terrorism Training (SLATT) program, and has provided briefings on the topic to NATO audiences, the United Nations Counter-Terrorism Executive Directorate. He is a member of the Maryland Domestic Terrorism Task Force and is consulting with the State of New York as they establish a new office to address domestic terrorism. He also serves on the Independent Advisory Committee of the Global Internet Forum to Counter Terrorism and helped expand their remit to look at white supremacist and neo-Nazi manifestos in addition to propaganda produced by organizations such as al-Qa'ida and the self-described Islamic State.

Prior to his ten years at START, Braniff served five years as the Director of Practitioner Education at West Point's Combatting Terrorism Center and an instructor in the Department of Social Sciences where be taught the introduction to Terrorism Class. Prior to that, Braniff worked in nuclear counterterrorism at the National Nuclear Security Administration after five years on active duty as an Armor Officer in the United States Army. He earned a Bachelor of Science degree from the United States Military Academy at West Point, and a Masters Degree from the Johns Hopkins School of Advanced International Studies (SAIS). He has over twenty years of experience in national security, seventeen of which have been in the counterterrorism field.

*Id.* In its supplemental disclosure, the government provided the citations for cases within

the last four years for which Mr. Braniff had been retained or testified. With the

exception of this case, all the cases involved individuals affiliated with specific

international terrorist organizations. Exhibit B (supplemental expert disclosure, dated

February 14, 2023). For the reasons that follow, the Court should exclude Mr. Braniff's

testimony for failure to meet Rule 702 standards. Alternatively, the Court should hold a

pretrial *Daubert* hearing to resolve factual disputes and elicit additional evidence

regarding the defense challenges to Mr. Braniff's proposed testimony.

## II.    Argument

The standard for the admission of expert testimony is Rule 702 of the Federal

Rules of Evidence, as interpreted by *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579

(1993), and its progeny.[3] Federal Rule of Evidence 702 provides as follows:

> A witness who is qualified as an expert by knowledge, skill, experience,
> training, or education may testify in the form of an opinion or otherwise if:
>
> **(a)** the expert's scientific, technical, or other specialized knowledge will
> help the trier of fact to understand the evidence or to determine a fact in
> issue;
>
> **(b)** the testimony is based on sufficient facts or data;
>
> **(c)** the testimony is the product of reliable principles and methods; and
>
> **(d)** the expert has reliably applied the principles and methods to the facts of
> the case.

Fed. R. Evid. 702. The requirements of Rule 702 represent "the 'trilogy of restrictions on

expert testimony: qualification, reliability and fit.'" *Calhoun v. Yamaha Motor Corp.,*

*U.S.A.*, 350 F.3d 316, 321 (3d Cir. 2003) (internal citation omitted). Here, Mr. Braniff's

proposed testimony falls outside the bounds of Rule 702: it is not scientific, technical, or

other specialized knowledge and does not help the trier of fact to understand the evidence

or determine a fact in issue; it is not based on sufficient facts or data and is not the

---

[3] *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999); *General Electric Co. v. Joiner*, 522
U.S. 136 (1997). The *Kumho Tire*, *Joiner*, and *Daubert* cases have come to be known as the
"*Daubert* Trilogy."

product of reliable principles and methods that Mr. Braniff reliably applied to the facts of

the case; and, in the context of this case, where there is no allegation that Mr. Bowers is

part of or shares an ideology with a specific terrorist organization and where the evidence

does not relate to international terrorism, Mr. Braniff is not qualified to offer the

proposed testimony.

> ### A.    The proposed testimony will not help the trier of fact to understand the evidence or to determine a fact in issue.

For several reasons, Mr. Braniff's proposed testimony violates Rule 702's

directive that expert testimony must "help the trier of fact to understand the evidence or

to determine a fact in issue." Fed. R. Evid. 702(a).

First, Mr. Braniff's testimony about a larger community of white supremacists and

neo-Nazis is not helpful to the jury because there is no evidence that Mr. Bowers is part

of any such community. No such allegation is part of the indictment in this case and the

government's Rule 404(b) notice does not allege any such affiliation. *See* ECF 44, 782.

The proposed testimony is little more than a general history lesson about past historical

events or figures based on Mr. Bowers' statements purportedly supporting those events or

figures. Such testimony is not helpful to the jury in understanding relevant evidence or

determining a fact in issue; it is outside the bounds of Rule 702.

Second, in offering a factually unfounded and unsupported hypothesis with a

veneer of social scientific theory for why Mr. Bowers' committed the shooting, Mr.

Braniff's testimony will distract jurors from their responsibility, for counts 1–11, 34–35,

and 40–47, to determine the intent element of the offense; that is, to determine whether

Mr. Bowers had a conscious desire or purpose to obstruct a person's free exercise of religious beliefs. 18 U.S.C. § 247(a)(2) ("Whoever . . . intentionally obstructs, by force of threat of force, . . ., any person in the enjoyment of that person's free exercise of religious beliefs"). Mr. Braniff's testimony seeks to substitute his opinion and views for the jury's task of deliberating these issues.

Third, to the extent that Mr. Braniff's testimony relates to counts 12–22 and 36–37 concerning Mr. Bowers' motivation for the shooting, the testimony does not aid the jury; rather it impermissibly directs the jury to find that the evidence proves the "because of" element of the offenses. 18 U.S.C. § 249(a)(1)(B)(i) ("Whoever . . . willfully causes bodily injury to any person . . . because of the actual or perceived . . . religion . . . ."). Mr. Braniff's testimony is simply a way for the government to impose on the jury Mr. Braniff's view that Mr. Bowers' actions were motivated by the victims' religion. Such interpretation of the evidence is within the jury's domain and Mr. Braniff's views should not be substituted for the jury's independent deliberation.

Finally, the testimony is not helpful in attempting to link historical information to the facts of this case because that proposed testimony is too attenuated from any determination that the jury must make.

The proposed testimony must be excluded because it does not meet the "fit" requirement of Rule 702. Whether a proposed expert's testimony is a "fit" for a particular case requires a district court to determine, under Fed. R. Evid. 702, whether such evidence "speaks clearly and directly to an issue in dispute in the case . . . ." *United States v. Ford*, 481 F.3d 215, 219 n.6 (3d Cir. 2007) (quoting *Daubert v. Merrell Dow*

*Pharm., Inc.*, 43 F.3d 1311, 1321 n.17 (9th Cir. 1995)); *In re Paoli R.R. Yard PCB Litigation*, 35 F.3d 717, 743 (3d Cir. 1994) (stating that "the requirement of reliability, or 'good grounds,' extends to each step in an expert's analysis all the way through the step that connects the work of the expert to the particular case").

### i. Mr. Braniff's testimony about a larger community of white supremacists and neo-Nazis is not helpful to the jury because there is no allegation and no evidence that Mr. Bowers is part of any such community.

The government proposes that Mr. Braniff will testify "about neo-Nazi and white supremacist ideological tenets," "the 'white power' movement," "the defendant's support for Hitler and the mass killing of Jews in the Holocaust, the white supremacist murder of a counter-protester in Charlottesville during a white supremacist rally, and the terrorist attack perpetrated by Anders Breivik in Norway," "the white supremacist idea that white people are being replaced by non-white populations," and "the role of social media platforms, including Gab, with respect to domestic terrorism and the proliferation of white supremacist and neo-Nazi ideological tenets." Exhibit A. All this testimony assumes that Mr. Bowers is part of a larger community of white supremacists and neo-Nazis. The mere fact that Mr. Bowers engaged with random individuals on an anonymous messaging site, primarily by "liking" posts, reposting content, or posting minimal original content, does not make Mr. Bowers part of any larger community.

The government cannot, and has not, put forth any evidence of any actual association or planning with other supposedly like-minded individuals, either related to these charges or to any other event or activity. It has not alleged, or offered any evidence

in discovery, that Mr. Bowers conspired with others; provided financial support to any like-minded cadre of white supremacists; attended any meeting, rally, or protest in support of white supremacists; participated in organizing or recruiting others; and no evidence that Mr. Bowers had an agreement with a specific group's set of rules and principles. Mr. Braniff lacks any basis for determining Mr. Bowers' affiliations or membership, instead seeking to associate Mr. Bowers with a larger group based on words and phrases. The use of similar, even identical phrases, does not constitute membership or affiliation sufficient to allow the proposed testimony. Absent evidence that Mr. Bowers is an actual member of a larger group of white supremacists and neo-Nazis, this testimony from Mr. Braniff will not "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). *See United States v. Street*, 548 F.3d 618, 632 (8th Cir. 2008) (ruling error for the district court to admit gang expert evidence, "considerable evidence tending to link [the defendant] to gangland culture," "[b]ased on nothing more than some association with several men who were current or former gang members"); *United States v. Archuleta*, 737 F.3d 1287, 1297 (10th Cir. 2013) (noting that the Tenth Circuit has "affirmed district courts' admission of gang-expert testimony as helpful to a jury when a defendant is a gang member"); *United States v. Norwood*, 16 F. Supp. 3d 848, 862 (E.D. Mich. Apr. 29, 2014) (noting "the Court is aware of no case— and the Government identifies none—in which a generalized gang expert, without knowledge of the specific gang in question, was permitted to testify"). Here, without a basis to associate Mr. Bowers with a specific white supremacist group, the government

proposes that Mr. Braniff testify as a generalized white supremacy expert. As the court in *Norwood* noted, such testimony would be unprecedented and should not be permitted.

Particularly striking here is the government's intention to put forth testimony from Mr. Braniff about Hitler, the Holocaust, the white supremacist murder of a counter-protester in Charlottesville during a white supremacist rally, and the terrorist attack perpetrated by Anders Breivik in Norway. All of this would deflect the jurors' attention from the charges at issue, inflame them with irrelevant acts committed by other people, and fail to help jurors understand the evidence in the case. The most that the government can say is that Mr. Bowers offered statements purportedly in support; it cannot show any actual association with any of these individuals or events. It is an impermissible use of the imprimatur of expert evidence to permit Mr. Braniff to testify about the criminal behavior of other individuals based on Mr. Bowers' mere statements purportedly in support of those individuals and events.

If Mr. Bowers were actually a part of an organized criminal group and his offense conduct stemmed from his participation as a member of that group, perhaps testimony about that group's structure and use of "esoteric terminology" would be helpful to the jury. *See United States v. Mejia*, 545 F.3d 179, 190 (2d Cir. 2008) ("An increasingly thinning line separates the legitimate use of an officer expert to translate esoteric terminology or to explicate an organization's hierarchical structure from the illegitimate and impermissible substitution of expert opinion for factual evidence."). There is only evidence, however, of Mr. Bowers' haphazard statements of support for certain historical events or individuals. There is no evidence, and it is not alleged, that Mr. Bowers is a

member of any specific criminal organization. Testimony from Mr. Braniff—essentially a

history lesson—about Hitler, the Holocaust, white supremacists, neo-Nazis, and the role

of social media generally in the proliferation of white supremacist ideology will inflame

the jury and deflect its attention from its task to determine proof concerning the elements

of the offenses charged. Mr. Braniff's testimony about these topics is outside the bounds

of Rule 702. *See United States v. Roark*, 924 F.2d 1426, 1434 (8th Cir. 1991) (ruling that

even where evidence showed defendant was member of a gang, it was error to permit

testimony about the gang's "institutional criminality" because such evidence is

"inherently and unfairly prejudicial" and would "deflect[] the jury's attention from the

immediate charges and cause [] it to prejudge a person with a disreputable past, thereby

denying that person a fair opportunity to defend against the offense that is charged").

### ii. Mr. Braniff's testimony will not help the jury to determine intent to obstruct the free exercise of religious beliefs.

Not one aspect of Mr. Braniff's proposed testimony supports the government's

claim that Mr. Bowers intended to obstruct victims in their free exercise of religious

beliefs. 18 U.S.C. § 247. To establish a conviction for counts 1–11, 34–35, and 40–47,

the government must prove an intent to obstruct a person's exercise of religious beliefs.

*See United States v. Barlow*, 41 F.3d 935, 942 n.15 (5th Cir. 1994) (quoting S. Rep. No.

324, 100th Cong., 2d Sess. 1, 5 (1988), reprinted in 1988 U.S.C.C.A.N. 721, 724)

("'Conviction under [§ 247], requires the prosecutor to show that the defendant

intentionally attempted or did obstruct another from engaging in activities pursuant to

that individual's religious beliefs and that he or she knew that the person was engaging in

the activities pursuant to religious beliefs.'"). That Mr. Bowers made anti-Semitic statements and statements concerning the Jewish community and immigrants and expressed support for Hitler and other white supremacist actors does not help the jury in determining whether he actually obstructed individuals in engaging in religious activities and knew that the individuals were in fact engaging in activities pursuant to religious beliefs.

### iii. Mr. Braniff's testimony directs the jury to find an element of the offense rather than allow the jury to draw its own conclusions.

Mr. Bowers' purported motivations for the shooting support only counts 12–22 and 36–37, for which the jury must determine whether he acted because of the victim's actual or perceived religion. 18 U.S.C. § 249. But that determination is for the jury to make based on the facts presented at trial. Mr. Braniff's testimony goes too far, leading the jury necessarily to the conclusion that Mr. Bowers acted because of the victims' religion.

Even if proposed expert testimony is helpful under Rule 702, the testimony must not direct the jury to find a mental state or condition that is an element of the offense. *United States v. Watson*, 260 F.3d 301 (3d Cir. 2001) (internal quotation marks and citations omitted) (stating that expert testimony is admissible "so long as the expert does not draw the ultimate inference or conclusion for the jury and the ultimate inference or conclusion does not necessarily follow from the testimony"); *see* Fed. R. Evid. 704(b) ("In a criminal case, an expert witness must not state an opinion about whether the

13

defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense. Those matters are for the trier of fact alone.").

If Mr. Braniff's testimony were limited to factual statements about the meaning of certain terminology, then, on its own, the jury would be able to draw inferences about the reason for Mr. Bowers' actions. But here, the proposed testimony extends far beyond the meaning of certain terminology and includes, for example, testimony about historical figures and events, general ideas held by white supremacists, views about statements made by Mr. Bowers related to the Jewish community, and the role of social media platforms in the proliferation of white supremacist and neo-Nazi tenets. The point of this testimony is (i) to offer as fact Mr. Braniff's speculation that Mr. Bowers is part of a larger community of white supremacists and anti-Semites who commit attacks on Jewish people because of their religion, and (ii) to lead the jury, rather than permitting the jury to make its own inferences, to the inevitable conclusion that Mr. Bowers himself acted because of the victims' Jewish religion.

Rule 704(b) prohibits an expert from providing testimony that leads a jury to an inevitable conclusion about a defendant's *mens rea* or motive. *See United States v. Blount*, 502 F.3d 674, 679 (7th Cir. 2007) (analyzing applicability of Rule 704(b) in the context of expert's testimony about defendant's motives). Here, in invoking testimony about historical figures and events, general ideas held by white supremacists, views about statements made by Mr. Bowers related to the Jewish community, and the role of social media platforms in the proliferation of white supremacist and neo-Nazi tenets, the government is using Mr. Braniff to opine directly, and impermissibly, about Mr. Bowers

purported motive. Not only is such testimony unhelpful, Rules 702 and 704(b) prohibit that testimony.

> ### iv. Mr. Braniff's testimony is too attenuated from any factual determination that the jury must make.

Mr. Braniff's proposed testimony will do little to "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). Rather than simply offer facts about the meaning of certain terminology, much of which is well within the scope of general information or common knowledge, Mr. Braniff's proposed testimony does not "speak[] clearly and directly to an issue in dispute in the case" such that the testimony "will not mislead the jury." *United States v. Ford*, 481 F.3d 215, 219 n.6 (3d Cir. 2007) (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1321 n.17 (9th Cir. 1995)).

The content of Mr. Bowers' statements may be relevant to establishing that he acted because of the actual or perceived religion of the victims. But Mr. Braniff's history lesson about the role of social media platforms with respect to domestic terrorism and the proliferation of white supremacist and neo-Nazi ideological tenets is not helpful to the jury to understand the meaning of the statements. The testimony will only confuse and mislead the jury in its task to determine whether the government has proven the elements of the offenses. This generalized testimony is far beyond what is necessary to help the jury understand Mr. Bowers' statements or the context in which they were made.

Similarly, Mr. Braniff's testimony about "the white supremacist idea that white people are being replaced by non-white populations" is not helpful to the jury in

understanding the evidence or determining any fact in issue. That Mr. Bowers made anti-Semitic statements may be relevant to the jury finding that he acted because of the victims' religion. But Mr. Braniff's speculation about Mr. Bowers' motivation in the first place for making those statements is not at all relevant to any issue before the jury. *In re TMI Litigation*, 193 F.3d 613, 670 (3d Cir. 1999) (noting that admissible expert testimony under Rule 702 "must be based on the methods and procedures of science rather than subjective belief or speculation"). And Mr. Braniff's conflation of white supremacist content and anti-Semitic content is similarly not relevant and is confusing and misleading. To the extent any of the proposed testimony is helpful to the jury, the only helpful aspects are those that convey the meaning of specific anti-Semitic statements Mr. Bowers made close in time to the offense. The remainder of the testimony is too attenuated from any fact at issue in the case.

Similarly problematic is Mr. Braniff's testimony about Hitler, the Holocaust, the white supremacist murder in Charlottesville, and the mass shooting perpetrated in Norway. That Mr. Bowers may have made isolated statements in "support" of those individuals and events are facts too attenuated from the task of the jury in this case to determine whether the facts prove the elements at issue. Mr. Braniff's proposed testimony fails to meet the "helpfulness" standard of Rule 702 and his testimony, therefore, must be excluded.

**B.    Mr. Braniff is not qualified to opine on Mr. Bowers' mental state or condition.**

Mr. Braniff is not qualified "by knowledge, skill, experience, training, or education" to opine on Mr. Bowers' mental state or mental condition. Fed. R. Evid. 702. *See Elcock v. Kmart Corp.*, 233 F.3d 734, 741 (3d Cir. 2000) ("Before an expert witness may offer an opinion pursuant to Rule 702, he must first be qualified by virtue of specialized expertise."). *See also* Exhibit C (CV of William Braniff) (failing to indicate any expertise in mental illness or mental health).

Yet, in offering the opinion that Mr. Bowers used, for example, the words "globalists" or "white genocide" the way that Mr. Braniff defines those terms, or that Mr. Bowers' statements in support of Hitler or the Holocaust mean what Mr. Braniff states they mean, or that Mr. Bowers adheres specifically to "the white supremacist idea," as opposed to his own version of the concept, "that white people are being replaced by non-white populations," Mr. Braniff is testifying as though he is inside Mr. Bowers' mind and knows what Mr. Bowers means and intends when he used those terms or phrases or mentioned those concepts. Similarly, in testifying about white supremacist and neo-Nazi ideological tenets, or the role of social media platforms in the proliferation of such ideologies, Mr. Braniff assumes Mr. Bowers shares a belief system and ideology with a larger community of white supremacists and anti-Semites—that he is a rational actor who is part of an ideologically-aligned community that provided the impetus for his decision to act. But he does not have the qualifications to testify as though he knows or understands Mr. Bowers' mental condition.

Mr. Braniff is not qualified "by knowledge, skill, experience, training, or education" to testify as to what Mr. Bowers meant to convey or as to his speculation that

Mr. Bowers was a rational actor who shared a belief system and ideology with a larger community of white supremacists and anti-Semites. Fed. R. Evid. 702. Because Mr. Braniff is not qualified to make the foundational claim that he knows what was in Mr. Bowers' mind, this Court must exclude his testimony.[4]

> **C.    Mr. Braniff's proposed testimony, which is premised on the claim that Mr. Bowers shares a belief system and ideology with a larger community of white supremacists such that he could be said to have been radicalized in a shared ideology, is not based on sufficient facts or data that support that premise.**

Rule 702 requires that expert testimony must be "based on sufficient facts or data." Fed. R. Evid. 702(b). To the extent that any of Mr. Braniff's testimony could be considered helpful to the jury, still it must be excluded because it is not based on facts or data that establish Mr. Bowers is part of a larger community of white supremacists. This is not a question of each party having a different version of facts. *See* Fed. R. Evid. 702, advisory committee notes (2000) ("The emphasis in the amendment on 'sufficient facts or data' is not intended to authorize a trial court to exclude an expert's testimony on the ground that the court believes one version of the facts and not the other."). Rather, here, the proposed testimony utterly fails to establish a basis for asserting Mr. Bowers' membership in a larger community of white supremacists and neo-Nazis.

---

[4] Notably, Mr. Braniff's organization recognizes that offenders who select their targets on the basis of perceived religious characteristics have "the highest rates of . . . mental illness . . . ." START National Consortium for the Study of Terrorism and Responses to Terrorism, "Motivations and Characteristics of Hate Crime Offenders" (October 2020)), available at https://www.start.umd.edu/research-projects/pathway-approach-study-bias-crime-offenders. Yet, here, for purposes of his testimony in this case, Mr. Braniff presumes that Mr. Bowers is a rational actor who is part of a community of white supremacists and neo-Nazis.

Isolated, anonymous statements on a message board purportedly in support of past historical figures and events and other general anti-Semitic statements do not establish membership in a community with a shared belief system and ideology. Without facts or data establishing that Mr. Bowers is in fact a member of a community of white supremacists and neo-Nazis, Mr. Braniff's proposed testimony about Mr. Bowers' support for extremist individuals such as Hitler, the white supremacist murderer in Charlottesville, and the Norway mass shooter, about white supremacist and neo-Nazi ideologies, and about the role of social media in the proliferation of such ideologies is not helpful to the jury. The Court, therefore, must exclude Mr. Braniff's testimony because it is not based on sufficient facts or data. Fed. R. Evid. 702(b).

**D.      Mr. Braniff's testimony about the role of social media platforms in the proliferation of white supremacist and neo-Nazi ideologies is not based on sufficient facts or data, nor is it the product of reliable principles and methods that Mr. Braniff has reliably applied to the facts of the case.**

The government proposes that Mr. Braniff will testify "about the role of social media platforms, including Gab, with respect to domestic terrorism and the proliferation of white supremacist and neo-Nazi ideological tenets." Exhibit A. But it has not provided "sufficient facts or data" to support Mr. Braniff's testimony and has not identified the principle or methods Mr. Braniff applied to reach his conclusions. Fed. R. Evid. 702(b), (c), and (d). In response to discovery requests seeking this information, *see* Exhibit D (defense discovery letter, dated July 14, 2022), the government only disclosed the following websites:

Profiles of Individual Radicalization in the U.S. (PIRUS):
https://www.start.umd.edu/data-tools/profiles-individual-radicalization-united-states-pirus

Bias Incidents and Actors Study (BIAS):
https://www.start.umd.edu/research-projects/pathway-approach-study-bias-crime-offenders

The Global Terrorism Database (GTD): https://www.start.umd.edu/gt

Exhibit E (government's response to defense discovery request, dated July 23, 2022).

With respect to the other related defense discovery requests, the government responded that it would "continue to assess specific aspects of your requests and will respond accordingly." *Id.* The government did not provide any additional information or respond further.

None of the discovery disclosed provides sufficient facts or data to support Mr. Braniff's testimony about the role of social media platforms in the proliferation of white supremacist or neo-Nazi ideologies. *See* Fed. R. Evid. 702, advisory cmt. note (2000) ("The trial judge in all cases of proffered expert testimony must find that it is properly grounded, well-reasoned, and not speculative before it can be admitted. The . . . expert must explain how the conclusion is so grounded."); *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311, 1319 (9th Cir. 1995) ("We've been presented with only the experts' qualifications, their conclusions and their assurances of reliability. Under *Daubert,* that's not enough."). Here, too, the government's bald assertions about Mr. Braniff's testimony are "not enough." What the government has disclosed are access to websites that themselves provide access to reports and data, without any guidance whatsoever as to what relevance any of the information has to Mr. Braniff's testimony in

this case. Absent sufficient facts and data and information about the principles and methods applied to support his assertion about the role of social media platforms in the proliferation of white supremacist and neo-Nazi tenets, this testimony must be excluded.

> **E.    The premise of Mr. Braniff's proposed testimony, that Mr. Bowers engaged in an act of domestic "terrorism" related to "white nationalism" is not based on sufficient facts or data and is not the product of reliable scientific principles and methods that he has reliably applied to the facts of this case.**

The government provided notice that Mr. Braniff would offer "Domestic Terrorism/White Nationalism Expert Testimony." Exhibit A. Nowhere in the expert notice does Mr. Braniff define "terrorism" or "white nationalism." Nor does he indicate that his definitions of terrorism or white nationalism, which are the general premises of his testimony in this case—that Mr. Bowers is a white nationalist who engaged in an act of domestic terrorism—is accepted or used by others in the field. *See* Fed. R. Evid. 702, advisory cmt. note (2000) (internal citation omitted) ("The trial court's gatekeeping function requires more than simply 'taking the expert's word for it.'").

"Terrorism" has different meanings and is conceptualized differently depending on the circumstances and the speaker. *See* Alex Schmid, "Terrorism—The Definitional Problem," 36 Case W. Res. J. Int'l L. 375 (2004) (noting that four United States government agencies have four different definitions of "terrorism"); Anastassiya Mahon, "Defining Terrorism: how Ambiguous Definitions and Vague Classifications Open Doors for Power Acquisition," Journal of Global Strategic Studies 02:01 (June 2022) (noting the "absence of consensus on the definition of terrorism"). The concept of "terrorism" is not well-defined and there is no consensus on what it means. So too with the phrase "white

nationalism." Yet, here, the government proposes, without foundational support, to put forward Mr. Braniff as an expert on domestic terrorism and white nationalism.

This Court, in its role as gatekeeper, must require more than just the government expert's "word for it." The government must establish that Mr. Braniff has scientifically-based expert definitions for "terrorism" and "white nationalism," that the definitions are generally accepted within the relevant expert community, and that the definitions apply to the facts of this case. *See United States v. Norwood*, 16 F. Supp. 3d 848, 864 (E.D. Mich. Apr. 29, 2014) (noting that the court had "no indication why [the expert's] opinion of what is a gang is a reliable definition" and that the expert's "acknowledgment of other definitions, and the lack of any evidence of the extent to which his definition has been accepted or used by others, deprives the Court of the ability to assess the reliability of his opinion of what constitutes a gang"). Unless Mr. Braniff justifies his definitions of "terrorism" and "white nationalism," whatever those definitions might be, demonstrates that he has sufficient facts or data to support the definitions, shows that the definitions are the product of reliable principles and methods, and establishes that he has reliably applied those principles and methods to the facts of this case, the Court should exclude his testimony.

      **F.**    **Much of the content of Mr. Braniff's proposed testimony does not constitute "scientific, technical, or other specialized knowledge" but to the extent any of it is within the realm of specialized knowledge, Mr. Braniff is not qualified to offer his opinions and certain of his opinions are not the product of reliable principles and methods reliably applied to the facts of this case.**

Mr. Braniff proposes to testify about the meaning of specific phrases. Many of those phrases are not within the realm of specialized knowledge and are more appropriately classified as lay opinion testimony. For example, Mr. Braniff proposes to testify to the meaning of "kike" and "holohoax." These are words that at most are appropriate for lay opinion testimony, not expert testimony under Rule 702. Even the other phrases, arguably more obscure, such as "the 14 words," "1488," "white genocide," "globalists," "Zion Occupied Government," and "invaders" are not so indecipherable that Rule 702 expert testimony is appropriate. *See United States v. Savage*, 970 F.3d 217, 286 (3d Cir. 2020) (noting that lay testimony must be grounded in experience or specialized knowledge and approving government agent's lay opinion testimony about the meaning of certain coded words and phrases used during recorded conversations between defendant and others). Mr. Braniff's testimony about the meaning of uncoded words and phrases used in the public domain is not the product of "scientific, technical, or other specialized knowledge." *See, e.g.*, *id.* (citing *United States v. Rollins*, 544 F.3d 820, 831–32 (7th Cir. 2008)) (noting that in *Rollins* the circuit court ruled that "agent's testimony as to the meaning of coded terms is based on experience in the particular case and is therefore permissible under Rule 701").

Similarly, Mr. Braniff proposes to testify about a certain hand gesture being associated with the "white power" movement, about Mr. Bowers' purported support for Hitler, the Holocaust, and certain white supremacist killers, and about the statements Mr. Bowers made "regarding the Jewish community and its relationship to immigrants and refugees, including the Hebrew Immigrant Aid Society (HIAS), and specifically the

white supremacist idea that white people are being replaced by non-white populations."

Exhibit A. All these topics are well within the capability of the average juror and do not

require expertise under Rule 702 to convey. If necessary, lay opinion testimony by a

qualified individual is the appropriate means to assist the jury in understanding these

words. That Mr. Bowers made certain statements or used certain words and their

common meaning are factual issues and not the subject of expert testimony. *See United*

*States v. Norwood*, 16 F. Supp. 3d 848, 865 (E.D. Mich. Apr. 29, 2014) ("[Expert's]

proposed opinions address relatively simple matters that a layperson can understand

without an expert's assistance, i.e. what constitutes a gang, and how gangs control a

particular geographic region and engage in criminal activity, such as violence and drug

trafficking. And these are matters that can be presented through fact witnesses relating

specific facts relevant to the Howard Boys—not generalized opinions based on gangs in

far off regions of the country. In such circumstances, an expert is neither necessary nor

helpful.").

To the extent that any of this testimony is specialized knowledge under Rule 702,

Mr. Braniff is not qualified to offer this testimony. He is not an expert on the meaning of

these terms and phrases. His experience, as indicated by his CV and prior case testimony

history, is primarily in international terrorism. Exhibit C. And nothing in his CV or

background indicates any prior familiarity with these phrases and concepts. *See*

*Norwood*, 16 F. Supp. 3d at 863 (concluding that "while [the expert's] FBI experience

touched on gang matters in different parts of the country, there is insufficient evidence

that the experience was comprehensive enough to conclude that what he learned has application to the Howard Boys in Flint, Michigan").

Additionally, Mr. Braniff's expert disclosure does not indicate that the source of his definitions for the various phrases and definitions are reliable. *See id.* at 864 (noting that the court had "no indication why [the expert's] opinion of what is a gang is a reliable definition" and that the expert's "acknowledgment of other definitions, and the lack of any evidence of the extent to which his definition has been accepted or used by others, deprives the Court of the ability to assess the reliability of his opinion of what constitutes a gang"). Here, as in *Norwood*, the government has not provided any indication why this Court should find reliable Mr. Braniff's testimony about the meaning of phrases used by Mr. Bowers' and statements made by him.

For the reasons stated, the Court should exclude Mr. Braniff's testimony. To the extent the Court finds that Mr. Braniff's testimony is a mix of lay and expert testimony, the Court should bar Mr. Braniff from testifying to lay opinions or matters. The risk is significant "that the jury could conflate the witness's expert and fact witness testimony." *United States v. Hawkins*, 934 F.3d 1251, 1266 (11th Cir. 2019). In *Hawkins*, where a government agent testified as both an expert and lay witness, the circuit court said that "even those portions of [the agent's] testimony that could be considered proper lay testimony were rendered improper by the indiscriminate merging of fact testimony with expert testimony throughout his time on the witness stand." *Id.* The court in *Hawkins* found plain error where the agent's testimony "placed the imprimatur of 'expertise' on his view of the facts of the case." *Id.* Here, to avoid the significant risk of prejudice

should the Court find that Mr. Braniff's proposed testimony covers both lay and expert

matters, the Court should bar him from offering lay testimony.

### G.    Mr. Braniff is not qualified to offer testimony on domestic terrorism and white nationalism.

Mr. Braniff's experience working in federal cases, at least as disclosed by the

government, is limited to cases involving international terrorist organizations. The

government's expert disclosure indicates that he has been retained and/or testified in the

past four years in three cases other than this case. Exhibit B. All three of the other cases

involve individuals charged with activities related to international terrorist groups.

Moreover, most of Mr. Braniff's publications involve international terrorism.

Here, the government proposes that Mr. Braniff will testify for the first time as an

expert witness on domestic terrorism and white nationalism. The government's

disclosures do not establish that Mr. Braniff is qualified to offer expert testimony in a

federal capital prosecution on issues other than international terrorism. *See Elcock v.

Kmart Corp.*, 233 F.3d 734, 741 (3d Cir. 2000) ("Before an expert witness may offer an

opinion pursuant to Rule 702, he must first be qualified by virtue of specialized

expertise."); *see also United States v. Norwood*, 16 F. Supp. 3d 848 (E.D. Mich. 2014)

(concluding that "while [the expert's] FBI experience touched on gang matters in

different parts of the country, there is insufficient evidence that the experience was

comprehensive enough to conclude that what he learned has application to the Howard

Boys in Flint, Michigan").

The District Court in *Norwood* highlighted the fact that though the expert in that case indicated he had been qualified as a narcotics/gang expert four times, "only one case involved gangs and, in that single instance, the subject of his testimony addressed the use of weapons by gangs in drug trafficking." *Id.* at 863. The court concluded, "Such limited testimony is a far cry from the opinions the Government wants to elicit regarding a generalized variety of gang practices and activities." *Id.* Here, as far as the government's expert disclosures reveal, Mr. Braniff has not testified in court a single time as an expert on domestic terrorism and white nationalism. He is not qualified as an expert to offer the generalized testimony the government proposes, and the Court should therefore exclude his testimony.

## CONCLUSION

For the reasons stated, this Court should exclude William Braniff's proposed expert testimony. Alternatively, the Court should hold a pretrial *Daubert* hearing.

Respectfully submitted,

/s/ Judy Clarke
Judy Clarke
Clarke Johnston Thorp & Rice, PC

/s/ Michael N. Burt
Michael Burt
Law Office of Michael Burt, PC

/s/ Michael J. Novara
Michael J. Novara
First Assistant Federal Public Defender

/s/ Elisa A. Long
Elisa A. Long
Supervisory Assistant Federal Public Defender