IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Criminal No. 18-292 |
| ROBERT BOWERS | |

**UNITED STATES' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION
UNDER THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS
FOR MATERIALS RELATED TO JURY SELECTION AND
POTENTIAL CLAIMS UNDER BATSON V. KENTUCKY (Doc. No. 1060)**

AND NOW comes the United States of America, by its attorneys, Troy Rivetti, Acting United States Attorney for the Western District of Pennsylvania, Soo C. Song, Eric G. Olshan, and Nicole Vasquez Schmitt, Assistant United States Attorneys for said district, Mary J. Hahn, Trial Attorney, Civil Rights Division, and Barry K. Disney, Trial Attorney, Capital Case Section, and hereby responds in opposition to defendant Robert Bowers's Motion Under The Fifth, Sixth, and Eighth Amendments for Materials Related To Jury Selection And Potential Claims Under Batson v. Kentucky (Doc. No. 1060).[1]

This motion should be stricken in its entirety for violating this Court's deadlines for the filing of pretrial motions.  See Doc. No. 857 (setting pretrial motions deadline for January 9, 2023). The defendant has not even attempted to provide any cause, much less good cause, for blatantly ignoring this Court's pretrial motions deadline and waiting until just a few weeks before trial to spring this sweeping discovery request—a request that would require three separate Department of Justice offices to identify and compile raw data of the use of peremptory strikes by every

---

[1] Although the defendant cites to the "Fifth, Sixth, and Eighth Amendments" in his pleading, the government notes that the only cases he cites are Batson and its progeny, all of which are based on the equal protection doctrine. Thus, any theories other than equal protection should be deemed waived.

prosecutor (regardless of whether that prosecutor is a member of the current prosecution team, has worked with a member of the prosecution team, or has ever been accused of discrimination in the use of peremptory strikes) who has ever been employed by that office during the last decade.  The defendant's total disregard for this Court's deadlines—a clear trial strategy to distract the government with meritless motions[2] seeking burdensome discovery in the weeks leading up to trial—should not be condoned.[3]

  This motion should also be denied on its merits.  Having gained no traction in his repeated attempts to attack the Western District of Pennsylvania's Jury Plan, he now asks this Court to order the Clerk of the Court and the government to produce <u>any data</u> "concerning race, Hispanic or Latino origin, and gender for jurors stricken through the use of peremptory strikes" by <u>all</u> prosecutors in the U.S. Attorney's Office for the Western District of Pennsylvania for <u>the past ten years</u>; the government to produce the same data and peremptory strike histories for <u>all</u> prosecutors in the Capital Case Section of the Criminal Division and the Criminal Section of the Civil Rights Division for the <u>past ten years</u>; the same data for all counsel of record for the government in this case, whether in federal or state cases, <u>without any date restriction whatsoever</u>; and all training materials related to <u>Batson</u> from each office for <u>the past ten years</u>.

  The defendant has not and cannot cite a single case in which a court has ordered discovery that comes even close to the breadth of his unprecedented and unreasonable demands.  In the

---

[2] As this Court is aware, the government has moved to strike another of the defendant's out-of-time motions, which demands \wide-ranging and irrelevant discovery and would require the prosecution team to canvass five separate government agencies (DHS, Department of Justice, Department of Defense, Department of State, and Office of the Director of National Intelligence)—four of which are not parties to this case and over which the prosecution team has no authority—for "[a]ll notes, handwritten or typed, report, memoranda, or other documents, electronically stored information, or objects . . ." related to any "awareness" or "monitoring" of the defendant and "any user on Gab" with whom the defendant interacted.  See Doc. Nos. 1026 & 1072

[3] Defense counsel are surely aware that it would take weeks, if not months or years, to identify, compile, and review the documents required to respond to his latest discovery motions.  The government strongly opposes any attempt by the defense to delay the start of this trial.

absence of supporting caselaw, the defendant instead asserts that this data is somehow essential to mounting an entirely hypothetical challenge to the government's use of peremptory strikes under Batson v. Kentucky, 476 U.S. 79 (1986).  On its face, this assertion is clearly meritless.  If Batson challenges required such data, then such onerous discovery would be required to be disclosed by both parties in every criminal and civil case tried before a jury in every state and federal court across the country.[4]  That is obviously not the law.

Importantly, the defendant seeks this wide-ranging and irrelevant discovery in the absence of any suggestion, much less a prima facie showing, that any member of the government team will violate Batson during jury selection in the present case.  The defendant has not cited a single case, and the government is not aware of any, in which a court has ever ordered the production of raw historical data spanning a decade concerning the government's use of peremptory strikes (and in the case of individual prosecutors on the trial team, such data with no date restriction whatsoever)—which is utterly meaningless given the myriad of neutral reasons the government may exercise its peremptory strikes in any given case.

With respect to the defendant's demand for training materials, the defendant fails to acknowledge controlling Third Circuit decisions rejecting nearly identical defense requests for internal training materials where, as here, there is no evidence that any member of the prosecution

---

[4]     The government notes that it also has the right to challenge the striking of jurors under Batson.  See Georgia v. McCollum, 505 U.S. 42, 48-50, 59 (1992) (holding that a defendant's "purposeful discrimination on the ground of race in the exercise of peremptory challenges" was unconstitutional).  Indeed, the government has successfully made such challenges, commonly referred to as "reverse-Batson" challenges, to defense strikes in a number of civil rights cases, see, e.g., United States v. Hobbs, 190 F. App'x 313, 316 (4th Cir. 2006); United States v. Mahan, 190 F.3d 416, 425 (6th Cir. 1999); United States v. Pospisil, 186 F.3d 1023, 1027–28 (8th Cir. 1999); United States v. Burton, 191 F.3d 461 (9th Cir. 1999); United States v. Stewart, 65 F.3d 918, 922 (11th Cir. 1995); United States v. Sowa, 34 F.3d 447, 452 (7th Cir. 1994)), particularly in federal hate crimes cases in which a defendant may have an incentive to avoid seating jurors who share characteristics of those he targeted.  Tellingly, despite the defendant's exaggerated claims that he could not possibly mount a Batson challenge without the data he seeks, the government has successfully made such challenges in those cases without demanding a history of peremptory strikes by defense counsel or their offices.

team has attended and endorsed any training that recommended ways prosecutors could circumvent the strictures of <u>Batson</u>.  The Department of Justice does not provide any such training.

Finally, the defendant's request that the Clerk's Office be required to disclose additional demographic data should be rejected.  As explained in greater detail below, the Clerk's Office has already produced data from which the defendant can derive the specific demographic information he now demands the Clerk's Office compile for him.  The defendant provides no justification for requiring the Clerk's Office—which, as this Court is well aware, has already expended substantial resources and produced an enormous amount of demographic data in this case—to perform the yeoman's work of combing the relevant datasets for the information the defendant is seeking.  Each party in this case is responsible for doing their own work and analyzing the relevant data.  The Clerk's Office should not be required to do more than it already has.

This latest discovery request—which the defendant filed over two months after this Court's deadline for pretrial motions—should be stricken as untimely, or denied on its merits.  The defendant should not be permitted to seek a litigation advantage by flagrantly ignoring this Court's deadlines.

## I.     The Defendant's Motion Should Be Stricken for Violating This Court's Order Setting Pretrial Motions Deadline

The defendant has moved several times to extend the deadlines to file pretrial motions in this case.  In the last of such motions, which requested an extension to March 25, 2023, the defendant acknowledged that he had previously represented to this Court that he did not plan to file a motion for extension of time.  <u>See</u> Doc. No. 844.  The <u>only</u> specific justification provided by the defendant to extend the pretrial deadline was "potential jury challenges" once they receive "updated jury data" from the Clerk of Court.  The government opposed that request, specifically noting that "the likelihood of proceeding with the firm trial date of April 24, 2023, could be

4

compromised and the United States will be disadvantaged by the need to respond to those motions while in the midst of final trial preparations." Doc. No. 844 at 2. By order dated December 1, 2022, this Court granted in part and denied in part the defendant's motion to extend the deadline, rejecting the defendant's request for a March 2023 deadline and allowing the defendant to file additional pretrial motions by no later than January 9, 2023.[5]

At no point during this litigation—including the defendant's numerous requests for demographic data from the Clerk's Office, the extensive litigation over various pretrial motions for discovery, his last motion for extension of time (which this Court partially denied), or his representations to this Court during status conferences—has the defendant ever suggested that he would require any data about peremptory strike challenges by the prosecution team and the offices by which they are employed.

At the January 9, 2023, status conference, the Court noted that the time for filing pretrial motions—which had been extended for over four years—had now passed, and that the Court, with the assistance of the parties, had established deadlines "for what I perceive to be everything up to the start of trial or very nearly everything up to the start of trial." See Transcript of Status Conference on January 19, 2023, at 4, 6; see also Doc. No. 1026 at 6.

---

[5] The defendant makes vague references to his plans to "lodge additional claims under the JSSA," see Doc. No. 1060 at 5. This Court should likewise deny any further attempts by the defendant to attack the district's Jury Plan under the JSSA. The defendant has now twice challenged the Jury Plan under the JSSA, and this Court has rejected both of those challenges. Notably, the defendant claimed Blacks and Hispanics were under-represented on the 2016 source list and jury wheels. Doc. No. 650. The Court rejected the defendant's arguments, Doc. No. 714 at 13-15, and he opted not to challenge the representation of Hispanics as to the 2020 source list and jury wheels, Doc. No. 916. The defendant has never asserted a JSSA claim on the basis of gender, and this Court has twice rejected the defendant's claims about the representation of African Americans. The JSSA does not permit such piecemeal litigation. 28 U.S.C. § 1867(a) (requiring a defendant to raise a Jury Act challenge "before the voir dire examination begins, or within seven days after the defendant discovered or could have discovered, by the exercise of diligence, the grounds therefor, whichever is earlier"). The defendant has had ample opportunity to raise the JSSA challenges he saw fit, and any additional attempts not be permitted.

The defendant's latest discovery motion should be denied as a blatant violation of this Court's deadlines. Indeed, in complete disregard of this Court's order specifically denying his request to file pretrial motions after January 9, 2023, the defendant has simply persisted in filing out-of-time motions—without even following the basic protocol of seeking leave from this Court to do so—based on the timeline that he has decided is best for him. This is not the way litigation works.

Indeed, nowhere in the defendant's motion does he even attempt to provide good cause for this out-of-time motion. See Fed. R. Crim. P. 12(c). Months ago, this Court provided notice to the parties that jury selection would begin on April 24, 2023. The defendant is represented by experienced defense counsel, including multiple learned counsel. If the defendant and his counsel actually believed a decades-worth of peremptory challenge data were important to their ability to mount a successful Batson challenge, they could have, and should have, requested that data well before the pretrial motions deadline. There is no good cause for the defendant to have waited until weeks before trial to make such a sweeping discovery request.

The defendant blithely asserts, without any basis, that "[t]he information and data the defense requests is not cumbersome to produce or record." Doc. No. 1060 at 5. The defendant is wrong. This untimely request would impose a substantial burden on the government—and the Court—and would be highly prejudicial given that trial is about to begin in just four weeks. No statute, regulation, or departmental policy requires any federal component to track the race, Hispanic or Latino origin, or gender of every juror against whom a peremptory strike has been used. Accordingly, none of the three components from which data has been requested maintains

a database listing such information.[6]  Nor do the individual prosecutors in this case maintain such records.

Attempting to compile such information would require identifying all of the cases that have gone to trial over the course of a decade; finding the associated case files (which in many closed cases would require recalling records from off-site archives); ad-hoc searches through files and notes, some of long-closed cases prosecuted by attorneys who left their respective offices years ago; and review of juror questionnaires and trial transcripts (if any transcripts were ever ordered) in an effort to ascertain whether it is possible to determine which jurors were struck and, among those, what their race, national origin, and gender were, which jurors were struck by the government, and which jurors were struck through a peremptory challenge rather than struck for cause or excused for hardship.  Even after such a review, it is likely that many case files would not have the relevant documents or any notations whatsoever related to the relevant protected classes. The defendant's request would require three separate Department of Justice components each to expend hundreds of staff hours to compile what would, at best, likely be an incomplete record.

Given the breadth of the defendant's request—ten years' worth of data for three components of the Department of Justice and untold additional not-date-limited data for counsel of record—it is unclear how the government could possibly collect, and the defendant could possibly analyze that data, unless the trial were continued for months if not years.  As detailed below, the defendant could clearly not rely on raw numbers of individuals of a particular race, color, ethnicity, or gender who were struck by individual prosecutors or their office.  To have any

---

[6]      To the extent that the defendant seeks data related to any members of the prosecution team who prosecuted cases in state or local prosecution offices (category 4), federal prosecutors have no authority to demand such privileged documents from the agencies of separate sovereign entities.

meaning, the numbers would need to be compared to the demographics of the jury eventually selected and of the entire venire, requiring a complex quantitative analysis.

The defendant's motion for such voluminous discovery—filed months after the pretrial motions deadline—would result in the exact prejudice and the potential delay of trial that the government predicted in opposing the defendant's prior request for an extension of time.  This motion should be stricken for flagrantly disregarding the deadlines set by this Court's order.

II.     **Raw Data on Peremptory Strikes Would Not Provide a Basis for a <u>Batson</u> Challenge, and the Defendant's Request Should Be Denied as Irrelevant and Unduly Burdensome (Categories 2, 3, and 4)**

Not only is the defendant's motion untimely, it is also meritless.  No defendant is entitled to go on a "fishing expedition" through the government's files, especially on the mere unsupported assertion that he may need the data for a hypothetical <u>Batson</u> challenge.  <u>See, e.g.</u>, <u>Williams v. Beard</u>, 637 F.3d 195, 210–11 (3d Cir. 2011) (finding that habeas petitioner was not entitled to prosecutor's contemporaneous voir dire notes in support of his <u>Batson</u> claim on the mere assertion that the notes were "imperative" for him to inquire into the prosecutor's state of mind and noting that petitioner's request amounted to a fishing expedition which the law forbids); <u>Deputy v. Taylor</u>, 19 F.3d 1485, 1493 (3d Cir. 1994) (denying habeas petitioner discovery on <u>Batson</u> claims and quoting, with approval, cases holding that petitioners "are not entitled to go on a fishing expedition through the government's files in hopes of finding some damaging evidence").  The defendant makes this extraordinary request even though raw data on peremptory strikes is entirely irrelevant to this Court's analysis of a <u>Batson</u> challenge.[7]

---

[7]     To the extent that the defendant's motion seeks "records," it is unclear what "records" the defendant seeks. The government objects to the production of any records that reveals the government's opinion work product (such as notes and mental impressions about jurors).  The defendant's hypothetical <u>Batson</u> challenge can hardly be described as warranting providing the defendant "a free ride on the research and thinking" of counsel for the United States related to their consideration of potential jurors.  <u>Coma v. United States</u>, 4:19-cv-286, 2022 WL 3220389, at *3 (M.D. Pa. Aug. 9, 2022).

A. **The <u>Batson</u> Framework**

In <u>Batson v. Kentucky</u>, the Supreme Court held that the Equal Protection Clause of the Fourteenth Amendment "prohibits a prosecutor from using a peremptory challenge to strike a prospective juror solely on account of race." 476 U.S. at 88. <u>Batson</u> established a three-step burden-shifting framework:

> First, a defendant must make a prima facie showing that a peremptory challenge has been exercised on the basis of race; second, if that showing has been made, the prosecution must offer a race-neutral basis for striking the juror in question; and third, in light of the parties' submissions, the trial court must determine whether the defendant has shown purposeful discrimination.

<u>Snyder v. Louisiana</u>, 552 U.S. 472, 478 (2008); <u>see also</u> <u>United States v. Jacobs</u>, 21 F.4th 106, 115 (3d Cir. 2021); <u>United States v. Savage</u>, 970 F.3d 217, 266 (3d Cir. 2020).

Factors relevant at step one include: "(1) the number of racial group members in the panel, (2) the nature of the crime, (3) the race of the defendant and the victim, (4) a pattern of strikes against racial group members, and (5) the prosecution's questions and statements during the voir dire." <u>United States v. Davis</u>, No. 21-2795, 2022 WL 7842204, at *3–4 (3d Cir. Oct. 14, 2022) (citing <u>Lewis v. Horn</u>, 581 F.3d 92, 103 (3d Cir. 2009)).

Step two requires the opposing party to provide "[a] neutral explanation . . . mean[ing] an explanation based on something other than the race of the juror. At this step of the inquiry, the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." <u>Savage</u>, 970 F.3d at 266 (internal quotation marks and citations omitted).

Step three "involves an evaluation of the prosecutor's credibility . . . and the best evidence of discriminatory intent often will be the demeanor of the attorney who exercises the challenge. This step requires the trial judge to decide whether the prosecutor's proffered reasons are the actual

reasons, or whether the proffered reasons are pretextual and the prosecutor instead exercised peremptory strikes on the basis of race.  The ultimate inquiry is whether the government was 'motivated in substantial part by discriminatory intent." Id. at 267 (internal quotation marks, brackets, and citations omitted).

Although a court may consider statistical evidence, the relevant inquiry under Batson is whether such statistics are probative of the government's use of peremptory strikes at the defendant's trial (such as the strike-rates and exclusion rates in that venire). Id.; see also Miller-El v. Dretke, 545 U.S. 231, 240–41 (2005) (analyzing the strike rates of the venire for the defendant's trial); Batson, 476 U.S. at 97 (noting that a "'pattern' of strikes against black jurors included in the particular venire might give rise to an inference of discrimination."  (emphasis added)).

Importantly, the Supreme Court has emphasized that "side-by-side comparisons" of struck and unstruck jurors are "more powerful than these bare statistics" of peremptory strikes of venirepersons at the defendant's trial. Miller-El, 545 U.S. at 241.  In other words, "if a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at Batson's third step." Id.

**B.  Raw Historical Data of Peremptory Challenges of Trials Is Irrelevant Under the Batson Framework**

The only purported justification for the defendant's sweeping request is his exaggerated claim that "without access to the requested information, absent unusual circumstances where the record in the case is clear, the defense will be unable to marshal the information and data necessary to support any asserted Batson violation." Doc. No. 1060 at 4-5.  However, neither Batson nor any court interpreting it has ever required a defendant to present evidence outside of the

defendant's own trial (at either step one or three), much less a decade's worth of data from trials that are wholly unrelated to the defendant's trial and the prosecutors in those cases.

Indeed, such raw data on the numbers of peremptory strikes, standing alone, is insufficient and irrelevant to proving a <u>Batson</u> claim.  Striking an individual who is a member of a protected class is not itself a violation of the Constitution.  Rather, to violate <u>Batson</u>, the strike must be made in the absence of a neutral reason.  Simply providing the raw numbers of peremptory challenges of jurors of a certain race, national origin, or gender would provide this Court with no insight on, for example, the many neutral reasons jurors of any race, national origin, or gender may have been stricken, the percentage of qualified venirepersons who are members of those protected classes,[8] or how many jurors of that race, national origin, or gender were ultimately seated on the jury.  For example, if a trial takes place in a district where the qualified jury pool is majority Black or Hispanic/Latino, or where the venirepersons after cause strikes and excusals were 75% women, it would hardly be surprising that the prosecution used at least some peremptory strikes against Black, Hispanic/Latino, or female jurors.  Absent relevant context, such as knowing how many jurors with those characteristics were actually seated, the demographics of the venire, or the reasons for specific strikes, the raw number of strikes is utterly meaningless to a court's analysis under <u>Batson</u>.  <u>See, e.g.</u>, <u>Lewis v. Horn</u>, 581 F.3d 92, 104 (3d Cir. 2009) (rejecting <u>Batson</u> claim and holding that "[w]ithout information about the number and racial composition of the entire venire, we cannot calculate the exclusion rate and we lack the 'contextual markers' to analyze the significance of the strike rate"); <u>Lee v. Commissioner</u>, 726 F.3d 1172, 1224 (11th Cir. 2013) (holding that "the number of persons struck takes on meaning <u>only</u> when coupled with other

---

[8]     Two of the three Department of Justice office involved in this case—the Civil Rights Division and the Capital Case Section—litigate cases in jurisdictions across the country.  Thus, determining the relevant demographics for the venires in each district in which these components have tried cases before a jury over the past decade would not be feasible.

information such as the racial composition of the venire, the race of others struck, or the voir dire answers of those who were struck compared to the answers of those who were not struck") (emphasis added and internal quotation marks excluded); <u>Howard v. Horn</u>, 56 F. Supp.3d 709, 723 (E.D. Pa. 2014) (analyzing strike rates by comparing data related to stricken and non-stricken jurors and noting that courts have almost never considered strike rates lower than 66.67% to constitute even a prima facie case of discrimination); <u>Bond</u>, 539 F.3d at 270 (noting that when doing side-by-side comparisons of juror questioning, "other factors, such as job stability or roots in the community," could have accounted for the differences in treatment of jurors).

The defendant has not cited to a single case, and the government has not found any, granting the sweeping discovery he seeks.  That is not surprising because a <u>Batson</u> challenge does not require a decade of historical strike data.  In fact, <u>Batson</u> specifically overruled <u>Swain v. Alabama</u>, 380 U.S. 202, 223–24, (1965), which had previously required defendants to show a historical pattern of repeated strikes of Blacks across multiple prosecutions in the jurisdiction. <u>Batson</u>, 476 U.S. at ("Thus, since the decision in <u>Swain</u>, this Court has recognized that a defendant may make a prima facie showing of purposeful racial discrimination in selection of the venire by relying <u>solely</u> on the facts concerning its selection in <u>his case</u>.") (emphasis added); <u>Fahy v. Horn</u>, 516 F.3d 169, 191 (3d Cir. 2008); <u>Hardcastle v. Horn</u>, 521 F. Supp. 2d 388 (E.D. Pa. 2007).  Thus, the defendant's claim that he will be "unable" to mount a successful <u>Batson</u> challenge without such historical data is exaggerated at best.

The cases on which the defendant relies are inapposite and easily distinguishable.  Indeed, each of these cases focus on <u>findings or admissions</u> of past discrimination, or clear evidence of discrimination by the prosecutors in the defendant's own case.  None of them held that raw data of strike history, standing alone, is at all relevant to the <u>Batson</u> analysis.

For example, in Miller-El v. Dretke, the Supreme Court reviewed various factors, including the use of peremptory strikes to exclude all but one of the Black venirepersons in the defendant's case, the differential treatment of African-American and white jurors during voir dire, the prosecutors' use of a procedural tool that the district attorney's office admitted was used to manipulate the racial composition of jurors in the past, and, finally, clear evidence, through deposition testimony and a written manual, that the district attorney's office maintained a formal policy of systemically excluding Black jurors.  545 U.S. 231, 240-264 (2005).  Thus, the history of past prosecutions was relevant in Miller-El because there was clear evidence that all prosecutors in that specific office operated under a policy of discrimination.  Id. at 264.  Any suggestion by the defendant that the prosecutors in this case, or the three offices that employ them, have engaged in such widespread systemic discrimination would be utterly baseless.  See also, e.g., United States v. Barnette, No. 3:97 CR-23, 2009 WL 2105752, at *6 (W.D.N.C. July 13, 2009) (squarely rejecting similar discovery requests based on Miller-El and holding that, in the absence of historical evidence of discriminatory jury selection practices and policies by the prosecuting office or individual prosecutors, "neither [Batson nor Miller El] authorizes a defendant to go on a fishing expedition through the Government's files in hopes of finding some damaging evidence" and denying as "overly broad, overreaching, burdensome, and without evidentiary foundation" the defendant's request for discovery requests seeking historical data about the use of peremptory strikes).

Similarly, in Flowers v. Mississippi, the Supreme Court held that after Batson, a defendant is no longer required to demonstrate a history of racially discriminatory strikes but is not precluded from doing so.  139 S. Ct. at 2244.  Importantly, however, the Court required that such evidence constitute "relevant history of the State's peremptory strikes in past cases."  Id. at 2243-2245.

Thus, in <u>Flowers</u>, the Court deemed it appropriate to consider "the history of Flowers' six trials" along with four other categories of evidence relating to discriminatory practices during Flower's sixth and final trial. <u>Id</u>. at 2244. In considering the past history of Flowers' trials, the Court noted that "the Mississippi courts themselves concluded on two separate occasions that the State violated <u>Batson</u>." <u>Id.</u> at 2245. Thus, the relevant historic data in <u>Flowers</u> pertained specifically to data about the defendant's <u>own</u> case and actual findings of discrimination by state courts considering his claims. This decision in no way justifies defendant Bowers's request for ten years' worth of data from three Department of Justice offices, including hundreds prosecutors who are entirely unrelated to the counsel of record in this case, that have no probative value related to any future <u>Batson</u> challenges that may be made in this case.

The defendant also relies on two Eleventh Circuit cases, both of which are easily distinguishable and neither of which in any way supports the sweeping discovery that the defendant requests here.

In <u>Lee</u>, the Eleventh Circuit considered a defendant's claim that the district attorney's office at issue had a "history of discrimination" that he claimed included "many cases overturned with <u>Batson</u> problems." 726 F.3d at 1201. The Eleventh Circuit rejected that claim, noting that although courts had reversed a "handful" of cases from over a decade before the defendant's case, such evidence was insufficient to sustain a <u>Batson</u> challenge. Notably, in <u>Lee</u>, the focus of the inquiry was on <u>actual findings of discrimination by courts</u> in previous cases, not the kind of raw statistical data, completely untethered to a finding by any court, that the defendant seeks in this case.[9]

---

[9]  Indeed, <u>even where the office in question had been found to have engaged in past discrimination</u>, the <u>Lee</u> court nevertheless held that reversals in "a few cases where the trials occurred more than a decade before [the defendant's] trial" failed to establish a <u>Batson</u> violation in that defendant's "particular case." <u>Id.</u> at 1226. Here, the defendant has failed to explain how raw data of the use of peremptory challenges for the past decade by prosecutors

Similarly, the Eleventh Circuit in <u>McNair v. Campbell</u> held that a relevant consideration under <u>Batson</u> could include "a prosecutor's <u>history of discrimination</u>."  416 F.3d 1291, 1312 (11th Cir. 2005) (emphasis added).  The defendant's motion entirely fails to mention that the "history of discrimination" at issue in <u>McNair</u> was a "list of cases in which convictions obtained by this district attorney's office have been reversed or criticized on the basis of <u>Batson</u>."  Nowhere in <u>McNair</u> does the court suggest, much less hold, that raw data of ten years of strikes, from cases that are entirely independent from the defendant's trial and that do not involve any claim of discrimination, constitutes "relevant history" for the purposes of <u>Batson</u>.

Indeed, the court in <u>McNair</u> went on to hold that even if such a history of discrimination may be relevant, it cannot be "dispositive."  Where a defendant "wholly fail[s] to connect any conduct criticized in the cited cases to [the defendant's] <u>own prosecutor</u>, much less [that prosecutor's] <u>conduct in this case</u>," such a "disconnected history" fails to sustain the defendant's burden in making a <u>Batson</u> challenge.  <u>McNair</u>, 416 F.3d at 1312 (emphasis added).  Thus, the holding in <u>McNair</u> actually undermines the defendant's effort to seek raw data that is entirely "disconnected" to the prosecutorial decisions that will be made in this case.

Thus, the cases cited by the defendant establish that the historical data requested by the defendant simply has no bearing on the <u>Batson</u> analysis of peremptory strikes that theoretically may be made <u>in this case</u>.  This is especially true given that, as noted above, the defendant has requested raw data that lacks any of the context that would make it at all relevant to the <u>Batson</u> analysis.

Although the defendant does not cite them, two Third Circuit decisions relate to the use of historical statistical evidence—and both undermine his position.  In <u>Bond</u>, a habeas petitioner

_____

employed by three separate Department components can plausibly be imputed to this case given that jury selection has not even begun.

presented a statistical study on jury selection practices in Philadelphia capital cases from 1983–1993 ("the Baldus study"), contending that this historical data demonstrated that the prosecution office and the prosecutor in the petitioner's case used strikes against Blacks more often than non-Blacks.  See 539 F. 3d at 274.  The district court in Bond refused to consider that evidence on procedural grounds.  Importantly, on appeal, the Third Circuit declined to determine whether the district court could have considered the study, holding that the defendant "may not prevail on his Batson claim by relying on such general evidence as the survey" given the findings by other courts that the prosecutor in that case had not discriminated in his use of strikes.  Id. at 275 (emphasis added).  In other words, the Third Circuit in Bond squarely held that a Batson challenge cannot be sustained on general evidence of disparities in the use of strikes; instead Batson requires evidence that specific prosecutorial decisions in the defendant's case were discriminatory.

The Third Circuit's decision in Riley v. Taylor, 277 F.3d 261 (3d Cir. 2001), is easily distinguishable from the instant case.  In a divided en banc decision, the Third Circuit granted a writ of habeas corpus based on a combination of factors including, the failure of the state courts to engage in step 3 of the Batson analysis (i.e., to make an ultimate factual determination about whether the strikes were discriminatory); the total exclusion of black jurors in the defendant's case; evidence that the same prosecutor's office had stricken all black jurors from three capital murder cases within a year of the defendant's trial; the prosecution's admission that it believed that it was both permissible and "desirable" to strike based on "group association"—in other words, the prosecuting office essentially admitted to using race-based strikes; and the prosecution's failure to present probative evidence to support its purportedly race-neutral explanations for the strikes.  Id. at 286.

There is nothing to support any of the factor identified in <u>Riley</u> in this case.  There is no allegation that the prosecutors in this case or their respective offices have endorsed a practice of using discriminatory peremptory challenges.  Moreover, unlike the state courts in <u>Riley</u>, this Court will undoubtedly appropriately engage in the three-step <u>Batson</u> analysis, should the need arise.  As the Third Circuit held in <u>Bond</u>, such specific determinations about the use of peremptory challenges that are actually made in this case must override any statistics about the generalized statistics of the use of peremptory challenges by the three DOJ components.  <u>Bond</u>, 539 F. 3d at 274.

Moreover, the Third Circuit emphasized that it did so in light of the state courts' failure to engage in the <u>Batson</u> analysis and the prosecuting office's admissions that it had, in fact, relied on "group associations" in striking all of the Black venirepersons.  Notably, even with that admission, the Third Circuit did not endorse a roving, decades-long inquiry of the peremptory strikes by all prosecutors in that office.

In light of the lack of probative value that historical strike data would have in this case, the defendant's request for such data (categories 2, 3, and 4) should be denied.

### C. Courts Have Repeatedly Rejected Requests for Training Materials Where, as Here, None of the Members of the Prosecution Team Has Ever Attended a Training on Methods to Avoid Complying with Batson (Category 5)

The defendant also asks this Court to order that "the government produce training materials and policy manuals or other documentation related to <u>Batson v. Kentucky</u>, 476 U.S. 79 (1986), for attorneys in the U.S. Attorney's Office for the Western District of Pennsylvania, attorneys in the Capital Case Section within the Criminal Division of the U.S. Department of Justice, and attorneys in the Civil Rights Division of the U.S. Department of Justice for the past ten years."

Courts in the Third Circuit have repeatedly emphasized that in order for internal training materials to be relevant to the Batson analysis, a defendant must make some showing that the prosecutor in his own trial not only was exposed, but also endorsed, trainings that include instructions on how to violate Batson and strike jurors of protected classes.  To be clear, the Department of Justice does not provide trainings or maintain any policies that instruct attorneys on how to circumvent the mandates of Batson.

Several cases, including one cited by the defendant, Wilson v. Beard, 426 F.3d 653 (3d Cir. 2005), involve a series of habeas challenges from Pennsylvania convictions obtained by the Philadelphia District Attorney's Office and focus, in particular, on an infamous training video (the "McMahon video") in which former Assistant District Attorney Jack McMahon instructed his colleagues on how to strike jurors on the basis of race, gender, occupation, and neighborhood.

Where McMahon himself prosecuted a defendant, the Third Circuit determined that the district court was justified in concluding that McMahon had "almost certainly followed the techniques he advocate[d] in the tape during [the defendant's] trial."  426 F.3d 653, 669 (3d Cir. 2005).  However, the Third Circuit has repeatedly rejected claims that the mere existence of the McMahon video, or other training lectures of a similar nature, support a Batson challenge.  See, e.g., Lewis, 581 F.3d at 104 (noting that the McMahon video was created four years after the defendant's trial and, therefore, did not provide "any information about the routine practices of the particular prosecutor in [the defendant's case] case or the practices actually utilized at the defendant's trial" and that "type of general information, while not inconsequential, will not do as a substitute for the concrete, case specific information that is necessary to demonstrate a prima facie Batson violation"); Bond, 539 F.3d at (upholding district court's finding that defendant had not demonstrated a culture of discrimination to support Batson challenge when the prosecutor

stated that he had not seen the video or was ever trained to strike Black jurors); <u>Newkirk v. Lawler</u>, No. CV 09-0763, 2010 WL 11500111, at *6 (E.D. Pa. Oct. 27, 2010), report and recommendation adopted, No. CV 09-0763, 2017 WL 952334 (E.D. Pa. Mar. 9, 2017) (petitioner's reliance on <u>Wilson</u> was misplaced because he was not prosecuted by McMahon and because the court found no evidence or racial bias by the prosecutor during the jury selection process); <u>Howard</u>, 56 F. Supp. 3d at 723–24 (noting that where the prosecutor was not involved in the tape or lecture, courts have required evidence of some link between the prosecutor and the tape or lecture); <u>Peterkin v. Horn</u>, 988 F. Supp. 534, 540–41 (E.D.Pa.1997) (finding that the McMahon video did not itself suffice to raise inference of discrimination).

### III.   The Defendant's Request for Discovery Based on Vague References to the Jury Service Selection Act Should Be Denied

Finally, the Court should reject the defendant's request that the Clerk's Office organize and re-produce juror information that he already possesses.  Doc. No. 1060 at 1.  The Clerk issued summonses to a total of 1,500 prospective jurors, and the parties conferred on agreed-upon excusals, which the Court granted prior to the jurors' completion of questionnaires.  <u>See, e.g.</u>, Doc. Nos. 955, 971, 985, 997, 1010.  All remaining prospective jurors who were summonsed and not excused by the Court were "tagged"—i.e., directed to appear—on at least one day during the two-week questionnaire period.  Moreover, for each day during that period, the Clerk's Office provided the parties (1) a list of the prospective jurors who were directed to appear (identified by pool sequence number/juror number, participant number, and name) and (2) a list of the prospective jurors who, in fact, appeared and completed a questionnaire.  In other words, for each day, the Clerk has already provided sufficient data for the parties to ascertain who was told to report, who actually reported, and who did not.

Likewise, more than five months ago on October 21, 2022, the Clerk's Office produced a spreadsheet to the parties reflecting qualified jurors—i.e., the 2020 qualified wheel from which the 1,500 summonsed jurors were drawn. <u>See</u> Jury Plan § 13 (specifying that summonses for petit jury service shall be issued to prospective jurors on the list of qualified jurors). This is the same qualified wheel that the defendant analyzed as part of his fair-cross-section and Jury Service and Selection Act challenge to the 2020 jury wheels and source list. Doc. No. 916. The qualified wheel contains self-reported demographic data for qualified jurors, including their participant number, gender, race, Hispanic/non-Hispanic ethnicity, year of birth, city of residence, and zip code. As a result, the defendant already possesses the demographic information he seeks for the jurors who received summonses and were not excused prior to being "tagged" to complete a questionnaire. The responsibility for organizing the data falls to him— not the Clerk's Office, which has already devoted substantial resources to complying with the defendant's many data-related requests for over two years. The Court should therefore deny this request.

## IV.   Conclusion

For the reasons set forth above, the United States respectfully requests that this Court strike the defendant's out-of-time discovery motion or deny it on its merits.

Respectfully submitted,

<u>Troy Rivetti</u>
TROY RIVETTI
Acting U.S. Attorney
PA ID No. 56816

<u>s/Soo C. Song</u>
SOO C. SONG
Assistant U.S. Attorney

20

DC ID No. 457268

s/Eric G. Olshan
ERIC G. OLSHAN
Assistant U.S. Attorney
IL ID No. 6290382

s/Nicole Vasquez Schmitt
NICOLE VASQUEZ SCHMITT
Assistant U.S. Attorney
PA ID No. 320316

s/Mary J. Hahn
MARY J. HAHN
Trial Attorney
Civil Rights Division
DC ID No. 500193

s/ Barry K. Disney
BARRY K. DISNEY
Trial Attorney
Capital Case Section
KS ID No. 13284