IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 18-292 |
| | ) | |
| ROBERT BOWERS | ) | |

## MEMORANDUM IN SUPPORT OF DEFENSE CHALLENGES TO JUROR 385

Robert Bowers, by and through counsel, and pursuant to the Fifth, Sixth, and Eighth Amendments to the United States Constitution, respectfully submits this memorandum in support of his challenges to Juror 385.

## INTRODUCTION

Asked about his answer to questions 73 and 74 on his questionnaire, Juror 385 candidly told the Court that "I selected 9[(b)] because in a lot of cases, I think that if someone is, you know, truly deserving of the death penalty and I don't see life imprisonment as a true fit for a punishment, they should be killed for it." (Transcript of Jury Voir Dire held on Wednesday, May 10, 2023 at 168). He confirmed on questioning by the defense that he was a strong supporter of the death penalty. (Id. at 171). He confirmed that he believed that the death penalty was imposed too seldom, and that it was very

important that the United States have a death penalty. (Id. at 171-172). He confirmed that the death penalty is "necessary in cases where the guilty has committed unspeakable and horrible things to a person/group of people", and that his religious or spiritual affiliation taught that the death penalty was "necessary in extreme cases." (Id. at 172). He thought the present case was such a case. (Id. at 174). He confirmed that the death penalty "[s]hould be expanded and be used for more crimes such as rape, sexual assault of a minor, mass murder, terrorism." (Id. at 173).

He further indicated that the death penalty was the appropriate penalty "when it's very obviously premeditated, they thought out everything and they chose this person for a specific reason." (Id. at 174). He indicated that he would "carefully consider the evidence presented by the government, by the defense" but he also indicated:

> MR. RUBENSTEIN: But where your sense of justice is, at the end of the day, if you're convinced it's a premeditated, intentional killing and the victims were identified by a certain characteristic, you're voting for the death penalty?
>
> PROSPECTIVE JUROR: Yes.

(Id. at 177).

On questioning by the government, Juror 385 indicated that he could "liste[n] to aggravating evidence, liste[n] to mitigating evidence, before

[he] made that ultimate decision." (Id. at 179). He would like to be able to
"hear every single piece of evidence before completely finalizing." (Id. at 179-
180). He would "at least listen and consider both sides." (Id. at 180). He
indicated that "even if it is an extreme case where the death penalty is very
much possible, I still want to hear everything from the defendant's side, all
the mitigating evidence, to finalize personally whether or not they should get
the death penalty or they deserve to be imprisoned until they die." (Id. at
181).

        Upon further questioning by the defense, Juror 385 stated:

        MR. RUBENSTEIN: … If we start the third portion of the trial,
        you will have convicted the defendant of the charges described. Would
        you be entering that phase strongly leaning towards death?

        PROSPECTIVE JUROR: Yes.
        …
        MR. RUBENSTEIN: Would it be up to the defense to present
        strong evidence before you change your mind?

        PROSPECTIVE JUROR: Yes.

        MR. RUBENSTEIN: The last question is, do you want to serve,
sir?

        PROSPECTIVE JUROR: Yes.

        MR. RUBENSTEIN: Why?

        PROSPECTIVE JUROR: Because I want to help -- I want to help
        our criminal justice system work as it should and help those who
        deserve punishment get punishment.
        (Id. at 188).

The defense challenged Juror 385 because of hardship, implied bias, and actual bias. (Id. at 189-191, 193.) The hardship challenge was based on the fact that Juror 385 did not know whether he would get paid while being on jury duty for two and a half months and he indicated if he did not get paid it might cause him financial difficulties. (Id. at 187.) The Court asked Juroor 385 to follow up on this issue. (Id. at 189.)

The implied bias challenge was based on Juror 385's final two answers, and on *Dyer v. Calderon*, 151 F.3d 970, 982 (9th Cir. 1998), where the court wrote:

> We don't know why Jessica Freeland so cherished her seat on Dyer's jury. Jury service is a civic duty that citizens are expected to perform willingly when called upon to do so. But there is a fine line between being willing to serve and being anxious, between accepting the grave responsibility for passing judgment on a human life and being so eager to serve that you court perjury to avoid being struck. The individual who lies in order to improve his chances of serving has too much of a stake in the matter to be considered indifferent. Whether the desire to serve is motivated by an overactive sense of civic duty, by a desire to avenge past wrongs, by the hope of writing a memoir or by some other unknown motive, this excess of zeal introduces the kind of unpredictable factor into the jury room that the doctrine of implied bias is meant to keep out.

Juror 385's "excess of zeal" to serve in this case in order to "help our criminal justice system work as it should and help those who deserve punishment get punishment" is a valid ground for striking this juror under the doctrine of implied bias. See, *United States v. Mitchell*, 690 F.3d 137, 144 (3d Cir. 2012)("[I]mplied bias remains available, in appropriate

4

circumstances, to disqualify jurors whose connection with the litigation makes it highly unlikely that they can remain impartial adjudicators."); *White v. Mitchell*, 431 F.3d 517, 541 (6th Cir. 2005)(granting habeas relief based on a finding that it was unreasonable for a trial judge to fail to excuse a juror whose "statements not only indicate that [she] had a strong inclination toward imposing the death penalty, they also indicate that she was looking forward to participating in the imposition of this particular defendant's sentence.")

The actual bias challenge was based on Juror 385's very strong support for the death penalty in general and in this particular case in particular, his ambiguous and conflicting answers, and on the fact that he clearly indicated that given his strong views on the death penalty he would be entering the third phase of the case strongly in favor of a death verdict, and would require the defense to present strong evidence before he would change his mind.

In opposition to the defense argument that under cases cited by the government in ECF 1177, a prospective juror who gives ambiguous or conflicting answers is not qualified to serve, the government argued that "the cases that we have cited on equivocation are about somebody's ability to

oppose the death penalty and that that makes them substantially impaired.

So that line of cases is not applicable to the situation here." (Id. at 191.)

In opposition to the argument that this prospective juror would improperly place the burden of proof on the defense in the sentencing phase of the case, the government, relying on its briefing in ECF 1187 with respect to Juror 265, argued that

> When we're asking questions about whether somebody is leaning toward or in favor of the death penalty in Phase 3, the jury, because the defense won on trifurcation, Judge, will already have found beyond a reasonable doubt that one or more aggravating factors have been established. There is nothing inappropriate with a juror saying, sure, at that point, I'll be leaning in favor of the death penalty and I'll need to hear mitigation.

(Id. a 193.)

Because these two arguments have been raised by the government in relation to Juror 385, and have been raised with respect to other prospective jurors (e.g., Jurors 265, 406), this memorandum will focus primarily on addressing and refuting these arguments. In doing so, Mr. Bowers does not abandon his hardship and implied bias arguments, which provide independent and adequate grounds for excusing Juror 385.

# ARGUMENT

**I. THERE IS NO DOUBLE STANDARD FOR DETERMINING WHETHER PROSPECTIVE JURORS ARE QUALIFIED TO SERVE IN A CAPITAL CASE AND ADOPTING SUCH A STANDARD WOULD VIOLATE DUE PROCESS AND THE SIXTH AMENDMENT RIGHT TO A FAIR AND IMPARTIAL JURY.**

As a general matter, a venireperson may be excluded from a capital jury panel if their views on the death penalty "prevent or substantially impair the performance of [their] duties as a juror in accordance with his instructions and his oath." *Wainwright v. Witt*, 469 U.S. 412, 424 (1985). And as the government correctly states in ECF 1177, under *Witt* "a venireperson's equivocation in the face of questioning is a valid basis for the trial court to dismiss that individual from the panel." Id. at 2, citing *United States v. Johnson*, 495 F.3d 951, 966 (8th Cir. 2007) (finding no abuse of discretion where the district court excluded a juror for "equivocal, ambiguous, and inconsistent" answers).

Contrary to the government's argument in opposition to the challenge to Juror 285, there is not one standard that applies to those who generally oppose the death penalty and another that applies to those who generally favor the death penalty. See, *Morgan v. Illinois*, 504 U.S. 719, 728 (1992) (applying the *Witt* standard to a pro-death juror and concluding that "[u]nder this standard, it is clear …that a juror who in no case would vote for capital

punishment, regardless of his or her instructions, is not an impartial juror and must be removed for cause.")

Adopting such a standard would violate Mr. Bowers' Fifth Amendment right to due process and his Sixth Amendment right to a fair and impartial jury. The issue was addressed long before *Morgan* in *Witherspoon v. State of Ill.*, 391 U.S. 510, 523 n. 20 (1968) where the Court concluded that the basic requirements of procedural fairness included the requirement that "the decision whether a man deserves to live or die must be made on scales that are not deliberately tipped toward death" and that

> It was in part upon such a premise that the Fourth Circuit recently invalidated a North Carolina murder conviction, noting that a juror who felt it his 'duty' to sentence every convicted murderer to death was allowed to serve in that case, 'while those who admitted to scruples against capital punishment were dismissed without further interrogation.' This 'double standard,' the court concluded, 'inevitably resulted in (a) denial of due process.' *Crawford v. Bounds*, 395 F.2d 297, 303—304 (alternative holding). Cf. *Stroud v. United States*, 251 U.S. 15, 20—21, 40 S.Ct. 50, 52, 64 L.Ed. 103, on petition for rehearing, id., at 380, 381, 40 S.Ct. 176, 177, 64 L.Ed. 317 (*dictum*).

The Court's reliance on *Crawford v. Bounds* is significant because there the Fourth Circuit concluded that

> At the outset, we think that petitioner would be entitled to the writ because of the inherently unfair manner in which the jury was selected in this case. Our recitation of the proceedings exposes two salient facts: (1) a venireman who thought it was his 'duty' to impose capital punishment in the event of conviction was permitted to serve, while those whose dictates of conscience would presumably feel a converse duty were summarily excluded from service, and (2) a

venireman who had reached an opinion about the case, prior to trial, was interrogated by the trial judge until his qualification to serve was established, while those who admitted to scruples against capital punishment were dismissed without further interrogation. We cannot escape the conclusion that, as a result of insufficient interrogation and a double standard of inquiry, the petit jury selected was at the outset more likely to impose capital punishment in the event of conviction than not. The unexamined 'duty' of one member of the panel may have been so strong that no verdict of guilt, except one imposing capital punishment, could have been returned. Certainly, the concept of 'duty,' standing alone, carries that inescapable inference. Petitioner was, therefore, denied due process of law in violation of the Fourteenth Amendment.

*Crawford v. Bounds*, 395 F.2d 297, 303–04 (4th Cir.), *cert. denied,* 397

U.S. 936 (1970).

The Fourth Circuit further explained that the  use of a "double

standard of inquiry" in the death qualification process violated due process

under well-grounded  Supreme Court precedent:

That the Fourteenth Amendment guarantees 'to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors' is established by *Irvin v. Dowd*, 366 U.S. 717, 722, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1961). Prejudice, bias or other basic form of predisposition on the part of the trier of the fact results in a denial of due process. *Re Murchison*, 349 U.S. 133, 75 S.Ct. 623, 99 L.Ed. 942 (1955); *Re Oliver*, 333 U.S. 257, 68 S.Ct. 499, 92 L.Ed. 682 (1948); *Tumey v. State of Ohio*, 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927); *Reynolds v. United States*, 98 U.S. 145, 25 L.Ed. 244 (1879). Where North Carolina has chosen to make the degree of punishment a jury question in the event of conviction, as in the instant case, the guaranty that a juror be 'impartial, 'indifferent," is as applicable to the issue of punishment as to the issue of guilt. To permit a juror whose mind is foreclosed on one side of that issue to serve, while eliminating those who think to the contrary, and to exert special effort to qualify one whose mind may be foreclosed on the issue of guilt while freely

excusing those who indicate a predisposition as to punishment, were not the ways to achieve the constitutional objective. Denial of equal treatment in the manner of selection inevitably resulted in denial of due process.

(Id. at 304)

*In Morgan,* the Court reiterated that "because the Constitution guarantees a defendant on trial for his life the right to an impartial jury,....the trial court's failure to remove [an automatic death] juror for cause was constitutional error under the standard enunciated in *Witt.*" *Morgan v. Illinois,* 504 U.S. at 728. Such a juror was disqualified under *Witt* because he "has already formed an opinion on the merits", and thus " the presence or absence of either aggravating or mitigating circumstances is entirely irrelevant to such a juror." (Id. at 729.) "Therefore, based on the requirement of impartiality embodied in the Due Process Clause of the Fourteenth Amendment, a capital defendant may challenge for cause any prospective juror who maintains such views." (Id.)

*Morgan*, *Witherspoon*, and *Crawford* thus make clear that that there is no double standard for determining whether prospective jurors are qualified to serve in a capital case, and that it would be a violation of due process to adopt such a standard.

The cases cited by the government in ECF 1177 do not hold to the contrary. None of the cited cases articulate or defend a double standard for

assessing jury impartiality in a capital case, Indeed, one of cited cases expressly acknowledges that "[t]he court may exclude a juror for cause based upon his views on capital punishment if 'the juror's views[,]' *either in favor of the death penalty or against*, 'would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" *United States v. Gabrion*, 719 F.3d 511, 527 (6th Cir. 2013)(quoting *Witt*)(emphasis added). See also, *United States v. Snarr*, 704 F.3d 368, 386 (5th Cir. 2013)(applying the *Witt* standard to pro-death jurors).

The government is therefore plainly incorrect in arguing that "the cases that we have cited on equivocation are about somebody's ability to oppose the death penalty and that that makes them substantially impaired. So that line of cases is not applicable to the situation here." (Transcript of Jury Voir Dire held on Wednesday, May 10, 2023 at at 191). Those cases establish that a venireperson's equivocation in the face of questioning is a valid basis for the trial court to dismiss that individual from the panel. That principle applies to Juror 385 and requires his excusal for cause.

**II. A JUROR WHO STRONGLY SUPPORTS THE DEATH PENALTY IN A MURDER CASE OF THE TYPE AT ISSUE HERE, AND CLEARLY STATES BOTH THAT HE WOULD ENTER THE SENTENCING PHASE STRONGLY LEANING TOWARDS DEATH AND THAT IT WOULD IT BE UP TO THE DEFENSE TO PRESENT STRONG EVIDENCE TO CHANGE HIS MIND, IS NOT NEUTRAL OR IMPARTIAL AND MUST BE EXCUSED FOR ACTUAL BIAS.**

In ECF 1187, the government first advanced the remarkable proposition that "the fact that a prospective juror indicates that he would lean toward the death penalty at the outset of the sentence selection phase is hardly surprising, let alone disqualifying, where, by that the point, the jury will have already convicted the defendant of capital-eligible offenses and found beyond a reasonable doubt that the government has proven at least one aggravating factor." (Id. at 2.) As indicated above, the government advances that same proposition in opposition to the defense's challenge to Juror 385.

The premise of this argument is that once the jury has returned a guilty verdict and found the defendant eligible for the death penalty, the Fifth and Sixth Amendment constitutional requirement of jury impartiality no longer applies and it is therefore perfectly proper for the jury at that point to make a preliminary decision in favor of the death penalty, even before any mitigating evidence has been introduced. and to then place a burden on the defendant to change that prelimary decision. The argument finds no support in the FDPA and is flatly inconsistent with controlling precedent construing

12

the Fifth Amendment right to due process and the Sixth Amendment right to a fair and impartial jury.

By the government's reasoning, it would be totally acceptable for a juror in the guilt phase of a criminal case to make a preliminary decision in favor of guilt at the end of the government's case-in-chief, before the juror had heard any defense evidence, received any instructions from the court, or heard the final arguments. After all, having not heard from the defense and after being exposed only to the government's case, a juror's leaning toward guilt would be "hardly surprising." (ECF 1187 at 2). But "hardly surprising" does not equate to "legally acceptable". Decades of precedent establish that a juror who engages in premature decision-making violates due process and is not a fair and impartial juror.

"'The theory of the law is [and has always been] that a juror who has formed an opinion cannot be impartial.'" *Morgan v. Illinois*, 504 U.S. at 727, quoting *Irvin v. Dowd*, 366 U.S. 717, 722 (1961) and *Reynolds v. United States,* 98 U.S. 145, 155 (1879). Consistent with this theory, the Third Circuit's Model Criminal Jury Instructions, Instruction 1.03, admonishes jurors to

> Keep an open mind. Do not make up your mind about the verdict until you have heard all of the evidence, and I have given final instructions about the law at the end of the trial, and you have discussed the case with your fellow jurors during your deliberations.

The failure to give such an instruction, combined with an instruction, consistent with the government's argument here, that the jurors could in fact form preliminary opinions about the case, has been held to be a violation of the Fifth and Sixth Amendments. See, e.g., *Winebrenner v. United States,* 147 F.2d 322, 327 (8th Cir. 1945). In *Winebrenner*, the court explained that "[w]hether guilty or innocent, appellants were entitled under the Fifth and Sixth Amendments to the Constitution to a fair trial to an impartial jury." (Id. at 327.) "Here the court not only declined to admonish the jury that they should not discuss the case among themselves, nor form nor express an opinion as to the guilt or innocence of the defendant until the case had finally been submitted to them, but the jury was in effect advised that the jurors might discuss the case among themselves if careful not to make up their minds finally and definitely about it." (Id.) The vice of such an instruction was that

> Under the court's admonition the jurors were warranted as a result of discussion among themselves, either in small groups or large ones, to form opinions so long as such opinions were not so absolutely fixed that they would 'prevent you from changing after you had heard all of the evidence in the case.' Such an opinion of necessity could result from a discussion of only part of the evidence, the evidence not having all been submitted. Such an opinion once formed could only be removed, if at all, by evidence. This in effect shifted the burden of proof and placed upon the defendants the burden of changing by evidence the opinion thus formed. A juror having in discussion not only formed but

expressed his view as to the guilt or innocence of the defendant, his inclination thereafter would be to give special attention to such testimony as to his mind strengthened, confirmed or vindicated the views which he had already expressed to his fellow jurors, whereas, had there been no discussion and no expression of tentative opinion, he would not be confronted with embarrassment before his fellow jurors should he change the tentative opinion which he might entertain from hearing evidence.

(Id.)

In *United States v. Resko*, 3 F.3d 684, 689 (3d Cir. 1993), the Third

Circuit expressed the same and additional concerns in reference to the

problem of premature jury deliberations and decisionmaking:

> There are a number of reasons for this prohibition on premature deliberations in a criminal case. See generally Lillian B. Hardwick & B. Lee Ware, <u>Juror Misconduct</u> § 7.04, at 7–27 (1988). First, since the prosecution presents its evidence first, any premature discussions are likely to occur before the defendant has a chance to present all of his or her evidence, and it is likely that any initial opinions formed by the jurors, which will likely influence other jurors, will be unfavorable to the defendant for this reason. See *Commonwealth v. Kerpan*, 508 Pa. 418, 498 A.2d 829 (1985). Second, once a juror expresses his or her views in the presence of other jurors, he or she is likely to continue to adhere to that opinion and to pay greater attention to evidence presented that comports with that opinion. Consequently, the mere act of openly expressing his or her views may tend to cause the juror to approach the case with less than a fully open mind and to adhere to the publicly expressed viewpoint. See *Winebrenner v. United States*, 147 F.2d 322, 328 (8th Cir.1945); State v. Joyner, 289 S.C. 436, 346 S.E.2d 711, 712 (1986).
> Third, the jury system is meant to involve decisionmaking as a collective, deliberative process and premature discussions among individual jurors may thwart that goal. See *Winebrenner*, 147 F.2d at 329; *Kerpan*, 498 A.2d at 831. Fourth, because the court provides the jury with legal instructions only after all the evidence has been presented, jurors who engage in premature deliberations do so without the benefit of the court's instructions on the reasonable doubt standard.

See *Winebrenner*, 147 F.2d at 327. Fifth, if premature deliberations occur before the defendant has had an opportunity to present all of his or her evidence (as occurred here) and jurors form premature conclusions about the case, the burden of proof will have been, in effect, shifted from the government to the defendant, who has "the burden of changing by evidence the opinion thus formed." Id. at 328.

Finally, requiring the jury to refrain from prematurely discussing the case with fellow jurors in a criminal case helps protect a defendant's Sixth Amendment right to a fair trial as well as his or her due process right to place the burden on the government to prove its case beyond a reasonable doubt. *See In re Winship,* 397 U.S. 358, 364, 90 S.Ct. 1068, 1072, 25 L.Ed.2d 368 (1970).

Because the Court in *Witherspoon*, *Witt*, and *Morgan* concluded that the right to a fair and impartial jury applies to the sentencing phase of a capital case, the prohibition against premature decision-making in the guilt phase of any criminal case must logically and necessarily apply to the sentencing phase of the capital case as well. As was held as early as *Crawford*, "the guaranty that a juror be 'impartial, 'indifferent', is as applicable to the issue of punishment as to the issue of guilt." *Crawford*, supra, 395 F.2d at 304.[4]

---

[4] In ECF 1187, page 2, the government stresses that "based on the trifurcated process that the defendant specifically requested, the jury will have already made the finding that the government has established one or more statutory aggravating factors <u>before</u> entering the sentencing selection phase; no mitigation evidence will have been presented at that point." But the fact that "no mitigation evidence will have been presented at that point" is exactly why impartiality is so critical at this point in the proceedings.  The government seems to be suggesting that Mr. Bowers has somehow waived his right to a fair and impartial jury in the sentencing phase by requesting trifurcation to protect his right to a fair and impartial jury trial in the eligibility phase. This

Although, in this case, the Court has ruled over defense objection that the government will not have a burden of establishing beyond a reasonable doubt that aggravating factors sufficiently outweigh mitigating factors to justify a sentence of death, the government nevertheless retains the burden under the FDPA and the Court's instructions of proving beyond a reasonable doubt all statutory and non-statutory aggravating factors, and the only burden placed on the defense is to establish mitigating evidence by a preponderance of the evidence. A juror like Juror 385, who strongly supports the death penalty in a murder case of the type at issue here, and clearly states both that he would enter the sentencing phase strongly leaning towards death and that it would it be up to the defense to  change his mind by "strong evidence", has impermissibly lessened the government's burden of proof as to aggravating factors, increased the defense's burden as to mitigating factors, and  placed on the defense a  burden that neither the FDPA nor the Court's instructions place on him as to the appropriateness of a life sentence. For the reasons stated in *Winebrenner and Resko,* such a juror, who has formed a premature and strong opinion as to the appropriateness of

---

suggestion is clearly wrong. *Witherspoon*, *Witt*, and *Morgan* protect Mr. Bowers' right to a fair and impartial jury at all phases of a capital trial. No court in the country has held that by taking and being granted measures to protect that right in an eligibility phase the defendant thereby waives or forfeits that same right in a sentencing phase.

the death penalty, is not an "impartial, indifferent juro[r]". *Morgan*, 504 U.S. at 727). Instead, he has "crossed the line of neutrality", such that allowing him to sit on Mr. Bowers' jury would violate the fundamental due process and Sixth Amendment principle that "the decision whether a man deserves to live or die must be made on scales that are not deliberately tipped toward death." *Witherspoon v. State of Ill.*, 391 U.S. at 529 n. 20. See also, *Wainwright v. Witt*, 469 U.S. at 426 n. 5 ("We adhere to the essential balance struck by the *Witherspoon* decision rendered in 1968.")

The sole case that the government cites in support of its novel argument that it is entirely appropriate for a juror sitting in an FDPA case to enter the sentencing phase with a strong predisposition in favor of imposing the death penalty is *United States v. Wilson*, No. 04-CR-1016 NGG, 2013 WL 2298952 (E.D.N.Y. May 24, 2013). Nowhere in *Wilson* does the court acknowledge the fact that *Witherspoon*, *Witt*, and *Morgan* all firmly acknowledge that the right to a fair and impartial jury applies to the sentencing phase of a capital case. Nor does the court address the Court's emphatic statement in *Morgan* that "a juror who has formed an opinion cannot be impartial." The persuasiveness of *Wilson*, which no court has yet cited, is thus questionable.

In any event, the government's selective quotations from *Wilson* do not

fairly capture the entirety of the court's analysis. In ECF 1187 at page 2, the government quotes and stresses that part of the *Wilson* opinion which states that " a juror's view regarding the appropriateness of the death penalty under a variety of facts and hypotheticals does not mean that she necessarily is unable to adhere to the court's instructions, so long as the juror is open to meaningfully considering other evidence and has not foreclosed the possibility of imposing a life sentence. See 18 U.S.C. § 3593(c); *Morgan v. Illinois*, 504 U.S. 719, 728, 112 S. Ct. 2222, 119 L.Ed.2d 492 (1992)." *Wilson*, 2013 WL 2298952, at *4. The government has overlooked the fact that the Court in *Wilson* was quick to add: "Of course, if a particular juror expresses such strong feelings regarding the death penalty that the court believes, as a factual matter, he is substantially impaired and cannot follow the court's instructions given at the close of trial that delineate the FPDA's scheme, the court will not hesitate to strike him for cause. Such factual determinations, however, may not be conclusively determined because of a likely view." *United States v. Wilson*, 2013 WL 2298952, at *5 (E.D.N.Y. May 24, 2013)

There were three prospective jurors at issue in *Wilson*. The first prospective Juror # 788 made "repeated statements evincing his ability to meaningfully consider mitigation evidence despite his belief that he would

perhaps favor the death penalty in the circumstances presented here." (Id. at
* 6). The court denied a defense challenge for cause. The challenge to the
second prospective juror  rested on the assertion that "because Juror # 823
preliminarily stated that he would lean in favor of the death penalty given
the specific facts presented—which, through the lens of the FDPA,
establishes the existence of all four threshold culpability factors, one
statutory aggravating factor, and one non-statutory aggravating factor—he is
'unable to fairly consider' the punishment decision and 'would shift the
burden to the defense to dissuade him.'" (Id. at * 9). The court denied a
defense challenge for cause, finding that the prospective juror "immediately
clarified that he is still capable of imposing a life sentence and meaningfully
considering mitigation evidence no matter the factual circumstances", and
that he "expressed an ability to meaningfully consider mitigation evidence
and has assured the court that he could impose a life sentence based on the
appropriate balancing of aggravating and mitigating evidence." (Id.).

The third prospective juror stated that he "believes that based upon the
facts presented thus far, he is likely to vote for a death sentence. In his
questionnaire and at voir dire, Juror # 1237 repeatedly stated that he
thought the death penalty is the appropriate penalty unless proven
otherwise." The court granted a cause challenge as to this juror. (Id. at * 10.)

Importantly, this juror was asked by the court "Now, if you concluded, after hearing the evidence of mitigation and the evidence of aggravation, that the appropriate sentence that the evidence justified was a life sentence without the possibility of release, could you vote for that sentence for intentional murder?" and the prospective juror answered " Absolutely." (Id.) Still, the juror had to be excused because he "repeatedly stated that he would require Wilson to prove that a life sentence was justified." (Id.) The court explained that "unlike Juror # 788 and Juror # 823, Juror # 1237 was informed that he must impose a life sentence "but for" the existence of significant aggravating factors, but remained firmly convinced that a death sentence is presumptively appropriate. What also distinguishes Juror # 1237 from qualified jurors is his belief that *any* defendant convicted of intentional murder must prove that a life sentence is appropriate.... Given how forcefully these answers were given, the court firmly believes that despite his claimed ability to consider a life sentence and mitigating evidence, Juror # 1237 would not be able to follow the court's instructions concerning the FDPA." (Id.)

In this case, Juror 385's attitudes and opinions are much closer to those of Juror # 1237 in *Wilson* than they are to *Wilson* Juror # 788 or Juror # 823. He did not merely state, like Juror # 788,  that "he would perhaps favor the

death penalty in the circumstances presented here", or, like Juror # 823, that "he would lean in favor of the death penalty given the specific facts presented". Rather, like Juror # 1237, he forcefully indicated that based upon the facts presented thus far, he is likely to vote for a death sentence, and that he would require Mr. Bowers to prove by strong evidence that a life sentence was justified. And he did so after listening to the Court's careful preliminary instructions regarding the burden of proof in the eligibility and selection phase. Therefore, even under the logic of Wilson, Juror 385 should be excused for cause.

For all of the foregoing reasons, Juror 385 should be excused for hardship, for implied bias, and for cause.

Respectfully submitted,

**/s/ Judy Clarke**
Judy Clarke
Clarke Johnston Thorp & Rice, PC

**/s/ Michael Burt**
Michael Burt
Law Office of Michael Burt, PC

**/s/ Michael J. Novara**
Michael J. Novara
First Assistant Federal Public Defender

**/s/ Elisa A. Long**
Elisa A. Long
Assistant Federal Public Defender