IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA

vs. Criminal No. 18-292

ROBERT BOWERS

Transcript of Jury Trial held on Wednesday, July 5, 2023, in the United States District Court, 700 Grant Street, Pittsburgh, Pennsylvania 15219, before Honorable Robert J. Colville, United States District Judge.

APPEARANCES:

For the Government: U.S. Attorney's Office
Soo C. Song, Esquire
Troy Rivetti, Esquire
Eric G. Olshan, Esquire
Nicole A. Vasquez Schmitt, Esquire
Barry Disney, Esquire
Mary J. Hahn, Esquire

For the Defendant: Federal Public Defender
Elisa A. Long, Esquire
Michael J. Novara, Esquire
Ashwin Cattamanchi, Esquire
and
Clarke, Johnston, Thorp & Rice, PC
Judy Clarke, Esquire
and
Law Office of Michael Burt
Michael N. Burt, Esquire

Court Reporter: Noreen A. Re, RMR, CRR

Proceedings recorded by mechanical stenography; transcript produced by computer-aided transcription.

VOLUME 20

P R O C E E D I N G S

(Private session held.)

(Private session concluded.)

(Public enters courtroom.)

THE COURT: Counsel, are we prepared to bring the jury in?

MR. OLSHAN: Yes, Your Honor.

THE COURT: Ms. Kim.

(Jury enters courtroom.)

THE COURT: Welcome back. Everyone, please be seated. Ladies and gentlemen of the jury, good to see you again. I hope you enjoyed your brief holiday. I'm going to ask you to raise your hand if your answer to any of the following questions is yes:

Have you been exposed to any media or news reports regarding this case of any kind, by whether television, Internet, magazine, newspaper or otherwise?

I see no raised hands, and I see a lot of shaking back and forth heads.

Have you had any discussions with anyone, strangers, friends, family, coworkers, even each other outside of the realm of formal discussions in this case while in the deliberation room? If so, please raise your hand.

I see no hands.

Finally, have any of you, either intentionally or

inadvertently, conducted or have been exposed to any research of any kind regarding any issue in this case?

I see no hands. Thank you all very much. I appreciate that.

Counsel, defense, I guess I'll ask you, any further witnesses or do you rest as to this phase of the trial?

MR. BURT: We rest at this point, Your Honor.

THE COURT: Thank you, Mr. Burt.

Is the government prepared to call its witnesses in rebuttal, if any?

MR. OLSHAN: Yes, Your Honor. United States calls Dr. Ryan Darby.

THE COURT: Very good. Dr. Darby, would you step up, please.

RICHARD RYAN DARBY, M.D., a witness herein, having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. OLSHAN:

Q. Good morning, sir.

A. Good morning.

Q. Can you state and spell your given name.

A. Richard Ryan Darby, D-A-R-B-Y.

Q. Do you go by Richard or Ryan, sir?

A. I go by Ryan.

Q. Where do you live?

A. I live in Nashville, Tennessee.
Q. Can you tell the jury where you're employed.
A. So I'm employed at Vanderbilt University Medical Center.
Q. Do you hold any titles at Vanderbilt University Medical Center?
A. I do. So I'm assistant professor of neurology, and I'm director of the Frontotemporal Dementia Clinic at Vanderbilt.
Q. That's the Frontotemporal Dementia Clinic; correct?
A. Correct.
Q. I want to ask you about your educational background. Doctor, where did you go to college and what did you study?
A. So I went to college at Princeton University. I majored in psychology and neuroscience.
Q. After you graduated from Princeton, did you go to medical school?
A. I did. I went to medical school at Vanderbilt University.
Q. When you completed your medical degree at Vanderbilt, did you do what's called a residency?
A. I did, yes.
Q. What was the area of specialty that you focused on in your residency?
A. So my residency was in neurology, and it was at the Harvard Neurology Residency Program at Massachusetts General and Brigham and Women's Hospitals in Boston.
Q. That's Massachusetts General, Brigham and Women's

Hospital?
A. Yes. They're two separate hospitals, but both in Boston.
Q. Can you tell the jury, during your residency in neurology, what did you learn to diagnose and manage?
A. So residency in neurology is really about learning how to diagnose and manage a full spectrum of neurological disorders. So that ranges from things like strokes, tumors, epilepsy, traumatic brain injuries, dementia, Parkinson's. So it's really any disease that can affect the nervous system.
Q. How long was your residency, Doctor?
A. It was a one-year internship in general medicine, so across all types of medical issues and then three years in neurology itself.
Q. After you completed your residency, did you do what's called a fellowship?
A. I did, yes.
Q. What was the area of focus in your fellowship?
A. So my fellowship was in behavioral neurology and neuropsychiatry, so a subset within neurology.
Q. Generally speaking, what is behavioral neurology and neuropsychiatry?
A. So behavior neurology and neuropsychiatry are really about understanding how neurological diseases lead to behavioral, cognitive and psychiatric symptoms. So how do these diseases lead to these symptoms and behaviors that we see in patients.

Q. So, for example, during your fellowship, did you have experience with patients who had delusions?
A. Yes. And so we would see patients with delusions that weren't due to a psychiatric disease like schizophrenia, but happened after a patient had a stroke or a tumor in a certain part of the brain. So we can see those same symptoms that happen in a neurological patient instead of a psychiatric disease.
Q. If you saw -- focusing on your fellowship, did you have a particular area that you researched?
A. Yes. So part of my fellowship, in addition to seeing patients in clinic, was also research. So I developed a research interest in functional and structural brain imaging and would use different types of structural and functional brain imaging to understand different types of behaviors that were of interest.
So those included things like delusions, antisocial and criminal behavior, agency and volition, different types of psychiatric behavioral cognitive symptoms.
Q. Where did you complete your fellowship?
A. That was at the Harvard Beth Israel Deaconess Program.
Q. Another hospital facility or program affiliated with Harvard?
A. Yes.
Q. Just to be clear, was your fellowship -- how long was it?

A. It was two years.
Q. It was both a clinical fellowship, meaning seeing patients, as well as a research fellowship?
A. Correct. So part of it was spent seeing patients in the clinic. Part of it was spent learning research methods and performing research.
Q. After you finished your fellowship, what did you do next?
A. So after I finished my fellowship, I came back to Vanderbilt, became a faculty member, assistant professor of neurology where I've been for the past six years.
Q. I want to ask you about the different things that you do at Vanderbilt. How many different things do you do at Vanderbilt?
A. There's probably about three different things I do at Vanderbilt.
Q. Can you just name them very quickly and then we'll go through one at a time.
A. So I'm a clinician so I see patients in clinic. I still perform research using structural and functional brain imaging, and then I have teaching duties and responsibilities.
Q. Just so we're all sure, can you just pull that up a little bit closer. Thank you, Doctor.
So you mentioned clinic, research and teaching?
A. Correct.
Q. Let's talk about clinic. You mentioned the name of a

clinic. What was that again?
A. The Frontotemporal Dementia Clinic.
Q. What is your role with that clinic?
A. I'm the director of that.
Q. Does that mean you run it?
A. Yes.
Q. Can you tell the jury what that clinic does.
A. So it really evaluates patients with frontal and temporal diseases. So the main patients that we see are patients with frontotemporal dementia. So it's an early onset dementia. It affects people before the age of 60. It's actually the most common early onset dementia. And they present with symptoms related to abnormalities in the frontal and temporal lobes.
Q. I want to talk to you about types of symptoms that you see in patients who come to your clinic. Are there different types of symptoms?
A. There are. There are a number of different sets of symptoms that we can see related to the frontal and temporal lobes.
Q. Is one of those types of symptoms involving executive functioning?
A. Yes.
Q. What does that mean?
A. So as you may have heard already, the executive functions really talk about our ability to plan, to reason, to make

decisions, and to execute or follow out on those plans.

Q. Do you see patients in your clinic who have deficits in that area of executive functioning?

A. Yes. So patients will come with symptoms related to that that they no longer can follow through on tasks, that they have difficulty in figuring out how to do things they were able to do before.

Q. What about another type of symptom? Do you see patients with problems with motivation?

A. Yes. So we refer to that sometimes as apathy or abulia.

Q. Abulia?

A. Abulia.

Q. Is that A-B-U-L-I-A?

A. Correct.

Q. What types of behaviors do you see in patients who have issues with motivation?

A. So these patients have difficulty motivating themselves to do things. They don't form goals. They don't have as many interests. And if they do have goals and motivations, they can't act on that or initiate it.

So these patients may say that they're lying in bed all day, and they can't even will themselves to do basic things sometimes, things like feeding themselves, getting bathed, changing their clothes. So all of those basic things that we would normally be able to initiate and do, they

struggle with.
Q. Do you also see patients who have other types of symptoms involving social and emotional behavior and function?
A. Yes. So we see patients that can develop these really bizarre and socially inappropriate behaviors as a result of their frontal lobe disorder.
Q. What kinds of behaviors do you see? Can you just give the jury some examples of social dysfunction behaviors.
A. These patients really lose their understanding of those normal social boundaries and the rules that normally govern how we behave in public. So we have patients that may begin hugging strangers. They may walk around naked in front of other people. I've had patients in clinic who have kissed me, who have plucked hairs from my head, who have a lit cigarette while we were talking in clinic. So they really don't understand those boundaries anymore and can present with these really bizarre behaviors.
Q. In addition to social dysfunction, does that category also involve emotional regulation issues?
A. It does, yes.
Q. Can you describe what that means and provide some examples to the jury.
A. These patients can also develop impulsivity and disinhibitions. So they may not think through their actions before they do them.

So we may have a patient who sees a half-eaten apple in the trash and then will reach and grab it and start eating it. They don't think through the fact that it could be dirty, it's being discarded. And if you try and interfere with those types of things, they can get frustrated. They react emotionally. They may not be able to regulate those emotions in the same way as they would have before.

Q. You testified about a couple different types of symptoms you see in clinic, executive functioning, problems with motivation, social and emotional behavior and functioning. Do you also see patients in clinic with psychiatric symptoms?

A. Yes, we do.

Q. Can you describe that, Doctor?

A. So --

MR. BURT: I'm going to object. I think we're in the substance of the testimony, not the qualifications at this point.

THE COURT: I'm going to overrule the objection. I trust you're not going to get too deeply into his observations or opinions at this point. This is regarding his experience, as I understand the question.

MR. OLSHAN: Correct. This is establishing what he does in the clinic, Your Honor.

A. I mentioned delusions before. So we see neurological patients that develop delusions. So one example that we

researched before is Capgras delusion.

BY MR. OLSHAN:

Q. How do you spell that, Doctor?

A. C-a-p-g-r-a-s.

Q. What is Capgras delusion?

A. So Capgras delusion is the belief that someone's loved one, their mother, their spouse, has been replaced by an identical looking imposter. And so they say, this looks just like my mother, dresses the same way, but there is something that feels different about this person that makes it so I come to this conclusion that it's not really my mother. It must be somebody else, an imposter.

Q. What other kinds of delusions do you see in clinic?

A. We see delusions around persecutory delusions, paranoid delusions, delusions involving the body, many different types of delusions.

Q. What is a persecutory delusion?

A. A persecutory delusion is a belief that one is being followed or attacked or targeted or in some way threatened.

Q. You've gone through four different types of symptoms that you see in patients in your clinic. How do you tend to get these patients?

A. So these patients are typically referred to me by other neurologists, other psychiatrists, sometimes their primary care doctors. Typically they're referred to me for a question

of whether a neurological disease is causing their behavior.
Q. So it's sort of try to associate the behavior with some kind of neurological source?
A. Correct.
Q. That is distinct from whether there is a psychiatric condition?
A. Correct.
Q. In order to assess patients in clinic, do you have sort of a toolkit that you use?
A. Yes. We have a standard approach for how we evaluate a patient and work them up for these conditions.
Q. Does that include a clinical interview?
A. It does. It always starts with the clinical interview and history.
Q. What is the significance or importance of the clinical interview?
A. Well, that's where you really learn and understand what is it the behavior that you're interested in. So what is the actual problem? What is it causing? When did it start? How has it evolved over time? So that's really the basis of what we're trying to understand is what is that behavior that we're then trying to see, is it associated with a neurological disease.
Q. As far as importance of the tools that you use in the clinic, how do you rank the clinical interview?

A. It's the most important part.
Q. As part of your clinical interview, do you ask questions about neuropsychiatric conditions?
A. Yes, we do.
Q. What does that mean?
A. It's really just reviewing any of those psychiatric symptoms that could be associated with a neurological disease, so delusions, hallucinations, obsessions, compulsions. Each of these can also be seen in neurological diseases.
Q. Again, when we say "neurological," we mean some kind of brain dysfunction as opposed to a purely psychiatric issue?
A. Correct.
Q. During your interview, do you also conduct a neurological examination?
A. Yes.
Q. Is that different than the interview you just discussed?
A. It is. So there are observations that happen during the interview itself, but then there is a more formal neurological exam where we test things at the bedside like memory, executive functions, language, as well as other signs of frontal lobe dysfunction, and then evaluate the rest of the neurological systems, the cranial nerves, movement, sensation, coordination.
Q. After you have completed the clinical interview with that neurological examination, what does that tell you about what

tools to use next?

A. Well, that guides your decisions towards what are the next tests I need in order to figure out what's going on, so what could be causing these types of behaviors and where is it located in the brain.

Q. In order to assess what's the cause, where is it, does the location in the brain as part of that assessment matter?

A. It does, yes.

Q. Why?

A. Well, when we're doing these tests, we want to see that they match up with the behaviors that we're seeing. And so any time we do a test, there is a chance of a finding there being incidental and not related to the behavior that we're interested in. So we want to know, does this test, this abnormality, explain what we're seeing in the patient or does it not.

Q. Is it common when you do diagnostic testing that you might find -- you might come upon an incidental finding that's unrelated to a neurological disorder?

MR. BURT: Judge, again, objection. We're getting into the substance of his testimony at this point.

THE COURT: At this point, I'm inclined to allow Mr. Burt's observation.

MR. OLSHAN: This is just establishing what he does and what his qualifications are, Your Honor.

THE COURT: I think you're getting beyond simply what he does and his qualifications. Certainly, you'll go here at some point, if and when he's qualified, but I'm going to sustain the objection.

MR. OLSHAN: I'll move on.

BY MR. OLSHAN:

Q. As part of your diagnostic work in clinic, do you review and order imagery?

A. Yes, I do.

Q. Which types?

A. MRI scans, so looking at the size, structure of the brain; PET scans looking at the function of the brain. We may order EEG tests looking at the electrophysiology of the brain, and then blood tests, spinal fluid tests, depending on if there is a specific disease that we're worried about in evaluating.

Q. Each of those types of diagnostic tests, MRI, PET, EEG, blood test, those are commonly used in clinical care?

A. Yes. Those are among the most common tests that we order.

Q. Do you see patients in clinic with schizophrenia?

A. Not directly. So I may be referred a patient with schizophrenia where they're worried about new symptoms that are developing, cognitive issues, they may think are not related to schizophrenia. Or I may be referred a patient where schizophrenia is being considered, but there is also a concern that it could be a neurological disease instead of

schizophrenia. And so I would evaluate to see whether it seems like a neurological disease would be the reason for the symptoms rather than schizophrenia.

Q. In addition to the clinic, the clinical work you do as the director of your clinic, you testified you also do research. Can you describe the nature of your research at Vanderbilt?

A. So my research really focuses on understanding these behaviors in frontotemporal dementia patients, and so how do these diseases lead to the symptoms that we see.

I'm interested in a couple symptoms in particular, things like delusions, antisocial and criminal behavior. So that tends to be the focus of my research.

Q. Do you use neuroimaging associated with neuropsychiatric symptoms as part of your research?

A. Yes. So it's using structural and functional brain imaging to better understand how do these diseases result in these specific behaviors.

Q. Do you also see patients in the research setting?

A. Yes. So all of our research is conducted on patients. So it's related to patients, their symptoms and their brain imaging findings.

Q. How does the nature of the evaluations in the research setting differ from the clinical setting?

A. Well, our research evaluations are much more thorough and involved. And so a patient may come in for two, three days as

part of their research evaluation. They're getting extensive testing during that time. The resident in the clinic may have only 30 minutes, an hour to see the patient.

Q. You also testified that you do some teaching at Vanderbilt.

A. Yes.

Q. Can you describe that and what you focus on in that setting?

A. Sure. So some of the teaching is what we call bedside teaching. So I have students who will come with me in clinic to see patients, to learn from the patients, how they describe their symptoms, their exam and their imaging.

And other types of teaching are more formal. So it may be a lecture that I would give on frontal and temporal disorders, on neuropsychiatric symptoms, or on behavioral neurology and neuropsychiatry.

Q. Do you have any certifications?

A. I do. I am board certified in neurology.

Q. Are you affiliated with any professional organizations?

A. Yes, I am.

Q. For example, are you affiliated with the American Academy of Neurology?

A. Yes.

Q. The American Neuropsychiatric Association?

A. Yes.

Q. The American Neurological Association?
A. Yes.
Q. And something called the International Society to Advance Alzheimer's Research and Treatment, or ISTAART?
A. Yes.
Q. Among others?
A. Yes.
Q. Have you served on various committees during your career?
A. Yes, I have.
Q. Have you served on the Neuropsychiatric Syndromes committee of ISTAART?
A. Yes.
Q. Have you previously served as the chair of the behavioral neurology section of the American Neurological Association?
A. Yes, I did.
Q. Do you also serve as a reviewer for peer-reviewed publications?
A. Yes.
Q. Does that include the New England Journal of Medicine?
A. Yes.
Q. JAMA or JAMA?
A. Yes.
Q. Is that J-A-M-A?
A. J-A-M-A.
Q. What does that stand for?

A. The Journal of the American Medical Association.
Q. Do you also do peer review for the journal Neuropsychiatry and Clinical Neurosciences?
A. Yes, I do.
Q. Neuropsychiatric Disease and Treatment?
A. Yes.
Q. The journal related to Cognitive Neuropsychiatry?
A. Yes.
Q. Another one called Psychiatry Research?
A. Yes.
Q. Biological Psychiatry?
A. Yes.
Q. A publication called Psychology of Violence?
A. Yes.
Q. The Journal of Law, Medicine and Ethics?
A. Yes.
Q. Have you received awards during your career, Dr. Darby?
A. I have, yes.
Q. And the peer review work you did, that was not exclusive to the ones that I named, was it?
A. Correct. There are others.
Q. With respect to awards, have you received what's called the Norman Geschwind, G-E-S-C-H-W-I-N-D, Prize in Behavioral Neurology from the American Academy of Neurology?
A. I did, yes.

Q. What is that for?
A. That is the highest award that one can receive from the American Academy of Neurology in the field of behavioral neurology.
Q. Have you also been awarded the career development award by the American Neuropsychiatry Association?
A. Yes.
Q. Among other awards?
A. Yes.
Q. In addition to reviewing other people's submissions to these periodicals, have you done your own peer-review writing?
A. I have, yes.
Q. Have you published in various publications involving delusions?
A. Yes, I have.
Q. For example, have you published on the topic of delusions in the Journal of Neuropsychiatry and Clinical Neurosciences?
A. Yes.
Q. Have you also published on the topic of seizures?
A. Yes.
Q. For example, in the Journal of Neurology?
A. Yes.
Q. Have you published on the topic of seizures in the peer-reviewed publication called The Neurohospitalist?
A. Yes.

Q. Have you also published in the Journal of Neurology, Neurosurgery and Psychiatry?
A. Yes.
Q. Have you published in the Journal of Cognitive Neuropsychiatry on delusions?
A. Yes.
Q. Have you published in the Journal of Biological Psychiatry?
A. Yes.
Q. And have you published on the topic of neuropsychiatric symptoms in Alzheimer's disease in the publication Brain?
A. Yes.
Q. Among other publications that were peer-reviewed?
A. Yes.
Q. Have you also given presentations during your career?
A. I have, yes.
Q. On delusions?
A. On delusions, yes.
Q. Also the neurobiology of criminal behavior?
A. Yes.
Q. Have you presented on neuropsychiatric symptoms?
A. Yes, I have.
Q. Have you presented on challenges in forensic psychiatry and neurology?
A. Yes.

Q. Have you -- I'm sorry. Have you presented multiple times on neuropsychiatric symptoms?
A. Yes, I have.
Q. Have you presented internationally?
A. I have, yes.
Q. And have you presented on the topic of evaluating decisionmaking capacity in neuropsychiatric patients?
A. Yes, I have.
Q. Have you also instructed residents?
A. Yes.
Q. On neurology?
A. Yes. So a combination of lectures, of having them see patients with me in clinic and in supervising their care of other neurological patients.
Q. The audience for your lectures, does that include students at all levels of education?
A. Yes. So it would depend on the audience, but it can range from undergraduate students and medical students to residents and fellows to other neurologists and psychiatrists.
Q. Have you testified before as an expert?
A. I have, yes.
Q. Have you been retained by both the government and the defense in cases?
A. I have.
Q. Have you testified about MRI, PET and EEG imaging?

A. Yes, I have.
Q. Have you testified about neurology and behavioral neurology?
A. Yes.
MR. OLSHAN: Your Honor, at this time we would offer Dr. Darby in neurology, behavioral neurology and neuropsychiatry.
THE COURT: Thank you.
Mr. Burt, do you care to cross as to qualifications?
MR. BURT: Yes. Thank you.

VOIR DIRE EXAMINATION

BY MR. BURT:
Q. Good morning.
A. Good morning.
Q. When did you graduate from medical school, what year?
A. 2011.
Q. 2011. And you graduated from Vanderbilt; correct?
A. Correct.
Q. And the prosecutor mentioned a couple of times that the place where -- the hospital where you did your fellowship was somehow associated with Harvard University?
A. Yes. The Beth Israel Deaconess Medical Center.
Q. Were you admitted as a student at Harvard Medical School?
A. So as a trainee, you are considered a member of Harvard University.

Q. Were you admitted as a student at the Harvard Medical School? Did you go through the application process and were you admitted to the Harvard University Medical School?
A. No. I was appointed in the Harvard Medical School as a trainee.
Q. So your answer is no, you were not admitted to the Harvard Medical School?
A. I was not a medical student at the time, so I was not in medical school.
Q. Thank you for answering that. How about as an undergraduate? Were you ever admitted to Harvard University as an undergraduate?
A. No. I went to Princeton University.
Q. Okay. Now, and you said you are board certified in neurology; correct?
A. Correct.
Q. Who certifies you in neurology? What's the name of the organization?
A. I believe it's the American Board of Neurology and Psychiatry or Psychiatry and Neurology.
Q. And what year did you get your certification in neurology?
A. 2015, I believe.
Q. All right. And is it true that there are a number of what are called subspecialties within neurology?
A. There are.

Q. That you can get board certified in?
A. Yes.
Q. And does the board maintain a website where someone who's wanting to know what you were board certified in can go and check and see what your certifications are in various subspecialties?
A. So I think there's a few different places where you can see that information. Some fellowships are accredited through the ACGME. Others, there is a different group or organization that would keep track of that.
Q. Okay. I want to ask you some questions about what the subspecialties are. For purposes of doing that, I want to show you your -- what's called your verified cert. Are you familiar with the academy's website where you can go and see what your certifications are?
A. No, I'm not.
Q. If I showed it to you, do you think you would be able to be familiar with it?
A. If you showed it to me, I would be able to tell you what was on there.
MR. BURT: Sure. Can I approach, Your Honor?
THE COURT: Yes. Mr. Olshan.
(Document shown to Mr. Olshan for his review.)
BY MR. BURT:
Q. And I'll tell you what I want to focus on is really the

subspecialties to make sure I have them right. And my question is whether that document accurately lists the subspecialties within your field of neurology.

(Witness reviews document.)

A. Let's see.

Q. I think they're along the left-hand side there.

A. Oh, okay. So I believe these are -- I could be wrong on this. I believe these are the ones that are certified by the ACGME, but I -- yes. Those are some of them. There are other fellowships that are available but wouldn't be listed here as board certifications. Does that answer your question?

Q. Yes. What I want to make sure is what they've got listed there is accurate for what the subspecialties are.

A. So there are more subspecialties than this, but these are the ones that they list as having a certification as a subspecialty within this system.

Q. Okay. Thank you.

MR. BURT: I move 163 into evidence, Your Honor.

MR. OLSHAN: That's fine, Your Honor.

THE COURT: Defense Exhibit 163 is admitted.

BY MR. BURT:

Q. And could you bring that up, please. And while we're doing that, Doctor, as I understand, the American Academy of Neurology issues board certification in both neurology and psychiatry, correct? Those are the basic certifications?

A. Through the American Board of Neurology and Psychiatry, yes, that's my understanding.
Q. Okay. And that's where your board certification in neurology is; correct?
A. Correct.
Q. You're not certified in -- you're not board certified in psychiatry?
A. No.
Q. Now, could you blow up the left-hand side where the list is, please. So does this list the subspecialties that the board certifies in?
A. The screen went blank.
Q. There we go.
(Pause.)
A. Yes. So this says that these are the subspecialty certifications by this organization.
Q. So up above there it says "The ABPN. What is the ABPN; what does that stand for?
A. I believe that's the American Board of Psychiatry and Neurology.
Q. It says it issues specialty certificates in psychiatry, neurology and neurology with special qualification in child neurology. Those are the three basic specialty areas; correct?
A. Correct.

Q. And then the subspecialties are listed below?
A. Yes.
Q. And as I understood your testimony, in the basic three there, psychiatry, neurology and neurology with special qualification in child neurology, you're certified in one of them. That is neurology; right?
A. Correct.
Q. You're not certified in, for instance, clinical neurophysiology?
A. No. I don't have that subspecialty certification.
Q. What is that, clinical neurophysiology? I don't need a long exposition, but what in general does that subspecialty involve?
A. It involves specific types of tests that look at the brain or nervous system, electrical physiological activity. So it's tests like the EEG, nerve conduction study, EMG tests using to look at the peripheral nerves.
Q. And how do you get a subspecialty certification in clinical neurophysiology? What do you have to do to get that certification?
A. I don't know the exact requirements for that specific sub certification.
Q. All right. The next one I want to focus on is epilepsy. There is a subspecialty in epilepsy; correct?
A. Yes.

Q. Do you know what you need to do in order to get certified in that subspecialty?
A. I don't know the specifics of the qualifications for those.
Q. And you're not board certified in epilepsy; correct?
A. No.
Q. The next one I want to focus on is forensic psychiatry. What is the difference between the basic certification in psychiatry and forensic psychiatry?
A. Again, I don't know the specifics of what is necessary to be certified in those subspecialties.
Q. And you're not certified in forensic psychiatry; correct?
A. No, I'm not.
Q. Now, did this board also have a certification, a subspecialty certification, in neuropsychiatry?
A. It's not listed on this list. I'm not sure if they do or not.
Q. Okay. Now, there is another board that does certification for neurologists, correct, called the United Council For Neurological Subspecialties?
A. Yes. That is another organization that has a certification process for certain subspecialties.
Q. And how are they related to the other board?
A. I'm not sure that they are related.
Q. And I want to show you, if I could, 164 and ask you

whether that document accurately states on the right-hand side what the subspecialties are for the second organization.

(Witness reviews document.)

A. These are listed. I believe this is an accurate list, but I don't know the exact list of different subspecialties that they have.

Q. But as far as it goes, that's an accurate list?

A. This is what's listed on this paper, yes.

Q. Okay. Thank you.

MR. BURT: So I move that into evidence, Your Honor.

MR. OLSHAN: No objection.

THE COURT: Defense Exhibit 164 is admitted.

BY MR. BURT:

Q. And could you pull that up, please. So before I get into the subspecialties, what are the basic reasons to become certified in a subspecialty in your profession of neurology?

A. So the reason to be certified would be if you need that certification to do your job, so to see the patients or to practice in the way that you would like to.

Q. And is it true, as it's stated here, that the top reasons to become certified is to validate your subspecialty expertise through the certification?

A. Yes. To employers and patients.

Q. Could you go to that top reasons to become certified. "Achieving subspecialty certification through the UCNS is a

recognition that a physician has met the requirements and standards of knowledge set by experts in the subspecialty and with the oversight of a peer-review process." Is that basically why you become certified?
A. I would say it's the second reason; to validate your subspecialty qualifications and knowledge to employers and patients is one reason why people do that, yes.
Q. And to the public; right?
A. Yes. Employers and patients.
Q. Could you back out of that, please, and go to the right side of that document where it's certification and highlight that whole area down to the bottom.
(Pause.)
Q. Now, this lists the subspecialty areas of certification by the UCNS; correct?
A. Correct.
Q. And one of them is behavioral neurology and neuropsychiatry. Do you hold board certification from this organization in that subspecialty?
A. No. I'm board eligible, meaning I did the fellowship and training, but I have not taken the certification test.
Q. Board eligible meaning you could take the examination, and if you passed it showing you were qualified, then you would be board certified?
A. Right.

Q. Okay. There are a bunch of subspecialties that don't really concern us here, but one of them does and that is neuroimaging. What does that subspecialty involve?
A. So that, I believe, is a clinical fellowship in neuroimaging. I don't know the specifics of what that fellowship looks like.
Q. Do you know how long that fellowship lasts before you can apply for board certification in neuroimaging?
A. I don't, no.
Q. You can take that down. You're not board certified in neuroimaging; correct?
A. No, I'm not.
Q. Now, your profession has the organization, which I think you said you're a member of, the American Academy of Neurology; correct?
A. Yes.
Q. And they have, do they not, what's called a qualification and guideline for the physician expert witness, setting forth what the standards are in your profession for qualifying as an expert witness?
A. They may have that. I have not reviewed that.
Q. Let me show you 178 and ask you if that is the document from the American Academy setting forth the standards for getting qualified as an expert witness within your field.
(Witness reviews document.)

A. Yes. This is a -- it says the American Academy of Neurology Qualifications and Guidelines For Expert Witnesses.

MR. BURT: Move that into evidence, Your Honor.

THE COURT: Any objection?

MR. OLSHAN: No, Your Honor.

THE COURT: Defense Exhibit 178 is admitted.

BY MR. BURT:

Q. Could we pull that out, please. Second page. This sets forth various guidelines to, according to your association, qualify you to testify as an expert; right?

A. It looks like this is predominantly in the context of medical malpractice cases, but yes. What exactly was the question?

Q. So the question is, there is a section on this page toward the bottom right-hand side, the heading is "Qualifications of a Medical Expert." Do you see that?

A. Yes. It says "A physician must have a valid and unrestricted license to practice medicine."

Q. And you have such a license; right?

A. Yes.

Q. In Tennessee?

A. Yes.

Q. Any other states?

A. I don't believe so. At some point, I had one in Massachusetts but I no longer do.

Q. Could you go to the next page, please. And could you blow up the B factor there. It says "Training and certification: Physician expert witnesses should be fully trained in a specialty and a diplomate of a specialty board recognized by the American Board of Medical Specialties or the American Osteopathic Association or by a board with equivalent standards and qualified by experience to demonstrate competence in the subject of the case. The specialty of physician expert witness should be appropriate to the subject matter of the case." Right?
A. Yes. So in this case, that specialty board is neurology.
Q. Right, if you're testifying about neurology. But if you're testifying about epilepsy or neuroimaging or behavioral neurology, those subspecialties are the specialty areas that we're concerned with; correct?
A. No. Those are subspecialties. The specialty is neurology, which encompasses all of those other things.
Q. So what would the purpose of getting a subspecialty be if a certificate in neurology would allow you to testify to everything that comes under the umbrella of neurology?
A. Well, most people aren't getting board certifications to be able to testify. They're getting it because their employers would require that or make them more competitive for getting that opportunity to get employment where they would specialize in a certain area within neurology.

Q. Is it true that -- you can take that down. Thank you.
There is another specialty area of medicine called radiology; correct?
A. Yes, there is.
Q. And what does a radiologist do as opposed to what you do as a neurologist? What's the difference in specialties?
A. A radiologist trains in a broad range of different types of imaging techniques. So they image different parts of the body. They use different types of imaging, some we talked about like PET scans and MRIs, but there are other ways to image the body. And they specialize in how to read and interpret those broad range of different types of imaging modalities.
Q. A radiologist gets certified, board certified, by a separate board, right, called the American Academy of Radiologists?
A. I don't know their exact board, but, yes, they're certified by a different group.
Q. And they have their own sort of guidelines for how to become an expert witness in the field of radiology; correct?
A. They likely do.
Q. And those guidelines state that you need to be board certified as a radiologist in order to offer opinions about radiology; correct?
A. To offer a radiology opinion, but that would not exclude

talking about imaging related to a clinical disease or symptom.

Q. A radiology opinion would be an opinion in which you are interpreting, say, an MRI?

A. Yes. That would be one opinion a radiologist would provide.

Q. And their guidelines provide, do they not, that in order to offer opinions on an interpretation of a scan, an MRI, CT, EEG, whatever, you need to be board certified in radiology?

A. I don't know their exact guidelines, but I think in general, we want to offer opinions about things that we do routinely as part of our practice.

Q. Sure. Let me show you this, 169.

(Witness reviews document.)

Q. Have you had a chance to look at that?

A. Not in detail. Was there a part that you're wanting me to look at?

Q. Sure. I just would like you to identify, if you can, that those are the guidelines for expert witness testimony for radiologists.

A. This says, "ACR Practice Guideline on the Physician Expert Witness in Radiology and Radiation Oncology."

MR. BURT: Okay. I move that into evidence.

THE COURT: Any objection?

MR. OLSHAN: No objection.

THE COURT: Defendant's Exhibit 169 is admitted.
MR. BURT: Thank you.
BY MR. BURT:
Q. So could you pull that out, please. Go to the second page, under "Qualifications and Responsibilities of the Expert Witness." Could you highlight that paragraph. Keep going. Right there.
So this says "The expert witness should be a physician with the following qualification unless otherwise stipulated by applicable state law: Licensure and active incurred engagement at the time of the incident under review and for a reasonable period of time in the practice of the radiographic specialty or subspecialty relating to the testimony and then certification in radiology or diagnostic radiology, therapeutic radiology, nuclear radiology or radiation oncology by the American Board and several other boards." Correct?
A. That is what this states, yes.
Q. Do you hold certifications in any of those boards?
A. No.
Q. Is there a subspecialty certification for neuroradiology?
A. There is.
Q. And neuroradiology is the subspecialty of reading brain scans; correct?
A. Yes.

Q. And you're not board certified in neuroradiology?
A. To qualify, that's not just brain scans. It would include the spine and any part of the nervous system, but yes.
Q. Okay. And you're not board certified as a neuroradiologist; correct?
A. No.
Q. You can take that down.
Doctor, in this case, you were asked at some point as part of the discovery process to provide a list of cases where you've testified as an expert witness?
A. Yes.
Q. In the last four years?
A. Yes.
Q. And you provided a list of six cases; correct?
A. That sounds close to accurate, yes.
Q. The first one you ever testified in, according to the statement that we received, was *State of Ohio versus Matthew Nicholson* on October 17, 2019.
A. Yes.
Q. And you testified -- that was a capital murder prosecution where you were testifying for the prosecution as a rebuttal expert as you're doing here; correct?
A. I was for the prosecution. I don't remember at what point in the trial that was, but yes.
Q. You said that a critical part of your methodology when

you're dealing with patients is to conduct a clinical examination; correct?
A. Yes. Whenever we can, we would like to conduct a clinical evaluation.
Q. And in the Nicholson case, you offered opinions in a case where you had not done a clinical evaluation; correct?
A. Correct.
Q. And that case did not involve schizophrenia, did it?
A. No, it did not.
Q. It involved an issue of traumatic brain injury?
A. I think there was -- if I'm remembering correctly, there was an MRI scan and a question whether there had been a car accident about 15, 20 years before the incident.
Q. And in that case, just like this one, before you offered any opinions, there was some questioning about your qualifications; right?
A. Yes, I believe so.
Q. And you testified under oath as to what your board certifications were; correct?
A. Yes.
Q. And you represented to the Court and to the jury that you were board certified in neurology and psychiatry. Do you remember giving that testimony under oath?
A. I don't. I would have said it was by the Board of American -- the American Board of Psychiatry and Neurology.

That may be what you're referring to.

Q. Sure. Let me, if I could, show you.

(Pause.)

MR. OLSHAN: I'm sorry. What page are you looking at?

MR. BURT: So I'm at Tab 3, page 4909. And I've highlighted your testimony that I would like to ask you about there.

THE COURT: Before the witness reads it out loud, are you asking him to just read it?

MR. BURT: To himself.

THE COURT: Thank you.

(Witness reviews document.)

A. Yes.

BY MR. BURT:

Q. Is it true you were asked under oath:

"Are you board certified?"

You said, "Yes, I am."

"Question: In what?"

And your answer was: "In neurology and psychiatry."

"Question: And what boards are we talking about there?"

And you said: "The American Board of Neurology and Psychiatry."

Do you recall giving that testimony?

A. Yes. That's what it says here.
Q. Okay. And at the time you gave that testimony in 2019, you were not, in fact, board certified in psychiatry, were you?
A. No. I think I was thinking of the board name, which is Neurology and Psychiatry, but I am not boarded in psychiatry now or at that time.
Q. Okay. And what were you qualified to testify -- what area were you qualified in that case, do you recall, after making that representation to the Court?
A. I don't know what I was qualified in.
Q. Take a look at -- so at that point, when you were offering what you were board certified in, you had not previously testified in the field of neurology or in behavioral neurology or epilepsy or in any other subspecialty area in neurology; correct?
A. I believe this was the first time that I testified.
Q. Now, you also said -- you testified in that case you identified yourself as a neurologist; right, not a behavioral neurologist?
A. I am a neurologist, yes.
Q. Right. But here you're being offered as a behavioral neurologist. When did you first start identifying yourself as a behavioral neurologist as opposed to just a general neurologist?

A. I guess I've always been interested in behavioral neurology in neuropsychiatry. So going into neurology, that was what I was interested in and thought that I would specialize in.

After doing the fellowship in behavioral neurology and neuropsychiatry, I was hired as an assistant professor of neurology in the Division of Behavioral Neurology at Vanderbilt.

And so at that time I still -- I don't know exactly what I referred to myself as, but I would consider myself a behavioral neurology and neuropsychiatry subspecialist within neurology.

Q. Sure. In the Nicholson case, if you take a look at 4995, you identified yourself, at least in 2019, as a neurologist, not a behavioral neurologist; right?

A. Those aren't exclusive. So neurology is all neurological diseases. Behavioral neurology is a subspeciality within that.

Q. Right, but somehow the board, your boards have distinguished between a neurologist and a behavioral neurologist, correct, at least according to their subspecialty classifications?

A. Yeah. I mean, I think that you start general and then you get more specific. So neurology is the broad umbrella of neurological diseases.

Behavioral neurology is a subset of issues related to how these diseases lead to specific types of behaviors.

Q. Right. And as you get narrower, your specialty gets more focused; correct?

A. You focus more on those issues, yes.

Q. And that's why you have the subspecialty boards, because you want to make sure that the person who is a generalist -- like hypothetically, I'm a lawyer doing criminal law, but if somebody asked me a tax question, I would be lost. Does it work the same way in medicine?

A. Yes and no. So as a neurologist, I have responsibilities for all types of neurological disorders. So if I'm on call manning the after-hours phone calls, it could be any patient with a neurological disease that's seen at Vanderbilt. And so we have knowledge and understanding of how to diagnose and manage neurological diseases.

Now, my practice focuses on those specific areas I'm interested in, which is behavioral neurology, neuropsychiatry and the frontal and temporal lobe disorders.

Q. Now, after representing in the Nicholson case that you were board certified in psychiatry, you then testified in your second case, correct, *U.S. v. Brockman* out in California?

A. Yes, I testified in that case. It was in Houston, Texas, not California, I believe.

Q. And that was in November of 2021; correct?

A. Yes.
Q. Again, hired by the prosecution?
A. Yes.
Q. And that testimony involved not an issue of schizophrenia; right?
A. It did not.
Q. It involved a person who had Alzheimer's; correct?
A. No. It involved a question of dementia, the reason for that possibly being Parkinson's disease, Lewy body disease, Alzheimer's or other causes of dementia.
Q. And there you represented that you were now a specialist in Parkinson's and dementias; right?
A. Yes. I see patients with Parkinson's disease and psychotic symptoms and Parkinson's disease that causes dementia.
Q. My question is you represented yourself as a specialist in Parkinson's disease and dementias; correct?
A. I do see those things, yes.
Q. Maybe we're not tracking. If you could take a look at --
MR. OLSHAN: Your Honor, I'm going to object. This is more cross-examination than the witness' qualifications to testify today. I'm not quite sure where we're going.
THE COURT: Mr. Burt?
MR. BURT: Your Honor, it goes to what areas he is qualified to testify in and what he has represented his

specialty to be. Here he's being offered as a specialist in neuropsychiatry --

THE COURT: I'm not inviting extended argument.

MR. BURT: Okay.

THE COURT: I'm going to overrule the objection, but I guess I'm going to invite you to be more precise in your question regarding his past testimony. You're welcome to explore.

BY MR. BURT:

Q. Doctor, let me approach you and direct your attention to what I'm trying to focus on here.

(Pause.)

Q. You see some highlighting there. And in that case, in the qualification phase of the case, you were representing to the Court that you went -- "I went on to specialize in those disorders," specifically referring to Parkinson's and dementias; right?

A. I don't think it's clear from this which disorders I was talking about, but I have -- I do see patients with Parkinson's disease and dementia, again, as part of my specialty practice.

Q. Yeah. Again, let me redirect you. I'm not asking you what patients you see and what areas. I'm asking you what representations you were making to the Court about your qualifications.

And is it true that, according to the transcripts, you said you were involved with disorders including Parkinson's and dementias, and then you said, "I then went on to specialize in those disorders specifically"?

Did you say that or not?

A. Yes.

Q. Okay. And in that case, you were testifying about competency to stand trial; correct?

A. Yes.

Q. But you also said that you're not an expert in competency to stand trial; right?

A. I said I was not -- there is no forensic training in neurology.

Q. Will you take a look --

MR. OLSHAN: Your Honor, I'm going to object. He has not been offered to opine about the defendant's competency to stand trial.

THE COURT: The objection is overruled.

Mr. Burt, I'm going to let you keep going. I'll be honest with you, you're losing me. But I'll let you proceed.

MR. BURT: Thank you.

BY MR. BURT:

Q. Look at page 76. Do you see at the top of the page where you testified under oath, "I don't have expertise in competency to stand trial"?

A. Yes. At that time, I had never evaluated someone for competency to stand trial.

Q. But you were, nevertheless, offering opinions about that subject in the Brockman case; correct?

A. I believe that I -- yes.

Q. Now --

A. I think my opinion's changed, yes. I'm trying to remember the exact case. I believe my opinion was that I could not determine --

THE COURT: Forgive me. The witness was kind enough to clarify what word he used in the prior answer. If you want to explain your answer, you can. You don't need to. I'm just saying you seem to be wanting to.

A. Yes. I was just trying to remember what my opinion had been, and I believe it was that I could not determine whether he was competent or not at that time.

Q. And, again, I'm not focused on what your opinion was in that case so much as what you represented to the Court your qualifications were.

And let me just summarize where I think we are, which is you represented you were a specialist in Parkinson's and that you didn't have an expertise in competency to stand trial?

A. Correct.

Q. Okay. Now, the next case where you testified was in Mississippi, *Mississippi versus Herrington*; right?

A. Yes.
Q. That was in May of 2022?
A. Yes.
Q. This is the third time you're testifying; right?
A. I believe so.
Q. Again, for the prosecution?
A. Yes.
Q. You're offering opinions about sleep disorders?
A. About a sleep behavior disorder.
Q. And this time you represented that you're a behavioral neurologist and your specialty was behavioral neurology. Do you remember that?
A. Yes. That's my subspecialty.
Q. And you were giving that testimony, even though at the time, and even today, you're not board certified in behavioral neurology; correct?
A. I am not board certified, no.
Q. But you were holding yourself out as being a specialist in that area; correct?
A. Yes. I believe that I am qualified in that field.
Q. But, according to the American Academy, you're not board certified in that subspecialty; am I correct?
A. I think it's the UCNS is what you said, but yes, I'm not board certified in that specialty.
Q. Now, the list that you gave to us as to the cases you

testified in, the next one you listed was Donne Riehl versus State of California. And you said you testified for the defense; correct?
A. That was a civil case, yes.
Q. So when you said defense, you don't mean defense in a criminal case; you meant in a civil case?
A. Correct.
Q. Somebody got hurt in an accident, and the State of California hired you to come in and rebut the testimony of the plaintiff's experts; right?
A. They hired me to do an evaluation.
Q. And you never, in fact, testified in that case; right? You did some depositions, but you never appeared in court and established your qualifications in court, correct?
A. So I did a video testimony. So it was a Zoom testimony is what I was told it was. So I did a deposition first and then they took the testimony via Zoom and recorded it.
Q. Testimony in front of a Judge or a deposition -- Zoom deposition?
A. So my understanding is that it was testimony. There was a deposition first, and so I did that. And then I later did a second session that I was told was recorded testimony that would be shown to the jury.
Q. Now, is the next time you testified in a case out in Los Angeles, *United States versus Alonzo* in December of 2022?

A. I believe it was Valiente, but it was in Los Angeles.
Q. Was it Catalino Esteban Alonzo?
A. I understood his last name to be Valiente. But that is, I believe, the case that you're referring to.
Q. And even though in the prior case you had said you don't have any expertise in competency to stand trial, you were being offered as an expert in competency to stand trial; right?
A. I was providing an opinion about competency to stand trial, yes.
Q. Did you bring to the Judge's attention that you had previously testified that you were not an expert in that area before you offered opinions in this second competency case?
A. I don't think that question came up.
Q. And did you think you had an obligation to let the Court know that, hey, I previously testified that I'm not an expert in competency to stand trial; you should know that, Judge, before you qualify me in this case?
A. I did not offer that. It is something that I have learned about through that first case and through work with others about the issues related to competency to stand trial.
Q. But the last case you listed was Commonwealth versus Frank Kotopoulis. And you said you testified in May of 2023; right?
A. Yes.
Q. What was the topic of that testimony?

A. That was a patient who had been arrested for a DUI, driving under the influence, and he had suffered a brain injury before that. And so part of his presentation is that he has slurred speech. He has difficulty in terms of his processing speed. And so some of the evidence that they were using to say that he was driving under the influence was actually related to his underlying neurological diseases.
Q. None of the cases you testified were you offered as an expert in delusions; correct?
A. No, none of the cases have involved delusions.
Q. And none of the cases where you testified have involved schizophrenia; correct?
A. I just want to be careful. I believe there was a question of delusions related to Parkinson's and Lewy body in one of the cases, but none have related to schizophrenia.
Q. And you don't consider yourself to be an expert in schizophrenia; correct?
A. No.
Q. And the research work you've done in criminal behavior, you said, that involves fairly -- actually, one published study on criminal behavior; right?
A. Yes. It involves one published study on criminal behavior, other reviews looking at the issues related to criminal behavior, and then ongoing NH funding that I have to study antisocial behavior in frontotemporal dementia patients.

Q. But correct me if I'm wrong, you have one publication in the area of the connection between neurological disorders and criminal behaviors?
A. I have other publications in that area. Only one of them was an actual scientific study.
Q. And that involved looking at a fairly small sample of people; correct?
A. Yes. So it was 17 patients where we could say that there was a more clear association between the onset of a brain lesion in developing behavioral problems including criminal behavior and then a second set of 23 patients who we weren't as confident about that association.
Q. Now, in terms of your publications, you represented that you had publications in the area of epilepsy; correct?
A. So I've published about seizures that have been caused by a wasp's sting and seizures that have happened in the context of antibiotic use.
Q. Okay. And neither of those -- when you say "publications," the piece about the bee sting was what's called a case report; right, an unusual event that you were reporting on involving somebody who got stung by a wasp and had a seizure?
A. Yes. So our publications can range from single case reports like that reporting an unusual finding, to reporting on groups of patients and to actually doing scientific studies

to reviews of data that we've interpreted from the literature.
Q. And other than that publication, you said there was one other that involved seizure activity. What was the name of that publication?
A. We did a study where we looked at the association of side effects from antibiotics that could lead to neurological symptoms. And so in some cases, that can be related to seizures. In other cases, it was more of a neuropsychiatric presentation. I think the third subtype was related to cerebellar dysfunction.
Q. Okay. And that, again, is somebody having a seizure reaction from a medication or the other one was a wasp sting; correct?
A. Yes.
Q. Neither of those involved epilepsy, correct?
A. No. Because they're provoked by an external event, they would not be associated with epilepsy.
Q. And you have not published anything in the area of epilepsy; correct?
A. No, not that I know of.
Q. And you've not published anything on schizophrenia; correct?
A. No. We do have findings from using schizophrenia as a comparison of sorts in one of the papers that we published on. So we were looking at disorder volition and agency, so not

being able to initiate movements or control movements. And we compared our finding in neurological patients to study findings that are reported, abnormalities in patients with schizophrenia and catatonia.

So it was a subset of patients with schizophrenia with a similar type of symptom that we compared it to.

Q. Let me see if I understand that. You didn't do the study on schizophrenia, but you used somebody else's study to compare what you were looking at?

A. Correct. We did a quantitative comparison.

Q. So your answer would be you've never done any published work on schizophrenia, other than what you just indicated; correct?

A. Correct. I believe so.

Q. And your publications about delusions have focused, have they not, exclusively on these very -- I won't call them strange, but rare cases of people with frontotemporal dementias who develop a delusion like Capgras delusion?

A. So that's one area that I focused on is on Capgras delusion. Other of the studies were more broad. So when I looked at delusions in Alzheimer's, they weren't really differentiated into different types of delusions. In Alzheimer's, the most common type of delusion is paranoid or persecutory delusions.

Q. In what publication do you have persecutory delusions,

where you're focused on persecutory delusions?
A. On that delusion specifically, I don't believe any of the publications have focused on that.
Q. And have you focused in any publication you've done on what are called nihilistic delusions?
A. No, I don't believe so.
MR. BURT: Thank you, Doctor.
THE COURT: Thank you, Mr. Burt.
MR. BURT: Could we approach so I could --
THE COURT: You want to go to sidebar? Do you want to redirect as to qualifications?
MR. OLSHAN: I can ask a few questions, unless the Court is prepared to rule.
THE COURT: If you want to ask questions, you can. If you don't want to, you don't have.
Mr. Burt has asked for sidebar. We'll go to sidebar. I'm not sure we'll need to discuss it at length at sidebar as opposed to publicly.
MR. OLSHAN: Let me just clarify one thing, Your Honor.

REDIRECT EXAMINATION

BY MR. OLSHAN:
Q. Mr. Burt asked you a number of questions about whether you were board certified in a subspecialty of neurology. Do you remember those questions, Doctor?

A. Yes.
Q. I think you testified at some point, but I'll ask you again, when do you need to be board certified in a subspecialty?
A. So in my mind, it's to make it so that you can do something that you wouldn't be able to otherwise. So whether that's to get a position, a job, or to be able to take care of and treat and evaluate the patients that you're interested in.
Q. At Vanderbilt where you are the director of the Frontotemporal Dementia Clinic and see patients there as well as in your research setting, do you need a board certification in order to do that neuropsychiatric and behavioral neurology work that you do on a day-to-day basis?
A. No, you do not.
MR. OLSHAN: I think that's all.
THE COURT: Thank you.
Mr. Burt, any other questions?
MR. BURT: No, Your Honor. I would like to approach, though.
THE COURT: Okay. Feel free to stretch your legs, if you care to.
(Sidebar discussion held as follows.)
MR. BURT: So, Judge, I just want to specify. Our objection is that he is not qualified in behavioral neurology or in neuropsychiatry.

We have no objection to him testifying about neurology as a generalist, but he has not shown a qualification in either neuropsychiatry or in behavioral neurology, which is the three areas he was being offered in.

THE COURT: Mr. Olshan.

MR. OLSHAN: Your Honor, the witness has provided more than an adequate basis for his qualifications. He completed his fellowship specifically in neuropsychiatry and behavioral neurology. That is the focus of his research. That is what he does on a day-to-day basis in his clinic. There is more than sufficient evidence here -- testimony here to qualify this witness in the fields of neurology, neuropsychiatry and behavioral neurology.

I would also note there is some irony here. Dr. Bigler testified on Monday. He is a board certified physician in -- excuse me. He is board certified in neuropsychology, but he was asked questions about neuroimaging. He was asked questions about diagnoses. Dr. Darby, for purposes of his testimony here, is amply qualified. He does research on delusions.

I'll leave it there. But we believe the record is absolutely sufficient. This witness is qualified in the areas that we've offered him in.

THE COURT: Did you want to add something?

MR. BURT: Just the difference between Dr. Bigler and

this witness is Dr. Bigler has published extensively on neuroimaging. He said nothing about neuroimaging. He's not qualified in neuroimaging to interpret neuroimaging, at least the qualifications have not been established.

MS. LONG: He admits he's not a psychiatrist and he's not board certified in neuropsychiatry, so there is no expertise in that area. He also admits he's not board certified in behavioral neurology. And he doesn't establish qualifications in that area by simply saying, I deem myself to be a behavioral neurologist.

Those standards for getting into that field, he hasn't complied with them. So he's not qualified.

THE COURT: Defense objection is overruled. He'll be permitted -- attorneys will be permitted to elicit opinion testimony from this witness in the fields of specialty defined by Mr. Olshan.

MR. BURT: Also, one other thing. The Court made a comment during the examination of the witness that you're losing me. And I would ask the Court to just remind the jury that the Court's comments are not meant to suggest in any way how they should find or not find any facts in the case.

THE COURT: I'll be happy to do it now if you would like me to, or I would do it at a later time. I do at the close of the evidence. You have my apologies. As soon as I said it, I frankly regretted it. I didn't mean anything, to

be honest with you. I wasn't quite sure I understood the target of your inquiry. That is what I was trying to communicate, but it was impolitely done, so I apologize. Do you want me to make that note now?

MR. BURT: Okay.

(Sidebar discussion concluded.)

THE COURT: Mr. Olshan, any --

MR. OLSHAN: No. I just would ask the Court to rule on our offer of Dr. Darby in the areas of neurology, behavioral neurology and neuropsychiatry.

THE COURT: Thank you. I'm going to permit you to proceed with this witness. You may elicit opinion testimony from those fields identified. We're going to take our morning break.

Before I excuse the jury, though, I would like to speak to something which I owe an apology to everyone, the jury and, in particular, Mr. Burt. I made a comment during Mr. Burt's examination which was, frankly, poorly phrased, inappropriate, and I just shouldn't have said it the way I did.

My intention was not to be dismissive of Mr. Burt's inquiries at all. I was, frankly, just simply not following. And that's all I meant to communicate, but I didn't do it very eloquently.

And so I apologize to Mr. Burt and to you, ladies and

gentlemen of the jury. I should have spoken more clearly than I did. Please disregard my comment. Don't read anything into it. Please accept my explanation. And I'll leave it at that.

Thank you all very much. I appreciate that. With that, we'll take 15 minutes for a morning break.

(Short recess taken.)

THE COURT: Welcome back, ladies and gentlemen. Everyone, please be seated.

Mr. Olshan, you may proceed when you're ready.

MR. OLSHAN: Thank you.

DIRECT EXAMINATION

BY MR. OLSHAN:

Q. Dr. Darby, you were retained as an expert in this case?

A. Yes, I was.

Q. By the prosecution?

A. Yes.

Q. What were you retained to do?

A. To perform a forensic neurological examination and evaluation.

Q. Of the defendant, Robert Bowers?

A. Of the defendant, yes.

Q. Did you review medical records and any case-related documents?

A. I did, yes.

Q. Can you briefly describe the nature of those records?

A. So there were medical records from Mr. Bowers' prior treatments and interactions with the medical system. There were some legal documents that were made available. There were some reports about interviews with people who knew Mr. Bowers. And there were the MRI and PET scan results obtained by his defense team.
Q. Why was it relevant, focusing on the medical records and other non- imaging documents, why was it relevant to review that?
A. Well, for a couple reasons. One is to determine if there were any diagnoses of neurological diseases, any signs of neurological diseases that may have been present throughout his care, and then to see observations of his behavior or of any symptoms that may have been apparent to other people that knew him.
Q. You also testified that -- let me ask you, in addition to reviewing those types of records, did you conduct a clinical -- excuse me, a forensic interview and examination of the defendant?
A. I did, yes.
Q. Do you remember what day that was?
A. That was May 21, 2023, of this year.
Q. So about six weeks ago, give or take?
A. Yes, approximately.
Q. You also had access to MRI, PET and EEG data that was

generated as to the defendant?
A. Correct.
Q. Did you consult with other experts hired by the government?
A. I did, yes.
Q. Was one of those experts Dr. Park Dietz?
A. It was.
Q. What is his area of specialty?
A. So Dr. Dietz is a forensic psychiatrist.
Q. Have you worked with Dr. Dietz before?
A. Yes, I have.
Q. And was your work on this case by way of referral from Dr. Dietz?
A. Yes.
Q. Why was it referred -- why was the referral made to you?
A. Well, he thought that my expertise in neurological diseases and linking those to criminal behavior and delusions would be relevant for this case.
Q. You have done work -- have you done all of your work by referral from Dr. Dietz?
A. No.
Q. You have done expert work not associated with Dr. Dietz?
A. Yes. So some of my cases have come from Dr. Dietz as a referral. Others have come through other sources.
Q. Are you an employee of Dr. Dietz?

A. No.
Q. You're employed by Vanderbilt University Medical Center?
A. Correct.
Q. As part of your work as an expert in this case, did you review drafts of other government expert reports?
A. I did, yes.
Q. Can you tell the jury why you did that?
A. Well, I wanted to have as much information as I could when making my opinions and determinations. And so the findings from those other evaluations were helpful in that.
Q. Is that common in your practice?
A. Yes.
Q. Now, Dr. Darby, did any member of the prosecution review drafts or have input in your report in any way?
A. No.
Q. In connection with being retained in this case as an expert, were you aware of any diagnoses that were put forward by the defense in this case?
A. Yes, I was.
Q. What was the nature of those diagnoses or conditions?
A. So the potential diagnoses proposed were epilepsy, structural and functional brain dysfunction, schizophrenia and a delusional belief system.
Q. Prior to your work in the case and prior to finalizing your report, did you review any of the defense expert reports?

A. Not before finalizing my report. Those weren't available at that time.
Q. I want to talk about the MRI. Did you review the MRI?
A. I did, yes.
Q. Who performed -- who did the original read at UPMC of the MRI of the defendant?
A. I believe it was Dr. Mettenburg at UPMC.
Q. Can you remind the jury what Dr. Mettenburg at UPMC's findings were as to the MRI of the defendant?
A. Yes. So Dr. Mettenburg noticed that there were T2 hyperintensities. These were the bright spots on the MRI on some of the sequences in the white matter. He looked for other findings related to epilepsy such as cortical dysplasia, heterotopias, things that may be associated, or hippocampal sclerosis, and did not see those findings.
Q. Other than the hyperintensities, what was Dr. Mettenburg's assessment of the defendant's brain on the MRI?
A. That it was normal, other than the T2 hyperintensities.
Q. You mentioned the word "sclerosis" and you may use that later. Can you just tell the jury what sclerosis means?
A. It's scarring. So meaning that there's scarring or damage to the hippocampus.
Q. Dr. Mettenburg did not see that?
A. Correct.
Q. Did you review the MRI data?

A. I did, yes.
Q. What did you review?
A. I looked at the images themselves, so the images. And then there was a quantitative report, the NeuroQuant report that I also reviewed.
Q. In your clinical and research practice, you review MRI data?
A. Yes. We incorporate that into our diagnostic approach with every patient.
Q. You mentioned that Dr. Mettenburg observed T2 hyperintensities. Did you observe those?
A. Yes, I did.
Q. Can you tell the jury what you observed and whether it was consistent with what he saw or not?
A. Yes. So as you saw on some of the images earlier, there were those bright spots or those T2 hyperintensities in the white matter. So there were locations scattered throughout the brain where those were present.
Q. Were they specific or nonspecific?
A. So those findings are nonspecific, meaning that we can't tell what disease caused it just by looking at the MRI scan. There are a number of different causes that can cause that.
Q. In your practice as a neurologist, how common is it to see hyperintensities like those on an MRI?
A. They're very common.

MR. BURT: Objection. There is no foundation for that opinion.

THE COURT: Hang on. Let me make sure I'm reading the question properly. (Pause.) I'm inclined to overrule the objection, Mr. Burt. If you think I don't understand, we can come to sidebar.

MR. BURT: I think the Court understands it.

THE COURT: The objection is overruled.

BY MR. OLSHAN:

Q. In your time as a neurologist, you've reviewed many MRIs?

A. Yes.

Q. Have you seen white matter hyperintensities before?

A. Yes.

Q. In your experience, how common is it to see white matter hyperintensities?

A. It's very common.

Q. How do, in your experience, how do these features correlate, if at all, with age?

A. So they're something that you see increasing with age over time. So as people get older and older, there are more of these that you find. And that can be more pronounced or more accelerated in people with certain types of diseases or conditions.

Q. You mentioned that these hyperintensities are nonspecific. So what are some of the common risk factors that can lead to

the appearance of these hyperintensities?
A. So probably the most common cause is what we call vascular disease. And the risk factors for that would include things like smoking, obesity, high blood pressure, high cholesterol, diabetes, drug use in some circumstances. So that tends to be the most common cause of these findings.
Q. When you see white matter hyperintensities in your experience, are they deterministic of behavior?
A. No. We would always need to evaluate the patient and link that to any reported behavior.
Q. Are you familiar with the concept or -- this is my word -- sort of matching between the clinical and the imaging?
A. Yes. We would want to see how those test findings, do they correspond to the behaviors or problems that we're interested in.
Q. When you see white matter hyperintensities as a general matter, can you say whether it will have any real or actual consequences on an individual's behavior?
A. No. We can get a sense of how large the abnormalities are to get a sense of how likely it is it would be causing a problem. But it's not a one-to-one association.
Q. When you see on an MRI white matter hyperintensities, what do you typically tell the patient about them?
A. We tell them that they're there, because they're typically on the report that they give. And then we try and come up

with what are the potential reasons why that might be happening. And if it's the case of, say, vascular disease, we would say these are the risk factors for these findings. These are the things that you can do to try and prevent these from happening in the future.
Q. For example?
A. To stop smoking, to lose weight; if there are problems with cholesterol, blood pressure, diabetes, to treat those.
Q. What was your assessment of the nature of the defendant's white matter hyperintensities?
A. To me, they were likely consistent with vascular disease.
Q. What did you notice, if anything, about the size of the white matter hyperintensities?
A. So they were small. And so we saw discrete areas of white matter hyperintensities. In some patients that we see who have vascular dementia or who develop cognitive issues related to the white matter, they have really a confluent area. It's continuous. It fluffs out. It almost looks like a cloud on the MRI. And so there wasn't that type of appearance on the MRI scan.
Q. Did you reach a conclusion based on your review of the MRI data as to whether the nature of the defendant's hyperintensities would be likely or unlikely to cause or be causing a significant cognitive problem?
A. I thought it was less likely.

Q. Based on your review of the MRI and the presence of these hyperintensities, would you expect significant cognitive dysfunction in that individual?
A. No, not based on that.
Q. In addition to the white matter hyperintensities, what other findings or features did you notice on review of the data?
A. Well, the other feature was the asymmetry in the size between the left and right hippocampus, the right side being smaller than the left.
Q. What was the relevance of that asymmetry?
A. Looking at that, the question becomes, does that mean that the right hippocampus, the smaller side, is abnormal? And so to look at that, we looked at a couple different things. One was just the overall size of the hippocampus. And the size of the right hippocampus was normal. So even though there was an asymmetry, it was actually a normal size.
The other thing was to look for signs of that scarring or sclerosis to see are there any indications that there had been damage to that hippocampus. And those were absent.
So based on those facts, I concluded that the hippocampi were asymmetrical but they weren't abnormal, that it was normal in size.
Q. When you reviewed the MRI data, did you notice anything

about the orientation of the defendant's head or the images?
A. Yes. There was rotation on the scan. And so as you looked at the images, it wasn't lined up exactly correctly. So the two sides were not showing the exact same location.
Q. There was testimony about the NeuroQuant data. Did you review that?
A. I did, yes.
Q. You identified an asymmetry?
A. Yes.
Q. Are you able to comment on the accuracy of what NeuroQuant says about the asymmetry between the right and the left?
A. No. And so the NeuroQuant is as accurate as the algorithm is for identifying that area. And so it depends on how it's defining what that area is, how good it is at lining that up. So I do believe there is an asymmetry there, but I don't know if those are -- the actual numbers are, in truth, what his actual size of the hippocampi are.
Q. They were both normal, though?
A. On the NeuroQuant, yes, they were both normal in size.
Q. And on your visual review?
A. Correct.
Q. If a patient came into your clinic and the patient's MRI had that asymmetry with one side smaller than the other but both normal, would you talk to the patient about that?
A. No. I would tell them it was normal.

Q. Based on your review of the MRI data generated for the defendant, were you able to assess anything relative to a correlation to epilepsy or seizure activity?
A. There is nothing on the MRI that would have been concerning for a focus of seizure or epilepsy.
Q. What would you be looking for in order to assess that?
A. Well, one of the things would be that hippocampal sclerosis or scarring. And then some of the other things that Dr. Mettenburg mentioned in his report, things called dysplasia, heterotopias. So other abnormalities that might be a place where a seizure can generate.
Q. If you generated or you had that MRI for a patient based on your visual review of it, would you have sent it out for quantitative analysis using NeuroQuant in your clinic?
A. No. Probably not.
Q. Did you conclude the MRI for the defendant was normal or abnormal or something else?
A. So I concluded that there were T2 hyperintensities in the MRI and that there was asymmetry, but that the hippocampi were normal.
Q. Is that finding consistent or inconsistent with Dr. Mettenburg's conclusion when he reviewed the MRI here in Pittsburgh?
A. Consistent.
Q. Did you also review the PET data?

A. Yes, I did.
Q. Who was the physician who reviewed the PET imaging initially here in Pittsburgh?
A. Dr. Mountz.
Q. You've had a chance to review his clinical interpretation of the PET?
A. Yes.
Q. Can you tell the jury whether you agree or disagree with Dr. Mountz's assessment when he did that here at UPMC?
A. I agree.
Q. What do you agree about --
MR. BURT: Judge, I move to strike that. There is no foundation for expertise in PET.
THE COURT: Overruled.
MR. BURT: Thank you.
BY MR. OLSHAN:
Q. Before I ask you that, have you reviewed PET data in your experience?
A. Yes, I have.
Q. Many times?
A. Yes. We order PET scans on many patients.
Q. It's a common feature of your practice?
A. Yes, it is.
Q. In clinic, research, both?
A. Both.

Q. You testified you agreed with Dr. Mountz here at UPMC. What was the assessment that you agreed with, based on your own independent review of the PET scan?
A. His assessment, which I agree with, is that it was normal, that there weren't areas of reduced activity that would have been the focus for a seizure or underlying brain dysfunction.
Q. Have you used a software called MIMneuro?
A. MIMneuro has been obtained on some of the PET scans I ordered, yes.
Q. When you order it for certain patients, what age population do you order or use MIMneuro on?
A. So typically I'm ordering these in patients with dementia where I'm trying to differentiate are they likely to have a frontotemporal dementia or Alzheimer's disease. And so it tends to be patients in their 60s, 70s, typically.
Q. How important is the visual read relative to the use of a quantitative software like MIMneuro?
A. The visual read is always the starting point and the gold standard. The MIMneuro can have usefulness in cases where there is some uncertainty, but we also take the results with a bit of caution knowing what the control group is that we're comparing it to.
Q. Have you reviewed a page from the MIMneuro user guide related to normals?
A. Yes, I have.

MR. OLSHAN: Your Honor, we marked this one-page document as Government's Exhibit No. 1449, and we would offer it at this time.

THE COURT: Any objection?

MR. BURT: No objection.

THE COURT: Thank you. Government's Exhibit No. 1449 is admitted.

BY MR. OLSHAN:

Q. If we could publish 1449 and zoom in on the couple paragraphs above the MIM FDG heading. This is a page from the user guide for that software, Dr. Darby?

A. Yes, it is.

Q. Now, you mentioned normals, and the jury has heard a little bit about normals. What is normal? What's a normal?

A. So for all of these quantitative tests that we're doing, what we're doing is we're taking that patient's findings, so whether it's the size or the metabolism, and we're comparing it to what we think it should look like. And to know what it should look like, we take healthy individuals who don't have any neurological problems and have them do the same test and try and create that comparison group to say this person is or is not different from that group.

Q. What does MIMneuro recommend in this highlighted section for validating the sort of normals for whatever machine you're doing the PET imaging on versus the normals in the MIMneuro

software?
A. So it said it is strongly recommended that you validate normal images from your institution against the MIMneuro normals before clinical use.
Q. Why would that be important?
A. Well, there can be differences between the types of scans. And so it's to see if I run a normal person, is it likely that they're going to have areas that come out as being reported abnormal in a way that I would want to know about when I'm interpreting that patient.
Q. If we could zoom out. I want to ask you if there is information on this page about the number of normals that's used by the MIMneuro software. And to do that, can we zoom in on the middle paragraph on the bottom section.
Do you see that, Dr. Darby?
A. Yes.
Q. According to MIMneuro, the user guide, how many normals are in the database the software uses?
A. There is a total of 43 normal individuals.
Q. For what age range?
A. The age range is 41 to 80.
Q. Do you see where it breaks down the number of females and males?
A. Yes. There is 19 females and 24 males.
Q. Is there any significance to using a normal from the same

gender versus the patient?
A. There can be. So often when we're performing these types of normative analyses, we're correcting for age but also gender as a factor that may lead to slight differences in the size or activity.
Q. Is there a breakdown in this user guide by age range?
A. Yes, there is.
Q. How many normals -- let me ask you this: The defendant was in which age range when this PET was run?
A. So he would have been in the 40 to 49 age range.
Q. That's the lowest listed?
A. Yes.
Q. How many normals does MIMneuro have for that age range?
A. Six.
Q. Does it further differentiate male versus female?
A. It does not.
Q. As you sit here, do you know how many of those six normals in the software in that age range are male versus female?
A. No, I don't.
Q. How many subjects were in the next age range of 50 to 59?
A. Eight.
Q. Where are the bulk of the normals in the MIMneuro software age-wise?
A. So most of the subjects are in their 60s and 70s.
Q. You testified when you use MIMneuro, if you do, it's for

an older population?
A. Typically.
Q. What is the mean or average age, according to the last sentence on the user guide?
A. 63.79 years plus or minus 9.98.
Q. So 64, roughly, plus or minus ten years?
A. Correct.
Q. We can take that down. How useful, in your experience, is a PET scan for evaluating schizophrenia?
A. That's not an indication for getting a PET scan typically.
Q. If you were referred a patient who had a psychiatric diagnosis of schizophrenia, would you order a PET?
A. No, not to evaluate for schizophrenia.
Q. Can a PET scan be useful in connection with an epilepsy diagnosis?
A. Yes, it can.
Q. Can you describe for the jury how it would be useful for that purpose?
A. So in a patient where they have epilepsy, there is concern for seizures, we would use the PET scan to try and see are there any areas of the brain where there is reduced metabolism. That would be an indicator that those seizures could be starting from that location.
Q. That's what Dr. Mountz was evaluating?
A. Yes.

Q. What conclusion did you reach related to the PET scan and the indication of any seizure or epileptic activity?
A. That there were no areas of reduced metabolism that would be concerning for an epileptogenic focus.
Q. Was your conclusion consistent or inconsistent with Dr. Mountz at UPMC?
A. It was consistent.
Q. Now, you mentioned the word "indications." What are the appropriate indications for a PET scan, meaning when can you -- what are the appropriate indications?
A. So typically we're ordering PET scans of the brain to evaluate for dementia, so looking at different types of dementia, for epilepsy and for cancer to see areas where the cancer may be associated with increased metabolism.
Q. Now, somebody who has insurance, in your experience, other than for cancer, epilepsy and dementia, does insurance reimburse for PET scans for other indications?
A. Typically not.
Q. You also obtained and reviewed EEG data?
A. Yes.
Q. Now, in your day-to-day practice, do you analyze the actual EEG data when you order it for your clinic or research patients?
A. No. So typically I'm not reviewing the EEG itself.
Q. You're trained in reviewing EEG data; is that correct?

A. Yes. So that's a component of a general neurology training. It's not something that I do on a day-to-day. It's not part of my practice since residency.
Q. Did you ask a colleague to review the EEG data in this case?
A. Yes, I did.
Q. Who was that?
A. Dr. Angela Crudele.
Q. We've heard about her already and her findings?
A. Yes.
Q. Is she a specialist in EEG evaluation?
A. Yes, she is.
Q. Was there another reason, other than the fact that she's a specialist and you typically don't do it, why you wanted someone else to look at it in this case?
A. I think I wanted to be very careful about any of the findings that could be there, yes.
Q. Did Dr. Crudele review the EEG data blind?
A. Yes.
Q. At any point before she reached her conclusions about the EEG, did you provide her any information as to which side of the case you were on or which side suggested there was or was not epilepsy?
A. No. So I approached her. She knew that it was for a criminal case but did not know which side it was retained for.

Her approach is to do the initial evaluation blind and to ask for information about any medications that the patient may have been on and then to ask for any clinical information or other reads of the court that may be available.

Q. So a total of how many people reviewed the EEG data across this case?

A. Three.

Q. Who was the first person?

A. Dr. Rajasekaran.

Q. At UPMC here in Pittsburgh?

A. Correct.

Q. Who is the second?

A. Dr. Nadkarni.

Q. And then the third?

A. Dr. Crudele.

Q. Can you tell the jury what everyone, all three, agreed on in their assessment of the EEG data?

A. Yes. So there is agreement that there was slowing on the EEG that was intermittent and was happening mostly in the left temporal lobe, on rare occasions in the right temporal lobe, and on rare occasions there was a generalized or nonspecific slowing. So that was something that all of the reviewers agreed on.

Q. Was there any disagreement?

A. There were. There were some disagreements as well.

Q. Can you describe for the jury the disagreements.
A. So there was a disagreement about the presence of epileptiform spikes or spikes in waves. Dr. Rajasekaran and Dr. Crudele did not feel like those were present. Dr. Nadkarni felt that they were.
There was also a slight disagreement on whether there was rhythmic activity. Dr. Rajasekaran and Dr. Nadkarni felt that there was, and Dr. Crudele called it a quasi-rhythmic activity, meaning it looked like that, but it wasn't actually rhythmic. So those were the two areas of disagreement.
Q. What does that activity tell you about the brain?
A. So it tells you that there is dysfunction in the electrical activity that the EEG is picking up.
Q. Does it tell you anything about the degree of the dysfunction?
A. No.
Q. Does it tell you whether it's related to any symptoms?
A. No. So the EEG or any of these tests really need to be linked to the symptoms that are related to that finding to see whether those symptoms are present or absent.
Q. What does the EEG data itself tell you about whether the defendant has previously had or will have a seizure?
A. It doesn't tell you that. So it's a finding that can be associated with seizures, but it doesn't predict or tell you that a patient has had or will have seizures.

Q. How does the EEG reading align, if at all, with the MRI that was run by or reviewed initially by Dr. Mettenburg?
A. Well, it doesn't. So you may be looking for, again, those signs of hippocampal sclerosis that could be an indicator of seizure activity or epilepsy. And those findings were not present on the MRI.
Q. So the EEG indication of dysfunction, did it align or not align with the MRI?
A. It did not.
Q. What about the EEG reading aligning or not aligning with what Dr. Mountz and you saw on the PET scan?
A. It did not align. So there were no abnormalities that matched up with that EEG finding.
Q. Typically -- I've asked you some questions about the imaging in this case. Typically, what's the first thing you do before there's any imagery?
A. We are doing this backwards. So we typically start with a patient with a clinical interview and what the symptoms and behaviors that we're interested in are.
Q. You completed a clinical interview or a forensic interview of the defendant and an exam of him?
A. Yes, I did.
Q. You said it before, but was that May 21, 2023?
A. It was.
Q. Approximately how long did you talk to the defendant?

A. So I was there for about four hours, but we took about a 45-, 50-minute lunch break. So it was about three hours and ten minutes, give or take.
Q. Do you believe you had sufficient time to gather the information you needed as part of your interview of him and examination on scene in order to assess the claimed diagnoses and dysfunction in this case?
A. Yes, I do.
Q. Did you take notes?
A. I did.
Q. Can you describe what you did with your notes in completing your final report?
A. So typically what I do is I write notes during the interview. Immediately afterwards I try and put everything in that I can recall from the evaluation, and then I sent those to other experts in the case and then I copied and pasted those into my notes -- into my report.
Q. The notes, you copy and paste them into what becomes your report?
A. Yes. There may have been a few edits, but largely copied and pasted it in the report.
Q. The substantive information from your notes makes it into your report?
A. Yes.
Q. Can you describe for the jury when you met with the

defendant what his demeanor was in interacting with you?

A. Yes. When I met with him, he was calm. He was cooperative, and he was willing to answer my questions and participate in the evaluation.

Q. Was he hostile toward you?

A. He was not, no.

Q. Was there anyone else in the room besides you and the defendant?

A. No, there was not.

Q. At times did the defendant become animated?

A. He did. So when he would talk about topics that he was interested in, he would become more animated during those discussions.

Q. In your clinical experience, when do people tend to become more animated?

A. Often it's about things they're interested in.

Q. Was your observation of the defendant consistent with what you see in clinic in that regard?

A. Yes.

Q. When the defendant would become animated about something that he cared about, were you able to redirect him?

A. I was. So if he brought up topics that he wanted to discuss, would become animated, he was able to take redirection.

So if I said, we're going to talk about a few other

issues, we'll get back to that, he was able to participate with that and go back to a different topic.

Q. Can you explain or sort of give an example.

A. Yes. So he really wanted to talk about his beliefs on Jews, immigration, the Great Replacement, and brought those up early in our conversations. I told him that we were going to talk about some of the medical issues first but we would get back to those later in the interview. And he was able to do that. So he was able to then focus on my questions whenever I redirected him.

(Document given to witness for his review.)

Q. I just handed you a copy of your report; is that correct?

A. Yes, that is.

Q. And it has some redactions; correct?

A. Yes, it does.

Q. And I apologize. I handed you the one with the number on it. Can you tell me what the exhibit number is?

A. It is 1463.

MR. OLSHAN: So, Your Honor, subject to agreement regarding redactions, we would offer Government's Exhibit 1463, which is the doctor's report.

THE COURT: Any objection to Government's Exhibit 1463?

MR. BURT: Subject to what counsel said, no.

THE COURT: Thank you. It's admitted, again, subject

to counsel's qualifications.

MR. OLSHAN: And just for the record, we had marked Dr. Darby's CV as Government's Exhibit 1462. We would also offer that.

THE COURT: Any objection?

MR. BURT: No.

THE COURT: Government's Exhibit 1462 is admitted.

BY MR. OLSHAN:

Q. During your interview of the defendant, did you ask him questions about his developmental history?

A. I did, yes.

Q. Can you tell the jury how he described his childhood?

A. So he described a lot of challenges in his childhood. He had a very difficult relationship with his mother. He felt like she really wasn't equipped to take care of him and to raise him, and that because of that, there was instability.

So he described times where living with his mother he felt like he was cold and hungry. And there were other times when he lived with his maternal grandparents where he would have those things taken care of, but it was still stressful. He would feel like they would fight a lot. His maternal grandmother had issues with alcohol and substance abuse. So he felt like throughout that time, that his life was unstable.

Q. During that part of your interview, did he tell you whether his sort of housing situation stabilized at some point

when he was a child?
A. He did. So he said later in the '80s, as he was an adolescent teenager, the housing situation stabilized and he lived in the same apartment complex for several years.
Q. Who was he living with at that time?
A. He was living with his mother and his stepfather or his mother's long-term boyfriend at that time.
Q. Is that Raymond Bolt?
A. Yes.
Q. Did you ask the defendant whether -- any questions about a history of physical abuse or sexual abuse?
A. I did.
Q. What did he say?
A. He said that he had not experienced physical or sexual abuse.
Q. Did he talk to you about his hobbies, both earlier in his life and at present?
A. Yes, he did.
Q. Can you describe what he told you?
A. So, growing up, he was interested in computers and cars and in guns. He liked to shoot guns.
Later, as an adult, he became increasingly interested in politics and issues related to his beliefs on Jews, immigration, the Great Replacement.
Q. I'll just stop for a minute and ask you, what is the

purpose in your interview of asking questions about the defendant's developmental history and background in this way?
A. Again, it's to see are there any indications -- early indications of neurological dysfunction, behaviors that may be associated with that, risk factors for different types of neurological diseases.
Q. Did you ask him about his job history?
A. Yes, I did.
Q. Did he tell you anything about trucking?
A. Yes, he did.
Q. Was that -- can you describe what he told you about his time driving a truck?
A. Yes. So for a part of this time, he was employed driving trucks. And so he would drive routes. He was often on the road for six days and then would have a day off and would kind of repeat that. So he found it to be good money when he was able to do that but also a challenging lifestyle to be on the road that much.
Q. Did he say anything to you about whether he would take breaks from trucking over the years?
A. Yes, he did.
Q. What did he say?
A. That he would. So he would work for some period of time and then, because of the lifestyle, would take breaks where he wasn't working and was living off his savings.

Q. At one point, did he tell you anything about taking a break from trucking to care for someone?
A. He did, yes.
Q. What was that?
A. So he took a period of time where he was the primary caretaker for his grandfather.
Q. That's his maternal grandfather?
A. Yes.
Q. Do you know approximately how long he was a caregiver for his grandfather?
A. I'm not sure if I wrote it down here. I think it was a few years, but I don't remember exactly how long.
Q. If you take a look at page 28 of your report.
A. So it says that he was -- about five years that he was a caregiver for his grandfather.
Q. At the time of the shooting in 2018, did the defendant say he was employed or unemployed?
A. At that time he was not working. He was unemployed.
Q. Did he say whether that period of unemployment was sort of consistent with his past experience of taking breaks from working or was it something else?
A. Yes. So I think he had stopped sometime in 2017 and had not returned back to trucking.
Q. Did you ask him more questions about his relationship with certain family members?

A. I did, yes.
Q. Can you describe what he said about his relationship with his mother? You mentioned a little about his childhood relationship with her. Can you describe what he told you about his relationship from then on?
A. And so his relationship with his mother is challenging. He said it improved after childhood, that they reconnected and that they continue to have contact with each other, but that he struggled with her poor decisionmaking and irrational behavior.
Q. He characterized her as acting irrationally?
A. Yes.
Q. Did he give an example?
A. He did. He --
Q. Sorry. Did he explain that in a particular way?
A. He did. So he gave an analogy. So he said, "If it was two plus two equals five, that's a mistake but at least you can understand." He said with his mother, it was two plus two equals red. It was something that just did not make sense, did not follow, and it was really irrational when trying to talk with her about some of these issues.
Q. The defendant made an analogy about his mother and his view of her kind of judgment and thinking?
A. Yes.
Q. Now, in your assessment of the defendant's functioning,

you testified before about executive functioning; correct?
A. Correct.
Q. What is the concept of abstraction?
A. So abstraction is the idea of thinking in a less concrete way, so using analogies and metaphors, understanding the similarities and differences between things in terms of describing our thinking.
Q. What was the relevance, if any, to your assessment overall of the defendant using this analogy about his mother's thought process?
A. So this would be an example of abstraction. So using an analogy or an abstract concept to better describe what he's trying to communicate in terms of her irrational or illogical thinking.
Q. How did the defendant describe his relationship with his stepfather, Raymond Bolt?
A. He said it was good. He said that he had no issues with his stepfather, Raymond Bolt.
Q. Is Raymond Bolt still in a relationship with -- let me put it this way. At the time of your interview in May, was Raymond Bolt still in a relationship with the defendant's mother?
A. Yes, I believe so.
Q. And to your knowledge, are they still in a relationship?
A. To my knowledge, yes.

Q. Did the defendant say anything else about his mother's father, his grandfather and their relationship?
A. So he said that that was probably his closest relationship that he had growing up was to his grandfather. That was the person that he turned to for support and for help and that he felt took the most interest in him. So he definitely said that was among his closest relationships growing up and through his time being a caregiver for him.
Q. At one point was the defendant employed in the capacity as caregiver for his grandfather?
A. Yes, he was.
Q. By a third-party employer that compensated him for that care?
A. I believe so, yes.
Q. Did you ask the defendant anything about his religious views or attendance at church?
A. I did.
Q. Can you describe what he told you?
A. So he said that growing up he hadn't been particularly religious and that he had turned to the church around 2016. He said he had gotten a flier in the mail from a local church and attended for some time. He went back to truck driving so ended up not attending that church going forward after that, and then later in 2017 and 2018 became more interested in religion again. Wasn't attending a specific church, but began

reading the Bible more and more.
Q. Did he tell you in the latter period what it was that sort of got him interested in religion?
A. Yes. So he describes himself as a conservative and he said that many of the other right-wing and conservative individuals were Christians and that is what kind of drew him towards the church.
Q. Let me go back for a second. I forgot to ask you, did the defendant describe his relationship with his aunts?
A. He did, yes. He said he had a good relationship with both of his maternal aunts, his mom's sisters.
Q. Is that Cynthia Odorisio and Patricia Fine?
A. Yes.
Q. I'm going to ask you, did you talk to the defendant about behavior when he was a child involving fires or bomb making, anything like that?
A. Yes, I did.
Q. Can you tell us what he said about that?
A. Yeah. So he liked to light fires. He taught himself how to make bombs. And he would, with his friends, go to the junkyard, blow things up, when he was growing up.
Q. Did he say whether or not that was directed at individuals or was it for fun?
A. It was never directed towards individuals. So he said it was never targeting harming any person or animals. It was

just for fun to blow things up.
Q. With some of his friends as a kid?
A. Yes.
Q. Did you ask him about his past substance abuse?
A. I did.
Q. What did he tell you about his past use of tobacco?
A. So he described himself as a lifelong smoker. He typically rolled his own cigarettes so he couldn't tell me exactly how many he smoked a day, but that he was a frequent smoker for most of his life.
Q. What significance, if any, would that piece of information have in reviewing an MRI scan showing white matter hyperintensities?
A. Well, again, looking for what are those reasons we may see those on his MRI scan and smoking being one of the risk factors for developing vascular disease in those T2 hyperintensities.
Q. Did you talk to him about prescription opioid use?
A. I did, yes.
Q. What did he say about that?
A. So he had been working at a bakery and suffered a back injury at some point in the 1990s, and at that time was started on prescription opiate medications. He began to use them more and more. So there were times where he needed to purchase those either online or on the streets because he was

using more and more of those.
Q. Did he say anything about using heroin?
A. He did. So there were times where he wasn't able to obtain prescription opiates where he would use heroin.
Q. What about cocaine?
A. He said that he had experimented with cocaine on a few occasions in the '90s and early 2000s.
Q. Would anything about his use of those drugs be relevant to your evaluation of the white matter hyperintensities?
A. Yes. So drug use can be associated with -- again, is another risk factor for developing vascular disease.
Q. Did you assess the defendant's neurological history?
A. I did.
Q. As part of that neurological history, did you ask him questions about prior seizure activity?
A. I did. So I asked him questions about whether he could have had any episodes or spells that were consistent with a seizure.
Q. Did you ask him more than one question?
A. Yes. I asked him several questions about these types of symptoms that could have happened.
Q. Can you describe for the jury how specific were you in the things you asked him to assess whether he had had a seizure?
A. I was very specific. So I went through different types of convulsions, different types of other movements that he might

have, movements to his mouth, smacking his lips, different types of eye movements where they were deviated. Different types of postures that might be associated with seizures.

There were cognitive symptoms that can arise of problems with memory, not remembering a period of time, not being able to respond, not being able to speak.

There are psychiatric symptoms like feeling like you're outside of yourself, that you're in a dream. That deja vu like something is just happening or is very familiar like it's already happened. So a wide number of these types of symptoms that could happen in association with a seizure.

Q. Why was it important to you in your interview of him to ask that full range to get as many specific questions about these behaviors as you could?

A. Well, epilepsy was one of the diagnoses that had been raised as a potential consideration in this case. So I wanted to be careful in assessing for those types of symptoms.

Q. Epilepsy is a neurological disorder?

A. Yes.

Q. Can you diagnose someone with epilepsy without a prior seizure?

A. No.

Q. When you asked the defendant all these questions, did he answer in the affirmative? Did he say anything?

A. Yes. So in reviewing these questions, he did tell me

there was one occasion when he was 17 where he suddenly became short of breath. And so that was in asking about other tests of autonomic symptoms, whether he had flushing, heart racing, palpitations, and that was the one thing that he could recall and answered affirmatively.
Q. Did he say that was an episodic or one-off event?
A. So that happened on a single occasion.
Q. How did that affect your assessment of whether that was a seizure?
A. So that was unlikely to be a seizure.
Q. Based on your interview of the defendant, did you determine -- identify any seizure history?
A. No, I did not.
Q. Did you ask him about any motor symptoms he experienced as part of your neurological interview?
A. I did.
Q. What did he say?
A. He said that he had developed a tremor in his right hand. He noticed on certain occasions that it would come out. And he also described numbness in his middle left toe. And he had worked for some time as I think a UPS or FedEx delivery person, would jump out of the truck and noticed that this developed sometime after that and attributed it to that.
Q. What was the clinical significance of that information that he reported to you, if any?

A. I did not think that that was relevant to any of the questions about his criminal conduct.
Q. Why?
A. Those symptoms in themselves would not point -- are not a behavior that I would think of as influencing his criminal behavior.
Q. Did you talk to him as part of this portion of your interview about what's called socio-emotional or behavioral symptoms?
A. Yes, I did.
Q. What is the purpose of your questioning in that part of the interview?
A. Again, I'm just trying to ask him about any of the types of behaviors or symptoms that could be associated with neurological diseases in the frontal and temporal lobes.
Q. And what did he report in that -- in response?
A. So he did say that he had difficulty in putting himself in somebody else's shoes or reading them. So the example he gave was in a movie trying to understand what a character might be thinking. He said, "You have no idea what they're thinking; you're just guessing."
Q. Did he deny any behaviors or symptoms relevant to that topic?
A. He did.
Q. Can you describe that?

A. He denied that he had difficulties with apathy or motivation. He denied that he had any issues with his emotions, so experiencing them or understanding them.

He denied issues with impulse control or delayed gratification. He said that was something he was very good at. So there were many other symptoms that he denied having problems with.

Q. And just to go back to all of those seizure questions, did he answer in the negative to all of those questions you asked him, other than offering this one example about shortness of breath?

A. Yes, he did.

Q. Did you ask him about hallucinations?

A. I did.

Q. Did he indicate whether he had experienced any?

A. He denied that he was having any hallucinations.

Q. I'm sorry. Did he give an assessment about his impulse control?

A. He did, yes. He said he did not feel that he was impulsive and that he was very good at delaying gratification in certain context.

Q. Did you also take a neuropsychiatric history during your interview of him?

A. I did, yes.

Q. As part of that, did you ask him questions about his mood?

A. I did.
Q. What did he say?
A. So he said that he's always been somewhat depressed throughout his life. He was struggling to find particular times where he was more depressed than others. But he did talk about the times where he was in a psychiatric hospitalization, which were related to him developing anger and aggression towards his mother. And so those can be other indicators of depression in children.
Q. Did you ask him about any -- whether he was suffering from any depression or mood problems at the time of the shooting?
A. I did ask him, and he denied that. He said that he did not have any depression, anxiety, suicidal behaviors at the time of the shooting.
Q. Did you ask him about his past suicidal behaviors -- or past reports of suicidal behaviors?
A. I did.
Q. What did he say about any genuine suicide attempts?
A. So he said that he did have a genuine suicide attempt when he was 17 where he tried to overdose on medications. He wasn't sure exactly what it was. It was over the counter. He thinks it was Tylenol or aspirin.
He told me about other instances that have been concerning for possible suicide attempts. One of those was a time where he was drinking alcohol, grain alcohol, was

intoxicated, spilled some on his arms and was smoking and accidentally lit himself on fire. So he told me that this was an example of a time he wasn't trying to light himself on fire, but that it was accidental.

Q. Did he tell you anything about an event in 2004 related to when he was fired from his bakery job?

A. Yes, he did.

Q. What did he tell you?

A. And so he said that he had been found stealing some money as part of his bakery job and was fired. And he was able to live in an apartment above the bakery free of rent while he had that job. So he was losing his job and being evicted and he needed a place to stay. So he said that he told the police that he was suicidal and put a gun in his mouth so that he could go to a psychiatric hospital and have a few days to figure things out.

Q. During this part of your interview, did you also ask him about psychotic symptoms?

A. I did, yes.

Q. Did you ask him -- we've covered hallucinations. Did he say anything about prior history of hallucinations?

A. So he didn't tell me that. There are records that indicate that when he was five and a half, that he experienced hallucinations in the setting of a high fever.

Q. He did not mention that?

A. He did not mention that to me, no.
Q. Did you ask him whether he had any feelings about paranoia?
A. I did. He denied that.
Q. What about persecution?
A. He denied that.
Q. Did you also ask him about various specific kinds of or examples of potential delusional thinking?
A. Yes. So there were a few examples that had been communicated to us of beliefs that may have been delusional. So I asked him specifically about those.
Q. Was one of those related to his time working at that bakery?
A. Yes, it was.
Q. What did you ask him?
A. So the -- what had been reported is he may have had a belief at that time that the UN had -- the United Nations had soldiers that were out to get him and that they might attack him and, therefore, he kept a shotgun by his door in case anyone broke in. And when I asked him about that, he said that was ridiculous, that the UN wouldn't target him specifically, and also that he would never leave a shotgun by the door for the intruder to get. You would leave it by your bed so that if someone came in, he would have access to it.
Q. And when you say these things were reported to you, that

was through correspondence or communications initiated by the defense?
A. Yes.
Q. Did you ask him about an issue related to red dye and his bracelet in the jail?
A. Yes, I did.
Q. Can you describe what you asked him or what he said?
A. So I asked him about the issues related to the red dye, and he stated that he has an opaque bracelet that was getting a darker and darker red tinge, and he felt like it was due to the dye.
I tried to ask him more about whether he thought it was being absorbed into his skin or circulating through his body and causing any problems, and he said he didn't know.
Q. Did you have any conversation with him about salt intake and whether or not something about that might support the existence of a delusion?
A. I did. So he felt that around 2021, that his thinking became more clear, that he was able to process things better, that he was able to work through problems better. And in trying to find a reason for that, one idea he had was that he had increased the amount of salt that he was eating. So he found the prison food to be bland, was using more salt.
And he remembered that his mother had been in the hospital before. She had a disease that caused her to be

confused and to have a low salt level in her body. So she was started on salt tabs and her thinking improved.

He also remembered that his grandfather was known for putting a lot of salt on his food and that, as he aged, he seemed to have better memory than his great aunt, so his grandfather's sister, who didn't use as much salt. And so he thought maybe the salt is improved my cognition.

Q. Based on your questioning of the defendant about these couple examples, did you form any opinions about whether or not he was suffering from delusions as to those things?

A. I did not believe that any of those were delusions.

Q. Did you talk to him about any beliefs he has regarding the end times or end of days?

A. I did ask him about that, yes.

Q. Can you tell the jury what you asked him and what he said?

A. So I asked him about these beliefs related to the end of days, and he says that he believes in that. He's read the Bible and believes that that is the interpretation. But he said it would be impossible to know when that was happening.

And he gave analogy of a bike lock; that even if the first three combinations on the bike lock are showing correct, you still don't know what the fourth one is. So he didn't have an idea of when this would happen, only that he believed, based on his reading of the Bible, that it would happen.

Q. When you were asking him questions about his views on the

end of days or end times, he used another analogy to explain his view?
A. Yes, he did.
Q. Did you conduct a physical examination?
A. I did.
Q. So in this part of the interview, you've now asked him some questions. And are you assessing, based on your own observations, whether or not some of these conditions or symptoms exist?
A. Correct. So using the examination with a patient as opposed to asking them questions about their observations and statements about behaviors.
Q. As part of your examination, did you administer what the jury has heard about, it's called the MOCA, the Montreal Cognitive Assessment?
A. Yes. So it's a screening or standardized measure to look at cognitive function.
Q. What score did he get?
A. He was a 28 out of 30.
Q. Where does that fall in the range of normal, abnormal, something else?
A. So that's normal.
Q. What did he miss when you administered it?
A. So he was off when I asked him the date. He said the 22nd. It was the 21st. So he missed a point for that. And

then I asked him to remember five words after a delay of five minutes, and he remembered four of the five. So he missed one of the points for that.
Q. That test indicated normal cognitive functioning?
A. Yes, it did.
Q. Did you also administer something called the Frontal Assessment Battery or FAB?
A. Yes, I did.
Q. What is the purpose of the Frontal Assessment Battery in your interview?
A. So it's a combination of six different tasks to look at frontal lobe functions. So it's scored in relation to these six different tasks to get an idea whether there is evidence of frontal lobe dysfunction.
Q. How did he do on the Frontal Assessment Battery?
A. He scored normal. So he was 18 out of 18 on the test.
Q. Did you, as part of your cognitive examination, assess his working memory?
A. Yes. There are portions on the MOCA test that relate to working memory.
Q. In addition to your cognitive examination, did you do a neurological examination?
A. I did.
Q. Did you administer a smell test?
A. Yes, I did.

Q. What was his -- how did he do?
A. So this is a scratch and sniff test. There's three odors, and he identified with multiple choice all of those correctly.
Q. He had reported to you some motor issues, I think a tremor or something like that. Can you tell the jury what you observed when you assessed his motor functioning?
A. So he did have a tremor in his right hand. It wasn't present when he was resting, but when he would do things, use the pen, reach up, the tremor became noticeable. It was his right hand, not his left hand.
Q. Based on your experience as a neurologist, what significance, if any, do you ascribe to that tremor with respect to decisionmaking?
A. So that finding would not relate to decisionmaking. So those are different parts of the brain, different parts of the frontal lobe that would be involved in motor versus decisionmaking.
Q. What about planning?
A. It would not be related to that.
Q. Motivation?
A. No, it would not be related to that.
Q. So what was your -- essentially your takeaway from your physical examination involving, you know, general medical exam, psychiatric exam, cognitive exam and neurological exam?
A. So he had the tremor in his right hand that came out with

action. And he also had reduced sensation in his feet, and then some abnormal sensation over the areas of his arm that were scarred from when he had burned himself.
Q. What significance, if any, did you ascribe to those couple findings?
A. I did not think that they would have contributed to his criminal actions in any way.
Q. Now, did you talk to him about his mental state and behavior in relation to the crimes?
A. I did, yes.
Q. Can you tell the jury why it was important, if it was, to talk to him about his conduct?
A. Well, that's -- the entire purpose of the evaluation is to see, are any of these diseases, or the behaviors that they cause, are they relevant to his criminal actions, so did they contribute in any way to that behavior.
Q. Did you talk to him in this part of your interview about his beliefs on Jews, immigration, the Great Replacement and the War Against White Nations?
A. I did.
Q. Can you tell the jury what he said?
A. So he said that he had heard ideas about Jews and control of the media and issues with immigration, but it was really around 2017 when he started investigating this further. This is when he had stopped his truck driving route and had more

time to investigate these issues.

So he turned to the Internet. He would watch YouTube videos. He would click on links in the comment sections to other pages.

He eventually got into the social media site Gab and saw information there as well as other links and posts. And he became increasingly convinced that these ideas were accurate.

Q. And what was that view or those views, as he articulated them to you?

A. So the way he explained it to me is that there were efforts going on to undermine the majority and the culture of white culture and the majority of white nations. And so he said that these efforts included promoting immigration of nonwhite people into majority white countries to dilute the share of power by white people in that country. And he communicated the belief that he felt that Jews were orchestrating that or played a large role in those efforts.

Q. How did he see himself in that war?

A. So he saw himself as a soldier in that war is I think the way he described it.

Q. When you talked to him about this topic, did you inquire whether there was any sort of intersection between his view of himself in the war on white nations and the end of days or end times?

A. I did, and he said there was no connection, that they were two separate issues; that this effort to promote immigration and the Great Replacement were not related to the end of days.
Q. You testified earlier about -- I'll ask this a different way. Did you ask probing questions of the defendant about whether he felt he was personally being targeted by Jews or those who are seeking to replace whites?
A. I did. So I asked him about whether he felt like he was personally in danger, was he being targeted, were there individuals that were trying to attack him or follow him in any way, and he denied that. He said it wasn't about him, that he wasn't a target in this.
Q. In your experience with delusions, why was it relevant to you to inquire about whether his views were directed at himself as opposed to not himself?
A. So that's one of the core features of delusions in general is that they're personally salient. So they're about that person, their experiences, what's going on in their life.
Q. What did you conclude, based on how he answered those questions regarding his views on Jews and immigration and the Great Replacement, as it relates to the topic of delusions?
A. So based on how he found the information, that it was researched, it wasn't an idea that generated in his mind, that these were not personally salient or relevant beliefs, it was my opinion that they were not delusions.

Q. In your experience with respect to delusional thinking or delusional mindset, what impact, if any, would the fact that the defendant acted on his beliefs have on whether he was delusional?
A. So that -- that would be a criteria for saying that it is or is not a delusion.
Q. Why is that?
THE COURT REPORTER: Did you say is or is not?
A. It would not be a criteria for deciding if it is or is not a delusion.
BY MR. OLSHAN:
Q. Why is the fact that he acted or didn't act on those beliefs not a criteria for assessing them as delusions or not?
A. So the criteria or delusions are really based about the beliefs themselves, not about the actions that result from those beliefs.
Q. Did you talk to the defendant about his motivation and planning for the attack on the Tree of Life Synagogue?
A. I did, yes.
MR. OLSHAN: Your Honor, I notice it is noon. I would say now is probably a good time to break for lunch.
THE COURT: Okay. We'll take our lunch hour. We'll endeavor to reconvene in about an hour, as close to 1:00. I'll thank you all to remain where you are as the jury exits.
(Lunch recess taken.)

THE COURT: Welcome back, ladies and gentlemen. Everyone, please be seated. The witness remains under oath.

Mr. Olshan, you may proceed when ready.

MR. OLSHAN: Thank you.

BY MR. OLSHAN:

Q. Dr. Darby, when we left off before lunch, I was asking if you talked to the defendant in your interview of him about his motivation and planning for the attack on the Tree of Life Synagogue.

A. I did, yes.

Q. Let me ask you some specific questions about that topic. Did he tell you when he decided he needed to take definitive action and began planning?

A. He did.

Q. When was that?

A. He told me it began in April of 2018.

Q. April of 2018?

A. Yes.

Q. Did he describe how much time he spent investigating potential targets?

A. Yes. He said he spent tons of time doing research on potential targets in the attack.

Q. Did he identify any particular individual targets initially?

A. He considered various individual targets. He told me

about targets that associated with the Anti-Defamation League, a Jewish civil rights organization.
Q. Did he tell you at some point whether he identified a particular organization to target?
A. Yes. He eventually decided on HIAS as the group that he would like to target.
Q. Roughly when did he say he settled on HIAS?
A. He said it was sometime in September or October of 2018.
Q. Why did he say he chose HIAS?
A. That was a group he identified as being a Jewish organization in support of immigration, which he really felt like was one of the main issues driving the Great Replacement and many of the issues he was concerned about.
Q. Did he talk about whether he thought about targeting HIAS, the organization, directly?
A. He did. He had considered targeting them directly, but felt that it was impractical because they were likely to have more security, and they were located out of state. So that would make it logistically harder for him to plan and carry out an attack.
Q. After he decided not to target HIAS directly, what did he decide to focus on?
A. He instead decided to focus on local Jewish organizations that were supporting HIAS.
Q. Did he identify to you a particular Jewish congregation?

A. He did. He identified Dor Hadash as one of those organizations.
Q. In addition to Dor Hadash, did he identify any other targets?
A. He did. So he told me he had a second target that was located nearby next to a post office that was close by to Dor Hadash and the Tree of Life Synagogue.
Q. When you were asking the defendant questions about his motivation and planning, did he articulate for you any specific goals he had?
A. He did, yes.
Q. Did you ask him if he had goals, or did he volunteer that he had goals?
A. These were the goals that he brought up initially when he wanted to talk about the attack.
Q. How many goals did he say he had?
A. He had three goals.
Q. Can you tell the jury what they were?
A. Yes. So the first goal was to stop Jews that are supporting HIAS. The second goal was to scare Jews who might support HIAS in the future. And the third goal was to bring awareness to the Great Replacement.
Q. As you are assessing someone's executive functioning, how does this type of -- these descriptions affect your assessment?

A. I think the amount of planning, the research, the decisionmaking throughout the process tells you about the executive functions that are going on and how they're working in that person. The motivations and the goals and the articulation tell you, again, about those frontal lobe symptoms related to motivation or apathy and abulia.
Q. That's the lack of motivation?
A. The lack of motivation, yes.
Q. What did you assess as to the defendant on those topics when he started to tell you about his planning?
A. So based on these descriptions, it did not appear that he had any difficulty with executive functions when planning the attack and that he didn't have any difficulties with motivation while planning the attack.
Q. Did the defendant say anything about research he did specific to Dor Hadash?
A. Yes, he did.
Q. What did he say?
A. So once he had settled on Dor Hadash as one of the targets, he began researching them online. He used Google Maps and Google Images to get a sense of the layout of the synagogue. And he used the Dor Hadash website and their online calendar to have an understanding of when their events were planned and what days people would be there as part of the worship.

Q. What, if anything, did he say about when during the week he learned Dor Hadash had events?
A. He said that typically they had events on Wednesdays and Saturdays.
Q. Did he say whether or not he actually ever went to Tree of Life prior to October 27th?
A. He denied that he had ever gone there before the day of the attack.
Q. Did he express any confusion about the Tree of Life Synagogue and the presence of other congregations?
A. He did. So as he was using Google Maps, he saw that there were other labels on the same location for the other groups that worship there. So there was some confusion, but he eventually decided that Dor Hadash did, indeed, meet at the Tree of Life Synagogue for their worship.
Q. What, if anything, did he say about an initial date he had selected for the shooting?
A. He told me initially he had planned to do it on October 20th, the week before, and then delayed and decided to do it on October 27th.
Q. When you met with him, could he recall the reason he delayed from October 20th to the 27th?
A. He could not.
Q. Did you talk to him about the morning of the attack?
A. I did.

Q. What, if anything, did he say about driving by the two targets, that being Tree of Life and the second target, another Jewish organization nearby?
A. So he told me that he drove to the Tree of Life Synagogue first, saw that there were a small number of people there, and then decided to drive the route to the secondary target.
Along the way, he realized there was a police station in between the two targets. And he reasoned that it would be difficult for him to be able to hit both targets without being stopped in between. And so he decided to go back to the Tree of Life Synagogue as the higher yield target.
Q. You said "higher yield target"?
A. Yes.
Q. Are those your words or the defendant's words?
A. Those are the defendant's words.
Q. What did you understand him to mean when he used the phrase "higher yield"?
A. That it would have more of an impact, that there would be more victims and that also it was a place of worship.
Q. When you say have bigger impact, did he say anything or do you recall anything about making a statement?
A. Yes, that it would make a bigger statement.
Q. When the defendant explained to you his assessment on the morning of driving by Tree of Life and then going to the other location and making that decision about where to attack, how

did that factor into your assessment of his frontal lobe functioning?

A. Well, again, it tells you about executive functions, that decisionmaking and reasoning process. It also gives you a sense of impulsivity. So it wasn't that he couldn't prevent himself from doing it initially. He was able to delay that until he scoped out a second target and decided which would be the target to focus on.

Q. As he was describing his planning for the shooting and his actions on the morning of, is there anything about what he described that you evaluated as being impulsive in nature?

A. No. This was not impulsive.

Q. Did you talk to him about his actual shooting, the actual shooting?

A. I did.

Q. And did you talk to him in part to assess his mental state during the actual shooting?

A. Yes, I did.

Q. Now, with respect to the actual attack, did you ask him about whether he felt depressed?

A. Yes.

Q. Did he --

A. I asked him about that. He denied that.

Q. What about suicidal?

A. He denied that.

Q. Did you ask him whether he believed he was hallucinating at the time?
A. Again, he denied that.
Q. What about agitation at the time of the attack?
A. He denied that.
Q. Did you ask him whether he felt confused during the attack?
A. He denied feeling confused.
Q. Did you ask him to describe how he felt during the shooting?
A. Yes. The way he described it was that he felt calm, focused and goal-directed.
Q. Did you talk to him about whether he felt he was placing himself in any danger by carrying out the shooting?
A. I did. And he said that he realized that there were risks to what he was doing, that he might be injured or killed, but that he felt like he had to do something based on his beliefs.
Q. You testified about this before lunch, but did he articulate during the -- as to the time during the shooting, how -- you know, what he felt his role was?
A. Yes. I think he felt like he was a soldier in this war, is the way he described it.
Q. Did he say whether or not he was willing to make a sacrifice, if necessary?
A. He did. He did say that.

Q. Did you ask him about law enforcement?
A. Yes.
Q. What did he say?
A. He said that law enforcement was not his target, but that they were helping to defend the enemy, and so it was necessary for him to attack them, if needed.
Q. What, if anything, did he say about any mistake he realized he made or thought he made when he went toward the synagogue that morning?
A. So, in retrospect, he realized that he left ammunition in his car. He initially had divided it up for the two targets. And so in retrospect, he felt like that was a mistake.
Q. And why was it a mistake?
A. Because he could have used that additional ammunition.
Q. Was he able to remember the exact order of details for what happened during the shooting?
A. No. So he said the exact sequence of how things happened were still unclear in his mind as to the exact order of events.
Q. How did he describe his level of attention and focus, though?
A. He said that during the attack, he felt like he was focused and that he had the time to make decisions.
Q. How did he describe the building layout?
A. He said it was complex. So he says he still doesn't fully

understand the building layout and the complexity of it.
Q. Did you have an exchange with him about the number of people he killed and whether that was surprising to him?
A. Yes. So he said that he could remember killing five or six people, but didn't realize at the time that it was 11.
Q. How did he describe how the victims appeared to him in the moment?
A. So as he was shooting, he described the victims as silhouettes. So he said he could see the outlines of their bodies but not the specific facial features. He said there were other times where there would be pauses in the shooting and he would look at the victims and could see those features. But as he was shooting, he did not see them.
Q. In breaks in the shooting, he would -- he articulated he could make out the features and details of the people he had killed?
A. Yes.
Q. Did he use the word "victims" or did he use a different word when describing the people he was shooting?
A. He used the word "targets."
Q. What, if anything, did he say about the sound in the building when the shooting stopped or during breaks?
A. He said at times when the shooting stopped, it would be eerily quiet, is the way he described it. And he would become more aware of the adrenaline going through him, that he could

feel his heart racing at those times.
Q. Did you ask him if his perception in the moment was that this was a real thing that was happening or something else?
A. I did. So I asked him, you know, did it seem like it was a dream, that you were outside of yourself. And he said, no, it felt like it was really happening, that he was in control and that these were -- things were really happening.
Q. Why did you want to ask that question?
A. Again, looking for any signs that there could have been neurological dysfunction, a seizure, any other explanation for the behavior.
Q. Based on his answer, was there any indication that there was some neurological impairment at the time of the shooting?
A. No.
Q. Did he describe how he felt when he stopped shooting and later after he was apprehended regarding what he had done?
A. He did.
Q. What did he say he experienced?
A. He said that he felt in awe of his accomplishment, and he compared it to the feeling that the founders of the US Constitution must have had at their accomplishment.
Q. Did you ask him about his cognition or assess it by asking him questions after the shooting and he was apprehended?
A. About his cognition after the shooting?
Q. How he felt afterwards, whether he displayed any changes

to his cognition or psychiatric symptoms?
A. Yes.
Q. What did he say?
A. He described it at some points after the shooting he had been injured and was having blood loss, that he began to feel dizzy and lightheaded at times, but that afterwards he didn't feel confused, other than at that point when he went under anesthesia for surgery.
Q. Did he describe anything else you would consider as a psychiatric symptom?
A. No, he didn't.
Q. Any alterations to his mental state?
A. No.
Q. Dr. Darby, during your interview of the defendant, did he offer his current views on the shooting?
A. He did.
Q. Did you ask for his current views, or did he volunteer them?
A. He volunteered them.
Q. Did he say anything about whether -- what he would do if he could do it again?
A. He did.
Q. What did he say?
A. He said if he could do it again, that he would have more victims. He pointed to a local story in the news that just

aired about Dor Hadash supporting and doing a bike fundraiser for an immigrant family and said that it was indication that he hadn't done enough.
Q. He mentioned a news story?
A. Yes. A story he had just seen on the news.
Q. What was it about?
A. It was a fundraiser by Dor Hadash to raise money for an immigrant family, I believe.
Q. Do you know whether there was any local news around the time of your interview of the defendant about Dor Hadash organizing a bike event to support immigrants?
A. There was. I believe it was the day before there had been an event.
Q. The day before your interview of him?
A. My interview, yes.
Q. Did he say anything about whether he would have done more research?
A. He did. So he said that he would have tried to do more research to determine when there would be more people present so that the attack would have more victims.
Q. He mentioned this Dor Hadash bike ride fundraiser as an example of why he had not achieved his goal?
A. Correct.
Q. Did he articulate whether he continues to maintain his beliefs about Jews, the Great Replacement and the War Against

White Nations?
A. Yes. He continues to hold these beliefs.
Q. Did you reach some opinions about any neuropsychiatric diagnoses and your overall forensic opinions based on your review of records, your interview and examination of the defendant, and your review of imaging?
A. I did.
Q. Did you form an opinion about whether the defendant has a diagnosis of epilepsy or seizures?
A. Yes.
Q. What is your opinion?
A. My opinion is he doesn't have a diagnosis of epilepsy, that I could find no indication that he had ever had a seizure.
Q. Why did you -- I think you just answered this, but why did you reach the conclusion he does not have a diagnosis of epilepsy?
A. Yes. I saw no indication that he had ever had a seizure.
Q. Now, even if the defendant had epilepsy or a seizure disorder, did you reach a conclusion about whether those diagnoses would have had or contributed to his criminal behavior in any way?
A. I did.
Q. Can you explain what that opinion is?
A. So there is no indication that even if he had a diagnosis

of epilepsy, that that would have played any role in his criminal conduct.
Q. And can you describe your analysis as to why that is?
A. Yes. So there is no indication of a seizure or seizure-like symptom in his description of the planning or the attack. There can sometimes be a confusional state after a seizure, and there was no indication of that. So for those reasons, there appeared to be no reason why a seizure or epilepsy would have contributed to his behavior.
Q. There was testimony previously and also this morning about the abnormal EEG. Do you remember that?
A. Yes.
Q. How did the -- let me back up. I think this morning we got sidetracked. I was asking you about incidental findings. Do you remember that?
A. Yes.
Q. Can you remind the jury what an incidental finding is?
A. So an incidental finding, those are abnormal findings on a test that are not related to the behaviors or symptoms that we're evaluating with that test.
Q. So what is the value, if any, for diagnostic purposes as to what you're trying to assess?
A. So in this case, without evidence that he had ever had a seizure, the EEG does not help you to say whether or not someone has epilepsy or not.

Q. Now, if you took people off the street and you ordered them an MRI or a PET scan or an EEG, would it be uncommon that running those diagnostic imaging tests on people, you would find incidental findings?
A. It would certainly be possible running that many tests to find incidental findings.
Q. But sort of ordinary people off the street don't just get EEGs, PETs and MRIs?
A. Correct. Usually we're ordering it for a specific purpose, because there's some disease that we're concerned about that may have a finding on those tests that would be helpful.
Q. The findings from the EEG of the defendant, did you reach an opinion about whether they can occur in persons with seizures or without seizures?
A. They can. So the EEG is associated with seizures, but it doesn't tell you that a person has had a seizure or will have a seizure.
Q. I want to stay with the EEG for another moment. Did you reach any conclusions about whether the findings on the EEG related to any cognitive, behavioral or neuropsychiatric symptoms that could be attributed to temporal lobe dysfunction?
A. Yes.
Q. Can you describe that?

A. Yes. So I was looking for, you know, is there any linkage between those findings and any symptoms or behaviors that he might have. In relation to the criminal acts themselves, I did not feel like there was any association.

There were a few places where there might be an association that could have been there to things like his social cognition, so the emotional prosody and recognition. There had been an early indication that he may have had a speech delay when he was two. I didn't find any other evidence of language problems after that.

Q. What about anything indicative of problems with emotional regulation?

A. No. So, again, he had issues with anger and emotional regulation when he was a teenager, and altercations with his mother. I saw no evidence of that as an adult and no evidence of emotional dysregulation related to the criminal acts themselves.

Q. When you first started testifying, you talked about in clinic you assess generally four types of symptoms; correct?

A. Yes.

Q. Executive functioning, that was one?

A. Correct.

Q. What was your overall assessment of the defendant's executive functioning?

A. So overall, I saw that he had no impairments in his

executive functioning in relation to the criminal attack.
Q. What about the next category, problems with motivation?
A. Similarly, I saw no problems with motivation and goal-directed behavior.
Q. I think you just talked about this a little bit, but what about that third category of any issues related to social and emotional behavior and function as it relates to the defendant's shooting?
A. No, I did not see any issues related to impulsivity or emotional dysregulation related to the criminal acts.
Q. The last category you talked about from your clinical practice is psychiatric symptoms. I'm going to ask you about that one.
Did you reach an opinion about whether the defendant's beliefs about Jews, immigration, the Great Replacement and the War Against White Nations were delusions caused by a neuropsychiatric disease?
A. I did.
Q. Can you tell the jury what your conclusion was about the defendant's beliefs?
A. So in my opinion, these were not delusional beliefs.
Q. Why is that?
A. For a number of reasons. One is where they came from. So it didn't appear that the delusions were being generated by a neurological disease. It appeared that they came from him

researching and finding these ideas online, that they were shared with other people in that sub community.

And the second was that they weren't personally salient or personally relevant to him. They weren't people that were targeting him or attacking him, and so it didn't have that other feature of delusions that are common.

And the third thing is that there wasn't evidence of other delusions or psychotic symptoms.

Q. So did you assess whether his criminal conduct was intended to defend himself against what Jews were doing?

A. It was not.

Q. In your interview of the defendant, did you assess whether, at least on certain topics, he was able to take in competing information, assess it, and reach a conclusion one way or the other?

A. Yes. So for the example of whether salt improved his cognitive thinking, he had other potential explanations that he came up with such as the fact that he was in prison and had less distractions. He didn't have to worry about work or paying bills or doing the laundry, making his food. So he thought that that could be another explanation for why he was feeling his thinking was better.

Q. During your interview of the defendant, was his -- was he coherent in how he explained things to you?

A. Yes, he was.

Q. Did he display disordered thinking or logic to you?
A. No.
Q. Was his articulation of things linear?
A. Yes.
Q. And in your review of the various background materials, did you see any evidence of psychotic disorder from any of that prior to the attack?
A. No, I did not.
Q. And what about subsequent, since he has been in jail?
A. No, I did not.
Q. So what is the bottom line about your -- what is your bottom line opinion about the defendant's beliefs regarding whether they are delusional or the result of temporal lobe dysfunction or any other neurological disease?
A. In my opinion, they are not delusional, and they are not the result of a neurological disease.
Q. Based on your interview of the defendant and your review of his medical records and the other records you reviewed, if he had come into your clinic, would you have ordered an EEG in this case?
A. No, I would not.
Q. Would you have ordered any imaging?
A. No.
Q. If someone comes to your clinic and they have a valid diagnosis of epilepsy and is experiencing delusions, whether

neurological or psychiatric in nature, what would you do?
A. You would treat them.
Q. How would you treat that patient?
A. Well, you would typically start with medications to treat seizures if that was the concern and to treat psychotic symptoms, if that was the concern.
Q. Different medications?
A. Yes.
Q. Anti-seizure medication for a seizure disorder or epilepsy?
A. Correct.
Q. And then what kind of medication for a disorder involving delusions?
A. An anti-psychotic medication.
Q. You have prescribed those medications before?
A. Yes.
Q. Is that a common clinical path?
A. Yes.
Q. Would you recommend prescribing those to the defendant?
A. No.
Q. You have assessed patients for qualification for Social Security disability benefits?
A. Yes, I have.
Q. In your opinion, would the defendant qualify for Social Security disability?

MR. BURT: Objection. Relevancy.

THE COURT: I'm inclined to sustain.

MR. OLSHAN: There has been testimony about the defendant seeking disability, Your Honor.

THE COURT: I'm still inclined to sustain it. If we need to come to sidebar, that's fine.

MR. OLSHAN: That's fine. I'll move on.

BY MR. OLSHAN:

Q. Dr. Darby, based on your examination of the defendant and review of all the records you've obtained, do you have an opinion as to whether the defendant could form the intent to kill another person?

A. I do.

MR. BURT: We object to that opinion. It's improper opinion, 704.

THE COURT: No further -- objection is overruled. Consistent with prior rulings.

BY MR. OLSHAN:

Q. My question was based on your examination of the defendant and review of the relevant records and imaging, do you have an opinion as to whether the defendant could form the intent to kill another person?

A. I do.

Q. What is your opinion?

A. That he was capable.

MR. OLSHAN: One moment, Your Honor.

(Prosecution confer.)

Q. Just a couple additional questions. Did you ask the defendant about whether he is currently on any medication?

A. I did.

Q. Is he?

A. He said he was not.

Q. And putting aside the question about intent to kill, do you have an opinion about whether the defendant was capable of planning and carrying out the shooting at the Tree of Life Synagogue?

A. Yes. He was capable.

Q. That's based on your assessment of all of the information and in your area of expertise related to frontotemporal dysfunction in the brain?

A. Yes.

MR. OLSHAN: That's all. Thank you.

THE COURT: Thank you, Mr. Olshan.

Mr. Burt, do you care to cross?

MR. BURT: Just give me one minute to get set up, if I could.

THE COURT: Sure. Take your time.

(Pause.)

CROSS-EXAMINATION

BY MR. BURT:

Q. Good afternoon.
A. Good afternoon.
Q. Doctor, let's start with your experience. Is experience important in neurology?
A. Yes. Experience is important in general.
Q. When you went to medical school, I assume that the people who taught you were far more experienced than you were when you entered medical school; correct?
A. Yes. So, in general, the teachers in neurology are people who have already gone through the training program.
Q. And part of medical school is book learning; right? You go to classes?
A. Yes. It's a combination of lectures, small groups, seeing patients.
Q. And when is it in the medical school curriculum that you actually get to follow experienced physicians around and observe what they're doing?
A. It's at the beginning of medical school.
Q. And during the whole time that you're in medical school, do you get to make diagnoses of patients?
A. Yes and no. So the process is typically when you're seeing a patient as a medical student, that you would go in first. You would do the interview and examination. You would present it to either another resident or the attending neurologist. You would tell them what you thought was going

on. There would be some teaching. Then you would go back into the room, and they would do the assessment with you and come to an overall conclusion.

Q. "They" being the experienced physician?

A. Yes.

Q. Do you know of any state in this country that allows medical students to make a diagnosis in a situation where people are going to be rendered medication or treatment?

A. No. I believe there's always a supervising attending physician.

Q. When you graduated from medical school, that was in 2011, I think?

A. Yes.

Q. Do you know this textbook, De-Jong?

A. No.

Q. You don't know who William Campbell is?

A. The name sounds familiar, but I don't think I've met Dr. Campbell.

Q. What was the textbook you used in medical school?

A. For just general medical school? We had a number of different textbooks. It depends on the subject. It might be textbooks related to physiology or whatever aspect that we were learning about. I don't believe there was a single textbook for all of medical school that we used.

Q. And when did -- I'm sorry. Were you done?

A. Yes.
Q. When did you first start focusing on neurology?
A. So I was interested in neurology going into medical school. So I had done psychology and neuroscience. So I was deciding between neurology and psychiatry as specialties that I wanted to do.
Q. And you decided on neurology?
A. I did, yes.
Q. So that took you into a different track than if you had decided on, for instance, internal medicine?
A. Correct.
Q. Or psychiatry?
A. Correct.
Q. And you did a one-year residency in neurology?
A. No. So I did a one-year internship in internal medicine. So that was a broad training across all of the different types of medicine subspecialties. So it's infections, the heart, the lungs. And then I did a three-year training in neurology itself after that.
Q. And during that three-year training, were you continuing to follow experienced physicians around, sort of observing how they diagnose and hopefully learning the basics of the trade from more experienced people?
A. So, yes. So it's a similar process to what I described. You would see the patients, evaluate them, start treatment

recommendations. But there is a supervising attending throughout that process.
Q. Let me ask you if you agree with this statement: Physicians, particularly when young and inexperienced, and when confronted with an enigmatic patient often conclude the problem is not organic, but many diseases, particularly neurological ones, may present with puzzling manifestations, which seem all the more so if one has not encountered the entity before."
A. I think that's not only true of younger, less experienced, but even experienced neurologists to make those mistakes.
Q. Why is it a mistake that tends to be made by both experienced and inexperienced clinicians?
A. I'm not sure I quite follow your question.
Q. You said you agreed that that statement applies both to inexperienced clinicians and to experienced clinicians. So my question is why is it that both inexperienced and experienced neurologists make those kind of mistakes?
A. Well, some of the symptoms can be unusual and may not be picked up.
Q. And unusual in what sense?
A. They can be strange. They may not necessarily indicate a neurological disease like delusions. That may not be something that a neurologist necessarily thinks of.
Q. Now, and it's also the case, when it talks about unusual

presentations, that we really don't at this point know every symptom of every neurological disorder; correct?

A. No. I don't think we ever will.

Q. And part of your work as a physician is hopefully to do studies, focus on certain areas and see if you can bring clarity to your narrow focus of inquiry in the research you've done?

A. Yes. So in the clinic we're taking what we know and trying to apply that to patients. In research, we're trying to generate new knowledge and understanding.

Q. It's true, is it not, that there are physicians, be it in neurology or psychiatry, who devote their entire careers, research careers and clinical careers, to one particular illness?

A. Yes, I'm sure there are neurologists that do that.

Q. I mean, in the psychiatric field, you know of experts who do nothing but research schizophrenia; correct?

A. Yes. Behavioral neurology and neuropsychiatry is a little different in that respect in that it's essentially any neurological disease, what are those behavioral consequences and psychiatric symptoms.

Q. Let me ask you this: Is there a clear distinction as it applies to -- strike that. Are you familiar with the DSM-IV-TR -- DSM-V-TR?

A. Yes.

Q. Do you use that at all in your neurological practice?
A. Not typically.
Q. That's used by psychiatrists, both forensic and nonforensic, to diagnose psychiatric illnesses; correct?
A. I think it's used as a reference manual for that, yes.
Q. Okay. And it's not used by neurologists to diagnose neurological disorders; correct?
A. It would depend. Many neurological diseases would not be in the DSM.
Q. Is there a comparable manual in neurology that lists the criteria to diagnose somebody that you go to and say, does this person meet the criteria?
A. I don't think there is a single reference for that.
Q. And so that's unlike psychiatry; correct?
A. I also think that there are probably diagnostic criteria from other sources besides the DSM that are used by some psychiatrists.
Q. So is it your testimony that in your daily practice -- and we'll get to what that constitutes in a minute -- that you do not use what the prosecution referred to as the bible in the psychiatric diagnosis, which is the DSM?
A. Typically I don't, no.
Q. Are you familiar with the definitions that are in that publication?
A. Some of them, yes.

Q. Which ones?
A. There are definitions related to neurocognitive disorders which overlaps with some of the ways that we describe these diseases in terms of dementia. There were references made throughout the trial to DSM definitions of delusions, of schizophrenia. So I'm aware of many of those. I would not be able to recite them in detail right now.
Q. You wouldn't be able to recite the details of those definitions?
A. No.
Q. And that's because you simply don't use it in your field; correct?
A. Typically my diagnoses and evaluations are not using the DSM.
Q. When you were giving the jury opinions that Mr. Bowers did not suffer from a delusional disorder, what definitions were you using of the word "delusion"?
A. So "delusion" the way I define it is that it is a fixed false belief in that it is generated by a neurological or psychiatric disease. So it's not a learned belief. It's something that is generated by that disease. And that there is this personal salience or aspect to it.
Q. That there is a --
A. A personal salience.
Q. And I want to make sure I understand. Personal salience

meaning that the idea is important to the person who holds the idea? Is that what you mean by that?

A. Meaning it's related to that person's experiences in the world so that they are perceiving something that is personally meaningful to them in that belief.

Q. Personally meaningful to them. And where does that definition come from?

A. That is the definition that I use.

Q. Right. And my question is, where did you get that definition?

A. That's the definition that I use when evaluating patients and in my research. I do not believe it is from a single source.

Q. And is that common in medicine for each physician to kind of define what the disorder is according to their own personal definitions and then decide whether the person has that disorder or not?

A. I think it's based on a number of different sources. And I think it's largely consistent with what was reported from the DSM definition.

Q. When you say it's based on a number of sources, can you give me one source that you're aware of that advances that personal definition of "delusion" which you adhere to?

A. Yes. I don't know the exact name of the source, but in some of the papers I've written looking at conceptualizations

of delusion formation from Cognitive Neuropsychiatry Journal. I just don't remember the exact name of the article.
Q. Well, you're a researcher; right?
A. Yes.
Q. So would you consider yourself to have a pretty good handle on the literature that's out there?
A. Yes.
Q. On your field?
A. I read many papers.
Q. You said you review journals; correct?
A. Yes.
Q. So do you know the literature well enough to be able to cite to me a single source for the definition that you advanced here as to what delusion is?
A. It would probably be a version of the definition I've used in some of my papers.
Q. And which paper sets forth that definition, in your own words?
A. I guess I'm thinking of the papers that I wrote on Capgras delusion where it was -- it was a personally salient family member, so someone that that person knew and compared it to areas of the brain that were involved in personal familiarity.
Q. I assume you're familiar with your own literature; right?
A. Yes.
Q. Which publication are you referring to?

A. That is "Finding the Imposter."
Q. Let me, if I could --
(Pause.) Let me approach, Doctor. Let me hand you a binder with your articles in it -- not all of them, but the ones we're concerned about here, and hopefully the one you're referring to is in there. There is an index at the front.
If you could just take a minute and locate for me the article you're talking about.
(Witness reviews document.)
A. "Finding the imposter: Brain connectivity of lesions causing delusional misidentifications."
Q. And what year was that written?
A. 2017.
Q. I think that is Tab 29; right?
THE COURT: Mr. Burt, I just ask you to make sure you lean into the microphone.
MR. BURT: Yes. Thank you.
BY MR. BURT:
Q. That's, I think, under Tab 29. Do you have that there?
A. Yes.
Q. The title of that paper is "Finding the Imposter: Brain connectivity to lesions causing" --
THE COURT: You are, but your microphone may be off.
MR. BURT: It is. Apologies.
BY MR. BURT:

Q. The title of that paper is "Finding the imposter: Brain connectivity of lesions causing delusional misidentifications." Is that the paper you were referring to?
A. Yes.
Q. What is a delusional misidentification?
A. So it's delusions like Capgras, which I had mentioned. It also includes delusions where that may happen from one's home, thinking tat it's a replica home. So it's a class of delusions where something that is personally familiar feels unfamiliar or something that is not personally familiar feels personally familiar.
Q. And how is that type of delusion categorized in the DSM-V-TR?
A. I don't know if it is.
Q. Are there many different kinds of delusions?
A. Yes.
Q. And in your research, have you found that each delusion may have a separate location of where the brain disorder may be the source of the problem?
A. Well, it's actually more complicated than that.
Q. I'm sure it is.
A. There's probably one type of localization that's common, and then there is an idea that there is a difference between the different contents of the delusions that may explain why that particular delusion arises and not a different one.

Q. So you say in this article, "Delusional misidentification syndromes are among the most striking and least understood syndromes encountered in neurology and psychiatry"; correct?
A. Is this in the --
Q. In the introduction to the article.
A. Yes.
Q. And so I guess my question is, where in this article do you set forth the definition of what a delusion is?
A. I don't. What I'm referring to is on page 500 where we're linking up the delusional content. To do that, we looked at fMRI studies where we thought the brain activity in those studies was related to the content of the delusion, and the way we define that was the term "personal" or "personally" and then "familiar."
Q. And where are you referencing?
A. That's page 500.
Q. Okay. Direct me to the sentence that you're referring to.
A. It says, "Familiarity ALE meta analysis." Then the sentence is "We searched PubMed for the terms 'personal' or 'personally familiar' and 'functional MRI,' including studies of personally familiar stimuli, faces, names, voices, places, objects, when compared with unfamiliar stimuli."
Q. What has that got to do with the definition of delusion?
A. That was what our hypothesis was for the content of this delusion, that it involved personally familiar areas of the

brain that are involved in determining what was personally familiar or not.

Q. But that has nothing to do with defining what a delusion is, does it? It's got to do with the focus of your particular interest here, which is delusional misidentification?

A. So for this delusion, our hypothesis was that the delusion resulted because there was abnormalities in belief evaluation and that the specific content of that delusion was related to an abnormality in processing personally familiar stimuli.

Q. When you write one of these research articles, isn't it common to set forth what it is you're looking for and then define what that condition means?

A. I mean, in general you want to give the audience reading the paper an idea of what the topic is.

Q. Right. And when you're making a diagnosis, you have to have the definition of what it is you're diagnosing; right? If you're making an opinion that somebody is or is not delusional, you have to have some working definition of what "delusional" means; right?

A. Yes. Those are some of the features that I mentioned.

Q. And so my question is, where in your writing or anywhere else is there set forth the definition that you used in this case to conclude that Mr. Bowers does not have a delusional disorder?

A. I don't know if I outline a specific definition of

"delusion" in this paper. Is that what you're asking?
Q. Well, you directed me to this paper. I think we've now established there is no definition of "delusion" in the paper.
So the follow-up question would be where else, if it exists, is your definition of "delusion" set forth in a paper that other scientists can look at and then decide whether that's an appropriate definition?
A. So in my mind, the paper is framed around understanding this delusion, and the way that we're saying we're understanding this is a problem in belief evaluation and a problem in personally familiar stimuli.
Q. So the sentence you reference was "We searched PubMed for the terms 'personal' or 'personally familiar' and 'functional MRI,' including studies where personally familiar stimuli, faces, names, voice, places, objects were compared with unfamiliar stimuli"; right? You're saying that's the sentence that gives content to your definition of "delusions" in this case?
A. Yes. It points to the personal aspect of those delusional beliefs.
Q. Points to the personal aspect of that particular delusion you were studying; right?
A. Yes.
Q. But one of the things you found out when you studied this particular delusional belief system was that the personally

familiar that was somehow relevant to this delusion was not relevant for other delusions; isn't that true?
A. Correct. It did not have to do with familiarity for those other delusions.
Q. So from that, can we draw the conclusion that in order to have some knowledge of a particular delusional belief, you actually have to look at each delusion? You can't generalize from a delusion about misidentification that the same results are going to follow from, say, a nihilistic delusion?
A. There are certainly differences in other types of delusions.
Q. And so your answer to my question is, yes, we cannot generalize from one delusion to another?
A. Well, I think that you can, but not everything. So there are some features that are common to all types of delusions and some that are specific to that specific delusion.
Q. And as I understood your testimony when I questioned you before, you have never written about persecutory delusions; correct?
A. No.
Q. You've never written about nihilistic delusions?
A. No.
Q. What is a nihilistic delusion?
A. It is a delusion about destruction.
Q. And that type of delusion has nothing to do with whether

it's salient to the person that's holding the view; right?
A. I imagine that it has to do with the destruction either of themselves or the world around them.
Q. Well, when you say you imagine, you're, as I understood your testimony, holding yourself out as an expert in delusions. Are you holding yourself out as an expert in all delusions or just the ones you've studied?
A. I'm someone that evaluates delusions in neurological patients.
Q. Let's talk about what your actual experience is. When you left medical school, you eventually did -- was it a two-year program in neurology at the hospital in Boston?
A. So I did a one-year medicine internship and then a three-year neurology residency program.
Q. And during that time period, you were in the same status as you were in medical school in the sense that you weren't permitted to render diagnoses on neurological patients, correct, yourself?
A. No. It's not the same as in medical school. Typically, you're beginning to work up. You're ordering tests and medications. And it's at certain times that there is supervision. But, for instance, you're considered to have a medical license at that point. And so it is supervised, but the level of responsibility is higher.
Q. Higher, but you're still being supervised by a

neurologist, someone who has gone through the process, gotten their degree in medicine, gone through the fellowship process and has substantial experience in rendering diagnoses; correct?

A. But it's someone that's completed a neurology residency, yes.

Q. And you're working under that person?

A. Yes.

Q. Now, when you left that program, you went directly to Vanderbilt University, and you were hired on as a teacher?

A. No. So I did a fellowship in behavioral neurology and neuropsychiatry for two years. And after that, I went to Vanderbilt where I was hired by Vanderbilt University Medical Center where I see patients as an attending neurologist and then also perform research and have some teaching duties as well.

Q. And before you transferred to Vanderbilt, your work was research-based; correct?

A. It was research and clinic. So I saw patients in clinic and then also performed research.

Q. And you were working with a guy named Michael Fox doing the same kind of work you eventually do now, right, in term of research?

A. Yes. So much of my research was with Mike Fox.

Q. And then when you came to Vanderbilt, you had, as I

understand it, a combined teaching, research and clinical focus; right?

A. Yes. Very common for people working in academic medical centers to participate in each of those activities.

Q. And just so we're clear on the nature of that clinical experience, you spent only about 20 percent of your time doing clinical work at your clinic there at Vanderbilt; correct?

A. Yes. 25 percent of my time is in clinic and about 75 percent of my time is doing clinical research. That also includes patient evaluations, but in the research setting.

Q. I think you testified in past cases that about ten percent of your work is doing work for prosecutors and other people that hire you in the forensic context; correct?

A. You mean of my overall time?

Q. Yes. How much of your --

A. I would say somewhere between ten and 20 percent of my time is spent doing forensic cases for the prosecution or defense.

Q. Okay. And from the cases we reviewed when I questioned you before, is it true that you've never been asked in any case, except for this one, to do the kind of evaluation and render the kind of opinions that you're rendering here in the sense of opinions about what someone's mental state was at the time of the crime? You've never been asked to do that, have you?

A. I have.
Q. And when is that?
A. In terms of -- well, there are other cases I've been retained where I have done that. And then the case in Mississippi, I was asked to discuss with the patient the mental status at the time of the crime.
Q. That is the -- and was that based on the examination of the client, or was it based on a review of records?
A. It was an interview. It did not include an examination, but it did include an interview of the defendant.
Q. Right. But it didn't include an examination, what do you mean by that?
A. So the interview was done remotely.
Q. The interview with the client?
A. Yes.
Q. Okay. And what you were testifying to in that case was that there was a -- the issue was dementia; correct?
A. No. The issue was sleep behavior, so whether the defendant was sleepwalking at the time of the crime.
Q. And did you render an opinion in that case that, as a result of your analysis, the client did or did not have the capability to form certain intents at the time of the crime?
A. I don't know if the word "intent" was used, but it was related to whether he was in control of his actions or whether he was actually asleep.

Q. Whether he was in control of his actions or whether he was asleep?
A. Yes.
Q. So you never rendered opinions in that case about the person's mental state at the time of the crime; right?
A. Well, it was related to his mental states, how he described the dream he said that he was in when he carried out the attack.
Q. And that was the extent of your involvement?
A. Yes. I had reviewed records in addition to that.
Q. And what other cases have you rendered opinions about someone's mental state at the time of the offense?
A. I'm not sure if any of the other cases -- I mean, the DUI, I guess, in some ways his mental state at the time of the crime were when he was apprehended and they did the testing.
Q. In a drunk driving case?
A. Yes.
Q. But you weren't in a drunk driving case talking about looking at the facts of the crime and then saying, well, based on my experience, it's my opinion the defendant did or did not have a mental state?
A. Correct.
Q. You've never been asked to do that, other than to the extent you may have said something about that in this Mississippi case; right?

A. Yes.
Q. Okay. So ten percent forensic cases, 20 percent clinical cases, and then the 70 or so percent of your work is doing research; right?
A. Yes.
Q. And in the 20 percent clinical cases you do, how many patients do you see a month, generally?
A. I probably see about five to ten patients a week in clinic and an additional three in the research setting. So that would be on the order of 25 to 50 patients a month.
Q. And you said that these patients are referred by other doctors from within the university system, or is that other doctors in the community? I wasn't clear on how you actually get your patients.
A. It's both. So it may be other neurologists or psychiatrists at Vanderbilt. It could be outside of Vanderbilt.
For our research studies, there are sometimes patients that aren't our patients that might be referred for the research study itself that we would review.
Q. Do you actually -- sometimes you see in the newspaper people advertising, be a part of a research project. Do you do that kind of recruitment to get your patient population?
A. No, we don't.
Q. So these are generally people that come to you from

another doctor who has already made the determination that there is some neurological problem?

A. No. So usually they're being referred because they have a question. So they think it could be a frontotemporal disorder, they think it could be schizophrenia, but there's something unusual about it that they want us to evaluate further.

Q. Wait a minute. Your clinic is frontotemporal dementia; right?

A. Correct.

Q. So you just mentioned schizophrenia. It would be incorrect to say that people refer schizophrenia cases to you for evaluation? That would be misleading, wouldn't it?

A. It would not be for evaluation of schizophrenia. It would be to evaluate whether there was a neurological cause for the symptoms that could overlap with schizophrenia.

Q. And based on what you know about schizophrenia -- and I think you said you're not an expert in this area -- is there a clear-cut distinction between neurological disorders and psychiatric disorders such as schizophrenia?

A. So yes and no. So the field of neuropsychiatry, we think of that overlap between neurology and psychiatry. Now, there are specific diseases that we would say are not schizophrenia that can cause some of those symptoms. I'm not sure if that fully answers your question. But, for instance, if there is a

brain tumor that's causing those psychotic symptoms, we would typically not call that schizophrenia.

Q. Are you familiar enough with the schizophrenia literature to be able to render an opinion as to whether schizophrenia is a brain-based disorder as opposed to a nonorganic disorder?

A. So we don't typically use the term "nonorganic." So within neuropsychiatry, the common belief is that every psychiatric disease has a basis in the brain.

Q. You heard Dr. Bigler talk about that yesterday; right?

A. Yes, I believe he did.

Q. You agree with his testimony, the quote from Dr. Geschwind, every -- I forget it -- something along the lines of every action has -- every behavior has an anatomy. Do you remember that testimony?

A. I do. I mean, I think all of our actions and behaviors are related to the brain, yes.

Q. So you agree with Dr. Bigler on that point?

A. Yes. Every normal and abnormal action or behavior is related to the brain.

Q. Let me ask you about your role in this case. If I could, I would like to refer back to the guide that your profession has for expert testimony. That was 178. Let me put that up there in front of you so you have it. (Pause.)

Doctor, let me, if I could, approach you and give you this publication that we talked about.

A. (Reviewing document.)
Q. 178 is the "American Academy of Neurology Qualifications and Guidelines for the Physician Expert Witness"; right?
A. Yes.
Q. And could you open that up, please, at the third page of the exhibit, and highlight A under No. 3, "Guidelines for the conduct."
Is one of the standards of your profession is governed by this one, which says "A medical expert should strive to provide testimony that is accurate, impartial and relevant with respect to disputed medical facts or issues. The expert should avoid the role of advocate for the party on whose behalf the expert is providing testimony"?
A. Yes.
Q. Do you adhere to that standard?
A. Yes.
Q. Are you appearing in this case as an advocate for the government or as an impartial expert?
A. As an impartial expert.
Q. Have you been present during the entire course of this phase of the trial?
A. I believe I've been present for all of the expert testimony.
Q. And you've been seated over behind the prosecution table; correct?

A. Yes.
Q. With Dr. Dietz?
A. Yes.
Q. And Dr. Martell?
A. Yes.
Q. Is Dr. Dietz present in court right now?
A. He is.
Q. Could you identify him for us, please?
A. He's right over there (indicating).
Q. Indicating the gentleman smiling, raising his hand. Thank you.
How about Dr. Martell; is he present in court?
A. He is not here.
Q. Now, how did you get involved in this case?
A. So Dr. Dietz contacted me about the case to ask if I would be interested in doing an evaluation.
Q. Okay. And from your direct testimony, you -- correct me if I'm wrong -- made it sound like Dr. Dietz was just some sort of source of referrals to you, and you had other ways that you were getting involved in forensic cases; right?
A. Yes. I have cases that don't come through him.
Q. Okay. But truth be told, you actually advertise on Dr. Dietz's website as being somebody who is part of his group; isn't that true?
A. I don't know if I'm on his website, actually.

Q. Let's take a look at it.
A. It's certainly possible.
Q. Are you saying that you're not aware that --
MR. BURT: Your Honor, I would introduce into evidence or seek to introduce into evidence Defendant's Exhibit 166, which is a portion of Dr. Dietz's website listing Dr. Darby as an expert in his group.
THE COURT: Is there any objection?
MR. OLSHAN: I have seen it and I have no objection.
THE COURT: Defense 166 is admitted.
BY MR. BURT:
Q. Could we bring that up, please. Your resume has a caption on it, "Park Dietz & Associates"; right?
A. Yes. I think the resume that was provided was my resume on the PDA letterhead.
Q. PDA letterhead. And what is PDA? What does that stand for?
A. Park Dietz & Associates, I believe.
Q. And Park Dietz & Associates is a group run by Dr. Dietz; correct?
A. I believe that's the name of his business.
Q. And in this business, he holds out and advertises a group of people in various fields who are available for hire to testify; correct?
A. I believe that, yes. I haven't seen his website.

Q. And this is a portion of his website, if we can blow up the list there of who's -- first of all, the top of the list where the first two paragraphs are, including the header, the PDA down in the first two paragraphs.

So PDA, Park Dietz & Associates. And it says, "Attorneys seeking an expert for a particular case are encouraged to call a number for a free consultation about the issues in the case and the experts who might best address those issues. If you already know the name of a particular PD&A expert suitable for your case, click on the expert's name below to send an email. Don't reveal any privileged information."

And then if you would back out of that, and go down to the list of experts in Park Dietz & Associates.

And is it true, Doctor, that under forensic neurology, you are listed there as being one of the people that are available for hire through Park Dietz & Associates?

A. Yes.

Q. Now, who decided what category you were listed in terms of your expertise? Was that Dr. Dietz's determination or yours?

A. I guess it was his.

Q. And he does not list you as a forensic psychiatry expert, but as a forensic neurology expert; correct?

A. Correct.

Q. He doesn't list you as a behavioral expert, a neurological behavioral expert, does he?

A. It doesn't look like he has a category for that.
Q. And he doesn't list you as a neuropsychiatrist; correct?
A. Again, he does not have a category for that.
Q. There is another person on the list under forensic psychiatry about six down, Connor Darby, M.D.
A. Yes.
Q. That's your kid brother; right?
A. Yes. He's the program fellowship director at UCLA's forensic psychiatry program.
Q. He's your younger brother?
A. Yes.
Q. How did you get on this list in terms of when did you become associated with PD&A?
A. So I believe my brother knew Dr. Dietz and told him about my interest in these types of issues and my clinical and research work and put us in contact. Then we talked, and that's how I met Park, Dr. Dietz, and got associated with this.
Q. And what year was that that you first became connected with PD&A?
A. That, I'm not 100 percent sure. It may have been 2018. I'm not 100 percent sure.
Q. So how many cases have you worked with the Park Dietz & Associates group?
A. Again, I'm not sure on the exact number. Maybe ten.

Q. Ten cases. And how does the -- how do the finances work? Who pays you? What percentage of -- is there some sort of fee arrangement between Park Dietz & Associates and what you get paid?
A. So I basically provide my hourly rate to PDA and that's the agreement. And then I submit the hours that I work to them, and then they pay me those hours.
Q. And do they get some sort of percentage for you being part of the group?
A. I imagine they do, yes.
Q. Do you know -- when you say you imagine, you don't know what that percentage is?
A. I don't know what the exact number is.
Q. So what is the rate that you're currently charging in this case?
A. $350 an hour.
Q. And how many hours have you put into the case up to this point?
A. I think it was about 150 hours.
Q. Okay. And so you're saying that -- what was the rate again?
A. 350.
Q. 350. And then a certain percentage of that goes to Park Dietz & Associates?
A. No. That's my rate. So that's what I receive. I don't

know what rate he -- the business receives on top of that.
Q. And that's something you've never asked about in terms of what percentage they're going to take from your earnings?
A. Well, they don't take anything from my earnings. I have an agreement on this rate. And then if they get more than that, then that would be what they would keep.
Q. So you wouldn't be able to tell me what that rate is; correct?
A. Not with 100 percent certainty, no.
Q. Well, how about with reasonable certainty?
A. It may differ in every case. I think it was -- in one case, it came out that it was 50 percent extra on top of that. But I'm not sure if that's the rate for this case.
Q. 50 percent going to them?
A. Yes.
Q. And does that mean you're only making 150 an hour or how does that work?
A. No. So I receive 350 an hour, and that's my rate.
Q. And they get 50 percent of what?
A. They may take an additional amount on top of that. Again, I don't know the exact number.
Q. You testified on direct examination that it's very common for experts to share their reports with each other in the process of formulating their opinions; correct?
A. Yes.

Q. And how many cases have you worked on with Park Dietz & Associates where you've adopted that particular method of reaching opinions?
A. Meaning how many times have I seen and evaluated reports from other experts?
Q. Yeah. And I'm just talking about the methodology here of -- in other words, as I understand it, one way of doing it would be you referred to something called blind reading by the EEG expert; right?
A. Yes.
Q. So blind in the sense of you don't have any information from anybody, and you're just going in and reading the scan?
A. Yes.
Q. And that same concept, blind reading, could apply to the kind of evaluation you do in the sense that you could go in on your own, make an evaluation, without any input from other experts and then come to an opinion?
A. Well, the opinions are always your own. So they're your opinions. But certainly you want the information that is available in any other report from experts. So every case I've been involved in where there is that report available, I've reviewed.
Q. Say that again.
A. That you would want as much information as possible when coming up with an opinion. And so if there was a report

available from another expert, then I would review that.
Q. And that would include not only other opinions, but draft opinions from people in your own group?
A. It would depend on where in the process it was. It could be a draft opinion if they weren't finalized. In some cases, there are opinions that are already finalized.
Q. But I think what you said to the jury was that as a matter of routine, that's typically the way you do it; right?
A. That if there is a draft or a finalized report that was available to review, yes, that would be something I would be interested in reviewing.
Q. Okay. Have you ever testified that your procedure is just the opposite, that you would not look at drafts?
A. I don't believe so. I have certainly had reports that have been done without looking at a draft.
Q. But have you ever made a point in front of a jury or anybody else in a courtroom that you don't look at drafts, you wouldn't do that?
A. In terms of saying that the draft wouldn't be as reliable as the final report?
Q. No. That you wouldn't do it at all. That that's not -- would not be part of your methodology?
A. To look at a draft report? I don't remember saying that.
Q. Okay. Now -- (Pause.) I think you told us earlier that you testified in two competency cases in federal court. One

in Texas and one in California; right?
A. Yes.
Q. And were either of those cases involving a situation where you were working with Dr. Dietz and other experts?
A. Yes.
Q. Including Dr. Martell, whose name has been mentioned here?
A. No. I don't believe that I've worked with Dr. Martell in a competency case.
Q. You worked with him on this case, though; right?
A. Yes.
Q. And he was here last week sitting in the front row behind the prosecution with you and Dr. Dietz and Dr. Mayberg?
A. Yes.
Q. Is he present in court today?
A. He is not.
Q. Why were you seated in court? What was the purpose of that?
A. To listen to the testimony of other experts.
Q. And why did you need to be in court to listen to the testimony of other experts?
A. So my understanding of the role is to respond to the testimony of the other experts as part of that.
Q. Did that involve passing notes up to the prosecution of how they should cross-examine experts that you were listening to from the other side?

A. Yes. If there were questions about the testimony that I could help answer, I did.
Q. So in that role, you were, would you say, being an advocate for the government?
A. I was providing information. So if they asked me my opinion about a certain piece of testimony, then, yes, I would communicate that.
Q. And you were doing that to help the government, who hired you on this case, to assist them; right?
A. I'm giving them my analysis and interpretation of evidence that's being presented.
Q. And you thought that was consistent with that guideline I read to you about not being an advocate, sitting right behind counsel table and passing notes up to the government about how they should cross-examine witnesses?
A. Yes. If they asked me if something was correct, I would say yes or no, I disagree.
Q. You have no legal training; correct?
A. Correct.
Q. Have you ever cross-examined a witness?
A. No, I have not.
Q. But you were offering specific questions to the government to ask experts in your role as an impartial expert seated behind the government?
A. So they were asking me questions about the testimony, and

I was giving my response based on my understanding of neurology.
Q. You were informed before you came here and sat in court that the court reporters were producing a daily transcript that was available to you to review; correct?
A. I received a daily transcript after that. I don't know if I was informed about that beforehand. But I was asked to be present for the testimony.
Q. If you needed to know what the content of the testimony was, you could have read those transcripts, found out from the transcripts; right?
A. Yes. If there were transcripts available, I could have read them.
Q. You didn't need to be seated in court behind the prosecution in order to be apprised of what was being said by the experts; right?
A. I was asked to be present.
Q. Did you indicate that's not really a good idea because it would make it look like I was an advocate for the government?
A. I'm not sure what -- whether or not it looks like something was what I would have considered. I was observing the testimony. If they asked me questions about the neurological issues that were discussed, then I would provide responses.
Q. Okay. When you wrote your report in this case, as I

understood your direct testimony, you were taking handwritten notes; correct?

A. No.

Q. That's not correct? You didn't say, "I was writing things down"?

A. I was typing.

Q. Typing. So if you said on direct examination you were writing things down, that would be incorrect?

A. If I said writing -- if I said I was handwriting, that would be incorrect. If I said I was writing in a computer or typing, that's what I did.

Q. So let me see if I've got this right. You're seated in a jail somewhere with Mr. Bowers; correct?

A. Yes.

Q. It's just you and him in the room?

A. Correct.

Q. You've got a laptop with you?

A. Yes.

Q. And you're directing the conversation in the sense of he's answering your questions?

A. Yes.

Q. He's being very cooperative with you?

A. Yes.

Q. And you spent three hours and ten minutes total with him; correct?

A. Yes.
Q. A certain portion of that time was administering some, what are called preliminary screening tests?
A. It was administering the MOCA test and there was a Frontal Assessment Battery that had a form that I filled out.
Q. And is it true that those were what are called screening tests?
A. Those are, I would call them bedside tests. So they're tests that we use as neurologists in the clinic as part of our examination that are standardized.
Q. And that's routine to give those kind of screening tests; correct?
A. Yes.
Q. Dr. Nadkarni gave them. You gave them. That was --
A. Dr. Nadkarni gave the MOCA. I don't believe he gave the Frontal Assessment Battery. But it was the same MOCA test that we give.
Q. And what is the difference between what the MOCA test and what the -- your other screening tests were?
A. The Frontal Assessment Battery more specifically looks at frontal lobe signs on examination.
Q. And those are screening in the sense that they're very rough instruments. It's not going to pick up things that other examination techniques are going to pick up; right?
A. Certainly for some of them. So we ask about five words to

remember. Some of the neuropsychology tests would have 16 words. And so there is a difference in sensitivity.
Q. If there wasn't, you wouldn't go on. You would have everything you needed just from doing those tests; right?
A. Correct. There are differences in the neuropsychology tests.
Q. And in your clinical workups, in this 20 percent of the work that you do in the clinic, you have a standard routine that you go through when you evaluate patients; right?
A. Yes.
Q. And those patients are referred to you because you're running a dementia clinic; correct?
A. Yes. So some of them are referred for the question of frontotemporal dementia. That's the most common reason. Other times there are other diseases that overlap with the frontotemporal dementia symptoms as well. And then --
Q. Go ahead.
A. Sometimes there are other types of dementia patients; Alzheimer's, Parkinson's, Lewy body.
Q. But the vast number of patients that you see in this clinic are frontal dementia -- frontotemporal dementia patients?
A. That is the focus.
Q. And for those patients, they are, by definition, people that you're concerned have some sort of neurological disorder?

A. Based on the diagnosis, yes. So they're coming to me for evaluation. If I think that that diagnosis is correct, that means I think that they have the neurological disorder frontotemporal dementia.
Q. And you have a standard workup that you do; right?
A. Yes.
Q. It involves the screening test; correct?
A. Yes. The examination, which includes those tests.
Q. The neurological examination; correct?
A. Correct.
Q. Does it in every case involve neuropsychological testing?
A. Not in every case. But we certainly will refer for neuropsychological testing in many cases.
Q. And who do you refer that to?
A. A neuropsychologist.
Q. And is it also part of the standard workup that you do MRI?
A. Typically, if we're evaluating for frontotemporal dementia or if we think there could be a brain injury associated, we would typically get an MRI.
Q. And how about PET; is that part of the standard workup?
A. Yes.
Q. And when you order an MRI, who does that work?
A. So the MRI is done by -- it goes through the ordering system. It's scheduled. The MRI technician runs the scan.

It's interpreted by the neuroradiologist and then the scans are available for me to interpret as well.
Q. Is your clinic connected with a hospital at Vanderbilt? Is there a medical center there?
A. So it is Vanderbilt University Medical Center. So technically the university and the medical center are different business entities.
Q. But are they governed by the same rules, hospital rules?
A. So Vanderbilt University Medical Center is the hospital. Vanderbilt University is the university. So there is not patient care at the university side.
Q. Is it true that in a hospital setting, a neurologist cannot do an MRI himself or herself? It has to be done through a radiologist and they have to render an opinion?
A. Yes and no. So for billing purposes, the read of any scan is done by radiology.
Now, we do scans on the research side that does not involve radiology. And as a neurologist as part of our clinical note, we would talk about our review and interpretation of any of the tests, including MRI.
Q. By the way, in your research practice, the technique you use, correct me if I'm wrong, is not the same kind of MRI that was done at U Pitt; correct?
A. No. So on the research side, we do many different types of scans. So some of them overlap with the scans we get in

clinic. That includes the structural or the T1 scan, the T2 scan or the FLAIR scan where we see those bright spots. But we also do additional scanning using Resting-State Functional Connectivity, fMRI. And so it's a combination of scans that we use. Same as the ones in the clinic and some that are different.

Q. All of your studies refer to fMRI; right?

A. Yes. And all of them or I think the majority of them also refer to structural brain imaging, whether that's identifying brain lesions or using the T1-weighted images, which are the ones where they're talking about how big the areas are and measuring that in a quantitative way.

Q. And is it true that you, in your work, your research work, you are looking at certain groups and then comparing the fMRI results from that group to a database?

A. No, not entirely. So we -- again, there is many different types of imaging approaches. Some of the time we use just the fMRI signal. Much of what we do takes the actual structural size areas we have said have atrophy or brain damage and then uses the functional connectivity in addition to that. So it's a combination of those things.

Q. And fMRI, the output on that is much different than the kind of MRI test that the jury has seen in this case; right?

A. Correct. So we have seen the other sequences that we use, which are the structural sequences.

Q. And that's a lot of your work in the research end of things is involved in running fMRIs and looking at the results of those scans; correct?
A. I would say it's both. I mean, every -- every patient that we see gets a structural MRI to figure out which areas of the brain have atrophy or smaller. We do a similar type of approach. We have an algorithm to figure out the size of those areas.
Q. So you do, in some case -- it sounds like a lot of cases -- neuropsych testing. You do an MRI. You do a PET. And what else do you do? I think you mentioned blood tests?
A. Yes.
Q. And, in addition, you have recommended to other people that -- other students, that they also do genetic testing; correct?
A. In some cases. So in frontotemporal dementia, there is a higher incidence of genetic forms. So about ten percent of the cases or so have what's called autosomal dominance mutation, meaning if a parent has it and you get that, you have a 50 percent chance of developing the disease. So it is something we consider in those patients.
Q. Just in terms of what some of this looks like, I'm going to hand you Exhibit 172. Do you recognize that?
A. This looks to be slides from a presentation that I've given.

Q. Right. It's entitled "Frontotemporal Dementia FTD"; correct?
A. Yes.
Q. You were giving this talk to medical students?
A. This, I believe, is a talk that I gave to the Department of Geriatric Medicine.
Q. Okay. Is the talk basically here's the --
A. I could be wrong. It looks like there is a video. I believe that's what this is.
Q. Is the talk basically here's the standard of practice in our lab?
A. It is a discussion of frontotemporal dementia and clinical features in evaluation, yes.
MR. BURT: I move that into evidence, Your Honor.
THE COURT: Without objection?
MR. OLSHAN: That's fine. No objection.
THE COURT: It is admitted. That's Defense Exhibit 172.
MR. BURT: Thank you.
BY MR. BURT:
Q. Could you bring that up, please, and go to page 13. On this slide, are you demonstrating for your audience what an MRI scan looks like and what a PET scan looks like?
A. Yes.
Q. And then would you go to page 15, please. This says

"perirolandic atrophy," and it looks like a different kind of scanning. Could you explain what we're seeing here?
A. Yes. So this is a group level finding. So it's not a single patient. It's a comparison of groups of patients, in this case with corticobasal syndrome. And so this is looking at areas of the brain and that particular disease that are associated with corticobasal syndrome in terms of brain atrophy.
Q. And could you go to Exhibit number -- or Page No. 25, please. Does this slide indicate what you're telling the audience about what the workup involves in your patients?
A. Yes.
Q. So you indicate here thin T1 slices, FLAIR, SWIGRE, possible quantitative MRI (NeuroQuant) to look at frontal lobe volume percentiles?
A. Yes.
Q. And you indicate FDG PET scan if MRI unclear. Reason is to differentiate FTD versus AD. And you say you can ask the radiologist for quantitative analysis in unclear cases. That's your recommendation; right?
A. Yes.
Q. And that was essentially what was done by the defense experts in this case; right? They did an MRI. They used NeuroQuant. They did a quantitative PET.
A. They did all of those things, yes. The reason was not to

differentiate FTD versus AD, but --
Q. Understood. We're talking about -- we're not talking about FTD in this case, but what you were trying to assess in your FTD patients is do they have underlying neuroimaging findings?
A. Yes. So if I had a patient where I was concerned that they had FTD and the FTD PET was unclear from my visual read, those are the times that I would consider getting the quantitative.
Q. And I think from this -- and I think you've testified to this -- you've used NeuroQuant in your patient workups; correct?
A. Yes. We no longer do that at Vanderbilt, but I have in the past.
Q. And you also use neuroMIM; correct? MIMneuro?
A. Yes. I've used MIMneuro in the past.
Q. In fact, in one of your forensic cases, I think in the Brockman case that we talked about, the competency case, you recommended in that case that an independent PET expert do a PET analysis using MIMneuro; correct?
A. Yes. To look for evidence of dementia.
Q. And you used that as a basis for your opinion in that case?
A. Yes. It was related to my visual interpretation, but yes, we obtained that.

Q. So is it true, then, based on what you recommend in your cases, that you really have no quarrel with the methods that were used by the defense in this case in terms of the kind of MRI analysis that they did and the quantitative PET analysis?
A. I do quantitative analysis in other cases. I think in this case, the FTD PET quantitative analysis, because the age didn't line up with the control group ages and because it was lower to a smaller subset, I did have concerns about that.
Q. Because the age didn't line up with the normative database?
A. Yes, that was part of it.
Q. Okay. Do you have that literature binder in front of you there?
A. It should be -- the Darby articles?
Q. Yes.

THE COURT: Mr. Burt, while he's pulling that up, I'm just going to point out the time. You can continue until whatever is a good time to break.

MR. BURT: While he's doing that, it would be a good time to break.

THE COURT: We'll break for 10 or 15 minutes. When the jury is ready between 10 and 15 minutes, we'll reconvene.

(Short recess taken.)

THE COURT: Welcome back. Please everyone have a seat.

Mr. Burt, you may proceed when ready.
MR. BURT: Thank you.
BY MR. BURT:
Q. Did you have a chance to look at Tab 14 of that literature?
A. Is this in the articles?
Q. Yes. The articles.
A. No. I can turn to that.
Q. If you would.
A. Yes.
Q. This is an article by you called "Network Localization of the Heterogeneous Neuroimaging Findings"?
A. Yes.
Q. And in this article, do you address the issue of what meaning there is for using a database that is not matched by age?
A. Can you rephrase that?
Q. Sure. This is a study where you were comparing people that you were studying to a database?
A. Oh, the fMRI database, the connectome?
Q. Right.
A. Yes.
Q. And we'll get to what the study means in a minute, but you have a section called "limitations" on page 77?
A. Yes.

Q. And you say in the right-hand column, second paragraph, "A second potential limitation is that we use a normative group to level connectome to determine network localization of neuroimaging findings." Do you see that?
A. Yes.
Q. What is the connectome?
A. So this is a way of understanding the wiring diagram of the brain. So rather than just looking at individual locations, you look at the connections between those areas. And by using a large data set of imaging data, we can get an estimate of what that wiring diagram looks like.
Q. And the wiring diagram, you were in court when Dr. Bigler was explaining, showed a picture of the wiring diagram?
A. I know he showed pictures of connections. I'm not sure what that data was based on, if it was this is resting-state connectivity. There's other types of ways to look at those connections using diffusion tensor imaging. Yes, I believe he was trying to highlight connections in the brain in some of his images.
Q. So is that the same thing you're talking about now, basically?
A. I don't remember exactly what technique, but the general idea is, yes, that there are connections in the brain between different areas that may be important in understanding symptoms.

Q. And, by the way, you found in your research work that you can have a lesion in the brain in a certain area that can cause damage in another part of the brain that is remote from where the lesion location is; correct?
A. That's one idea. Not exactly. So what we saw is that the symptom relates to where that lesion is connected, and it's either that that area then becomes damaged, that's one interpretation, or that there is some disconnection in information transferred to that area that leads to the symptom. But the idea is that the symptom could relate to that other area.
Q. And how do you know that? How do you show that when you have a lesion in one part of the brain, it can cause problems in another part that is remote from where the lesion location is?
A. So we're using a map of connections that we get from other subjects to give us an estimation of where that damaged location would be connected to.
Q. Okay. And you have a word for that, right, that I think you used in your lecture? It begins with a D. I can't recall.
A. There's two D words. There's disconnection and diaschisis.
Q. That's the one. What do those two terms refer to?
A. So diaschisis is the idea that if you have damage in one

location, that there is actually a dysfunction that develops in that connected area. So it doesn't act the right way.

Disconnection is that it's not that that area becomes dysfunctional but that the information doesn't get to it. So it can't process that information in the same way.

Q. And you talk in your lectures about three different approaches to brain lesions; right? There is the localization approach?

A. Yes.

Q. Then there is something called the disconnection approach?

A. Yes. Either of the terms, yes.

Q. And what is the disconnection approach as it relates to the lesion approach?

A. So it's that the connection of information, as I said, from one area to another is what is disrupted.

Q. Is what? I didn't get the last part.

A. Is what's disrupted.

Q. That there is some disconnection?

A. Yes. That the information cannot get from one point to another.

Q. And is a disconnection in white matter networks, what are called white matter networks?

A. It can be in a white matter tract or it can be in the cortical area that connects along that pathway.

Q. And these white matter hyperintensities that you agreed

that are on the MRI scan, is that a white matter defect?
A. That is in the white matter, yes.
Q. And those white matter hyperintensities are actually a lesion or defect in the brain; correct?
A. So in the case of vascular disease, yes. We think that there is some damage there that has happened.
Q. And when you say that Mr. Bowers has a vascular disease, would you define what vascular disease means?
A. Vascular disease, vascular just meaning the blood vessels. And what we're referring to is the very smallest blood vessels in the brain. And so there are certain risk factors that can lead to those areas hardening and not flowing as well. And those are the things we talked about like smoking, obesity, cholesterol, hypertension, diabetes.
Q. And when there are vascular problems, is it important for the brain to have correct blood flow?
A. Say that again?
Q. Is it important for the brain to have correct blood flow in order to operate properly?
A. Yes. You need blood flow to the brain.
Q. And a vascular disorder means that the blood flow is being impeded in some way?
A. Yes. So in vascular disease, we're talking about those smallest vessels. They're the end vessels at those specific locations. There is different types of vascular disease

referring to the carotids that supply the entire brain with blood flow, and that's not what we're talking about necessarily.

Q. Were you able to determine when Mr. Bowers first obtained this vascular disease?

A. In terms of the MRI scan, there was only a single MRI.

Q. No. But you gave the opinion that the white matter hyperintensities indicated a vascular disease. My question is, how long did he have this vascular disease?

A. You can't tell from the MRI. So you know he had risk factors for certain periods of time, and that risk over time leads to the risk for vascular disease.

Q. Okay. So there is no way to really pinpoint that just based on the MRI alone, in your opinion?

A. Correct.

Q. Now, in this article, you were looking -- you were identifying a limitation, which was that you used a normative group level connectome to determine network localization; right?

A. Yes.

Q. Then you said, "It is possible that results could be improved by using the connectome better matched to the disease, gender or average age of the patients that generated the original neuroimaging findings. That said, prior work from our group suggests that using age match or disease match

connectomes makes little difference with respect to network localization."

A. Yes.

Q. So you were studying what -- using a normative database that wasn't age matched, and you're trying to determine here does that make a difference, and your conclusion is it didn't make a difference?

A. We said that it was a limitation for our current study that we did not do that, but that in prior studies that had done that, they obtained similar results using this method.

Q. Using similar results and you determined that using age match controls didn't change the results at all?

A. We did not conclude that for our study. We said in prior studies, it did not change results, but in a limitation of our studies, that we had not done that.

Q. Right. But your bottom line was, that said, prior work from our group suggests that using age match or disease match connectomes makes little difference with respect to network localization, and you cite an article by Fox and two others.

A. Yes.

Q. So there were three studies there that made the same conclusion, that using age match controls didn't really change the results; correct?

A. Yes. In those studies they did not change the results.

Q. Now, do you have the testimony binder there in front of

you?

A. (Witness reviews document.) Yes.

Q. Could you turn to Tab No. 5, please. This is your testimony from the Brockman case in Texas.

A. Yes.

THE COURT: Mr. Burt, make sure your mic is on and you're leaning into it.

MR. BURT: Thank you.

BY MR. BURT:

Q. Would you turn to page 83 of your testimony there.

A. Yes.

Q. Do you see where it says, in regard to this case, you consulted with Dr. Maria Ponisio. So Dr. Ponisio is a nuclear radiologist. She assisted in evaluating the PET scans as well as doing quantitative analysis on those PET scans."

A. Yes.

Q. And in that case, you, instead of doing the PET analysis on your own, you referred it to somebody in nuclear medicine, Dr. Ponisio; right?

A. I had done the visual evaluation of the PET scan, and I referred to her for the quantitative analysis and she also completed a visual inspection of the PET scan.

Q. Okay. And then you're asked, "Question: So is it fair to say that the team worked collaboratively with each person bringing their respective expertise?"

And you said, "We did, yes. We discuss at the beginning the benefits and cons of working together versus entirely independently. The thought was that by sharing opinions and information, that would lead each of us to arrive at the most accurate determination."

Do you remember giving that answer?

A. Yes.

Q. And then you were asked, "I want to explore the limits of this collaboration. Did you read each other's reports before they were filed?"

You said, "No. I did not read any of the other reports before they were filed."

"Question: Did you share your reports or drafts of your report with any member of the prosecution team before it was filed?"

And you said, "I did not."

A. Yes.

Q. Now, I thought you had testified on direct that the standard of practice was that you always share reports with other experts working on your side of the case. Isn't that what you told the jury?

A. Well, it's to share information and opinions. And so it appears in this case that the drafts weren't shared before, but there was information and opinions that were shared.

Q. Right. And you're making the point here in front of the

jury that that was somehow important to the independence of your opinion because you did not share your opinions with other people; right? Isn't that the thrust of that?
A. I don't think I said that.
Q. "Did you read each other's reports before they were filed?"
"Answer: No, I did not read any of the other reports before they were filed."
A. Correct.
Q. Okay. You did give that testimony; right?
A. Yes.
Q. Now, I think you also said on direct examination that the gold standard for reading scans was the visual approach; correct?
A. So that is typically what is done is the visual approach.
Q. You identified it as the gold standard; right?
A. Yes.
Q. And that's what you did in this case; right? You didn't make any reference to the quantitative PET analysis. You just looked at it, eyeballed it and said, I don't think there is any problem here; right?
A. No. I made reference to the NeuroQuant report as well.
Q. But you did a visual inspection of the PET; right?
A. Yes, I did both.
Q. And you did a visual inspection of the MRI?

A. Yes.
Q. And your understanding was Dr. Mountz did a visual inspection of the PET; right?
A. Correct.
Q. And Dr. Mettenburg did a visual inspection only of the MRI?
A. Yes.
Q. Now, have you recommended, contrary to your testimony here today, about what the gold standard is, that visual inspection is not what should be done?
A. I have said that visual inspection may miss findings, yes.
Q. You said it may miss findings?
A. Yes. That there are other ways. I think the slide is that in certain cases, I would get quantitative imaging.
Q. And why would the visual inspection miss findings?
A. So if there are subtle findings, it's possible that they would come out on a quantitative analysis.
Q. That's why you do the quantitative analysis?
A. Yes. For cases where you're worried about a clinical problem and the imaging is unclear, then those are the cases that I would consider getting quantitative imaging.
Q. But your opinion in this case is based on your visual read of, first of all, the MRI; right?
A. Well, I also had the NeuroQuant report in this case. So it was also based on my review and evaluation of the

NeuroQuant report.
Q. And that included the asymmetry between the hippocampus; correct?
A. Yes. That was noted on the NeuroQuant report.
Q. And you listened to Dr. Solomon's testimony; right?
A. Yes.
Q. He's a neuroradiologist; correct?
A. He is.
Q. His expertise is in reading brain scans; right?
A. Yes.
Q. You heard him say that that hippocampus asymmetry, compared to what it should be, was many times out of line of what you would expect; correct?
A. Yes. It was the second percentile.
Q. Right. And you also said that you did a visual read of the PET?
A. Yes.
Q. Even though in this other case you referred the PET work out to another expert; right?
A. Well, as I said in that other case, I had done a visual inspection of the PET and later it was determined it would be helpful to have a quantitative analysis that she assisted with.
Q. Now, you said the only reason you do the quantitative analysis is because the visual may miss something?

A. Not just for missing something, but also to get a different way of analyzing it and looking at it.
Q. Okay. Would you take a look at Tab 2 of the literature binder there.
A. Yes.
Q. Do you recognize what that article is?
A. Yes.
Q. Is that a chapter from a book called Ethics and Clinical Neuroinnovation?
A. Yes.
Q. And is Chapter 10 called In the courts: Ethical and legal implications of emerging neuroscience technologies used for forensic purposes?
A. Yes.
Q. This book was published in 2023, this year; right?
A. I believe so.
Q. When in 2023 was it published?
A. I don't see on this page.
Q. Try page 2.
(Witness reviews document.)
A. I apologize. I don't see the date for when this was published. It says 2023.
Q. 2023. All right. And this is an article coauthored by you, your brother and a couple of other people; right?
A. Yes.

Q. Setting forth your views about ethics and about the standard of practice doing neuroscience evaluations in courts; right?
A. Well, certainly my views. I don't know if it's the standard of practice, but it was implications of emerging neuroscience technologies. So these would be emerging techniques.
Q. I'm sorry. Emerging techniques.
MR. BURT: All right. I've had that article marked as 171. I would move that into evidence.
THE COURT: Without objection, Defendant's Exhibit 171 is admitted.
BY MR. BURT:
Q. Can we bring that up, please. Would you go to page 180. Well, first of all, the second page. The next page. This is the chapter you and your brother and other authors wrote; right?
A. Yes.
Q. Now, would you go to page 180. Would you highlight the -- in the first paragraph beginning with the sentence which says "Other authors have noted." Here you're talking about functional MRI; correct?
A. This first part is talking about functional MRI.
Q. Right. That's not something that was used in this case; correct?

A. No.
Q. You know there's controversy about using that particular technique in court; right?
A. Yes.
Q. In terms of its reliability?
A. There can be, yes.
Q. So you say "Other authors have noted the limitations of a single subject functional MRI to uncover evidence of behavioral aberration. Despite these limitations, however, quantitative approaches to detect single subject neuroimaging abnormalities are advantageous over unaided clinical interpretation of images in forensic settings which is subject to observer bias. It has been shown that radiologists are more likely to detect a lesion if they have knowledge of a clinical abnormality. This would be expected to be a highly -- to be highly prevalent in a courtroom where expert testimony on imaging is required only after inappropriate behavior has occurred."
Did you write that?
A. I don't know if I wrote this, but it was part of the paper that I authored, yes.
Q. Well, when you sign on to a chapter like this, you're endorsing it as your own views; right?
A. Yes.
Q. Okay. So here you're talking about the value of

quantitative approaches over unaided clinical interpretation, which is subject to observer bias. What is observer bias? What are you referring to there?

A. So it's a bias related to who is evaluating the scan. And so that person may have certain biases that they come into that would influence that interpretation.

Q. Okay. And so you're not saying here that observer visual read is the gold standard? In fact, you're saying it's not the gold standard; right?

A. No. I think it is the gold standard, but I'm saying that there are advantages to doing the quantitative approach over that gold standard.

Q. Right. And the advantage is not just because you may be missing something. It's also because of this observer bias issue; isn't that true?

A. It can be, yes.

Q. Okay. And observer bias can stem from the fact that if you were just looking at it visually and you get information that is outside the scan, that you might be biased in favor of finding either a defect being there or not being there? It could work in both directions; right?

A. It can. I'm not sure that's what it says, but yes, bias can work in any direction.

Q. So when you said that the visual interpretation is the gold standard, would you agree with me that that doesn't tell

the whole story?
A. Yes. I think that that is the gold standard, and I think that there is a lot of promise to quantitative methods to improve upon that.
Q. You don't say there is a lot of promise here. You say that the approach of using quantitative approaches is advantageous; right?
A. Yes. The advantages would be that it wouldn't be prone to bias.
Q. Right. So that's why you use both quantitative and visual approaches?
A. That would be the advantage, yes.
Q. You would want to take both into account?
A. Depending on the circumstance, yes.
Q. Okay. You can take that down.
At the same time, it's true, is it not, that you cannot get an MRI in a hospital unless you have some designation of what it is you are looking for?
A. Yes. When I order a scan in a hospital, I give an indication for that scan.
Q. And do you do that to bias the person who is doing the scan or for some other reason?
A. Typically it's a billing reason.
Q. It's a what?
A. It's related to billing so that the MRI scan will be

covered for a certain indication.
Q. Well, it's not just related to billing; right? Don't you want the MRI specialist to be looking for particular things to see what the question is you're trying to address?
A. That would be another reason. There is usually also a comments section where you can put your specific question. So usually I'll put that in the comments section.
Q. So I think Dr. Mettenburg's report and the report from the person who did the EEG both had indications of what it was they were looking for; right?
A. Correct.
Q. Did you think that biased the results in any way, that they were informed that this was a potential seizure case?
A. I mean, in the same way that information could bias anyone, but that is the information they had.
Q. Now, you said that in this case, you referred the reading of the EEG to someone else in your department; correct?
A. Yes.
Q. And when was that done? When did you make the decision to refer the EEG to someone other than yourself?
A. So when I obtained the data, I made the decision to have Dr. Crudele evaluate it.
Q. Why did you make that decision?
A. I wanted to be careful. I wanted someone who was experienced in reading EEGs to evaluate.

Q. And that was not you; right?
A. Yes. It's similar to what I would do normally in the clinic, that I would order this test, and it would be interpreted by another neurologist who spends their time reading EEGs.
Q. But is it true that in view of the high stakes in this case, you decided that, to be careful, you better have somebody who really knows how to read these EEGs?
A. Yes, I did want her to evaluate it.
Q. Now, what date did you get her involved?
A. It was sometime in late May, I believe.
Q. And how did you make the initial contact with her?
A. I asked her if she would be interested in evaluating an EEG for a forensic case I was involved in.
Q. And what else -- what other information did you give to her?
A. I had told her that it was an EEG for a forensic case that I was involved in.
Q. And did you tell her -- give her some indication of what it was you were looking for in terms of epilepsy, seizures, schizophrenia, anything else?
A. I don't believe so, no.
Q. Let me show you --
A. I may have said there was a question of a seizure. But I don't know if I gave her any information beyond that.

Q. So when would you have told her it may be a question of a seizure?

A. So I mean, that was probably her assumption based on the fact that there was an EEG. And then she read it. I then gave her the medications, and then after that, I gave her the clinical report from UPMC.

MR. BURT: If I could approach?

THE COURT: Of course.

MR. BURT: Thank you.

BY MR. BURT:

Q. Let me show you 160 and ask you if you can identify that.

A. Yes.

Q. And what is it?

A. This is -- appears to be Dr. Crudele's report.

MR. BURT: I move that into evidence, to the extent we don't already have it. I'm not sure we do.

THE COURT: Any objection to Defendant's Exhibit 160?

MR. OLSHAN: No, Your Honor. I think there are other exhibits that have content from that report already admitted.

THE COURT: In that case, Defendant's 160 is admitted.

MR. BURT: Did the Court say 150? It's 160.

THE COURT: If I misspoke, I apologize. 160.

MR. BURT: You may have said 160. I just didn't hear it.

BY MR. BURT:
Q. Can we bring that report up. Could you highlight under "Procedure," the paragraph under "Procedure."
So in this report, Doctor, it says "Reason for the study. Per OSH. 49-year old man with court-ordered EEG for evaluation for seizure?"
Do you see that?
A. Yes.
Q. Who is OSH?
A. That is the outside hospital. So this came from Dr. Rajasekaran's reports where she said the indication or reason for study was what's in quotations.
Q. So when you testified on direct examination that she read the scan blind, that wasn't true, was it?
A. I think what I said was that she initially read it blind. After that, I gave her information on the medications. And then after that, I gave her the clinical information that included the UPMC report.
Q. Well, was it your understanding from your assignment in this case and the orders of the Court that you were not supposed to be talking to other people about the case, other experts?
A. No.
Q. That was not your understanding?
A. My understanding was that -- no. We were allowed to talk

with each other through the completion of our reports.

Q. Okay. Let me show you 157. Do you recognize that?

(Witness reviews document.)

A. Yes.

Q. And what is that?

A. This is a letter dated June 12, 2023, to Judge Colville.

Q. Signed by you?

A. Yes.

MR. BURT: I move that into evidence.

THE COURT: Any objection? Defendant Exhibit 157 is admitted.

BY MR. BURT:

Q. Can you bring that up, please. This is written June 12, 2023. And do you state to the Judge, "I understand that I may not discuss the examination of Robert Bowers with anyone, unless pursuant to Rule 12.2(c)(2), defendant is convicted of a capital crime and the defendant confirms an intent to offer during sentencing proceedings expert evidence on mental condition"?

Did you write that letter to the Judge?

A. Yes.

Q. And when did you talk to the EEG expert?

A. In early June, before this letter was written.

Q. So you had already talked to the expert?

A. Yes.

Q. And when did you talk to her about when you said you got the report back? What date was that?
A. Do you have a copy of her report? I don't remember when it was dated.
Q. Yes. Let me find that for you. (Pause.) 6-10-23.
A. So that was June 10th.
Q. So you talked to her on what day?
A. I would have talked to her in the time before that, as I said, and then up through the report.
Q. And you had no other contact with her after that conversation?
A. Between this letter and when we -- when it was confirmed the intent to offer sentencing, no, I did not.
Q. Let me ask you -- you can take that down, please. Thank you.
You wrote -- I think you said, when I asked you about your publications, that you have one publication concerning neuroimaging abnormalities in patients with criminal behavior.
A. That is the title of one of my publications, yes.
Q. And is that the only published study you have on criminal behavior?
A. No.
Q. Is this study -- what are the other ones?
A. Well, I have one paper that's called "Lesion network localization of criminal behavior." And that was looking at

the brain lesions. I have other studies where I've discussed criminal behavior in neurological patients with various conditions.

Q. Would you take a look at Tab 16 of your literature binder there.

A. Yes.

Q. Is this the article that you wrote in 2018 entitled "Neuroimaging abnormalities in neurological patients with criminal behavior"?

A. Yes.

Q. How many patients were in the sample size that you were studying?

A. So this is a review article. So it's a review of other literature that I synthesized. It's not a study that I did.

Q. Okay. So this is just sort of not a study by you, but a review of the literature?

A. It's a review and synthesis of the literature.

Q. And based on that review and synthesis, you made certain statements in the article about the relationship between neurological diseases and behavior; correct?

A. Yes. I had summary of findings and potential implications.

Q. For instance, you state on page 1 of that article that "Neurological diseases can cause profound changes to behavior."

A. Yes.
Q. And that's true, isn't it?
A. Yes. It can.
Q. You say on the second page of the article "The degree to which neurological disease contributes to criminal behavior is difficult to estimate."
A. Which section is that in?
Q. It's on the second page. And I believe that it's in the --
A. Yes.
Q. Okay.
A. This is where I'm discussing literature about that association.
Q. Right. And you believe that statement is true, right, that the degree to which neurological disease contributes to criminal behavior is difficult to estimate?
A. Yes.
Q. Yet in this case, you're offering the opinion that you're able to conclude that whatever neurological or vascular disease Mr. Bowers had did not contribute to his criminal behavior?
A. Yes.
Q. Right? Now, you then say, "Some studies have investigated the incidence of neurological disease in persons who have already committed crimes. For instance, in one study, 64.5

percent of murders were found to have frontal lobe dysfunction on examination and approximately 47 percent had reportedly abnormal neuroimaging."

A. Yes.

Q. And you cite a study?

A. Yes.

Q. And so what that study involves is looking at a group of people who are convicted of murder and seeing in that pool of people what is the incidence of frontal lobe dysfunction and abnormal neuroimaging?

A. Yes.

Q. And half of those people had -- 47 percent had abnormal neuroimaging; correct?

A. Correct.

Q. And 64.5 percent of that group had neurological -- frontal lobe dysfunction?

A. Yes. In that study, they did.

Q. Okay. Now, you've also written other articles in which you have said "Psychiatric symptoms have been associated with criminal offenses in other conditions including bipolar disorder and schizophrenia."

A. Yes.

Q. And you cite a meta analysis which established that fact; right?

A. Which paper are you -- I'm confused as to where we are.

Q. Yeah. I said another study. The other study is Medical legal aspects of Huntington's disease written by you in 2021.
A. Yes. We're not looking at that paper, though?
Q. Yes. We're looking at another paper.
A. Okay.
Q. And I can direct you to that one, if you need to refresh your memory on it. It's Tab 5.
A. Okay.
Q. Did I read that correctly, "Psychiatric symptoms have been associated with criminal offenses in other conditions including bipolar disorder and schizophrenia"?
A. I believe you. I just don't know what page or where that is.
Q. I'll get it for you. It is on page 4, last paragraph.
A. Yes.
Q. So in this study, you're studying not schizophrenia but Huntington's disease; correct?
A. Correct.
Q. That's a progressive neurological disorder?
A. Correct.
Q. And how big of a sample were you studying here?
A. I would have to return to the methods. It looks like there were 31 patients with criminal behavior and 251 patients without criminal behavior.
Q. And you indicate there that all of the patients who had

committed criminal offenses had comorbid psychiatric symptoms with significantly higher rates of depression, irritability, aggression, apathy, perseveration and delusions compared with non-offenders?
A. Yes.
Q. So this is a group of people who had neurological disorders and you're trying to characterize what the prevalence of certain symptoms are?
A. Correct.
Q. And you indicate in the next sentence, "Psychiatric symptoms have been associated with criminal offenses in other conditions including bipolar disorder, schizophrenia, and posttraumatic stress disorder."
A. Correct.
Q. As to schizophrenia, you cite a paper that is a meta analysis of other studies; correct?
A. I don't remember that citation, but I believe you. Yes. It appears to be a meta analysis.
Q. Okay. So looking at a group of schizophrenics, there is an association with psychiatric symptoms?
A. Yes. That is what it says.
Q. You list here among the symptoms, depression, irritability, aggression, apathy, perseveration and delusions; right?
A. That's what is listed here, yes.

Q. And just to be clear, aggression is a symptom. It is a neurological symptom, correct, in your field?
A. I would characterize it as a neuropsychiatric symptom. It is a symptom that can happen in various diseases.
Q. So you look at criminal conduct as a symptom of a neuropsychiatric disorder?
A. So criminal conduct can be associated with disorders that lead to changes in behavior, cognition and to neuropsychiatric symptoms.
Q. But the point I want to make sure you're in agreement with, that criminal behavior is a symptom, a neuropsychiatric symptom; correct?
A. No. Criminal behavior is a behavior. And the question is whether that behavior is due to a neuropsychiatric symptom.
Q. Have you described in your description of your credentials that criminal behavior is actually a symptom?
A. It is a manifestation of a disease. That it can be. We describe it as antisocial behavior, the most extreme example can be criminal behavior. But I am not wanting to indicate that all criminal behavior is a neuropsychiatric disease.
Q. Okay. Let me show you this exhibit, 170. Do you recognize that?
A. Yes.
Q. Is that your profile at Vanderbilt University?
A. This is one of them.

Q. Do you write that profile or does somebody else?
A. I'm honestly not sure. It may have been taken from something I've written.
Q. I'll bring that up so you can see it.
MR. BURT: We move that into evidence, 170.
MR. OLSHAN: No objection.
THE COURT: Without objection, Defense Exhibit 170 is admitted.
BY MR. BURT:
Q. Can we bring that up. If you would, expand the first paragraph. This lists your qualifications; right?
A. Correct.
Q. This is all correct?
A. I believe so.
Q. Okay. Back out of that. Second paragraph, please.
So this paragraph says "Dr. Darby is interested in patients with symptoms at the border zone between neurology, psychiatry and philosophy. Both neurological and psychiatric patients can share similar symptoms, including delusions, hallucinations, criminal behavior and disordered free will perception"; right?
So here, in summarizing your interest, you're identifying criminal behavior as a symptom that is shared by both neurological and psychiatric patients; right?
A. In some patients, I do believe that their criminal

behavior is a result of their neurological diseases, yes.
Q. Well, I think there's two separate things here, Doctor. One is whether the criminal behavior is a result of their deficit, but the second issue is, is criminal behavior a symptom of neuropsychiatric or neurological deficit?
A. Not on its own. So I think it's a result of those symptoms.
Q. Right. But here you're defining it as a symptom; right?
A. I believe that criminal behavior can be a manifestation of certain neurological diseases that cause that change in behavior.
Q. Now, one of the things that's referenced here is something called free will perception; right?
A. Yes.
Q. And that's something you've studied?
A. Yes.
Q. And you can take that down. And you've said in your work, have you not, that the idea of free will can be studied scientifically, but we don't really know whether it exists or not?
A. Well, I said that it's controversial whether it exists or not. What we say when we study it is really talking about our belief that we have free will so that we initiate our behavior and that we have control over our actions, I believe is the way I've typically described it.

Q. The way you've described it, if you look at Tab 15, "Lesion network localization of free will"; do you see that?
A. Yes.
Q. And in that article you say, "Along the domain of philosophy, free will can be investigated scientifically. Experiments such as those by Benjamin Libet spark the debate regarding whether free will exists or is an illusion. This debate remains unsettled, but most researchers agree that we perceive our actions to be freely willed."
A. Yes.
Q. So am I understanding that correctly that science has not decided whether free will exists or not? That's unsettled. But that they have agreed that people have the perception that there is free will?
A. Yes.
Q. And so that's what you're studying? You're not studying -- the title says "Localization of free will," but you're actually studying the localization of the perception of free will; right?
A. Correct.
Q. Now, is it also true that common neurobehavioral and psychiatric conditions such as delirium, amnesia, autism and schizophrenia occur in patients with no obvious brain lesions?
A. Is that something that's referred to in this paper or is that a separate statement?

Q. No. This is actually a paper written by Dr. Fox, your mentor there at the Mass Hospital.
A. Yes.
Q. Do you agree with that statement?
A. I didn't hear all the conditions, but there are many neuropsychiatric conditions where there is not a clear lesion identified.
Q. The sentence is -- and the article is "Mapping symptoms in brain networks with a human connectome," 2018. You're familiar with that article?
A. Yes.
Q. What he says is "Common neurobehavioral and psychiatric conditions such as delirium, amnesia, autism and schizophrenia occur in patients with no obvious brain lesions."
A. I would say that they can. There are some cases of amnesia, for instance, where there is an obvious brain lesion. But yes, those things can happen without an obvious brain lesion.
Q. Including in schizophrenia; right?
A. Yes.
Q. According to Dr. Fox?
A. Yes.
Q. And you agree with that?
A. Yes.
Q. Now, you were asked a bunch of questions about these white

matter hyperintensities. And I think you said that there are various causes of where those hyperintensities come from; right?
A. Yes.
Q. And you mentioned smoking and drug use?
A. Yes. As risk factors for vascular disease.
Q. Okay. But when you testified in other cases about that, you never mentioned smoking or drug use; right?
A. I'm not sure if I have or not.
Q. Take a look at Tab No. 3 of the testimony binder there. This is your testimony in the Nicholson case in Ohio.
A. You said it's Tab 3?
Q. It should be Tab 3, I believe. It should be Nicholson.
A. Yes.
Q. Take a look at page 4941, bottom of the page.
A. There's two different numbering sequences. Is it the number on the top or the bottom?
Q. The top.
A. You said 49 --
Q. 41.
A. Okay.
Q. Line 24, bottom of the page. Do you remember being asked "What are some of the other things that can cause a person to have those white spots on MRI?"
And your answer was, "So they can be caused due to

vascular disease. They can be caused by inflammatory diseases like multiple sclerosis. They can be caused by migraine headaches. They can be signals of a prior infection that someone has recovered from, and they could be found in patients with psychiatric disorders. They can also be found in patients without any neurological disorders."

Do you remember giving that testimony?

A. Yes.

Q. So in your answer here, you didn't mention psychiatric disorders as being a source of those white matter hyperintensities. I'm wondering whether there is a reason why you didn't mention that as being one of the connections?

A. So I talked about vascular disease is what I thought was the most likely explanation. I didn't go through any of these other causes, which are also things associated with white matter hyperintensities on imaging.

Q. Right. So what you went through was vascular disease, drugs and smoking; right?

A. Well, drugs and smoking are the causes for vascular disease. So those are the risk factors that lead to vascular disease.

Q. One of the standards in that guideline from your academy points out that when you're giving testimony, you have to make sure that it's full and accurate; correct?

A. Correct.

Q. Do you think it's accurate to leave out that these can be caused by psychiatric disorders?

A. I don't think the question was what could cause this. I think the question was what did I feel was causing it.

Q. Well, weren't you asked what other explanations are there for these white matter hyperintensities?

A. I don't believe so, but these would be other explanations for that.

Q. And didn't you say, "Well, it could be from smoking. It could be from drug use"?

A. So those would be the risk factors for vascular disease, that specific cause.

Q. Now, in this particular case, in the Nicholson case, like in this case, you tried to downplay the significance of white matter hyperintensities; correct?

A. I did not believe that they were significant in this other case, no.

Q. And that was a case involving a 30-year old who was claiming he had traumatic brain injury; right?

A. Correct. I believe he said that he had been in a car accident at some point.

Q. And you identified six white matter hyperintensities; right?

A. I don't remember the exact number.

Q. How many white matter hyperintensities are there in this

case?
A. I believe the testimony was 28. I didn't count them in this case.
Q. 28. And are there any studies that characterize how many or what size the hyperintensities have to be in order to have significance to them?
A. There probably are, and that probably differs based on the expected cause. So whether it's vascular disease or traumatic brain injury.
Q. You used a study in that case to suggest that white matter hyperintensities -- six white matter hyperintensities in a 30-year old really didn't matter.
A. I believe there was an image in that case by one of the other experts taken for a study to show that this finding was associated with traumatic brain injury, and that study actually said that there was no difference in the number of white matter hyperintensities between patients with and without traumatic brain injury in that study, if I'm remembering correctly.
Q. Let me see if I can refresh your memory on that. Let me show you Exhibit 184. Is that the study you're referencing?
(Witness reviews document.)
A. I don't know if this is the -- it may be the exact study.
Q. Do you recall on the next page, 4943, you are asked, "And

did Dr. Schneider cite some of those studies in his report by a Gerard Reidy, R-E-I-D-Y?"
A. It's on the next page of this testimony?
Q. Yeah. I just want to make sure we're on the same page in terms of what study you were talking about there.
A. Gerard Riedy, yes. Yes.
Q. So the study I just showed you is the one you were referencing in your testimony to try and discount the significance of white matter hyperintensities in that case; right?
A. This was a study that, I believe, Dr. Schneider had used and taken an image from that I was discussing. It was not a study that I had brought up. It was a study that he had cited in his report.
Q. And what you said was, "Well, you didn't show the whole scan"; right?
A. Yes.
MR. BURT: I move that into evidence, Your Honor, the study.
MR. OLSHAN: No objection.
THE COURT: Without objection, Defense Exhibit 184 is admitted.
BY MR. BURT:
Q. This is a study of veterans who had suffered mild traumatic brain injury during their service; correct?

A. Yes.
Q. And the study found at about 58 percent of those cases or thereabouts, these veterans had white matter hyperintensities; correct?
A. If I could look at the study again?
Q. Yeah. Sure. I think it was 51.8 percent of the veterans who had admittedly suffered a brain injury had white matter hyperintensities.
(Witness reviews document.)
A. Oh, yes. So this was the issue. It was also that 38 percent of people without a traumatic brain injury also had these findings. So that was not different between the groups, meaning they weren't actually more likely in the veterans with brain injuries versus those without.
Q. Right. But the majority had those white matter hyperintensities; right?
A. Yes. But 38 percent of those without brain injuries also had them.
Q. Could you bring up the study, please. And go to the next page. Next page. Keep going. Keep going. Okay.
Would you focus in on Figure 2. So this is a FLAIR image showing multiple white matter T2-weighted hyperintensity areas in a 28-year old man with blast-related mild TBI. This patient had a total of 76 lesions on all sectors.
A. Yes.

Q. Right? So is it true that in 51 percent of the traumatic brain injury cases that he looked at, that there was these kinds of lesions?
A. That there was at least one hyperintensity.
Q. At least one. And in some cases many more?
A. Yes.
Q. Now, you said, I think -- you can take that down. I think you said that these white matter hyperintensities increase in the age group of 60- to 70-year-olds?
A. They increase over time, but, yes, in 60- to 70-year-olds, they can be very common.
Q. And, unfortunately, is that a period in time when our cognitive abilities attempt to start going downhill?
A. Yes, in some individuals it is.
Q. So is that an explanation for why you would see more white matter hyperintensities in that age group because their cognitive abilities have been declining?
A. Yes and no. So most of the causes we think are actually due to Alzheimer's disease and not due to those T2 hyperintensities.
Q. But in any event, the white matter hyperintensities are associated with a brain defect; correct?
A. In some patients, those vascular diseases can lead to cognitive consequences, yes.
Q. And in this case, your opinion is Mr. Bowers suffers from

a vascular disease?
A. In my opinion, those are the most likely reason for the T2 hyperintensities.
Q. I want to ask you some questions about your report. Do you have that there in front of you?
A. Yes. One moment. (Pause.) Yes.
Q. You took a social history not only from Mr. Bowers, but from hundreds of pages of records that you reviewed as part of your work in this case?
A. I did review many records, yes.
Q. And you set forth in your report a section called "Review of available records"?
A. Yes.
MR. BURT: Could we bring up Defendant's Exhibit 156, which is the unredacted report. And what I would like to do, Your Honor, is just reference portions of the report that I believe are being offered by the people -- by the government, the unredacted portions. We don't have their report electronically is the problem, unless they've got it and can share it.
THE COURT: We're all on the same page regarding which sections are redacted and unredacted; correct? Are there final decisions made regarding that?
MR. OLSHAN: We have provided to the defense a redacted version. I'm unclear what Mr. Burt wants to show the

witness.

THE COURT: I think he's saying you've got that hard copy. You don't have that in digital format.

MR. BURT: Correct. So where I would like to focus on is page 4, below "Review of available medical records," the paragraph which reads "Child and youth services, 3-21 to 27, 1973."

MR. OLSHAN: That's fine.

THE COURT: You may publish.

MR. BURT: Thank you.

BY MR. BURT:

Q. Please bring up 156, page 4. And just highlight that paragraph beginning with "Child youth services." This is part of your report; right?

A. Yes, it is.

Q. And you wrote that on March 21, 1973, age six months, that refers to Mr. Bowers' age; correct?

A. Correct.

Q. "There were reports of violent gestures and suicidal threats from both Bowers' mother and father. A follow-up assessment on 3-27 reported that Bowers' mother denied any danger to the child, had moved out to live with her parents and was divorcing Bowers' father. On 3-28-73, they contacted Bowers' therapist, who stated her opinion that Bowers was not in danger from his mother."

A. Yes.
Q. What was the source of that information; do you recall?
A. It says "Child and Youth Services records."
Q. Was that a -- I'm going to hand you a report.
Was this record I just handed you entitled "Dependent and Neglect Report" the source of the information that we have highlighted here?
A. It looks like it includes this information, yes.
Q. And when you say in your report that "there were reports of violent gestures and suicidal threats," what was your understanding of who was being violent and toward whom?
A. I believe it was that the father was being violent toward the mother, I believe.
Q. Do you want to take a look at that report and make sure that you've accurately summarized?
A. I can read it. It says that "the mother threatened to put her fist through a window today. Mother did not follow through with this threat. According to the caller's information, mother kicked down the door to her apartment and has threatened to throw Robert out of the third floor apartment window. Father reportedly turned the gas on in their apartment and threatened to kill himself and the baby." So it was both of them.
Q. So the violence was being directed toward Mr. Bowers, the six-month old child; correct?

A. Yes. Some of the violence was being threatened against him.
Q. And the father was threatening to throw Robert out of the third floor apartment window?
A. Yes. That was what the report said.
Q. And the mother had reportedly turned on gas in her apartment and she was threatening to kill -- it says himself -- oh, "father reportedly had turned on the gas in their apartment and threatened to kill himself and the baby." And that's when the police were called?
A. Yes. That was the father.
Q. So it's unclear from your report who the violence was being directed to, but when we go to the source, it's clear that the violence was being directed to Mr. Bowers; correct?
A. That the threats and gestures involved him, yes.
Q. Okay. And in your opinion, as a neurologist, can early childhood trauma affect someone's brain?
A. Yes, it can.
Q. How so? How does that work?
A. So adverse childhood events are really associated with every type of medical problem that you can imagine, medical issues, psychiatric issues, neurological issues.
Q. And is it -- when someone is threatened with trauma, can you also have damage, even though they're not physically being beaten up?

A. You can. It's a question of how much at the age of six someone would be aware of that threat and that danger. But certainly, you know, having threats can influence brain development in these other adverse childhood events.
Q. Anything you read in this dependency report suggest to you that this kind of behavior was a -- Mr. Olshan's words -- a one-off, that this was just one isolated incident?
A. In terms of the violence, the gestures or --
Q. Yeah.
A. No. I mean, I think that there are other reports of potential domestic violence between Mr. Bowers' mother and father.
Q. I mean, when you see an entry like this that the father has threatened to throw his son out a third-story window and is threatening to turn on the gas and to kill himself and the baby, does that tell you anything about the kind of parenting that Mr. Bowers was subjected to at age six months?
MR. OLSHAN: Objection. This witness is not testifying about the nature of the defendant's parents' capabilities.
THE COURT: I'm going to overrule the objection. He can explain that, if that's his thoughts about it and his position. That's what I understand the import of the question.
A. It's not my area of expertise, but obviously that's not an

example of good parenting.

BY MR. BURT:

Q. Right. But your area of expertise is neurological damage; correct?

A. Correct.

Q. And I'm trying to assess whether if you see this kind of parenting across time, you begin to draw inferences that there may have been a traumatic upbringing here that could lead to brain defects?

A. So a wide range of these adverse childhood events can lead to a higher risk of neurological, psychiatric and medical diseases later.

Q. Do we know how that happens, what the mechanism is?

A. Not directly, no.

Q. But it's something that has been established?

A. Yes. It's not my area of expertise, but I think there are studies linking it to many different types of medical conditions.

Q. Now, I also think you said that you had some information that was provided to you by the defense concerning a possible delusion of Mr. Bowers being attacked by UN law enforcement authorities. Do you remember that testimony?

A. Yes, that I had heard about that potential belief that he had.

Q. But you didn't mean to suggest that information came from

the defense lawyers; right? I mean, in the sense that they were saying, hey, I think this. You had other sources for where that came from; right?
A. For that particular belief, yes. Again, for some of these, there were multiple sources where that information came from.
Q. Sure.
A. But that one, I believe, had another source.
Q. I want to show you -- again, I'm not going to mark this, but just to refresh your memory. Just take a look at what I've had marked is which is an FBI report of an interview with a guy named Patrick Kelly. Do you remember reviewing this report?
A. Yes.
Q. Who is Patrick Kelly?
A. I think he is someone who worked at the bakery. Mr. Bowers worked at a bakery for 14 years, and I believe someone that worked there. And I can't remember if it was also someone who rented one of the other apartments or not.
Q. And the FBI interviewed him about his knowledge of Mr. Bowers. They then wrote this report. You read the report, relied upon it in forming your opinions; right?
A. Correct.
Q. And what did -- was Mr. Kelly the source of this information about Mr. Bowers and the UN forces?

A. Yes. He did report that.
Q. What did he report?
A. I guess my note is redacted. It would take me a while to find it in this report where he talked about that. But my recollection was that there were -- he reported that there was a belief that there were UN forces. I think they were referred to as blue hats that may be threatening Mr. Bowers, he thought that, and that he kept a shotgun by his door.
Q. Now, is it on the next page, 2 of 5, documented there toward -- I think it's the fifth paragraph down.
A. Yes.
Q. And read what that says, if you would.
A. "Kelly knew Bowers to often keep a shotgun near the front door of his apartment. Bowers kept the shotgun at the front door in the event he had to defend himself from intruders. Bowers often made comments that he believed the United Nations would send troops into the US. Bowers would often refer to the UN military as "blue hats" due to the blue helmets they would wear. Bowers kept the shotgun by his front door to fight off these blue hats he had believed one day would come for him. Bowers" -- do you want me to keep reading?
Q. Yeah. Just to the end of that paragraph, if you would.
A. "Bowers would also say you had to aim at the face and head because the blue hats wore body armor."
Q. Now, did you do any investigation to see if, in fact, the

UN military forces had, in fact -- were in the process of sending troops into the US in the way that Mr. Bowers indicated?
A. I did not.
Q. Is this an idea that you would refer to as self-referential in the sense that it refers to an idea that Mr. Bowers had that somebody was going to come for him?
A. If he believed that people were coming after him, then yes, that would be an example of where he felt personally threatened.
Q. Did you interview Mr. Kelly yourself to kind of flesh out the details?
A. I did not. I asked Mr. Bowers about it.
Q. And, by the way, when you asked Mr. Bowers about it, did he make any attempt to sort of elaborate on that theme and try and convince you that, "look how crazy I am"?
A. I'm sorry?
Q. Did Mr. Bowers make any attempt, when you questioned him about this incident, to pick up and run with this theme and try and convince you that he was crazy?
A. No.
Q. In fact, he was trying to convince you just the opposite; right?
A. He told me that he believed that he had issues with world governments like the UN, but that he did not believe they were

targeting him specifically, and that he wouldn't keep the shotgun by the door.
Q. And you asked him repeatedly whether he thought he was -- there was anything wrong with him; right?
A. I don't know that I said that. I asked him specific questions about specific symptoms.
Q. But was the general thrust of what he was telling you that there's really nothing wrong with him?
A. He does not believe that he has a disease, but the questions were about specific beliefs and symptoms, and that's what I asked him about.
Q. So he was really kind of unaware of any symptoms that he might have had showing that he was suffering from a mental disorder?
A. He did not feel that he had a mental disorder.
Q. Right.
A. But the questions were about specific symptoms that may or may not relate to a mental disorder.
Q. Could we go back to 172, please, page 20.
A. Of?
Q. This is 172. I'll put it up on the screen. It's in evidence. Page 20. This is from your slide presentation; right?
A. Yes.
Q. And one of the things you were instructing your students

to look for in terms of neuropsychiatric deficits is whether there was any executive dysfunction; right?
A. Correct.
Q. And unawareness of symptoms?
A. Correct.
Q. So somebody who is suffering a neuropsychiatric or neurological disorder often presents with being totally unaware that they have symptoms of the disorder? That itself is symptomatic, is it not?
A. Correct. They often do not believe they have symptoms or are unaware of them.
Q. Certainly in your interview of Mr. Bowers, he was not conveying any symptoms of any mental illness to you; correct?
A. Well, he would tell me about certain symptoms. So he described his prior suicide attempts, his prior depression, his issue with putting himself in someone else's shoes. But for many of the questions I asked him, he denied.
Q. Now, from the social history records, you had documentation of various suicide attempts beginning at a fairly early age; correct?
A. Yes. There were reports of potential suicide attempts.
Q. And when did they begin and how frequent were they?
A. I think there was a mention in one of the medical records about him saying that he might jump off a bluff close by at age ten. When I asked him about that, he didn't recall that.

Q. All right. Is that unusual that somebody at age around 50 does not recall what may have been a pretty traumatic event at age ten?
A. Well, if it's traumatic, they might be more likely to remember something that's meaningful. But it certainly would be possible to not remember something after 40 years.
Q. Now, when was the next attempt?
A. I don't know off the top of my head.
Q. Do you recall what you said in your report when the next attempt was?
A. If I can look at it.
Q. Sure. Do you have that there in front of you?
A. What page is it?
Q. (Pause.)
A. In the section -- I guess do you want me to answer or --
Q. Yeah. If you've got it located and you can use that to refresh your memory, that's fine.
A. So I discussed the genuine suicide attempt that he said where he tried to overdose on pills in 1989 when he was 17. He said he did not recall feeling suicidal at age ten and threatening to jump off a bluff. He talked about 1989 when he was drinking grain alcohol and smoking cigarettes. He talked about the 2004 episode where he said he had put a shotgun in his mouth. And then he said he denied any suicidal thoughts at the time of the shooting.

Q. Are suicide attempts a symptom of a neuropsychiatric or neurological disorder?
A. It can be a symptom of depression and other conditions, yes.
Q. Now, you also noted in your review of the social history that he had numerous psychiatric hospitalizations?
A. Yes.
Q. Can that also be a sign -- a symptom of neuropsychiatric or neurological dysfunction?
A. So typically people are admitted to a psychiatric hospital because of psychiatric symptoms.
Q. And is that what happened in this case?
A. Yes.
Q. So you were able to document that he had fairly early on psychiatric or -- neuropsychiatric or neurological symptoms?
A. Yes. He was admitted for aggressive behavior and actions towards his mother.
Q. And aggressive actions would be, again, along the lines of criminal behavior is a symptom; right?
A. Again, criminal behavior is one behavior of a range of antisocial behaviors that can be present.
Q. Now, did you determine from the records when Mr. Bowers' father committed suicide?
A. I'm trying to remember. I believe it was around when he was six years old, but I think there was some conflicting

information about that.

Q. Can detachment from one's parents cause neuropsychiatric or neurological impairments?

A. Well, again, it's an adverse childhood event. So not having a close relationship with one's parents or feeling neglected has been associated with other diseases.

Q. Do you write in your report on page 6 that -- you mentioned he liked as a kid making explosives; right?

A. Yes.

Q. Blowing them up at the junkyard?

A. Yes.

Q. And did you write at page 6 that he didn't seem to recognize the danger involved in that?

A. Which section?

Q. Page 6 under "Bradley Center program," second sentence down.

A. Yes. That was reported.

Q. And is unawareness of danger or risk a neuropsychiatric symptom?

A. That can be. During development, we usually don't make a diagnosis of a fixed problem, because there is a developmental trajectory for how children and adolescents view things like risk. In an adult, that would be an example.

Q. You say in the paragraph below that in 1986, he began to miss school frequently?

A. Correct.
Q. Is that also a neuropsychiatric or neurological symptom?
A. No. I mean, that is a symptom of truancy. That can be due to a number of social or psychological other factors. I don't think that specifically tells you why he was missing school.
Q. It doesn't tell you specifically, but it could be an indication of neuropsychiatric or neurological impairment; correct?
A. I mean, it would really depend why he was missing school.
Q. I mean, you talked a lot in your testimony about, oh, we can't use certain things as a one-to-one diagnostic indicator; right?
A. Correct.
Q. There is nothing in medicine that you can use as a one-to-one marker for doing anything, is there?
A. Correct.
Q. But it's your understanding in this case that the defense experts adopted the approach of looking at various things to see if the whole picture fit together?
A. I think that was the approach of all the experts in this case.
Q. That's the approach that you used, and that approach makes sense to you; right?
A. Correct. You would incorporate every piece of

information. Some may be meaningful. Some may not. But you're trying to use as much information as you can.

Q. Did you understand any of the defense experts to be saying that one piece of information or one test or one neuroimaging technique was the only thing that should be looked at here to reach a correct diagnosis of Mr. Bowers?

A. I don't believe that any of them said that.

Q. And you think their approach in not doing that is one that you agree with; correct?

A. So I agree that you should not take any single piece of information in isolation.

MR. BURT: This would be a good stopping point, if the Court wanted to stop here.

THE COURT: I take it you have significantly more time?

MR. BURT: I don't know about significant, but I'm not going to be able to finish in half an hour.

MR. OLSHAN: I was going to ask. Could we get an estimate of how much longer Mr. Burt thinks the cross will take?

THE COURT: I don't mind having that discussion at sidebar. Bear with us just a moment.

(Sidebar discussion held as follows.)

MR. BURT: So I don't have too much more to go. I think outside 45 minutes, but I would like to have the

opportunity to try and consolidate my notes and shorten it up in the morning and hopefully can finish in half an hour, 45 minutes.

MR. OLSHAN: You're proposing we do that in the morning?

MR. BURT: Yes.

MR. OLSHAN: Given the hour, Your Honor, I don't expect my redirect, based on what's happened so far, will be lengthy. But if Mr. Burt would move forward now, even if it were 15 minutes or 20 minutes, we would be past 5:00 based on that estimate. So I don't think we have much choice other than to break.

THE COURT: Well, I wouldn't mind going. I wouldn't mind polling the jury. I don't want to have to cut anybody off, but I also don't want a 45-minute estimate turn into two and a half hours while you need to look at your notes and decide I want to revisit everything we talked about. Not to suggest that's your plan or it's happened before. With the gentle person's understanding we're going to do our best to either complete in 45 or less and another 15 or 20 or less, let's break for the day and hope -- is there any reasonable hope of getting this witness finished and the next witness on and off tomorrow?

MS. SONG: I'm sorry. What was your question?

THE COURT: Is Dr. Dietz going to be someone that's

likely going to be done in less than a day or do we expect he's going to go into Monday? Whatever it is.

MS. SONG: I think given the pace of this witness, that might be unlikely.

THE COURT: All right. We'll do what we can do. Thank you.

MR. BURT: Thanks.

(Sidebar discussion concluded.)

THE COURT: Ladies and gentlemen of the jury, thanks for your patience. We're going to excuse you for the evening.

Please recall my instructions regarding not viewing or observing any media reports on the case, having any discussions about the case or engaging in any form of research about the case.

We're going to begin at 9:00 a.m. tomorrow. Same protocols as usual. Thank you very much. Everyone, please remain where you are as the jury exits.

(Jury exits courtroom.)

THE COURT: Counsel, the jury has stepped out. Anything for public session? I had a 30-second question for folks in private session.

MR. OLSHAN: No, Your Honor. Consistent with what happened with Dr. Rogers last week, we understand we won't have any communications with Dr. Darby while he's still on the witness stand.

THE COURT: I appreciate that. I trust that Dr. Darby understands that limitation. Again, if you need directions to the airport or something, that's something else. But no discussions regarding your testimony or reactions.

MR. OLSHAN: Other than administrative matters.

THE COURT: Administrative matters, correct.

Anything else?

MS. CLARKE: No, Your Honor.

THE COURT: We'll recess for the day. I don't mean to chase the public out but I do have -- actually, we can do it at sidebar or right here, actually. I just need to mention one thing in ten seconds.

(Private session held.)

(Private session concluded.)

-----

(Whereupon, the above-captioned matter was concluded.)

-----

C E R T I F I C A T E

I, NOREEN A. RE, RMR, CRR, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled case.

s\ Noreen A. Re
NOREEN A. RE, RMR, CRR
Official Court Reporter

July 5, 2023
Date of Certification