IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA

vs.

Criminal No. 18-292

ROBERT BOWERS

Transcript of Jury Trial held on Thursday, July 6, 2023, in the United States District Court, 700 Grant Street, Pittsburgh, Pennsylvania 15219, before Honorable Robert J. Colville, United States District Judge.

APPEARANCES:

For the Government: U.S. Attorney's Office
Soo C. Song, Esquire
Troy Rivetti, Esquire
Eric G. Olshan, Esquire
Nicole A. Vasquez Schmitt, Esquire
Barry Disney, Esquire
Mary J. Hahn, Esquire

For the Defendant: Federal Public Defender
Elisa A. Long, Esquire
Michael J. Novara, Esquire
Ashwin Cattamanchi, Esquire
and
Clarke, Johnston, Thorp & Rice, PC
Judy Clarke, Esquire
and
Law Office of Michael Burt
Michael N. Burt, Esquire

Court Reporter: Barbara Metz Loch, RMR, CRR

Proceedings recorded by mechanical stenography; transcript produced by computer-aided transcription.

VOLUME 21

I N D E X

| WITNESSES | PAGE |
| --- | --- |
| RICHARD RYAN DARBY, M.D., | |
| Cross-Examination (Resumed.) By Mr. Burt | 4 |
| Redirect Examination By Mr. Olshan | 49 |
| Recross-Examination By Mr. Burt | 84 |
| PARK DIETZ, M.D., | |
| Direct Examination By Ms. Song | 102 |
| Cross-Examination En Voir Dire By Mr. Burt | 122 |
| Direct Examination (Resumed.) By Ms. Song | 125 |

(Private session held.)

(Public enters courtroom.)

THE COURT: Counsel, are we ready for the jury? Ms. Kim, would you bring the jury in, please.

(Jury present.)

THE COURT: Welcome back. Please have a seat. Ladies and gentlemen of the jury, before we begin, I'll ask you to raise your hand if your answer to any of these questions is yes.

Have any of you been exposed to or read or seen any reports, news or otherwise regarding this case or anything respecting this case? I see no raised hands.

Has anybody engaged in any discussions whatsoever about this case or any issues touching upon this case with anybody, strangers, co-workers, friends, neighbors, even each other outside the context of formal deliberations? I see no hands.

And finally, have any of you either intentionally or inadvertently engaged in any research regarding any issues involving or touching upon this case? I see no hands.

Thank you very much. I appreciate that.

Mr. Burt, I believe you were still in the midst of your cross-examination. You may continue at your leisure.

RICHARD RYAN DARBY, M.D., a witness herein, having been previously sworn, was examined and testified as follows:

CROSS-EXAMINATION (Resumed.)

BY MR. BURT:

Q. Good morning, Doctor.

A. Good morning, Mr. Burt.

THE COURT: I'll take the opportunity to remind everybody, myself included, because I'm not very good at it, if we'd all just attempt to be close to the microphone when we speak so that everybody can be heard. Thank you.

Q. Doctor, yesterday you mentioned some notes that you were taking during the examination?

A. Yes.

Q. And let me show you what has been marked as 182. Are those the notes you took during the examination you did on May 21st of this year?

A. These are notes from the examination, yes.

Q. Okay. Are these the only notes that you took during the examination?

A. Yes. There were, I guess, the MOCA test and the Frontal Assessment Battery, which were printouts that were scored as I was doing the testing, but besides that, I'm not aware of any other notes.

Q. And I think you said you clarified in cross-examination yesterday that you didn't write any notes as you were doing the examination; correct?

A. No. So I did write notes as I was doing the examination

and I continued with the notes following the examination, trying to get everything that I could remember from that time.

Q. And I want to be clear when you say you wrote notes, are you talking about handwritten notes?

A. No, typed notes.

Q. Typed notes.

A. Yes.

Q. So the only notes you took during the exam are what's in front of you there, 182?

A. Yes.

MR. BURT: I would move those notes into evidence, Your Honor.

THE COURT: Any objection to 182?

MR. OLSHAN: No.

THE COURT: Defense 182 is admitted.

BY MR. BURT:

Q. Doctor, I want to hand you your report, which is Defendant's Exhibit 156. That's your final report; right?

A. Yes.

Q. And when did you write that final report?

A. I was writing it as the -- I was reviewing information and it was up until June 12 that I wrote that.

Q. So June 12th is the date of the report, so it would have been about a month, roughly, after you did the exam; correct?

A. Yes. It was about three weeks, I believe.

Q. Yes. And if you take a look at page 2. You have a section in the report called Informed Consent; correct?
A. Of the exam notes?
Q. No. Of your actual report.
A. Page 2 of my actual report is not Informed Consent.
Q. Where is that in your report, if there is a section on that?
A. Page 26.
Q. And that page of the report is entitled Neuropsychological, Psychiatric and Medical Evaluation; correct?
A. Yes.
Q. It goes from page 26 all the way through the end of the report; correct?
A. I guess there's a section at the end about my opinions.
Q. Right. And on page 37, you have a section called Current Views on the Attack.
A. Yes.
Q. Is it true that from page 26, where you have Informed Consent, all the way through Current Views on the Attack, that that part of your report is verbatim from your notes?
A. It is largely verbatim. I think there were some potential edits or typos or if there were any inaccuracies I noted, but it was largely the same.
Q. Largely the same. If you went through it word by word,

would you agree that it is the same?

A. I don't know that it's exactly the same. I think there are a few places where I may have made some typo edits and I think there was one part where I had Googled something that may have not been accurate that I took out. But other than that, I think it was largely the same.

Q. What did you Google that was inaccurate that you took out?

A. So he told me about the second target that was near the post office and I had looked at a Google Map of the area, seen that there was a JCC adjacent to the post office, and so I put in parentheses, I Googled and this may have been a second target. I think I later found out that he was asked about that and said it was not the JCC but the JFS or some other Jewish organization. And so because I wasn't sure if that was accurate or not, I took that out.

Q. Other than that, is it true that, for the most part, from page 26 of your final report all the way through the section which says Current View on the Attack, is identical to what's in your notes?

A. Again, it's essentially the same. I don't know if there are typos I corrected, but it was essentially the same.

Q. So are you saying that during the interview itself, you were dictating what was a large portion of your report as you were doing the interview?

A. So part of it was during the interview itself, and then it

was in the afternoon to potentially the next morning afterwards where I tried to put in as much as I could about what I remembered.

Q. In your notes, there's no indication of what questions you asked Mr. Bowers or what answers he gave to you in response to those specific questions; correct?

A. I think there are examples where he -- where I said he denied X, Y and Z, referring to specific questions, but I did not organize it as question this, answer that, if that's what you're asking.

Q. Right. And when you say there are sections where you said he denied something, your notes kind of reflect your conclusions as to what you thought he was saying, but there's no indication of what questions you were asking him and what answers he was giving you; correct?

A. Well, I mean, if I asked him if he had a symptom and he denied it, then that's what I wrote. I guess I'm not following you.

Q. Well, can you point to anywhere in your notes where we can tell what questions you asked Mr. Bowers?

A. So, you know, when he says that he denies something, that means that I asked him about that and he denied it.

Q. And do we know how you framed that question in terms of what you asked him and what he said?

A. No. The only way to do that would be to have had a

recording.
Q. And so you are sitting there dictating a large portion of your report. Other than that, you're not kind of recording what he's saying to you; is that accurate?
A. I am recording the answers as we're going through.
Q. Let me show you 142, Defense 142 and 143, which are Dr. Rogers' detailed notes. Were you ever given access to those notes before you wrote your report?
A. No, I was not.
Q. And at any point in time, have you looked at those notes?
A. I had been given access to them following my report.
Q. And you reviewed them, correct?
A. I had looked at them and I heard the testimony about them.
Q. And you heard Dr. Rogers testify that those notes reflect the statements that Mr. Bowers was making to him as he's doing the interview; correct?
A. So I think what he said is that some of them were paraphrases, so summarizing what he said but not verbatim, and then in some places he had quotations where he was referring to specific quotes.
Q. And you didn't make any notes similar to those kind of notes, correct, where you are actually jotting down what Mr. Bowers is saying to you?
A. I mean, that's what I'm taking from this is the story. The things he told me about his beliefs are reported in those

notes.
Q. You didn't make any notes, similar to what Dr. Rogers has there, where you're taking down what Mr. Bowers is saying to you?
A. The things that are in my sections of the notes are what Mr. Bowers told me.
Q. Okay. And, again --
A. They are not verbatim quotes, but they are what he told me.
Q. I'm not referring to your dictating your final report and your notes. I'm referring to did you take any handwritten notes similar to the notes that Dr. Rogers took when he was doing his examination? A very simple question.
A. I did not do any handwritten notes. I typed notes as I was doing the interview.
Q. Thank you.
A. They were not handwritten.
Q. Now, during your writing your report, prior to it, you reviewed a large amount of social history information; correct?
A. Yes. There's a large amount of information.
Q. And you were looking, as I understood your testimony, for symptoms of neuropsychiatric or neurological disorders; correct?
A. Correct.

Q. And how much time did you spend reviewing those records, do you think?
A. A large amount, a very large amount of time.
Q. I just put a large binder of information in front of you there. Would you take a look at that binder and see if it contains the records that you reviewed?
A. So I won't be able to look through this and see if this is every record that I reviewed.
Q. Right. But just give me --
A. Is there a specific one that you're asking about?
Q. Yeah, I will be asking about specifics. I just want to get a general sense of whether, in terms of the amount of records, and just if you could flip through the index there and see if that index allows you to say, yeah, these generally -- I'm not trying to pin you down on what exact records you reviewed, but I just want to make sure we're working from the same set of records there.
THE COURT: Mr. Burt, I appreciate that clarification because we are talking about, for the record, about a ten-inch thick, one-foot thick binder we're talking about.
MR. BURT: Yes.
A. I can at least see this first part it's clipped in, but many of these are records that I reviewed.
BY MR. BURT:
Q. Okay. Good. That's all I was trying to get at.

And your report contains a breakdown of some of the records you reviewed in terms of what information you derived from those records; correct?

A. Yes.

Q. And I think when we left off yesterday, you were reviewing the very first entry under Review of Available Medical Records. And can we pull up Defendant's 156, please, page 4.

A. Am I going to be using this binder? Can I put it over here (indicating)?

Q. We are going to be using that binder. So if you could just keep it there for a minute. In that first paragraph.

You remember yesterday we talked about this section of your report, right?

A. Correct.

Q. So as I understand what you're doing is you're going through the records and you're pulling out information that is relevant to your assessment of whether there's any social history information or psychiatric symptoms or neurological symptoms that are relevant to your evaluation?

A. Correct, trying to find any information that could be relevant.

Q. And is it true that you weren't selectively going through and just picking out the things that supported your opinion; you were trying to fairly include in your summaries everything that was relevant to Mr. Bowers' social history or his

symptoms that you were looking for?
A. Yes. I would try to.
Q. And I think we talked yesterday that this first entry you have in your report references violent gestures and suicidal threats from the mother and father, but doesn't really refer who the threats were directed to; right?
A. No. It says that there were threats but it doesn't say exactly who it was directed to, but it said it was both his mother and father.
Q. We looked yesterday at a document, 379 --
MR. OLSHAN: Judge, I'd just note that there was probably ten minutes of testimony already on this same exact paragraph in the report and this same exact document.
MR. BURT: I just need to identify the document and then I'm going to move on.
THE COURT: Thank you.
BY MR. BURT:
Q. Is that the document we were talking about, 379?
A. Yes.
MR. BURT: I move that into evidence.
THE COURT: Any objection?
MR. OLSHAN: It might already be in, but I don't have an objection.
THE COURT: Defendant's Exhibit 379 is admitted.
BY MR. BURT:

Q. Could you back out of the record, please.
And you also reviewed some records from Children's Hospital of Pittsburgh?
A. Yes.
Q. And you summarize those on page 4 of your report, correct?
A. Correct.
Q. Could you highlight the third -- well, let's go through it. You indicated that at one and a half years old, he was presented to the ED -- I assume that's emergency department -- after accidentally ingesting two of his mother's pills?
A. Yes.
Q. Did you question Mr. Bowers about that incident?
A. I did not.
Q. I doubt he would be able to remember, right, at 1.5 years?
A. Correct, he would not be able to remember.
Q. Did you interview the mother at all?
A. I did not.
Q. Why not?
A. My understanding is that Dr. Dietz, another expert for the team, had reached out and was not able to interview her. There were reports of interviews that were conducted with her that I did review.
Q. Interviews conducted by the FBI?
A. Correct.
Q. Do you know what the focus of the FBI was in interviewing

the mother?
A. I don't.
Q. Do you know whether it was on documenting neuropsychiatric or neurological symptoms?
A. I don't.
Q. Would it have been important for you to actually interview the mother to see whether she had any memory of this incident when Mr. Bowers was a year and a half years old?
A. The more information that would have been available is always better.
Q. Okay. Then you note in your report that on February 26th of '74, he swallowed an alkaline substance leading to difficulty swallowing saliva, causing erythema in his oropharynx, although no ulceration was observed.
Did you question or inquire of anybody else as to what that was about?
A. No, I didn't. It was in the medical record, but I did not ask him about that.
Q. And no one else, right? The mother you had no contact with?
A. Correct.
Q. Could you back out of that, please, and go to the next paragraph. It says on May 2, 1974, at 20 months old, he was referred to an ear, nose and throat specialist due to an ear infection. It says, "An audiology exam revealed concerns from

Robert's mother about his lack of speech development. The exam noted high-pitched squeaks but no babble, jargon or intelligible speech. While he could identify a few common objects, his performance was inconsistent, and it was determined his language delay was unlikely due to hearing loss. A note on 5-21-74 described his birth without complications, weight, 7 pounds, 7 ounces. He achieved sitting at five to six months, walking at eight months, but experienced delayed speech." And then it goes on to describe his speech patterns. And it says, "It was mentioned that his mother's one-week hospitalization during that time might have had an impact."

Do you know what hospitalization of the mother is being referred to here?

A. I don't.

Q. Now, a speech delay is a neurological symptom, is it not?

A. It's a symptom that can be due to a neurological problem. In some people, it's a difference in normal development. But it in some people, it can be an indication of a neurological problem.

Q. Yesterday, during your direct examination, Mr. Olshan asked you this question: "Based on your interview of the defendant, and your review of his medical records and the other records you reviewed, if he had come into your clinic, would you have ordered an EEG in this case?" And you said,

"No, I would not." "Question: Would you have ordered any imaging?" And you said, "No." Right?

A. Correct.

Q. And when you answered that question, you had in mind this documentation of his speech problems, his delayed speech problems, correct?

A. Yes. I think I put in my report that he had had this noted speech delay but no other problems with his language after the age of two and that his language was normal for me, so I would not have ordered an MRI based on that.

Q. I see. I think you said yesterday you are not really familiar with the bible here, the DSM-5-TR; right?

A. I'm familiar with it.

Q. You are familiar with it? Okay.

A. I have seen it.

Q. Are you familiar with page 49 where it says "Loss of speech and language in a child at any age warrants thorough assessment to determine if there is a specific neurological condition such as Landau-Kleffner syndrome. Language loss may be a symptom of seizures and a diagnostic assessment is necessary to exclude the presence of epilepsy, for example, routine and sleep EEG. Declines in critical social and communication behaviors during the first two years of life are evident in most children presenting with autism spectrum disorder and should signal the need for autism spectrum

disorder assessment"?

Were you aware of that guideline in the bible here?

A. I wasn't aware of that specific guideline, but if I had seen him at age 2, I would have referred him for further workup, which I believe is what they tried to do.

Q. So when you said in answer --

A. I'm sorry.

Q. Go ahead. I didn't mean to cut you off. Are you done?

A. Yes.

Q. So when you said, in your answer to the question here, that you would not have ordered an EEG, I want to clarify, are you saying if the mother had brought him in at that age you would have done it, but given what you are looking at in terms of a history, you would not, if you had that history as an adult?

A. Yes, if I had that history and there were no other signs of language problems, I would not order those tests. If it was a two-year-old presenting with speech delay that was present, I would evaluate that further.

Q. So if an adult came in and you looked at his social history and you saw significant history of suicide attempts, delayed speech, other symptoms, neurological symptoms, you would have said, you're good to go, and said, we really don't need to do anything with you?

A. Someone presenting with a speech delay that resolves at

the age of two, 40 years later I would not look at that further.

Q. Now, one of the things you emphasize when you lecture to your students is that sometimes when a patient presents, you don't see the symptoms, and it's very important to do follow-ups. And in the presentation I showed to you yesterday, you cited an example of one of your patients that had no symptoms, had no positive imagine findings, and yet when you went back and looked at him again, the situation had changed dramatically. Do you know the case I'm referring to?

A. If I remember the case you're referring to, they did have symptoms. It's just that their imaging was normal and their neuropsychological testing was normal. And so they had the symptoms of frontotemporal dementia without those other features and I'll follow up as other features developed.

Q. So you had symptoms, neurological or neuropsychiatric symptoms, but you had negative imaging, negative neuropsychological testing. And then when you went back later and did further testing, you had positive results; right?

A. And it's because it's a progressive disease, so the disease progresses over time, those findings become more clear or are apparent later in the disease course.

Q. And you remember instructing your students that the take-home message is you've got to follow up on these cases?

A. So that isn't a case of someone with continued symptoms

that progress over time. I mean, that's different than someone who has symptoms that resolve, evaluating them 40 years later.

Q. Now, when you evaluated Mr. Bowers, you were aware that he had already undergone EEG testing; correct?

A. Yes.

Q. And you knew that there were irregularities in that EEG testing, correct?

A. Yes.

Q. And you had had the option, did you not, of conducting any kind of testing you thought was appropriate to inform your evaluation, including further neuroimaging to include MRI, PET or further EEG testing?

A. I don't know that I had the capability of dictating that. I could have asked for it and I did not.

Q. You did not?

A. Correct.

Q. Okay. Now, I asked you yesterday if you had signed that statement, I think it was dated June 12th, indicating that you would not talk to other experts in the case?

A. It was not regarding other experts. It was that I would not talk about the findings of my evaluation, I believe, is what it said.

Q. "I understand that I may not discuss the examination of Robert Bowers with anyone"?

A. Yes.
Q. Were you informed that that letter was being written because on May 8th, the Court had entered an order indicating that you were not to be talking to other experts?
A. My understanding was that I was allowed to talk to other experts.
Q. Let me hand you something. Were you ever given a copy of the order dated May 8, 2023 that I just put in front of you?
A. I believe that I was.
Q. And do you remember when you got that order?
A. I don't.
Q. Do you recall that when you read the order, it indicated that each rebuttal expert will deliver their materials to the designated government expert who will deliver all of the sealed envelopes to the Clerk of Court together with signed statements from the experts indicating their understanding that they may not discuss the examination with anyone unless defendant is convicted of a capital crime?
A. Yes.
Q. Now, as I understand it, your conversation with the EEG person took place sometime --
A. In June.
Q. In June. And then after you did your examination of Mr. Bowers on May 12th, you discussed that interview with Dr. Dietz; correct?

A. Yes.
Q. How many times did you discuss the interview with Dr. Dietz after you did the work on May 21st?
A. I'm not sure how many times it was.
Q. And what did you tell him?
A. I told him the results of my interview and examination.
Q. And in detail or can you give me a better sense of what exactly you said to him?
A. Yes. Our conversations would have been around the information that he had told me during our discussion, things that he might want to follow up on. I believe I shared a copy of my notes that you produced, and then there was a copy of the draft reports that we shared.
Q. So you were sharing information with him and he, in turn, was sharing information with you?
A. Yes.
Q. Including his draft report, correct?
A. Yes.
Q. And how many pages was that?
A. I think it was close to 200.
Q. And did he tell you or represent to you that he had written that draft report or that somebody else had?
A. Well, there's a section summarizing information on a review of records that somebody else had reviewed for him.
Q. Somebody else had reviewed for him or somebody else had

written that draft report for Dr. Dietz?
A. It was just a section summarizing the other records that I believe was written by somebody else.
Q. And did he tell you who wrote that portion of the draft report?
A. He did.
Q. Did he tell you that person was Stephen Carter, an ex-FBI agent?
A. I believe that's the name. I don't know if I knew he was an ex-FBI agent, but yes.
Q. He didn't tell you that the person who wrote -- a large section of that draft report was written by Mr. Carter; correct?
A. He did say that.
Q. Okay. And did you have any concerns that you were reviewing a draft report that was written by ex-law enforcement official?
A. So it would have been a consideration when reviewing those sections, but I didn't -- I don't think any of those sections went into my report.
Q. And why would it have been a concern?
A. Well, I would have noted who wrote it.
Q. Was there any indication in the draft report that Mr. Carter had wrote it -- written it as opposed to Dr. Dietz?
A. I don't know if that was indicated in the report. I don't

have it in front of me.

Q. Now, can we go back to your report, 156, page 4. And at the very bottom there, right before McKeesport, yeah, that paragraph, could you highlight that?

You wrote in your report that "On April 5, 1978, at age 5.5 years, Robert presented with a fever 104 to 105 degrees and began experiencing hallucinations, talking to people who were not present and expressed delusional beliefs that the wall was burning. These psychotic symptoms resolved and were attributed to a febrile illness with delirium or possibly a medication effect."

What was the source of that entry in your report?

A. I believe those were medical records I reviewed.

Q. Who was it that was documenting that entry that is the source for which you wrote here? Was it a physician?

A. It was a medical record. I don't remember who wrote which sections of that medical record.

Q. And I take it from the fact that you put this in your report that you thought that it was diagnostically significant that he was -- began to experience hallucinations, talking to people who were not present and expressing delusional beliefs that the wall was burning?

A. I put most of the medical information that I could in the report, so I have other entries that refer to ear infections that he was evaluated for. I had this and so it was something

that I noted, yes.
Q. So are you saying that the only reason you put that in the report was because you were trying to document essentially his entire medical history in your report and that's the only reason that it's in there?
A. I was trying to document any medical issue that I could find that could be relevant, yes.
Q. And you thought this could be relevant?
A. Yes.
Q. Okay. Could you back out of that, please.
Now, on the next page, at the very bottom, it says "McKeesport Hospital records," and then if you go on to the next page and highlight the first two paragraphs of that page, please.
You state in your report "Robert was admitted from 9-24-85 at the age of 13 after allegedly threatening an older boy in the neighborhood by holding a lighted aerosol can as a torch and throwing lighter fluid on his mother and threatening to ignite it."
As we discussed yesterday, that's a symptom; correct? Criminal behavior is a symptom?
A. That is a behavior.
Q. And as you state in your website, it is also a symptom, a neurological symptom. That's why you noted it here, right?
A. I would call it a behavior that can be due to a

neurological disease or could not. And that is the purpose of an evaluation.
Q. Right. But in your writing and in your teaching, you refer to criminal behavior as a symptom, do you not?
A. So, again, it is something that can be the result of a neurological or psychiatric disease. Certainly not every case of criminal behavior is due to that.
Q. Certainly not every case of criminal behavior is what? I didn't get the last part.
A. Is due to a neurological disease.
Q. So in your presentation, when you are telling medical students to look for symptoms and you put down antisocial symptoms, that's -- is that different?
A. Yes. So antisocial, nuanced antisocial symptoms can be a sign of frontotemporal dementia. That does not mean that every instance of antisocial behavior is a sign of frontotemporal dementia.
Q. I see. And so could you bring up 170, please, for a moment, second paragraph. When you say that "Both neurological and psychiatric patients can share similar symptoms, including delusions, hallucinations, criminal behavior and disordered free will perception," are you now saying that description on your website is wrong?
A. I'm trying to make it as clear as I can that criminal behavior, antisocial behavior, can be the result of a

neurological disease. But it is not my opinion that every act of criminal behavior or antisocial behavior is a neurological disease.

Q. And how long -- is that an opinion that you developed for purposes of this case or is that an opinion you've always held?

A. That's an opinion I've always held.

Q. So would you go to page -- I'm sorry, Exhibit 172, and page 20. So you're lecturing your students here in doing evaluations, FTD evaluations, to look out for behavior such as antisocial, disinhibited, inappropriate, crimes, fraud, scams, other legal issues?

MR. OLSHAN: Your Honor, I'm going to object at this point. We covered this ground already. I would like to, if the Court would permit, have a brief sidebar.

THE COURT: We'll have a sidebar. Can we take that down while we're at sidebar, please.

(At sidebar.)

MR. OLSHAN: Your Honor, yesterday afternoon, the Court inquired of Mr. Burt how long we were going to be this morning. It's been 40 minutes already. Mr. Burt was going to take the evening to cull down his notes. We're on page 4, I think, of Dr. Darby's report.

Twice already this morning, Mr. Burt has gone back to topics that he cross-examined the witness about before. So we

are objecting at this point to the length of this cross-examination, because, one, it's about to exceed Mr. Burt's own estimate, and two, he is covering ground that he's already covered with this witness on cross-examination.

THE COURT: Okay. Mr. Burt.

MR. BURT: Two things. I wanted him to identify the exhibit we talked about yesterday that was with the attorney to the topic of the 1973 records.

Second of all, in terms of the other topic that I'm inquiring about right now, he's changing his testimony from yesterday. Yesterday he said --

THE COURT: In what way?

MR. BURT: Yesterday he said that criminal behavior was a symptom. Apparently he's --

THE COURT: I don't recall him -- I recall him saying the exact same thing. I may be wrong.

MR. OLSHAN: He did not say that, Your Honor. He's explaining it in the exact same way he explained it yesterday.

MR. BURT: I disagree with that.

THE COURT: I'll let the record speak for itself on that point. I don't recall it being different.

In any case, he has explained his position regarding this eight times today. I'm not -- I'm going to let you continue. How much time are you going to be, realistically?

MR. BURT: I've got a few more items on his report

that I want to cover and I'm done.

THE COURT: Is that ten minutes or is that two hours? I'm not trying to box you in too much.

MR. BURT: A lot depends on his answers. I do respectfully disagree that he's being consistent. If he gives me inconsistent answers, I'm going to go back and clarify that he's made statements directly contrary to what he's saying now, so I can't anticipate that.

THE COURT: Fair enough. My disagreement is respectful as well. That said, I'm hoping we can move through this quickly. I think the witness is being cooperative and very straightforward, as far as I can tell, and relatively precise in his answering, but I'm going to permit you to continue.

MR. OLSHAN: Your Honor, I just want to make a record. Mr. Burt said at sidebar his estimate was "I think, outside 45 minutes, but I would like an opportunity to try and consolidate my notes and shorten it up in the morning and hopefully can finish in a half hour, 45 minutes."

We are at 45 minutes. So Your Honor, just so the Court is aware, if Mr. Burt is going to be repetitive, I'm going to be objecting each time.

MR. BURT: That's fine. As counsel knows, this is a capital case. If the Court wants to cut off the cross-examination, I would make a motion to strike his

testimony and we can preserve that issue for review.

THE COURT: I don't want to cut off his testimony, but I don't want to needlessly or irresponsibly engage in cumulative or repetitive testimony, and I'm sure you don't either, so I encourage you not to do so.

MR. BURT: Thank you.

THE COURT: Thank you.

(In open court.)

BY MR. BURT:

Q. Could you bring that slide up, please? This is what you instructed your students, correct?

A. Again, I believe this is a lecture I gave to the geriatric medicine group describing behaviors that can be seen in frontotemporal dementia.

Q. Thank you. You can take that down.

Back to your report, 156. Would you go to page 5?

MR. OLSHAN: Could we please take that down?

MR. BURT: Take what down?

MR. OLSHAN: Your Honor, we had an issue with respect to redaction. So I would ask Mr. Burt to be mindful because their exhibit has not been redacted.

MR. BURT: I am mindful of that.

THE COURT: Thank you, sir. I appreciate it.

BY MR. BURT:

Q. Could you go to the next page, please? I'm sorry, page 5.

Here, at the top, you are reviewing his records from the McKeesport Hospital records; correct?
A. Yes, I believe so.
Q. Would you go highlight the paragraph right before the Southwood psychiatric hospitalization. He noted in the records that he was diagnosed with chronic -- this is in 1985 -- "diagnosed with chronic depression, an adolescent adjustment reaction and a homicide attempt. A possibility of incipient schizophrenia could not be ruled out definitively." What is incipient schizophrenia?
A. I believe what they're referring to is could these be -- does not fit the criteria for schizophrenia, but there could be signs that could eventually lead to that.
Q. Do you know what the person is referring to here or is that just your understanding?
A. That's just my understanding. I don't know what this term at that time meant.
Q. And did you interview or attempt to interview the person who made -- the mental health professional who made this entry?
A. No. From the 1980s?
Q. Yes.
A. No, I did not.
Q. It said at the bottom there, "Medications prescribed during this period included Cogentin and Thorazine." What is

Thorazine?
A. It's an anti-psychotic medication.
Q. And how about Cogentin?
A. Cogentin is a medication that's typically used to try and prevent side effects.
Q. Now, did you also have in your report an indication that the mother had been beaten by the husband and thrown down the stairs when she was about eight months pregnant?
A. That sounds familiar. Is it in a specific part?
Q. Yes. Let me find it for you. Could you go to page 5, last paragraph, please.
A. Yes.
Q. You wrote -- and, again, this is from the Southwood psychiatric records -- "Social history noted that his mother was reportedly 'a wreck' during pregnancy due to conflict with Bowers' father, including reportedly suffering a concussion after being pushed down a flight of stairs by him at eight months pregnancy."
Can that sort of event have an impact on a fetus?
A. It's possible that it could.
Q. And what would the concern be with an injury like that?
A. It could be a range of things. It could be that it resulted in stress in the mother, some type of injury to the mother occurred, that that baby would be hit on the fall. There could be a number of different things.

Q. Is that why you noted it in the record, because that could have diagnostic significance in terms of a possible injury to the fetus?
A. It was in the record, yes, so I noted it.
Q. You can take that out or down. Did you also interview Mr. Bowers about a head injury that he suffered in 1993 as a result of a car accident?
A. He described two head injuries to me, yes.
Q. What did he tell you about those?
A. The first, he was, I believe, in middle school, fell and hit a bleacher. He doesn't remember much about it other than his mother had to wake him up overnight.
And in the second was he was driving a delivery van for the bakery, was in a car accident, and I think the rack in the back hit him in the back of the head. He had some memory loss around the time of that. He may have gone to the hospital but doesn't remember any changes that occurred after that.
Q. Did he describe how staples were placed in the back of his head as a result of the wound?
A. Could I look at my report?
Q. Sure. Certainly.
A. Yes, he did say that.
Q. I want to show you an Exhibit 214. Do you recall reviewing a police report documenting that he, in fact, had been in this accident and had been taken to a hospital in

1993?
A. I don't recall reviewing this, but this would go along with that.
MR. BURT: I move that into evidence, Your Honor.
MR. OLSHAN: No objection.
THE COURT: No objection. It's admitted as Defense Exhibit 214.
BY MR. BURT:
Q. Did you also review some records from the Bradley Center?
A. Yes.
Q. When was Mr. Bowers admitted to the Bradley Center?
A. So, after his admissions to psychiatric hospitals, he was admitted there.
Q. Could you go to page 6 of Dr. Darby's report, please? At the bottom of the page, would you highlight where it begins "Bradley Center program."
In your summary here of the Bradley Center program, you seem to be focusing on things like "Robert enjoyed making explosives and didn't seem to recognize the danger," right?
A. That's something I reported here, yes.
Q. And not being able to recognize danger is a symptom, is it not?
A. Again, it would be something that I would want to consider.
Q. Now, your report here also focuses on the fact that he

improved during the time that he was in the custody of this program, correct?
A. That was reported.
Q. But nowhere in your summary did you notice what the presenting symptoms were that got him there in the first place, right?
A. Those were summarized in the prior records.
Q. But in terms of the Bradley Center records, they indicated, did they not, what his treatment areas were, the things that got him committed to this institution?
A. Maybe I'm not following you, but I believe that those were reviewed in the records from the psychiatric hospitalizations.
Q. They were reviewed in what sense? I'm not sure I follow you.
A. So, I guess the reasons are anger and aggression and issues there that were reported in the psychiatric hospitalization as the reason why he went to Bradley Center, that I may have not included all of those things again in the secondary record.
Q. Would you take a look at tab 1 of that big binder there in front of you?
A. Yes.
Q. Is tab 1 the Bradley Center records?
A. It is.
Q. And page 2 of those records indicates the treatment areas

that Mr. Bowers was in that institution in the first place for; right?

A. These are areas that they are working on improving.

Q. And the areas are, number 1, poor social skills; correct?

A. Where is that?

Q. Page 2.

A. Yes.

Q. Impulsivity?

A. Yes.

Q. Poor self-esteem?

A. Yes.

Q. Catastrophic thinking?

A. Yes.

Q. And none of those symptoms are noted in your report, correct?

A. I said that they are -- if I could look again.

Q. Sure.

A. I believe I said he had improvements.

Q. Right. And that's my point. Is it your focus on he's improving?

A. I said he improved with his interactions with peers, becoming more socially engaged. So that was referring to the social skills.

Q. Right. But in terms of what got him there to begin with, these areas kind of identify what the problem was at that

point; right?
A. I mean, I guess I go through each of these problems. His living space was clean, although he received reminders for self-care refers to the -- and then I noted there was a noticeable decrease in impulsive and risk-taking behaviors. I guess my reading of that indicates that he had those and that they improved or decreased.
Q. Under structured -- in a structured environment, his conditions improved, correct?
A. Yes, that's what it says in this report.
Q. Can someone with a neurological disorder improve in a highly structured environment?
A. There can be improvements, although typically the problems are still there.
Q. And what is it about a structured environment that allows somebody with a neurological disorder to operate effectively in a controlled environment?
A. So it's really the opportunity to act on those impulses. And so if someone has difficulty controlling their finances, if they no longer have a credit card, then they can't act in that same way.
Q. Just a few more things and we're done. Is it true that neurological disorders are often associated with impairments in emotional processing and social cognition?
A. There can be, yes.

Q. And you were informed through Dr. Martell's testing that Mr. Bowers had a severe deficit in social cognition, correct?
A. He had a problem in understanding the emotional intonation of voices.
Q. And that's a significant symptom, correct?
A. It was abnormal, yes.
Q. Yeah. Severely abnormal, right?
A. On that test, yes.
Q. That was Dr. Martell's opinion?
A. Correct.
Q. And you've written about those kinds of symptoms in connection with your writing about Huntington's disease, right?
A. I don't remember that specifically.
Q. Do you remember saying that "Huntington's disease is associated with impairments in emotional processing and social cognition that may play an important role in the development of criminal behavior"?
A. Yes. My understanding in Huntington's is that it is emotional recognition of faces.
Q. Right. And so a deficit in social cognition can play a significant role in the development of criminal behavior, correct?
A. I think it's possible, depending on the situation.
Q. You also wrote that "deficits in theory of mind have also

been linked to criminal offenses." Is that true also?
A. I think in certain situations, it can be. I don't know how closely that's been linked, but it is an idea that that could be important in several types of criminal behavior.
Q. You said that your opinion was that Mr. Bowers had a vascular disease. Did you order any lab work or other tests to assess the seriousness of that disorder?
A. I did not. There would be no other tests that would help to assess that beyond the MRI for the small vessel disease that we're talking about.
Q. You said that you talked to Mr. Bowers about the War on White People, The Great Replacement, Jews and immigration?
A. Yes.
Q. Who came up with that list to talk to him about?
A. Those were the things that he told me about.
Q. And based on what he told you, you felt that his own belief was that he was impelled to commit the criminal acts that he committed; correct?
A. I don't remember writing that.
Q. I'm asking you whether that's your opinion. You said, I think on your direct examination, that he felt the need to commit these crimes?
A. I think he told me that he felt like he had to do something to address these issues and that this act was the way that he could do that.

Q. And you described it as a "need" in your direct examination. Were those his words, he needed to do this?
A. It was something similar to that, that he felt like he needed to act and that this is what he did.
Q. And in terms of his mental state at the time of the crime, did you have occasion to review the statements that Mr. Bowers made to law enforcement officers immediately following his arrest?
A. I did.
Q. And was that consistent with what he told you in terms of why he had to act, those statements?
A. He communicated statements about Jews and the need to -- I guess is there a specific statement you're referring to? There were a number of them.
Q. I think the gist of them was that he felt compelled to act, "I had to do this," "Jews are killing our children."
A. He stated beliefs about Jews, yes.
Q. And was the way he stated them similar to what your understanding was he stated to the police back at the time of his arrest?
A. Were the statements that he made to me?
Q. Yeah. Were they along the same lines, in terms of the urgency that he felt to act?
A. Well, I don't know if it was an urgency. He waited six months to act. But he did feel like he wanted to do something

because of these issues.

Q. Well, did he say "I wanted to do it" or "I needed to do it"? Because on direct examination, you said -- the statement was "he needed to do it." Are you now changing your testimony and saying, he really said he just wanted to do it, like it was some casual thing?

A. No, I don't think it was a casual thing.

Q. Did you think the crime itself in this case was a symptom, a neuropsychiatric symptom?

A. No, I did not believe that any neurological disease contributed to this crime.

Q. My question is not whether you thought a neurological disease contributed to the crime. It's whether you thought the crime itself was a symptom of mental disorder, as you've instructed your medical students.

A. In this case, the criminal act was not related to any neurological disease. It was not a symptom of any neurological disease.

Q. So in this particular case, as opposed to what you instruct your medical students, criminal behavior is not symptomatic; right?

A. I have tried to clarify. I tell my students that criminal behavior that is new in onset can be a sign of neurological disease. That does not mean that every act of criminal behavior is a neurological disease.

Q. I see. You told me that you spent 150 hours on this case?
A. Yes.
Q. And my question is, by my count, the eligibility phase of this case has lasted about 24 hours and 49 minutes so far. And you said that you've sat in the entire eligibility phase, right?
A. Yes, or I think the first day I was not present.
Q. So is the amount of time you spent on the case 150 hours plus the 24 hours you spent sitting in the courtroom listening to witnesses?
A. Yes. I haven't tallied up the amount of time since the case -- the trial started.
Q. So it's 150 plus whatever that time is, 24, 25 hours?
A. Plus the amount of time I've been here.
Q. And do you bill a different rate for sitting in court listening to witnesses than you do for your evaluation process?
A. No.
Q. Same billing rate?
A. Correct.
MR. BURT: Thank you, Doctor.
THE COURT: Thank you, Mr. Burt.
Mr. Olshan, do you care to conduct redirect? We started late so if you want to do it now, you can, or we can take a break. Whatever makes most sense to you is fine by me.

MR. OLSHAN: I think we can take a break now.

THE COURT: Why don't we attempt to reconvene in ten minutes.

(Jury excused.)

THE COURT: Thank you, everybody.

(Recess taken.)

(Private session held.)

MR. BURT: Before we begin, can we approach?

THE COURT: Just be careful. The public is here. We don't have -- put the sound on.

MR. BURT: Based on the testimony of Dr. Darby, we would move to strike his testimony and also move to prohibit the testimony of Dr. Dietz on the grounds that he has clearly violated the Court's Rule 12.2 order which prohibited these experts from talking with each other and also prohibiting them from talking to outside experts, which Dr. Darby said he did in relation to the EEG expert. So I think there's clear violations that sanction that the Court should strike the testimony and prohibit Dr. Dietz from testifying.

MR. OLSHAN: Your Honor, the Court's order did no such thing. The Court permitted the experts to conduct the examinations as they deemed necessary and prudent. One of the things that I was going to confirm with Dr. Darby is that in his report, which is under cover letter to the Court, in his report, he indicated he talked to Dr. Crudele, he talked to

Dr. Dietz, he talked to Dr. Mayberg, he talked to Dr. Martell.

There's nothing in the Court's order that prohibited the professional experts from talking to each other and doing what was necessary in order to complete their examinations in the time that the Court permitted.

Rule 12.2 is about the disclosure of potential Fifth Amendment material to the prosecution. That didn't happen. So to the extent that Mr. Burt is insinuating that the witness did anything inappropriate with respect to his consultation with any of the other government experts or Dr. Crudele so that he could be careful about the EEG read, that is completely incorrect and the Court should deny any request to strike this witness' testimony or Dr. Dietz's.

THE COURT: I'm not at this moment convinced that I -- let me take it under advisement. I'm not inclined to grant that motion, but let me look at it to make sure.

MS. LONG: The Court's order did say that the expert report should go individually under seal, sealed document. Each of the experts that the government retained were supposed to provide a report under seal in a sealed envelope and they were supposed to provide all of those envelopes sealed to the government's lead expert and then that lead expert provided them to the Court.

But in no place -- so we took it to mean that those experts were not to be seeing each other's reports. That was

the whole purpose of the sealing of the individual reports.

MR. BURT: And also, just to add, under no interpretation would it allow consultation with an expert that the Court did not authorize to do any work on the case. The wording of the Court's order is clear. It did prohibit, as we read it, any consultation with people who had been retained and certainly any people who had not been retained.

MR. OLSHAN: Your Honor, I don't believe the Court's order specified anybody by name. I would also note there was no prohibition in the Court's order that the experts had to even do their examinations independently. They all could have chosen to be in the same room. The Court left that to the experts in their evaluation of what was necessary given the time constraints that the Court imposed.

There is nothing about the conduct of the experts in this case with respect to their consultations, their preparation and their candor to the Court that would in any way warrant a sanction like what Mr. Burt is suggesting. We would ask the Court to rule clearly on that when the Court is ready to do that.

THE COURT: I'll do so when I'm ready. I want to look more closely on the order and the issue. Thank you.

MR. OLSHAN: There's one other thing, but we can do it in open court.

THE COURT: Mr. Olshan.

MR. OLSHAN: Your Honor, one more matter before the jury returns. We want to ask -- we're asking the Court for a curative instruction. Yesterday, and again just now, Mr. Burt, through his questioning of the witness, insinuated that there's something unethical or improper about the witness or any other expert witness being in the courtroom and observing the testimony of other experts.

As the Court will recall, this was by agreement of the parties. I believe the Court actually teed up this issue right before we started the eligibility phase as to whether experts would be permitted in the courtroom. That was agreed to by the parties.

The defense has equal opportunity -- Mr. Freedman is sitting at counsel table and has been throughout this entire phase. So we would ask the Court to instruct the jury that both sides were permitted by order of the Court for their expert witnesses to sit in the courtroom, as is common in cases in which there's expert testimony, and that they should disregard any insinuation that there was something improper about what this witness or any other government witness did.

We would also note that there is realtime transcription, so whether or not their experts are sitting in the courtroom, they could be somewhere else reviewing the realtime transcript and providing information to the defense team. That's totally appropriate.

But the nature of the questioning insinuates for the jury that there is something untoward about what this witness and the government's experts did. So we would ask the Court to issue a curative instruction on that point.

THE COURT: Mr. Burt.

MR. BURT: First of all, we objected to the presence of Dr. Dietz being in court while this witness was testifying. The Court overruled that objection. Noting that the witness is present, there's nothing inappropriate. I didn't insinuate that it was an ethical violation.

I merely pointed out that the witness who is next going to testify for the government is sitting in court hearing this witness testify. That's an appropriate question on cross-examination.

There was no objection to that questioning. And so I think, for the Court to comment that an insinuation was made, would not be an appropriate response at this point because no insinuation was made.

MR. OLSHAN: Your Honor, that's exactly what was done. Mr. Burt asked this witness not questions about whether or not it was okay for Dr. Dietz to sit in the courtroom while he testified, but he asked questions about where they're sitting.

The Court knows that both sides have allotted seats where people associated with the parties can sit. He asked

questions about the fact that the government's experts were sitting behind the government table and providing information, and he did that by insinuating that the witnesses were somehow advocates for the government in violation of their ethical obligations as physicians.

So that was clear not from the discussion we had about whether Dr. Dietz could remain in the courtroom while Dr. Darby testified, it was clear from the questioning Mr. Burt advanced in front of the jury.

And so we would ask the Court to correct the record, that there's nothing improper about experts for either side sitting in the courtroom and sitting in designated seats. That is common, not just in cases like this, but in any case where there's expert testimony, particularly here where this witness is a rebuttal witness.

THE COURT: Okay. I'm going to deny the government's request in this regard. The questions were raised within the context of inquiring about the witness' understanding of his own role as an independent witness.

Certainly, you can revisit that question if you care to do so. I would invite us all to consider how we can most efficiently use all of our time. I understand your concern, but I don't think it warrants the Court redirecting anything.

But again, it's fair ground for further examination or further highlighting the points you just made to me, some

of which I think would be appropriate. I should say this would not be inappropriate to make to the jury, perhaps not all of it.

That said, the motion is denied. Anything else before we bring the jury in?

MR. OLSHAN: No.

THE COURT: Thank you.

Ms. Kim, please bring in the jury.

(Jury present.)

THE COURT: Welcome back. Please be seated.

Mr. Olshan, you may conduct your redirect.

MR. OLSHAN: Thank you, Your Honor.

REDIRECT EXAMINATION

BY MR. OLSHAN:

Q. Good morning, Dr. Darby.
A. Morning.
Q. I want to start with a few things that Mr. Burt asked you about this morning. He asked you whether you interviewed the defendant's mother. Do you remember him asking you that?
A. Yes.
Q. Do you remember -- and your answer was you did not?
A. Correct.
Q. Do you remember the testimony of Dr. Rogers?
A. Yes.
Q. Was he asked whether he had tried to interview or did he

state whether he had tried to interview the defendant's mother?

A. He was asked that, yes.

Q. And had he?

A. I don't believe so.

Q. Mr. Burt showed you Dr. Rogers' notes. Did you have access to those before you finalized your report?

A. No.

Q. Mr. Burt also asked you some questions about whether the content of your notes, your typewritten notes, was reproduced in your ultimate report. Do you remember those questions?

A. Yes.

Q. And I believe he was asking you whether they were essentially verbatim, and you testified there were some edits and you had removed one Google Maps reference; is that correct?

A. Correct.

Q. There was testimony about Dr. Rogers' notes. Do you remember that?

A. Yes.

Q. And were there substantial details in his notes about the defendant's conduct that were not in Dr. Rogers' report?

A. Yes.

Q. This morning, Mr. Burt asked you about whether speech delay could be a neurological symptom that you would take into

consideration. Do you remember that?
A. Yes.
Q. Just so we're all clear, that speech delay, based on your review of the records, was at what point in the defendant's life?
A. It was when he was about two years old.
Q. You interviewed him when he was 50?
A. Yes, 49 or 50.
Q. Approximately, 48 years later?
A. Correct.
Q. Was that passage of time relevant to you in assessing whether or not that speech issue, when he was that young, was something that would support currently a neurological disorder or the presence of a neurological disorder?
A. Yes. It was to look to see if that continued over time, and there was no indication after the age of two that he had any problems with speech or language.
Q. Mr. Burt asked you some questions about the Court's order, the rules that were in place with respect to your examination. Do you remember that?
A. Yes.
Q. And do you recall that the government was required to list which tests the experts were going to administer prior to actually -- the experts obtaining the records about the defendant?

A. Yes, I believe so.
Q. Were you also limited in the amount of time that you and the other experts had to conduct examinations of the defendant?
A. Yes.
Q. Now, if you had deemed, in consultation with the other experts, that it would be appropriate to examine the defendant together or in more than one at a time, you could have done that?
A. Yes.
Q. On cross-examination yesterday, Mr. Burt asked you about the definition of "delusion" that you used. Do you remember that?
A. Yes.
Q. You testified that you are not a psychiatrist, so you typically do not use the DSM?
A. Yes. I think my definition overlaps with it.
Q. I just want to clarify whether your view of, for example, persecutory delusions in this case is consistent with the description of those in the DSM-5-TR. There's been testimony about that. Do you remember?
A. Yes.
Q. So was the definition you used consistent with that description, which is that persecutory delusions, i.e., a belief that one is going to be harmed, harassed and so forth

by an individual organization or other group, that's from the DSM-5-TR?

A. Yes.

Q. And is that consistent with your approach to persecutory delusions?

A. It is.

Q. Are you aware that the American Psychological Association has definitions of certain psychiatric terms or psychological terms?

A. Yes.

Q. And are you aware that institutions like Johns Hopkins has a psychiatry guide including definitions of certain terms?

A. I think there are probably many different references for defining these terms.

MR. OLSHAN: Your Honor, we would offer Government's Exhibit 1466 from the Johns Hopkins psychiatry guide and Government's Exhibit 1465 from the American Psychological Association as to the definition of "delusion" in those references.

MR. BURT: I don't think he has a foundation that this expert relied on these definitions.

THE COURT: I don't know that he relied upon them, but you might want to ask more questions to establish a foundation.

BY MR. OLSHAN:

Q. Is it your testimony that you're -- although you're a neurologist and so you don't typically rely on the DSM, that your definition of "delusion" as you applied it in this case is consistent with psychiatric and psychological definitions of the term "delusion"?

A. Yes.

Q. And would it assist you to review the definition of "delusion" from, for example, the Johns Hopkins psychiatry guide?

A. Yes.

Q. And the American Psychological Association?

A. Yes.

MR. OLSHAN: We would offer these exhibits, Your Honor.

MR. BURT: There's no foundation.

THE COURT: Sidebar briefly.

(At sidebar.)

MR. BURT: So the objection is there's no foundation that this expert relied on these definitions. He was very clear yesterday that the definition he used was his own. There's no mention in his report of any definition from the two sources that counsel is submitting you from some website which, on its face, looks to be something that -- I'm not sure what it is, but I don't think there's a foundation unless he wants to call these people and say that this expert --

THE COURT: Is the objection hearsay, foundation or authenticity of these documents?

MR. BURT: It's not authenticity. It is a relevance objection because there's no foundation he relied on these definitions. It's hearsay because it's bringing before the Court expert testimony by somebody who is not subject to cross-examination. And it's a confrontation clause issue as well as a 3593(c), more prejudicial than probative, absent a foundation that these are the definitions he used.

MR. OLSHAN: Your Honor, one, we are outside the Rules of Federal Evidence. And even if we weren't, everything -- a lot of what Mr. Burt did in his cross-examination went well beyond the bounds of the Federal Rules of Evidence.

The nature of his questioning on cross-examination is that you are out of step with what the definition of a delusion is. Mr. Burt referred to materials that were completely separate from what this witness reviewed and what he testified about. So it's not about whether or not the witness relied on these definitions.

It's to respond on redirect to the nature of Mr. Burt's questioning that what this witness did was somehow his own made-up, out-in-the-ether definition of "delusion." So the witness can absolutely testify about this and say, I'm familiar with this definition and what I applied is consistent

with that. There's no hearsay issue.

THE COURT: It's not being offered for the truth of the matter asserted. First of all, the rules of evidence don't strictly apply, although I take some guidance from them here. That said, there's no hearsay problem because you're not really offering it for the truth of the matter asserted.

You're simply saying there are different entities that define "delusion" differently. And I assume you might elicit from this witness that, while he is not necessarily a member of these organizations, he recognizes them as professional, reliable sources of medical and psychological knowledge within the medical community.

MR. OLSHAN: That's all, Your Honor.

THE COURT: Again, you don't have a genuine authenticity objection. This is, I assume, a publication from the American Psychological Association and Johns Hopkins. I don't know that but --

MR. OLSHAN: The APA Dictionary of Psychology is the entry on delusions. It's the Johns Hopkins psychiatry guide entry on delusions, Judge.

THE COURT: I don't know if he would acknowledge them as learned treatises, but he might.

MR. BURT: The Court is correct that under the Court's ruling, the rules of evidence don't apply, but 3593(c) does apply. The evidence has to be relevant and it's not

relevant. And it's also, there is a confrontation clause problem here to the extent he's introducing opinions by other experts not before the Court, here's my definition of what "delusion" is. This expert has said clearly on direct examination he didn't know what the definition was from the DSM. He said --

MR. OLSHAN: He did not say that.

MR. BURT: He said clearly that he relied on his own definition. There was no reference in the report to what the source of his definition is. Counsel apparently went out overnight, dug these definitions up. It has nothing to do with this expert's opinion. If he wants to call another expert to say there are other expert opinions out there, that's fine, but it has no relevance to this witness' testimony.

He has not relied on it. He's not familiar with it until counsel puts it in front of him and says, oh, yeah, I'm familiar with it now.

THE COURT: I don't want to spar with you, but I am curious. The DSM-IV, he similarly said, look, I don't -- some of us are calling it the bible, but he didn't adopt it as the authoritative source. He made it clear that, I think I'm saying -- that I'm offering a definition that overlaps with what I understand to be the DSM-IV, but he's not being authoritatively guided by it. How does that come in? Other

than it's already in through other witnesses, how is it relevant to his testimony even in the context of cross?

MR. BURT: The jury has heard from other witnesses that the definition of "delusions" in the DSM, what that definition is and who has applied it. So the question on cross was, did you apply that definition. The jury knows what that definition is. This is different.

Now he's saying, well, here's two other definitions outside the DSM and I, what, I relied on it? He's not going to say that. There's no credible indication he relied on it. The only relevance is counsel's assertion that, oh, other people out there believe that there are other definitions. That's got nothing to do with this witness' testimony.

If he wants to bring in experts to say that, he can do that. That's relevant, but it's not relevant in the context of this cross-examination to try and feed these definitions to him and say, oh, yeah, I just realized these are the ones I relied upon.

THE COURT: I don't think he's going to say he is relying upon them. I'll let him speak for himself.

MR. BURT: He's never seen it. So how is he going to say these are common definitions?

MR. OLSHAN: He is going to say that -- and to be clear, Mr. Burt opened this door by insinuating through his questioning that this witness uses some made-up fanciful

definition in his own mind. And the witness testified that there are different definitions of these terms and his is consistent. And so this is just examples of how his applied definition in this case is consistent with other definitions. Mr. Burt elicited this.

On the confrontation clause point, Judge, just for the record, as a legal matter, nothing about writing a definition is in any way testimonial. So we have nothing here that implicates the Sixth Amendment even if -- we don't implicate the Sixth Amendment. The witness is not going to say, I relied on these. He'll be asked, is your -- is the definition of "delusion" that you used in this case consistent or not with these other sources? Yes. That's something that Mr. Burt clearly opened the door to. It's not going to -- this sidebar is taking longer than the testimony.

THE COURT: I'll give you the last word, Mr. Burt.

MR. BURT: Sure. The issue is not how long the discussion is going to take. It's whether the evidence is relevant. It's not relevant for him to be confronted with definitions he's never seen. Counsel has no idea what he's going to say if he's adhering to the Court's order not to talk with the witness, so he has no foundation this witness has ever seen these documents.

To spring the documents on him and say, is your definition of "delusions" consistent with these definitions

is, I think, not relevant given the testimony that he's given so far that he has a definition, he used it, and his definition is his personal definition, not this definition or these definitions. There's no foundation and relevance to these particular exhibits.

THE COURT: I'm going to overrule your objection. That said, I am willing to offer a limiting instruction really just to say the government is not proffering either of these definitions as authoritative or through expert opinion in any manner. They are simply definitions that are available through common sources or otherwise as acknowledged by the witness.

MR. BURT: I do want the Court to give the instruction, but my point is I think it just underscores that -- to say these are just definitions he took off the Internet just underscores that under 3593(c), this is more prejudicial, time-consuming, misleading than probative of this witness' opinions because he hasn't seen these definitions, didn't rely on them.

MR. OLSHAN: Your Honor, again, that's not the point of the testimony. It's to allow him to review it and say, yes or no, we'll see, his approach to delusions in this case is consistent with these or not. The DSM is authoritative, but there are other definitions as the witness has already testified to, so --

THE COURT: Right. But no one has identified -- we don't have an -- we don't have the expert testimony established --

MS. LONG: Mr. Burt did ask Dr. Darby, gave him ample opportunity to say what the source of his definition was, and he failed to do so. He pointed to one of his own publications. Ultimately he said, look, it's my own, it's what I believe in my mind is the right thing. Now the government is feeding him this. You can see the prejudice in this.

THE COURT: I hear what everybody said. I'll keep the rest of my comments to myself. We are spending a lot of time on delusions. Anything else?

MR. OLSHAN: No.

THE COURT: Thank you.

(In open court.)

THE COURT: Thank you for your patience, ladies and gentlemen.

Mr. Olshan, what numbers have you associated with those documents? What exhibit numbers?

MR. OLSHAN: 1465, 1466.

THE COURT: Okay. Consistent with our discussions at sidebar, ladies and gentlemen, I'm going to permit the government to present these two exhibits to the witness and elicit some testimony from the witness regarding those

exhibits. I'm going to give you what's called a limiting instruction, so portions of these are definitions will be read to you.

I just want to remind you that we've not received any expert opinion testimony regarding the authoritativeness of these definitions. They are not really being offered for that purpose. I'm telling you don't use them for that purpose. They are not definitions that are authoritative descriptions of the words they are attempting to define. Mr. Olshan is making a different point with this witness, I believe, and he may do that much. But I don't want you to accept these definitions as an authoritative statement of these terms.

MR. OLSHAN: May I proceed?

THE COURT: Yes.

MR. OLSHAN: I apologize. Has the Court formally ruled on the admission of these two?

THE COURT: 1466 and 1465 are admitted subject to the limiting instruction.

MR. OLSHAN: Thank you.

BY MR. OLSHAN:

Q. There was testimony yesterday about your definition of "delusion" that you use in your neurological practice. Do you remember that?

A. Yes.

Q. And I just asked you a question about whether your

definition or approach to delusions is consistent with the description in the DSM. Do you remember that?

A. Yes.

Q. If we could publish the definition of "delusion" from the American Psychological Association, that's Government Exhibit 1465.

Can we zoom in on the definition. You see that in front of you, Dr. Darby?

A. Yes, I do.

Q. Can you read just the first sentence below "delusion"?

A. "An often highly personal idea or belief system not endorsed by one's culture or subculture that is maintained with conviction in spite of irrationality or evidence to the contrary."

Q. And I'm not asking if that was the basis for your definition that you use in your practice as an expert in delusions, but is this consistent with how you conceptualize delusions?

A. Yes, it is.

Q. If we could take that down. Publish Government's Exhibit 1466, delusions from the Johns Hopkins psychiatry guide.

Do you see that in front of you, Dr. Darby?

A. Yes, I do.

Q. Can you read the first bullet and the three sub bullets, please?

A. "A delusion is a fixed, false and idiosyncratic belief and is one of the trilogy of psychotic symptoms; hallucinations, delusions and thought disorder. 'Fixed' refers to the strength of that patient's belief. The patient is certain and not persuaded by any arguments to the contrary. 'False' relates to the veracity of the patient's belief. 'Idiosyncratic' means the belief is characteristic of the individual patient."

Q. Can you read the next two bullets, please?

A. "Beliefs about which the truth cannot be known with reasonable certainty, such as cultural or religious beliefs, should not be classified as delusions without careful consideration. Beliefs shared by a group of people, for example, a belief in UFOs, are not delusions."

Q. Do you see a bullet farther down that starts with "delusions and hallucinations"?

A. Yes.

Q. What does that say?

A. "Delusions and hallucinations frequently co-occur."

Q. Now, Dr. Darby, I'm not asking you if this is the definition that you relied on when you -- in your practice as a neurologist or when you examined the defendant and the records in this case. My question is only, is the definition that you used, do you believe it to be consistent or inconsistent with this additional definition of "delusion"?

A. It is consistent.
Q. Thank you. We can take that down.
You run the frontotemporal dementia clinic at Vanderbilt?
A. Yes.
Q. Vanderbilt is a premier medical institution in the United States?
A. Yes, it is.
Q. Do you see patients with delusions on a fairly regular basis?
A. Yes.
Q. The definition you use of "delusions" in your practice as a neurologist, is it consistent with what you talk to other neurologists about and residents and other practitioners in your field?
A. Yes, it is.
Q. So we're clear, I believe you testified on cross-examination that your definition refers to whether or not the belief is personally salient?
A. Yes.
Q. Whether or not the content of it is internal or from an external source?
A. Yes, whether it's generated by a disease or whether it's a learned or shared belief of one's culture.
Q. And whether or not there are other delusions or psychotic symptoms along with it?

A. That would support as delusional.

Q. Based on your experience as a neurologist with a focus on behavioral neurology and neuropsychiatry, does the defendant suffer from any delusions, in your opinion?

A. No, he does not.

Q. Mr. Burt asked you some questions on cross-examination about whether behavior ties to something occurring in the brain. Do you remember those questions?

A. Yes.

Q. I want to see if I understand you correctly. Are you saying that all behavior, criminal or otherwise, ties to some kind of brain dysfunction?

A. No. So I believe that some patients with neurological diseases, that can lead to criminal behavior, but that not every instance of criminal behavior is related to a neurological disease or brain disfunction.

Q. If someone makes the decision to carefully plan over a period of months to carry out a shooting, that planning and decision-making process, does that relate to a part of the brain?

A. It does.

Q. Which part of the brain?

A. So it points to parts of the frontal lobe that are involved in executive functions.

Q. The executive functioning part of the frontal lobe?

A. Of the frontal lobes.
Q. If someone does that, that is, plans over a period of months, assesses risks and consequences, and carries out a methodical, goal-oriented shooting, does that reflect that that part of the brain associated with executive functioning is dysfunctional or would it indicate that's functioning?
A. It shows that that area is functioning.
Q. Mr. Burt asked you this a couple different times. Is all criminal behavior a symptom of brain dysfunction?
A. No.
Q. If it were, wouldn't that mean that essentially people who engaged in any criminal activity would be absolved of responsibility because it was due to some brain dysfunction?
A. Yes.
Q. Do you believe that?
A. No. Again, I think that there are some patients where neurological diseases can lead to that, but it is certainly not every -- every act of criminal behavior is not related to a neurological disease.
Q. Mr. Burt asked you some questions about the defendant's developmental history and what you put in your report. Do you remember those questions?
A. Yes.
Q. He asked you about an incident in 1973 involving the defendant's mother and father. Do you remember that?

A. Yes.
Q. I just wanted to clarify, in 1973, was he six months old or six years old? I want to go back to how you may have answered that yesterday. Was he six months or six years?
A. He was six months old.
Q. When you spoke with the defendant, did he articulate that he even remembered that incident?
A. He did not remember that.
Q. Is there any indication in the records of anyone, the defendant's mother or father, actually carrying out violence against him when he was a six-month-old?
A. Not that I saw.
Q. Did you see any records indicating any acts of violence carried out against the defendant in his childhood?
A. Not that I saw.
Q. Mr. Burt asked you some questions about whether that incident reflected good parenting. Do you remember that?
A. Yes.
Q. And are you aware of how early in Mr. Bowers' life his father was no longer in the picture?
A. It was early. I don't remember the exact date.
Q. That strife that was described in the record from 1973 between the defendant's mother and father, because the father was out of the picture when he was young, was that a longstanding dynamic in the defendant's life or not?

A. No. As far as I knew, no, once his father left, there was little contact after that.
Q. Mr. Burt asked you some questions about your role as an expert and the fact that you're paid for your work. Do you remember those questions?
A. Yes.
Q. In your experience, how standard is it that experts are paid for the work they do in forensic cases?
A. I think every expert is typically paid.
Q. That would be both for the government and the defense?
A. Correct.
Q. You are professional, you are not here out of the kindness of your heart donating your time?
A. Correct.
Q. The same for all of the defense experts?
A. Yes.
Q. I think you testified that you have been an expert since 2019; is that correct?
A. It was about that -- I think that's the first time I testified. I had reviewed some cases before that, I believe.
Q. So within the last five years or so is when you started?
A. Yes.
Q. In your experience, are experts' rates higher or lower depending on how long they had been doing expert work or been active in their fields of expertise?

A. I would imagine that the rates would go up with experience.
Q. So the fees get higher the longer the expert has been doing the work?
A. Typically.
Q. You're aware of the defense experts in this case, you heard some of them testify?
A. Yes.
Q. Let me ask you, would you expect your fee to be higher or lower than Dr. Newberg's, a neuroradiologist?
A. Probably lower.
Q. What about Dr. Solomon's, a neuroradiologist?
A. Probably lower.
Q. What about Dr. Nadkarni, a neurologist?
A. I'm not exactly sure what their salaries would be, so the same, or mine would be lower.
Q. Let me talk to you about some other experts. Dr. Rogers, he testified?
A. Yes.
Q. He testified that he examined the defendant for four days, over four days?
A. Yes.
Q. There was also another defense expert, Dr. Bigler, who testified on Monday. Do you remember that?
A. Yes.

Q. Dr. Bigler testified about another defense expert, Dr. Moberg, who conducted neuropsychological testing. Do you remember that?
A. Yes.
Q. Dr. Bigler also testified about reviewing a report by a Dr. Corvin. Do you remember him testifying about that?
A. Yes.
Q. During -- do you have any reason to believe that all those experts, those defense experts, were not paid a fee for the hours they worked on this case?
A. I assume they were all paid.
Q. Dr. Rogers also mentioned somebody who was present in the room when he was interviewing the defendant. Do you remember that testimony?
A. Yes.
Q. Do you remember the name of that person who was in the room while Dr. Rogers interviewed the defendant?
A. I don't remember the exact name.
Q. Would it be possibly David Freedman?
A. Yes, I believe that's the name.
Q. Is that individual in the courtroom today?
A. Yes. I believe he was pointed out during that testimony.
Q. Do you know where he's sitting?
A. Yes. I think it was the individual over there.
Q. At counsel table?

A. Yes.
Q. Do you know how much Dr. Freedman is -- what his fee is?
A. I do not.
Q. But Dr. Rogers testified that Dr. Freedman had been working with the defendant for a period of years?
A. He did.
Q. Mr. Burt also asked you some questions about the fact that you were sitting in the courtroom during the defense mental health case. Do you remember that?
A. Yes.
Q. You've been in court, I think by your own testimony, since what day last week?
A. Tuesday last week.
Q. Let me ask you, Dr. Darby, did you expect that you would be in Pittsburgh this long?
A. No, I did not.
Q. Did you have any control over how many witnesses the defense called or how long those witnesses would take?
A. No, I did not.
Q. During Mr. Burt's questioning, he suggested that you were an advocate for the prosecution. Do you remember that?
A. I remember a question about that.
Q. Do you agree with that?
A. No.
Q. What's your job here?

A. So my job was to perform a forensic neurological evaluation, so to review the evidence and come up with opinions about whether any neurological disease was present and whether it contributed to his criminal actions.
Q. And with respect to the testimony you're providing, that's rebuttal testimony, correct?
A. Yes.
Q. In response to testimony from whom?
A. In response to testimony from the other expert witnesses on the defense.
Q. So was your role as an advocate for the government's position or to provide information to help make sure the jury understands the science and technical things that they are hearing from all of the experts?
MR. BURT: I'm going to object to that question as leading in the extreme.
THE COURT: It's leading. You can rephrase it, I'm sure.
BY MR. OLSHAN:
Q. How would you describe what you were doing by providing information to the government?
A. So I was providing my analysis and interpretation of the data that was being presented.
Q. To make sure that it was accurate or inaccurate?
A. Yes, to state whether I thought it was accurate or

inaccurate.
Q. You testified that no one from the prosecution reviewed your report before it was finalized and sent to the Judge, correct?
A. Correct.
Q. After the prosecution, the prosecutors had access to your report, did anyone tell you to change it?
A. No.
Q. In your report, Mr. Burt took you through a number of events in the defendant's life that might have some neurological significance. Do you remember those questions?
A. Yes.
Q. Did anyone from the prosecution instruct you to remove that or edit it in any way in your report?
A. No.
Q. Did anyone from the prosecution instruct you not to testify or put in your report that the defendant's EEG, for example, did show some abnormal electrical activity?
A. No.
Q. Mr. Burt asked you some questions about where you were sitting in the courtroom. Do you remember that?
A. Yes.
Q. Were you told that there were certain seats that were allotted?
A. Yes. I was directed to those seats.

Q. Were you able to pick where you could sit in the courtroom?
A. No.
Q. Are you aware of whether the parties are getting realtime transcripts, meaning as the testimony is occurring, the parties can remotely review the transcript?
A. Yes, I believe that's possible.
Q. Do you know whether any of the defense experts who are not in the courtroom are realtime reviewing any of the remote, or the transcripts?
A. I don't know.
Q. Do you know whether, if they're doing that, they are communicating with the defense any thoughts about the testimony?
A. I don't.
Q. Mr. Burt asked you about the letter you sent to Judge Colville indicating you understood you're not to talk about your examinations. Do you remember that?
A. Yes.
Q. What was the date on that letter again?
A. It was June 12th.
Q. What, if any, was that reference in relation to communicating with the prosecution, the prosecutors?
A. So my understanding was that we were not to communicate with the prosecutors.

Q. Did you communicate with the prosecutors before the defendant was found guilty and placed his mental health at issue?
A. No.
Q. You submitted that letter to the Judge on June 12th. Did you also submit your report to the Judge that same day?
A. I did.
Q. Also under cover letter?
A. Yes.
Q. In your report, which went to the Judge, did you note whether or not you had conferred or reviewed drafts of other government experts?
A. I did note that.
Q. That was in your report that went to the Judge?
A. Yes.
Q. Did you indicate in your report that you sent to the Judge the same day that you had consulted with Dr. Angela Crudele?
A. I did.
Q. You mentioned her by name?
A. Yes.
Q. That report with those indications about who you conferred with went to the Judge the same day as the letter that Mr. Burt asked you about?
A. Yes, it did.
Q. Mr. Burt also asked you some questions about the visual

and quantitative analysis of the imaging. Do you remember that?

A. Yes.

Q. There were references to the visual being the gold standard?

A. Yes.

Q. You testified -- did you testify that the quantitative analysis can be useful?

A. Yes.

Q. I want to clarify something that Mr. Burt asked you about on cross-examination on that topic. If the MRI and PET on a visual read is clear as opposed to unclear, with respect to what they show you, how does that affect whether you would want to do a quantitative analysis in a particular case?

A. So I think, again, it really also relates back to those symptoms and behaviors that you're trying to understand and explain. Typically, the routine is to get a visual inspection of the MRI. If there is uncertainty about any potential findings, then a quantitative analysis can be helpful.

Q. If there is uncertainty?

A. Yes.

Q. So it's that combination of whether there's anything unclear on the visual read and whether there's something from the clinical interview that would warrant further quantitative analysis?

A. Correct. So if it was unclear or if there was a clinical issue that you felt like the quantitative analysis could be helpful for.
Q. In this case, were the PET and MRIs clear as to what they showed visually on your review?
A. Yes.
Q. In this case, what, if anything, was there about your interview of the defendant or his history that indicated further quantitative analysis was necessary?
A. There wasn't.
Q. Do you remember Mr. Burt asked you some questions about a book chapter that you co-authored?
A. Yes.
Q. There were some questions about observer bias or confirmation bias. Do you remember that?
A. Yes.
Q. Would that concept come into play if a visual read did not support a diagnosis that a physician had been told existed so the physician decided to keep looking and to go to the quantitative data?
A. Yes.
Q. And that's what the defense experts did here?
A. Yes. I think that, you know, bias can be present in any person for many different reasons.
Q. Dr. Mettenburg, Dr. Mountz and Dr. Rajasekaran, they don't

work for the government or the defense in this case, do they?
A. Correct.
Q. They are just physicians who were doing their job on that day at UPMC here in Pittsburgh?
A. Yes.
Q. Are you aware of any reason that they would have to be biased one way or another?
A. No.
Q. Did your conclusions align or not align with their unbiased review of the data in this case?
A. It aligned.
Q. Only the defense experts' opinions did not align with --
MR. BURT: That's leading.
MR. OLSHAN: I'll rephrase.
BY MR. OLSHAN:
Q. Did the defense experts align with the readings of Drs. Mettenburg, Mountz and Rajasekaran?
A. I think there were certain parts where there was alignment and certain parts where there was disagreement or differences in their interpretation.
Q. Did anyone instruct you to come up with findings that would be helpful to the prosecution?
A. No.
Q. You're bound by ethical rules?
A. Correct.

Q. If your clinical assessment of the defendant and your review of the imaging had established a history of seizures and an epilepsy diagnosis was appropriate, would you have confirmed that diagnosis, Dr. Darby?
A. Yes.
Q. Does the defendant have a seizure history?
A. No.
Q. Does he have epilepsy?
A. No, he does not.
Q. And if the defendant suffered from delusions, based on your training and experience as a neurologist, would you have confirmed the existence of delusions?
A. Yes.
Q. Does he suffer from delusions?
A. No.
Q. Did you conclude that the defendant had any neurological disease at all?
A. There was abnormality on the EEG that suggested there was dysfunction in that area, but I could not see any link between that to his criminal behavior.
Q. Mr. Burt asked you some questions this morning about an entry in your report related to the defendant having a hallucination when he was five years old and had a fever?
A. Yes.
Q. Do you recall Dr. Nadkarni's testimony about whether he

concluded that that was a seizure?
A. Yes.
Q. Did he identify that as a seizure in his report?
A. No.
Q. In his notes, what, if anything, did he say about the presence or the existence of any clear seizures?
A. He had said no seizures in the note.
Q. Do you agree that the defendant's fever when he was five and the hallucinations he reported at the time was a seizure?
A. No, I do not believe that was a seizure.
Q. Do you agree or disagree with what Dr. Rogers, another defense expert, testified when he concluded there was no clinical significance to that fever?
A. Yes, I didn't see any indication that that caused any long-term problems.
Q. Do you agree or disagree with Dr. Rogers on that point, that is, had no clinical significance?
A. I agree.
Q. And do you agree or disagree with Dr. Rogers who did not assign any clinical weight to the red dye statements the defendant made?
A. I agree.
Q. During your cross-examination, Mr. Burt asked you questions, some questions about the defendant's views on Jews and immigration and where that came from. Do you remember

that?
A. Yes.
Q. On direct examination, you testified why it was important -- whether it was important to ask the subject of the interview about their criminal conduct. Do you remember that?
A. Yes.
Q. Why was that?
A. Well, you know, the main purpose of this is really to see are there any behaviors that impacted that criminal behavior, so is there any neurological disease that affected those aspects of his behavior. And so in order to do that, you have to ask the defendant about that behavior.
Q. That was why it was important to you?
A. Yes.
Q. What did his answers to your questions about the planning for and carrying out of the attack tell you about the presence of any neurological disease in the defendant?
A. Well, it tells you about the executive functions, again, that were working as part of the planning. It tells you about his motivation and his goals. It tells you about whether he was emotionally dysregulated at that time. And it told me about the nature of his beliefs.
Q. On cross-examination, how many questions did Mr. Burt ask you about what the defendant said about his crimes?

A. I don't remember.
Q. Lastly, the Court in this case, by agreement of the parties, authorized experts to be in the courtroom during other testimony of other experts.
MR. BURT: I object to the form of that question.
THE COURT: I don't think there's a question yet. As part of the basis for the objection you -- could you restate?
BY MR. OLSHAN:
Q. Did you understand whether or not you were authorized to be in the courtroom for purposes of viewing other experts' testimony?
A. Yes. It was my understanding that I could be.
Q. You were told that you could be in the courtroom?
A. Yes.
Q. Was that relevant to your job as a rebuttal expert, someone who is responding to what the defense experts say?
A. Yes. It was to observe the testimony.
Q. Are you aware of whether the defense experts, in addition to Mr. Freedman, may also be in the courtroom if they choose to?
A. They can be. I don't know if they have been or not.
Q. For all you know, they could be in the courtroom now?
A. Yes.
MR. OLSHAN: That's all. Thank you.
THE COURT: Thank you, Mr. Olshan.

Mr. Burt.

RECROSS-EXAMINATION

BY MR. BURT:

Q. You said you sat and listened to all the defense experts, right?

A. Yes.

Q. And you were able to observe who they were?

A. Yes.

Q. Did you see Dr. Freedman testify?

A. No.

Q. Do you see him listed on any expert witness list?

A. No.

Q. Do you know what his role in the case is, if anything?

A. I do not.

Q. You don't know what any defense expert has been paid or not paid in this case, correct?

A. I do not.

Q. But you are willing to speculate that you thought it was at least equal to or maybe even higher than what you had?

A. I would assume it's in the same ballpark.

Q. You assume that because you are willing to speculate on behalf of the government; isn't that true?

A. I think I said I didn't know, but that I assumed that people with specialties that get paid more than a neurologist would have a higher rate.

Q. Right. Those are assumptions you are willing to make in furtherance of the government's points on cross-examination, right?
A. That was my answer to the question.
Q. You are willing to make those assumptions and make those speculations in furtherance of the government's questioning on cross-examination, correct or not correct?
A. I tried to answer the question accurately.
Q. You're not going to answer my question?
A. Can you say it again?
Q. Sure. You are willing to make assumptions and speculations about what someone is being paid in order to advance the prosecution's case; isn't that true?
A. I don't know if it's to advance the prosecution's case. I said I didn't know their exact fees and I would expect that they were higher.
Q. And you, even though you sat in and saw each defense expert who testified, you are willing to say, I'm not sure whether any other defense experts -- there may be other defense experts in the courtroom, right? You've heard them all.
Do you see any of them in the courtroom right now?
A. I believe there are some experts that haven't testified. I don't see any in the courtroom. I don't know if there were there on any of the other days.

Q. You said that in order to do your job, you needed to sit in the courtroom?
A. I needed to observe the testimony of the other experts.
Q. And why couldn't you have read the transcripts in order to do that?
A. I could have.
Q. And would it have been a lot more economically efficient to have done that? You can probably read a transcript in two hours as opposed to sitting here for six days, at six hours a day; right?
A. I don't know if it's more or less efficient. It's different than observing the testimony.
Q. Why is that?
A. There are referrals to visual information, different things that are displayed during the testimony that wouldn't be part of that.
Q. And, in addition, I think you said on cross-examination, that not only were you observing, you were passing notes to the prosecutor to assist them in doing cross-examination; right?
A. I was not passing any notes. If there were questions asked of me, I would respond, whether that was to a question in person or in a note.
Q. So your testimony now is that you weren't passing any notes up?

A. If I received a note with a question, I would have written a response.
Q. So you would have gotten a note from the prosecutor and passed up your response to what the question was?
A. If there was a question, yes.
Q. How many times did that happen?
A. That I actually responded, I can think of one.
Q. Were there more you just can't think of?
A. I don't remember writing anything other than one time.
Q. You said your testimony is bound by ethics, right?
A. Yes.
Q. And that's ethics as you define them, correct?
A. I'm not sure I quite follow your question.
Q. Well, you've written that article that we referenced on cross-examination that the prosecutor just referenced. That was an article written by you to advise other practitioners of ethics; isn't that true?
A. Yes.
Q. Could you pull that up, please? 171, page 176. Go to page 176, please. Highlight the Table 10.1.
Here you and your brother are advising other practitioners of what their ethical duties are, ethical duties of a physician working in different roles as described by dialectical principlism, whatever that is; right?
A. Yes.

Q. And you are advising people that, in the forensic role, they have a primary duty of advancing justice by way of truth-telling and respect for persons but, in addition, in addition, they have a secondary duty to consideration of the evaluee's welfare and, number 2, consideration of the retaining attorney's case.

Could you highlight number 2, please?

So when you testified, in answer to the prosecutor's questions that you were testifying here according to ethics, you were -- you're testifying here according to your own formulation of ethics, which includes considering the retaining attorney's case; right?

A. I believe I testified as to what I did in this case.

Q. But my question goes to what you just told the jury that you are testifying here under ethical constraints. And the ethical constraints, as you define them, include your duty to consider the retaining attorney's case. Did you write that or not?

A. It is in this table on a paper that I co-authored.

Q. And that's your definition of ethical -- ethics in the context of a forensic expert, right?

A. Yes. It's in this table.

Q. And you're advising other forensic experts that this is the way they should act, they should be mindful of their duty to consider the retaining attorney's case; right?

A. That is in this table.
Q. Okay. And you acted in accordance with this duty that I have highlighted there in this case; isn't that true?
A. Again, yes, I provided information about the neurological evidence, whether I agreed with it or not, to the attorneys, which may be helpful to their case.
Q. And in consideration of the -- you were mindful of your duty to consider the retaining attorney's case?
A. To provide them with information.
Q. And the retaining attorney in your situation is who? Is it Dr. Dietz or is it the government?
A. Dr. Dietz is not an attorney.
Q. Right. But who retained you? Did the United States government retain you, the prosecutors in this case, or Dr. Dietz?
A. That, I believe the prosecutors retained me through PDA.
Q. Does that mean that they searched you out and had you sign some sort of a contract with them or did Dr. Dietz hire you as a subcontractor?
A. I don't believe I've signed any contract.
Q. So you were retained -- your understanding is you are working for the prosecutors in this case?
A. That I am -- yes, that I am hired by the prosecution.
Q. And in line with your definition of ethics, your testimony here is abiding by your secondary duty to consider the

retaining attorney's case; right?

A. Yes, to provide them with information about the neurological issues in the case.

Q. Okay. Would you go in that same article to -- one moment.

(Brief pause in the proceedings.)

Page 180, please. And would you highlight the paragraph about midway down where it begins "Other authors have noted." Yeah, that paragraph, please.

I asked you this on cross-examination, whether you wrote this, which says "Other authors have noted the limitations of a single subject functional MRI to uncover evidence of behavioral aberration. Despite these limitations, however, quantitative approaches to detect single subject neuroimaging abnormalities are advantageous over unaided clinical interpretation of images in forensic settings which is subject to observer bias."

You wrote that, right?

A. Yes. It's missing some of the information above that provides more context to this.

Q. Sure, but you wrote this sentence that I just outlined?

A. Yes. The part above it outlines the highlights of false positives on quantitative testing, and so the usefulness of quantitative testing being dependent on how accurate it can identify the area, what that control group is that you're comparing it to to make appropriate analyses, with the

advantage being that it can be something that's obtained without that bias of a potential expert evaluation.
Q. So when you write "Neuroimaging abnormalities are -- quantitative approaches are advantageous over unaided clinician interpretation of images which is subject to observer bias," that's what you're writing now. But what you just said on redirect examination is that you only use quantitative analysis when the visual reads are unclear. That's completely different than what you said here, right?
A. So this is talking about the potential benefit to a forensic setting. It's talking about emerging technologies. And so what would be a benefit of the quantitative imaging is the fact that it's not biased. The disadvantage is the accuracy of it, and that's what you weigh in consideration of whether to get that --
Q. What does the word "advantageous" mean to you, Doctor?
A. It means that would be the advantage of doing that test.
Q. So when you write "quantitative approaches are advantageous over unaided clinician interpretation," are you now meaning to say but only if the visual is unclear?
A. No. We are highlighting a section and there are advantages and disadvantages, and so in the forensic setting, that would be an advantage.
Q. I see. And so are you now changing what you wrote here to say that there are advantages and disadvantages, and so

visual, looking at the image is the gold standard?
A. Well, looking at the image is the gold standard. And so you test a new developing method against the gold standard, so all clinical imaging is visually examined, that's the gold standard.
Q. That's what you said on direct examination. Then when I confronted you with this statement that you wrote, you acknowledge you wrote it. Now you're saying, despite this statement, that visual examination is the gold standard.
Do you see that anywhere stated here, Doctor?
A. I don't think I ever said that I wrote that visual inspection is the gold standard. I believe this sentence --
Q. Yeah, that's right. You said just the opposite, didn't you?
A. That is my -- my testimony.
Q. You said just the opposite, didn't you?
A. I don't think I'm quite following you.
Q. Okay. Let me see. Maybe I'm not understanding English here. "Quantitative approaches to detect single subject neuroimaging abnormalities are advantageous over unaided clinician interpretation of images in forensic settings which is subject to observer bias."
Are you telling us that that sentence means that unaided clinical interpretation is the gold standard?
A. I'm not saying that.

Q. Is that what that sentence means?
A. That sentence doesn't talk about which one of these would be the gold standard but --
Q. Does it talk to about which is advantageous, quantitative over observer?
A. Again, this part of the paper talks about the advantage of a quantitative method, which we've talked about. There are other parts of the paper that talk about the disadvantages of that.
Q. Right. And the disadvantage of the observer visual inspection is that it's subject to observer bias, right?
A. Yes, that is what is written here.
Q. That's what's written here, but that's not what you testified to on redirect; right? You said you only use quantitative if the visual is unclear. You're changing your testimony to advance the prosecution's case in furtherance of what you think your ethical duty is to take into consideration the retaining attorney's case; right?
MR. OLSHAN: Objection, argumentive.
THE COURT: I'm going to overrule the objection. If the witness understands it, he can answer it. If he doesn't, you can rephrase it.
A. So the question I was asked was clinically what I do, and that is to get the quantitative analysis in cases where it's uncertain or I haven't fully explained the video.

BY MR. BURT:

Q. And that's your answer to what this sentence means?

A. This sentence is referring to the advantage in a forensic setting, so not a clinical setting, where the concern for bias would be higher.

Q. So in a forensic setting where the concern for bias is higher, you want to avoid observer bias and, therefore, that's why quantitative analysis is more advantageous. Isn't that the plain meaning of what you're saying here?

A. That would be the advantage of getting quantitative analysis.

Q. Okay. Thank you. Now, can you bring -- we don't have electronically 1465, but could we bring that up somehow?

THE COURT: I don't recall which was 1465.

MR. OLSHAN: We can bring it up.

MR. BURT: Thank you.

THE COURT: Do you want them in that order, 1465 and 1466?

MR. BURT: Yes.

BY MR. BURT:

Q. Prior to being shown this exhibit by the prosecutor, had you ever seen this definition before?

A. I don't believe so.

Q. Had you suggested to the prosecutor that he should go search out the American Psychological Association definition?

A. No.
Q. So you didn't rely on this definition to form any opinions in this case, right?
A. No.
Q. The definition of "delusions" you relied upon is your own personal definition, as you testified yesterday; right?
A. Yes.
Q. And this definition says "A delusion is often highly personal." What do you take the word "often" to mean? Do you take that to mean exclusively highly personal in all cases?
A. No.
Q. So according to this definition, a delusion does not always have to be a highly personal idea, correct?
A. This says "often highly personal idea."
Q. Right. And you take the word "often," as most people would take it, in terms of it's not always the case?
A. Yes. That would be my interpretation of what that means.
Q. And you said that the -- at the bottom there, it says "Some researchers believe that delusions may be the most important symptom of schizophrenia." Are you one of those researchers that believes that?
A. That's one of the core features of schizophrenia.
Q. Is it the most important active symptom of schizophrenia, in your view?
A. I don't know how I would rank the symptoms of

schizophrenia. It is certainly one that causes a lot of distress and problems for people suffering from that disease.
Q. And you have no doubt in your mind that if Mr. -- if you're wrong about whether Mr. Bowers suffered from a delusion, and, in fact, he did, he was acting under the compulsion of that delusion during the crime; correct?
A. I don't know if I would say compulsion, but he was certainly motivated by those beliefs.
Q. Now, the next exhibit, 1466, please. Had you ever seen this definition of "delusion" before you testified?
A. No, I don't believe so.
Q. And had you based your opinion in this case on any aspect of this definition?
A. No.
Q. You can take that down. You said that your definition is consistent with that used in the DSM-5-TR?
A. Yes, I think that it is.
Q. What is the definition that's -- you say is consistent with the one you used? What is the definition in the DSM of "delusion"?
A. I don't have that memorized.
Q. Can you give me a general idea? When you answered that question that your opinion was -- your definition was consistent with the one in the DSM, you must have somehow gone through the process of comparing the two and concluding that

they are the same. So tell me generally what the definition is in the DSM.

A. So in general, it's a fixed false belief that differs from one's subgroup or culture. So that means it's not something that's a shared belief or learned belief. It's different than that. And then it goes through examples of different types of delusions.

Q. Can you give me any more content as to what it means?

A. The different types of --

Q. Yeah, what the definition is. Is that the extent of your knowledge of the definition?

MR. OLSHAN: Your Honor, I'm going to object. If Mr. Burt has something to show the witness, he should do that. He's asked him multiple times.

THE COURT: I'm going to overrule the objection. Mr. Burt can continue if he cares to.

A. Yes, that's the part I'm referring to.

BY MR. BURT:

Q. Does the DSM definition include what are called nihilistic delusions?

A. I believe so, yes.

Q. What is the definition of "nihilistic delusion" in the DSM?

A. So I assume this is the same as the DSM, but they are delusions related to the world ending or to something

personally about dying or death of that individual.
Q. When you say you assume that's the definition, my question is what is the definition of "nihilistic delusions" set forth in the DSM that you were using when you answered the prosecutor's question that the definition you used is the same as the one in the DSM?
MR. OLSHAN: Objection. I did not ask any questions about nihilistic delusions.
THE COURT: I'll actually sustain that objection to the extent, Mr. Burt, you intend to be inquiring as to the nihilistic delusions described within the DSM-IV or V. You may be talking about the broader definition of delusion however.
BY MR. BURT:
Q. I'm talking about when you answered the question that your definition was consistent with the one used in DSM, I'm trying to get at what you think that definition in the DSM is when you answered that.
A. That definition was read at various times during the testimony. I listened to it and it seemed consistent with my own definition of delusions.
Q. Okay. Now, you were asked some questions about seizures. Can somebody have a seizure and not be aware of it?
A. Yes, they can.
Q. Can you describe in what circumstances that can happen?

Especially, if you could, a young person, how could a young person have a seizure and not be aware of it?
A. Well, there are some seizures that are defined by losing track of time or being unaware of what's happening.
Q. Could you bring up 157, please. You were asked some questions about the letter you wrote to the Court?
A. Yes.
Q. And in the letter, you said, "I understand that I may not discuss the examination of Robert Bowers with anyone." And did you testify on redirect examination that your interpretation of the word "anyone" is only prosecutors?
A. My understanding was that, as we were doing the evaluations, that I could discuss the findings and evaluations with the other experts involved in the case.
Q. So you interpret the word "anyone" to mean anyone except prosecutors, right?
A. I did not discuss it with anyone besides the other experts in the case.
Q. I'm just asking you what you wrote in the letter, the meaning of the word "anyone." When you said "I understand that I may not discuss the examination of Robert Bowers with anyone" --
A. Yes. I wrote that. This is dated June 12th. As far as I know, I had no discussions after that time. My understanding before the evaluation was done was that I could discuss the

findings with the other experts in the case.
Q. All right. And so when you wrote this, what you really meant to say was "I understand that I may not discuss the examination of Robert Bowers with anyone except prosecutors and the experts in this case," right? That's what you meant when you wrote this sentence?
A. No. I did not talk with prosecutors involved in the case from the time I received the defense materials in May until there was the guilty verdict.
Q. I think we're talking over each other. I'm asking you what you meant when you wrote that.
A. I did not mean that I could talk with the prosecutors about the case. I thought that's what you asked.
Q. You're saying that your understanding was "anyone" meant anyone except prosecutors and other experts, right?
A. No. My statement was that my understanding was that I could talk with the other experts involved in the case.
MR. BURT: I see. Thank you.
That's all I have.
THE COURT: Thank you, Mr. Burt.
Mr. Olshan, any further direct?
MR. OLSHAN: No. Thank you.
THE COURT: Thank you, sir. You can step down.
Counsel, this looks like a perfect time to take a lunch hour. With that, ladies and gentlemen, please enjoy

your lunch hour. We will attempt to reconvene at 1:00 p.m. Please remain where you are as the jury exits.

(Jury excused.)

THE COURT: Counsel, anything to discuss before lunch? I know I have not seen the video. Counsel, so the video we discussed earlier today, do you have time stamps? It's a 40-minute video. And my understanding is you want to play 13.

MS. SONG: The first 13.

THE COURT: The first 13.

MS. SONG: And what you have is just 13.

THE COURT: We understand we have a 40-minute video. I don't want to say I know that, but just I've been advised that.

MS. SONG: I'm sorry. It's just the first 13 minutes is what's been clipped for purposes of the exhibit.

THE COURT: Okay. Thank you.

(Luncheon recess taken 12:00 p.m. - 1:01 p.m.)

THE COURT: Counsel, as soon as you all have a moment, I want to talk about the intake video.

(Private session held.)

THE COURT: Let's bring the public in. Once you're settled, we'll bring the jury back. Thank you.

(Public enters courtroom.)

THE COURT: We are returning the flash drive.

I will say we had some issues viewing that on the laptop that was provided by the Court.

Counsel, are we ready for the jury? Ms. Kim, when you're ready, please bring in the jury.

(Jury present.)

THE COURT: Welcome back. Please have a seat.

Ms. Song, are you prepared to call the government's next witness?

MS. SONG: We are, Your Honor. At this time, the United States calls Dr. Park Dietz to the witness stand.

THE COURT: Sir, would you step up.

PARK DIETZ, M.D., a witness herein, having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. SONG:

Q. Good afternoon, sir.
A. Good afternoon.
Q. Would you please state your name and spell it again for the court reporter.
A. Park, P-A-R-K, Dietz, D-I-E-T-Z.
Q. Dr. Dietz, where did you grow up?
A. I grew up in the Harrisburg area.
Q. Harrisburg, Pennsylvania?
A. Yes.
Q. Did you spend any time in Western Pennsylvania while you

were growing up?
A. I did. I had family in Beaver Falls.
Q. Dr. Dietz, what is your profession?
A. I'm a psychiatrist and for many years have limited my practice to forensic psychiatry.
Q. You said "forensic psychiatry." Can you explain to us in your view what forensic psychiatry is?
A. Forensic psychiatry is the application of the principles and practice of psychiatry for legal purposes, typically helping to resolve legal disputes by providing evidence for courts and litigation and administrative law judges.
THE COURT: Doctor, or sir, would you be kind enough to be very conscientious about keeping the microphone close. I have to practice it myself. Thank you, sir.
MS. SONG: It seems to be flopping down for some reason.
THE COURT: Feel free to move it however you need to, but it will make a difference. Thank you.
BY MS. SONG:
Q. Dr. Dietz, if we understood you correctly, were you saying that forensic psychiatry is important in resolving the truth about legal matters?
MR. BURT: Judge, I'm going to object and ask that counsel direct questions to the witness and not repeat what the witness just said. It's asked and answered and it's

counsel testifying, not the witness.

THE COURT: You may be right, Mr. Burt. I'm going to overrule the objection for the moment. If you want to rephrase, however, Ms. Song, you may.

MS. SONG: Sure. We had a pause because of the microphone. So I was just reorienting ourselves on where we were.

BY MS. SONG:

Q. Dr. Dietz, you referenced forensic psychiatry in connection with the law. Can you elaborate on that a little bit, please?

A. Forensic psychiatrists are asked to conduct evaluations or to offer opinions in connection with a great many kinds of issues that arise in legal disputes, not just criminal matters, but civil matters such as personal injury cases, child custody, divorce, elder abuse, the competence of elders to change their wills or estate plans and many, many other issues.

Q. Dr. Dietz, where did you go to college? Where did you obtain an undergraduate degree?

A. Cornell University in Ithaca, New York.

Q. What did you study at Cornell University?

A. I double majored in psychology and biology.

Q. Dr. Dietz, what about your medical school education? Where did you study?

A. I spent my first two years of medical school at the University of Pittsburgh under a senatorial scholarship.
Q. Did you say a senatorial scholarship?
A. Yes. Senator Wade from Camp Hill, Pennsylvania, arranged for me to have a scholarship.
Q. At the University of Pittsburgh Medical School?
A. Yes.
Q. After the first two years at the University of Pittsburgh Medical School, where did you conclude your medical studies?
A. I transferred to Johns Hopkins which had an MD Ph.D. program in the behavioral sciences, and that's where I completed medical school.
Q. Dr. Dietz, when you were studying at the University of Pittsburgh, where did you live?
A. In Squirrel Hill on Fifth Avenue.
Q. Dr. Dietz, you said that you went to Johns Hopkins for a joint degree. Did you say that was an MD, what was the second part of that degree?
A. Ph.D.
Q. MD Ph.D. And you transferred into that program for what reason?
A. Because of the MD Ph.D. program, which provided tuition and research support, and also because my wife wanted to go to law school in Washington.
Q. The Ph.D. that you were pursuing at Johns Hopkins was in

what area of study?
A. The name of the department at the time was social relations, which everyone understood to be sociology, and I think they changed the name of the department to sociology now. My interests in that were medical sociology and criminology.
Q. And that's sociology and criminology in conjunction with your medical degree?
A. This was for the Ph.D. So I was in medical school at the same time as graduate school and sociology. And because the grant from the National Institute of Medicine paid for any tuition, I also did a master's degree in public health at the same time.
Q. So you ended up with an MD, a master's in public health and a Ph.D. in the areas you described?
A. Yes.
Q. After you completed your study and obtained those degrees from Johns Hopkins, Dr. Dietz, what additional training did you obtain in psychiatry?
A. Well, at that time, which was 1975, the training programs in psychiatry required a three-year residency, and I did two years as an assistant resident in psychiatry at the Johns Hopkins Hospital and then I did my third year of residency as chief fellow in forensic psychiatry at the hospital of the University of Pennsylvania in Philadelphia.

Q. As the chief resident in forensic psychology, what types of things were you studying and doing?
A. I was actually chief fellow in forensic psychiatry, and there was a clinic at the University of Pennsylvania directed by my mentor, Dr. Robert Sadoff. I was to manage that clinic day by day where we also had a library, and so I would supervise the part-time fellows as they were then called and their evaluations and would accompany my mentor when he was doing evaluations in the area. And I had the freedom to also spend time at the Center for the Study of Criminology, which is the predominant center at the university of the Wharton School.
Q. At the University of Pennsylvania?
A. Yes.
Q. Dr. Dietz, after your psychiatric training, what was the first position and assignment that you then held?
A. My first post-training job was as assistant professor of psychiatry at the Harvard Medical School, where I was at the McLean Hospital, which is a division of Massachusetts General Hospital. It is the private psychiatric hospital associated with the Mass General Hospital. But my actual work wasn't there. It was under contract that the hospital had with Bridgewater State Hospital, which was a maximum security hospital for the criminally insane.
And for two years, I served as director of forensic

psychiatry there, conducting evaluations. I had an inpatient ward of 30 patients -- they called them inmates because it was run by the Department of Corrections -- and was responsible for seeing about -- excuse me, I was responsible for seeing that about a thousand pretrial evaluations per year were conducted. I had no help in that at the outset, but I recruited help. And by the second year, I had a team available to do that.

Q. You were doing up to a thousand evaluations in one year related to --

A. I was expected to and I did my best to achieve it, but they were not what should have been done.

Q. And the inmates, the 30 inmates that you referred to, you referred to them as criminally insane and they were in custody?

A. That's what the hospital was known as. They were in custody, but what they had done varied in severity.

Q. Dr. Dietz, after your work at Bridgewater and through Harvard Medical School, where did you then go?

A. Well, after doing that for two years, I was asked to conduct significant evaluation of John Hinckley, Jr. for the attempted assassination of President Reagan, and I took a leave of absence from my hospital responsibilities for a year to evaluate John Hinckley.

Q. For what purpose were you evaluating John Hinckley?

A. It was a pretrial evaluation for which the focus was his mental state at the time of the offense.
Q. And what was that offense?
A. Pardon me?
Q. What was the offense?
MR. BURT: I'm going to object to what the offense was. Your Honor, I object to going into the details.
THE COURT: I'm going to overrule the objection. I'm trusting we're not going to go into the details but the question itself is fair.
MS. SONG: We are not going into the details.
BY MS. SONG:
Q. Dr. Dietz, you referenced the offense and John Hinckley, Jr. What are we talking about? What did he do?
A. He attempted to assassinate President Reagan, did shoot him, shot Police Officer Thomas Delahanty and the Press Secretary James Brady and I believe another victim.
Q. Dr. Dietz, after your leave of absence working on that particular case, did you go to the University of Virginia?
A. Not immediately. I spent another year back at Harvard working on research under a subcontract from the University of Pennsylvania center on -- for the study of criminology, and what I was studying was the relationship between mental disorder on one hand and criminal behavior on the other.
Q. After that study, did you find yourself at the University

of Virginia?
A. I was recruited by a number of universities at that point, and the University of Virginia had the most interesting offer and I did go there.
Q. What were your responsibilities at the University of Virginia?
A. I was originally an associate professor and later promoted to full professor in both the law school and the medical school.
In the law school, I taught courses or co-taught courses in psychiatry and criminal law, psychiatry and civil law, law and medicine, law and psychiatry, and a seminar that I taught for years on criminal violence.
Q. Did you do research at the University of Virginia, Dr. Dietz?
A. Yes.
Q. What kind of research?
A. I told you about the medical school duties.
Q. What type of research did you do when you were able?
A. So there were several different projects that I spent my time on during those years. One was on sex offenders of a particular kind, and particularly those who engaged in serial offenses.
Another was really the first study of stalking of celebrities and public figures, and those were studies of

people who were writing to and threatening members of the U.S. Congress and Hollywood celebrities.

And the third was a study of -- that I thought of at the time as a study of the violence industry, but it turned out to be something rather different from that.

Q. What was that study of the violence industry or what you thought might be the study of the violence industry?

A. During my first visit to the FBI academy in 1978, an agent named Bob Ressler took me to the FBI academy library and showed me a magazine called Soldier of Fortune, in the back of which he pointed out some advertisements. There were a lot of advertisements for weapons, but there were classified ads that sounded as though they were people offering to commit crimes. And he said that the FBI wasn't permitted to study these because no crime had been reported. They hadn't been able to open a case file and too bad nobody can study it in the FBI.

And so in the 1980s, when I had the ability to do it, I began studying those classified ads and the people committing those crimes, and that led me to a part of the world that nobody wanted to look at and few had looked at, which I did by beginning to go to organizations that were engaged in what looked like behaviors related to learning how to harm other people.

I ordered a lot of books, many of which were published by Paladin Press, that were about how to commit various crimes,

and I opened a mailbox in another town under the name Hawkeye Enterprises and got on every mailing list I could of weapons, people and extremists and neo-Nazis and white supremacists, though that term was not in vogue, and was shocked at the quantity and the variety.

I had teams of law students available to help look into this and devoted considerable effort to understanding the point of view of these people, many of whom weren't in organized groups but were communicating with one another.

Q. So just to summarize and then to move on, you spent some time --

MR. BURT: Excuse me, counsel. I'm going to say object to summarization. It's not a question. It's summarization.

THE COURT: I'm going to overrule the objection. As long as we don't get too carried away here. You want to confirm what he said for purposes of setting aside validation, you may do so.

MS. SONG: Thank you, Judge.

BY MS. SONG:

Q. Dr. Dietz, so it sounds as if you spent some time studying that particular culture at that particular time?

A. Yes.

Q. That was associated with individuals intending violence and other things?

A. Well, it wasn't clear they were intending violence. They were certainly discussing where there should be violence and why there should be violence and how to commit violence.
Q. And I'm sorry?
A. I was not in a position to look at their intent except for the classified ad study where I found a number of murders for hire committed through those classified ads, as well as extortions, kidnappings and other crimes, that the people who were advertising in Soldier of Fortune had committed, and that resulted in a number of lawsuits against the magazine that eventually put it out of business.
Q. And you described that culture as neo-Nazi or to later be called white supremacist?
MR. BURT: I'm going to object, Your Honor, to summarization. The form of the question is improper.
THE COURT: Overruled. Ms. Song, there will come a time. I know you're trying to move it along.
MS. SONG: Thank you, Judge.
A. That was not accurate. Soldier of Fortune was not neo-Nazi at all. It was really meant for soldiers, for mercenaries, for survivalists. It had a wide readership. But one of the groups that was interested in it and that I ran into at the Soldier of Fortune convention and some of the other things I was looking into were the groups that would now be called neo-Nazis or white supremacists.

BY MS. SONG:
Q. Thank you for clarifying, Dr. Dietz.
Following your research in Virginia, did you find yourself in California?
A. I did, yes.
Q. How did that happen and what have you been doing in California?
A. Well, I had been recruited to the criminology program at the University of California Irvine back before I went to Virginia and had fallen in love with the area, and so there came a time that I wanted to stop teaching and really expand a business I had created called Threat Assessment Group that does workplace violence prevention and have the freedom to do more private consulting, so that's why I moved to California. It was a beautiful spot and I had freedom by going private.
Q. Dr. Dietz, are you currently associated with a university? Are you a professor?
A. Yes. I'm on the voluntary faculty. So I'm clinical professor of psychiatry and biobehavioral sciences at the David Geffen UCLA School of Medicine in Los Angeles.
Q. How long have you been a professor at the School of Medicine at UCLA?
A. Over 30 years.
Q. Dr. Dietz, in addition to the Threat Assessment Group that you mentioned, what is your business? What do you do now?

A. When I found myself too busy with cases to be able to handle them all, I began bringing associates on board. Dr. Martell was the first of those associates, more than 30 years ago. But then the number has grown since then. And in 1995, someone had the smart idea to incorporate and make it more formal and that I should stop typing my own invoices and stop answering my own phone. So I began to hire employees and formalize the activity under the name Park Dietz & Associates.
Q. What function or services does Park Dietz & Associates provide?
A. We provide consultation to attorneys and we are asked for expert testimony about a variety of forensic issues. And the disciplines that are represented are psychiatry, psychology, social work, neurology, pathology, nursing and more.
Q. Dr. Dietz, relevant to your anticipated testimony today, are there professional organizations that you remain active in?
A. Not as active as I once was, but the three that I have over the course of my career been most active in are the American Psychiatric Association, where I was a member of two of the committees involved in creating earlier versions of the DSM. My role in particular was on the areas of the paraphilias, which is sexual deviations, and on disorders of impulse control.
Q. With respect to the DSM?

A. For the DSM. I also chaired a committee on the misuse and abuse of psychiatry in the United States and I used to actively participate in the meetings and present papers.

The second group is the American Academy of Forensic Sciences, where I served as chair of the psychiatry section and expanded it to allow psychologists to join as well and was the chair of that section, I think, for three years and on the council of the academy and I was also, I think, vice president of the Forensic Sciences Foundation, and I used to present often at those meetings as well.

And the third group, and the most important one to me, is the American Academy of Psychiatry and the Law, and I held numerous offices in the organization, served on numerous committees, and was eventually president of the organization.

Q. Of American Academy of Psychiatry and the Law?

A. Correct.

Q. Dr. Dietz, you are published in professional publications?

A. Yes.

Q. I'm not going to ask you to itemize all of your publications, but very briefly, relative to your anticipated testimony today, what are some of the topics that you have written on?

A. Well, I'd say the overarching themes have to do with criminal behavior with injurious activity. Those are probably the principal things, ways people get harmed, but mostly

criminal behavior.
Q. Dr. Dietz, you have been involved as an expert and consultant in many other criminal cases; is that true?
A. Yes, I have.
Q. What was your involvement in the Jeffrey Dahmer prosecution?
A. I was asked to evaluate him for the prosecution. I examined Mr. Dahmer, wrote a report and testified.
Q. What was your involvement in the Theodore Kaczynski prosecution?
A. In that case, I had some involvement in profiling him for the FBI, but that was minor. And then once he was identified and charged, I was involved in evaluating him but did not get to interview him because while I was on the way to interview him, he decided to change his plea.
Q. Dr. Dietz, what was your role in the prosecution of Andrea Yates?
A. There I was asked to evaluate her mental state at the time of killing her five children.
Q. Would you explain to the jury whether there was a problem that arose in that case after you had testified?
A. Sure. In my testimony, I described why I believed Andrea Yates had done it and acknowledged she was mentally ill, but in cross-examination, I gave an answer to a question about a TV show I used to consult with. That's the television series

Law and Order. And I was asked a question about Law and Order. I had consulted on 250 episodes at that point, and it was a question really designed to see if I was an expert on women's mental health, and I tried to give an answer responsive to the question and came up with a memory of a particular episode.

Turns out the episode I thought I remembered was not an episode of that show. And the description I gave hadn't come from my experience with the show. It was something the prosecutor had suggested to me in an earlier conversation. I had forgotten where I heard it.

And then later in the trial, when I discovered my mistake, I offered to fly back to correct it at my own expense. They told me not to bother. And unbeknownst to me, the prosecutor argued that Mrs. Yates had gotten her idea for the crime from that show, which is not what I had said and was not true.

That turned out to be reversible error for which I was blamed and there was a press brouhaha about it and I got a lot of negative press.

There was then a retrial and I was asked by the government, by the state to again testify, which I did.

Q. At the time that you noticed your error, Dr. Dietz, did you document in a letter in writing what you misremembered or mistaken in your memory about Ms. Yates and the Law and Order episode?

A. I tried to. I wrote a letter saying that that had been wrong and trying to explain where I heard it, but I still hadn't remembered where I really got the information.
Q. Dr. Dietz, did you have a role in a prosecution of a case that involved the so-called D.C. snipers?
A. Yes.
Q. Did you consult with the prosecution in the case of Dzhokhar Tsarnaev who conducted the Boston Marathon bombing?
A. I did, yes.
Q. Did you consult in the case of Dylann Roof?
A. Yes, and I was able to evaluate Mr. Roof.
Q. Dr. Dietz, do you always work for the prosecution or do you work for the defense, also?
A. I work for both, but how much depends on what stage of my career. Early on, all of the cases were court-appointed because I was an employee of the state. And when I went to Virginia, most of the cases came from the defense because that was the history of the clinic I ran in the medical school. But I worked at getting prosecutors to send cases, too, so by the time I left, it was 50/50.
When I went into private practice, I got more prosecution referrals, primarily because of some high profile cases I had done, and then I worked at getting more defense cases.
And in recent years, I've done more for the defense than the prosecution.

Q. So it has varied over time as to what ratio of defense and prosecution work you do?
A. Yes. I've never been able to get it 50/50 exactly.
Q. Dr. Dietz, when you have been retained by the prosecution, have there been cases where you've made findings that are not helpful to the prosecution or adverse to the prosecution?
A. Oh, yes. Most of the time when I find the defendant insane, I've been working for the prosecution when I gave them what they regarded as bad news, but it was the truth, the person was insane.
Q. Without breaching confidence or naming any names, did some of those cases resolve at least based in part upon your opinion?
A. Yes.
Q. Dr. Dietz, is it possible for you to estimate the number of forensic interviews that you've conducted in your career, or could you ballpark it?
A. It would be so -- the number would be so biased by those early years of inadequate exams at the state hospital, that it wouldn't really be very informative, but I've certainly seen many hundreds of people since then.
Q. Dr. Dietz, when you conduct forensic interviews, what do you believe is the best way to document them?
A. Videotape. Since 1982, I have sought to obtain videotape of every evaluation of a defendant that I've had occasion to

conduct because videotape preserves the evidence best, makes sure both sides can catch any errors, any misrepresentations, any inaccuracy. It gives a complete record of everything that's been said. It has a complete record of nonverbal behaviors by the defendant. And it's a technology that's easy to use and seems to me the gold standard for how evaluations should be documented.

Q. Dr. Dietz, you have been qualified and testified as an expert in psychiatry in prior federal and state cases?

A. Yes.

Q. Multiple times, many times?

A. Many times.

Q. Is your experience as an expert witness and as a consultant and as a professor and as a publisher summarized in your CV, your curriculum vitae?

A. Yes, it is.

Q. And that has been marked as Exhibit 1455. Dr. Dietz, is that document over 100 pages?

A. Yes.

Q. Does it fairly summarize your experience to date or close to date?

A. Yes and no. Everything in it is correct to the best of my knowledge, but there are areas of experience that aren't represented in it. For example, areas I do a lot of evaluations in that I don't publish about, and so they would

not be represented.

MS. SONG: Your Honor, we move to admit Exhibit 1455.

THE COURT: Without objection?

MR. BURT: It's the CV?

THE COURT: It is the CV.

MR. BURT: No objection.

THE COURT: Thank you. Government Exhibit 1455 is admitted.

MS. SONG: Your Honor, we offer Dr. Park Dietz as an expert in psychiatry.

THE COURT: Mr. Burt, do you care to cross on qualifications?

MR. BURT: Just briefly, Your Honor.

CROSS-EXAMINATION EN VOIR DIRE

BY MR. BURT:

Q. Good afternoon, Dr. Dietz.

A. Good afternoon.

Q. Good to see you.

A. Nice to see you, too.

Q. I just want to clarify, you are being offered as an expert in psychiatry, and is it your understanding that psychiatry, in particular forensic psychiatry, includes neurology?

A. No. It is an overlapping field with neurology, but I'm not a neurologist.

Q. Okay. And that's what I wanted to clarify. You've heard

the testimony of various witnesses offered here. You are not going to be testifying as an expert in neurology, correct?
A. That's correct.
Q. Or in forensic psychology?
A. I'm not a forensic psychologist.
Q. Or in neuroimaging?
A. Definitely not a neuroimaging specialist.
Q. Do you have any expertise in nuclear medicine, PET analysis or anything like that?
A. No.
Q. So you are strictly going to be testifying as a forensic psychiatrist?
A. Well, maybe as a criminologist sociologist, too, but yes. Soft social sciences, not brain sciences.
Q. So you are not offering any expertise in brain science, brain imaging, neurology, correct?
A. Well, this always depends on what one means by "expertise." Obviously, I have greater knowledge than most laymen about most, if not all, of those fields.
Q. Sure.
A. And I would bring that to bear if asked the relevant question, but I do not present myself as an expert on those issues at the level that a specialist would be.
Q. In other words, you don't read MRI scans?
A. Correct.

Q. You don't read PET scans?
A. Correct.
Q. You don't read EEGs?
A. Correct. I read the reports of those who do read them.
Q. And we've heard other experts talk about board certification. What, if any, are your board certifications?
A. I'm board certified in psychiatry by the American Board of Psychiatry and Neurology.
Q. And is that a board certification -- we've heard that there's a board certification in psychiatry and then a subspecialty in forensic psychiatry.
A. There is such a subspecialty now.
Q. And are you board certified just in the general psychiatry field as opposed to the subspecialty of forensic psychiatry?
A. Correct. Although I did a forensic psychiatry fellowship, I did not take the exam because I disagreed with the formulation of the exam.
Q. Okay. Then I think the last area of specialization we've heard about is neuropsychiatry. Are you board certified in neuropsychiatry?
A. No.

MR. BURT: Thank you very much. We have no objections to Dr. Dietz testifying as a forensic psychiatrist.

THE COURT: Thank you, Mr. Burt.

Ms. Song, you may proceed and you may elicit opinion

testimony.
MS. SONG: Thank you, Your Honor.
DIRECT EXAMINATION (Resumed.)
BY MS. SONG:
Q. Dr. Dietz, before I ask you some additional questions, I want to ask you in particular about epilepsy. Is that a condition that you've treated as a doctor?
A. It is.
Q. And have you also appeared as an expert in cases that may have involved epilepsy?
A. I assume so. There's so many cases. I couldn't quote too many offhand.
Q. Is there some overlap with your expertise as a psychiatrist and the treatment or diagnosis or consideration of epilepsy?
A. Sure. Well, in medical school, one is exposed to many, many specialties, not necessarily every single one of them. And once one is licensed as a physician and surgeon, one is licensed to treat any medical condition.
That doesn't mean it's wise to do so. And so physicians tend to limit themselves to the areas that they're really competent in and to refer patients who don't fall within their area to specialists who are more appropriate for it. I forgot what your question was.
Q. I was asking you about epilepsy. But as a medical doctor,

you have had exposure to epilepsy and have treated patients with epilepsy and you have familiarity with epilepsy?
A. Oh, yes.
Q. Dr. Dietz, approximately when were you contacted by the government in this case?
A. Six or seven weeks after the crime had occurred, so it was December of 2018.
Q. Dr. Dietz, at the time that you were contacted, did anyone on behalf of the prosecution suggest a working diagnosis or an outcome to you in connection with your retention as a consultant?
A. Absolutely not.
Q. Since the time that you were contacted IN December of 2018, have you been reviewing evidence related to the defendant, and by the defendant, I mean, Robert Bowers, and his offenses?
A. Yes.
Q. Dr. Dietz, what effort, if any, did you make to compile or summarize the materials that were provided to you in connection with the case?
A. Well, the flow of information has varied in velocity, so there were times when information came in clusters that were manageable and times when it flooded in unmanageable quantities. And somewhere along the line, I decided to have some of the work of reviewing documents and synopsizing them

conducted by an associate. And over the years, I've used a great many professionals for that task and have discovered which ones do how good a job.

In this instance, I was able to use the best record reviewer summarizer I've ever had the pleasure of working with, who is Mr. Stephen Carter.

Q. What was Stephen Carter's occupation prior to working with you?

A. For 20 years, he was an FBI agent specializing in interviewing and interrogation and was a polygrapher, not for that entire 20 years, but for his final time in the bureau. And then he went to work for Hewlett-Packard and was manager of investigations for HP. And then he went to work for Target where he became the director of global investigations for Target Corporation Worldwide. And then he came to work for my firm, Threat Assessment Group, and Park Dietz & Associates as an consultant. He's a contractor. And one of the things he does is on major cases with voluminous records, to help me organize the materials.

Q. Is this such a case, a major case with voluminous records?

A. Yes.

Q. How do you work with Mr. Carter; is it collaborative or is it his work product?

A. It's collaborative. So we make sure that each of us has all of the documents. I tell him which ones that he should

start with and where I'm going to start.

And so, for example, in this case, I reviewed all of the medical records, highlighted them and told him through the highlighting which parts I wanted included in what we call a factual summary. But there were areas where I didn't think I needed to be the first one to read them, like law enforcement interviews or remote family members' medical histories, where he went over it first and then I would go back to the record to confirm that what he had written was complete and accurate.

Q. So it's summarizing and collating the voluminous records you received in this case?

MR. BURT: I'm going to object to summarization questions, Your Honor.

THE COURT: Overruled.

BY MS. SONG:

Q. The question, Dr. Dietz, was this work product that you and Mr. Carter collaborated upon is a summary and collation of the records?

A. It is.

MR. BURT: Object, that's leading question, Your Honor.

THE COURT: I'll overrule the objection. The doctor can clarify if he needs to.

A. We call it a factual summary. That's what we believe it to be. It went through many, many iterations and kept growing

in size as we got more material. And at some stages, not every stage, I also shared it with the government's other retained experts so that they would have at least a guide to where to look and what was in the records, because they, too, were being deluged with tens of thousands of pages.

BY MS. SONG:

Q. You said "deluged"? Was the word you used "deluged"?

A. Deluged, yeah. Flooded.

Q. Flooded. Dr. Dietz, have you been in the courtroom for defense expert testimony in this phase of the trial?

A. I have since the experts began testifying. I was not here for the opening statements.

Q. For what purpose? What was the purpose of your presence here in the courtroom?

A. Well, as a rebuttal expert, I wanted to know what the defense was going to say that I might be asked to rebut since at the time of our reports, we didn't know what the defense experts thought or said except indirectly. We had had a representation of what the lawyers for the defense thought their experts might say.

And later we got expert reports and only very late did we get expert notes. And so in order to know what the experts were actually going to say, we wanted to be here to do it.

Also, we thought that was only going to be a couple days and that we would be going home last week, so none of us

anticipated we would be here for two weeks.

Q. Dr. Dietz, had you reviewed a transcript, would you have been able to assess in realtime the visuals that the witness was referring to and displaying?

A. No. Any exhibits, we would either have missed or had the burden of trying to match exhibits to lines of testimony if we were given the exhibits. We would not have been able to see the nonverbal behavior and we would be at the disadvantage of distance to be able to speak to each other about what we were observing.

Q. Dr. Dietz, is it common to observe opposing experts as you are preparing to be a rebuttal witness?

A. Yes, whenever the Court allows it, which in my experience is every time.

Q. Was it your understanding that the Court and defense counsel were aware of and did not object to your presence?

MR. BURT: Object to the form of that question. It's testimony.

THE COURT: I'm going to overrule the objection.

BY MS. SONG:

Q. Dr. Dietz, what was your understanding as to whether the Court and defense counsel had agreed to your presence in the courtroom?

MR. BURT: I'm going to object and ask to approach, please.

THE COURT: It's probably worth it. Thank you.

(At sidebar.)

THE COURT: Before either of you speak, can I just say this, I don't want to get in a yelling match or spitting matches over what was agreed to or not agreed to between counsel privately. Is there a way to avoid that and still get to the point that he had every reason to believe he was welcome in the courtroom?

MS. SONG: The way I phrased the question the second time that Mr. Burt still objected to was what was his belief, what was his understanding. We are still concerned, Judge, that there has been an insinuation to the jury that there's something improper about him being here.

THE COURT: I appreciate your point. I guess my point is I don't want to invite another round of questions at a later point in the trial regarding other agreements that counsel have made. Can we excise that part of the question, just sort of make it, look, did you have any reason to believe that you were not welcome and permitted to be in the courtroom, as opposed to based upon agreements of counsel? That's my only really principal concern about the line of inquiry.

MR. BURT: That was the focus of the objection.

MS. SONG: It's in the transcript, but I can certainly ask it to Dr. Dietz in the way the Court described.

THE COURT: I appreciate that. Thank you.

MR. BURT: And Your Honor, while we are up here, I've noticed counsel during the questioning has a habit of repeating and summarizing answers that are given by the witness. I think -- I don't want to have to keep objecting to it. I will if the pattern continues as it has every time she is questioning the witnesses, but I think it's inappropriate to do that with a witness like Dr. Dietz who is clearly answering the questions.

We don't have a language problem here. There's no need to resummarize answers that have been given and inappropriately allows the government to reemphasize testimony that the witness has just stated. And the latest example, he said there was a deluge of information. She then repeats "deluge"; right? She's done that repeatedly. I ask the Court to instruct counsel not to do that. It's not an appropriate way to question the witness.

MS. SONG: Your Honor, we think that's an inappropriate objection. I was making sure I heard him correctly. The way he pronounced it, I wasn't sure that that's what he had said. And this is a ticky-tack objection.

MR. BURT: Your Honor, counsel does not get to repeat testimony under the guise of saying, I'm not sure I heard it correctly. That's an inappropriate way to reemphasize testimony. And to characterize it as "ticky-tack" does not

really assist the Court on rulings on the objection.

THE COURT: Let me do my best here. My impression was that Dr. Dietz's response to the final question example which you point to respecting the use of the word "deluge" was not perfectly clear. I actually presumed Ms. Song was telling me the truth when she says she wasn't sure what his answer was so she was seeking clarification.

That said, and I mean this respectfully to everybody because we all have our own patterns of speech and habits, I chief among us have bad practices in speaking publicly. To the extent possible, we should endeavor to not unnecessarily repeat the testimony of witnesses.

It may happen, and you are certainly entitled to object, unless it becomes a much more disturbing trend than it has been, at least to my ears, so far. I'll probably continue to overrule the objections.

That said, you are entitled to object. I'll make the ruling as I see fit. I'll invite Ms. Song and all of us to be more precise in our questioning.

MS. SONG: I will make a record, Your Honor, that defense counsel, the qualification portion of many of their witnesses was an hour or more. Part of my efforts in this case is to move us along. I'm not trying to emphasize testimony. I'm trying to direct us to the important testimony and that is my purpose.

THE COURT: I appreciate that. That's how I understand it. I accept it as such.

(Sidebar discussion concluded.)

(In open court.)

THE COURT: Thank you all for your patience. Ms. Song, you may proceed.

BY MS. SONG:

Q. Dr. Dietz, did you -- I'm going to ask this question -- same question or a similar question in a different way. Did you have any reason to believe that you were not permitted to be in the courtroom to observe defense experts?

A. No. I understood there was a stipulation between the parties that all the experts could observe the testimony of other experts.

Q. Dr. Dietz, have you prepared slides to help the jury understand your testimony today?

A. I did.

Q. Do those slides contain excerpts from your report related to an interview of the defendant?

A. Yes, among other things.

MS. SONG: That report, Your Honor, has been marked as Exhibit 1456, and defense counsel has a copy, although the precise redactions are still being discussed.

BY MS. SONG:

Q. Dr. Dietz, approximately how long was your original

report?
A. I don't know what you mean by "original report."
Q. I mean, your report that summarizes your interview of the defendant and findings related to him, approximately how many pages is that?
A. My report is 200 pages.
Q. And the preparation of slides, is that an effort to forego flipping through 200 pages of your report?
A. It is.
Q. Have your slides been marked as Exhibit 1461? You may not know.
THE COURT: They have.
MS. SONG: They have.
THE COURT: Let me answer that.
MS. SONG: Your Honor, we move to admit Exhibit 1456 subject to whether we can come to some agreement on the redactions, but we move to publish Exhibit 1461, which are Dr. Dietz's slides.
THE COURT: Any objection to the Government Exhibit 1456 as redacted? I'm sure we'll reach an agreement -- excuse me. 1456 as redacted and 1461?
MR. BURT: No further objections, Your Honor.
THE COURT: Noted. No further objections. Thank you. They are admitted.
BY MS. SONG:

Q. If we could move to Exhibit 1461. Now, Dr. Dietz, these are the slides that you prepared in connection with your testimony today?

A. Yes. These are my demonstrative exhibits.

Q. And if we could advance to the second slide, please. Now, Dr. Dietz, can you summarize some of the materials that you reviewed in connection with this case?

A. Yes. This is really just a summary. So with respect to the documents, they came from both the government and the defense, though not all at the same time. The first category would be the personal and financial records. I'm sorry. The family medical records, which were representative of multiple generations, and those were provided by the defense fairly recently.

The school records, we had had for a long time. Those were provided by the government. Then there were employment records from the various employers that Mr. Bowers had over the years. Medical records from childhood up through his time in custody. Social service records, because of the involvement of the Department of Youth and Child Services in his early years. Law enforcement records from the investigation of this case.

There were no previous crimes committed by Mr. Bowers, but the records of this case were voluminous with investigative reports, witness interviews, photographs, search

results, the video evidence that was created in the course of the investigation.

Then there were corrections records that included his medical records, his emails from custody and his phone calls from custody, which, of course, are recorded.

There was his Internet activity prior to the crime that was reconstructed as best could be done from sources that had not been destroyed, and that included emails he had sent and videos that he observed and sent to other people and his postings and likes on Gab.

Q. On Gab?

A. Yes.

Q. And finally, if we could put up the last bullet there.

A. I also reviewed the reports of each of the experts for both sides and their notes and their test results, that is, the raw data from their testing.

Q. If we could take the slide down for just a moment. Dr. Dietz, in connection with this case and prior to interviewing the defendant, did you conduct research?

A. I did. Some of this was done based on what he posted on Gab and themes I knew were of interest to him. Others, I researched during the course of my interview each evening after seeing him, I would research topics he had mentioned to see if he was correctly quoting various events that he had seen in the news or sources that he had mentioned, and then

annotated my notes with some of those citations.

Q. Dr. Dietz, what distinguishes a forensic interview from a regular interview?

A. Well, there are several things. First of all, in a regular psychiatric interview, I'll call it a clinical interview, the default assumption is that one is seeing a patient who wants to get well and is cooperating with the clinician for the purpose of getting better.

In a forensic interview, one has the default assumption that someone has a problem that they want a particular outcome with and so they may mislead in various ways and that one shouldn't rely -- one shouldn't take at face value what someone is saying during a forensic interview.

Q. Was that in part why you conducted that research?

A. Yes, in part, but also because if he were talking about something which I wasn't familiar, I wanted to verify did this really happen in reality or is this something in his imagination.

So, for example, he told me about a couple crimes that had been in the news, and I checked to make sure the details he gave me were correct and, with one exception, they were. There was one where I think he had -- he thought it happened in New York. It was really in Washington, D.C.

Q. If we could put up slide 3, please, and just populate those bullets.

Now, Dr. Dietz, can you describe the research, in particular, you did in conjunction with the forensic interview of this defendant?

A. Well, I already knew quite a bit about far right extremism, white supremacy, nationalism and separatism, and I dug deeper in connection with this case on some of the particular points he made. Anti-Semitism, I knew generally about, but I looked further into that in connection with this case, particularly some of his assertions.

Biblical interpretation, I just wanted to verify some of what he said because he quoted the Bible fairly accurate -- well, fairly often, and I wasn't always sure that what he was saying was accurate. And everything I had in my notes that he had told me was exactly correct about what the Bible says, which is no surprise since he told me he read the Bible cover to cover multiple times and had a very good memory for it. But there were passages that were unfamiliar to me that he accurately cited.

Q. You mentioned news events already. What about other sources of the defendant's extreme beliefs, what do you mean by that?

A. I'm not sure there are any other sources besides the ones listed above.

Q. Okay. If we could advance to the next slide. Did you review testimony in conjunction with your preparation and

examination of the defendant?
A. I did. Prior to the exam, I already had grand jury testimony in part, the testimony of law enforcement, family members and a neighbor who had known Mr. Bowers. I had read those before the exam. I also had testimony from a suppression hearing in October 2021 that I had read before the exam.
I had read the guilt phase testimony of Evan Browne, William Braniff, both of whom addressed related issues. Evan Browne talked about the Gab postings and William Braniff spoke about white supremacy, so their testimony was of particular interest. And then, of course, I've observed the eligibility phase testimony since last Tuesday.
Q. Dr. Dietz, in addition to those materials, did you conduct interviews of other witnesses?
A. A few.
Q. And can you tell us who some of those witnesses were?
A. So I interviewed his aunt, Cynthia Odorisio, and also interviewed three of the correctional officers who had worked closely with the defendant.
Q. Ultimately, after all of this preparation, were you able to conduct interviews with the defendant?
A. Yes.
Q. When did those interviews take place?
A. In May, on three different days in May. May 20th, 21st

and 23rd, I was able to interview the defendant at Butler County Prison.

Q. Before I ask you about that interview, why was it important to interview even the four people that are listed here, Cynthia Odorisio and the three corrections officers?

A. I understood that Cynthia Odorisio was the one family member who had agreed to speak to me telephonically; and so, of course, it's always good to try to interview family members.

With respect to the correctional officers, my interest there was in speaking to people who had known him closely since the crime had occurred who would have had occasion to observe his behavior during those four-plus years. And I was given to understand that those were the three who knew him best, and all of them were agreeable in speaking with me.

Q. Dr. Dietz, you interviewed the defendant on May 20th, 21st and 23rd of this year. Where did those interviews take place?

A. They all took place in a large comfortable room in the Butler County Prison that was quiet. There was a correctional officer seated at quite a distance who could observe through a window but would not be able to hear anything that was said.

Q. There were other people in the room with you or not in the room with you?

A. At the beginning of some of those sessions, one of his attorneys might be present and right outside the room or in

the room. But for the interview itself, it was always just the two of us.

Q. Dr. Dietz, how much time in aggregate did you spend with the defendant?

A. 14 hours and 47 minutes of actual interviewing time. There was other time standing around in the adjacent area or --

Q. Not actively engaged in interview?

A. Correct.

Q. Dr. Dietz, can you tell the jury how the interview started? How did you meet the defendant?

A. I was introduced to the defendant by Judy Clarke, who kindly offered to introduce us. I accepted her offer. And both Ms. Clarke and Mr. Novara, I believe is his name, were present when I explained to the defendant the purpose of my being there, the lack of confidentiality, the fact that I was not there to treat him. And as I tell all defendants, it's not my purpose to either help him or hurt him but, rather, to get to the truth as best I can.

Q. Dr. Dietz, how did the defendant react to you when you were introduced to him?

A. Well, I offered to shake hands either before -- probably before I had even said all that; and he declined, saying, "You're with the other side."

Q. Dr. Dietz, were you permitted to videotape this interview?

MR. BURT: I'm going to object. May I approach, Your Honor?

THE COURT: Yes. We can approach. Forgive me.

(At sidebar.)

MR. BURT: Judge, my objection is I want to make sure we don't get into an area that the Court just identified when we were here before, which is negotiations between counsel. There was a back-and-forth about whether the interview should be videotaped.

The defense offered to have the interviews videotaped. The government came back and said they would agree to that only if certain conditions were met. Ultimately, the negotiations broke down; and there was no video being offered.

THE COURT: Ultimately, I ordered there would be no videotaping. The answer to the question is going to be -- actually, I don't know how --

MS. SONG: It's a yes/no question, but Mr. Burt is incorrect as to the state of negotiations. I wasn't planning to ask Dr. Dietz about that. There was an offer at one point for the defense to allow a court reporter in the room, but only if they received transcripts immediately at the close of the examination. So the question is yes/no, were you permitted to videotape? And that's where I plan to leave it.

MR. BURT: That was my concern. I wanted to make

sure we are not getting into those negotiations.

MS. SONG: No.

(In open court.)

BY MS. SONG:

Q. Dr. Dietz, yes or no, were you permitted to videotape the interview with the defendant?

A. No. That was no.

Q. Dr. Dietz, how did you perceive the demeanor of the defendant when you started the interview?

A. Calm.

Q. Did you conduct a mental assessment of the defendant?

A. During the course of my time with him, I did what's called a mental status exam, but that was not the first thing I did.

Q. What were the first things that you did with the defendant, in addition to what you've already said?

A. Began to talk to him about his earliest memories and his childhood.

Q. How responsive was the defendant to your question?

A. Very. He didn't always remember everything, but he was very responsive and was able to give me information about everything I did ask about.

Q. Dr. Dietz, you mentioned the mental status assessment. Can you tell us a bit about some of your findings in connection with that? And to start, how would you have characterized the defendant's affect?

A. Well, all of this is in my notes and in my report. But about almost everything, he was normal. There were only a few areas where there was anything that might be regarded as an abnormality, and those were minor.
Q. You described his mood as calm?
A. Yes.
Q. Dr. Dietz, what is cognition?
A. Thinking.
Q. How did you assess his cognition?
A. Are you asking what's in my notes or my recollection?
Q. Sure, if it would help you to refer to your notes, by all means.
A. One thing we look at to assess cognition is orientation. Orientation is a part of cognition. And the usual way of looking at that is, does somebody know what time it is and where they are, who they are. And, of course, he did know when it was and the date and where he was. But when I asked him about what we were doing here, the issue of -- does he know the purpose of our being in this place, he said, "I'm being held a POW in a war. There is a war on white people orchestrated by the Jew, and I'm a soldier in that war."
THE COURT: I apologize. Doctor, if you would lean in and maybe restate -- re-begin your answer.
A. Thank you. When I have the paper in front of me, I lean back.

THE COURT: I have that practice, also. Thank you.

A. He said, "I am being held a POW in a war. There is a war on white people orchestrated by the Jew, and I am a soldier in that war."

Q. That was in response to what type of query by you to assess his cognition?

A. "What are we doing here today?"

Q. Dr. Dietz, is abstraction another aspect of your mental status assessment?

A. Yes, it is.

Q. What is it?

A. What is abstraction?

Q. Yes.

A. That's the ability to think in an abstract manner, which he showed even in the answer to that question by describing the metaphor of being a soldier in a war, but he showed it throughout the interview.

I did a formal test of it by asking him to interpret proverbs, but he repeatedly used analogies or similes or abstract thinking, so he had no difficulty with abstraction.

Q. Why are proverbs, similes and analogies significant when you're making that assessment about abstraction?

A. It requires abstract thinking to be able to interpret an ambiguous passage or to be able to recognize the relationship between concepts.

Q. Dr. Dietz, when you were speaking to the defendant, how would you characterize his manner of speech?
A. Quite matter-of-fact, very direct, never minced his words. But there were occasions when, on subjects that angered him, at which he would speak faster and louder. And the topics that angered him repeatedly or caused him to speak louder and faster were anything about his mother and how she behaved toward him, anything about Jews, anything about immigration, and anything about the design of gas cans and how they have been changed.
Q. The design of gas cans?
A. Yes.
Q. What did he say about the design of gas cans?
A. He said there was a perfectly good design for gas cans that allowed one to use a spout and pour the gasoline safely from the can into the tank that you are trying to fill, and that some genius had redesigned it supposedly for safety in a way that requires the use of something that can fall off into the gas tank, causing a problem with safety, and that can cause a spill, causing a problem with safety, and it was idiotic.
And he used a phrase such as "The problem was solved. What did you do?" Which I thought was really interesting that he recognized that there had been a solution to something that some bureaucrat or engineer had made worse.

Q. Doctor --
A. I resonated with that, because I think a lot of that goes on in the world, so I laughed when he said it.
Q. When you say it resonated, it resonated with you?
A. Yes.
Q. Dr. Dietz, other than talking or even when, I should say, talking about his mother, Jews or gas cans, were you able to redirect him to other topics, even if he had become animated?
A. Yes. This was mostly during the first day with him when it was not as clear to him that I had a sequence I was going to go through. At the very beginning, he was kind of eager to tell me about why he had done it and the issues that really mattered to him.
When I explained that I was going to go through a lot of his life story first and that we would eventually get to that, he stopped inserting so many comments about the things that interest him the most.
Q. After he stopped inserting comments and you framed where you wanted to go in the interview, were you able to proceed in an organized, logical fashion through the topics that you wanted to cover?
A. Yes. Sometimes after answering my question, he would tell me some story related to it or some other area that interested him related to what we've been talking about, but he answered my questions.

Q. So, Dr. Dietz, without going as much into the substance, in terms of your assessments of the defendant's thought process generally, what did you observe?
A. I observed a smart, articulate man who had done his homework, who had been trying to improve his mind and knowledge base, who had paid careful attention to the news, if selective, about what he was most interested in and who had a great memory for the detail of what he learned and where he learned it and how one of his beliefs fit with another of his beliefs. He cited evidence to support propositions.
Q. Dr. Dietz, did you find his expression to be organized in terms of his thought process?
A. Yes.
Q. We have heard the term "tangentiality." Can you explain what that is and whether you observed that?
A. The term "tangential" is used to describe when someone is asked a question and they go off on a tangent. And "circumstantial" is used to describe when someone goes off on a tangent but eventually comes back to the topic. And normal people do that. That's not necessarily pathological to go off on a tangent or talk around a subject.
People with a serious thought disorder, it gets to an extreme where they go off into outer space on that, on the subject, or don't come back at all until you bring them round to it. I didn't see any significant evidence of tangentiality

or circumstantiality.
Q. What about flight of ideas? Did you observe that in his comments to you?
A. No, not a bit. I was able to follow the train of thought for absolutely everything he said to me.
There were times when he would use a phrase to designate something without describing in a whole paragraph what he was talking about. But because I knew the topics that he was discussing, none of that was weird to me. So, for example, after he had already told me how abortion is a part of white genocide and in future discussions of that he would just list abortion as one of the pieces of evidence.
Q. Abortion, you're saying?
A. Yes. This is just an example, that he would use a shorthand version of something he had already told me about or something that I already knew about.
Q. Dr. Dietz, in terms of his thought content -- and I'm still referring to your mental status examination. What did you observe about the defendant?
A. In terms of which?
Q. Thought content.
A. Thought content. Well, I asked him what his major preoccupations were, the things you think about all the time. And he said, "I'm kind of dedicated to the war now. Keep paying attention to what's going on. If ever the time comes,

be ready to fight again. Don't expect to have an opportunity while in custody, but nations don't last forever." He said he had no idea if he would ever get out of custody, "but if that day ever comes, know your target. This war ain't over."

Q. In the context of your discussions with him, was that an understandable response to you?

A. Yes.

Q. Why was that?

A. Because he already made clear that he saw himself as a soldier in a war and that he was prepared to fight in that war, to die for that war, even if he's the only soldier who is standing up for white culture and white people.

Q. Dr. Dietz, did you observe the defendant to have any hallucinations?

A. No. He denied every kind of hallucination. I asked him about each type, and he did not have any.

Q. While we will discuss this in some greater detail, but with respect to your mental status examination, did you find the defendant to have any delusions?

A. I did not.

Q. In particular, what about persecutory delusions?

A. No, he did not have any persecutory delusions.

Q. Did he make comments to you about anyone being out to harm him or get him?

A. Yes. I asked him specifically whether there was anyone

who was out to harm him or conspiring against him; and he said, "Only the people on the prosecution team."

Q. Dr. Dietz, what did you observe --

MS. SONG: And, Your Honor, if I can do a few more questions, then I think we have a logical time for a break.

THE COURT: I'm glad you are paying attention to it. Thank you.

BY MS. SONG:

Q. Dr. Dietz, what did you observe about the defendant's insight?

A. Well, I asked him whether he thought he had any mental problem or psychiatric problem. And he said, "I don't, but apparently a lot of people do. I don't know. It's not really my field. I don't really know the measure of anything. If anything, I put up with stuff longer than I should."

Q. Dr. Dietz, when you are commenting on things that the defendant said in the first person, like "I," how were you able to record his responses? Are those quotations, essentially?

A. Yes. Most of these are quotations that I was able to write down and even type quotation marks during the exam. But after the exam, each evening, I went back through my notes and used my recollection to edit them, make them more accurate, put in missing quotation marks and so on.

They may be imperfect in that regard. I did the best I

could to accurately record it, but the -- this is one of the reasons I like to videotape, so I have a verbatim record.

Q. Dr. Dietz, did you let the defendant know that you were recording or typing or writing his responses to your questions?

A. Yes. At the outset of the exam, I told him that it's been my practice to videotape and that that makes it so I don't have to take notes, but that since that wasn't possible, I was going to have to have awkward pauses while I tried to type out what he was saying, and that -- and I apologized for the fact that it would be awkward in that way.

Q. Dr. Dietz, still related to insight, you have described his sense of whether he had psychiatric or mental problems. Were there other responses important to you related to his insight of himself that you observed?

A. Well, I think the real issue with respect to insight is that for what I believed eventually when I came to my conclusions was his biggest problem, he did not think it was as bad as I thought it was. He doesn't entirely recognize the extent to which he's a loner, so he says he has interactions with other people, but most of his interactions with other people are passing small talk.

The same thing was observed by his aunt, who said that he was always superficial with her. He didn't really confide anything deep, that it was small talk and superficial talk.

But I don't think he recognizes that there are many people who confide in others and who have deep intimate relationships. He has not really had deep relationships.

Q. That is an observation you made relative to insight with regard to his mental status examination?

A. Yes, that there's something about him that is -- that psychiatry would regard as not normal or ideal, that he doesn't even appreciate that that's lacking. So he was willing to tell me that he thought he had an interest in relationships with family and friends, but his behavior throughout life hasn't really supported that.

He had a few girlfriends, but not a real depth of relationship that I could tell. His relationships with his family were mostly superficial or sharing information, and his one true confidant was the friend who passed away.

MS. SONG: This might be a good breaking point, Your Honor.

THE COURT: Ladies and gentlemen, we'll try to convene as shortly after ten minutes as possible. Thank you.

(Jury excused.)

THE COURT: Thank you, everyone.

(Recess taken.)

THE COURT: Ms. Kim, please bring in the jury. Let's give Mr. Burt a minute. Here he comes right now. Just one second.

MS. CLARKE: Thank you, Your Honor.

THE COURT: My pleasure.

Ms. Kim, would you please bring in the jury.

THE DEPUTY CLERK: Yes.

(Jury present.)

THE COURT: Welcome back. Everyone please be seated.

Ms. Song, you may proceed.

MS. SONG: Thank you very much, Judge.

BY MS. SONG:

Q. Dr. Dietz, before we move off from insight, if you would refer to page 168 of your report, which has been admitted subject to redaction, I want to ask you what responses the defendant gave about his ability to work or hold a job. I'll give you a minute there, 168 of your report.

A. That's not about insight, but I was talking about disability.

Q. My question to you was in your insight observations in your report at page 168.

A. It's under that heading, but this isn't about insight.

Q. Okay. What did the defendant say, if anything, about his ability to work or hold a job?

A. I asked if anything impaired those abilities. And he said "Yeah, I had a serious back pain for years. It eventually went away and never came back." Then he told me about the injury at the bakery when an ice machine came downstairs, slid

down too quickly, and he braced to take the load and that's how his back was injured. He had never filed for workers' comp. He said he didn't trust the system, didn't know about Workers' Compensation.

Q. Did he reference the injury in relation to any pills or illicit substances?

A. He did. I already knew that he had become addicted to pills. I don't remember if I had spoken to him before that point, but I knew from the records that he became addicted to prescription opiates, that he was buying opiates online, that he was selling some of them and using the money to buy himself more and that eventually he stole some money from the bakery intending to pay it back in order to support this habit and that's why he got fired, because they caught him stealing.

Q. And in his response to you, he was forthcoming about all that information?

A. Very.

Q. Dr. Dietz, you mentioned that you were typing notes in the course of your interview of the defendant. Those have been marked as Exhibit 1460.

MS. SONG: Your Honor, we move those notes into evidence, subject to hopefully some agreement on redactions.

THE COURT: Any objection to a redacted copy of Government Exhibit 1460?

MR. BURT: Subject to the same objections we made and

also some review to see what the redactions are.

THE COURT: Noting no further objection, but subject to the understanding that an agreement will be reached regarding redaction, 1460 is admitted.

BY MS. SONG:

Q. Dr. Dietz, in terms of your conclusions, and based on your interview with the defendant and everything else you reviewed in this case, did you find that there were some areas of agreement with the defense witnesses?

A. Yes.

Q. If we could move to slide No. 7, please. Can you explain to the jury the areas of agreement between you and the defense experts?

A. Well, I agreed with what I understood the defense experts to say, that no EEG or MRI or PET or neuropsychological test can diagnose or prove delusions or schizophrenia. I agree with that principle.

And, also, that no EEG, MRI, PET or neuropsychological testing can disprove delusions or schizophrenia.

Q. Why is that? Why can schizophrenia not be determined one way or another, from all of those tests?

A. Well, first of all, it's a psychiatric illness defined by its symptoms; and those particular tests do not show the symptoms that would allow one to make the diagnosis.

The test can still be useful in patients who do have

schizophrenia to make sure their symptoms aren't due to a brain tumor, for example, but -- and they can at times show evidence that would make it more believable that the correct diagnosis is schizophrenia, because there's some features that are very commonly found in schizophrenia, but he didn't have those features.

Q. What significance, then, does the interview hold when you are diagnosing schizophrenia?

A. The interview and the history are the bulk of what is significant for making a diagnosis of schizophrenia.

Q. If we could advance to slide No. 8. Were there other areas of agreement with the defense experts, Dr. Dietz?

A. Yes. I believe that the defense experts and I would agree that Mr. Bowers had a challenging childhood and that he responded with anger and depression.

Q. What about the defendant's social interactions?

A. I think we would agree that he has lived his life in adulthood as a socially isolated loner who did not live up to his potential.

Q. With regard to his beliefs, Dr. Dietz, what do you see as a point of agreement with defense experts?

A. Well, we agree that he has strongly-held extreme beliefs. I would go so far as to say that I think we agree that he holds them with great conviction.

Q. Now, if we might take that down for a moment.

Fundamentally, however, Dr. Dietz, do you have significant areas of disagreement with the defense experts?

A. Yes.

Q. Do those relate to diagnosis, for instance?

A. Yeah, that's one of the three areas where I disagree.

Q. If we could display slide No. 9, please. Please explain, in terms of the diagnoses that we've heard testimony about, where you disagree with defense experts.

A. In my opinion, the defendant does not have schizophrenia; and I'll explain why. And, in my opinion, he does not have epilepsy; and I'll explain why.

I also disagree with what I believed were suggestions as to their conclusions on two other points, though they were not expressed in this language. It was really suggestive language, and that is as to whether the defendant had the capacity to engage in substantial planning and premeditation. I believe he did. And also the question of whether he had the capacity to form the intent to kill, and I believe he did, for reasons I'll provide.

Q. Let's start with your opinion that the defendant does not have schizophrenia. If we could turn to slide 11, please. Can you explain the basis for your opinion that he is not schizophrenic?

A. Well, first of all, it's noteworthy that the first time he was ever diagnosed as schizophrenic was after the murders.

Very often when we're having -- when we have a chance to evaluate someone after a crime who may be schizophrenic, there will be documentation of a 10- or 20-year history of schizophrenia with multiple hospitalizations, drug treatments, stopping the medication, getting sick again and so on. There was none of that. There was no prior diagnosis of schizophrenia.

Second issue, and this is really the biggest, is that in the course of our examinations; that is, Dr. Darby, Dr. Martell and my own, we did not observe any delusions or any thought disorder.

Q. And in terms of thought disorder, because we've heard a lot of testimony about that, why -- why does that matter? Why did that factor into your assessment that he did not have delusions or thought disorder?

A. Well, the two criteria for a diagnosis of schizophrenia on which the defense has relied is their assertion that he has delusions and their assertion that he has thought disorder. We did not find either of those to be true.

None of us believes he's had hallucinations in adulthood and none of us believes he has the other psychotic conditions that could be mistaken for schizophrenia. So the area of disagreement that goes to whether schizophrenia is a true or untrue diagnosis are delusions and thought disorder. That's the crux of the diagnosis -- sorry. That is the crux of the

diagnostic dispute.
Q. The thought disorder and delusions?
A. Yes.
Q. What, Dr. Dietz, about medication? What about the fact that the defendant was not medicated? Did that factor into your assessment of a schizophrenia diagnosis?
A. Yes, although it's not dispositive. Here's why it matters. First, if he were medicated at the time of any of our exams, that could account for symptoms disappearing. Had he been delusional or had he been hallucinating or had he had thought disorder, if he were appropriately medicated for months before we saw him, it would explain why we were no longer seeing that, but he wasn't. He's never, in adulthood, been on any of the medications to treat psychosis.
Q. So medication -- can you explain, then? So the lack of medication or the presence of medication wouldn't have altered your observations or wouldn't have changed his behavior?
MR. BURT: That's leading.
MS. SONG: I can rephrase it.
THE COURT: Thank you.
BY MS. SONG:
Q. Can you clarify the "if this, then this" as to medication?
A. There was no medication at any time in custody that could have influenced what we were seeing. So that tells me that I was seeing him and Drs. Darby and Martell were seeing him in a

completely unmedicated state. So if he were deluded or had a thought disorder, we ought to have seen it.

But the second reason that the fact he's not on medication is significant, which, again, is not dispositive of the issue, is that when someone has either schizophrenia or epilepsy, not treating that condition can allow the condition to worsen, so a physician would want to recommend that it be treated with medication for the benefit of the patient.

Here, he's not the patient of any of the experts, but if I were working for the defense in a case where I believed somebody was having delusions or seizures, I would surely recommend they get a treating doctor to consider medicating the person.

Q. Dr. Dietz, if we could move to slide 12. In terms of your assessment of whether the defendant had delusions, what definition of "delusion" did you use or description?

A. So the DSM-5-TR no longer gives a definition. DSM-IV had a definition and a glossary. Now there's merely a description in the chapter on schizophrenia; and the description is not all-encompassing. It's not very detailed. But what the description says is that delusions are fixed beliefs that are not amenable to change in light of conflicting evidence. And I believe that's true, as far as it goes.

Q. Without belaboring the point, can you explain why -- what's the difference between whether it's a definition or a

description?

A. Well, a complete definition, we would tighten up the concept such that one could reliably say whether a particular set of facts qualified as a delusion or did not or does not.

This description only addresses part of the issue that a good definition ought to address. So some of the issues that historically have been considered important in determining if a delusion is present or not have to do with is it amenable at all to change or is it completely fixed in place.

The reason that's important is that as people are having the onset of delusions, it may begin as a suspicion in which they're not sure what the truth is. But once it's a full delusion, they have the conviction that it's true and it's an unshakeable conviction while it is a delusion.

Then if they are treated, typically with medication, and the delusion begins to fade, they begin to doubt, maybe it's not true this thing I once believed. And when they are really fully treated, they will often say, "I can't believe I ever thought that was true." They recognize how absurd the idea was.

So this definition encompasses some of that. The -- this description, rather. This description in that sentence also does not encompass something that DSM-5-TR says later, which has to do with the -- whether other people share this belief, and this is a critical element of it.

We are cautioned in psychiatry not to diagnose people based on shared religious beliefs or shared political beliefs, which are often extreme and which, to those unfamiliar with them, can look just like a delusion, because it's a strong conviction about something that the viewer may not believe.

Q. Let me stop you there for a moment, Dr. Dietz. We heard some testimony that a person's action apparently in conjunction with a delusion somehow helps to determine whether it's, in fact, a delusion. Can you explain that or remark upon that?

A. Before hearing it in this courtroom, I had never encountered that concept that acting had anything to do with determining whether a delusion was present or not. I've since researched it, and I see that there was a time when some theorists believed that acting was related to whether a delusion was firmly held or not. But I believe that today, the pivotal issue is whether it is a strongly-held conviction that can't be changed through contrary evidence or reasoning, whether it's acted on or not.

Q. You used the term "strongly-held conviction." What about that? Does the severity or the intensity of the belief make it a delusion or not a delusion?

A. No. Unless it's intense, it isn't a delusion. If the person is unsure or in doubt or merely suspicious, then it isn't a delusion. It has to be strongly held, 100 percent

intense in order to be a delusion. Unfortunately, there are many other 100 percent intense beliefs, many of them incorrect, that are not delusions.

Q. If we could go to slide 13. Dr. Dietz, are there different kinds of delusions and was there a kind of delusion that you considered in this particular case?

A. Yes. There are a dozen or so different kinds of delusions commonly seen, and one of the ones that I considered in this case is that of a persecutory delusion. And the DSM-5-TR description is that this is a belief that one is going to be harmed, harassed and so forth by an individual, organization or other group. And it notes that this is the most common kind of delusion. I see this very often.

Q. For example, how? What's an example of a persecutory delusion you've seen?

A. Well, one of the ones that I see routinely through Threat Assessment Group is an employee who becomes completely convinced that their co-workers are following them, spying on them, vandalizing their homes, rearranging their furniture, doing various bad things to them and that they're out to harm them.

Q. Dr. Dietz, if we could go to slide No. 14. You already referred about cautionary instruction in the DSM-5-TR. Can you explain that in light of this slide and how you distinguish between a delusion and a strongly-held idea?

A. So the DSM-5-TR says in its description is that "The distinction between a delusion and a strongly-held idea is sometimes difficult to determine and depends in part on the degree of conviction with which the belief is held, despite clear or reasonable contradictory evidence regarding its veracity."

This is a point I already made, that it has to be strongly held to be a delusion. The other point it makes is that assessing delusions in individuals from a variety of cultural backgrounds can be difficult.

Q. Dr. Dietz, before we move to the defendant specifically, if we can take that down for a moment, can you provide some relatable examples of extreme beliefs that are considered cultural that are not delusions? What commonly do you see or would we see in our lives?

A. That are cultural and aren't delusions?

Q. Yes.

A. Certainly the most common type that we all see is people with strong religious beliefs that are different from our own. People who are certain that Jesus was the birth from a virgin who was impregnated by the Holy Spirit. If you are a Christian, that's a fundamental belief. If you are a Catholic, it's core to much of what you believe. If you are from another faith altogether, this may seem radically irrational and not plausible.

If you are a Mormon, you may believe that Joseph Smith discovered tablets in Upstate New York and that these give the word of God. If you are not Mormon, that may seem completely unreasonable and look delusional.

Q. Dr. Dietz, what about there are a large segment of the population who believe in UFOs and, in fact, study them or believe they have documented them. Are those people delusional?

A. No, they are not. This is another example of a widely shared belief that could be mistaken for a delusion. For those who hold the belief, it can be strongly held with great conviction; and they can build their hobby or their life around it, but for other people, it can look like it's delusional.

Another example would be Bigfoot or Sasquatch. The latest survey from a year ago this month showed that 13 percent of Americans answer yes to the question of whether Bigfoot or Sasquatch is a real living creature. It's 15 percent in California.

Q. And those individuals, in your estimation, are not delusional, or at least not based on that belief alone?

A. Well, it is a shared belief that, to those who don't share it, looks irrational and delusional, but for those who hold it, they could cite you the evidence for it; and they may hold the belief very firmly. And there are many, many examples of

this. And throughout history, there have been lots of social movements where a group shared some strong belief that looked irrational and delusional to those who weren't part of the group.

Q. If we could advance to slide No. 16, please. Now, turning to this defendant, Dr. Dietz, was it important, in your diagnosis, to really explore the defendant's extreme beliefs?

A. Yes. That was really the most important thing I had to do in order to determine the diagnosis in this case and whether the beliefs motivating the crimes of which the defendant has been convicted were due to delusion and mental illness, on the one hand, or due to something else on the other.

Q. In addition to your interview, did you mention that you reviewed his Gab posts and Gab activity?

A. Yes.

Q. If we could turn to slide 17. Dr. Dietz, what about -- what were some of the first observations you made about the defendant's extreme beliefs?

A. Well, one of his extreme beliefs was that Jews support illegal immigration. This one is quite central to his committing this crime. He spoke about it at the crime scene, and he continued to speak about it to the experts.

This I learned was something that he also said to Correctional Officer Michael Williams, who had observed the defendant get vocal whenever there was TV coverage about

illegal immigration. And the defendant had commented to Officer Williams that the Jews were behind it.

Q. If we could go to the next slide, 18, were these comments that the defendant made to you?

A. Yeah. I asked him what sorts of things made him angry. And he said, quote, watching the invasion. That's a big one. Dor Hadash was just on the news today, that being the primary target, end quote. He told me he had seen a news story about Dor Hadash having a fundraiser to rescue refugees from the Democratic Republic of the Congo.

Q. When the defendant used the term "that being a primary target" or that phrase, who was he referring to?

A. He was referring to Dor Hadash being the primary target.

Q. This is a comment he made to you in May of 2023 in your interview?

A. Correct.

Q. If we could turn to Exhibit 411A, page 18. Dr. Dietz, you said you reviewed the defendant's Gab activity. Were you aware that Dor Hadash figured in his Gab postings, particularly in relation to HIAS?

A. Yes.

Q. And if we could go to page 19 of that same exhibit. We're looking at the top of the page at 411A, which has been admitted, which is the Gab posts by the defendant. Dor Hadash was listed. The date of that particular post was in October

of 2018?
A. Correct.
Q. And he was still talking about Dor Hadash in May of 2023?
MR. BURT: That is argumentative.
Q. Was he, Dr. Dietz, talking about Dor Hadash in May of 2023?
A. He was.
Q. If we could turn to slide No. 19. Still on the belief about Jews and illegal immigration, Dr. Dietz, what else did the defendant tell you?
A. So to get a sense of how his beliefs align with those of one particular right-wing group, I read him a newsletter from an organization that was talking about the border crisis and the number of immigrants. And when I got to the part of the email that gave the latest order and counters numbers, he explained "That's an invasion." And then he went on, "Don't stop there. Find out what organizations are pushing this. Climb the ladder and find the Jew. 2.5 percent of the population is showing up like 80 percent of the time."
Q. What did you understand him to mean, Dr. Dietz?
A. So here this is very much a part of his thinking. He knows that not everything related to bringing illegal immigrants into America is due to people who are Jewish, but his observation is that although Jews are 2.5 percent of the population, they are involved in a disproportionate amount of

the activity that welcomes refugees and supports the idea of illegal immigrants being welcomed and supported.

Now, the exact numbers, I don't think anybody knows, but I think what he's done is to attribute to a monolithic concept of a Jew everything that a more objective person would say might be attributed to progressive activists, that he has this stereotype notion in his mind of Jewish people being involved in so many of the things that he reviles and rebels against.

And so, as many people in these white supremacist circles do, he uses the phrase "find the Jew" or "name the Jew" to suggest that if you dig deep enough, you'll find someone with a Jewish surname or someone who is married to someone Jewish involved in the activity that is trying to harm white people.

Q. Was this a perspective that you had never heard before? Was this unique or idiosyncratic?

A. No. I've heard it many times. It's all throughout the commentary on Gab, and it's throughout lots of white supremacist and white separatist propaganda and many different media.

Q. Could we advance to slide No. 20, please? Dr. Dietz, what else did the defendant tell you about illegal immigration and Jews?

A. He said specifically, "This is not a paranoid delusion. This is really happening." And an example, one of many, he pointed to was New York's effort to allow illegal aliens to

vote in the local elections, which had been on the news. He heard the news reports, as anyone might.

And he pointed out that "Even if immigrants don't get the vote immediately, that their children will." He said, "They breed like rabbits; and in 20 years, they'll vote. This is how you destroy the country."

Q. If we can take that down for a moment, please.

Dr. Dietz, as you were having these conversations with the defendant, how would you describe your rapport with him?

A. Excellent.

Q. Did he have a reaction when you appeared to know the subject matter of some of his comments?

A. He was delighted that I knew about some of this and that I knew about firearms. And I think he must have felt that he had a kindred spirit or fellow traveler, someone who knew about the same world he was very much in.

Q. Did you have to force the discussion?

A. Not at all.

Q. Could we advance to slide No. 21, please? Dr. Dietz, still on this belief about Jews and illegal immigration, what else did the defendant tell you?

A. Well, I asked him a couple questions about -- you know, to gently challenge this idea. One of them was, what if the Jewish faith demands helping those in need? And he knew immediately where that was coming from. And he said that

Christianity also counsels helping a stranger, but "not at the expense of your own people."

He said that "By loving and caring for nonwhite immigrants, Jews destroy nations." "You are not fixing the problem; you're just relocating the problem."

Q. If we could go to Exhibit 411A at page 22. Dr. Dietz, was this concept reflected in a Gab post that you reviewed of the defendant?

A. Yes.

Q. If we could focus on the top post, please. What did you see that was consistent with his comments to you from this post, for example?

A. So he has the generalization that "Every time a white country is being invaded by people of color, you will find evidence that the Jews are behind it somehow." He's not just referring to the U.S. He would say that the countries of Europe have experienced this, that Australia is experiencing it. He would be able to point to Rhodesia, and he would think that it was Jewish people who were behind the activities that led to such mass immigration diluting the white population.

Then he included a picture with this post from a caravan heading to the southern border, which was very much in the news at the time, or at least on some stations; and he pointed out that a truck carrying migrants had a Star of David.

So from that, he goes on to argue that "The Jews are

trying to erase you, white man, so that they can control the whole world. You are the only thing left standing in the way of their globalist one-world order."

Now, this idea of a globalist one-world order goes back at least 20, 30 years. I don't know how much farther, but this was one of the concerns of the John Birch Society in the 1950s. And it became a very hot issue in the '80s and inspired a number of attacks that today we would think of as extremist attacks and terrorist attacks, because of the concern that global bankers and certain families connected to what's called the Trilateral Commission were plotting to create a single global world order that would impose rule on all nations so that Americans would no longer be free.

That is not the least bit a novel idea. Then he invites the reader to call him a racist or Nazi, saying he doesn't care about that. "All I know is that my people are under attack, and we are losing. #riseup, #14words."

Q. If we could take that down for a moment. Now, Dr. Dietz, in reviewing the defendant's posts and reposts, did you see concepts that were new or different to you related to new world order, immigration, Jews, Jews control of certain aspects of society?

A. I was familiar with all of those.

Q. Could we advance to slide No. 22, please? You prefaced this, I think in your prior comments, another extreme belief

that you explored with the defendant was what?
A. The belief that Jews control academia, the media, law and entertainment. That, of course, is a very common anti-Semitic trope that's been said for many years in lots of contexts. There are a great many people who believe that, not just these extreme groups.
Q. And if we could advance to the next slide, please. How did the defendant tie pornography to Jews, if at all?
A. So the major point was he claimed that eight of the ten people at the head of the pornography distribution companies were Jewish, that Jewish college professors tell white students they're evil and that the Jewish-controlled media amplify news of crimes against minorities while remaining silent about attacks on whites. And he gave multiple examples of that.
His illustration of how Jews were involved in controlling the law was his pointing out that he's being tried in the Weis Federal Courthouse. And he said, "Jews always like to exalt themselves." He gave examples of hospitals named after Jewish people as well.
Q. Familiar concept, but bringing in a current contemporary example by referencing the courthouse?
A. Yes.
Q. Could we -- let's actually take the slide down for a minute. Dr. Dietz, I wanted to ask you about comments the

defendant made to you and exploration that you did with him about this notion of Jews being the children of Satan. Was that something that you explored with him in depth in your interviews?

A. I did. This, of course, I already knew about, because he's not the first to speak of this. It's in the Bible, and it is often used as a predicate for anti-Semitism by Christian nationalists who are of the view that Jewish people are the enemy of their brand of Christianity. And so I'd already checked the Bible for references to Jews being the children of Satan and am aware of at least three places where that arises.

But before I even asked him about it, he cited the Gospel of John and told me that Jesus told his fellow Jews that they were the children of Satan.

Q. If we could pull up slide No. 24. Is that the Bible passage that you were referring to in the Gospel of John?

A. That's where he told me about it. And knowing that there were two other similar statements in the Book of Revelation, I asked him about Revelation; and he said, "That doesn't really have anything to do with this."

Q. If we could pull up Exhibit 417, the second page. You've testified, Dr. Dietz, that you reviewed the defendant's Gab material. If we could do a close-up on the front.

Prior to your interview, were you aware that the defendant had posted "The Jews are the children of Satan" statement from

John on Gab?
A. Yes. And this particular image has greater significance. For those who don't know, this is a device that measures the velocity of a round being fired from a firearm. And many shooters have such devices so they can check whether their ammunition is as advertised or if they are hand-loading their own ammunition so that they can make sure it's compliant with the rules of whatever competition they are involved in.
And this shows a velocity of 1,488 feet per second, which would be consistent with the .357 Sig round that he was using. And he would post this because of the significance of the number 1488, which is a reference to the 14 words, which I'll talk more about, in which he mentioned in an earlier post, and also a reference to 88.
88 is significant in the world of white supremacy because H is the eighth letter of the alphabet. So 88 is HH, which stands for Heil Hitler.
Q. Dr. Dietz, was the defendant aware that he had 380-plus followers on his Gab? Was that something he mentioned to you?
A. He thought it was around 300. He was surprised that there had been a few more after his crime hit the news.
Q. Did he regard that as a positive or a negative?
A. Positive.
Q. Could we advance to slide No. 27, please? Dr. Dietz, what is the belief that's reflected on this slide that you

discussed with the defendant?
A. This is about his belief that "Jews kill children" or "Jews kill our people," which are comments he is quoted of making at the scene and that he continued to tell people interviewing him. And to support this claim, he gave multiple examples of invaders and people of color killing whites.
Now, because he believes that people of the Jewish faith support not just immigration, but also the African-American community and the Muslim community and other people of color, he attributes to Jews what is true of a much broader group and blames Jews for what invaders do and for what people of color do. And, of course, "invaders" is his code for illegal immigrants.
Q. You say his code. Is that unique or original to him, the term "invaders"?
A. No, it's not the least bit original to him. It was around before him, and it's only grown in popularity since then. In fact, one of the candidates for the presidency has a website saying "Stop the invasion," meaning exactly this group of people.
Q. Dr. Dietz, have you -- your slide here appears to reference an email that the defendant sent to his mother with a YouTube video?
A. Yes. He sent his mom, more than once, links to a particular video. Many of the versions of it have been taken

down by YouTube and are no longer retrievable, but one of them, I was able to view the video, which is a very disturbing video called Satanic Talmud. It takes the position that there were two versions of the Talmud.

One was the Jerusalem Talmud. The other was the Babylonian Talmud. And that the more sacred and authoritative version among the Jews, particularly those who subscribe to the ancient Pharisees, was the Babylonian Talmud. And then the video describes what it regards as perverse passages from that Babylonian Talmud, giving very specific citations to which book of the Talmud and which chapters give these specific directions.

I have no knowledge of whether there's even such a book or what it means or how anyone regards it, but the fact that he sent this to his mother repeatedly and the correspondence between what's in that video and some of the comments he's made suggest it was significant to him.

Q. Could we advance to slide 28, please? Dr. Dietz, was blood libel a topic that the defendant talked about to you?

A. Yes, but I don't think we made a point about the Satanic.

Q. I think we'll return -- I plan to ask you additional questions about the Satanic Talmud.

A. Well, a key point in it is that it talks about the right to kill anyone, as long as it is done indirectly. And he used that as support for the idea that Jews stir up people of color

to kill whites, because that's indirect killing. And in this film that he sent his mom, the Satanic Talmud, it specifically mentions two examples of indirect killing. One is if you tie up your neighbor such that your neighbor starves to death, you are not guilty, because it was done indirectly.

The other example it gives is the claim that the Jews manipulated the Romans into killing Christ so that the Jews didn't kill Christ; the Romans did. That's indirect killing.

Q. If we could pull up slide 27. Is that what you had embedded in the second bullet on this particular slide?

A. Yes. And the final slide in that film, Satanic Talmud, says, "Even the best of the goyim should all be killed."

This particular passage, if one were to believe this, means this is the declaration of war against not just white people, but all non-Jews that he keeps referring to.

Q. That's what the term "goyim" refers to?

A. "Goyim" means not Jewish.

Q. Slide 28. I had asked you about blood libel. This was another topic that you had talked about?

A. Yes. I asked him about it. And he said that he knew about it as "Jews drinking Christian blood." And, of course, there's a long history of this back to the Middle Ages of this belief. The belief originally was that Jews would take Christian children, drain their blood, and use it in matzah, in the preparation of the unleavened bread for Passover. And

that's been a belief held by large numbers of people for centuries. But he said he posted about it and talked about it because it's inflammatory and he likes to stir them up.

He says, "It stirs them up, and I enjoy that." And then he added "My big thing is the Great Replacement. I care about what's happening today, but this war goes way back."

Q. Did you find, Dr. Dietz, that the defendant had a sense of humor in his interactions with you?

A. Yes. I was kind of surprised by that, but there was anecdotes he told in which I felt myself laughing aloud, because he was very funny about it. We're not on one of those anecdotes right now, but when he talked about his mother's driving habits, for example, he was very funny.

Q. If we could advance to slide 29. Is this another one of the views about Jews in particular that the defendant explored with you?

A. Yes. Another one of his beliefs is that Jews have sex with children. And that same video he sent his mom claimed that the Pharisees were permitted to have sex with children under three, both boys and girls, particularly if it were perverted sex, and that having sex with a child under three is of no consequence because they regain their virginity immediately.

Q. Could we advance to slide 30. On this topic, what else did the defendant invoke, or who?

A. So he had previously --

MR. BURT: Object to that question as leading.

THE COURT: Overruled.

BY MS. SONG:

Q. Dr. Dietz, why did you prepare this slide in relation to "Jews have sex with children"?

A. Because the defendant had posted on Gab about Patrick Little, and I was aware of Patrick Little as a candidate for political office who had walked around town holding a sign that reads "Jews rape kids" consistent with the defendant's claim.

And when I asked him about that, he said that what Little was referring to was Epstein, Weinstein and other Jewish child molesters. And then he pointed out that he had modified the phrase to "Yids rape kids."

Q. He, being the defendant?

A. The defendant used the phrase "Yids rape kids," and I think he posted that on Gab as well.

Q. As well as did you see photos of Patrick Little and reference to him on Gab?

A. Yes. I'm not sure if this exact photo was there.

Q. Could we advance the slide, please? What else did the defendant say about Patrick Little specifically and Jews having sex with children, Dr. Dietz?

A. Well, he described Little as running for Senate in

California. He said a lot of people were worried he was going to win. There were some reports he got zero votes. I think I informed him at that point that it seemed to be that he got 50,000 votes. And he said he was a huge fan of Patrick Little.

"He was getting out there and naming the Jew. He was not doing it violently. He was going out there and holding signs and running for office. That is his part. I'm a real good shot and not afraid of getting shot. That will be my part."

Q. What did you take the defendant to mean when he said that, "I'm a real good shot and not afraid of getting shot; that will be my part"?

A. He had told me at other points in the interview that everybody has their own role in this war, that he had become convinced that everyone had to use their talents to best contribute to the war against white people, and that there were people who were capable of lecturing about it and leading an audience and speaking intellectually about it.

That wasn't his role. His role was to act as a soldier and use violence and that he had trained in firearms and weapons and that that would be his role.

Q. Dr. Dietz, we heard considerable testimony from a defense expert that a delusion that the defendant had related to white genocide. What did you assess in terms of the defendant's embrace of white genocide principles, if anything?

A. Well, I was very aware of the theory of white genocide and have been since it was created in 1985 by the author of the White Genocide Manifesto. And so I already recognized that much of what the defendant was posting on Gab was derivative of the White Genocide Manifesto and simply talking about the same things that neo-Nazis have been saying for the last 38 years.
Q. Could we advance to the next slide, please.
You had personal familiarity with the manifesto itself and its principles?
A. Yes.
Q. And let's advance to -- is that what you're representing on this slide?
A. Yeah. It was written by David Lane while he was in prison for a series of crimes, including the murder of Alan Berg, who was a Jewish talk show host in Denver, killed by Lane and his associates in a group called The Order. The Order was one of the most extreme of the white separatist organizations. And David Lane became one of the great heroes not only for the murder, but for writing this manifesto.
Q. Dr. Dietz, we're not going to go through each of the 14 declarations, but if we could go to the next slide. What did the defendant say related specifically to White Genocide Manifesto declarations?
A. So the second declaration in that manifesto is -- and

these are David Lane's words, not the defendant's -- "The inevitable result of racial integration is genocide for the white race through miscegenation. The promotion of miscegenation between white women and colored men is self-evidently a priority in all existing system-approved methods of communication."

I could translate that. What Lane was saying was that interracial mating and giving birth to interracial children was genocide for the white race and that it is being promoted through the depiction of white women and men of color being couples in all system-approved, in other words, government authorized media. So he's really talking about television and movies and was recognizing in 1985 a growing number of such depictions.

Now, Mr. Bowers, in 2023, pointed out to me multiple examples of this from television ads, TV shows and a particular National Geographic cover photo, which I was unable to locate, that he believes shows a push toward interracial procreation. He described that cover as a black man with a naked white woman wrapped around him.

Q. If we could advance to the next slide. In terms of declaration No. 7, what did the defendant say or indicate to you that may relate to that declaration?

A. Declaration No. 7, in David Lane's words, is that "All western nations are ruled by a Zionist conspiracy to mix,

overrun and exterminate the white race." For Mr. Bowers, that's the central belief that motivated his crimes, the belief that the government is controlled by Jews in all western nations and that they are working to overrun and exterminate the white race, in part through bringing in immigrants who are not white, but also through a variety of other means.

Q. If we could advance to the next slide, please. What about this, these comments that the defendant made to you, Dr. Dietz?

A. So declaration No. 13 in the White Genocide Manifesto in David Lane's words is that "The Zionist occupation governments of America and other western nations promote the unnatural act of homosexuality knowing full well the power of the male instinct for sexual union must be directed toward procreation with females of the same race to ensure racial survival."

Well, Mr. Bowers didn't talk to me about homosexuality, but he made exactly that point, the same point about procreation when he talked about the publication of pornography and teaching children about transgender issues.

In other words, his point is that pornography distracts men from having sex with their white wives and that transgender education of children will encourage them to engage in perverted acts that do not result in procreation of white with white. This is very much a part of the general

ideology among white separatists and white supremacies.

Q. Dr. Dietz, there were multiple examples of White Genocide Manifesto beliefs that the defendant expressed to you?

A. Yes.

Q. I'm going to move to slide 37 and ask you about specific 14 words and what the defendant said about that.

A. So the final passage in the manifesto reads "Let those who commit treason with the Zionist destroyer or sit on the fence be aware. If we are successful in our goal," expressed in the 14 words, "we must secure the existence of our people and a future for white children. Then your treachery will be appropriately rewarded.

"If not, and the white race goes the way of the dinosaurs, then the last generation of white children, including yours, will pay for your vile complicity at the hands of the colored races who will inherit the world."

Now, Mr. Bowers expressed exactly the same point as the beginning and end of this passage when he told me that "Jews will be killed, but those who side with the Jews and cooperate with them are going to get it worse. They are going to have a painful death."

Q. Could we advance to the next slide, please? Did the defendant recite the words to you or comment upon the 14 words exactly?

A. He did. I was actually a little surprised by this. I had

quoted a different extremist who had used the phrase "to secure a future for my people." It was one of the people involved in promoting the Ignite the White rally in Charlottesville and used those words.

As soon as I used that phrase "secure a future for my people," the defendant recognized the concept as reflecting the 14 words; and he accurately recited them. "We must secure the existence of our people and a future for white children." And he added, "I look forward to the day when a candidate wouldn't even be electable unless they subscribe to the 14 words."

Now, he did not know that the 14 words were written by David Lane in the <u>White Genocide Manifesto</u>, which he never read. He had just been exposed to all of these concepts that derive from the <u>White Genocide Manifesto</u> and have been circulating in that subculture for the last 38 years.

Q. So not unique to him?

A. Not at all unique to him.

Q. Dr. Dietz -- if we could take that down for one moment -- you have already testified that the defendant talked to you about the Great Replacement?

A. Yes.

Q. And that was a concept that was familiar to you at the time that he mentioned it?

MR. BURT: I'm going to object. That's been asked

three or four times now.

THE COURT: Overruled. Reminding us where we are.

BY MS. SONG:

Q. Dr. Dietz, in terms of the Great Replacement, was that a topic that the defendant talked to you about quite a bit?

A. It is.

Q. And when he was talking about the Great Replacement, what did he mean?

A. He meant what everyone has meant by it for the last 12 years, 13 maybe. So the Great Replacement idea and that terminology came from a French author named Renaud Camus who wrote two books in 2010 and 2011 that set forth the theory that the people of what have been primarily white nations, the indigenous white people, were being replaced by immigrants of color largely from Africa and from the Middle East, and that they were going to dominate the previously white majority nations.

And this became a controversy that someone was pointing this out, and it has gathered enormous press coverage. I think most educated people in Europe are familiar with this concept. There was a survey in the past year showing that a third of the people in the United Kingdom believed the Great Replacement is happening and that it is real. It's been a topic of countless news stories and television coverage and commentary.

Q. Could we advance to -- one moment, Dr. Dietz. Could we advance to slide No. 41, please. In terms of some of the things -- and you've indicated there were quite a few things the defendant said to you about the Great Replacement. In terms of some of the things, what does this slide reflect?

MR. BURT: I'm going to object. It's an improper form of the question. Argumentive.

MS. SONG: Your Honor, I'm trying to move the testimony along.

MR. BURT: Regardless of the motive, it's still argumentive.

THE COURT: I'm going to overrule the objection. Can you just restate the final point of your question. What are some of the things the slide reflects?

BY MS. SONG:

Q. What is important about this slide, Dr. Dietz, in light of the things that the defendant said to you about the Great Replacement?

A. Well, his quotation to me in my examination was an accurate statement of what is generally meant by the Great Replacement. He said, "The Great Replacement is that they are trying to flood any white majority country until there is no white homeland and minimization or complete destruction of anyone white. They want to flood Europe, flood the U.S., and flood Australia.

"Barbara Lerner Spectre was target number 1, because she says this directly. She said 'We Jews will be hated for our leading role.' This isn't in my mind. This isn't delusional. This is really happening."

Now, I, of course, looked to see what Barbara Lerner Spectre had actually said. And this is not an inaccurate characterization of it, but she was on a panel discussion in which she is talking about immigration. And she makes the comment that "Of course, because we Jews are so central to this immigration strategy, we'll take the blame for it like usual," but it's a side comment. She wasn't making a political statement that this is all Jews or that this is endorsed by the faith generally.

He's placing heavy weight on it, because it's the first time he observed someone who was known to be Jewish who was admitting activity designed to encourage immigration. And her statements were that it's inevitable, it has to happen, that we need to bring in these many non-European people into Europe.

Q. Dr. Dietz, in terms of your method in interviewing this defendant and assessing what he said to you, if there were things that were unfamiliar to you, did you research them? Did you look them up?

A. Of course. How else would I know whether what he was saying was original to him, much less a product of his mental

condition? I needed to know whether he was learning all of these ideas from others, from the subculture, from the culture generally, or whether these were the product of his own mind.
Q. And/or delusional?
MR. BURT: I'm going to object to that as leading.
THE COURT: I'll sustain it. You can rephrase it, if you care to.
BY MS. SONG:
Q. Dr. Dietz, your research in doing this, did it help you to inform an opinion about whether the things that the defendant told you were extreme, widely-held beliefs within his culture or delusions?
A. It certainly did. I was able to determine that not a single one of the extreme beliefs that I was able to identify originated with him. They were all ideas that have currency within a subculture that he was actively involved with online.
Q. Dr. Dietz, we heard some testimony that a delusion of the defendant's, in connection with his schizophrenia, as diagnosed by a defense expert, related to literally invaders coming across the border more by the hour.
Did the defendant speak to you about invaders and the border? And how did you assess those statements?
A. So he did speak about invaders and the border, and I was very familiar with a problem at our border that was being treated differently on different news stations and in

different media.

Some were covering it hourly. Some were not covering it at all, and it had become a source of controversy between the right and the left nationally. And there were often reports from the Department of Homeland Security about the number of border encounters, how many people had been stopped, how many people were getaways and so forth. So this was common knowledge.

I did take a look at the border encounter numbers from the fall of 2022, when Dr. Rogers did his interviews of the defendant, during which the defendant told Dr. Rogers that it was "more by the hour," which is something Dr. Rogers implied was an unreasonable belief.

Q. Could I stop you for one moment, Dr. Dietz. If we could pull up slide No. 43, please. What did you find for that time period?

A. I found that in fiscal year 2022, the Department of Homeland Security reported more than 2 million border encounters in the calendar year. And the simple arithmetic is in a calendar year of 365 days, there are 24 hours, which is 8,760 hours per year. If you divide 2 million border encounters by 8,760 hours in a year, you learn that at that time there were 228 per hour, which I believe means more by the hour.

Q. In terms of the specific timing of these calculations,

where did they fall in terms of Dr. Rogers' examination of the defendant?

A. Right between his two exams, but they're based on the prior year, fiscal year ending in June. And those exams were September and November.

Q. We can take that down.

Dr. Dietz, there was some testimony that the defendant's recall of license plates and passwords were subtly delusional, I believe was the defense expert testimony. Did the defendant talk to you about numbers?

A. Yes, although it was primarily technical numbers, whether AR rifles of a certain age had 12 twists or 14 twists, whether they had the velocity of Sig .357 rounds. So the numbers he cited to me were completely accurate. I looked up every one of them and determined that he was correct about them all. So rather than calling that subtly delusional, I would call it a superb memory for numbers.

Q. Dr. Dietz, did you talk to the defendant about end times? Or let me rephrase that. Did he talk to you about Revelations or end times?

A. Yes.

Q. What did he say?

A. Well, the most important thing he said is that that's got nothing to do with this crime and that he resents that anyone was trying to suggest that his thoughts about the Bible had

anything to do with this crime and that he didn't know why people wanted to drag that into this, that he did believe that Revelations was correct, but he had no idea when it would occur, and he does not believe that the war that he sees himself as a soldier in will bring about end times or has anything to do with end times.

Q. Could we pull up slide 45. Did you find the defendant to have nihilistic delusions?

A. No.

Q. And the quotes that you just described, are those embodied in this slide, the quotes about end times and not knowing when it might be?

A. They are, but there's one other thing embodied in this slide is that when I tried to talk to him about this, he said, "As far as I'm concerned, this is the war on white people; and I don't care about anything outside of that." In other words, he didn't really want to talk about end times, because it was unrelated to what he had done and why he had done it.

Q. Did you find the defendant to exhibit hyperreligiosity?

A. Yes. I think it's fair to say that he was particularly religious. I don't know that I would have said that had he been born and raised in the fundamentalist church and community, but it was fairly recent that he had turned to reading the Bible and watching Bible-related content on YouTube. So I would describe it as hyperreligious.

Q. Dr. Dietz, did you find that the defendant communicated a pressure or compulsion to act on October 27th of 2018?
A. Well, the pressure he mentioned to me was that his rent was due and he didn't have any money and his car lease was up.
Q. Could we pull up slide No. 48, please.
Dr. Dietz, you used the term "war." Can you explain what's on this slide?
A. Yes. I think I may have testified to this previously. He had told me "I'm kind of dedicated to the war now" and commented "Keep paying attention to what's going on. If ever the time comes, be ready to fight it again." And while he didn't expect to have an opportunity while he was in custody, he said that "Nations don't last forever." He had no idea if he would ever get out of custody, but if the day ever came, his advice was "Know your targets. This war ain't over."
Q. If we can pull up slide 50. Can you explain these comments by the defendant?
A. I asked him if there were any other soldiers in the war on his side; and he said, "Sure hope so." He has no idea how many there may be. He said, "We don't have like a central command and control at this stage. That's too easy to infiltrate. I don't care if I'm the only one on the planet fighting this. I'm going to fight it. If others jump in the fight, that tickles me a little."
In other words, he had a realistic view about soldiers on

his side. He didn't imagine that he's one of 100,000 who are going to attack in the next six weeks. He correctly sees that other people may not be taking up arms in this way.
Q. Dr. Dietz, based on your knowledge, was the defendant's description of war in this context delusional or idiosyncratic?
A. No. It's metaphorical.
Q. Could we pull up slide 53, please. What about these comments, Dr. Dietz?
A. He told me that he was being held POW in a war and that "There is a war on white people orchestrated by the Jew," and he said he was a soldier in that war.
At another point, he told me, "This is the most plush POW camp ever. As far as I'm concerned, this is a war. There is a movement to demonize, dilute and destroy white people, white countries and white culture; and it is being perpetrated primarily by the Jew."
Q. When the defendant was referring to this being "the most plush POW camp," what he was talking about?
A. Nice conditions at Butler County Prison.
Q. Slide 54, please. Next slide. So, Dr. Dietz, what did you conclude about the defendant's extreme beliefs?
A. My opinion is that his extreme beliefs all originate from the Bible, anti-Semitic tropes, propaganda, hate speech, white supremacist and white separatist rhetoric, his own

observations of the world, and his self-selected exposure to materials on the Internet that support these beliefs. They do not spring from mental disease. And one of the reasons I conclude that is that none of his extreme beliefs is original to him.

Q. In terms of how you assessed his beliefs, could we go to the next slide?

A. So this is from my report where I wrote that, in my view, defendant's beliefs must be evaluated in the context of the subcultures in which he increasingly immersed himself in the months preceding the offenses with which he stands charged.

Now, of course, he's been convicted of the offenses. And I continue to believe that it was these subcultures and his immersion in them that heightened his interest, awareness and concern during the months preceding the crime.

Q. Dr. Dietz, did you -- if we could go to the next slide -- ask the defendant about alleged delusions that didn't relate to his crime?

A. Yes.

Q. Tell us about that.

A. So I talked to him about his thoughts about the dye in his prison uniform, and he did describe two possible ways that the dye could be getting from his uniform to his wristband. He showed me his wristband, and it really was discolored red. The center layer of the wristband was clear, but both the

external layer and the internal layer had turned quite reddish, not subtle as is obvious.

And theory number 1 was that the dye was being absorbed into his skin, circulated through the bloodstream and then excreted such that it was discoloring both the wristband and that plastic pen he had.

The other theory was that it was rubbing from his uniform to the wristband or the pen, which, of course, I believe is the more reasonable theory. And when I told him so, he said, "Well, I'm not an expert on that. I guess."

And we had a similar conversation about salt and whether salt was improving his ability to multitask and to think clearly, where he had one theory, which was that salt somehow assisted those abilities. And Dr. Darby testified about the evidence he cited for that, including his grandfather's salt intake, his great-aunt's salt intake, and their relative mental states, and his noticing that as he used more salt because of bland prison food, his ability to think had improved.

His other theory was because he didn't have any responsibilities or anything else to do, he didn't have to pay the bills or worry about it, didn't have to do his laundry, didn't have to do food prep, didn't have to take out the trash, so now he could think without all those distractions and was performing better.

And he came up with both of those theories on his own. I told him I thought it was the second one, not the first one. He said that that might be so and said that salt was not his expertise.

Q. What about persecutory delusions, Dr. Dietz?

A. So because the PAI, the Personality Assessment Inventory, had that critical item about a conspiracy against him, I asked him, "Is there a conspiracy against you?" And he said, "No. The only people out to get me are the prosecution team."

Q. You did not deem that to be delusional?

A. No, that's not delusional. But, you know, all of these beliefs about terrible things happening to white people and internationally are not personal to him. He sees them as major political issues worldwide and, while he's a white person, he's not taking it personally. He wants to stand up for his race, as he called it, his tribe.

Q. Could we move to slide 57? Dr. Dietz, does the defendant have a mental illness, in your opinion?

A. No, I don't think he has what I would characterize as a mental illness, meaning a mental condition with a biological basis that is pathological. I do, however, think he has a mental disorder. And the specific mental disorder that I think he has is called schizoid personality disorder.

Now, a personality disorder is a persistent maladaptive pattern of relating to the world that begins by age 18 and is

not necessarily permanent or fixed, but is very enduring. They're characteristics that tend to last for decades through adulthood; and there are a dozen different kinds or ten maybe now described in DSM-5-TR, plus some vaguer categories where you can combine features of the other ones or name a new one, if you like.

But the ten recognized patterns that have a full description and criteria in the manual include one called schizoid personality disorder. And in order to be classified with that diagnosis, one has to have four or more of a list of criteria. I think there's seven on the complete list. And he had four for sure and had two others probably, though he wouldn't really admit it.

The four that he had for sure are that he almost always chooses solitary activities, that he lacks close friends or confidants, other than first-degree relatives, that he appears indifferent to the praise or criticisms of others, and that he shows emotional coldness, detachment or flattened affectivity.

There are other conditions in which those things also appear, but this is the only one of the conditions in which those appear where I believe he met all the criteria. I don't think any of the other conditions, that these features apply to him.

Q. Dr. Dietz, what's the difference between a mental illness and a disorder?

A. It's a distinction I make based on the training I received at Johns Hopkins in which we take seriously the question of whether there is underlying brain pathology in determining what's a mental disease. So the treatise on this, it's called The Perspectives of Psychiatry, by Paul McHugh and Philip Slavney. They argued, and I believe correctly, that in order to understand a person, one has to look at four different perspectives.

The first perspective is, what's the life story? Can we understand in the context of this person's life how various things happened and how they got where they are.

The second perspective is, can we find any disease? Is there a disease, mental or physical, that accounts for this? And sometimes mental symptoms are caused by neurological conditions, by endocrine abnormalities, by chromosomal abnormalities, by toxicity from organ failure such as liver failure or kidney failure, but often there are not. Often there's no disease that accounts for the behavior.

The third perspective is to look at maladaptive rituals, habits, repetitive behaviors. So that would be gambling, addiction, some sexual behaviors that get people in trouble. Those aren't diseases, but they are, from this point of view, important to recognize and deal with, even though there's no brain tumor to account for it, for example.

And the fourth perspective is dimensions of behavior, like

introversion and extroversion, or IQ, is it abnormally high or low? Or many other things that we can measure on a dimension. And I try to bring all four of those perspectives to bear in understanding a case. And I see personality disorders as falling more in the habit pattern than disease, that these are repetitive ways of relating to the world rather than reflecting underlying pathology of the body.

MS. SONG: Dr. Dietz, let me stop you there.

Is this a good time to stop, Your Honor?

THE COURT: I think so. Ladies and gentlemen, we are going to recess for the day. Please recall my instructions regarding not reading or observing any media or news regarding this case. Please have no discussions with anyone regarding this case or issues associated with it, and please conduct no research of any kind regarding this case or issues related to it.

With that, we will begin Monday morning at 9:00 a.m. Enjoy your weekend.

(Jury excused.)

THE COURT: Thank you all very much. Counsel, as soon as the door closes, I've got two quick questions. I think there will be quick answers. Is the government still intending to respond to defendant's motion regarding video testimony?

MS. SONG: We are not. Whatever the Court decides is

fine with us.

THE COURT: My inclination is -- although I'll take a closer look, but my inclination is to grant that motion with respect to each individual asserting a medical or similar need. They can testify by video.

And are there -- do I have both sets of parties' positions -- do I have both sides' positions respecting eligibility phase verdict forms?

MS. SONG: No. We will be filing or, at a minimum, lodging some comments with respect to the instructions and the verdict form, which we can do quickly.

THE COURT: Okay. I don't mean to be rushing, but that's approaching.

MS. LONG: We did file a pleading with respect to the eligibility phase verdict form, but we may have some additional things to add with respect to the instructions themselves.

THE COURT: Thank you. I think I saw that and this actually -- this suggests exactly what you just said, but I don't want to trust my memory. Thank you.

Anything else from anybody regarding any issues? Any need to have any sort of closed session discussions before we recess for the day?

MS. LONG: Not from the defense, Your Honor.

MS. SONG: No, Your Honor. Thank you.

THE COURT: Can I say see you Monday morning at five to 9:00 or ten to 9:00? If we have something to discuss earlier, we can. Enjoy your weekends.

(Whereupon, the above-captioned proceeding was concluded.)

C E R T I F I C A T E

I, BARBARA METZ LOCH, RMR, CRR, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled case.

_\s\ Barbara Metz Loch_ July 6, 2023
BARBARA METZ LOCH, RMR, CRR Date of Certification
Official Court Reporter