IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA

vs.

Criminal No. 18-292

ROBERT BOWERS

Transcript of Jury Trial held on July 10, 2023
United States District Court, 700 Grant Street,
Pittsburgh, Pennsylvania
Honorable Robert J. Colville, District Judge

APPEARANCES:

For the Government: U.S. Attorney's Office
Soo C. Song, Esquire
Troy Rivetti, Esquire
Eric G. Olshan, Esquire
Nicole A. Vasquez Schmitt, Esquire
Barry Disney, Esquire
Mary J. Hahn, Esquire

For the Defendant: Federal Public Defender
Elisa A. Long, Esquire
Michael J. Novara, Esquire
Ashwin Cattamanchi, Esquire
Matthew Rubenstein, Esquire
and
Clarke, Johnston, Thorp & Rice, PC
Judy Clarke, Esquire
and
Law Office of Michael Burt
Michael N. Burt, Esquire

Court Reporter: Karen Earley, RDR, CRR

Proceedings recorded by mechanical stenography; transcript produced by computer-aided transcription.

VOLUME 22

I N D E X

\- - -


| WITNESS: | PAGE |
| --- | --- |
| Park Dietz, M.D. | |
| Direct by Ms. Song | 4 |
| Cross by Mr. Burt | 87 |

P R O C E E D I N G S

(Closed session removed.)

(July 10, 2023, morning session.)

THE COURT: We ask the public to come in or welcome the public in, please.

Counsel, while we wait for them to arrive, any other pre-jury motions or issues that should be public?

MS. SONG: No.

(Whereupon, the public entered the courtroom.)

THE COURT: Counsel, just by way of an update respecting the motion Ms. Long addressed five minutes ago, that will be addressed on the docket shortly.

Counsel, are we prepared to bring the jury in?

MS. SONG: Yes.

THE COURT: Ms. Kim, you may bring the jury in, please.

(Whereupon, the jury entered the courtroom.)

(In open court, jury present.)

THE COURT: Welcome back. Please be seated.

Ladies and gentlemen of the jury, welcome back. I hope and trust you had a pleasant weekend. I know you know your responsibilities by now. I'm going to ask you a few questions.

Have any of you been unable to avoid media or news report regarding the case or issues relating to the

case in any regard? If so, please raise your hand.

I see no hands.

Have any of you been engaged or overheard any discussions of any kind with anyone regarding this case or any issues related to this case? If so, please raise your hand.

I see no hands.

Finally, have any of you, either intentionally or inadvertently, engaged or conducted any research regarding this case or issues regarding this case of any kind? If so, please raise your hand.

Again, I see no hands.

Thank you all very much. Welcome back.

Ms. Song, you may proceed.

DIRECT EXAMINATION (Continued)

BY MS. SONG:

Q. Good morning, Dr. Dietz.

A. Good morning.

Q. When we ended for the day on last Thursday, you were responding to a question about the difference between mental illness and schizoid disorder or a disorder. You had started talking about four perspectives from the treatise Perspectives in Psychiatry, and my question to you was, because I interrupted you, was that the extent of your response to

the difference between a mental illness and a disorder, or is there more to that?

A. Well, there is more to it. Personality disorders such as I believe the defendant has are mental disorders. They are not normal, but they are also not mental diseases as that is typically understood, and I have always made this distinction between psychotic mental diseases and those mental diseases in which someone may become psychotic on the one hand versus a host of other mental disorders, including personality disorders in which psychosis does not occur.

So for psychiatry, that is an important distinction of where the categorization should have the lines drawn.

Q. So a mental disorder versus a mental illness, you focused on what in particular?

A. I think the major distinction between those two categories is whether the person can ever suffer psychotic symptoms because of their disease and whether it is, in fact, a disease with a biological basis that makes the person's experience of the world categorically different than the experience of a normal person.

The only ways in which a person can ever have delusions or hallucinations is when they are in a psychotic state. And there are many causes of that,

including drugs and delirium, that can occur with a host of medical conditions.

So a normal person can temporarily have such a state if they have uncontrolled diabetes or liver failure or kidney failure, but it is categorically different from ordinary human experience. And I do not believe Mr. Bowers has ever had that, except for one episode at age five and a half when he had a high fever and was taking an over-the-counter medication called Dimetabs that contained Sudafed, and the pediatrician who treated him at that time when he had hallucinations was unsure whether it was the fever or the medications that were causing the hallucinations.

Of course, we can't tell now, either, which it was, but it was short-lived and related to that passing episode.

Q. When you refer to that state, are you talking about a psychotic state?

A. Yes.

Q. And can you explain to the jury what that means? What is a psychotic state?

A. A psychotic state is a mental state in which an individual is experiencing hallucinations or delusions often accompanied by an extreme disorder in their thinking and ability to communicate. We call that

formal thought disorder.
Q. In your interactions with the defendant in your 14-plus hours, did you find thought disorder in his speech or affect?
A. I did not. I was able to follow every thought he had. I understood everything he said. I understood his reasoning behind each point he made. And although there were times that he would prefer to talk about his interests rather than what I was trying to ask about, that was understandable, and he was easily redirected to what I wanted to ask him.
Q. If we could bring up your slides at No. 57, please. When you finished your testimony last week, you were explaining this slide and the particular personality disorder that you observed the defendant to have.
Can you, Dr. Dietz, explain what you considered in determining that the defendant, in your view, has schizoid personality disorder?
A. Well, what I considered was my observations of him during those three days, the reports of friends and family and neighbors, and all of the medical records in his entire life history. And from that, I concluded that there were four particular features that were well established, and to which he also admitted, that together constitute the pattern sufficient for a

diagnosis of schizoid personality disorder.

And those four features were that he almost always chooses solitary activities; that he lacks close friends or confidants other than first-degree relatives, meaning immediate family; that he appears indifferent to the praise or criticism of others; and that he shows emotional coldness, detachment or flattened affectivity, meaning that there is not much variation in his apparent mood state.

Q. Dr. Dietz, as to the first, always chooses solitary activities, why did that matter? Why was that significant?

A. Well, if it were that alone, it wouldn't matter. Normal people often choose solitary activities. I do, for one. But it is also a feature of a number of conditions. When it is associated with a sufficient number of other features, it may classify as a personality disorder.

And so the significance of it is, in his case, is not only as one element of the diagnosis, but more importantly, it's that solitude and all the time he spent on the Internet that permitted him to acquire so many -- such extreme beliefs without having people to whom he could speak who would say, that's stupid, why do you believe this stuff?

Most of us interact with the world in a way where others will call us on it when we are going off the rails in our thinking or develop fringe ideas, but he was interacting primarily online with other people who shared these ideas.

So the solitude is contributory for him that it allowed him to develop this elaborate set of ideas, shared with an entire group of people who also believe in white genocide and who are also anti-Semitic and who also share some of his fundamentalist views. And there was no one that he was interacting with and trusted who was telling him where he was wrong or why he should doubt it or why he should think of another way of looking at things.

Q. So you used the term "fringe." Is that how you would describe the extreme beliefs that this defendant articulated to you?

A. Well, I'm not sure if "fringe" implies rarity. These aren't rare, but they are on the fringe in some respects.

Q. And yet, in your estimation and given your knowledge, you did not find them delusional?

A. No. I couldn't find a single example of a delusional belief, that is, a belief that came from his brain and was not shared by other people.

All of the beliefs that he told me about that are unusual or extreme are shared by a subculture. Now, that subculture goes by a variety of names and has lots of subgroups, and if you were to diagram it, there would be these overlapping circles of who believes what.

I think in my testimony on Thursday, I may have misspoken and used the term "Christian nationalists" as one of the groups with some of these beliefs when I meant to be talking about the Christian identity movement. It turns out that what I said was true but less true of Christian nationalists as a group than of the Christian identity movement as a subgroup.

Q. Since you raised the distinction, can you explain why that matters in light of some of the extreme beliefs that the defendant talked to you about?

A. I don't understand the question.

Q. Why does it matter whether it was Christian nationalists or Christian identity? What is the difference?

A. The only reason I bring that up is I wanted to correct the record about what I had intended to say. But I don't know that it does make any difference. If I were to attempt a classification, I would say that Mr. Bowers is a white separatist who believes a white ethnostate would be the ideal political entity for him.

But even though he shares a great many beliefs with neo-Nazis and Nazis, many of which he articulated to me, he says he is not a Nazi because he doesn't have any of the memorabilia and that's not his thing.

Q. On that point on not being a Nazi, did you ask the defendant whether he had read some of the texts or background material of Hitler and the Third Reich?

A. Yes.

Q. What did he say?

A. He had posted on the Internet a reading list that had a large number of books and directions on the order in which to read them of that group. He'd only purchased two, Hitler's *Mein Kampf* and the book *The Turner Diaries*. He only read the first chapter of each.

And about *Mein Kampf*, he said that the first chapter was about the Jews and the problem of the Jews and that Hitler wasn't wrong. But he hadn't read the rest of the book.

Q. You mentioned *The Turner Diaries*. Why was that significant?

A. Well, the reason I asked him specifically about *The Turner Diaries* is that during that period in the '80s when I was looking at these extremist groups, I came across *The Turner Diaries* and read it and brought it to the attention of the FBI in a lecture at the time

because it talks about attacks on the FBI. This was prior to the Oklahoma bombing where the FBI was attacked, and I thought it very significant.

Now, that particular book, *The Turner Diaries*, is very much opposed to interracial breeding and uses the phrase "the mud people" very often to describe people of mixed race. Mr. Bowers uses his own term, "cappuccino people."

*The Turner Diaries* is a very extreme book that is one of the core readings of those who are violent white supremacists.

Q. What did the defendant say, if anything, about the first chapter he read in *The Turner Diaries*?

A. Nothing.

Q. Dr. Dietz, your second finding or your second bullet says, "lacks close friends or confidants other than first-degree relatives," which you equated to immediate family. Why was that an aspect of your diagnosis of schizoid personality disorder?

A. In his adult life, his only real friend was Joe Sedley, who died two years before this attack, and the only people he communicated with often were his mother and two aunts.

He would see other family members on holidays and at family gatherings but -- and he said that he had

acquaintances from church or the neighborhood, but he readily admitted that Joe had been his one and only friend in adulthood.

There had been another man who had been described by the defendant's relatives as a friend, but he never mentioned him to me. That was another truck driver that had died.

Q. The defendant talked about himself being a truck driver to you?

A. Yes.

Q. Dr. Dietz, in terms of "indifferent to the praise or criticisms of others," how did you determine that, and why did that matter?

A. Well, first, I noticed that others had commented that he didn't seem to care what others thought. I also observed it in my own interview, and he made a number of comments showing he didn't care what other people thought of his beliefs or his actions.

I asked him directly whether he cared. He indicated that if someone were to criticize him, whether he would care would depend on how much respect he had for them. If someone would praise him, he would simply say thank you.

Q. Dr. Dietz, what about "shows emotional coldness, detachment, or flattened affectivity"? What is

flattened affectivity?
A. That means showing little variation in the external appearance of mood.
So a normal person will, over time, sometimes be happy and smile and show it in their face. Other times, they are sad, and they show that in their face and, other times, be angry, and there will be facial expressions of this.
Mr. Bowers doesn't show the same full range of emotional expression and, for the most part, has two gears. One is calm and rational, and the other is angry and animated.
Q. I believe you testified last week that there were certain topics that would prompt the second affect, the angry and animated?
A. Yes.
Q. What were those topics?
A. His mother, Jews, immigration and gas can design were the ones that I triggered.
Q. Let's start with his mother. What did the defendant say when he was in that more animated state when he was talking about his mother?
A. Well, he actually said quite a bit, but from memory, some of the points he made about his mother are that she was not fit to care for herself much less for

another person; that from the age nine to 13, he mostly wondered what was wrong with her; and from ages 13 to 18, he rebelled against her and was angry toward her and acted out with respect to her, that she had not been able to support him adequately, that when he was with her alone, he was often cold and hungry, he did not have clothes that fit, he didn't get enough haircuts.

They lived in housing that was not ideal for a young child. There weren't playgrounds nearby or other children that he could readily play with at many of those locations.

He experienced some housing instability moving from place to place, except when he would move back with his grandparents where he had plenty of food and it was warm, and the main problem was that his grandparents argued often because his grandmother abused alcohol and some medications.

That his mother did not think logically, and it bothered him, and he used with me an example, which I think he had used with Dr. Darby as well, which is it's not two plus two equals five, it's two plus two equals red. It's not even the same topic. He found it very frustrating to try to communicate with her.

Another example he gave was that when he was trying to show her how to search Google for a particular

topic, she could not distinguish between the line at the top of a web browser in which you enter search terms and a different line in which one can search the website one is on at the moment. This frustrated him enormously that she couldn't make a simple distinction.

And he described various occasions on which she had done things that he considered detrimental, the most traumatic of which was the occasion on which his mother told her then boyfriend or husband, I'm not sure which at the time, Ray, to hold the defendant down so that she could hit him, and that's the occasion on which the defendant sprayed her with starter fluid and tried to light it. He was furious with her about this.

Q. Do you recall how old the defendant was when that happened to him, from the records?

A. It gets a little confusing because every witness puts things at a different age, and sometimes we have a medical record to show the age. As I recall, that was when he was 13, but I could be wrong on the age.

Q. Dr. Dietz, you mentioned that Jews and immigration were other topics that prompted a different affect from the defendant, but can you explain the "gas cans" reference that you made last week and then again today?

A. Yes. It almost seems silly, so it's small in comparison to these other issues, but I asked him what

else upset him, and he raised the issue of gas can design, saying that there had been a perfectly sound design for gas cans. And we were talking about something one would fill up at the pump and then carry down the road where your car ran out of gas and fill up the tank.

It used to have a spout on them that was perfectly safe. You could carry the can without spilling the gasoline, and that someone, for alleged safety reasons, had required a redesign that was flawed, he said, because now the spout could fall off into the tank of the vehicle and would have to be fished out, and it was more prone to spilling, and that those were safety hazards. And it upset him that they had taken a perfectly sound design and made it worse. He got animated in that discussion.

Q. Did you find anything unreasonable about his animation on the topic of gas cans?

A. No.

Q. Dr. Dietz, I want to go back to your description from the defendant about when his mother was telling his stepfather to hold him down so she could hit him.

What was the rest of that story, according to the defendant? Did she actually hit him, or was there violence that he experienced?

A. No, she did not hit him. And this was one of the number of disruptions in his relationship with his mother that led to the police being called and to his mother's efforts to hospitalize him.

On that occasion, it did result in his being taken from the home and the series of events that led him to spend more than six months outside the home in a succession of institutions.

Q. Dr. Dietz, in your review of the records in preparation for your interview of the defendant, did you find any record of violence against the defendant by his mom or his family?

A. None at all. But the mom had been pushed down the stairs while pregnant with the defendant. She was said to have been eight months' pregnant when she was pushed down the stairs by her husband. The defendant, of course, was unborn.

Then there was an incident in which a neighbor who knew the family made an anonymous report that the parents were threatening the child. The father was threatening to blow up baby Robert and himself with gas. I think he turned the gas on in the apartment and threatened to blow it. The mother allegedly threatened to drop the baby out the window.

Neither of those events occurred. And Robert

at the time was too young to have formed any memory of this. I think he was in the first year or two of life.

Q. Other than the things that he described to you about unstable housing and things like that, did he comment on violence or maltreatment?

A. He felt neglected, but he denied any emotional -- let me rephrase that. He denied any physical abuse, and he denied any sexual abuse by anyone, ever.

MS. SONG: You can take that slide down for a minute.

Q. Dr. Dietz, schizoid personality disorder sounds a lot like schizophrenia. Can you help explain the distinction between schizoid, or "schizoid," and schizophrenia?

A. Yes. There are different concepts of this. The current concept, and the one that seems correct to me, is that there is a spectrum of disorders from schizoid personality disorder, which is not a mental disease, through schizotypal personality disorder, which is not a mental disease but is weirder, to schizophrenia which is a mental disease. And sometimes these occur in a sequence, and someone may start with schizoid and become schizotypal and become schizophrenic.

There is probably some relationship between

these conditions, but we don't fully understand it. We do know they have certain features in common. And it may well be that someone who has schizoid personality disorder is at risk of someday being schizophrenic. That's not entirely clear.

Q. Is there any research as to how long that might take to happen, if it happens at all, or when in life that happens?

A. There may be, but I'm not familiar with studies that look specifically at the progression. It is well known that the usual age of onset of schizophrenia is by the 20s, but certainly there can be onset much later in life.

Q. Dr. Dietz, once you determined that you disagreed with the defense diagnosis of schizophrenia, why not stop there? Why did you proceed to make your own diagnosis?

A. It's just a normal part of the diagnostic process, to consider what are all the possibilities, and through the process of elimination and looking at what evidence appears to be reliable, what is the correct diagnosis.

So one of the things I did was to take it as a given because there were so many pieces of evidence supporting it that Mr. Bowers was something of a loner. There were one or two witnesses who said in childhood he

wasn't, he had friends in childhood. It seemed to me he was a loner.

So I looked at all of the diagnoses associated with being a loner, and, one by one, ruled out all but schizoid as not quite meeting the criteria, say, for schizotypal. There is one called avoidant personality disorder where one doesn't interact with other people because of anxiety. I could not find that that was supported.

There is one called paranoid personality disorder in which suspiciousness and distrust interfere with the ability to form relations with others. And while I entertained that, because there were some indications of his being suspicious and distrustful, I couldn't find that diagnosis was supported either.

One by one, I eliminated all the alternatives but supported schizoid personality disorder.

Q. Could we go back to slide 8 in your slide deck for just a moment.

I want to ask you about your second bullet, "Mr. Bowers is a socially isolated loner who did not live up to his potential."

How did that observation fit with your schizoid personality disorder diagnosis?

A. Well, schizoid personality is one of the potential

explanations for someone being a socially isolated loner who doesn't live up to his potential.

I was in court as defense experts indicated that they thought schizophrenia did that to him. I don't agree. I think it's schizoid personality disorder that explains that.

Q. So this is a slide that you testified to represented an area of agreement with defense experts. So to some degree, you perceive that there is agreement on the fact that he was a socially isolated loner.

MR. BURT: Object. That's leading.

THE COURT: Sorry, Mr. Burt, I could not hear you.

MR. BURT: That's leading.

MS. SONG: It's asking him about the slide, Your Honor.

THE COURT: If you are willing to rephrase the question, I will let you rephrase the question.

Q. Dr. Dietz, explain how this was an area of agreement with defense experts, the socially isolated loner bullet?

A. It's an area of agreement because I believe we all agree that that's a true statement. We disagree as to what caused him to be such a person.

Q. If we could go back to slide 57.

Now, Dr. Dietz, does schizoid personality disorder involve delusions?
A. No.
Q. Generally and specifically to this defendant?
A. It never involves delusions. If someone had those features and delusions, it is very likely it would be schizophrenia.
Q. Dr. Dietz, are people with schizoid personality disorder considered psychotic, as you've described psychotic?
A. No. Schizoid personality disorder is not a psychotic illness.
Q. Dr. Dietz, you have used the term "mental illness," and I want to ask you if, in your experience, is there some variation in how psychiatrists use the term "mental illness" for what they are referring to?
A. Yes, there is.
Q. Can you talk about that?
A. Well, there are people who would use the term "mental illness" to describe every single condition in the DSM-5-TR. I would say they are muddleheaded and wrongheaded about this. And I'm not willing to call it a mental illness if someone wishes to have sex with children or is turned on by torture or has trouble sleeping because they're on shift work or has jet lag.

Those are all in the DSM, but I don't consider them mental illnesses.

Q. So the way you refer to mental illness perhaps is more specific than every condition or disorder that's in the DSM?

A. Correct. I'm making a distinction between those mental disorders that do and do not have the possibility of psychotic symptoms and a biological basis of disease.

Q. If we can turn to slide 58, please.

Dr. Dietz, can you explain this conclusion that you reached?

A. Well, there's quite a bit in the medical records about the defendant's behavior when he was a youngster, because he was hospitalized several times and he was under the supervision of social service agencies.

So social workers were receiving these hospital records. They were trying to visit with the family, who were not particularly cooperative, and there's an unusual amount of documentation that came from that. And one of the themes that comes up again and again in those record is that young Robert was depressed. Another theme is that he was reacting against his mother and that he had what was called an adjustment disorder with mixed disturbance of emotions and conduct, were the earlier words for that.

I have no doubt he was sad and depressed, but as far as I could tell, he did not meet the criteria for either major depressive disorder or the equivalent language at the time, nor did he meet criteria for what today would be called dysthymic disorder. And it had another name back in the time.

Q. I'm sorry. Go ahead.

A. The DSM has changed the names of some of these conditions, but it's clear what they used to be called. And while he was depressed, and understandably so considering what was going on at home, he behaved badly as well as sadly, and it's that that led a series of doctors at different institutions to give the diagnosis that corresponds to today's diagnosis of adjustment disorder with mixed disturbance of emotions and conduct.

What that implies is that his reaction to his environment caused him to behave with inappropriate emotions, the sadness and depression and inappropriate behavior, which was a series of actions against his mother, actions against other peers, some modest property destruction, as many troubled teens do.

Q. So, Dr. Dietz, the adjustment disorder that you refer to, was that at the time that he was an adolescent?

A. Yes.

Q. And not currently?
A. I'm referring here to at the time he was an adolescent, but if there were to be any diagnosis given of him at the time of his crime or shortly after his arrest, it might be appropriate. Had there been any symptoms, this would be the right one.
Q. The adjustment disorder?
A. Yes.
Q. What does mixed disturbance of emotions and conduct mean?
A. It means that instead of just having emotions as the reaction to these events in life or just having behavior as the reaction to the events in life, the person has both, both emotional reaction and the behavioral reaction, and he did throughout adolescence.
Q. Is that uncommon in adolescence?
A. Not at all.
Q. Dr. Dietz, why is adjustment disorder not a mental illness, in your view?
A. Because it's a reaction to life circumstances. It's an understandable reaction. And it typically disappears when the circumstances change, and that's exactly what happened with Mr. Bowers. Each time he went from his mom's home to his grandparents' home, suddenly his symptoms vanished, and he behaved properly

and wasn't sad.

That happened repeatedly. So that makes for a single-case experiment where you can see it comes and goes depending on his environment.

Q. Dr. Dietz, at the time that you interviewed the defendant in May of this year, how did he describe his relationship with his mother?

A. As better. He is still angry about how it was during adolescence, but he feels better about the relationship now, feels that they've made their peace. He would still be frustrated to be in her presence, but he speaks to her on the phone, and he conveys love for her.

Q. Dr. Dietz, you used the term last week I think that the defendant was "funny" at different times during your interview with him?

A. Yes.

Q. I think you mentioned in reference to his mother?

A. Yes. I thought the very funniest he described was his mother's habit when trying to drive through a particular tunnel in town, and he said that she hates to drive through that tunnel, and so she'll aim for it, expecting to drive through it, but then take the exit right before the tunnel and drive 17 miles out of her way and then try again, and that one time when he was a

kid, she did this eight times in a row, and he feared they were going to run out of gas.

But the way he told the story was very funny. He knew it was funny, and I laughed aloud at it. And that was not the only time he displayed a sense of humor.

Q. Dr. Dietz, you mentioned that you listened to communications between the defendant and his mother?

A. Yes.

Q. Can you talk about that?

A. Yes. There were recorded jail calls between the defendant and both his mother and aunts, and I listened to those -- to those calls trying to understand what the relationship was and to see if there was anything pertinent to the case.

Q. Not with respect to whether there was anything pertinent to the case, but can you describe what you heard in terms of his interactions with his mother and his aunt?

A. They are mostly chatty, family news. He takes care not to speak about the case because he knows the phone calls are being recorded and more than once reminds them not to be talking about the case. He wants to hear about the family and what's going on. He wants to share some of his concerns. There is some talk about news

events. It's small talk.
Q. Anything unusual or noteworthy in the calls that you listened to, separate and apart from -- I'm going to ask you about whether there was subject matter that relates to what we are talking about?
A. I think only that there is positive affinity toward his mom and his aunts. He is not expressing anger or hostility. He is indicating that he loves them.
Q. If we could turn to slide 59.
Dr. Dietz, in reaching your opinions and conclusions about the defendant, what did you observe about post-offense behavior, and why did it matter?
A. It matters how people are behaving after an offense because if a person is mentally ill during the offense, often they still will be in the immediate and subsequent aftermath, and so it's an opportunity to determine what their mental state was shortly after the offense.
In this instance, there was one video that captures at least some of the defendant's behavior shortly after the offense, and it was important for me to see that in case it contained an abnormal behavior.
Q. So this was a video of the defendant. Is it in fact his intake at Allegheny County Jail? Is that why you have that on there?
A. It's when he is being processed at the

Allegheny County jail.
Q. Was this a short video or a lengthy video, if you recall?
A. It's less than a half-hour.
Q. Dr. Dietz, can you tell the jury what you saw in the video and why it mattered to you?
MS. LONG: Your Honor, I want to object and preserve for the reasons we previously gave at sidebar.
THE COURT: Objection is noted. Same ruling.
Proceed, Ms. Song.
BY MS. SONG:
Q. Dr. Dietz, I asked what you saw in the video and why it mattered to you.
A. Well, what I observed was an obese white male being escorted in custody through various processing stages at the jail, who was asked questions at certain times, and where one could hear the question and answer, he was giving coherent answers to each question asked.
Some of it was unintelligible; that is, I couldn't make out the words. He was, at all times, calm and cooperative. He was given a garment that looks as though it might have been for his protection. It was a quilted material, but I don't know whether it was an anti-stab vest or a ballistic vest or what it was.
One can still see his wounds at times during

the video. And in the entire video, there was also some footage shot through a window in which his dressing was being changed.

Q. Dr. Dietz, what did you observe about how the defendant moved or other behaviors of his? What were you looking for?

A. I was looking for lack of cooperativeness, agitation, psychomotor slowing. That is, I was observing whether he was slowly walking with downcast eyes as someone who is depressed might or whether he was pridefully strutting as someone who was in an elevated mood might. Neither of those was true. He was simply following direction and doing as he was told.

Q. Dr. Dietz, are you aware of whether any of the defense experts had reviewed this video?

A. I don't know.

Q. Dr. Dietz, if you were diagnosing schizophrenia, would the things that you would be looking for in that video align with what you just described?

A. I don't think one can diagnose schizophrenia just from observing someone. It requires knowing what their internal experience is or hearing them communicate.

In this instance, what could be heard of his communications was organized and reasonable, but it was really responding to simple questions.

Q. So, ultimately your viewing of the video, how did that factor in your assessment of delusions or schizophrenia?
A. There was nothing there to support any psychotic symptoms. He behaved as a normal, rational human.
Q. The video was within a few days of the offense?
A. Correct.
Q. Dr. Dietz, you referred to a diagnosis by Dr. Hauber. What is that, and why is that important?
A. What I am referring to as the intake of the jail is the mental health intake. Dr. Hauber is the psychiatrist who saw him at the jail and who did an evaluation of him.

Part of the reason for Dr. Hauber's evaluation is that the Court ordered suicide precautions at the jail, which is typical after a crime of this sort, and Dr. Hauber wanted to determine if it was necessary to continue to have suicide precautions because that eats up manpower.

He took a history. Some of it was accurate, and some of it was incomplete. It was not entirely accurate. But, of course, this is a very brief evaluation done in a jail setting without the benefit of prior records.

Dr. Hauber found the defendant was not

suicidal, had no current suicidal thoughts. Ultimately, he concluded that he did not need to be on suicide precautions.

He observed that there were no delusions, no hallucinations, no thought disorder, that the defendant was not psychotic, that he did have beliefs that were not described in very much detail, but there was some description there.

He did not believe that medication would be useful for treating these beliefs, and he thought the beliefs were cultural rather than signs of mental illness. The diagnosis he gave was adjustment disorder with mixed disturbance of emotion and conduct.

Q. That's the same diagnosis that you assessed to the defendant in adolescence; is that right?
A. Correct.
Q. If we could show Exhibit 1451, please.

Dr. Dietz, is this the report that you were referring to?
A. Yes. This is Dr. Hauber's evaluation.
Q. In reviewing this report and his findings, did you observe statements that the defendant made and use them in assessing whether you found him to be delusional?
A. Yes.
Q. If we could do a close-up on the chief complaints/

presenting problems section. What was significant to you about statements that were attributed to the defendant?

A. Well, first, the quotation I am -- correction. First, there is the quotation, quote, "I am going to probably be here forever, but at least in here, I do not have to worry about food," end quote.

The significance of that is that it shows his detachment from the enormous harm he's inflicted, that his concern is for his own well-being and whether he needs to earn a living and worry about food on the table.

He is not saying a word about his victims and what he's done and lamenting as to what he has done. He does rationally recognize he is going to be in custody for the long term.

There is nothing psychotic about that statement.

Q. Dr. Dietz, there's a statement at the last line that's shown on your screen. It's, quote, "Flood all white countries with immigrants and make cappuccino people."

What significance did you attach to that statement?

A. Well, this is his central concern about immigration

diluting the white population and increasing interracial mating and eliminating eventually the white race. This is what he refers to and his kindred spirits refer to as white genocide.

Q. Did the defendant, I think as you've testified, actually use the term "cappuccino people" in his discussions with you?

A. Actually, I don't recall whether he used it with me or I learned the term from this report.

Q. If we could turn to page 3 of Dr. Hauber's report.

MR. BURT: Can we approach?

THE COURT: Sure. I'm going to give the jury a ten-minute break. I need a break for myself. We are going to keep you back there ten minutes and bring you back as soon as we can. Come to sidebar first, though.

(Closed Session removed.)

THE COURT: Anything else before we bring the jury back?

MR. BURT: No, Your Honor. Thank you.

THE COURT: Ms. Kim, when you're ready.

(Whereupon, the jury entered the courtroom.)

THE COURT: Welcome back, ladies and gentlemen. Please be seated. Thank you for your patience.

Ms. Song, you may proceed.

MS. SONG: Thank you, Your Honor.
BY MS. SONG:
Q. If we can pull up Page 3 of Exhibit 1451, which is the report we were talking about. If we could go under Developmental Social History Current Living Situation.
Dr. Dietz, what, if anything, did you observe in this section in the defendant's assessment by Dr. Hauber?
A. Well, the defendant described himself as having been living off savings here as a truck driver and said that he's been, quote, "Fine, and it is pretty relaxing," end quote.
The defendant denied what are called neurovegetative symptoms, and those are symptoms common to depression, with difficulty with sleep, appetite and ordinary functioning, and he wasn't having those problems.
Q. Those are neurovegetative symptoms?
A. Yes.
Q. Dr. Dietz, did you study the mental status examination -- if we can back out to the full page and focus on the mental status examination portion of this report.
Did you study what Dr. Hauber noted or what was observed about the defendant in this section?

A. I did. That was that his orientation was unimpaired. That means whether he knows when, where he is. His memory was unimpaired. His appearance was well groomed.
Q. If we could go to the next page. What other assessments are reflected on this report, on this page?
A. That the defendant's demeanor was spontaneous, his psychomotor activity was normal -- that refers to how quickly he is moving -- that his speech was appropriate.
Q. What does -- let me just ask you what "spontaneous demeanor" means.
A. It means that he would speak on his own without being asked a question. He was not turned so inward that he wouldn't speak. He was not uncooperative. He was not demanding or mistrustful or hostile.
Q. If we could, then, focus upon "Mood and Affect." What did you observe in this section of the report, Dr. Dietz?
A. There was no checkmark under "Mood," but with respect to "Affect," he was appropriate.
Q. What is in the comment section under "Mood"?
A. That he denies depression but admits he is in a difficult situation but feels reassured that he doesn't have to worry about where his next meal is coming from.
Q. If we can continue to 1451, Page 5. At the top of

the page under "Affect," there appears to be comment that says "Calm." Is that consistent with the other findings you saw in this report?

A. Yes. So far, consistent with how the defendant was years later when I examined him.

Q. If we can back out to the full page. What about thought process and thought content?

A. His thought process was said to be appropriate. His thought content was said to be appropriate without abnormalities noted, and there is a comment that he is concerned about his comfort and doesn't see the logic of not having a mattress when he feels that a person can harm themselves with a hard metal frame, but when the logic was explained to him, he seemed to understand and agreed that it made sense.

Q. Is that pattern of interaction similar at all to your interactions with the defendant about certain of the observations that were represented as delusions, like his prison suit or salt?

A. Yes. There was a flexibility to his thinking that would not have been true had he been delusional about salt or the diet or uniform or, in this instance, the hard metal frame.

Q. If we could back out to the full page and focus on "Delusions and Hallucinations." What did you note here,

Dr. Dietz?
A. Here there was a comment under "Delusions" that his beliefs are not apparently delusional.
Q. And you read that as the defendant making the statement that he didn't believe they were paranoid or delusional?
MR. BURT: That's leading.
THE COURT: Sustain the objection.
Q. Dr. Dietz, how did you read that comment? Who's the "he" or the "his"?
A. I read it as the -- as Dr. Hauber's judgment that the beliefs that the defendant told him about were not clearly paranoid or delusional.
Q. If we could proceed to page 6. What insight and judgment findings were reflected by the doctor?
A. Fair.
Q. You testified I believe last Thursday about what "insight" refers to. Can you remind us about that?
A. Insight refers to whether a patient recognizes the presence of illness. In this context, that's what it refers to. And I had commented that I didn't think that the defendant's insight was perfect because I don't think he recognizes entirely how isolated he's been, but that there's no mental illness for him to have insight about. So I would agree with Dr. Hauber that his

insight was fair.

With respect to judgment, that has a particular meaning as part of a mental status exam, and we typically measure judgment during a mental status exam with a series of hypothetical questions.

What would you do if you found a stamped, addressed letter in the street? When I asked the defendant, he said he would mail it.

What would you do if you found a wallet with $20 and credit cards in it and a driver's license? And he said, well, not only would I turn it in, but there is a police report showing I did turn in a wallet just like that many years ago.

So that is ordinary judgment. People know what they're supposed to do.

Q. That's a standard aspect of the mental assessment that we're talking about?

A. Mental status examination.

Q. If we could turn to page 7. Now, Dr. Dietz, what was the primary diagnosis that you observed?

A. It was -- Dr. Hauber's diagnosis was adjustment disorder with mixed disturbance of emotions and conduct.

Q. And if we could back out of that page and go down to "Recommendations." What did Dr. Hauber recommend after examining the defendant?

A. He didn't think that the defendant was suicidal or at risk of harming anyone else in the jail, and he recommended that close observations be stopped -- in other words, to stop the suicide precautions -- but they would keep him on assault precautions so that he couldn't hurt others and would reevaluate that.

He didn't think there was a need for medication and that the beliefs that provoked the alleged murder of unarmed civilians seemed to be part of cultural indoctrination rather than delusion system, and "I suspect that medication would be ineffective."

He talked to him about immigrants and expressed the belief that the caravan, which was at that time on the way from South America, represents a threat and that there were other forces planning to undermine the United States with immigration. And this is, of course, consistent with what he had been writing to his mother shortly before the attacks.

Q. Dr. Dietz, how is Dr. Hauber's finding and recommendation similar or dissimilar to your own?

A. It's very similar.

Q. In what way?

A. That he believed that these were cultural beliefs not delusions and that the defendant did not have any psychotic symptoms.

Q. He did not -- he made the comment, "I suspect that medication would be ineffective." Is that consistent or inconsistent with what you believe?
A. Consistent. If a person doesn't have delusions or hallucinations or thought disorder, there is no reason for medication. We can't change political or religious beliefs with medication.
Q. If we could go back to document 1461. I think we were at slide 60. Maybe 59. Okay.
"No medications prescribed." What does that bullet refer to? Just Dr. Hauber or something more broad than that?
A. Something more broad. Dr. Hauber saw him in 2018, late October. Now, in -- at least as of the last information I have, in May of 2023, the defendant was given no psychoactive medications during that entire period of time. So we're talking four and a half years in which he has not been given medications.
Q. That's important why?
A. I think I mentioned on Thursday that if someone had either schizophrenia or epilepsy, medicating them would be important to prevent a worsening of the condition or the onset of new symptoms such as seizures.
Q. Dr. Dietz, why did you include detailed recollection of offenses on this slide?

A. In a sizable proportion of cases of people who commit homicide, there is fuzziness to their recollection of what occurred, or amnesia. They may recover some memories down the road, or the story of what they remember may change over time.

In this instance, there's no indication that the defendant ever lacked a memory for his offenses or what had taken place, and he certainly had a clear recollection during Dr. Darby's exam and my exam.

Q. When you say "Detailed recollection of offenses," are you basing that on your exam, Dr. Darby's exam and what else?

A. The notes from Dr. Rogers.

Q. The defense expert?

A. Yes.

Q. Dr. Dietz, what was your purpose in mentioning clear communications and letters and telephone conversations?

A. Well, I had access to the letters the defendant had written from jail during those four and a half years, and his telephone conversations had been recorded, and in all of them, I believe his communications were clear, free of any thought disorder, free of any of the hallmarks one tends to see in the writings of people who are psychotic, which is an area I happen to have done

research in many years ago.

Q. Dr. Dietz, we talked about generally your impression of certain of the jail calls that you listened to. Was there a particular call between the defendant and his mother that you actually transcribed in your report, or at least a portion of it?

A. Yes, there is.

Q. Why did you do that?

A. I did that because it's the one call that had something arguably related to his thinking about the offenses.

Q. What was that? Can you describe why it was that call seemed noteworthy to you?

A. He was seeking to educate his mother that republics tend to last about 250 years and that the U.S. was getting close to that mark, and so the suggestion was that the U.S. may be in its final days, final years, as we head to a 250th anniversary of the founding.

Q. Was that concept something he had talked about with you?

A. Yes. Well, he said republics don't last forever, and he talked about nations coming and going.

Q. You have testified that you did not find the defendant to have any nihilistic delusions. This is not a nihilistic delusion?

A. I don't think it's a delusion at all. I think it's an observation about history that is not original to him. Others have made that observation as well. And he actually doesn't particularly care much about whether the United States survives under that name and this organization. What he cares about is preserving white culture, white people, white heritage, and would prefer there be a white ethnostate by whatever name.
Q. Now, Dr. Dietz, in your report at 132 and 133, you transcribed the portion that you just described from that phone call. What was the date of that phone call? Or do you need a copy of your report?
A. I don't have any documents here.
(Whereupon, Ms. Song hands document to witness.)
A. That particular call was on March 2, 2019.
MS. SONG: Your Honor, we have marked that phone call as Exhibit 1464. We don't intend to play the entire thing, but we at this point move to admit it and play a portion of it.
THE COURT: Any objection?
MR. BURT: No further objections.
THE COURT: Noting no further objection, Government Exhibit 1464 is admitted, and you may publish it.

(Whereupon, a portion of Government Exhibit 1464 was played for the jury.)

Q. Pause that, please. Move to, like, 17:50 in the call.

THE COURT: Ms. Song, where did you stop that? Would you be able to designate that?

MS. SONG: I was hoping to play the first minute. I couldn't see on the screen how far the call was.

THE COURT: Okay.

(Whereupon, Government Exhibit 1464 was continued to be played for the jury.)

Q. Dr. Dietz, that wasn't a particularly high-quality recording, but on your transcription, is there anything in addition to what you talked about already about that call that you thought was interesting?

A. Yes. When you resumed playing it, it was starting a little late for the quotation. Bowers said to his mother search for the -- "There's something I heard a long time ago. It may have been way back in the '80s. It said something like republics last on average 250 years."

His mother asked, "Republic what every ten or 50 years?"

Bowers said, "Republics last on average 250

years."

She said that was interesting, and then the call goes on with the part you played.

To me, the important thing here is the idea that republics last 250 years is not original to him. He said he heard it years ago, perhaps back in the 1980s.

Q. That's what he told his mother?

A. Yes.

Q. If we could return to your slides at slide No. 59. The final bullet you've placed on this slide is "Cooperative and rule-abiding." Why did you include that, and why did it matter?

A. Well, all of the evidence available to me -- that is, the correctional records and my own interviews of correctional officers and my observations during my few days there on-site -- are that Mr. Bowers has been a model inmate, cooperative and rule-abiding the entire time he has been in custody.

Q. Why did that matter as you were assessing whether he had mental illness?

A. People who are profoundly impaired by mental illness may be incapable of being cooperative and rule-abiding. They aren't necessarily that way, but they may be. In his case, he has been an ideal inmate.

Q. If we could move to slide No. 60. Dr. Dietz, would you tell us about what you have concluded here?
A. Well, let me first say that I'm trained as a physician. I'm licensed to practice medicine and surgery. I do not specialize in epilepsy or have boards in epilepsy, but I have diagnosed and treated it.
Using conventional criteria, Mr. Bowers has not been known to have a seizure, and he would have to have had a seizure to receive a diagnosis of epilepsy. And in my view, the three things that have been suggested as possible seizures can't reasonably lead to the conclusion that those were seizures.
The first was this -- I keep misspeaking. The first was this episode of delirium when he was five and a half, which has an obvious cause of fever and medication.
The second was a panic attack while driving. Many people have had a panic attack.
The third was an episode of sleep paralysis, which is a normal phenomenon that many people experience.
So I don't think it's reasonable to leap to the conclusion that any of those was a seizure or that he should be diagnosed as epilepsy because of it.
Q. If we could proceed to the next slide, 61.

A. His MRI and his PET neither proved or disproved seizures or epilepsy to inform us one way or the other. He does have an abnormal EEG which I think shows that he's at risk of seizures, not that he has ever had any.

Q. In your review of the records and interviews, did the defendant report having had a seizure?

A. No. He not only denied it, but he denied every symptom related to seizures that I could think of to ask him. And he did the same with Dr. Darby. And throughout his medical records, he's been asked repeatedly about seizures. There have been prior neurological exams. All of those records consistently say no seizures.

In his applications to drive a truck and his medical exams for that, he also denied ever having had seizures. The last thing they need is somebody with active seizures driving big-rig trucks.

Q. Are you referring to a CDL, like a commercial driver's license?

A. Yes.

Q. If we could advance to slide 62. Dr. Dietz, can you frame this portion of your slides, please?

A. This is the second area of disagreement. Although the defense experts did not, to my recollection, address this issue head-on, I believe one of the reasons for

this phase of the proceeding --

MR. BURT: Object to his characterization about the purpose of the proceeding.

THE COURT: While I appreciate the doctor's area of expertise, I'm going to constrain the response to -- just tend to communicate by this section.

MS. SONG: Okay.

Q. Dr. Dietz, if you would, explain what your framing in this section of your disagreement with defense experts.

A. Here I am going to review the evidence that I believe informs me and informs others as to whether the defendant had the capacity to engage in substantial planning and premeditation.

Q. And in terms of what your belief is versus the defense experts', how would you posit that?

A. Well, likely he did have the capacity to engage in substantial planning and premeditation based on the evidence I'm about to review. It was unclear to me what the defense experts believed on this point.

Q. Okay. If we could go to the next slide, 63.

A. The first issue is when the plan began. And what the defendant told me is that he planned to do this, something of this sort, since April of 2018. So that's about six months from the time the plan hatched until

the time it was executed.

He said that it was in April 2018 that he realized what was going on and had no more doubt that the Jews were behind the invasion. He said, quote, "They keep saying it's not Jews, but every time you turn around, it's the Jew. There's a disproportionate amount of stuff that is orchestrated by the Jew, not just two and a half percent. You deal with what's the biggest problem."

Q. Dr. Dietz, what did you take him to mean? Can we start with "there's a disproportionate amount of stuff that's orchestrated by the Jew"?

A. Here he is referring to the idea that HIAS and other organizations that assist refugees and immigrants, organizations and political parties that favor increased immigration, or that wish to promote illegal immigration, in Mr. Bowers's view, is disproportionately run by people who are Jewish.

He doesn't think everyone who does these things is Jewish but that more than two and a half percent of them are. He is, I think, trying to describe his position accurately when he says it's a disproportionate number of those orchestrating this invasion who are Jewish.

Q. The "two and a half percent" referring to what?

A. To the prevalence of the Jewish faith in the U.S. population.
Q. "You deal with what's the biggest problem." What did you understand him to mean?
A. So this is kind of tactical consideration, that first one handles the biggest threat. So any defensive shooting school, law enforcement training points out, if you got two assailants coming at you and one has a shotgun and the other has a revolver, you deal with the larger threat first, the shotgun.

Well, it's true in military strategy as well that the biggest threat is the one that gets priority. And his view is that the biggest problem with respect to illegal immigration is those Jewish people and organizations who -- whom he blames for being behind it.
Q. And that -- this prompted him to start his plan?
A. This solidified the idea that it had to be Jewish targets. And that wasn't solidified until April.

There is a backstory to this of when he began worrying about the Great Replacement. Originally he said when the news came from right-wing talk radio, he thought they were exaggerating the concern about the Great Replacement. He didn't think it could be as big a problem as they were saying it was in 2016 and 2017. But he heard left-wing media say to the right-wing, get

out of your bubble and listen to other sources. So he did.

He said the more he listened to CNN and MSNBC and the legacy media -- NBC, ABC, CBS -- the more he became convinced that the Great Replacement was an enormous problem and that the Jews were behind it.

Q. Dr. Dietz, when the defendant talked to you about right-wing talk radio or when you learned that may have been an interest of his, did you do any research into what he may have been listening to?

A. Yes. Some witnesses had described him listening to the Jimmy Quinn radio show, particularly a show called War Room, and said that Mr. Bowers may have been an archivist for the show.

I was able to determine through witness interviews that he had done some volunteer work doing Internet archives for the show. I listened to a number of broadcasts of the -- of that particular show to see what topics they were discussing.

In October of 2018, there was a lot of commentary about the caravans heading from South America.

Q. Which is something he specifically mentioned to you?

A. Yes. But I don't think he was listening to the

Jimmy Quinn radio show then.

Q. Do you recall seeing reference to the caravans in his Gab posts and likes?

A. Yes.

Q. If we could go to the next slide, 64. Dr. Dietz, what about target selection?

A. So in considering whether he was capable of planning or premeditating, I wanted to understand how did he select his target? Was it a random choice that he just one day stumbled into. And he said that he was attempting to get the most bang for the buck and "hit the best target I had available."

He described for me a series of targets that he considered during that six-month period. His first choice would have been Barbara Lerner Spectre, but she was overseas, and that wasn't something he would be able to achieve.

He considered regional antidefamation leaders, but he didn't consider that practical.

He considered the headquarters of the Hebrew Immigrant Aid Society, but that was too far away for him.

This consideration of various target alternatives was part of his planning process.

Q. If we could go back to 63, slide 63, for just a

second. You said the defendant told you he planned to do something of "this sort." What is "this sort"?

A. Well, since he had concluded in April of 2018 that the immigration problem, the invasion as he referred to it, was being prompted by Jews, it's then that he decided that he would have a Jewish target, that he would take action against the Jews who were behind the invasion.

Q. Action how?

A. Violent action. He was rejecting the other white separatists who thought it would be more effective to use nonviolent means to persuade others to join their point of view and support them and siding with those who thought violence was the only way to achieve change.

Q. "Violence" meaning to kill them?

A. Well, to destroy, whether by killing people, destroying buildings and a variety of ways to use violence to make a statement and achieve the goals. But in his case, killing people was the one he eventually chose.

Q. If we could go back to slide 64. "Most bang for the buck," what did you understand him to mean by that?

A. I understood him to mean that he is going to expend ammo, he is going to give up his freedom, he is going to risk being harmed, so he wanted to achieve some result

for his investment and that he wanted to maximize what that result would be.

Many criminals, for a variety of reasons, engage in a kind of calculus, and this is why smart criminals don't rob the 7-Eleven for $20. They rob a bank and end up in higher status in prison because of it.

He is engaging in this kind of calculus to decide how do I get the biggest bang for the buck, and some of the targets that would certainly have achieved that were out of reach for him or too hardened, too much security for him to do that, but the Dor Hadash Congregation was local, reachable. He saw that as a place where he could have multiple victims and make a statement.

Q. Dr. Dietz, what did the defendant say to you about Barbara Lerner Spectre? Why was that impractical?

A. Because she is overseas. He couldn't afford to get there. And he didn't have to say. I knew it would be hard for him to take weapons overseas.

Q. What about regional Antidefamation League leaders? What did he say about that?

A. He thought it would be too much security and they were scattered around. He would only be able to get one at a time. That didn't seem to him as good a target.

Q. "One at a time," meaning to assault or kill one person at a time?
A. Right.
Q. What about HIAS headquarters? What did he say about that?
A. That it was out of state and not his territory, not an area he was familiar with.
Q. If we could go to the next slide, 65. You mentioned Dor Hadash. What did he tell you about Dor Hadash?
A. Well, it became his primary target when he ruled out the others. And he told me that just two days prior to my interview of him, he seen a story on TV about Dor Hadash raising funds for refugees from the Congo and observed "Dor Hadash has not learned its lesson."
Q. When he said "Dor Hadash has not learned its lesson," what did he mean? Not learned its lesson from what, from what he did?
A. Yes, he meant that his attack hadn't caused them to stop helping the invasion.
Q. Even though he had killed 11 people?
A. Yes.
Q. What was his tone of voice when he communicated to you that Dor Hadash has not learned its lesson?
A. As best I could demonstrate to you, it was

"Dor Hadash has not learned its lesson"

Q. If we could turn to slide 66, please. Dr. Dietz, what was important about the weapons that he told you about?

A. Well, of course, to commit a crime of this sort requires the use of some form of weapon. So I discussed with him his weapons, when he got them, why he chose them, and so on. He said that he used the weapons that he already owned, that he had tested them and he criticized other active shooters who had failed to train with and test their weapons and had lesser success than he.

He went into some detail about the technical advantages of the older Colt AR-15 rifle platform that he used in the shooting.

He purchased the weapon from his friend Joe Sedley and liked the particular vintage that this rifle came from. He made a point of bringing along IMI -- that is, Israeli Military Industry -- ammunition with him for the attack and commented that the irony of that wasn't lost on him.

He never said what IMI stood for, but he knew then that I knew about weapons, and that stands for Israeli Military Industry, the makers of the well-known Galil rifle family and the Uzi submachine gun family.

Q. What was he suggesting was ironic about bringing that particular kind of ammunition to the attack at Tree of Life?
A. That he would kill Jews with Israeli ammunition.
Q. Dr. Dietz, you say he used the weapons he already owned. What does that mean? He didn't buy new ones?
A. He didn't buy any new weapons for the occasion.
Q. On purpose or just because he liked the ones he had?
A. Because he already had what he needed and he didn't have money to buy new ones anyway.
Q. You mentioned that he said he tested his weapons. Do you remember what other active shooters he actually criticized for not testing their weapons?
A. There was one in -- John Earnest, certainly, who had done a synagogue shooting in Poway, California, six months to the day after the Tree of Life attack.
He criticized someone who had done a shooting in Atlanta for not being familiar enough with their weapons.
Q. Did the defendant tell you how he tested his weapons?
A. By going to the range.
Q. Could we turn to Page 67 in your slides, please. What else did he tell you about weapons, Dr. Dietz?

A. So he had purchased all three of his Glock handguns that he had with him that day in a fairly unusual caliber. Notice 357 SIG. Most Glocks that civilians fire chamber .9-millimeter or .40-caliber or .45-caliber. These are commonly used in less expensive ammunition. But he had purchased 357 SIG because it's better against body armor than the other top defense choice of .45 ACP.

He described some of the technical details of the 357 SIG cartridge, its ballistics. He described it as very reliable, very fast and very likely to penetrate armor.

Q. Why did he want weapons that would penetrate body armor?

A. Well, he saw himself as a soldier and knew that there could be a response by others who would be wearing body armor.

Q. Namely who?

A. As it turned out, it was SWAT. But the body armor that SWAT uses can stop a 357 SIG. Local police typically don't have body armor that would stop that round.

Q. What else did he say about his Glock 31, Dr. Dietz?

A. That that's what he used after he ran out of rifle ammunition and was engaging SWAT.

Q. So beyond telling you what he planned for, he told you what he actually did in the synagogue?
A. Yes.
Q. Did he say who he was shooting at with the Glock 31?
A. The SWAT team.
Q. Could we go to Exhibit 411-A, page 11, at the top of the page. Dr. Dietz, is this a Gab post of the defendant's that you reviewed in conjunction with your interview with him?
A. Yes. This was posted about a month before the shooting, and that's his three Glocks in their cases.
Q. Do you recall if the full post refers to "my Glock family"? If we could go back one page, actually.
A. Yes, it does.
Q. At the bottom. Would you mind reading what you can make out of that post?
A. "My Glock family with a plastic training and KKM .40s with barrels for each TruGlo TFX on the 31 and XS big dots on the 32 and 33" -- he's talking about the sights there -- "and grip tape on the Generation 3 on the right so it's not greasy when wet." And this pic, 33, still had TFX sights.
Q. And the 31 is what he shot at SWAT with?
A. Yes.

Q. Dr. Dietz, you mentioned that, among other things that you and the defendant spoke about, were guns. How did that happen in your 14 hours that you spent with him?
A. How did it come up?
Q. Yes.
A. Probably first came up when I was talking to him about his hobbies.
Q. What did he say about guns?
A. Well, I would say his two biggest hobbies in life were dirt bikes and firearms; dirt bikes as a youngster and firearms from the time he was able to lawfully possess them. He spoke with enthusiasm about them. And when he saw that I knew what he was talking about, he discussed more technical details about them.
Q. He had technical knowledge and details about firearms?
A. Yes.
Q. If we could go to slide 68, please. Dr. Dietz, why do you mention operational secrecy?
A. It was important to him that others not catch on to his plan, and so in discussing his planning and preparation, I spoke to him about what he did to keep a low profile about this.
He mentioned the concept of the gray man,

which is someone that nobody notices and who blends in.

That's a concept that is widely discussed in the self-defense community and amongst survivalists and even among those who are concerned with concealed carry and not drawing attention to themselves and the possibility they have a weapon on them, both to avoid being a victim or to avoid being challenged or provoked.

So he said, about the gray man, "I was really going for that. Don't stick out. Don't bring notice to yourself."

And he mentioned another person who had been planning to hit the Jewish Community Center in Youngstown, Ohio, quote, "but he shot off his mouth on the Internet, so he couldn't accomplish the mission," end quote, because he failed to stay gray.

So he is criticizing someone who drew attention to himself prematurely and announced his intention. That's related to the fact that he did not announce his intention until immediately before committing the attack.

Q. So, Dr. Dietz, the gray man concept was not something that originated with the defendant?

A. No, not at all.

Q. Did he, in speaking to you, draw a contrast between this person who had shot off his mouth on the Internet

and his discretion on Gab and on the Internet?

A. I think he was proud that he succeeded in staying the gray man.

Q. Could we go to slide No. 69, please. What else about operational secrecy did you find important, Dr. Dietz?

A. Of course I asked him if he had visited the Tree of Life Synagogue, and he said that he had not. He made a point of not driving by it. He knew that his vehicle had within it something that emits location and that he did not know if authorities would be looking at people who drive by high-value targets. So he made a point of not doing any in-person reconnaissance but, rather, using the Internet to try to learn what he could about location, architecture, floor plan, what the interior would look like. He complained there weren't many interior photos available.

But he didn't want his vehicle tracked. He made a point of not sharing his plan with anyone until the last moment. He deleted the content from his cellphone. He wrote a program that succeeded in shredding his computer memory and those of the six attached hard drives. And as he left on his mission that morning, he hid his weapons and ammo under a blanket in his car.

Q. When you refer to a "high-value target," is that how the defendant regarded the Tree of Life Synagogue?
A. He didn't use that term as I recall, but yes, that is how he regarded it.
Q. Slide 70 has more operational secrecy facts that you noticed.
A. Immediately before the attack, he posted on Gab, "Screw your optics. I'm going in." In fact, when I asked him how he thought society would view what he did, his response was "Screw your optics. I'm going in."
Then he explained that when he wrote that on Gab that morning, he was reacting to the Martin Luther King sorts on Gab where there had been infighting between those who wanted to use nonviolent means of conveying their message and attracting additional supporters to their cause versus those who thought violence was the only way to achieve the objective, or the best way to achieve it.
Q. What else did he say about optics? Is that a topic that you spoke to him in some detail with him?
A. Yes. You have to understand that this was just about that debate within his community. It didn't mean anything else.
Q. And his statement, "Screw your optics," meant what in terms of which side he was choosing?

A. Meant he was choosing the violent side. He didn't care what anyone thought of it. He didn't care how it looked to others. Of course, that is consistent with his personality of not caring about praise or criticism.
Q. In your view of the defendant's Gab posts and likes, did you see references to optics and that debate you are describing?
A. Yes.
Q. If we could turn to slide 71. What about the timing of the attack did he tell you, Dr. Dietz?
A. I asked him how did he pick the timing; why choose that day, that month? He said that he looked at the website for Dor Hadash, and they had something that looked like a Google calendar on the website and that it looked to him as though Saturday morning was the most active time.
He thought to himself, "That's convenient. My car lease is up that day."
I asked him if he ever doubted that he would go through with the attack, and he said, quote, "I kind of put myself in a position where I had to; ran out of money, had rent due in a couple days."
Q. So the October 27th, as he told you, related to his car lease being up?
A. Yes.

Q. Why did that matter if his car lease was up?
A. He didn't want to renew a car lease when he would be in custody, and he needed a car in order to get to the synagogue that day.
Q. If we could turn to slide 72. Dr. Dietz, what about operational objectives?
A. I asked him, "What were your goals?" He listed three, and he numbered them.
First was stop those that are actively aiding HIAS.
Second, scare the hell out of anyone who is considering helping HIAS or groups like HIAS.
Third, bring attention to the Great Replacement.
Q. You have those goals in quotes. How is that, Dr. Dietz? Were you taking notes of exactly what the defendant said at times?
A. At times, I was able to take precise notes. I typed my notes while I was with him, and I had warned him at the outset there would be awkward pauses while I tried to type to capture what he had said. This was one of the times where it was important enough that I wanted to get down his exact words.
Q. Did the defendant have any hesitation in listing those three objectives to you, his goals?

A. No. I think he had them memorized. I believe they are the same ones he told Dr. Darby and the same ones he told Dr. Rogers.

Q. If we could go to slide 73. Dr. Dietz, why is tactics a part of his capacity to plan and premeditate?

A. Well, if somebody were unable to plan and premeditate, I would expect them to be behaving in a random, disordered manner. But in contrast, Mr. Bowers tried to bring to bear his knowledge of tactics.

So he told Dr. Rogers he was slicing the pie. Slicing the pie is a law enforcement technique for maintaining as much cover or concealment as one can from an enemy combatant while still having the opportunity to strike them.

So the most common example is not going right to the edge of a door or window but standing back from it, which provides better angle for the defender and worse angles for the assailant.

He understood that, and he was trying to use that tactic that day.

Q. Against the police or against the congregants or both?

A. Both. It's a mind set. Where we can see it clearly is, I guess, the police. But he had it in mind as he was behaving that day.

Likewise, he used tactical reloads which refers to the practice of keeping magazines that are only partially expended so that one is able to conserve the ammunition which might be needed after one has moved to another position and to top off one's weapon with a fully loaded magazine.

Q. Just on that point, did he describe to you that that's something he actually did inside the synagogue?

A. Yes, and he was quite proud how quickly and efficiently he did it.

Q. Did he mention that was something he had practiced prior to attacking the synagogue?

A. He did not mention that to me. I have no doubt that he did practice because it's easy to flub if you don't practice it.

Q. Please proceed.

A. I asked him about a device that I knew he had taken with him called the Screaming Meanie, and he said that it makes a lot of noise. He bought it as an alarm clock when he was driving trucks. He took it with him to the attack because he thought he might need something to make a loud distracting noise.

Q. Why would he need a loud distracting noise in the synagogue?

A. He could have needed it in order to get law

enforcement to head off in a different direction from where he actually was.

Q. What else about tactics, Dr. Dietz?

A. It is apparent that he had moved boxes in the classroom where he holed up in order to provide greater concealment from SWAT because the boxes had not been on the table prior to this attack and were there after the attack.

Q. Could we look at slide 74.

A. This is from inside the classroom, showing three large boxes between the entry door and the classroom. Those had not been on the table prior to the attack.

Q. And 75.

A. This is seen from the door side.

Q. Why did you consider this behavior to relate to a capacity to plan and premeditate?

A. This gives him a better opportunity to shoot his enemy before they shoot him. He's got greater concealment and better angles.

Q. Could we go to slide 76. Dr. Dietz, what did you think about the defendant's afteraction analysis?

A. Well, those are my words, "afteraction analysis," because in military and law enforcement, this is always done to try to look at did one make mistakes, how could one have done better, and he saw this as war and an

attack.

So I asked him if he made any mistakes, and he said some of his mistakes were not knowing how many people were in the building, leaving the rest of his ammunition in the car, and not anticipating the complexity of the building.

He said that he felt like there were a lot of mistakes. Initially he thought there were only six people in the lobby, so he left three quarters of his ammunition in the car. He thought he should have left the car running to get to his second target and was surprised when he learned that he hadn't. And he explained that everything was fast and required quick decisions.

Q. So there's a lot of information there. How was it that he thought there were only six people in the lobby? Was he looking into the building at some point?

A. Yes. That's all he could see when he first pulled up. He just saw the people in the lobby area.

Q. And so by leaving three-quarters of his ammunition in the car, what was he trying to allow for?

A. He was trying to allow for going to a secondary target.

Q. Did he tell you what the secondary target was?

A. Yes. We discussed that, and to me, he said it

wasn't the JCC near the post office but a JFC. I'm still not sure what the secondary target really was, because they are both in the same area.
Q. Did he explain why he chose to go to the Tree of Life Synagogue first?
A. He believed that that would have the larger number of people and was specifically a location where Dor Hadash could be found.
Q. When he talked about not anticipating the complexity of the building, what did he mean? What did he say?
A. Well, the building is very complex. There are multiple levels. The layout is not intuitive. He hadn't been able to get floor plans online.
So there is no doubt it's a surprise to walk into a complex building like that and try to carry out the attack he had hoped to achieve. So he would go from one floor to another, one level to another, in order to be able to locate and shoot every victim he could.
Q. So he thought there were six people in the lobby. Did he describe how or when he figured out that there were actually more people in the building?
A. Once he got inside.
Q. How did he react to knowing that the bulk of his ammunition was still in his car?

A. He thought about going back to the car to get it, but he reasoned to himself that if he returned to the car for more ammo, quote, "They would just scatter," end quote, and then a bird in the hand is worth three in the bush.

Q. What did he mean about how he should have left his car running to get to his second target?

A. To reduce the time between target A and target B, leaving the car running would have trimmed a few seconds off of that.

Q. How did you assess the level of detail that he was able to provide about his attack on the Tree of Life?

A. I thought it was very good. I thought it was consistent with that of law enforcement officers I have interviewed who have been involved in shooting incidents, that one doesn't remember every single detail.

Often there is a change in mental state in which one focuses on particular details and ignores others. Often sounds aren't heard, smells aren't smelled, and there can even be distortions of time and of one's sense of whether one's purposefully acting oneself or watching oneself from above.

He didn't have any of those distortions, and there was no significant amnesia. So I thought his

accounting of this was better than the average law enforcement officers post-incident accounting of what had occurred.

Q. Could we turn to slide No. 77, please. What else did you think was important about how he perceived his crimes, his attack?

A. Well, I asked if he had any regrets, and he replied, quote, "That there wasn't dozens and dozens more in there. They can kill me if they want, but the score will still be 11 to one. That's not winning the war, but I won that battle," end quote.

Q. What did you understand him to mean by that? What was the context of that comment?

A. That his only regret was not having more victims and that he regards this battle as a success, that he is contributing to the cause he set out to contribute to, of the war in which there are those who want to bring in invaders and destroy white culture, and he thinks he successfully attacked some of them.

Q. What else did he say, Dr. Dietz, about the 11 victims that he killed?

A. He referred to his 11 dead victims as the Yiddish dozen and said that's because you always get shorted one.

Q. Referring to what anti-Semitic trope?

A. Of greed.
Q. Return to slide 78. What was the third disagreement, Dr. Dietz, that you explain in this and following slides?
A. Well, again, I'm not sure it was a disagreement because I didn't hear the defense experts say the opposite of what I'm concluding here, but it's my view, based on the evidence that I will give, that the defendant did have the capacity to form the intent to kill his victims.
Q. If we could go to slide 79.
Why is that? Why did you reach that conclusion?
A. Well, first, when I asked him about the crime, he delighted in telling me that he had no malfunctions, everything fit perfectly, his reloads were flawless. And he said, "I have 30 years of experience with weapons, and I have probably fired over a hundred thousand rounds."
So this is a man very familiar with weapons, their use and their impact. He is not a naive person who just picked up a loaded gun by accident.
Q. Could we turn to Exhibit 411-A, page 5.
Dr. Dietz, you mentioned that the defendant talked about his target practice. Did you see

communications related to that on his Gab posts?
A. Yes. He posted about a month before this incident both a distant shot of target down range and a close-up of where his rounds struck, which are all ten-ring.
Q. Did he, in relation to October 27th, tell you whether he thought he was a good shot or he was an accurate shot?
A. Yeah. He thought he was quite good.
Q. Could we go back to the slides at No. 80, please. What else about his capacity to form the intent to kill the victims?
A. I asked him about his mental state at the time, that is, during the shooting, and he said, "Just calm and focused. It was like a real calm, precision focus."
He told me that he had it all planned out and was just implementing the steps. He said it started flawlessly, but then that changed when he thought there were 20 or 21 people inside. He debated going to his car for more ammo but thought they would all scatter.
Q. And that's the comment you had said previously about "just get as many as you can"?
A. Yes.
Q. Dr. Dietz, how did he sort of react to realizing that there were more people and that most of his ammunition was in the car? How did he react to that or

compensate for that, if he said?
A. Well, he had to make a choice. Do I go back to the car for more ammo and risk losing some potential victims, or do I do the best I can and chase them down now? And he chose the latter.
Q. Did he perceive the shortage or, I should say, the finite supply of ammunition as motivating greater accuracy or care in his shots?
A. He did not comment to me about that.
Q. If we could turn to slide 81, please. What is important on this slide, Dr. Dietz?
A. When I asked him his impression of the people who were inside the synagogue, he said that he never heard a single person say a word except for one man who was slumped over and said, "I think I have been seriously injured."
That is someone whom he had intentionally shot in the back of the head with a rifle round. He said the man was alert for a full second after that shot, and the defendant remarked, "I almost felt sorry for him."
Q. Almost but did not?
A. I'm quoting his words.
Q. So this was an individual -- if I understand the sequencing, he had already shot this man, but he remained alive for a short time?

A. For a second.
Q. Can we turn to slide 82, please. What do you have on this slide, Dr. Dietz?
A. I asked him if he knew a .223 round would hurt his victims, and he said he did and that he was trying for a messy kill as opposed to a quick kill or a painful kill, and so he was aiming for the abdomen, and the purpose of trying for a messy kill was to deter others in keeping with goal No. 2 that he laid out to me, that is, to get others to not assist immigrants.
Q. What in particular did he say about head shots?
A. He said that other than the man he already told me about, any other head shots were inadvertent, he wasn't particularly aiming for the head.
Q. How is it that a messy shot in the abdomen would not be seen as painful? Do you understand that reference?
A. Yeah. I don't think it's a good categorization of three kinds of kills; messy, clean and painful -- or messy, quick and painful.
Messy, he definitely meant abdomen, and he said so.
Quick kill would be a head shot, where the person would ordinarily not survive long enough to experience pain, nor would it necessarily be that messy.

By painful, probably he meant extremities, hips, but he never said what he meant by painful.

Q. That was his word?

A. Yeah.

Q. If we can go to slide 83, please. What else did the defendant tell you?

A. He said that he felt in control of his own actions, especially reloads. He was proud about how flawless they were. And then he also took pride in the dead-injured ratio. He attributed that to his ability and his weapon choice.

Here he contrasted his dead-injured ratio with an incident in Atlanta that had 32 injured and four killed, and he blamed that on not knowing what you're doing and not using the right gun.

Q. So his goal or his pride was based on the number of people dead versus injured?

A. Yes.

Q. If we can go to slide 84, please. What about civilian casualties, Dr. Dietz?

A. Since he was describing the war metaphor, I asked him a question about civilian casualties, and he said he didn't want to fight with the police, but they were aiding the enemy. He wasn't going to kill them, but he was willing to injure them. And it was maddening to him

to have the police protect the enemy.

He also said that at one time he would have felt badly about killing Jews who were not part of Dor Hadash, but after watching MSNBC and the rest, he made no distinction. Quote, "A Jew is a Jew," end quote.

Q. How did he explain that, or what did you take him to mean? So why did he transition from feeling badly about killing Jews who were not part of Dor Hadash to then just accepting he would kill any Jew he found in the synagogue?

MR. BURT: Leading.

THE COURT: Overruled.

Q. Here he is referring back to something he told me earlier in the interview about his watching various news channels.

As he watched what he regarded as liberal or leftist news channels, he saw commentary about immigration and the invasion coming from news anchors and newspersons that he believed to be Jewish who seemed to be welcoming the immigrants into the U.S., and this is what hardened his position that people of the Jewish faith were behind the invasion, that even the newscasters of Jewish heritage were sympathetic to those coming into the country and diluting the white

population and engaging in white genocide.

Q. So in terms of the three congregations in the Tree of Life Synagogue, what did he mean about that, then?

A. That it no longer mattered which congregation or whether they were actively funding HIAS. What mattered is that they were Jewish and involved in more than their two-and-a-half-percent share of the border crisis, the immigration problem, the invasion.

Q. Go to slide 85, please. So, Dr. Dietz, in terms of your conclusions, based on everything that you reviewed -- if we could go to slide 86 -- what can you explain to the jury?

A. Diagnostically it's my opinion that the defendant does not have schizophrenia or epilepsy but, rather, does have a schizoid personality disorder resulting in social isolation other than his interaction with his family and the Internet and other people on the Internet.

Q. Dr. Dietz, in your view, how do you account for the difference in the schizophrenia diagnosis from the defense experts' and your own conclusion?

MR. BURT: Object to that. Calls for a credibility opinion.

MS. SONG: This is rebuttal testimony, Your Honor.

THE COURT: I'm going to overrule the objection. You can answer the question.

A. I think the difference hinges entirely from whether we regard the defendant's extreme beliefs as delusions on the one hand or subcultural shared beliefs on the other. In my opinion, the defense experts who testified that the defendant had delusions simply mistook very ordinary widespread white separatist beliefs for delusions because they weren't familiar with them.

I see how the first time you hear it, it sounds pretty crazy, but when you have seen this promoted for 20 years, 40 years, among thousands and thousands of people, in their books and the propaganda and online forums, it's clear that these are subcultural beliefs.

Q. Dr. Dietz, some of the extreme beliefs that you described were familiar to you based on your experience and research; is that true?

A. All of them. All the subcultural beliefs, I was familiar with before.

Q. If there were any references that you weren't knowledgeable about, or if there were, what did you do? Did you look them up? Did you research them?

A. I looked them up, as I did with some of the Biblical references I didn't know. And I verified,

again, there were sources for all of this. The White Genocide Manifesto is the principal source from which so much of this flows.

Q. Did any of the extreme beliefs that the defendant articulated to you, or were any of them original to him, based on your knowledge?

MR. BURT: Asked and answered.

THE COURT: You may have asked it, but you can answer it again.

A. Not a one.

Q. If we can go to the next slide, please, 87. Can you summarize your conclusion about substantial planning and premeditation, Dr. Dietz?

A. It's my conclusion and my opinion that the defendant's organized, goal-directed thoughts and behaviors before and during the attack demonstrate that he had the capacity to engage in substantial planning and premeditation.

Q. Dr. Dietz, if you had determined that the defendant was schizophrenic, would that in itself answer the question of whether he had the capacity to engage in substantial planning and premeditation?

A. No, because individuals with schizophrenia often have the capacity to engage in substantial planning and premeditation. The diagnosis doesn't inform this one

way or the other, when asked to look at behavior to see if he had the capacity to plan and premeditate.

Q. Dr. Dietz, whether or not it's called a mental disorder or a mental illness, does schizoid personality disorder ever involve delusions or hallucinations?

MR. BURT: Asked and answered.

THE COURT: Again, we are in conclusion, so I will permit the answer again.

A. No, never.

Q. So your diagnosis of schizoid personality disorder would not answer the question of whether he could engage in substantial planning and premeditation -- or effective, I should say?

A. Hard to imagine how it could affect that ability. I can't think of an example of how it could.

Q. Your diagnosis does not suggest psychosis or delusion?

A. No. On the contrary, I'm clear in my opinion that the defendant does not have psychosis or delusions.

Q. And with regard to epilepsy, does that -- whether he did or didn't, does that answer the question of whether he had the capacity to engage in substantial planning and premeditation?

A. No, it does not answer the question at all.

Q. Can we go to slide 88, please. What about the

intent-to-kill conclusion you reached, Dr. Dietz?
A. I concluded, for the reasons I've already gone over, that the defendant's thoughts and behaviors before, during and after the offenses demonstrate his capacity to form the intent to kill the victims, that is, that he did have that capacity.
Q. And if you determined that the defendant was schizophrenic, would that in itself answer this question of whether he had the capacity to form the intent to kill the victims?
A. No, it would not.
Q. Why not?
A. Because individuals with schizophrenia may or may not have the capacity to form intent. Most of the time, they do have that capacity to form the intent to kill.
Q. Dr. Dietz, are you frequently retained by defense teams; criminal defense and civil defense?
A. Yes.
Q. You charge for your services?
A. Yes.
Q. You charge a fairly high rate for your services?
A. I do.
Q. Do you charge the same rate for defense attorneys and prosecutors?
A. I quote the same rates, which are public rates

discounted from my private rates, but the defense cannot always pay the same rate the government can.

Q. In your opinion, Dr. Dietz, given the experience of the defense experts in this case, would you expect their rates to be high as well?

MR. BURT: That calls for speculation. No foundation.

THE COURT: I'm going to sustain that objection.

Q. Dr. Dietz, do you ever modify your opinions and conclusions based on who's paying your bills?

A. No. Only based on evidence.

Q. Did you modify or change any conclusions in this case because you were retained by the prosecution?

A. No.

Q. Why do you believe that your high rate is justified as a consultant and expert?

A. Because of my years of experience, the level of my experience, my contributions to the field, the quality of the work I do. I think those are the bases for being able to charge high rates.

MS. SONG: Just one moment, Your Honor.

THE COURT: Of course.

(Pause in the proceedings.)

MS. SONG: Those are all my questions, Your

Honor.

THE COURT: Thank you, Ms. Song.

Mr. Burt, do you care to cross?

MR. BURT: Yes.

THE COURT: Mr. Burt, I'm allowing for the possibility that you won't exceed 15 minutes.

MR. BURT: That's a good prediction.

CROSS-EXAMINATION

BY MR. BURT:

Q. Good morning, Doctor.

A. Good morning.

Q. Doctor, there's various reports and documents I want to make reference to. If it's okay with you, I would like to approach and give you a copy of that, and we can go through it.

A. I think I need a bigger desk to be able to handle that.

Q. So, I want to start in that binder there in front of you. There's a tab way toward the end, tab 238, which is an exhibit.

A. 238?

Q. 238. It's one of the last ones in there.

A. Yes.

Q. Got it. Do you want to open it up, because I am going to ask you some questions about it.

A. I don't know if I can open it up.
Q. Let me help you there, Doctor. You mentioned in your direct and in your PowerPoint slide that you have disagreements with the defense experts, correct?
A. Yes.
Q. I think you outlined those. So I thought I would start with 238 because this is an article you wrote a while ago called "Why Experts Disagree." Do you remember that?
A. I do.
Q. And I think your résumé reflects you have done quite a bit of writing on just the theory of forensic psychiatric practice, how it's done and how it should be done, standards in your profession, educational issues, things of that nature?
A. Yes.
Q. Okay. This is an article that was published in a medical journal back in 1985, correct?
A. Yes, it is.
Q. And you're familiar with the content of the article in terms of what opinions you expressed in that article?
A. More or less. It's been a long time.
Q. Okay. Let's go through it because I want to see if there's opinions in here which you still adhere to from what you wrote back then.

You talked generally in this article about why forensic psychiatrists or mental health experts disagree, right?

A. Yes.

Q. And if you look at page 85, you say, "Two explanations are commonly offered for disagreements among experts in insanity cases." We are not talking about insanity here, but we are talking about the disagreement part.

You said, "The first is that the legal test for criminal responsibility requires social, moral, and philosophical judgments outside the scope of psychiatric expertise."

You still hold that opinion?

A. That is sometimes true.

Q. Then you say, "Accordingly, it has been proposed that experts not offer testimony on the ultimate legal issue."

A. Correct.

Q. And you still adhere to that view, correct?

A. I still what?

Q. You still adhere to that view, that it would be inappropriate for a psychiatrist to be offering opinions on the ultimate legal issue before the jury?

A. I don't know if it's always inappropriate. If a

Court wanted that, then that would make it appropriate.
Q. Sure.
A. But just as today I talked about the defendant's capacity rather than concluding whether the defendant did plan or premeditate or whether the defendant did form the intent, that's the distinction. We can talk about capacity. We shouldn't, unless asked by the Court, talk about the ultimate issue.
Q. Right. Is that because capacity is a medical issue; whereas, the ultimate issue is really, as you say in your article, a social, moral, philosophical judgment that is best left to the fact-finder?
A. It is the fact-finder's duty to determine such things, not the experts.
Q. Okay. Then you say the second explanation for disagreements, on the same page there, is that "The adversarial process generates conscious or unconscious bias in experts who have been retained by one of the adversaries."
A. Yes.
Q. You expressed that opinion then. Do you still hold to that opinion?
A. I think this definitely happens.
Q. Explain to me a little bit what the mechanism is for how conscious or unconscious bias can affect the

opinions and cause differences of opinion?

A. I think this happens most when someone works so closely in person with a team for the defense or the prosecution that they're living together, eating together, socializing together, working together repeatedly, and come to develop a common sense of the defendant and come to share opinions and beliefs about the defendant. This can be biasing. And so it is better for the expert who seeks to remain objective to keep a distance from the prosecution team or the defense team who may have retained the person.

Q. Is it also part of avoiding bias not to reach premature conclusions about a patient or a client?

A. Yes, or at least to be aware of why it's premature or what the issue is. Just yesterday, I read an article about what's called anchoring bias among physicians in emergency rooms.

If a patient comes in with a complaint of shortness of breath, how the patient's chief complaint is written down determines whether they're going to be examined for -- whether they might have a pulmonary embolism, which is a clot in the leg, for example, and that physicians are biased just by those words that the triage desk writes down why the patient is here, and that makes a difference in what follow-up studies

they'll do.

I think this is true in all of medicine, that if one is told right up front of a diagnosis or respected diagnosis, that that can create that anchoring bias in which the person keeps looking for that same thing, evidence to support it, the confirmation bias that's been mentioned previously.

There are all kinds of biases that can be introduced into a case. One has to struggle to fight against them.

Q. Sure. Anchoring bias, when you refer to anchoring bias, are you meaning there in part that if you reach conclusions prematurely, that you're likely to stick to those conclusions even if they are wrong?

A. Well, it's not that it's a conclusion. It's that the initial information can be biassing and can limit how far the inquiry goes.

In forensic work, one should not be reaching a conclusion until all the data are in hand, and even then should have an open enough mind to say if you show me more data, you can persuade me I have been wrong all this time.

Q. Is it also the case that doctors, especially doctors who specialize in certain areas, tend to see things within their specialty?

A. Yes. There's no doubt about it. I'll give you an example. I was reviewing a homicide case unrelated to this in which, as I go through the defendant's history, the first thing I'm thinking is this guy could be a child molester; kids love him, he spends all his time with kids, his occupation is taking care of other people's kids, he's a pillar of the community, parents trust him with their kids.

This is the story I hear in one after another serial child molesters. That isn't this guy. It's just because of my expertise in that field and seeing, as I have, thousands of such cases, that I am seeing things in this case that aren't part of it.

I think the same thing can happen, that an epilepsy expert can see epilepsy everywhere he looks.

Q. Or any other medical specialty, if they tend to specialize. When somebody comes into them, they are already looking to kind of fit them in whatever their subspecialty is because that's who they see every day.

A. Exactly. You become a tertiary referral center, and inundated with the same kind of thing, then you start seeing it everywhere.

Q. In your article, you discuss those two reasons for why there are disagreements, and then you say you want to set those aside and consider other reasons why

experts disagree, correct?
A. Yes.
Q. And you say in the article -- this is at page 86 -- "I contend that the evaluation setting, the evaluators, and the evaluation techniques used in insanity cases are so heterogeneous that disagreements in some proportion of cases is inevitable?
A. That's what I wrote.
Q. Again, there you are talking about specifically insanity cases, but the same principle applies when you are evaluating mental state at the time of the crime?
A. Yes.
Q. So, the factors are, first of all, the evaluation setting, where -- that, I take it, refers to where the evaluation is done and under what circumstances?
A. Yes.
Q. The evaluators in terms of what the evaluators', as you describe in that article, their orientation is, correct? Page 86, left-hand column, second paragraph.
A. Oh, yes, that's right.
Q. Okay. So when you say, "I contend that the evaluation settings, the evaluators, and the evaluation techniques used in insanity cases are so heterogeneous that disagreement in some proportion of cases is inevitable"?

A. Yes.
Q. And heterogeneous in the sense that there's lots of different reasons, doing things in lots of different settings and lots of different evaluators with different philosophies?
A. Yes.
Q. So when you look at the setting, you talk here about was the evaluation done in a private or a public setting, correct?
A. Correct.
Q. And there you talk about things like resources?
A. Yes.
Q. The kind of evaluation, for instance, that can get done in a jail is different from the kind of evaluation that you and the defense experts did in this case, correct?
A. Yes, very different.
Q. And the reason for that is not only do you lack resources, but typically in a public setting, a jail or a prison or a large clinic or even in the Bridgewater State Hospital where you work, you are dealing with hundreds of patients?
A. Yes. There isn't time to do anything carefully.
Q. Right. Typically, you don't have the resources to do the kind of social history that you have alluded to

in your testimony here?
A. Correct.
Q. You've got to kind of do what you can do and then move on to the next patient?
A. Yes.
Q. And I think you alluded to that when you talked about your background. You said when you worked up in Bridgewater in Massachusetts, you were dealing with a thousand cases in a month, you said?
A. In a year.
Q. A year. You just didn't have the resource to look at them?
A. Not in any depth at all.
Q. And you know, from your experience working forensic psychiatric cases for many years, that jail psychiatric evaluations can be pretty perfunctory?
A. Yes, they can.
Q. They are kind of checklists, what some people call drive-by evaluations, right?
A. Often. It depends in part on who's doing it, and they may make distinctions depending on the type of case.
I thought here there was an unusually complete jail evaluation by Dr. Hauber. Often we'll see a nurse who has five minutes to ask the person are you thinking

of hurting anyone, are you thinking of hurting yourself, ever been in a psych hospital, and that's all we get.
Q. Sure. And one important aspect of your investigation is to determine exactly how thorough an evaluation is before you rely on it, right?
A. Thorough and whether it includes the things that matter.
Q. Right. Did you talk to Dr. Hauber?
A. I did not.
Q. You did not. So you don't know what methods, techniques, or orientation was involved in his evaluation, correct?
A. No. I only know what he wrote in his report.
Q. And if he were to testify that what he wrote in his report was not really a thorough or was a misguided evaluation, that's something you would want to know, correct?
A. I would.
Q. Okay. And what we are talking about here also applies to, not just in jail records, but to evaluations that are done in the social history records that you looked at, correct?
A. I don't follow the question.
Q. You said you looked at various medical records relating to Mr. Bowers?

A. Yes.
Q. And what you had regarding those records were whatever the summaries were that were written down, correct?
A. Correct.
Q. You don't know the thoroughness of the evaluations, who was doing them, what questions were asked. You're kind of just relying on the records?
A. That's true. And it's clear, even from the records, that there are errors there.
Q. And one of the reasons for those errors is, again, like jails, psychiatric hospitals that deal with young kids, public hospitals tend to be busy places?
A. That's one of the reasons, yes.
Q. They don't have the time or the resources to really do the kind of complete workup that you were able to do in this case?
A. I think that's fair.
Q. Okay. So that's something that has to be weighed into your analysis in terms of how much weight you put into relying on either the presence or absence of symptoms that are in medical records, correct?
A. That's true.
Q. Also, in the particular disorders that we're talking about, things like schizophrenia, the fact that

you don't see something documented as an abnormal symptom in a medical record does not rule out schizophrenia, correct?

A. Well, the single omission would not, but eventually, if nobody is seeing delusions or hallucinations or thought disorder, the hypothesis of schizophrenia gets pretty close to being rejected.

Q. Well, you've done a lot of work with corporations, right, trying to work with them on workplace violence issues?

A. Yes.

Q. And you've testified in other cases, have you not, that in a workplace violence shooting, the typical period of time that goes by before somebody notices anything wrong with somebody in the workplace is about seven years?

A. Yes.

Q. So you can have a period of time where somebody who could be schizophrenic all of a sudden goes off, shoots people in the workplace, and nobody for a period of seven years has seen anything wrong with that person?

A. I don't know if that could happen with somebody who is schizophrenic. What I'm referring to in the workplace cases are people whose misconduct is minor. It starts with not reciprocating hello in the hallway or

rolling your eyes when your boss gives you an instruction or not offering somebody candy that you brought in for your closest friend and you're sharing it with somebody nearby and you don't offer it to them.

These simple acts of instability and rudeness are usually the sign that begins the process that may grow over a period of years, if it's not managed properly, into frank insubordination, failing to put in the hours one is supposed to, a bit of timecard fraud, pilfering some items from the office.

If those things are ignored, then eventually one can see angry words spoken and discriminatory conduct or stalking or threats, and then it may still be a year or two before violence.

Somewhere along the line, management has to notice and intervene. So we work to help employees be able to report what they're seeing and management know what to do when they hear about it.

Q. A certain percentage of those mass shooters in the workplace are in fact psychotic, are they not?
A. A few of them, yeah, there have been.
Q. So you can have situations where the signs and signals don't emerge up to a period of about seven years, right?
A. Well, again, the seven years is not about

schizophrenia. That's workplace violence in general.

For schizophrenia, it really depends on the knowledge of the observers. When we see this in the workplace, usually it's very obvious from the first complaint that somebody is seriously mentally ill when we hear about it.

But in a family situation, it is dependent on the family's sophistication and knowledge.

There were studies even in the last century showing that in poor families and uneducated families, someone could have schizophrenia that went unobserved for years. The person did nothing but sit at home talking to the television that was turned off before anyone noticed this person was mentally ill.

Typically it's when the police came to arrest them for some violence that they were first diagnosed. Whereas, in a wealthy family, within the first six months, they were taken off to a psychoanalyst for evaluation.

It's very different depending on social class and the family's resources.

Q. Not only social class but also educational factors. In other words, parents more educated tend to kind of pick up on it a lot sooner?

A. Yes.

Q. I think from what you said, we can all agree Mr. Bowers' family is at the lower end of the socioeconomic spectrum?
A. Yes.
Q. And you didn't have a chance to evaluate the mother, correct?
A. That's correct.
Q. But fair to say that she would fit into that category of coming from a lower socioeconomic status and, from your review of the medical records, somebody who may have her own mental problems?
A. That's fair.
Q. Okay. Now, so we talked about one factor causing disagreement being where the evaluation takes place, and you talk in your article of public hospitals, and we talked about that. Then you talk about private settings, like when somebody hires a psychiatrist to do the evaluation.
A. Yes.
Q. That you refer to as a private setting evaluation, right?
A. Private sector.
Q. You say in your article, "Psychiatrists conducting private sector evaluations do so on a fee-for-service consultation basis and are motivated to increase their

referrals." What did you mean there?
A. I mean that often forensic psychiatrists who are earning an hourly fee for what they do want to make their clients happy and get referred more work.
Q. Now, you said here that there's two different kinds of private evaluations. One is a fixed-fee arrangement. And you say a typical fixed-fee, such as $300 or $600 for an evaluation, are sufficient only for a screening evaluation, correct?
A. Yes. At that time, it might have been.
Q. Yeah. You know from your work that a lot of court evaluations are fixed-fee evaluations, correct?
A. Correct.
Q. You don't get to name the rate. The Court says this is how much you are getting; do the best you can with this fee?
A. That's right.
Q. And that kind of fixed-fee arrangement sort of discourages a thorough job, right, because you can only do so much for what you're getting paid for?
A. Yes. Those who do a thorough job despite the fixed fee take a great financial loss.
Q. Right.
A. Because of their conscience.
Q. Then you say, "Private psychiatrists" -- "Private

psychiatrists charge $75 to $200 per hour and a full evaluation leading to a comprehensive report requires a minimum of ten hours for preparation, interviewing, investigation and report writing." That's kind of changed, hasn't it?

A. It sure has.

Q. In cases of this nature, you're not going to be able to do a workup in ten hours?

A. Oh, no.

Q. You spent how many hours up to this point doing the workup in this case?

A. I have no idea, but it would not surprise me if it were hundreds.

Q. Hundreds?

A. Yes. I don't know, but it has been a lot of time. There were 25,000 pages of records that the defense sent us a couple weeks before our reports were due. We already had many thousands of pages of records, a tremendous quantity of information.

Q. We'll talk about that a little bit later.

The second part of what you said here is a typical fixed fee such as a private psychiatrist charges $75 to $200 per hour. That's radically changed, hasn't it?

A. Yes, it has.

Q. So the prosecutor asked you have you charged a high fee, and you said yes, but I don't think she mentioned what the fee was.
A. Is there a question?
Q. The question is she didn't mention what the fee was, so what is the high fee that you charged in this case?
A. I couldn't tell you. I can tell you what it could be. Because the case started in 2018, my rate at that time may have been $600 per hour, or it may already have changed to $800 per hour. I don't know when that changed.
Q. So you think, in this case, there could be two billing rates, one when you first started, and then at some point, there was an increase to $800 per hour?
A. It's whatever it was when the case started is what I would have stayed with. We don't increase rates once a case is underway.
Q. Okay.
A. But I don't know what my rate was in 2018. I would have to ask my office.
Q. Did the prosecutors in this case tell you, you were going to be asked questions about what your rate is in this case?
A. No. They told me that they thought if they were

gentlemanly and didn't ask that, perhaps the defense wouldn't either. But they were wrong.

Q. They were wrong.

Actually, she was the one that asked you whether you charged a high rate, and you said, yes, I did.

Do you think it's reasonable to ask what that rate is in light of that question, without being ungentlemanly?

A. I think it's reasonable.

Q. Is that information you might be able to find out for us when we take a break here?

A. Yes.

Q. Thank you. I appreciate that.

You say, on the next page, "One of the restraints is that few prosecutors' offices have a budget for expert consultations." That certainly wasn't a problem in this case, right?

A. No, it wasn't.

Q. Were you given any restrictions, like don't go over so many hours or --

A. I believe the way it works -- and my office handles this. I don't discuss rates or fees or billing or any of this, but I have someone who works for me who does that.

My understanding is that she arranges authorization up to a particular amount on behalf of any of the experts in our firm who are working on a project, that she learns what the requirements are with respect to travel expenses, and then she communicates to the experts what they're supposed to do.

So my knowledge of this is that if I get too close to the authorized amount of money, she'll tell me stop until I seek additional funds, which may or may not be awarded. I'm told that if I want to upgrade from a middle seat in the last row, I have to pay for that out of pocket. I'm told what I'll be reimbursed for meals regardless of what I spend. They tell me the rules, and I comply with them.

Q. Okay. One thing I was unclear about from Dr. Darby, he said he charged, I think, $350, or maybe it was $300, but there was some sort of markup. I wasn't clear on whether Park Dietz & Associates bills for his time or he bills separately. How does that work?

A. We handle the contracting, the billing, the collections, the practice management for the expert, and so Park Dietz & Associates charges the government an hourly fee, and of that, we pay Dr. Darby $350 per hour after we've collected the funds.

Q. So the fee you are charging the government is higher than what Dr. Darby gets?
A. Higher than we pay Dr. Darby, yes.
Q. Do you know what you bill Dr. Darby's time at in this case?
A. I don't know, but I can find that out, too.
Q. Okay. If you would, that would be helpful.
I want to ask you about the second sort of variable and why people disagree. We talked about the setting, public, private, retained work versus fixed fees. You said the second factor is the evaluating psychiatrist himself, right?
A. Yes.
Q. This is discussed at page 89.
A. Yes.
Q. You say there, "Three sources of variation among psychiatrists influence the nature and quality of their evaluations of defendants: Qualifications in general psychiatry, psychiatric ideology, and specialized qualifications." Right?
A. Yes.
Q. Your view then and now has been that, in order to offer opinions in the area of forensic psychiatry, you should have some sort of specialized training, fair?
A. Yes.

Q. And I think you said, when I asked you some questions during your initial testimony, that there is a certification or board certification on forensic psychiatry but that you didn't take those boards because you had a disagreement that the test was not the right kind of test?

A. So when I went through my fellowship, which is the starting point for certification to do a fellowship, there was no such thing as a board. Then my colleagues in the American Academy of Psychiatry and the Law got together to decide to create a board.

Their emphasis was on knowing certain constitutional cases, which they called the landmark cases, and they believed that board certification in psychiatry should involve showing that one had sufficient familiarity with the law, and much of the examination they proposed was about landmark legal cases.

I argued that certification in forensic psychiatry should require training and expertise measured by exams about the science, what forensic sciences have been studied. Does this person know about weapons? Do they know about ballistics? Do they know about the subcultures that create violent crime? Do they know about the genetics of psychopathy? Do they

know about criminology? Do they know about penal institutions and how they operate? That's what was relevant for forensic psychiatry.

Q. All right.

A. My older colleagues and more senior believed the law was the more important thing. I thought that they were wrong. I still think they are wrong, and I refuse to be involved in that.

Q. Okay. But they went ahead and established this program that you disagree with, right?

A. Yes. Just with the exam, with what they were testing for. I felt they had the wrong notion of what forensic psychiatry ought to be.

Q. And do you know -- in terms of other qualifications, you feel strongly that a person offering opinions about forensic psychiatry should have some sort of practical training in the field, right?

A. I think so, but it doesn't necessarily have to be in a fellowship. There are people who learn on the job and are taught by others or learn through their reading. There are many ways to acquire knowledge and expertise.

Q. Your own view is that there should be a lot of reading done in other fields that may not be strictly labeled "forensic psychiatry."

For instance, criminology, you would

want -- you want to be knowledgeable in that area as it affects your work, right?
A. Well, I think it would be useful, but, of course, it is possible to read about the relevant aspects of any given case. And I think that fine forensic psychiatrists are often researching topics in the case at hand.
Q. Or another field, sociology. You have written that forensic psychiatrists should have a handle on the literature in sociology, correct?
A. Maybe. I don't remember writing that, but it could be.
Q. The point is you want to be familiar with as many fields of literature that affect the opinions you are offering so that you are giving knowledgeable opinions?
A. One certainly wants to be knowledgeable. If there is an area of ignorance, one should attempt to fill it.
Q. Right.
A. One should know one's limitations.
Q. I mean just -- you would want that knowledge base to be as broad as possible, right? You wouldn't say to somebody just look at one piece of information from there and start drawing conclusions about an entire field of study?
A. Well, I think that's right. I don't think there

are sharp boundaries to all these disciplines. I don't think any one of us knows everything about any topic.

So this calls for some humility and for willingness to consider other perspectives. It's part of why we collaborated in the evaluations so that we would have more than one discipline having a look at the defendant.

Q. Sure. Just as one example, it wouldn't be reasonable, would it, to say, Well, I read the white separatist manifesto and, therefore, I know everything there is to know about white supremacist ideology? Would that be fair?

A. From reading one manifesto, one could not conclude that one knew everything there was to know.

Q. You would want to look at -- first of all, the white manifesto is not a piece of scientific literature, is it?

A. White Genocide Manifesto is not scientific.

Q. But a lot of people in your field or in criminology have studied the phenomenon of what are called false beliefs. There's a lot of literature out there about that, isn't there?

A. Yes, in each of my fields, there is.

Q. It spans psychiatric literature, literature on terrorism, literature on extremist views. There's a lot

out there?
A. Yes.
Q. Do you feel you are on top of that literature? Other than the white manifesto, are you conversant with the current literature that is out there on extremist ideologies?
A. With at least some of it.
Q. Okay. We'll talk about that.
Then you talked about psychiatric ideology. What is that, and how does that affect psychiatrists coming to different opinions?
A. Well, at the time I wrote this, there was still some divergence among psychiatrists and how they thought about the field as a whole. I had done my Ph.D. dissertation on this issue, looking at how the characteristics of psychiatrists affected their practices.
So for this article, I described the ideologies as psychotherapeutic and sociotherapeutic, analytic and eclectic, analytic psychological and directive organic, psychological organic and other variations. I'm citing literature on these various things.
Q. Sure.
A. Those would no longer be the categories that a

psychiatrist would sort themselves, but there still are psychiatrists who are heavily on the side of psychotherapy and even psychoanalysis, and there are others who are very biological and don't pay much attention to that psychotherapeutic sort of thing.

Q. Is it true that, nowadays, the ideology differences are between people who believe, for instance, in they want to adhere just to what's in the DSM versus others who say we want to go in a new direction?

A. Well, with respect to diagnosis, there are those who stick to the DSM as is. There are those who reject pieces of it and have their own views of some aspects of it.

Q. And I think the DSM talks about something called the dimensional approach?

A. Exactly.

Q. So as I understand it, correct me if I'm wrong, there's the categorical approach, and then there's the dimensional approach, right?

A. Yes, I think that's correct.

Q. And the DSM talks about their approach as being a categorical one, but it acknowledges that we're kind of moving in the direction of dimensional approach, right?

A. I think that's fair.

Q. What does that mean, "dimensional approach"? You

kind of touched on this when you were talking spectrum disorders. What is dimensional approach?

A. For a great many kinds of behaviors, including abnormal behaviors, one can look for a way to measure how little or how much of it is present, and rather than say that someone has so much that we are going to give them this label, we'll instead say here is the dimension and here's where the person fits on it.

That's a reasonable thing to do, and it makes sense for lots of different aspects of psychiatry. In fact, it makes sense for lots of medicine.

Yet there are some things that are categories. It's not a dimension of what percentage pregnant is someone. It's yes, they are or no, they're not. And the same thing would be true of some diseases; yes, you have it or no, you don't.

Q. And how does that apply to, say, the schizophrenia spectrum? Is there a dimensional aspect to schizophrenia?

A. I would say with schizophrenia, it's yes, you have it or no, you don't, but that the spectrum is used to describe the three conditions I mentioned earlier and is something of a spectrum of severity.

At the mild end, there is schizoid personality disorder. Even milder would be schizoid personality

traits. We don't even have four of them, just one, two or three of the traits.

Then intermediate in severity would be the one called schizotypal personality disorder or schizotypal traits.

And the high end of the severity would be the disease of schizophrenia, which I would say is a hard-and-fast line between personality disorder and mental disease that you know you have reached when there are delusions or hallucinations or formal thought disorder, none of which I believe this defendant has had in adulthood.

Q. Another issue is --

THE COURT: Mr. Burt, I don't want to interrupt you. You can finish your question or finish your line if you care to.

MR. BURT: This is good.

THE COURT: Why don't we take our lunch hour now. We'll reconvene as close to 1:25 as possible.

(Whereupon, the jury exits the courtroom.)

(Whereupon, a luncheon recess was taken.)

THE COURT: Counsel, I don't mean to be hurrying. Are we ready for the jury?

MR. BURT: Yes.

THE COURT: Ms. Kim, when they're ready, you

can bring in the jury.
THE DEPUTY CLERK: They need a minute or two.
THE COURT: Take your time.
(Pause in the proceedings.)
THE COURT: We're just waiting for the jury. It's more comfortable to stand while I can.
THE DEPUTY CLERK: All rise for the jury.
(Whereupon, the jury entered the courtroom.)
(In open court, jury present.)
THE COURT: Welcome back. Everyone, please be seated.
Mr. Burt, you may proceed.
MR. BURT: Thank you.

CROSS-EXAMINATION (continued

BY MR. BURT:
Q. So, Doctor, before the lunch break, we were talking about this idea that, depending upon the psychiatrists' ideology, as you described it in your article here, that can lead to differences of opinion, correct?
A. It can.
Q. Okay. In current psychiatric ideology, one issue is how you define a mental illness, correct?
A. Probably.
Q. I think you told the jury yesterday that according to your definition, a mental illness is a mental

condition with a biological basis that is pathological?
A. That's true.
Q. That's your orientation, part of it, correct?
A. That's part of it, yes.
Q. You render opinions based on your understanding of what a mental illness is?
A. Yes.
Q. That concept of what a mental illness is that you hold is not the same that's in the DSM, correct?
A. I don't know exactly what the DSM says. Usually it uses the term "mental illness"; whereas, the law uses the term "mental disease," but I couldn't say it would be the same definition.
Q. Well, at 615 of the DSM-5-TR it says, "Serious mental illness defined as a mental disorder."
So it seems from that they use the term "mental illness" and "disorder" interchangeably. Would you agree with that?
A. Can I see the context?
Q. Yes, certainly.
(Pause in the proceedings.)
A. What I think this says is "Further prescription opioid use disorder and heroin use disorder are generally associated with serious mental illness defined as a mental disorder other than a substance use disorder

that results in a serious functional impairment substantially limiting or interfering with major life activities."
Q. Right. So as I'm reading that, they're using the word "disorder" and "mental illness" interchangeably there in that definition?
A. I don't think so. I think they are describing what a serious mental illness is. This isn't a definition.
Q. What is the definition in the book of a mental illness?
A. Well, there aren't definitions in a glossary anymore. They stopped doing that between editions. There may somewhere be a definition of mental illness.
Q. But you don't know whether there is a definition in the DSM that defines mental illness as a condition that involves a biological basis?
A. I don't know what DSM says about it. I do know DSM considers functional impairment one of the key hallmarks; and many, many diagnoses require that there be significant functional impairment before making a diagnosis.
Q. Right. Before making a diagnosis of a disorder, correct, there has to be impairment?
A. There has to be functional impairment, yes.
Q. That holds true for personality disorders as well

as other disorders, correct?
A. Yes. They have to interfere with life in some way.
Q. Okay. While you've got the book up there, do they say at page 29, if you can turn to that, where they say, "A diagnosis does not carry any necessary implications regarding the etiology or causes of the individual's mental disorder."
A. That's correct.
Q. Okay. Is that different than what your definition is in terms of you need to identify a biological cause before you can call it a mental illness?
A. No, not really. Let's see. Where exactly does it say that?
Q. Page 29. I can locate it for you, if you would like me to help on that. It's the beginning of the sentence that says, "Nonclinical users of DSM."
(Pause in the proceedings.)
A. "Nonclinical decision-makers should be cautioned that a diagnosis does not carry any necessary implications regarding the etiology or causes of the individual's mental disorder or the individual's degree of control over behaviors that may be associated with the disorder."
Q. So --
A. I'm not a nonclinical user.

Q. You're not, but my point is doesn't the DSM indicate you don't need to identify a cause in order to have a mental disorder?

A. I think it's indicating that you don't have to identify the cause in order to diagnose; for some diagnoses, that there is no way to identify the cause.

Q. Sure. Does that mean those disorders are not mental illnesses? If we haven't yet reached the point in science where we can't identify a biological cause, does that mean that there is no disorder there?

A. I think there has to be a plausible expectation that there is a biological basis for it. So that argument could be raised, if there is a biological basis for any of the psychotic disorders. I think it's reasonable to believe there is a biological basis for each of them.

For depression, it's reasonable. For anxiety, I think it's reasonable.

Q. But does it say anywhere in the DSM that you need to identify a biological basis in order to have a mental illness or a mental disorder?

A. No. That is not a DSM concept. It's a concept I would trace back to my training with McHugh and Slavney, the authors of the book I referenced, The Perspectives of Psychiatry.

Q. Right. That's a different sort of ideology than the DSM ideology, right?
A. It's a little more biological than DSM.
Q. So that's sort of a different ideology or school of thought than people who say we don't need a biological basis in order to call something a mental illness, correct?
A. Yeah. I don't know if it's a different ideology. From the point of view of the Hopkins people, including me, we're just more thoughtful and precise than the committees that wrote this.
Q. I see.
A. They might say, oh, they're ideologically different. They are overly biological.
Q. Let's be clear here, Doctor. The DSM is the standard of practice in psychiatric medicine, is it not?
A. For diagnosis?
Q. Yes.
A. Yes.
Q. You use it. You have been doing forensic work since the '80s, correct?
A. Yes.
Q. And in every case where you have testified, you always have referenced the DSM as the basis for making your diagnosis?

A. Yes, whatever the edition was at the time.
Q. It's used not only in forensic practice, but in hospital psychiatric practice, correct?
A. Yes, it is.
Q. It's the standard of practice throughout the United States for defining what a particular mental illness is, correct?
A. For diagnosis, it is the standard reference work. That doesn't mean that people cannot disagree with it.
Q. Sure.
A. There are some diagnoses where I would disagree with some editions of it.
Q. Right. For instance, in your testimony, I think you referenced that -- this is this morning -- that "While there are people who would use the term 'mental illness' to describe every single condition in the DSM-5-TR, I would say they are muddleheaded and wrongheaded about this; and I'm not willing to call it a mental illness if someone wishes to have sex with children or is turned on by torture or has trouble sleeping because they are on shift work or just jet lag."
Do you remember that testimony this morning?
A. I do.
Q. So at least as I read that, you were implying, if

you weren't expressly stating, that the DSM considers things like jet lag to be a mental disorder. Did you mean to imply that?
A. I didn't just mean to imply it; it's true. That DSM in various editions has had diagnoses of mental disorders for having disrupted sleep because of jet lag or having disrupted sleep because of shift work.
Q. Would you turn to the index at the back of the volume there and look up the word "jet lag."
A. Yes, page 446.
Q. The only reference in DSM-5-TR is 446, right? Would you turn to that page. Read it to yourself, if you would, the discussion of jet lag there.
(Pause in the proceedings.)
A. I don't see the words "jet lag" on this page.
Q. On 446?
A. On 446. This is the section on circadian rhythm sleep-wake disorders.
Q. Sleep disorders. And the DSM says "distinguish sleep disorders from jet lag." Isn't that the only reference in the entire book to jet lag, saying you should not confuse a sleep disorder with jet lag?
A. I don't see where it says that.
Q. Let me show you.
A. Previous editions had a jet lag sleep disorder and

a shift work sleep disorder.

(Pause in the proceedings.)

Q. I think the index has it wrong.

A. Could be.

Q. Take a look at 451.

(Pause in the proceedings.)

A. So here under "Differential diagnosis of sleep-wake disorders," there is a section on shift work type; and it says, under "Jet lag," "Individuals who travel across many time zones on a very frequent basis may experience effects similar to those experienced by individuals with shift work type who work rotating shifts. The distinction should be clear based on the travel history."

Q. Right. That discussion is under a disorder which is called sleep disorder, correct?

A. It's in the chapter on sleep disorders, and that's talking about shift work type of sleep disorder.

Q. And it is saying -- it's in the paragraph called "Differential diagnosis," which is telling the clinician distinguish a sleep disorder from things like jet lag or shift work type issues. Isn't that what that differential diagnosis means?

A. Yes, but I think it's saying there is a circadian rhythm sleep-wake disorder called shift work type.

Q. Where is that?
A. It starts on page 443 and goes to page 450. In the description of shift work type, it says to distinguish that from jet lag. So that's what used to be jet lag type.
Q. Right, but there's no current disorder in the DSM called jet lag, is there?
A. Not today, but there was.
Q. Well, is there a disorder in there that says you have a disorder if you wish to have sex with children? Is that a disorder?
A. Yes. Pedophilia.
Q. Pedophilia is not just defined by you want to have sex with children, correct?
A. Right. Pedophilia is a recurring desire or attraction to children. Pedophilic disorder is that plus actually acting on the desire.
Q. Right. You've done a lot of work with sex cases, right?
A. Yes.
Q. You have testified in many cases that a defendant is or is not -- has a pedophilic disorder, correct?
A. I don't know about "many." I worked on many and testified in some.
Q. But have you ever testified that just having sex

with children constitutes a disorder?
A. It has to be recurrent desire. I was using a shorthand.
Q. Shorthand. So there is no condition in DSM that calls anybody wishing to have sex with children has a mental disorder? There is no such diagnosis, correct?
A. Sure, there is. Let me find it for you. I just told you if somebody has the recurring desire or attraction to children, that would be pedophilia.
Q. Right. But the way you described it this morning, somebody who wishes to have sex with children. My question is, is there a disorder that identifies somebody as having a mental disorder simply because they wish to have sex with children?
A. If it is recurrent, it earns the name "pedophilia." I didn't mention recurring earlier today.
Q. Okay. So your orientation in terms of defining mental illness is defined by your belief that you have to have a biological basis in order for it to be a mental illness, correct?
A. Well, that is one part of it. The more important part is that the experience of reality is categorically different from that of normal humans.
Q. And is that a part of any -- say, the personality disorder, is that part of the definition in the DSM?

A. It's not part of the personality disorders. They do not experience reality in a categorically different way from normal people.
Q. What defines it as a disorder?
A. What defines what?
Q. A personality disorder.
A. A personality disorder is called a disorder because it is -- because it is a pervasive, recurrent maladaptive pattern of behavior in how one relates to the world that causes significant functional impairment or distress.
Q. Is the current thinking that there is a biological basis for personality disorders or at least certain of them?
A. I think that depends on whose current thinking. By and large, no, but it wouldn't be surprising if that emerges.
Q. Well, not only if it emerges, it has emerged, hasn't it?
A. I don't know.
Q. You are not familiar with any of the literature on the neuroimaging of people with personality disorders?
A. I am, but that doesn't tell me whether it's biologically based pathology.
So, for example, I know that the neuroimaging

of people with schizoid and schizotypal personality disorder includes some of the same findings that are found in people with schizophrenia. But that doesn't tell us about pathology, necessarily.
Q. Okay. When you say "biological," do you mean by that there is a hereditary aspect to it?
A. No, though there might be.
Q. Do you mean it has to be brain-based, like a damage to the brain in order for it to be a mental disorder?
A. It has to be pathological. Now, the causes of pathology are variable. It doesn't have to be what we would think of as damage. The cause of pathology can be hereditary, it can be traumatic, it can be infectious, it can be inflammatory, and more.
Q. Is it true that you get this perspective, this ideology, from the book that you referenced yesterday, The Perspectives of Psychiatry?
A. And from my training by the same people.
Q. Right. You said this is a belief held in the people at Johns Hopkins University?
A. Well, that's where they were professors at the time they wrote that book and at the time I trained. I can't speak to all later generations of Hopkins alumni.
Q. Their approach is different than the DSM, correct, in many respects?

A. In a couple respects. They anticipated the current issue about dimensionality. They were probably early on looking for biological bases.
Q. But that's a subculture of mainstream psychiatric thought, is it not?
A. You could see it that way, yes.
Q. Or a difference in ideology?
A. Could be.
Q. Would you describe it as a cult?
A. I wouldn't, no. Would you?
Q. I don't know. I don't know what the definitions of those terms are. And we're going to talk a little bit about that. Let me turn, if I could, to see if you can help us out on some of these disorders you have been talking about.
The schizophrenic disorders are -- you mentioned schizophrenia spectrum disorders, correct?
A. Yes.
Q. And in the DSM, they're listed in part of the book called "Schizophrenia Spectrum and Other Psychotic Disorders," correct?
A. Yes.
Q. There are a number of them, correct?
A. There are.
Q. Schizotypal personality disorder?

A. That's one.
Q. Delusional disorder?
A. That is another psychotic disorder. I don't think it's a schizophrenia spectrum disorder.
Q. But I think the chapter is "Schizophrenia Spectrum and Other Psychotic Disorders." So this would be "other psychotic disorder"?
A. Delusional disorder would be.
Q. Is the definition of a delusional disorder in terms of what a delusion is, is it the same as in schizophrenia, at least according to your definitions?
A. Delusions in schizophrenia and delusions in delusional disorder may be very similar. In delusional disorder, typically it is a single focus of delusion rather than a variety of them; and typically hallucinations, if present, are a minor part of the picture.
Q. When you say "a single focus," you mean one single false belief?
A. No. I mean that the delusional beliefs of a person with delusional disorder will tend to all be of the same type, erotomanic type, persecutory type, or grandiose type or grandiostic type.
Q. But are the definitions of what a delusion is the same for schizophrenia and delusional disorder?

A. If there were a definition, it ought to be the same. There are no longer definitions of delusions in the DSM.
Q. So is it up to each clinician to decide for himself or herself what the definition is?
A. Well, there's the agreed-upon understanding that it must be a false fixed belief, not susceptible to change in the face of evidence or persuasion. I think everyone would agree to that. There are other aspects of the definition that aren't specified in the DSM and where reasonable people might disagree.
Q. That's where the disagreements can come about. In other words, two different clinicians using two different definitions of what a delusion is can come to different opinions?
A. That can happen.
Q. Sure. The next one listed is "Brief psychotic disorder." That's, as it implies, a psychotic disorder that can involve delusions?
A. Yes. It's exactly like schizophrenia, but for a shorter duration.
Q. Same kind of delusions, though?
A. Yes.
Q. Then the next one is schizoform {sic} disorder. What is that?

A. I don't think you read it correctly.
Q. I probably haven't.
A. Schizophreniform disorder.
Q. Yes.
A. Same thing. It's like schizophrenia, but for a shorter duration.
Q. And then schizophrenia. That's the one we've been talking about, right?
A. Yes.
Q. And then below that is schizoaffective disorder?
A. Yes.
Q. How do you define that? How is that different from schizophrenia?
A. In schizoaffective disorder there are prominent mood symptoms that occur at the time, other than the psychotic symptoms. So it is sort of a combination of a mood disorder and schizophrenia. It can be very difficult to separate the two.
Q. You personally don't believe in that disorder, even though it's listed in the DSM, correct?
A. That's not correct.
Q. Did you -- you mentioned a Yates case, Andrea Yates. Did you testify in that case "I don't happen to like the conception of schizoaffective disorder; and I don't use it other than for court, because I use it in

court only because it's in the book. I don't really believe in it as a separate condition, and the researchers I speak to about it don't believe in it either"?

Do you remember testifying to that?

A. I do. And that was true at the time.

Q. So that was what? Early 2000?

A. About 20 years ago.

Q. So has it changed now? It is a legitimate diagnosis?

A. Yes. I used to think it meant the person had both conditions. That's why I didn't like using one term to describe both things. I'm increasingly persuaded it can be a single condition.

Q. Okay. Is it hard to distinguish between those particular disorders in that list that I just read to you?

A. Sometimes.

Q. Okay. Then the other sort of major category you mentioned were personality disorders, correct, in terms of classifying mental disorders?

A. That is one of the other major categories.

Q. And personality disorders are, first of all, disorders, right?

A. They are.

Q. And in order to have a disorder, you have to have impairments in function in some way. Otherwise, you are just talking about somebody's personality, right? It has to be maladaptive?
A. It has to be a problem with function or distress. Either one will do.
Q. Otherwise, you are just talking about somebody's sort of general personality?
A. Yes. Everyone has personality. Some people have personality traits that show up in the DSM as associated with these disorders. It is only when there's a pattern of the traits that cause either distress or functional impairment that we call it a personality disorder.
Q. So distress and functional impairment, those are the symptoms of those disorders?
A. They aren't symptoms. They are effects.
Q. Effects. That's how you get to call it a disorder, because there's some observable effect in function, correct?
A. Well, it's called a disorder because the manual calls it that, but the manual requires, before labeling someone with a disorder, that there be distress or functional impairment.
Q. All right. The personality disorders we're talking about are paranoid personality disorder?

A. That's one.
Q. Schizoid personality disorder? That's one I think you diagnosed here.
A. Correct.
Q. Schizotypal personality disorder?
A. Yes.
Q. How is that defined as opposed to schizoid?
A. Well, in addition to the characteristics found in schizoid, schizotypal also requires that there be odd, magical or superstitious beliefs, and/or, because it's a menu. You have to have a certain number ideas of reference. That would be believing that a song on the radio or something on TV or passing a license plate was conveying personalized meaning.
There are some other criteria. I went through each of the criteria in considering Mr. Bowers and did not think he fulfilled the criteria for that condition.
Q. Okay. That's also listed in the schizophrenia section as being in the schizophrenia or other psychotic disorder spectrum, right?
A. It's listed in that chapter to be able to identify the spectrum, but it's classified as a personality disorder. So it shows up in both chapters.
Q. Is the reason it shows up in both chapters because you can have psychotic behavior in relation to

schizotypal personality disorder?
A. No.
Q. Why is it -- you said, I think, that schizoid personality disorder can be a precursor to schizophrenia?
A. Yes, I believe it can.
Q. And what is the mechanism for that?
A. So I don't know what the mechanism is. What the history of our understanding of it is, is that at various points we thought this differently.
At one time it was thought that there was a cluster of symptoms called prodromal schizophrenia, meaning before the psychotic symptoms had their onset, where the person was socially isolated, didn't have confidants, liked to spend their time alone, wasn't interested in sex. Those were prodromal symptoms.
At another point in time that was called latent schizophrenia, thinking that eventually the person might show what we now call the positive symptoms of psychosis.
At another point in time it was considered there was type 1 and type 2 schizophrenia, where type 1 was these latent features or schizoid features, and type 2 was when the person was psychotic.
These have been proposed, studied, argued

about; and the current resolution of those arguments is to consider this a spectrum with the mild, moderate and severe forms of disorder along that spectrum, schizoid being the mild form, schizophrenia being severe and sometimes psychotic.

Q. I didn't see this idea referenced anywhere in your report, but is it true that in the records you reviewed for Mr. Bowers that there was a reference early on of something called incipient schizophrenia?

A. That was when he was a child, someone suggested that that might be what this was, but it didn't pan out, obviously.

Q. Well, we'll get to the "whether it panned out" part of it, but what is the term "incipient schizophrenia"? What does that mean?

A. It's never been a diagnosis, to my knowledge, but I think the clear meaning of the word is might be about to launch into schizophrenia.

Q. Might be about to launch. What age was that diagnosis rendered?

A. He was a teenager. So I would see it as an effort to call him at that point what we would today say prodromal schizophrenia.

Q. And that word, "prodromal," what does that mean?

A. Before the entire syndrome is apparent.

Q. So early signs of, is that --
A. Prior to the syndrome making itself known. So that you can say that somebody with a blood sugar of 110 over and over, getting a fasting blood sugar of 110 would be prodromal diabetes.
Q. Prediabetes, as I think they call it, right?
A. Exactly.
Q. So similar concept. You are almost there, but you are not quite over the line?
A. You are not there. You don't have the diagnosis. That disease is not what you have yet. But if you keep eating that way and don't take steps, you may get there.
Q. Okay. Now, is it true that the criteria for diagnosing schizoid personality disorder contain the same symptoms that are used to judge the negative symptoms of schizophrenia?
A. Nearly identical. There are some slight differences. This is why the concepts have changed of what to call it over the years.
Q. So I take it from the fact that you diagnosed Mr. Bowers with a schizoid personality disorder that you would agree that he meets the negative symptom criteria for schizophrenic disorder, correct?
A. He probably does. I haven't looked about the discrepancies between them, but I'm sure he has several

of the negative symptoms, because they're identical to these personality features; preferring solitary activities, not having confidants, et cetera.

Q. So this morning you were asked the question:

"Dr. Dietz, does schizoid personality disorder involve delusions?"

Your answer was "No."

Question: "Generally and specifically to this defendant?"

And your answer was: "It never involves delusions. If someone had those features and delusions, it is very likely that it would be schizophrenia."

When you gave that answer, when you were talking about features, you were talking about the features of schizoid personality disorder, right?

A. The features of schizoid personality disorder that are also negative symptoms of schizophrenia would, in the presence of the additional symptoms of delusions or hallucinations or formal thought disorder, change the diagnosis to schizophrenia.

Q. I see.

A. That's the entire issue of disagreement in this case; does he have delusions or not.

Q. You also mentioned thought disorder?

A. Yes.

Q. And it's true, is it not, that you don't always have thought disorder in schizophrenia. You can be diagnosed with schizophrenia without thought disorder?
A. As long as you have delusions and hallucinations.
Q. So, again, that whole thing in this case, as you said, turns on the definitions of delusions and whether he had delusions, correct?
A. Yes. I think that's the critical fulcrum in the case.
Q. You agree with the defense experts that his belief system was fixed, correct?
A. Yes.
Q. You agree that it was false?
A. Yes. I suppose I should qualify this. I'm not talking about his beliefs about salt or dye or whether end days might someday happen. Those are all flexible and not fixed in the same way.
I'm talking about his anti-Semitic beliefs and his white genocide beliefs. Those, I think, are all fixed, quite fixed.
Q. And all false, correct?
A. Well, the only one that I would say isn't false is his belief that there is what could be called an invasion with more by the hour. That seems to be empirically true.

Q. Right. But the core of his belief system is he has to kill Jews because this invasion is coming, correct?
A. No. It's that the Jews are behind the invasion, and so a good soldier who wants to protect the white race and white culture from extinction would be wise to kill Jews.
Q. And he felt a compulsion to do so at the time of the crime, correct?
A. I don't think "compulsion" is the right word.
Q. The need to do it?
A. A desire to do it. And circumstances made this a choice time for him to do it.
Q. Well, you looked at all the statements that he made to the police right after his arrest, right?
A. Yes.
Q. And the gist of those statements was "I had to kill Jews," right?
A. I think it's fair to say that. He saw that as the source of the problem, who was behind the invasion in the Great Replacement, felt he had to stand up and do something, save his race.
Q. You believe, also, that as a result of his belief system, that he, in his mind, believed that what he was doing was morally correct?
A. He thought it was consistent with his values, to do

this thing to save the white race, even though he knew it was against the law and he could be arrested for murder.

Q. We're going to come back to your article there, but I just want to reference something you said in your report.

Page 198 of your report, where you say, "While the defendant readily concedes he knew his acts were unlawful and he would be charged with murder, he considers his actions justified as acts of war against Jews who he believes to be at war with white people, white culture and white majority populations."

Did you write that?

A. Yes.

Q. And is that your opinion?

A. Yes.

Q. That he considers his actions were justified?

A. Yes.

Q. Morally justified?

A. Yes, from his point of view, with his values.

Q. So the real issue in this case, as you said, comes down to whether that belief system is delusional, correct?

A. It comes down to whether it's delusional or part of a white separatist shared belief system.

Q. Now, I want to turn back to your sort of methods article here. This is 238 at the back of the book. We've talked about ideology, and then the other thing that you focus on is the evaluation itself, correct?
A. Yes.
Q. How the evaluation is conducted. I think you say at page 92 that "Interviewing techniques vary widely from the use of highly structured diagnostic questions to a casual conversational style."
A. Yes.
Q. And I think when you were talking about the issue of qualifications, you said at page 89, "Today the average physician, without postgraduate psychiatric training, is ill-prepared compared to the average clinical psychologist."
Remember writing that?
A. Not particularly. Where is it?
Q. Page 89, second column, first sentence.
(Pause in the proceedings.)
A. Yes, that's true.
Q. Okay. So when you say, "Interview techniques vary widely from the use of highly structured diagnostic questions to a casual conversational style," you used a structured diagnostic instrument in this case, correct, at least one?

A. Not by design.
Q. Didn't you use an ACE questionnaire?
A. Yes, but that's not diagnostic.
Q. First of all, what is it that you used?
A. So I chose one of the many questionnaires used to inventory an individual for adverse childhood experiences, and most of the questionnaires that are asking someone about adverse childhood experiences list 10 or 12 different categories of bad things that can happen to a child.
The one I used is one put forward by government authorities in California that has ten different categories.
If you look at many of these different instruments, they will all have some of the same things like emotional abuse, neglect, physical abuse, sexual abuse, witnessing violence in the home, growing up with someone who is mentally ill, having substance abuse in the home. Some of them will have violence in the neighborhood. Some will have the experience of bullying. They vary in which particular events get listed.
Q. Would you turn to tab 189 of your binder there, Doctor.
A. 18 --

Q. 189, yes.

(Pause in the proceedings.)

A. Yes.

Q. Is that the instrument that you administered to Mr. Bowers, the questionnaire?

A. It is.

MR. BURT: I would move that into evidence, Your Honor, 189.

THE COURT: Without objection, hearing none, 189 is admitted. Thank you.

MR. BURT: Can we bring that up, please.

Q. So, Doctor, tell us what it is we're looking at here and how this works.

A. So this is simply a questionnaire that can be given directly to someone to fill out on their own.

In this case, I read him the items and the instructions; and he gave positive answers to four of the ten items.

Q. And is the idea of using an instrument like this that you -- it's standardized in the sense that everybody gets asked the same questions. You then score it, and then you compare his score to other people who have given -- been given this instrument?

A. Well, if you used it for research purposes, that would be part of the reason for using it. I was just

using it as a way to start the process, since I asked about additional adverse childhood experiences that aren't in the questionnaire.

Q. Now, you reached certain conclusions after administering this questionnaire, correct?

A. Well, not merely from the questionnaire.

Q. Right. But you analyzed this, the results of this instrument, reached certain conclusions, which you put into your report?

A. I think all I concluded from this is that he had four of the ten, and I listed what they were. But he had additional ones that aren't on this, and from that I drew conclusions.

Q. Okay.

A. The research generally shows that if somebody has three or more, they are considerably more likely to have a variety of bad things happen later in life. If they have four or more, it's even more true.

So it's considered cumulative. The more bad things that happen to you in your childhood, the more likely you will someday be suicidal or someday be poor or someday be arrested or someday have cancer or someday smoke or someday drink too much or someday have too many colds.

Literally everything that's been studied, you

have a worse outcome the more bad things happened to you in childhood.

Q. And that holds true even if the bad things involve something other than physically beating someone, correct?

A. Correct.

Q. And this idea, this perspective that early life experience can affect your mental state and cause mental illnesses, that's part of this Perspectives of Psychiatry textbook, which we're going to get to, correct?

A. Yeah. I don't know how much is in there, but certainly consistent with it that there is a dimension to be considered about one's life experiences. And in many ways, this concept of life experiences contributing to later outcomes is the essence of the Hopkins approach to mental health.

The founder of the department at Johns Hopkins, Adolf Meyer, who began the Henry Phipps Clinic there, had everyone of his trainees, the students and the residents, complete a life tree on every patient, which might be a long sheet of paper in which you look chronologically at everything that happened in a patient's life to try to put in a sequence what occurred and to understand how the earlier events could result in

the later problems.

Now, at the time this system of diagnosis, for which he was largely responsible, conceptualized all manner of psychiatric disorders as responses to the events that had occurred.

So the disorders were given the name reaction, schizophrenic reaction, depressive reaction, et cetera. That put a little too much emphasis on cause and effect; and it didn't turn out to be all caused by life events, but there are lots of things caused by life events.

Sometimes it's a one-to-one relationship. You experience a horribly traumatic event in which your bodily integrity is threatened and you develop posttraumatic stress disorder from that single event. Other times it's much less clear.

So, for example, with these ACEs, how having several of them increases risk, the amount it increases that risk is sometimes quite small. If you have a sample of 10,000 subjects, that's big enough for you to see the effect that it increased risk over the course of a lifetime from a 2 percent chance to a 4 percent chance. That's doubling the risk, but it is still 96 percent likely it won't ever happen to you.

Q. Assume these factors are cumulative in the sense of having more than one risk increases what can happen

downstream?
A. Yes. The more bad event types, the worse the risk.
Q. So the four that Mr. Bowers checked yes on, or that you checked -- were you the one marking the checkmarks?
A. I think this was a Microsoft Word file where when you mark it, it makes that checkmark.
Q. Before he checked, or whoever did this, "Did you feel you didn't have enough to eat, had to wear dirty clothes, or had no one to protect or take care of you," that was marked "Yes," correct?
A. Yes. That would be, refining his answer, I think he said yes, yes, no.
Q. Then the second one, "Did you lose a parent through divorce, abandonment, death, or other reason?" He checked that "Yes"?
A. Yes.
Q. You knew from your independent investigation that was, in fact, true; he lost his father to suicide?
A. Correct.
Q. Is there a genetic aspect of suicide?
A. Probably.
Q. So someone whose parent commits suicide increases their child's risk of committing suicide?
A. It increases it. It doesn't make it likely that the child will commit suicide, but it's an increased

risk.
Q. Is suicide a symptom of mental illness?
A. Sometimes. Not always. There are people who suicide for other reasons.
Q. We'll get back to that topic.
The third one: "Did you live with anyone who was depressed, mentally ill, or attempted suicide?" He checked that "Yes" as well?
A. Yes. He was referring to his mother there.
Q. And did he think she was depressed, mentally ill and had attempted suicide? Or did he specify what he was talking about there?
A. I don't recall. He certainly considered her to be mentally ill, and I think he knew that she had been depressed at times.
Q. Next one: "Did you live with anyone who had a problem with drinking or using drugs, including prescription drugs?"
A. And here he checked "Yes," or I checked it on his behalf; and he had in his mind his maternal grandmother.
Q. Who appeared to have an alcohol problem, or was it drugs and alcohol?
A. Alcohol and prescription medication. I think he said that it was a drug that began with the letter M. And because of the time that that would have been true,

I would reason that it was likely Meprobamate, also known as Miltown, which was a common tranquilizer in, I guess, the 1960s to '80s.

Q. Did that situation lead to some chaos in the home of his grandparents?

A. Yes.

Q. In what respect?

A. Well, grandma had a couple DUIs. She once drove the family vehicle into the garage and wrecked the garage, which he told me had never been repaired. There was screaming and yelling bouts in the house with grandfather angry at her for her behavior and her being intoxicated. And the defendant, as a young boy, would try to hide someplace safe until they were done yelling. He still preferred that to being cold and hungry with his mom.

Q. Was there some physical violence between grandmother and grandfather?

A. He never saw it, but he believed it occurred. He did see grandma have some bruises and injuries, but he could never tell whether it was because she fell due to intoxication or his grandfather had hit her.

Q. And what period of time was this that he was living with the grandparents?

A. He was on again and off again for years. This

could have been at any time in his youth. He did definitely live there from kindergarten through second grade, but that was not the only time.

Q. Now, the rest of the items he did not answer yes, correct?

A. Correct.

Q. "Did parents or adults in the home kick, punch, or beat you or threaten you?" "Did you live with anyone who went to jail?" "Did a parent or child in your home ever swear at you, insult you or put you down?" "Did a parent or child in your home ever hit, beat, kick or physically hurt you in any way?"

"Did you feel that no one in your family loved or thought you were special?" "Did you experience unwanted sexual contact such as fondling or oral, anal, vaginal intercourse or penetration?" All of those were nos, correct?

A. Correct.

Q. Now, you can take that down. If you would go to Dr. Dietz's report, which is 186, Defendant's 186, at page 196. If you can highlight the "He acknowledges" portion all the way down to the end of the page.

MS. SONG: Your Honor, this is actually not in evidence. We haven't resolved the redactions between the parties.

THE COURT: Take that down for a moment until we resolve what we are talking about.

MR. BURT: Sure. Can we approach?

THE COURT: Sure.

(Sidebar discussion held as follows:)

MR. BURT: Here is the page. I would like to focus on the portion of this page which he discussed, in addition to what was in that form, some additional childhood adversity.

MS. SONG: What page?

MR. BURT: 196, but he acknowledges down to the end of the list.

MS. SONG: Okay. We need to see the mitigation portion. We never saw it. I'm okay with that.

MR. BURT: Okay. Does it continue on to the next page?

MS. SONG: No.

MR. BURT: That's the end of the list?

MS. SONG: Yes.

THE COURT: Great. Thank you.

(Sidebar discussion was concluded.)

THE COURT: Do you all want to take five minutes? We're going to be at least five minutes.

THE JUROR: We need more than five minutes.

There are only two bathrooms.

THE COURT: We're going to be five minutes, regardless. We can take 10, 15 minutes now and call it our afternoon break and then just keep going.

THE JURY: Let's wait a little bit.

THE COURT: We can't start right now, regardless, is my point. Feel free to stretch.

(Pause in the proceedings.)

THE COURT: Counsel, are we good to go?

MR. BURT: Yes.

THE COURT: We will give you a real break around 3:00 or so. Thank you.

BY MR. BURT:

Q. Can we pull up Dr. Dietz's report, which is 186, page 196. If you would just highlight "He acknowledges" and down to the bottom of that list.

Doctor, is this the portion of your report where you are discussing this adverse childhood experience questionnaire and then adding some additional factors you thought were important?

A. I don't know if I thought they were all important, certainly not all equally, but other factors I observed.

Q. And I'm wondering if you can walk us through what the other factors were that you observed from your interviews and -- your own interviews and interviews by

some of the witnesses. You refer to witnesses here. You mean the people that are mentioned in the reports that you reviewed?

A. Correct.

Q. Okay.

A. One was frequent moves and unstable housing. That's not on the California questionnaire I used, but I think it's significant. If a child moves around a lot, they can't form close attachments in the neighborhood or among their peers at school; and it's a kind of instability for a child.

He had too much of that. So I thought that was significant, as significant as the four that are on the questionnaire.

Violence in the home was primarily between his mother and him. And that's not on most of these questionnaires, but it's still quite important. If mother was threatening him, if he was violent towards his mother, chasing his mother out of the room, that's not good, healthy development. So I thought that, too, was important.

The bullying at school was pretty minor, and he got even with the people who bullied him. Being assaulted outside the high school, it's only because he said he was outside the high school when someone got out

of the car and sucker-punched him that I thought later, gee, he was probably a student at the time. For all I know, he was an adult at the time. But just in case he was still a child when he got sucker-punched, I put it in the list. That, too, I don't think is all that significant compared to the others.

Q. Okay. Parental loss or abandonment through his father's suicide and his mother's separation from his first stepfather. I don't think we talked about the second aspect of that.

A. No, we didn't. And, actually, it's the absence of having a father in the home or a relationship with a male figure in the home that I think is the issue.

He never knew his dad. He doesn't remember anything about his stepfather. His grandfather became a father figure to him probably more than Ray. Ray Bolt he got along with, but it was his grandfather that was more of a father figure.

Q. By the way, he was fairly young when his father committed suicide?

A. Yes. Every different witness and medical record places it at a different time, but it seems to me that the correct record is the death certification about the father when compared to the defendant's birth certificate. And that would make it correct that he was

in second grade and about eight years old at the time.
Q. And how did the father commit suicide?
A. Expecting to be incarcerated for a sex offense, a rape with additional felony charges and worried about what would happen to him in prison, he went to a waterfront park and, under a picnic table, shot himself with a .22 rifle.
Q. Now, was Mr. Bowers too young to be aware of that happening when it happened?
A. He is younger than he should have been aware of the details, and it's not clear to me when he learned what about it.
Q. Is it often the case that a young child, as he or she grows up, begins to wonder where's dad, who is he, what happened to him, how come he's not here?
A. Sure. It's a tough decision for parents to make; when to tell the child, how to tell them, how much to tell them. What often happens is some busybody beats them to it and reveals it in a not very therapeutic way to the child. I don't know how he learned it.
Q. That's something you talked to him about?
A. I think I tried to, and perhaps I just don't remember what he said. But I don't think his mother sat down and patiently told this young child what had happened.

Q. The second factor there, neglect by his mother who was not always able to provide adequate food for him, clothing, or peers with whom to play, that was encompassed a little bit in the ACE questionnaire, right?

A. Yes.

Q. Was there anything more to add about that factor?

A. I think the peer issue may not have been mentioned. At some of the early apartments where he lived with his mother, there were not peers to play with. His mother was criticized by someone for bringing her friends over but no children for Robert to play with. And, instead, she was accused by her own mother or grandmother of just being out for her own fun and not taking care of her child.

Q. So you had the four items on the ACE list, and you had the additional elaboration you were able to get from your interview, correct?

A. Yes.

Q. And could you go to the next page, please, first paragraph. Highlight just the first paragraph. I'm sorry. That's 195. We need 197. Just the first paragraph.

Is this a conclusion you drew from your examination of those ACE's factors and the additional

ones you have listed in your report?
A. Yes.
Q. So you said that "These two likely contributed to his adjustment disorder, and it is now well-established that such events have a cumulative impact and are associated with increased risk of a wide variety of adverse outcomes including substance abuse, mental disorders, arrest, and criminality in those populations in which this has been studied." Right?
A. Yes.
Q. Do you know from the research end of this what the increase in psychosis risk is from factors like neglect?
A. There are some data on this; and I don't know the numbers, offhand. I did do some research on that and found that there was an association with schizophrenia, as there is with everything that's been studied.
Q. Okay.
A. The numbers aren't big enough to make it probable that someone would have any particular outcome, but they're big enough to strongly endorse public policies that reduce how many children overall are exposed to this. If you expose a million children to multiple stressors, you will have an increased burden of crime and mental disorder and physical health problems.
Q. And is it true that we've come to an understanding

that these risk factors apply even if a kid is not being held down and beaten, that there are things like neglect, psychological abuse, abandonment, those kinds of things, are within the realm of risk factors that lead or can lead to mental disorders?
A. Or increase the risk of it, yes.
Q. You can take that down. Thank you.
Now, your own personal opinion is that these kinds of childhood development factors can make it impossible for someone to grow up and lead a productive life, correct?
A. Would you say that again, please.
Q. Your own professional opinion is that risk factors like these that we have just been talking about can make it impossible for someone to grow into a healthy adult?
A. I don't recall ever thinking that it made it impossible. It makes it more difficult.
Q. One of the things you have listed in your CV, beginning at page 98, under a heading called "Filmography," which goes from page 98 all the way to page 106, where you've listed all the Law and Order TV series that you consulted on, right?
A. And documentaries and other things, yes. That all comes from IMDb, which is a website that keeps track of that stuff.

Q. And you mention the various documentaries that you have been involved in, correct?
A. Yes. Everything that's on IMDb I listed there.
Q. These documentaries also involve you sitting down with some infamous killer and conducting an interview, right?
A. Or me sitting down with some reporter and giving an interview. It could be either way.
Q. And I see one of the documentaries you list on here is called The Iceman and the Psychiatrist. Do you remember that one?
A. Yeah. I don't think it's a documentary. It was entertainment. HBO hired me to interview this Mafia hit man and to sit in jail with him a few days talking to him. Everything he told me was a lie. All the crimes he conjured up were fabrications. I told HBO that; and they, nonetheless, went ahead and created fake headlines and fake crime scenes and pretended like I got these confessions out of him.
Q. That was all for entertainment purposes?
A. I think so. It certainly wasn't for any clinical or forensic purpose.
Q. Well, during that interview, do you remember at one point he said to you -- you said to him, "Do you want to ask me any questions?"

A. Yeah, I do remember. I thought that was a pretty effective technique.
Q. I did, too. I liked that.
A. Thank you.
Q. What he said to you was -- you at that point had elicited from him a pretty horrific child abuse history, right?
A. I don't remember. Could be.
Q. He wanted to know from you "What made me become what I am," which is a Mafia multiple killer, right?
A. Yes.
Q. And do you remember what you told him?
A. I remember telling him that I thought he had two personality disorders, one of which was antisocial, that he doesn't follow the rules and he behaves badly and breaks the law.
The other of which made him good at his job, which was paranoid personality disorder; and that caused him to be careful and not to trust people; and that let him get away with many more murders, had he not had that suspiciousness and distrust.
Q. Do you remember addressing with him the effect of his childhood experiences?
A. No.
Q. I would like to play clip number 22 -- 222-7.

MS. SONG: We object to this. We haven't had a chance to review it. We did get a thumb drive after lunch, but I object to it being shown before we have a chance to look at it.

THE COURT: How much time is it going to take to look at it?

MS. SONG: We can try to do it at the break.

MR. BURT: It's less than one minute in length.

THE COURT: I'm inclined to overrule the government's objection, because I'm assuming this is just what has been characterized up to this point. This is a hypothetical question and answer, perhaps not even a real question and answer, but -- I'll let the doctor characterize what it is. This appears in the doctor's CV, correct?

MR. BURT: Yes, it does. 222-8.

THE COURT: I'm going to overrule the government's objection. We'll look at it. If there is still an objection after we have seen it, we'll discuss it. I appreciate the concern, but in the interest of time --

MR. BURT: Thank you.

(Whereupon, the clip was played for the jury.)

Q. Doctor, do you recognize the voice on that tape?

A. Yes.
Q. Is that you?
A. It is, despite the guy on the photo having color in his hair.
Q. That was several years ago, right?
A. Yeah.
Q. We've all aged.
Were you expressing an opinion there that you truly believed in, or was that just entertainment?
A. I was trying to communicate to him, as I would in a clinical setting, the difference between having a loving family and having a constantly abusive family. I do think it's impossible to form great healthy attachments if all one has known is unhealthy developmental experiences.
It doesn't make it impossible to have a productive career or to become a productive citizen. Certainly it doesn't make it inevitable that someone will be a criminal.
Q. But it's a significant factor?
A. It is.
Q. Now, Doctor, back to this issue of your interviewing techniques. We saw that you used at least one instrument, but there are others for doing psychiatric interviews, correct?

A. Oh, sure.
Q. Can we bring up Exhibit No. 139, which is Dr. Rogers' report. You had a chance to review that report, correct?
A. Yes.
Q. Can you go to --
MR. OLSHAN: Can you take that down, please. That's not subject to the redactions that we had discussed, that page.
MR. BURT: I'm trying to direct her to the page that there's no --
THE COURT: Before we put it up, let's find out what page and paragraph.
Thank you, Mr. Olshan.
MR. BURT: Page 3 under "Clinical and Diagnostic Measures." I think we have agreement.
BY MR. BURT:
Q. Highlight that for me, please. You said you did review Dr. Rogers' report, correct?
A. Yes.
Q. When did you first get this report?
A. Mid-June.
Q. Mid-June. That was after you wrote your report, correct?
A. Yes. I had to submit my report, as did the other

government experts, before we had seen any of the defense expert reports or notes.
Q. So you got both the report by Dr. Rogers and what's called his raw testing data after you did your report, correct?
A. No. We had the raw testing data earlier. It is only the reports and the notes from defense experts that arrived after our reports.
Q. And when did you get the raw testing data from Dr. Rogers' testing?
A. I couldn't tell you the date, but it was before the report.
Q. Okay. Now, he has listed on this page of the report the diagnostic instruments that he used in assessing Mr. Bowers, correct?
A. Correct.
Q. And you sat and listened to his testimony, correct?
A. Yes.
Q. Is he correct that the first measure that's listed here, the Schedule for Affective Disorders and Schizophrenia, SADS, is a well-recognized instrument that clinicians use in assessing affective and schizophrenic disorders?
A. Well, it certainly was when it came out. In the late '70s and '80s, it was all the rage among academic

psychiatrists and researchers. Because it's no longer tied to the diagnostic manual, it's fallen out of favor, but it was a very well-done instrument construction that proved valuable and helped get many people on track to ask more systematic questions to really nail down diagnosis. Because without either disciplined habits or such instruments, too many clinicians would forget to ask half of the symptoms and criteria or would forget to ask how long it lasted or would forget to ask what affects it had on somebody's function. So this improved upon that kind of haphazard or sloppy approach.

Q. How about the second instrument there, the Schedule of Affective Disorders and Schizophrenia Change version, called the SADSC? Is that an instrument you are familiar with?

A. Yes. What I just said is true for all of these. They are an improvement on haphazard or slipshod questioning. Psychologists are very much attuned to using the standardized instruments much more than psychiatrists do.

It's at a research setting that both tend to use it, because you want systematic data that can be coded and input for computerized analysis. For the individual patient, this would go beyond what most clinicians would do.

Q. The third item here or the fourth item -- or the third item, Structured Interview For DSM-IV Personality, have you used that instrument?
A. I try not to use any instruments. I'm a psychiatrist, not a psychologist.
Q. The fourth instrument, the Personality Assessment Inventory, your own expert used that instrument in this case, correct?
A. Yes. If there hadn't been a psychologist in the case, I probably would have used it myself and had a psychologist score it.
Q. How about the Psychiatric Diagnostic Screening Questionnaire? Are you familiar with that instrument?
A. I've never used it myself, but I'm familiar with it.
Q. And the Positive and Negative Syndrome Scale, PANSS?
A. I'm familiar with that.
Q. You are familiar with that?
A. Yes.
Q. Dr. Rogers' report indicates it's been "ostensibly researched, more than 20,000 unique and peer-reviewed scholarly articles." Do you agree?
A. Yes.
Q. Did you make use of that instrument in this case?

A. No.
Q. Do you ever use instruments yourself as opposed to having Dr. Martell or some other psychologist in your group come in and use those type of instruments?
A. I would have a psychologist use instruments of that sort. The only one I ever hand out to someone to fill out themselves is the PAI. And before that was available, I used to hand out the MMPI.
Q. Okay. Again, the whole idea of these instruments is to make the collection of information systematic, make sure you are not missing anything?
A. I think there are a couple reasons to do it. One is it makes the process more straightforward than living by your wits and talking to the person.
Second is it makes sure you don't miss anything. That's a good thing. Third is it standardizes it. That's a very good thing. Fourth is that it sounds scientific, whether it is or not. That can be a good thing.
Q. Okay. You can take that down.
Is there something else you want to add?
A. Just that it can miss the main point, as it did here. The subjectivity leading to whether the patient had delusions led to a completely wrong answer, in my view.

Q. Well, in your view?
A. Correct.
Q. But at least there was some attempt to rate the severity of it, correct?
A. There was an effort, yes.
Q. That is not something that you did, right? You did more of it's either there or it's not?
A. Well, I rated the severity as a conviction, as all sincerely held beliefs are.
Q. Now --
A. Severity wasn't the issue. The issue was, was it a delusion that came out of a diseased mind, or was it a bad idea that came out of a bad ideology?
Q. Okay. Could you go to Exhibit No. 146, please. This is the DSM-5-TR. Can you go to the very last page of that exhibit. One up. One more.
Are you familiar that the DSM-5-TR recommends the use of the Clinician-Rated Dimensions of Psychosis Symptom Severity?
A. No. I have never looked at this.
Q. You've never seen this in the DSM-5-TR?
A. Nope.
Q. So you weren't even aware this existed?
A. No. I presume it's in the back section, not the main text.

Q. Right.
A. There are a number of experimental things for people to try out.
Q. Can you go to the next page. One more down. Can you highlight the top "Delusion" section.
In terms of rating the severity of delusions, were you familiar with this part of the DSM that talks about rating delusions according to its severity?
A. No, I wasn't. It's very interesting.
Q. And you see on the right-hand side, "Severity present and severe, severe pressure to act upon delusional beliefs or is very bothered by such beliefs."
A. I do see that.
Q. I think you had said in your direct testimony that you had never heard of this concept that the pressure to act has anything to do with diagnosing delusions, correct?
A. That's correct.
Q. But that you went and did a bit of research and found out, in fact, there were people who endorsed that idea?
A. Yes.
Q. You can take that down.
What did you find out in that regard? Who was it that endorsed the idea that you should actually be

looking in terms of severity of beliefs and how they affect conduct, whether the actions actually took place?

A. I don't remember who it was, but it wouldn't surprise me if it's whoever lobbied to put that in the DSM.

Q. Okay.

THE COURT: Is this a good time for a break?

MR. BURT: This is a good time.

THE COURT: We'll take our afternoon break. We'll give you ten minutes for sure, but when you're ready. Thank you.

(Whereupon, a break was taken.)

(In open court, jury not present.)

THE COURT: I would like to have a discussion with counsel. Anyone who wants to is welcome to come up. I want to have a brief discussion about plans.

(Sidebar discussion held as follows:)

THE COURT: The only reason I ask you over here -- and I'm not asking for a commitment from anybody. What's the best guess schedule, thinking about a charge conference? Do we have additional witnesses after Dr. Dietz? Hopefully you are finishing before the day or before lunch tomorrow.

MR. BURT: I'm hoping I'll finish before lunch tomorrow. We have one surrebuttal witness, possibly

two, but I think it is just one.

THE COURT: We have testimony through tomorrow. We're not going to potentially charge them tomorrow afternoon, then.

MR. BURT: Yeah. That doesn't include redirect and recross. I think we'll be into the afternoon with Dr. Dietz conceivably. These other two witnesses will not be lengthy, but I do expect they will take some time.

MS. SONG: They are not experts?

THE COURT: They will be available live?

MR. BURT: One of them, if we're going to call him, we're going to do it by way of Zoom, because he resides in Texas and he is tasked with taking care of a psychiatrically disabled son. It's going to be very brief testimony. We would ask to call him by way of Zoom. The other witness will be here.

MS. SONG: You said they're not experts, or are they?

MR. BURT: I guess they'll be testifying as experts, yes.

MS. SONG: Well, who are they?

MR. BURT: Surrebuttal experts.

MS. SONG: Well, the Court had said 72 hours ahead of expert testimony.

MR. BURT: Remember your argument. These are rebuttal witnesses. They are totally different.

MS. SONG: You had 72 hours for all our rebuttal witnesses.

MR. BURT: The one expert, you've got the report, which is the M.D. at the jail, Dr. Hauber.

MS. SONG: That's the report he is going to testify to?

MR. BURT: Yes. That's the only report we have on him. The other expert is John Edens. Depending upon some questioning of Dr. Dietz, we may not even call him. It has to do with a very narrow issue on the PAI.

MS. SONG: Do we have anything on him? Is he on your list?

MR. BURT: You will have something on him as soon as I hear what Dr. Dietz says about the PAI; and we will forward something in advance of his testimony, but I haven't questioned him about that yet. He did mention it during your examination.

THE COURT: Okay. Any other anticipated witnesses or other issues? We can try to do a charge conference tonight at the close of testimony, if we wanted to push things, but I'm getting the sense we're not -- you are not ending tomorrow.

MS. SONG: It doesn't look like it.

THE COURT: We'll do a charge conference tomorrow night after close of testimony, but we are fully expecting this phase of testimony will end tomorrow, whether it's two additional witnesses or one?

MR. BURT: Yes, that's my prediction.

THE COURT: We are not expecting anything further.

MR. BURT: Thank you.

THE COURT: Thank you.

(Sidebar discussion was concluded.)

THE DEPUTY CLERK: All rise for the jury.

(Whereupon, the jury entered the courtroom.)

(In open court, jury present.)

THE COURT: Welcome back. Please have a seat.

Mr. Burt, you may proceed.

BY MR. BURT:

Q. Doctor, you said you couldn't recall what literature you looked at on this idea of looking at actions in terms of delusions?

A. Yes. It was one of the formulations offered. It was an article about the concepts underlying delusions and how they ought to be defined.

Q. I opened your binder there to Exhibit 213, and it's an article by Dr. Appelbaum and others.

A. Yes.

Q. Is that the article you looked at?
A. No, I don't think it is. I was looking at something more recent.
Q. Do you know Dr. Appelbaum?
A. I do.
Q. What is his reputation in your community?
A. Excellent.
Q. Have you read his article called "Dimensional Approach to Delusions: Comparison Across Types of Diagnoses"?
A. If I did, it would have been long ago.
Q. Is it true that he found that prosecutory {sic} delusions were marked by strong negative affect and a propensity to act?
A. Persecutory?
Q. Persecutory.
A. Yes.
Q. Is that consistent with what you know, that persecutory delusions are marked by strong negative affect and a propensity to act?
A. Yes, it's true. It's one of the reasons we regard them as particularly dangerous.
Q. If you look at the last page of the article, he has something called the description of dimensions in MacArthur-Maudsley Delusions Assessment Schedule. Are

you familiar with this instrument?
A. I'm familiar with every concept in this, and I'm familiar with MacArthur's study that Dr. Appelbaum was involved in. It was intended to predict violence among the mentally ill.
Q. One of the things he points out is that, in the beginning of the article, "Delusions are the quintessential symptom of psychotic disorders. Systematic study of the phenomenology of delusions, however, is a relatively recent enterprise and many fundamental questions remain unanswered."
A. Yes. That is the paper.
Q. At the time he wrote that, that was true, correct? Many questions remained unanswered in terms of delusions?
A. Yes.
Q. This was an intent to bring content to what it meant to have a delusion?
A. Correct.
Q. And he characterizes them not by the content of the delusion, but by other dimensions such as conviction, how strongly the person holds the idea?
A. Yes.
Q. Negative affect, that's another aspect of delusions?

A. Yes.
Q. Action, whether you have taken action on the delusion?
A. Yes.
Q. Or inaction would be the opposite of action, I guess?
A. Correct.
Q. Preoccupation, how much of your time is spent on the delusion?
A. Yes.
Q. Pervasiveness, how pervasive is the delusional belief system?
A. Yes.
Q. And then fluidity. What does that mean, fluidity?
A. It has to do with whether it's rigidly held. So is the belief truly fixed, or does it fluctuate even during the course of the interview?
Q. Okay. Now, in terms of Mr. Bowers' fixed beliefs, it's your opinion that he held those beliefs at the time of the crime, correct?
A. Yes. I would say that the conviction is strong.
Q. And when did it first start to become strong, in your analysis? When did that first start?
A. Well, it depends on which particular belief we're talking about. But by his account, it was April of 2018

when he became completely convinced that the Jews were behind the invasion.
Q. Is it true that that belief system remained fixed through the time of the crime?
A. Yes, up until the time I saw him.
Q. And everybody who's analyzed him has seen that same fixed belief system, correct?
A. Correct.
Q. Okay. Thank you.
Now, in terms of your orientation, your ideology, you kept mentioning to us the book The Perspectives of Psychiatry, right?
A. At least twice.
Q. At least twice. The guys who wrote that book were professors and maybe still are professors at Johns Hopkins?
A. Yes.
Q. They first wrote this book in 1984, correct?
A. Correct.
Q. And when did you first come into contact with the book? You were out of medical school by then, right?
A. Yes. Actually, I first came in contact with the book when the New England Journal of Medicine asked me to write a review of it. And I saw it as an opportunity for me to get even with two men who made my life

miserable when I was a resident by making me wear a white coat as a psychiatrist and being unkind to some of the people that I admired, the old-timers.

And to my amazement, I loved the book and gave it a glowing review. I called it the best and truest book in psychiatry that anyone could read.

Q. In your review in the New England Journal of Medicine, you said, "This is the best and the shortest single volume on psychiatry that one could read."

Remember?

A. That's a more precise recollection than mine, yes.

Q. Okay. And you also said that one of the teachings of the book was that "The construction of life stories provides the most useful approach for discerning that which is unique about a person and his or her intentions."

A. Yes.

Q. That's one of the premises of that book, right?

A. Yes, it is.

Q. The other premise is that you look for a biological basis for your disorders, correct?

A. At least for diseases.

Q. And another premise of the book is that you adopt a dimensional approach?

A. Yes.

Q. Meaning what? As used in the book, what were they teaching in terms of using a dimensional approach?

A. At that time the idea was not to ignore dimensions, that certain attributes of humans are on a continuous scale, and where we can measure the attribute on that scale, that that is a useful enterprise. Rather than saying yes or no, instead of ones or zeroes, let's measure.

Q. Measure in terms of severity; in other words, you don't look at a symptom and say yes or no, you look at it and say where in the spectrum is it in terms of very strongly held or not so strongly held?

A. Well, really, at the time the examples the book described were measurement of intraversion, extraversion and measurement of IQ. Those were well-established dimensions for which measures were widely available.

I took the concept to be that if we could expand the number of attributes that were measured along dimensions, that would aid our precision and our ability to do multivariant research.

The statistics available when you have categories are limited, and the power to make inferences from statistics is limited, if you only sort people into categories. But if you have a number, a continuous variable that you can measure from, say, zero to a

thousand, you can have much more statistical power to look at multiple variables at the same time and to discern whether when controlling for certain variables a relationship still holds.

So for research purposes, it is a tremendous bonus to be able to measure something.

Q. And is that the same idea behind that part of the DSM that I had up on the screen before the break where they're saying let's measures delusions by severity?

A. I think the hope would be that that would pan out.

Q. Now, the book, when it first came out, it was sort of critical of the DSM in certain respects?

A. Yes.

Q. Basically, the idea was it's there, it's the book, we've got to live with it, but there are other things we need to look at?

A. I think that's fair.

Q. Okay. Then the book went through a second edition, right?

A. It did.

Q. The book itself is not like the DSM in terms of a cookbook of diagnoses, right? It was a collection of essays or chapters that dealt with various subjects?

A. That's true.

Q. The second edition of the book, the most recent

edition came out in 1998?

A. Yes.

Q. Hasn't been updated since then?

A. Not to my knowledge.

Q. Take a look at tab 215. I think it's just a couple down from where you are. Is that a copy of the second edition of the book?

A. Yes, it is.

Q. Is it fair to say that, from your direct testimony that you mentioned this book, that this book defines your ideology, your approach to psychiatry?

A. Well, it certainly shaped my approach.

Q. Okay. I want to go through a couple of things in the book and ask you whether you agree or disagree with it.

First of all, I would like to go to page 18, which is the chapter on schizophrenia. I'm sorry. page 82.

A. 82?

Q. 82, yes.

A. Yes.

Q. Very first sentence. "Schizophrenia is the great clinical challenge to psychiatry."

A. Correct.

Q. Is that true?

A. It is.
Q. Tell us why it's a challenge, just in terms of diagnosing it. What is challenging about it?
A. Well, to diagnose it is usually not so challenging. To understand it and to get to the pathology that underlies it is the great challenge, I would say.
It's been recognized for a very long time. It's common in every culture. It is enormously burdensome to the patients who have it and to their families and to society. So if there were a correctible cause that would prevent the onset of all the symptoms, that would be of enormous value.
Right now, we know of some of the causes that could be modified and corrected, the most absurd of which is that a certain proportion of cases are attributable to the use of Cannabis, which hastens the onset of schizophrenia and is related to half the new cases that are seen clinically; and yet we have governments that are legalizing Cannabis and increasing the prevalence of schizophrenia.
Q. By the way, those Cannabis studies show that schizophrenia is a brain-based disorder, correct?
A. I think we all believe it is a brain-based disorder.
Q. And those drug studies corroborate that, do they

not? I think there is some discussion in this chapter about that very topic.
A. Yeah. I don't think that Cannabis could have the effect it has if this were not brain-based.
Q. Right. It says on that same page that "Schizophrenia represents a tragic affliction, chronic not fatal, breaking into the course of a life, directing it away from promise and opportunity and toward incoherence, forced hospitalizations, and chaos."
A. "Frequent hospitalizations."
Q. Do you agree with that?
A. I do.
Q. It says, "Some 50 percent of patients with schizophrenia attempt suicide, and 10 percent ultimately succeed."
A. Yes.
Q. Why is the rate of attempted suicide so high in schizophrenia?
A. Because the symptoms are so intolerable, frightening, painful, distressing to the patient.
Q. It says that "All are drawn by the disorder away from family and community life into a state of isolation, self-absorption, confusion and distress."
A. That's true.
Q. So self-absorption, isolation is one of the

hallmarks of this disorder?
A. And many others.
Q. And on the same page, it says, "Fortunately, over the past two decades, a stable consensus has gradually emerged that schizophrenia is a product of disease of the brain."
A. Exactly.
Q. That was in 1998. It's even more so today, right?
A. Yes.
Q. Now, page 83 says, "Evidence strongly suggests that schizophrenia is due to a neurodevelopmental disruption of the brain."
A. That's true, and I believe it, but I don't see it on the page yet.
Q. It's on 83. Right before the term "Definition."
A. Yes.
Q. That's true?
A. It is.
Q. "Neurodevelopmental in the sense that it could be connected with insults that occur in the fetus."
A. It could.
Q. How -- what's the mechanism there?
A. I don't know, and I don't know if anyone knows.
Q. Mother, eight months' pregnant, somebody shoves her down the stairs, falling, tumbling. The fetus brain can

be damaged in that sort of scenario, correct?

A. The fetal brain could be damaged or not damaged in that scenario.

Q. What are the other mechanisms for neurodevelopmental disruption of the brain that leads to schizophrenia?

A. Well, we don't know -- I don't know what, if any, of these would lead to schizophrenia in any predictable way, but insults to the developing brain that could affect its trajectory.

Prenatally they would include toxins circulating in the mother, lack of oxygen to the fetal brain because of the mother's circulatory problems, or deprivation of oxygen, or let's say she had sickle cell anemia and had a crisis to convey enough oxygen to the fetus.

If the mother is exposed to environmental contaminants that are toxic and absorbs them, they could affect the fetus. Mother's circulating hormones, medications or illicit drugs that the mother is exposed to during pregnancy -- the list is very long.

And that same thing is true after the child's birth as to things that could affect the developing brain of the child. The brain of the child continues to be developed up until around age 30. So well beyond

childhood, by any definition, the brain continues to develop.

Q. Unfortunately, in this case, you didn't have any birth records for Mr. Bowers, correct?

A. Correct.

Q. Did you or the FBI question the mother about her pregnancy history with Mr. Bowers? Do you recall that?

A. I don't recall, offhand.

Q. By the way, you have developed a technique for law enforcement officers to do interviews that are focused on the defendant's mental state, correct?

A. Yes.

Q. It's called the Dietz Mental Status Interview Checklist or something like that?

A. Dietz Mental State Interview.

Q. And you teach law enforcement people to use that in cases where the defendant's mental state may be an issue, correct?

A. I urge that be used in all homicides and perhaps all serious felonies after the detectives were done with their initial interview. I have not taught it to law enforcement other than once or twice, but I know it became part of the curriculum for the DC Metro Police Department and at least one other.

Q. You taught it to a group of prosecutors who were

involved in trying to seek the death penalty, correct? A conference?
A. Maybe.
Q. 2012?
A. I don't know. I may have.
Q. Where you presented a PowerPoint presentation urging the prosecutors who were seeking death penalties to have their law enforcement people use this interview?
A. That sounds like something I would have done. I simply don't recall it.
Q. Do you know if that instrument was used in this case by the FBI, who did all the interviews of the witnesses?
A. To my knowledge, it was not.
Q. Okay. Now, back to this. There's a --
A. It's not for witnesses. It's to be asked of the defendant when the defendant is interviewed.
Q. It can be used for witnesses who had information about someone's mental state?
A. No. This is an interview of the defendant that I recommend be done and videotaped.
Q. And that was not -- that instrument was not used by you or by any law enforcement people interviewing Mr. Bowers, to your knowledge?
A. I do not believe law enforcement had the

opportunity to interview Mr. Bowers.
Q. Okay. Now, back to our Perspectives of Psychiatry book here. There is a section on page 83 which is entitled "Definition," right, in the "Schizophrenia" section, on that page?
A. There is.
Q. It says, "Psychiatrists have had difficulty agreeing on a definition of schizophrenia. This is not only because its characteristics are mental changes lacking a defined pathology, for such is also true of manic depressive disorder, but also because schizophrenia has no unifying psychological feature that is fundamental to its nature and aids in its recognition."
Did I read that correctly?
A. You did.
Q. Do you agree with that statement?
A. I do.
Q. The same page, it says, "Its course" -- that is, schizophrenia's course -- "is not uniform. Schizophrenia can appear insidiously and progress slowly and relentlessly, or it can begin suddenly and continue with exasperations {sic} and remissions."
Do you agree with that statement?
A. Exacerbations. Yes.

Q. Sorry. "The most dramatic features occur during active phases of the disorder and take the form of hallucinations and delusions"?
A. Yes.
Q. "Odd moods of things, peculiar incongruities of mood, and loss of mental energy varying from minimal to severe can develop gradually or during an acute attack, but may not recover after the attack"?
A. Yes.
Q. "The disorder often renders the patient's personality cold and unpredictable"?
A. Yes.
Q. You used that characteristic in regard to Mr. Bowers, correct, "cold"?
A. Correct.
Q. "And it may lead to a disappearance of finer sensibilities and capacities for affection." Do you agree with that?
A. I do.
Q. That's a characteristic you saw in Mr. Bowers, correct?
A. Yes. These are negative symptoms.
Q. "There's good evidence that a mild form of cognitive deficit, a dementia, develops in schizophrenic patients."

Do you agree with that statement?
A. That's true. Actually, it was the first observation of schizophrenia, which at one time was known as dementia praecox, premature dementia.
Q. And a mild form of cognitive deficit, that was observed in some of the psychological and neuropsychological testing of Mr. Bowers, correct?
A. Very mild in his case.
Q. Yeah. Well, the testing by Dr. Martell suggested a severe impairment in social recognition, correct?
A. Prosody and social cognition, the same as one would see in someone with schizoid personality disorder, schizotypal personality disorder or autism.
Q. Page 84 says, "A patient can have almost any combination of positive and negative symptoms."
Do you agree with that?
A. Yes, as long as they have enough of each to be diagnosed as schizophrenic under DSM.
Q. Page 84, again, "Schizophrenia usually begins in late adolescence or young adult life, although onset even after 60 occurs."
A. Yes. I think I made this point earlier.
Q. So you cannot see it until up to age 60. It doesn't surface until age 60?
A. That can happen, yes.

Q. Same page. "Among the symptoms" -- "signs and symptoms that mark the onset of schizophrenic illness, none can be agreed on as characteristic of the disorder."
A. That's true. There is no single symptom that occurs only in schizophrenia.
Q. Page 85. "Delusions in schizophrenia can begin as vague, fearful interpretations or half-beliefs and then develop into incorrigible convictions that are well-formed and persistent."
A. Correct.
Q. "A delusion coming on suddenly, not prompted by a hallucination or previous delusion and not related in an obvious way to the client's mood is called a primary or auto-synchronous delusion and is highly suggestive of schizophrenia."
A. Yes.
Q. Page 85. "Many other characteristics schizophrenic experiences are of delusional form, but have such individual features that they have been named separately." Do you agree with that?
A. Yes.
Q. Page 86. He says -- or the authors state, "Only after repeatedly stopping the patient and attempting to restart a more coherent answer does it become clear that

the problem lies with the patient's responses and not the doctor's questions."

A. That's an example of something that can happen.

Q. Again, on that page, "Difficulty" --

MS. SONG: Your Honor, I'm going to object. I don't see the point of reading this textbook and asking Dr. Dietz whether he agrees or disagrees with the statement.

THE COURT: I trust we are not going to read the entire textbook.

MR. BURT: No. I've just got select portions.

THE COURT: As long as you don't go on exhaustively, you may proceed.

MR. BURT: Thank you.

BY MR. BURT:

Q. On Page 86, it states, "Difficulty in recognizing thought disorder comes not when it is extreme but in examples of milder incoherence where one examiner's threshold for vagueness in the discourse of a patient may be higher or lower than in others."

A. Yes, that's true.

Q. So reasonable minds can differ about whether a thought disorder is present or not, depending upon the individual psychiatrist's threshold for what is vague or not vague?

A. Yes, and depending on what their observations are. This is one of the great virtues of videotaping. One can see if two people have the same interpretation of precisely the same exchange.
Q. On page 87 it says, "Especially after an acute attack of schizophrenia with its positive symptoms" -- "with its positive symptoms subsides, the patient may remain oddly cold and distant, whatever the circumstances." Is that true?
A. I don't see where you are yet.
Q. Page 87.
A. Yes. The full sentence says, "Finally and especially after an acute attack of schizophrenia with its positive symptoms subsides" -- I think it should say "when" -- "the patient may remain oddly cold and distant, whatever the circumstances."
Q. And you agree with that?
A. Yes. Between episodes, the negative symptoms remain.
Q. Page 87 also states, "Careful psychological studies with at-control subjects have demonstrated schizophrenic patients show deficits in those tasks tied to concept recognition and those requiring shifts of attention or shifts of cognitive set. These patients do especially badly on such problem-solving set-shifting tasks as the

Wisconsin Card Sorting Test."
A. That's true. Mr. Bowers did particularly well on a number of such tasks.
Q. You think the testimony was that he did well on the Wisconsin Card Sorting Test?
A. No, on such tasks. On show-making tests, for example, he did just fine. The only one of the set-shifting tasks that he did poorly on was the Wisconsin Card Sorting where he didn't complete more than a few trials.
Q. So he did poorly on the Wisconsin Card Sorting Test, correct?
A. But he did well on the other tests of the same set-shifting tasks.
Q. And the test that the textbook singles out is the Wisconsin Card Sorting Test, correct?
A. As an example. It says, "such problem-solving set-shifting tasks as the Wisconsin Card Sorting Test."
Mr. Bowers completed a battery of such tests and did poorly on one.
Q. Okay. But you heard Dr. Bigler explain how he performed poorly on the Wisconsin Card Sorting Test. You acknowledge that?
A. I do.
Q. Good. On page 89, it says, "Because disturbances

in expression can occur in vulnerable people under stress, a consideration of the patient and his or her circumstances is required before it can confidently be stated that a symptom is inexplicable. An anxious and preoccupied person may, for example, have fragmented thinking. A naturally reserved introverted individual can appear distant or cold, and a person of a different cultural heritage may express emotions in a manner unfamiliar to the psychiatric observer." Do you agree with that?

A. Yes.

Q. Now, page 89, it says, "Many of these diagnostic problems, though, can be resolved by adding a careful longitudinal assessment of the onset of progress of the conditions to the cross-sectional interview done upon admission to the clinic."

Do you agree with that?

A. I do. It's why I spent so much time looking at his entire life from every document available.

Q. Right. But you had -- it says here, "Sometimes a longitudinal assessment in a hospital is required."

A. Hospital or a prison or a jail, and then allow daily observations.

Q. Is it -- it's true, isn't it, that the more time you have to assess the patient, the greater is the

information you have to assess symptoms?
A. Yes, although eventually it reaches a point of diminishing returns.
Q. But you have had cases where you have initially diagnosed someone with a nonschizophrenic disorder; and then upon closer examination, over lengthy periods of time, it was revealed that the patient, in fact, did have a psychotic disorder, isn't that true?
A. I think that's probably happened. It's unusual, but it's happened.
Q. It happened in your Hinckley case, did it not?
A. No.
Q. It didn't happen in Hinckley?
A. When I examined him, he only had personality disorders and some depression.
Q. Well, according to --
A. That's what Saint Elizabeth's Hospital continued to find for years. When eventually Saint Elizabeth's was unable to hold him without a mental illness diagnosis, they called him schizophrenic.
Q. They called him schizophrenic?
A. Yes, based on him having a relationship with a one-armed patient.
Q. Let me get this straight. You said he was nonschizophrenic at trial, correct?

A. Correct, and so did Saint Elizabeth's for years.
Q. Five doctors and the jury disagreed with you, correct?
A. Yes. Saint Elizabeth's agreed with me, where he was observed longitudinally for years.
Q. Well, when he was discharged, his diagnosis was a schizophrenic disorder, was it not?
A. Yes. What was that? 35 years later?
Q. Right.
A. For many years, they did not diagnose him with schizophrenia. They used the same diagnosis I did.
Q. When did he get diagnosed with schizophrenic disorder by Saint Elizabeth's?
A. Years after he was sent there. But I couldn't tell you what year.
Q. That's my point. In other words, there are situations where you miss it; and over time, as someone has more time to be with a patient, they realize the symptoms are actually there?
A. That's one possibility from what occurred.
Q. Okay. Thank you.
Now, it says on page 92, "Family studies have repeatedly demonstrated an increased risk for schizophrenia with increased proximity of blood relationship to a proband with the disorder." Does that

mean this disorder has genetic roots?
A. Yes. It's widely believed to run in families. If a single parent has schizophrenia and the other parent does not, then the child is at increased risk compared to a child who had no schizophrenia in either parent. If both parents have schizophrenia, the child is at even greater risk.
Q. What is the increase in risk if the parents have other serious mental disorders?
A. A variety of disorders can flow in the same family as schizophrenia. The risk to a particular child only becomes palpably high when both parents have similar conditions.
So I can't tell you what the numbers are for any particular condition, and it's very hard to find good data on this. Nobody doubts that there is some genetic component to these and many other mental conditions.
Q. I notice that you spend a good deal of your time in the report documenting the intergenerational history of mental illness, not just schizophrenia, in Mr. Bowers' immediate and extended family, correct?
A. Yes. There are quite a few cases of mental illness, dementia, criminality, epilepsy, among a very extended family, because records were provided by the

defense of second cousins twice removed and great-aunts and people so far removed that we wouldn't expect it to have any effect on his genetic makeup or mental health. But there's a long line of problems there, as there would be in many, many families.

Q. 93 says, "The discovery of people born in the winter and spring months have a higher incidence of schizophrenia than those born in the summer and fall." Is that true?

A. I think it is; but, see, here's the thing about findings like this. The way all research is done, the researcher only calls its findings statistically significant if the odds of that finding occurring by chance are 5 percent or 1 percent. That's the convention.

If there's a 5 percent chance this is occurring solely by chance and randomly, we will still consider it significant.

So, if you measure 20 things, the chances that one of them will be significant purely by random chance are high. We expect 1 in 20 things to be significantly different purely by chance.

That's why when we look at, for example, the NeuroQuant, where there are measures of 20, 40, 60, 80 things, we expect to find four significant differences

just by chance.

Q. Doctor, let me stop you, because I think we are getting afield from the question, which had to do with whether it's true that finding has been made.

A. Yeah. It doesn't mean it would replicate and that it can bear explanation. Chance findings are not just common, they are ubiquitous.

Q. What your textbook says is "This seasonal factor in schizophrenia first powerfully suggests that some injury to the developing brain by an infection in the mother during the cold season is responsible for that finding."

Is that the significance of that, that it points toward fetal brain defects as being the cause of schizophrenia?

A. So this is a reasonable inference, but first you have to make sure it's not a chance association.

Q. Sure.

A. The fact that it's been found repeatedly is suggestive that it is a true finding. And one of the theories that could account for that true finding is that it's related to colds in the mother.

Q. Colds -- in other words, winter season, the mother gets an infection, the infection affects the fetus, the fetus then develops schizophrenia is the pathway there?

A. That's the theory. So it would be very interesting

to see in another 20 years how many schizophrenia patients find their way into clinics after COVID.

Q. And so it concludes there, "The most recent hypothesis about the etiology of schizophrenia combined genes of pathogenic potential with brain-damaging events in pregnancy with a prenatal period, a combination of damage that may itself have only the most subtle effects in childhood but gives rise to the schizophrenic symptoms with maturation.

"Thus, a broken part in the brain generated by a combination of genes and environment and pathogens affecting fetal brain development is proposed to be the mechanism behind schizophrenia?"

A. That could turn out to be true.

Q. That was written in 1998. Are we any closer to deciding whether that theory is true or not?

A. I'm not the right one to ask. I don't know.

Q. Now, a couple more things in the book I want to ask you about.

He got a section on IQ test, correct?

A. Yes.

Q. At page 107, he says, "Measures of intelligence have reliable statistical relationships with important social phenomenon, but they are a limited tool for deciding what to make of any given individual."

A. I don't see where you are, but I agree.
Q. Page 107.
A. I'm on 107. Could you direct me to which paragraph.
Q. Yeah. Sure.
A. I see it.
Q. Do you agree with that statement?
A. Yes.
Q. Same page. "A high IQ does not guarantee success, nor lower IQ failure in school or in life."
A. That's true.
Q. Have you had forensic clients who had very high IQs and, nevertheless, were diagnosed with schizophrenia?
A. Yes.
Q. So is there a relationship between somebody having a high IQ and developing a mental -- serious mental illness such as schizophrenia?
A. To my knowledge, schizophrenia can occur with any IQ level.
Q. So a high IQ is not a fact that rules out schizophrenia?
A. Correct. Nor does it rule it in.
Q. Okay. Page 239. Talking about suicide. He says, "Psychiatric investigations on suicide have demonstrated that mental disorder is common in both those who commit

suicide and those who attempt it, but fail."
A. You're on page 238?
Q. 239.
A. Oh. That's a true statement.
Q. He says on page 241, "More complete view would propose that delusional beliefs act indirectly by provoking a depressive attitude that then facilitates the expression of the impulsive aggressive disposition in suicide."
A. For delusional patients who commit suicide, that would be true.
Q. How many acts of attempted suicide did you document as it relates to Mr. Bowers?
A. That's -- it's an interesting and unanswerable question. There are a variety of acts that someone somewhere at sometime considered suicide attempts, but to really answer it, one has to recognize the possibility of distinguishing between several different kinds of behavior that in the UK they call parasuicidal behavior.
So one type is somebody who makes a suicide threat. Now, a suicide threat, which is words rather than action, can be done as a manipulation. Children often do this. Teenagers do it in the midst of breakups. They'll say, "If you don't come back to me,

I'll kill myself" or "If you make me clean my room, I'll kill myself."

Suicide threats come in many shapes and sizes, and the meaning can't be known just from the words. You have to look at the context. So some of what Mr. Bowers has done could be seen as a suicide threat.

A second kind of behavior that he engaged in may qualify for what's called a suicidal gesture, and that is some self-destructive act designed to gain attention to the fact that he was distressed and found his life circumstances unacceptable.

That might be the right way to classify the incident in which he drank himself to the point of stupor and accidentally lit a fire with alcohol that he had spilled onto his arm.

Now, some records call that a suicide attempt. His mother frequently called it a suicide attempt. He once years later said that that was a suicide attempt. At other times years later he said, no, it was an accident.

What he told me was it was reckless. He acknowledged that. He acknowledged that he didn't care if he lived or died, but that he wasn't trying to kill himself that day.

Q. I see.

A. That incident, in which it's the one he was most injured, is the most serious, may or may not have been an attempt.

There was another incident which he sometimes said was an attempt where he took an overdose of pills. In one interview he said it was aspirin and his mother's sleeping pills. In another interview he said it was aspirin and Tylenol. In another interview he said he didn't remember. But that he said he intended to harm himself, so maybe that's an attempt.

Then there's the incident in which he called police and told them by phone that he put a shotgun in his mouth and intended to kill himself. What he told me is he made up that story because he was going to lose his apartment. He didn't have a job, was out of money, needed to go somewhere where he could use the phone for a few days until he figured out what he was going to do. And then he never did load the shotgun and never did put it in his mouth, but he had to tell them something in order to get a room.

Q. By the way, that was a point in time when his aunt lived nearby and he had been living with his aunt?

A. He had been living at an apartment at that time, but he got fired from his job for stealing money from the bakery. And so he felt that -- well, he knew he was

being evicted from his place. He had lost his phone. He was out of cash. And rather than go to his aunt's, he did this fake suicide threat.

Q. But your understanding was he had the availability of his aunt? In other words, his aunt was supportive? He could have gone there, right?

A. I would think that's true.

Q. To solve the problem, was it, in your view, completely rational, instead of going to his aunt's, he would choose to go to a police department and get himself admitted into a psychiatric hospital?

A. He didn't go to a police department. He called the police and claimed he had done this.

Q. Was it --

A. Saying it as rational or not rational is something that should be done with full knowledge of what he was thinking and feeling at the time. What I would say is that is a maladaptive way to solve this problem.

Q. I would agree.

What were the age ranges when these various attempts were taking place?

A. That last one, he was 31 or 32. The others were when he was a juvenile.

Q. A juvenile. Can you be more specific?

A. Adolescence.

Q. In addition to what he told you about the suicide attempts, there were other collateral people that told you about them as well, correct?

A. To some extent his mother reported that he was threatening to jump off some cliff when he was younger.

Q. How old?

A. I don't remember precisely, but there was no corroboration of that. And his mom seems to have exaggerated the number of suicide attempts in an effort to get him hospitalized.

Q. In addition to the mom, you also had records, hospital records, social service records, that corroborated the suicide ideation, correct?

A. In some of them. But even there, there are errors that crept in and discrepancies from one record to the next about what his intent was or what had happened.

This is very common with medical records that an error made at one point in time gets passed along. Everyone gets the old record, assumes it to be true, and keeps repeating the same erroneous information. It's quite difficult to know exactly how many of these things there were.

As far as I could tell, every plausible example of parasuicidal behavior was in his juvenile period. In adulthood the only issue was the hoax call

to the police to get three nights in a hospital.

Q. Can you pull up Exhibit 429, please. Second page. Fourth paragraph, "At age 10." You recall seeing this social history report as part of your review of records, correct?

A. I do. That's history coming from the mother, who wants him to stay in the hospital. That's why I said I think the mom exaggerated suicide ideology in order to keep him hospitalized.

Q. That's your speculation, right? You never talked to her about why she gave the history she gave?

A. I did not interview her, no.

Q. In fact, the FBI never asked her why she made various statements about suicide attempts, correct?

A. No, they didn't, but it's not mere speculation. I read all of the hospital records, and it appears quite clear to me that this was a mother who was often trying to get her son hospitalized and taken away. And I'm not saying whether that was for his benefit or hers, but that is the thrust of her efforts.

Q. Did you state that opinion in your report, that all the evidence and suicide was the mother trying to get him hospitalized?

A. Probably not, but I think anybody reading the whole history in my report would see that the mom is pushing

for this repeatedly.
Q. Anybody reading your report and looking back 20 years before would be able to speculate the way you are speculating right now?
A. You want to call it speculation. I want to call it informed deduction.
Q. Informed deduction from what?
A. From the records describing how what the mother says on one occasion after another appears to be designed to get him hospitalized, to get him committed, to get him out of the house.
Q. Did anybody who was actually doing the evaluations at the time these entries were made make any documented conclusions along those lines?
A. What they said is that the mother was uncooperative, wouldn't participate in therapy, wouldn't engage in any follow-up care, wouldn't let them in the home to interview her, and other descriptions of mom's behavior consistent with exactly what I'm suggesting was going on.
Q. So your answer is that the records did not document anybody saying that we suspect the mother is making this up about the suicide attempts?
A. I didn't say she was making it up. I said she was exaggerating.

Q. Is there any documentation of anybody doing the evaluation saying, we suspect the mother is exaggerating here?
A. Well, they expressed a number of other suspicions about the mother and how she was seeking to control this situation.
Q. Where was that indicated?
A. Which part?
Q. Where in this particular report that we've got up here is there any indication that someone was suspecting that the mother was exaggerating?
A. You have to show me the whole report, not just these two sentences.
Q. Did you include in your report that at age 10 there was documentation that he was preoccupied with suicide?
A. I'm afraid I don't have an electronic form with me that I can search. So I don't know one way or the other.
Q. You can take that down, please. Thank you.
A. The copy I have is redacted. But there is a section on suicidality; and, of course, there is the history regarding all of these mental health contacts.
Q. If you documented that that was in the record, I'm sure that would be brought to your attention on redirect examination, but you don't have any recollection of

putting that in your report?
A. I don't remember one way or the other.
Q. By the way, your report -- you indicate in your report that the vast majority of it was a report that was written by you and your employee?
A. That's not quite accurate. On this issue, what I state on the very first page of it is that Mr. Carter and I collaborated in reviewing and synopsizing the massive volumes of information available; and this has been incorporated into this report at pages 2 to 145.
I offered to the other government experts if they wanted to use some of it in their report, that I would make it a separate document called simply a factual summary, which is what it was called up until this point.
Q. What I'm trying to figure out is who actually wrote pages 2 through 145.
A. Most of it was typed by Stephen Carter, but it was typed based on records that he and I had each reviewed. For my part, which included all of the medical records and many others, I highlighted in yellow what I wanted included; and he would then include that material and add a footnote for it.
For the parts where he was the first to read it, he would type what would be included in the factual

summary, add the footnote for it; and then I would go back and look at the document to make sure that he hadn't missed anything that I considered important.

Q. Mr. Carter is an ex-FBI agent?

A. Yes, and former, in prior years, in corporate investigations and then has worked with one of my companies for three years.

Q. Does he have training as a mental health expert at all?

A. He has a master's degree in forensic psychology and spent the latter part of his Bureau career as an expert interviewer and interrogator and polygrapher.

Q. Is it true, then, that 2 through 145 of your report is written by him with your input?

A. Pardon me?

Q. Is it true that pages 2 through 145 are written by him with your input?

A. You can put it that way, or you could say they were written by both of us. I selected the material in part. He selected the material in part. Most of the typing of that was done by him.

Q. I see. Now, do you believe that mass shootings such as the one that took place here is a form of suicide?

A. Generally, that is true. I do not believe it's

true in this case.

Q. Well, have you stated in your presentations to other people that mass shootings are a form of suicide?

A. Yes. This is the first mass shooting case I've personally been involved with in which the defendant absolutely denies that he had any expectation or intention of dying that day.

I would still say that to do an event of this sort, knowing that there is going to be an armed law enforcement response, is to risk death. And so I believe a point I've generally made is that in mass murders, 50 percent will be dead that day at the hands of themselves or law enforcement and the other 50 percent know that that's a risk. I think that remains true.

Q. Did you say in one of your slides that he was aware that he would be caught, that he would lose his freedom and that he was risking his life? Did I mishear that?

A. I said that he was aware that what he was doing was against the law, that he would be charged with murder.

Q. But that he knew he was going to be in some sort of a confrontation with law enforcement?

A. Yes. I think he expected to be arrested or die.

Q. Right. So, in that sense, it was an act of suicide, just like all the other cases where you

rendered that opinion, right?
A. Or highly reckless act knowing he could die or a highly brave act knowing he could die. I think it depends on one's perspectives in values which way one characterizes it.
The risk of death was certainly there. I don't think I would call every soldier that goes into combat suicidal, nor would I call Mr. Bowers necessarily suicidal the day of this attack.
Q. But you have characterized people who are involved in these mass shooting across the board as suicidal?
MS. SONG: Objection, Your Honor. This has been asked and answered.
THE COURT: Overrule the objection.
Doctor, you can answer it.
A. Yes.
Q. Is that the way you would characterize it?
A. I have said that mass murder is a form of suicide. I have pointed out that 50 percent are dead by the end of the day and that all of the others do this knowing they may die.
Q. And you have been very emphatic about that opinion, correct?
A. Yes. It's one of the reasons that I think the press has violated their own codes of ethics, by giving

such attention nationally to every mass murder, that they created an epidemic out of it.

Q. The mass media has created an epidemic of mass murders, you say?

A. Yes, they have, because they know -- the reason it violates the ethics, which was the initial point, is that -- it's accepted by journalists that they should not give front-page publicity or wall-to-wall coverage of suicide, because it is well-known that there will be copycats. If someone famous commits suicide, there will be more suicides.

Even locally, if someone prominent in a school or university or factory commits suicide, there may be more suicides that follow quickly. We have investigated several.

In a case of mass murder, I have been telling the press for close to 40 years now that if you give this saturation-level coverage, wall-to-wall coverage, we will have another case in the next two weeks. And I have been right over and over again when I've gone on CNN or other national media and said so. Yet they keep doing it.

And I believe that's why we have more mass murders today than we ever had before, because they keep getting this intense coverage rather than the

second-page, factual, nonalarmist coverage outside the affected region.

They all observe great coverage locally where the families live and communities have been so impacted, but there's no reason for the whole world to be impacted every time one person does this.

Q. So your strong opinion is that the media is a vector for these crimes, correct?

A. Yes.

Q. And you hold that opinion even though you, yourself, have contributed to the kind of circus atmosphere of the reporting of these crimes, correct?

A. I hope I haven't contributed to that. I hope I'm always tamping it down and telling them that this coverage is problematic and to stop it.

Q. Let's see if that has any basis in reality.

A. Pardon me?

MS. SONG: Your Honor, I move to strike that. That's not a question. It's commentary and editorial and improper.

THE COURT: I will sustain that motion. Mr. Burt, you can rephrase, if you care to.

Q. I want to show you whether -- it's for whether what you just told this jury is true or not. Can we pull up Exhibit 222-9, please.

(Whereupon, the exhibit was played for the jury.)

MS. SONG: Your Honor, I would like to ask defense counsel is this something they made or who is filming this?

THE COURT: Ms. Song --

MS. SONG: It appears to be a film of television. What is this, Mr. Burt?

THE COURT: It appears to me to be a video of a deposition. I could be wrong. What are these collections of video?

MR. BURT: Your Honor, this particular section we are playing is Dr. Dietz's trial testimony in a case that we'll identify.

MS. SONG: Is this a montage created by the defense?

MR. BURT: This is a questioning of Dr. Dietz in a prior trial about the videos that are being displayed to him.

MS. SONG: So the prior clips were produced by the defense team?

THE COURT: Let me suggest this. I don't know if there is much more on this, but it's nearly the end of the day, anyhow. The government can take a look at it and know what it is they are seeing and the jury is

seeing and can raise a more specific objection. It's a reasonable time to end for the day.

MR. BURT: Yes.

THE COURT: Thank you all very much.

Ladies and gentlemen, we'll call it a day. Please avoid all media news reports regarding the case, engage in no discussions regarding the case, perform no research of any kind regarding the case. We'll see you tomorrow morning as usual.

Thank you.

(Whereupon, the jury exited the courtroom.)

THE COURT: Counsel, anything for us to discuss while we are still in open session?

MS. SONG: Your Honor, if the video that is about to play is, in fact, Dr. Dietz being cross-examined by somebody else about something else, we object and don't think that it has bearing on this case, the issues in front of this jury.

THE COURT: Well, I may need to look at it. It seems to me, no matter what the context is of the video played, it may be relevant to Mr. Burt's inquiry. Whether the entire montage as presented, then, is -- I don't know.

MR. OLSHAN: At least in that video, there is off-screen voices which appear to be other lawyers in

another trial cross-examining the witness, having a Q-and-A. That would be like Mr. Burt reading into the record question/answer/question/answer from another trial.

If Mr. Burt wants to cross-examine the witness with his appearance on television shows the way they did in other trials, he can do that. But to just play a video from another trial of a Q-and-A is completely improper. We'll look at it, but it's improper.

MR. BURT: There is nothing improper about it, Your Honor. These are statements that Dr. Dietz made under oath, he will testify. He is being asked questions, and he is answering them in the same way as if he was being interviewed by someone in a TV show, and he made the statements and answered the questions. That would be a prior inconsistent statement.

THE COURT: Does the video you want to play for this jury include both ongoing testimony by the doctor as well as the video montages, or is it just like the video, like you're asking questions?

MR. BURT: No. This is the actual trial, video trial in which he is being shown these clips and being asked questions about it in the same way that if I had a transcript, I would be able to say to him "Did you testify -- do you remember being asked this question and

giving this answer?"

It's actually a more accurate form than if I had a transcript, because it shows what he was shown and what his answers were. There is nothing improper about that form of impeachment. It goes to what he just testified about.

THE COURT: How long is this?

MR. BURT: I think it's less than two minutes total.

THE COURT: Okay. We may reach out. I may want to look at it. The government, I guess, is going to look at it; and we'll talk more about that tomorrow. We'll pick it up there tomorrow when we reconvene or anything else that you think is appropriate.

Any other issues for public discussion?

MS. SONG: No.

(Closed session removed.)

(Whereupon, court was recessed for the day at 4:40 p.m.)

\- - -

I hereby certify by my original signature herein, that the foregoing is a correct transcript, to the best of my ability, from the record of proceedings in the above-entitled matter.

S/_Karen M. Earley

Karen M. Earley

Certified Realtime Reporter